**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EPSILON ENERGY USA, INC., | : | Civil No. 1:21-CV-00658 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CHESAPEAKE APPALACHIA, LLC, | : | |
| | : | |
| Defendant. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

This is a diversity action brought by one oil and gas company against another oil and gas company based on the defendant's alleged breach of several joint operating agreements between the parties as well as a settlement agreement between the parties from a previous case in this district. The case is presently before the court on a motion to dismiss for failure to join an indispensable party under Federal Rule of Civil Procedure 12(b)(7) brought by Defendant Chesapeake Appalachia, LLC ("Chesapeake"). For the reasons that follow, the motion is denied.

### BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Epsilon Energy USA, Inc. is an Ohio corporation with its principal place of business in Texas. (Doc. 4, ¶ 1.) Chesapeake is an Oklahoma corporation with its principal place of business in that state. (*Id.* ¶ 4.) Beginning in 2009, Epsilon, Chesapeake, and several other oil and gas companies entered into several Joint Operating Agreements ("JOAs") for the purpose of developing natural gas at

1

locations in Pennsylvania.[1]  (*Id.* ¶¶ 12–16.)  Epsilon and Chesapeake also entered into a Farmout Agreement[2] on February 1, 2010, that incorporated the parties' earlier Poulsen JOA.  (*Id.* ¶ 16.)  Each JOA governs a different tract of land, and each JOA exists independently from the other JOAs.  (*Id.* ¶¶ 19–20.)

Under the JOAs, any JOA party may propose the drilling and completion of a well.  (*Id.* ¶ 21.)  Upon receipt of a drill proposal, each other JOA party must either elect to participate in the proposal or not participate.  (*Id.* ¶ 22.)  Parties that elect to participate in the well proposal pay a pro rata share of the costs of developing the well.  (*Id.*)  A JOA party may also make a competing well proposal within thirty days of receiving the original well proposal.  (*Id.* ¶ 23.)

Chesapeake is designated as the default operator under the parties' JOAs.  (*Id.* ¶ 24.)  In the event that Chesapeake elects not to serve as the operator for a proposed well, one of the other JOA parties that has consented to participate in the

---

[1] The four JOAs relevant to this case are the Baltzley North JOA, dated October 18, 2010, the Baltzley South JOA, dated October 18, 2010, the Craige JOA, dated December 16, 2010, and the Poulsen JOA, which was a draft model JOA that was subsequently incorporated into the Farmout Agreement between Epsilon and Chesapeake.  (*See* Doc. 4, ¶¶ 13–16; Baltzley North JOA, Plaintiff's Exhibit 1, Doc. 4-1 at 1–35; Baltzley South JOA, Plaintiff's Exhibit 2, Doc. 4-1 at 69–103; Craige JOA, Plaintiff's Exhibit 3, Doc. 4-3 at 25–31; Poulsen JOA, Schedule 7.1.2 to Farmout Agreement, Plaintiff's Exhibit 4, Doc. 4-4 at 25–58.)

[2] A farmout agreement is an agreement between oil and gas operators in which one operator assigns all or part of its oil or gas lease to another operator for the purpose of drilling under the lease.  58 C.J.S. *Mines* § 401 *Farmout Agreement for Transfer of Rights Under Oil and Gas Lease*, Westlaw (database updated March 2021).

well proposal may step in and act as the operator for the purpose of that well.  (*Id.* ¶ 25.)

If a well proposal does not receive unanimous consent from the JOA parties, the proposing party must notify the other consenting parties of which parties have consented and advise the other consenting parties as to the whether the proposing party recommends proceeding with the well proposal.  (*Id.* ¶ 26.)  If the proposing party does not withdraw the well proposal at this point, the proposing party is deemed to be participating in the proposal and must contribute any outstanding interests needed to equal 100% participation for the proposal.  (*Id.* ¶ 28.)  Once 100% participation is reached, the operator of the well must begin operations.  (*Id.* ¶ 29.)

