**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

EPSILON ENERGY USA, INC.,  :  Civil No. 1:21-CV-00658
                            :
        Plaintiff,          :
                            :
    v.                      :
                            :
CHESAPEAKE APPALACHIA, LLC, :
                            :
        Defendant.          :  Judge Jennifer P. Wilson

**<u>MEMORANDUM</u>**

This is a diversity action brought by one oil and gas company against

another oil and gas company based on the defendant's alleged breach of several

joint operating agreements between the parties as well as a settlement agreement

between the parties from a previous case in this district.  The case is presently

before the court on a motion for preliminary injunction filed by Plaintiff Epsilon

Energy USA, Inc. ("Epsilon").  (Doc. 5).  Although the motion for preliminary

injunction as a whole is not yet ripe for the court's disposition, *see* Doc. 26, ¶ 4, the

parties have separately briefed a component part of the request for preliminary

injunctive relief in which Epsilon seeks a court order compelling Chesapeake to

sign a commitment letter ("SRBC Letter") that the parties would send to the

Susquehanna River Basin Commission ("SRBC").  For the reasons that follow,

Epsilon's request for preliminary injunctive relief compelling Chesapeake to sign

the SRBC Letter is denied without prejudice to Epsilon's right to re-raise the

SRBC Letter issue as part of its larger motion for preliminary injunction.

1

## BACKGROUND AND PROCEDURAL HISTORY

Epsilon is an Ohio corporation with its principal place of business in Texas. (Doc. 4, ¶ 1.)  Defendant Chesapeake Appalachia, LLC ("Chesapeake") is an Oklahoma corporation with its principal place of business in that state.  (*Id.* ¶ 4.) Beginning in 2009, Epsilon, Chesapeake, and several other oil and gas companies entered into several Joint Operating Agreements ("JOAs") for the purpose of developing natural gas at locations in Pennsylvania.[1]  (*Id.* ¶¶ 12–16.)  Epsilon and Chesapeake also entered into a Farmout Agreement[2] on February 1, 2010, that incorporated the parties' earlier Poulsen JOA.  (*Id.* ¶ 16.)  Each JOA governs a different tract of land, and each JOA exists independently from the other JOAs. (*Id.* ¶¶ 19–20.)

Under the JOAs, any JOA party may propose the drilling and completion of a well.  (*Id.* ¶ 21.)  Upon receipt of a drill proposal, each other JOA party must

---

[1] The four JOAs relevant to this case are the Baltzley North JOA, dated October 18, 2010, the Baltzley South JOA, dated October 18, 2010, the Craige JOA, dated December 16, 2010, and the Poulsen JOA, which was a draft model JOA that was subsequently incorporated into the Farmout Agreement between Epsilon and Chesapeake.  (*See* Doc. 4, ¶¶ 13–16; Baltzley North JOA, Plaintiff's Exhibit 1, Doc. 4-1, pp. 1–35; Baltzley South JOA, Plaintiff's Exhibit 2, Doc. 4-1 at 69–103; Craige JOA, Plaintiff's Exhibit 3, Doc. 4-3, pp. 25–31; Poulsen JOA, Schedule 7.1.2 to Farmout Agreement, Plaintiff's Exhibit 4, Doc. 4-4, pp. 25–58.)

[2] A farmout agreement is an agreement between oil and gas operators in which one operator assigns all or part of its oil or gas lease to another operator for the purpose of drilling under the lease.  58 C.J.S. *Mines* § 401 *Farmout Agreement for Transfer of Rights Under Oil and Gas Lease*, Westlaw (database updated March 2021).

either elect to participate in the proposal or not participate.  (*Id.* ¶ 22.)  Parties that elect to participate in the well proposal pay a pro rata share of the costs of developing the well.  (*Id.*)  A JOA party may also make a competing well proposal within thirty days of receiving the original well proposal.  (*Id.* ¶ 23.)

Chesapeake is designated as the default operator under the parties' JOAs. (*Id.* ¶ 24.)  In the event that Chesapeake elects not to serve as the operator for a proposed well, one of the other JOA parties that has consented to participate in the well proposal may step in and act as the operator for the purpose of that well.  (*Id.* ¶ 25.)