In September 2018, Epsilon filed suit against Chesapeake in this district. (*Id.* ¶ 34; *see also Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, No. 3:18-CV-01852 (M.D. Pa. filed Sept. 20, 2018) [hereinafter *Epsilon I*].)  Epsilon alleged that Chesapeake had not followed the proper election procedures under the Baltzley North and Baltzley South JOAs in order to improperly hinder Epsilon's ability to propose and operate new wells.  (Doc. 4, ¶ 35.)  Epsilon moved for preliminary injunctive relief in the suit.  (*Id.* ¶ 36; *Epsilon I*, Doc. 2.)  United States District Judge Malachy E. Mannion scheduled the case for a preliminary injunction hearing.  (*Epsilon I*, Doc. 17.)  Before the court conducted the hearing, however,

the parties settled the case. (Doc. 4, ¶ 37; Settlement Agreement, Plaintiff's Exhibit 5, Doc. 6-1, pp. 1–7.) As part of the settlement agreement, Chesapeake agreed that it would not unreasonably withhold cooperation with Epsilon's well proposals and that it would allow permitting and use by Epsilon of assets that were co-owned by the JOA parties, including water withdrawal points and impoundments. (Doc. 4, ¶ 38.)

According to Epsilon's complaint in the present case, Chesapeake has obtained surface and subsurface mineral rights for the estates that are subject to the Baltzley North, Baltzley South, Craige, and Poulsen JOAs, which are treated as joint assets under the JOAs. (*Id.* ¶¶ 41–42.) The complaint also alleges that the Wyalusing Creek surface water withdrawal point ("the Wyalusing Creek water source"), which is the water source for the Craige well pad, is a jointly owned asset, and that Epsilon therefore has the right to use the water impoundment facility and other infrastructure that was constructed in connection with the Wyalusing Creek water source. (*Id.* ¶¶ 48–59.)

In May 2020, Epsilon and Chesapeake began discussing a proposal by Epsilon for a well on the Craige well pad. (*Id.* ¶¶ 60–61.) The parties continued to discuss Epsilon's proposal through June 2020. (*Id.* ¶ 62.) In September 2020, Chesapeake requested additional information from Epsilon as to how Epsilon planned to operate the proposed well. (*Id.* ¶ 63.) Discussions between the parties

4

continued, and on October 14, 2020, Epsilon advised Chesapeake that it planned to proceed with the proposal so that it could comply with applicable permitting deadlines.  (*Id.* ¶ 67.)  Epsilon told Chesapeake that its understanding of the JOAs was that Epsilon could proceed with drilling the wells with or without Chesapeake's consent.  (*Id.* ¶ 68.)

Epsilon reiterated its plan to move forward with the proposed well on December 16, 2020.  (*Id.* ¶ 70.)  Chesapeake responded that there was "not much incentive" for Chesapeake to work out a deal with Epsilon and stated that it wanted to negotiate a situation in which Epsilon agreed not to propose any additional wells.  (*Id.* ¶ 71.)  Epsilon stated that it intended to proceed with the proposed well. (*Id.* ¶ 72.)

On December 23, 2020, Epsilon formally proposed four new wells, labeled Craige N 1LH, Craige N 1UHC, Craige N 4UHC (collectively, "the Craige North Wells"), and Craige S 3LHC ("the Craige South Well").  (*Id.* ¶ 74.)  JOA parties Chief Oil & Gas LLC ("Chief"), Radler 2000 Limited Partnership ("Radler"), and Tug Hill Marcellus, LLC ("Tug Hill") elected to participate in the Craige South Well, but the other parties to the JOA governing the Craige South Well—namely Equinor Onshore Properties, Inc. ("Equinor"), Jamestown Resources, LLC ("Jamestown"), Enerplus Resources (USA) Corp. ("Enerplus"), and Unconventionals Natural Gas, LLC ("Unconventionals")—elected not to

participate in the Craige South Well.  (*Id.* ¶ 76.)  The other parties to the JOA

governing the Craige North Wells—namely Equinor and Jamestown—similarly

elected not to participate in the Craige North Wells.  (*Id.* ¶ 77.)

On January 19, 2021, Chesapeake advised that it would not participate in the

drilling of the proposed Craige Wells and that it would not serve as the operator on

the projects.  (*Id.* ¶ 80.)  Chesapeake also stated its position that Epsilon was not

allowed to serve as the operator with regard to the proposed wells and refused to

grant Epsilon access to the Craige well pad on that basis.  (*Id.*)

In a separate communication on January 19, 2021, Chesapeake proposed a

separate well, labeled the Koromlan 107HC ("Koromlan Well").  (*Id.* ¶ 81.)