If a well proposal does not receive unanimous consent from the JOA parties, the proposing party must notify the other consenting parties of which parties have consented and advise the other consenting parties as to whether the proposing party recommends proceeding with the well proposal.  (*Id.* ¶ 26.)  If the proposing party does not withdraw the well proposal at this point, the proposing party is deemed to be participating in the proposal and must contribute any outstanding interests needed to equal 100% participation for the proposal.  (*Id.* ¶ 28.)  Once 100% participation is reached, the operator of the well must begin operations.  (*Id.* ¶ 29.)

In September 2018, Epsilon filed suit against Chesapeake in this district. (*Id.* ¶ 34; *see also Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, No. 3:18-CV-01852 (M.D. Pa. filed Sept. 20, 2018) [hereinafter *Epsilon I*].)  Epsilon

alleged that Chesapeake had not followed the proper election procedures under the Baltzley North and Baltzley South JOAs in order to improperly hinder Epsilon's ability to propose and operate new wells.  (Doc. 4, ¶ 35.)  Epsilon moved for preliminary injunctive relief in the suit.  (*Id.* ¶ 36; *Epsilon I*, Doc. 2.)  United States District Judge Malachy E. Mannion scheduled the case for a preliminary injunction hearing.  (*Epsilon I*, Doc. 17.)  Before the court conducted the hearing, however, the parties settled the case.  (Doc. 4, ¶ 37; Settlement Agreement, Plaintiff's Exhibit 5, Doc. 6-1, pp. 1–7.)  As part of the settlement agreement, Chesapeake agreed that it would not unreasonably withhold cooperation with Epsilon's well proposals and that it would allow permitting and use by Epsilon of assets that were co-owned by the JOA parties, including water withdrawal points and impoundments.  (Doc. 4, ¶ 38.)

According to Epsilon's complaint in the present case, Chesapeake has obtained surface and subsurface mineral rights for the estates that are subject to the Baltzley North, Baltzley South, Craige, and Poulsen JOAs, which are treated as joint assets under the JOAs.  (*Id.* ¶¶ 41–42.)  The complaint also alleges that the Wyalusing Creek surface water withdrawal point ("the Wyalusing Creek water source"), which is the water source for the Craige well pad, is a jointly owned asset, and that Epsilon therefore has the right to use the water impoundment

facility and other infrastructure that was constructed in connection with the Wyalusing Creek water source.  (*Id.* ¶¶ 48–59.)

In May 2020, Epsilon and Chesapeake began discussing a proposal by Epsilon for a well on the Craige well pad.  (*Id.* ¶¶ 60–61.)  The parties continued to discuss Epsilon's proposal through June 2020.  (*Id.* ¶ 62.)  In September 2020, Chesapeake requested additional information from Epsilon as to how Epsilon planned to operate the proposed well.  (*Id.* ¶ 63.)  Discussions between the parties continued, and on October 14, 2020, Epsilon advised Chesapeake that it planned to proceed with the proposal so that it could comply with applicable permitting deadlines.  (*Id.* ¶ 67.)  Epsilon told Chesapeake that its understanding of the JOAs was that Epsilon could proceed with drilling the wells with or without Chesapeake's consent.  (*Id.* ¶ 68.)

Epsilon reiterated its plan to move forward with the proposed well on December 16, 2020.  (*Id.* ¶ 70.)  Chesapeake responded that there was "not much incentive" for Chesapeake to work out a deal with Epsilon and stated that it wanted to negotiate a situation in which Epsilon agreed not to propose any additional wells.  (*Id.* ¶ 71.)  Epsilon stated that it intended to proceed with the proposed well. (*Id.* ¶ 72.)

On December 23, 2020, Epsilon formally proposed four new wells, labeled Craige N 1LH, Craige N 1UHC, Craige N 4UHC (collectively, "the Craige North

Wells"), and Craige S 3LHC ("the Craige South Well").  (*Id.* ¶ 74.)  JOA parties

Chief Oil & Gas LLC ("Chief"), Radler 2000 Limited Partnership ("Radler"), and

Tug Hill Marcellus, LLC ("Tug Hill") elected to participate in the Craige South

Well, but the other parties to the JOA governing the Craige South Well—namely

Equinor Onshore Properties, Inc. ("Equinor"), Jamestown Resources, LLC

("Jamestown"), Enerplus Resources (USA) Corp. ("Enerplus"), and

Unconventionals Natural Gas, LLC ("Unconventionals")—elected not to

participate in the Craige South Well.  (*Id.* ¶ 76.)  The other parties to the JOA

governing the Craige North Wells—namely Equinor and Jamestown—similarly

elected not to participate in the Craige North Wells.  (*Id.* ¶ 77.)