Chesapeake asserted that Epsilon's proposed Craige Wells conflicted with

Chesapeake's proposed Koromlan Well.  (*Id.* ¶ 82.)  Chesapeake announced plans

to drill the Koromlan Well in January 2022 and accordingly refused to grant

authority or approval to Epsilon to access the Craige well pad.  (*Id.* ¶ 83.)

On February 9, 2021, Epsilon informed Chesapeake that it had obtained the

required 100% subscription in order to proceed with the proposed Craige Wells.

(*Id.* ¶ 84.)  The parties then engaged in email communication regarding a letter that

Chesapeake needed to sign in order for Epsilon to obtain water permits for the

proposed Craige Wells ("the SRBC Letter").  (*Id.* ¶ 85.)  The letter sought

confirmation that Chesapeake was willing to provide water to Epsilon for the

proposed Craige Wells in accordance with permits that Chesapeake held with the Chesapeake River Basin Commission ("SRBC").  (*See* SRBC Letter, Doc. 4-5 at 2.)  Chesapeake informed Epsilon that under its reading of the JOAs, Epsilon was not allowed to drill the proposed wells if Chesapeake did not elect to participate in the proposal and stated that it would not sign the SRBC Letter.  (*Id.* ¶ 86.)  The parties exchanged subsequent emails in which they reiterated their respective positions as to whether Epsilon's proposed wells conformed to the terms of the JOAs.  (*Id.* ¶¶ 87–88.)

Epsilons's efforts to obtain Chesapeake's signature on the SRBC Letter followed from months of discussion between the parties on that issue.  Epsilon first sought Chesapeake's cooperation in its efforts to obtain water permits for the proposed Craige Wells on July 1, 2020.  (*Id.* ¶ 89.)  On September 18, 2020, Epsilon sent Chesapeake a draft SRBC commitment letter.  (*Id.* ¶ 91.)  Chesapeake informed Epsilon on September 29, 2020 that it would not sign the draft letter until Epsilon was named as the operator of a formally proposed well.  (*Id.* ¶ 94.)

Epsilon accordingly renewed its efforts for Chesapeake to sign the SRBC Letter after it formally proposed the Craige Wells in December 2020.  (*Id.* ¶ 95.)  Specifically, Epsilon confirmed with the SRBC that its SRBC Letter would be acceptable and that it would enable Epsilon to obtain the required water permits for the Craige Wells.  (*Id.* ¶ 96.)  Epsilon accordingly sent the SRBC Letter to

Chesapeake on February 9, 2021.  (*Id.* ¶ 97.)  Chesapeake informed Epsilon on February 11, 2021 that it would not sign the SRBC Letter and reiterated its position that Epsilon could not proceed with the Craige Wells because Chesapeake had not elected to participate in the wells.  (*Id.* ¶ 98.)  Chesapeake also reiterated that it would not provide access to the Craige well pad.  (*Id.* ¶ 99.)

The proposed Koromlan Well, which Chesapeake asserts would compete with Epsilon's proposed Craige Wells, would traverse real estate on the Craige, Poulsen North, Poulsen South, and Davis units.  (*Id.* ¶ 101.)  The Koromlan Well would also traverse a tract of land that has not yet been unitized, which Chesapeake labels the Bradbury Unit.  (*Id.* ¶ 102.)  Epsilon asserts that because the Koromlan Well traverses non-unitized land, it does not comply with the terms of the JOAs.  (*Id.* ¶ 103.)  All parties to the JOAs other than Epsilon and Chief have elected to participate in the Koromlan Well.  (*See* Defendant's Exhibit C, Doc. 23-3; Defendant's Exhibit D, Doc. 23-4; Defendant's Exhibit E, Doc. 23-5.)

Epsilon brought suit against Chesapeake on March 10, 2021, seeking a declaration that if Chesapeake does not participate in the proposed Craige Wells, Epsilon has the right to drill the wells, Chesapeake is required to allow Epsilon to access and use jointly owned assets, and Chesapeake must cooperate with the operator of the proposed wells in order to facilitate the drilling of the wells.  *See Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, No. 1:21-CV-00433

(M.D. Pa. filed Mar. 10, 2021) [hereinafter *Epsilon II*]. The complaint also brought claims for breach of the parties' JOAs and breach of the parties' settlement agreement in *Epsilon I*, sought a declaration that Chesapeake's proposed Koromlan Well did not comply with the terms of the JOAs, and sought specific performance and injunctive relief. *Epsilon II*, Doc. 5.