On January 19, 2021, Chesapeake advised that it would not participate in the

drilling of the proposed Craige Wells and that it would not serve as the operator on

the projects.  (*Id.* ¶ 80.)  Chesapeake also stated its position that Epsilon was not

allowed to serve as the operator with regard to the proposed wells and refused to

grant Epsilon access to the Craige well pad on that basis.  (*Id.*)

In a separate communication on January 19, 2021, Chesapeake proposed a

separate well, labeled the Koromlan 107HC ("Koromlan Well").  (*Id.* ¶ 81.)

Chesapeake asserted that Epsilon's proposed Craige Wells conflicted with

Chesapeake's proposed Koromlan Well.  (*Id.* ¶ 82.)  Chesapeake announced plans

to drill the Koromlan Well in January 2022 and accordingly refused to grant authority or approval to Epsilon to access the Craige well pad.  (*Id.* ¶ 83.)

On February 9, 2021, Epsilon informed Chesapeake that it had obtained the required 100% subscription in order to proceed with the proposed Craige Wells. (*Id.* ¶ 84.)  The parties then engaged in email communication regarding the SRBC Letter.  (*Id.* ¶ 85.)  The SRBC Letter sought confirmation that Chesapeake was willing to provide water to Epsilon for the proposed Craige Wells in accordance with permits that Chesapeake held with the SRBC.  (*See* SRBC Letter, Doc. 4-5 at 20.)  Chesapeake informed Epsilon that under its reading of the JOAs, Epsilon was not allowed to drill the proposed wells if Chesapeake did not elect to participate in the proposal and stated that it would not sign the SRBC Letter.  (*Id.* ¶ 86.)  The parties exchanged subsequent emails in which they reiterated their respective positions as to whether Epsilon's proposed wells conformed to the terms of the JOAs.  (*Id.* ¶¶ 87–88.)

Epsilons's efforts to obtain Chesapeake's signature on the SRBC Letter followed from months of discussion between the parties on that issue.  Epsilon first sought Chesapeake's cooperation in its efforts to obtain water permits for the proposed Craige Wells on July 1, 2020.  (*Id.* ¶ 89.)  On September 18, 2020, Epsilon sent Chesapeake a draft SRBC commitment letter.  (*Id.* ¶ 91.)  Chesapeake

informed Epsilon on September 29, 2020 that it would not sign the draft letter until Epsilon was named as the operator of a formally proposed well.  (*Id.* ¶ 94.)

Epsilon accordingly renewed its efforts for Chesapeake to sign the SRBC Letter after it formally proposed the Craige Wells in December 2020.  (*Id.* ¶ 95.) Specifically, Epsilon confirmed with the SRBC that its SRBC Letter would be acceptable and that it would enable Epsilon to obtain the required water permits for the Craige Wells.  (*Id.* ¶ 96.)  Epsilon accordingly sent the SRBC Letter to Chesapeake on February 9, 2021.  (*Id.* ¶ 97.)  Chesapeake informed Epsilon on February 11, 2021 that it would not sign the SRBC Letter and reiterated its position that Epsilon could not proceed with the Craige Wells because Chesapeake had not elected to participate in the wells.  (*Id.* ¶ 98.)  Chesapeake also reiterated that it would not provide access to the Craige well pad.  (*Id.* ¶ 99.)

The proposed Koromlan Well, which Chesapeake asserts would compete with Epsilon's proposed Craige Wells, would traverse real estate on the Craige, Poulsen North, Poulsen South, and Davis units.  (*Id.* ¶ 101.)  The Koromlan Well would also traverse a tract of land that has not yet been unitized, which Chesapeake labels the Bradbury Unit.  (*Id.* ¶ 102.)  Epsilon asserts that because the Koromlan Well traverses non-unitized land, it does not comply with the terms of the JOAs.  (*Id.* ¶ 103.)  All parties to the JOAs other than Epsilon and Chief have

elected to participate in the Koromlan Well.  (*See* Defendant's Exhibit C, Doc. 23-3; Defendant's Exhibit D, Doc. 23-4; Defendant's Exhibit E, Doc. 23-5.)