Epsilon filed a motion for preliminary injunction in *Epsilon II* on March 10, 2021. (Doc. 7.) The court conducted a status conference with the parties on March 26, 2021 to discuss a briefing schedule for the preliminary injunction motion and to schedule a hearing on the motion. During that call, the parties discussed the fact that Chesapeake's filing for Chapter 11 bankruptcy was currently being litigated in the United States Bankruptcy Court for the Southern District of Texas ("the Bankruptcy Court") and that Chesapeake had recently filed a motion for emergency relief in the bankruptcy court seeking to enjoin Epsilon from proceeding with a suit against Chesapeake in this district.

Following the March 26, 2021 conference, the court issued a scheduling order that set a briefing scheduled for Epsilon's motion for preliminary injunction, scheduled a preliminary injunction hearing, and set an expedited schedule for letter briefs on the issue of whether Chesapeake should be compelled to sign the SRBC Letter. *Epsilon II*, Doc. 25.

The Bankruptcy Court granted Chesapeake's motion for emergency relief on March 30, 2021, ordering Chesapeake to dismiss the case in this district without prejudice and specifying that Chesapeake could refile the case subject to conditions laid out by the Bankruptcy Court.  *See Epsilon II*, Doc. 30-1; *see also In re Chesapeake Energy Corp.*, No. 20-33233 (Bankr. S.D. Tex. hearing held Mar. 30, 2021).  Chesapeake complied with the Bankruptcy Court's order on April 5, 2021 and filed a notice of voluntary dismissal.  *Epsilon II*, Docs. 31–32.  This court accepted the notice of voluntary dismissal on April 6, 2021 and formally closed the case.  *Epsilon II*, Doc. 33.

Epsilon filed the instant case on April 9, 2021, and filed motions for preliminary injunction and expedited discovery on the same day.  (Docs. 4–5, 7.)  On April 12, 2021, the court scheduled a status conference for April 19, 2021.  (Doc. 13.)  Prior to the conference, Epsilon filed a letter brief on the SRBC Letter issue in conformity with the requirements that the court had previously imposed in *Epsilon II*.  (Doc. 15.)  The court accordingly set an expedited schedule for an opposition letter brief and reply letter brief on that issue.  (Doc. 16.)

On April 16, 2021, Chesapeake filed the instant motion to dismiss for failure to join an indispensable party under Federal Rule of Civil Procedure 12(b)(7) along with a brief in support of the motion.  (Doc. 22.)  The court subsequently conducted the status conference on April 19, 2021, after which the court issued an

order that (a) set briefing schedules as to the motion to dismiss, the motion for preliminary injunction, and the motion for expedited discovery; (b) scheduled oral argument on the SRBC Letter issue; and (c) scheduled a preliminary injunction hearing.  (Doc. 26.)

The parties have since timely briefed the SRBC Letter issue, *see* Docs. 27–29, and the motion to dismiss.  (Docs. 31–32.)  The motion to dismiss is ripe for the court's disposition.  The motion for expedited discovery and the motion for preliminary injunction are not yet ripe.  Additionally, oral argument on the SRBC Letter issue is scheduled to proceed on April 26, 2021 and a preliminary injunction hearing is scheduled to proceed on May 11, 2021.

In light of the aforementioned schedule, the court turns its attention to Chesapeake's motion to dismiss for failure to join an indispensable party, which seeks dismissal on the grounds that Epsilon has failed to join the other parties to the JOAs.  (Doc. 22.)  It is undisputed that joinder of the absent JOA parties would destroy the court's subject matter jurisdiction since Epsilon and several of the absent JOA parties are citizens of Texas.  The court therefore must consider whether joinder of the absent JOA parties is necessary, and, if so, whether the absent JOA parties are indispensable to this case.  That analysis is set forth below.

JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1332, which allows a district court to exercise subject matter jurisdiction where the parties are citizens of different states and the amount in controversy exceeds $75,000.[3]

STANDARD OF REVIEW

A district court considering a motion to dismiss for failure to join a party under Federal Rule of Civil Procedure 12(b)(7) "must accept as true the allegations in the complaint and draw all reasonable inferences in the non-moving party's favor." *Scottsdale Ins. Co. v. RSE Inc.*, 303 F.R.D. 234, 236 (E.D. Pa. 2014) (citing *Cummings v. Allstate Ins. Co.*, No. 11-CV-02691, 2012 WL 2327855, at *3 (E.D. Pa. June 19, 2012)).  The court may consider evidence outside of the pleadings when analyzing the motion to dismiss.  *Id.* (citing *Jurimex Kommerz Transit G.m.b.H v. Case Corp.*, 201 F.R.D. 337, 340 (D. Del. 2001)).  The moving party has the burden to establish "that a non-party is both necessary and indispensable" under Federal Rule of Civil Procedure 19.  *Nigro v. Pa. Higher Educ. Assistance Agency*, No. 1:19-CV-02000, 2020 WL 5369980, at *12 (M.D.

---

[3] As noted above, joinder of the absent JOA parties would destroy the court's subject matter jurisdiction.  The court's conclusion in this section is accordingly limited to a finding that the court has diversity jurisdiction in the absence of those parties.  Whether joinder of the absent JOA parties is necessary is analyzed below.

12

Pa. Sept. 8, 2020) (quoting *Eaton v. XPO Logistics Worldwide Inc.*, No. 1:19-CV-01518, 2020 WL 2847863, at *2 (M.D. Pa. June 2, 2020)).

**DISCUSSION**

Chesapeake's motion seeks dismissal of the case for Epsilon's failure to join the other parties to the JOAs.  Determining whether a case should be dismissed for failure to join a party under Rule 19 requires the court to conduct a two-part analysis.  *Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 312 (3d Cir. 2007).  First, the court must determine whether joinder of the absent party is necessary under Rule 19(a)(1).  *Id.*  If the party should be joined but its joinder would destroy the court's subject matter jurisdiction, the court must move to the second part of the analysis, which requires a determination as to whether the party is indispensable under Rule 19(b).  *Id.*

If the absent party is both necessary under Rule 19(a) and indispensable under Rule 19(b), the action must be dismissed.  *Id.* (citing *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 404 (3d Cir. 1993)).  Conversely, if the court finds that an absent party is not necessary under Rule 19(a), it need not decide whether the party is indispensable under Rule 19(b).  *Id.*

A necessary party under Rule 19(a) is one "whose joinder is compulsory 'if feasible.'"  *Janney Montgomery Scott*, 11 F.3d at 404 (quoting Fed. R. Civ. P. 19(a)).  A non-party is necessary under Rule 19(a)(1) if:

**(A)** in [the non-party's] absence, the court cannot accord complete relief among existing parties; or

**(B)** [the non-party] claims an interest relating to the subject of the action and is so situated that disposing of the action in the [non-party's] absence may:

> **(i)** as a practical matter impair or impede the [non-party's] ability to protect the interest; or

> **(ii)** leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1). Consistent with the language of the rule, courts treat subsections (a)(1)(A) and (a)(1)(B) disjunctively: if either subsection is satisfied, the absent party is necessary. *Gen. Refractories*, 500 F.3d at 312 (citing *Koppers Co., Inc. v. Aetna Cas. & Sur. Co.*, 158 F.3d 170, 175 (3d Cir. 1998)).

If the court determines that a non-party is necessary under Rule 19(a)(1) and joinder of the party would defeat the court's subject matter jurisdiction, the court then must analyze whether the non-party is indispensable under Rule 19(b), which requires the court to "determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). In conducting this analysis, the court should consider several factors, including:

> **(1)** the extent to which a judgment rendered in the [non-party's] absence might prejudice that [non-party] or the existing parties;

14

**(2)** the extent to which any prejudice could be lessened or avoided by:

    **(A)** protective provisions in the judgment;

    **(B)** shaping the relief; or

    **(C)** other measures;

**(3)** whether a judgment rendered in the [non-party's] absence would be adequate; and

**(4)** whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

*Id.* The four factors listed under Rule 19(b) are not exhaustive, but they are generally the most important factors for the court to consider. *Gardiner v. V.I. Water & Power Auth.*, 145 F.3d 635, 640 (3d Cir. 1998). Nevertheless, the question of whether a non-party is indispensable is a "case-specific inquiry" that varies based on the facts of each particular case. *Republic of Philippines v. Pimentel*, 553 U.S. 851, 863–64 (2008).