Epsilon brought suit against Chesapeake on March 10, 2021, seeking a declaration that if Chesapeake does not participate in the proposed Craige Wells, Epsilon has the right to drill the wells, Chesapeake is required to allow Epsilon to access and use jointly owned assets, and Chesapeake must cooperate with the operator of the proposed wells in order to facilitate the drilling of the wells.  *See Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, No. 1:21-CV-00433 (M.D. Pa. filed Mar. 10, 2021) [hereinafter *Epsilon II*].  The complaint also brought claims for breach of the parties' JOAs and breach of the parties' settlement agreement in *Epsilon I*, sought a declaration that Chesapeake's proposed Koromlan Well did not comply with the terms of the JOAs, and sought specific performance and injunctive relief.  *Epsilon II*, Doc. 5.

Epsilon filed a motion for preliminary injunction in *Epsilon II* on March 10, 2021.  (Doc. 7.)  The court conducted a status conference with the parties on March 26, 2021 to discuss a briefing schedule for the preliminary injunction motion and to schedule a hearing on the motion.  During that call, the parties discussed the fact that Chesapeake's filing for Chapter 11 bankruptcy was currently being litigated in the United States Bankruptcy Court for the Southern District of Texas ("the Bankruptcy Court") and that Chesapeake had recently filed

a motion for emergency relief in the bankruptcy court seeking to enjoin Epsilon

from proceeding with a suit against Chesapeake in this district.

Following the March 26, 2021 conference, the court issued a scheduling

order that set a briefing scheduled for Epsilon's motion for preliminary injunction,

scheduled a preliminary injunction hearing, and set an expedited schedule for letter

briefs on the issue of whether Chesapeake should be compelled to sign the SRBC

Letter. *Epsilon II*, Doc. 25.

The Bankruptcy Court granted Chesapeake's motion for emergency relief on

March 30, 2021, ordering Chesapeake to dismiss the case in this district without

prejudice and specifying that Chesapeake could refile the case subject to conditions

laid out by the Bankruptcy Court. *See Epsilon II*, Doc. 30-1; *see also In re*

*Chesapeake Energy Corp.*, No. 20-33233 (Bankr. S.D. Tex. hearing held Mar. 30,

2021). Chesapeake complied with the Bankruptcy Court's order on April 5, 2021

and filed a notice of voluntary dismissal. *Epsilon II*, Docs. 31–32. This court

accepted the notice of voluntary dismissal on April 6, 2021 and formally closed the

case. *Epsilon II*, Doc. 33.

Epsilon filed the instant case on April 9, 2021, and filed motions for

preliminary injunction and expedited discovery on the same day. (Docs. 4–5, 7.)

On April 12, 2021, the court scheduled a status conference for April 19, 2021.

(Doc. 13.) Prior to the conference, Epsilon filed a letter brief on the SRBC Letter

issue in conformity with the requirements that the court had previously imposed in *Epsilon II*. (Doc. 15.) The court accordingly set an expedited schedule for an opposition letter brief and reply letter brief on that issue. (Doc. 16.)

On April 16, 2021, Chesapeake moved to dismiss the case for failure to join an indispensable party under Federal Rule of Civil Procedure 12(b)(7). (Doc. 22.) The motion sought dismissal on the grounds that Epsilon had failed to join the other parties to the JOAs, which Chesapeake contended were indispensable parties under Federal Rule of Civil Procedure 19. (*Id.*)

The court conducted the scheduled status conference on April 19, 2021, after which the court issued an order that (a) set briefing schedules as to the motion to dismiss, the motion for preliminary injunction, and the motion for expedited discovery; (b) scheduled oral argument on the SRBC Letter issue; and (c) scheduled a preliminary injunction hearing. (Doc. 26.) Chesapeake then filed an opposition letter brief on the SRBC Letter issue on April 19, 2021, *see* Doc. 27,[3] and Epsilon filed a reply letter brief on April 20, 2021. (Doc. 29.)