The court will first analyze whether the absent JOA parties are necessary under Rule 19(a). Chesapeake confines its argument under that subsection to Rule 19(a)(1)(B)(i), *see* Doc. 23, pp. 8–11, and the court will similarly confine its analysis to that subsection because Chesapeake has the burden to establish that the absent JOA parties are necessary. *See Nigro*, 2020 WL 5369980, at *12.

Under Rule 19(a)(1)(B)(i), a party's joinder is necessary if the party has an interest relating to the subject of the action and disposing of the action in the

15

party's absence would impair or impede the party's ability to protect that interest. Fed. R. Civ. P. 19(a)(1)(B)(i).  The party's interest under this rule must be a legally protected interest, and not merely a financial interest.  *Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 419 F.3d 216, 230 (3d Cir. 2005).

A party to a contract that is the subject of the litigation generally has such a protected interest in the litigation under Rule 19(a)(1)(B)(i).  *See, e.g.*, *Epsilon-NDT Edustriayel Kontrol Sistemleri Sanayi Ve Ticaret A.S. v. Powerrail Distrib., Inc.*, No. 3:18-CV-00821, 2018 WL 5078276 at *3 (M.D. Pa. Oct. 18, 2018) ("A 'party to a contract which is the subject of the litigation is a necessary party.'" (quoting *Downing v. Globe Direct LLC*, 806 F. Supp. 2d 461, 467 & n.32 (D. Mass. Aug. 25, 2011))); *Image Masters, Inc. v. Chase Home Fin.*, 489 B.R. 375, 398 (E.D. Pa. Mar. 11, 2013) ("Because the homeowners are parties to the mortgage contracts at issue, they have a sufficient interest in the litigation [to be deemed necessary parties]."). There is no per se rule requiring joinder of a party to a contract, however, and the issue of whether the party is necessary still must be analyzed on a case-by-case basis.  *Phila. Indem. Ins. Co. v. Admiral Ins. Co.*, No. 15-CV-03486, 2016 WL 1241865, at *5 (E.D. Pa. Mar. 30, 2016).

Chesapeake argues that the absent JOA parties are necessary parties to this litigation under Rule 19(a)(1)(B)(i) because Epsilon's argument hinges on interpretation of the JOAs, and the absent parties have an interest in the outcome of

that interpretation.  (Doc. 23, pp. 8–9.)  Chesapeake further argues that the absent

JOA parties have a legally protected interest in the litigation because they have

taken divergent positions on whether to consent to Epsilon's proposed Craige

Wells or Chesapeake's proposed Koromlan Well.  (*Id.* at 9–10.)  Finally,

Chesapeake argues that the absent JOA parties have an interest in the litigation

because Epsilon could potentially impose a 200% or 400% surcharge under the

JOAs on the parties that did not consent to the Craige Well proposals.  (*Id.* at 10.)

Epsilon argues in response that any interest held by the absent JOA parties

would not be impaired or impeded by the litigation proceeding without them

because the positions of the absent parties are "forwarded by either [Chesapeake]

or Epsilon."[4]  (Doc. 31, p. 16.)  In other words, "if a JOA party believes

[Chesapeake] does not have a veto power" over wells proposed by Epsilon or other

parties, "its position is represented by Epsilon," and if the JOA party "believes

[Chesapeake] does have a veto power, its position will be protected by

[Chesapeake]."  (*Id.* at 16–17.)  Epsilon also argues that any relief that the court

might grant could be tailored to avoid any harm to the absent parties, which,

---

[4] Epsilon also argues that Chesapeake has failed to satisfy Rule 19(a)(1)(A).  (*See* Doc. 31 at 14–16.)  The court will disregard these arguments, because, as noted above, Chesapeake confines its argument to Rule 19(a)(1)(B)(i), so the court need not determine whether Chesapeake has satisfied the alternative standard under Rule 19(a)(1)(A).  *See Nigro*, 2020 WL 5369980, at *12 (noting that moving party has burden of persuasion under Rule 12(b)(7)).

Epsilon contends, defeats Chesapeake's argument that the absent JOA parties are harmed by a potential surcharge.  (*Id.* at 18.)

Chesapeake responds that Epsilon's argument conflates "*positions* taken by the existing parties . . . regarding the 'legally protected interests' of all JOA Parties with the 'legally protected interests' themselves."  (Doc. 32, p. 5 (emphasis added).)  Chesapeake argues that the absent JOA parties have a legally protected interest in the litigation given that they are parties to the underlying contracts and the fact that "Chesapeake and Epsilon have advanced positions regarding the issues presented within this litigation does not obviate the necessity of the absent JOA Parties' joinder."  (*Id.* at 6.)