On April 26, 2021, the court denied Chesapeake's motion to dismiss for failure to join an indispensable party, concluding that the absent JOA parties were

---

[3] Chesapeake's original letter brief and associated exhibits are docketed at Doc. 27, but Chesapeake has also submitted an amended version of the letter to correct a typographical error, which is docketed at Doc. 28.

necessary parties under Federal Rule of Civil Procedure 19(a), but that they were not indispensable parties under Rule 19(b).  (Docs. 33–34.)  Later that day, the court conducted oral argument on the SRBC Letter issue.  With briefing and oral argument on the SRBC Letter issue completed, the issue is ripe for the court's disposition.

## JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1332, which allows a district court to exercise subject matter jurisdiction where the parties are citizens of different states and the amount in controversy exceeds $75,000.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 65 allows a district court to enter a preliminary injunction.  To obtain a preliminary injunction, plaintiffs must establish (1) that they are likely to prevail on the merits of the case; (2) that they would suffer irreparable harm if preliminary injunctive relief were denied; (3) that the harm defendants would suffer from the issuance of an injunction would not outweigh the harm plaintiffs would suffer if an injunction were denied; and (4) that the public interest weighs in favor of granting the injunction.  *Holland v. Rosen*, 895 F.3d 272, 285–86 (3d Cir. 2018) (citing *Del. Strong Families v. Att'y Gen. of Del.*, 793 F.3d 304, 308 (3d Cir. 2015)).  The first two factors are "gateway factors": if the plaintiffs have not established those factors, the court need not

consider the last two factors. *Greater Phila. Chamber of Commerce v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020) (quoting *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017)). If the plaintiffs do establish the first two factors, "[t]he court then determines 'in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief.'" *Id.* (quoting *Reilly*, 858 F.3d at 179). A party seeking mandatory injunctive relief that would alter, rather than preserve, the status quo, "must meet a higher standard of showing irreparable harm in the absence of an injunction." *Bennington Foods LLC v. St. Croix renaissance, Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008) (citing *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995)).

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Benisek v. Lamone*, 585 U.S. __, 138 S. Ct. 1942, 1943 (2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). Thus, a preliminary injunction should only be awarded in the "limited circumstances" where "the movant, by a clear showing, carries the burden of persuasion." *Holland*, 895 F.3d at 285. Ultimately, the decision of whether to issue a preliminary injunction is left to the sound discretion of the district court. *Pennsylvania v. President of United States*, 930 F.3d 543, 565 (2019) (citing *Winter*, 555 U.S. at 24).

## DISCUSSION

In its request for preliminary injunctive relief regarding the SRBC Letter, Epsilon argues that the court should compel Chesapeake to sign the SRBC Letter because the Wyalusing Creek water source is a jointly owned asset between Epsilon and Chesapeake, because Epsilon will suffer irreparable harm if Chesapeake is not compelled to sign the letter, and because signing the letter will not prejudice Chesapeake. (Doc. 15.)

Chesapeake responds that it should not be compelled to sign the SRBC Letter because: (1) the Wyalusing Creek water source is owned exclusively by Chesapeake and is not a jointly owned asset; (2) even if the Wyalusing Creek water source were a jointly owned asset, Chesapeake, as the default operator under the JOAs, does not have a duty to allow Epsilon to use the infrastructure that it has built in connection with the source; and (3) denial of preliminary injunctive relief would not cause Epsilon irreparable harm and the request for injunctive relief is against the public interest. (Doc. 27.) Epsilon responds to these arguments in its reply brief. (Doc. 29.)

Although the parties make arguments as to whether Chesapeake has a duty to allow Epsilon to use the infrastructure it has developed in connection with the Wyalusing Creek water source, *see* Doc. 28, pp. 2–3; Doc. 29, pp. 1–2, these arguments are tangential to the narrow question that is currently before the court of

14

whether Chesapeake should be compelled to sign the SRBC Letter.  The SRBC

Letter states only that Chesapeake would agree to provide water to Epsilon from

the Wyalusing Creek water source; it does not say anything about whether Epsilon

can use the infrastructure that Chesapeake has developed in connection with the

water source.  (*See* SRBC Letter, Doc. 4-5 at 20.)  The court will accordingly

disregard these arguments for the purposes of the current issue and confine its

analysis to two questions: (1) Is the Wyalusing Creek water source a jointly owned

asset?  And (2) Does Epsilon meet its burden to show that it is entitled to

preliminary injunctive relief in the form of an order compelling Chesapeake to sign

the SRBC Letter?