The court agrees with Chesapeake.  The absent JOA parties have a legally protected interest in this litigation because they are parties to the JOAs and have taken divergent positions on whether to consent to the Craige Wells or the Koromlan Well.  Conducting the litigation in their absence could impair or impede their ability to protect that interest because the result of this case could prevent the construction of the Craige Wells, the Koromlan Well, or both.  The court therefore concludes that the absent JOA parties are necessary parties under Rule 19(a). Epsilon's argument that the absent JOA parties are not necessary because their positions would be advanced by either Epsilon or Chesapeake is more appropriately considered in the analysis of whether the absent JOA parties would

18

be prejudiced by conducting the litigation in their absence under Rule 19(b).  *See Gen. Refractories*, 500 F.3d at 320 (noting that "the first factor under Rule 19(b) 'overlaps considerably with the Rule 19(a) analysis.'" (quoting *Gardiner*, 145 F.3d at 641 n.4)).

The court accordingly turns its attention to whether the absent JOA parties are indispensable under Rule 19(b), which requires the court to "determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."  Fed. R. Civ. P. 19(b).

Based on an analysis of the factors enumerated in Rule 19(b), the court concludes that the action should not be dismissed.  First, with respect to prejudice, the court finds that conducting the litigation in the absence of the JOA parties would result in little or no prejudice to the absent JOA parties.  Although Chesapeake argues that conducting the litigation in the JOA parties' absence would "necessarily" result in prejudice because the JOA parties have important legal interests in the outcome of the case, *see* Doc. 23, p. 13, the court agrees with Epsilon's argument that the positions of the JOA parties with respect to the legal issues before the court would be advanced by either Epsilon or Chesapeake.  (*See* Doc. 31, p. 19.)  Similarly, although Epsilon could potentially invoke a surcharge on the absent JOA parties if the court ruled in Epsilon's favor, the court is not persuaded that the JOA parties' presence in the suit would have any effect on

19

whether this surcharge would be invoked.  The first factor accordingly weighs against dismissal of this case.

The second factor also weighs against dismissal because any potential prejudice to the absent JOA parties could be lessened or avoided by shaping the relief, if any, that the court awards.  Notably, the complaint in this case seeks declaratory and injunctive relief, and a court granting such equitable remedies has wide discretion in determining the nature and scope of that relief.

As for the third factor, the adequacy of a judgment in the absence of the parties, Chesapeake notes that this factor allows the court to consider the potential for successive litigation on the same or similar issues.  (Doc. 23, p. 15.) Chesapeake argues that absent the JOA parties, the likelihood of successive litigation involving the same contractual provision and mineral rights at issue is greatly increased.  (*Id.*)  Epsilon argues that this is speculative because the JOAs were signed more than a decade ago, but Epsilon is the only JOA party that has ever proposed a well for which Chesapeake has refused to participate and refused to act as the operator.  (Doc. 31, p. 22.)

The court agrees with Epsilon.  Although the court should consider the public's interest in resolving an entire controversy when considering the third factor under Rule 19(b), *General Refractories*, 500 F.3d at 321, it is speculative to conclude that that will not be the case here given that no other JOA party has

previously advanced a well proposal for which Chesapeake has refused to act as operator.  The third factor accordingly weighs against dismissal.

Finally, although Epsilon's claims could be brought in the Susquehanna County Court of Common Pleas if this case were dismissed, forcing Epsilon to take such an action could result in prejudice to Epsilon in the form of missed permitting deadlines associated with its proposed Craige Wells.  The final factor— whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder—is therefore either neutral or weighs against dismissal.[5]

Accordingly, having considered the factors enumerated in Federal Rule of Civil Procedure 19(b) in light of the particular facts of this case, the court concludes that the absent JOA parties are not indispensable to this litigation.  Chesapeake's motion to dismiss for failure to join an indispensable party will therefore be denied.

---

[5] This conclusion shall not be construed as a finding that Epsilon has established irreparable harm for purposes of its pending motion for preliminary injunction.  That motion shall be analyzed on its own merits.

CONCLUSION

For the foregoing reasons, Chesapeake's motion to dismiss for failure to join

an indispensable party is denied.  An appropriate order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: April 26, 2021