### A. Is the Wyalusing Creek Water Source a Jointly Owned Asset?

The court will first address the parties' arguments as to whether the

Wyalusing Creek water source is a jointly owned asset.  In order to understand the

parties' arguments, a brief recap of the relevant permits held by the parties and the

agreements between the parties is necessary.

### 1.  History of Relevant Permits and Agreements

On December 4, 2008, the SRBC awarded a permit to Turm Oil, Inc., a

subsidiary of Epsilon, to withdraw up to 0.249 million gallons of water per day

from Wyalusing Creek in Rush Township.  (SRBC Docket No. 20081227, Doc.

27-3, pp. 2–7.)  On June 18, 2009, the SRBC awarded a separate permit to

Chesapeake to withdraw up to 0.499 million gallons of water per day from Wyalusing Creek.  (SRBC Docket No. 20090610, Doc. 27-3, pp. 8–13.)  Turm Oil, Inc. subsequently transferred its interest in Docket No. 20081227 to Epsilon on August 8, 2009.  (SRBC Notice of Request for Transfer on Aug. 8, 2009, Doc. 29-1, p. 17.)

Epsilon and Chesapeake entered into the Farmout Agreement on February 1, 2010.  (Farmout Agreement, Doc. 29-1, pp. 25–50.)  Under the Farmout Agreement, Epsilon agreed to farm out a 50% interest in its leases for numerous properties to Chesapeake, which included the two Poulsen wells and the Hardic well.  (Farmout Agreement, ¶ 1.1, Doc. 29-1, p. 25.)  The interest that Epsilon agreed to farm out to Chesapeake, included, inter alia, "[a]ll easements, permits, licenses, servitudes, rights of way and all other rights and appurtenances situated on or used in connection with the Real Property Interests . . . ."  (*Id.* ¶ 1.1.9, Doc. 29-1, p. 26.)

Approximately two months later, on March 31, 2010, Epsilon announced in a letter to Chesapeake that it intended to transfer its ownership rights under Docket No. 20081227 to Chesapeake.  (Letter from Daniel J. Ward to Douglas J. Jacobson [hereinafter Ward Letter], Doc. 27-2, p. 4.)  This transfer was made official on April 15, 2010, when Epsilon filed a notice of request to transfer its interest with

the SRBC.  (SRBC Notice of Request for Transfer on Apr. 15, 2010, Doc. 27-2, p. 3.)

Following its acquisition of the water rights under Docket No. 20081227, Chesapeake applied for a new SRBC permit to consolidate its water rights under Docket No. 20081227 and Docket No. 20090610 into one SRBC permit.  The SRBC approved this application and awarded Chesapeake a consolidated permit on June 23, 2011, allowing Chesapeake to withdraw up to 0.715 million gallons of water per day from Wyalusing Creek.  (SRBC Docket No. 20110607, Doc. 27-3, pp. 14–19.)  The water withdrawn under this permit was used at the Craige well pad and other well pads operated by Chesapeake.  (*See* Complaint, ¶ 48, Doc. 1, p. 11.)  Chesapeake subsequently renewed this permit on December 14, 2012, SRBC Docket No. 20121209, Doc. 27-3, pp. 20–25, and then reactivated it on June 16, 2017, after it had expired.  (SRBC Docket No. 20170605, Doc. 27-3, pp. 26–32.)

On June 14, 2019, the SRBC awarded a permit to Epsilon separate and apart from Chesapeake's water rights memorialized in Docket Nos. 20110607, 20121209, and 20170605.  (SRBC Docket No. 20190606, Doc. 27-3, pp. 33–38.)  This permit allowed Epsilon to withdraw up to 0.715 million gallons of water from Wyalusing Creek at a different withdrawal location from the location at which Chesapeake withdrew water pursuant to Docket No. 20170605.  (*Id.* at 34.)

17

Epsilon sent the SRBC Letter that is the source of the present controversy to Chesapeake on February 9, 2021. (SRBC Letter, Doc. 4-5 at 20.) The letter sought confirmation that Chesapeake was "willing to supply Epsilon Energy USA, Incorporated with water up to the approved amount per" the conditions of Docket No. 20170605. (*Id.*) The letter provided that the water would be provided to Epsilon subject to the terms of a water sharing agreement that the parties have not yet executed. (*Id.*) The letter also noted that it "does not obligate Chesapeake Appalachia, LLC to sell water to Epsilon Energy USA, Inc.; rather it states a willingness to do so subject to availability as determined by Chesapeake Appalachia, LLC." (*Id.*)

## 2. Epsilon Fails to Show a Likelihood of Success on the Merits as to Its Argument that the Wyalusing Creek Water Source Is a Jointly Owned Asset

Having reviewed the relevant permits and agreements, the court turns to the parties' arguments as to whether the Wyalusing Creek water source is a jointly owned asset between the parties or whether it is exclusively owned by Chesapeake. The parties present starkly different arguments on this issue.

Epsilon's argument as to why the water source is a jointly owned asset relies primarily on the language of the Farmout Agreement. The argument proceeds in several steps: (1) Turm Oil obtained a permit for withdrawing water from Wyalusing Creek and subsequently conveyed that permit to Epsilon; (2) Epsilon

18

and Chesapeake entered into the Farmout Agreement after the Turm Oil permit had

been conveyed to Epsilon; (3) the Farmout Agreement conveyed from Epsilon to

Chesapeake a 50% interest in "[a]ll easements, permits, licenses, servitudes, rights

of way and all other rights and appurtenances situated on or used in connection

with the Real Property Interests" named in the Farmout Agreement; (4) the two

Poulsen wells and the Hardic well were among the real property interests named in

the Farmout Agreement; (5) the Wyalusing Creek water source provided water to

the Poulsen wells and the Hardic well; (6) the permit for withdrawing water from

the Wyalusing Creek was therefore a "permit[] . . . used in connection with" a real

property interest named in the Farmout Agreement and is thus a jointly owned

asset.  (*See* Doc. 15, pp. 1–2.)

Chesapeake's argument is much more straightforward.  According to

Chesapeake, the clear language of the parties' agreement shows that Epsilon

transferred ownership of its rights under its Wyalusing Creek permit to Chesapeake

on April 15, 2010.  (Doc. 27, p. 2.)

Epsilon responds that Chesapeake's argument is "baseless" because it

presumes that Epsilon transferred its interest in the Wyalusing Creek permit to

Chesapeake without receiving any consideration in return.  (Doc. 29, p. 2.)

According to Epsilon, "[i]it is apparent that Epsilon did not give its permit to

[Chesapeake]."  (*Id.*)  Epsilon acknowledges that it transferred its interest under the

permit to Chesapeake, but asserts that "it did so in accordance with the Farmout Agreement because (as the designated operator) [Chesapeake] would now utilize the permit to develop jointly-owned wells under the JOAs." (*Id.*)  Thus, Epsilon argues, "[s]hifting the permit into [Chesapeake's] name did not divest Epsilon of its undivided 50% interest in the permit." (*Id.*)

Based on a review of the relevant documents and the parties' written and oral arguments, the court concludes that Epsilon has not met its burden to show that it is likely to succeed on the argument that the Wyalusing Creek water source is a jointly owned asset.  The clear language of the March 31, 2010 letter from Epsilon to Chesapeake and the subsequent notice of request to transfer filed with the SRBC indicates that Epsilon was transferring its ownership interest in the Wyalusing Creek water source to Chesapeake.  (*See* Ward Letter, Doc. 27-2, p. 4 ("This letter is acknowledgement that Epsilon Energy USA, Inc (Epsilon) intends to transfer its ownership of surface water approvals for the East Branch of Wyalusing Creek, Wyalusing Creek, Elk Lake Stream, and Deer Lick Creek to Chesapeake Appalachia LLC."); SRBC Notice of Request for Transfer on Apr. 15, 2010, Doc. 27-2, p. 3 ("[E]ffective April 15, 2010, Chesapeake Appalachia LLC will take ownership of the Surface Water Withdrawal – Wyalusing Creek facility, located in Rush Township, Susquehanna County, PA currently approved under Susquehanna River Basin Commission Docket No. 20081227.").

20

Although Epsilon argues that the transfer of ownership regarding the Wyalusing Creek water source was done pursuant to the parties' Farmout Agreement and that it did not operate to transfer Epsilon's entire interest in the source to Chesapeake, reaching that conclusion requires the court to disregard the plain language of the underlying documents.  Epsilon could seek to introduce extrinsic evidence to allow the court to reach such a conclusion, but at this stage of litigation the plain language of the underlying documents cannot be ignored, and based on that plain language Epsilon has not shown that it is likely to succeed on its argument that the Wyalusing Creek water source is a jointly owned asset.

This conclusion is further supported by the language of the SRBC Letter, which, contrary to Epsilon's argument, suggests that the Wyalusing Creek water source is exclusively owned by Chesapeake and is not a jointly owned asset.  The SRBC Letter "confirms" that Chesapeake "is willing to supply" Epsilon with water drawn from the Wyalusing Creek water source.  (Doc. 4-5, p. 20.)  The letter states that the water will be provided from Chesapeake to Epsilon "subject to the terms and conditions of the Water Sharing Agreement that will be entered into" by Epsilon and Chesapeake.  (*Id.*)  The letter then clarifies that it "does not obligate" Chesapeake to "sell water" to Epsilon, but rather "states a willingness to do so subject to availability as determined by Chesapeake."  (*Id.*)

At oral argument, the court pressed Epsilon's counsel as to whether the foregoing language constituted an admission by Epsilon that the Wyalusing Creek water source was not a jointly owned asset.[4]  Counsel argued that the specific language of the SRBC Letter was included for practical reasons because Epsilon was aware that Chesapeake would not sign a letter stating that the Wyalusing Creek water source was jointly owned by the parties.  Thus, counsel argued, Epsilon included language that seemed to suggest that the Wyalusing Creek water source was exclusively owned by Chesapeake solely in an effort to get Chesapeake to sign the SRBC Letter.

Counsel's account of Epsilon's motivations in drafting the language of the SRBC Letter may be true, and evidence might subsequently come to light that would support the conclusion that the Wyalusing Creek water source is not exclusively owned by Chesapeake.  Nothing in the language of the letter supports such a conclusion, however, and the court is again left with an undisputedly authentic document that clearly indicates that the Wyalusing Creek water source was exclusively owned by Chesapeake.

---

[4] Given the expedited nature of this case, a transcript of the oral argument was not yet available at the time of this writing.  Accordingly, information regarding the hearing is based on the court's own notes and recollections.

Ultimately, the court has been asked to separate the SRBC Letter issue from the rest of Plaintiff's request for preliminary injunctive relief and has been asked to grant preliminary injunctive relief on that issue on an expedited timeline and without the aid of an evidentiary hearing. Although the court has entertained this request and has allowed the issue to proceed on an expedited schedule, the court can only grant preliminary injunctive relief based on the record before it and not on inferences, assumptions, or speculation. Based on the record before the court, Epsilon has not shown a sufficient likelihood of success on the merits for the court to enter the extraordinary remedy of a preliminary injunction.

Accordingly, because Epsilon has not shown that it is likely to succeed on the merits, the court will deny Epsilon's request for a preliminary injunction compelling Chesapeake to sign the SRBC Letter without considering whether Epsilon has established the other elements required for a preliminary injunction. This denial is without prejudice to Epsilon's right to re-raise the SRBC Letter issue as part of its larger motion for preliminary injunction. In addition, because the court is denying the request for preliminary injunction with respect to the SRBC Letter, the court declines to address the disputed issue of whether Epsilon's requested preliminary injunction would constitute a mandatory injunction. (*See* Doc. 27, p. 1; Doc. 29, p.3.)

**CONCLUSION**

For the foregoing reasons, Epsilon's request for a preliminary injunction compelling Chesapeake to sign the SRBC Letter is denied.  This denial is without prejudice to Epsilon's larger motion for preliminary injunction or Epsilon's right to re-raise the SRBC Letter issue as part of that motion.  An appropriate order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: April 27, 2021