IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

EPSILON ENERGY USA, INC.,

                Plaintiff,

      v.

 

CHESAPEAKE APPALACHIA, LLC,

            Defendant.

Civil Action No. 1:21-cv-00658

District Court Judge Wilson

## REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Gregory J. Krock
Pa. I.D. No. 78308
Elizabeth M. Thomas
Pa. I.D. No. 322002

**McGUIREWOODS LLP**
Tower Two–Sixty
260 Forbes Avenue, 18th Floor
Pittsburgh, PA 15222–3142
(412) 667–6000 (Telephone)
(412) 667–6050 (Facsimile)
gkrock@mcguirewoods.com
ethomas@mcguirewoods.com

Jonathan T. Blank
Admitted *Pro Hac Vice*

**McGUIREWOODS LLP**
652 Peter Jefferson Parkway
Suite 350
Charlottesville, VA 22911
(434) 977–2500 (Telephone)
(434) 980–2222 (Facsimile)
jblank@mcguirewoods.com

*Counsel for Plaintiff Epsilon Energy USA, Inc.*

FILED
HARRISBURG, PA

MAY 0 7 2021

PER ___ 2182 _____
DEPUTY CLERK

## TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ........................................................................................1

II.   ARGUMENT...............................................................................................2

    A.   Question 1: Is Epsilon likely to succeed on the merits based on its interpretation that the Agreements allow Epsilon to act as Operator when CHK chooses to non-consent and chooses to not be the Operator? ............................................................................................2

        1.   The Settlement Agreement supports the answer of "Yes." ........2

        2.   The JOAs support the answer of "Yes." ....................................4

        3.   CHK cannot make a collateral motion to dismiss argument, and otherwise, Epsilon's claims are adequately pleaded............8

    B.   Question 2: Is Epsilon likely to succeed on the merits based on its interpretation that CHK is required to cooperate with Epsilon by allowing Epsilon to utilize the Craige well pad and related water sources to effectuate its well proposal under the Agreements? ..........10

        1.   Epsilon has a contractual right to access the Craige Well Pad ......................................................................10

        2.   Epsilon has a joint or co-owned interest in the applicable water sources................................................................................11

        3.   The Court's decision does not change that the water source is a joint or co-owned interest...................................................13

    C.   Question 3: Is CHK required to cooperate with Epsilon by not appealing Epsilon's PaDEP permits to drill the four wells at issue? *–The Settlement Agreement says "yes."* .............................................14

    D.   Question 4: Has Epsilon shown irreparable harm given the delay, potential for lost opportunities, and potential dilution of Epsilon's property interests if CHK is allowed to continue its uncooperative behavior? ............................................................................................16

E.    Question 5: Has Epsilon proven that the prejudice to CHK is outweighed by the harm to Epsilon and CHK's own obstructionist behavior, and that the public interest weighs in Epsilon's favor? ......18

F.    CHK must provide more support than speculation for a bond ...........19

III.   CONCLUSION..............................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Eagle Outfitters v. Lyle & Scott, Ltd.*,
   584 F.3d 575 (3d Cir. 2009) ...........................................................................7

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
   No. 3:06-CV-1105, 2011 WL 4916397 (M.D. Pa. 2011) ...........................20

*Bollinger v. Palmerton Area Communities Endeavor, Inc.*,
   361 A.2d 676 (Pa. Super. 1976) ......................................................................4

*CBM Ministries of S. Cent. Pa. v. Richards*,
   2017 WL 4150904 (M.D. Pa. Sep. 19, 2017)..................................................9

*Franklin Sugar Ref. Co. v. Howell*,
   118 A. 109 (Pa. 1922)......................................................................................6

*Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*,
   905 A.2d 462 (Pa. 2006)..................................................................................7

*Larson Texts, Inc. v. O'Neil*,
   1:19-cv-297-SPB, 2020 WL 5203617 (W.D. Pa. Sep. 1, 2020) .....................9

*Lever Bros. Co. v. International Chem. Workers Union*,
   554 F.2d 115 (4th Cir. 1976) ........................................................................20

*M&G Polymers USA, LLC v. Tackett*,
   574 U.S. 427 (2015)........................................................................................7

*Minard Run Oil Co. v. U.S. Forest Serv.*,
   670 F.3d 236 (3d Cir. 2011) ..........................................................................16

*NE Hub Partners, L.P. v. CNG Transmission Corp.*,
   239 F.3d 333 (3d Cir. 2001) ..........................................................................15

*Owens-Illinois, Inc. v. Lake Shore Land Co.*,
   610 F.2d 1185 (3d Cir. 1979) ..........................................................................9

*RoDa Drilling Co. v. Siegal*,
   552 F.3d 1203 (10th Cir. 2009) .....................................................................16

*Roe v. Chief Expl. & Dev, LLC*,
　　No. 4:11-CV-00579, 2013 WL 4083326 (M.D. Pa. Aug. 13, 2013) ..............3

*Stambaugh v. PNC Bank, N.A.*,
　　532 B.R. 572 (M.D. Pa. Bankr. 2015)...........................................................9

*Temple Univ. v. White*,
　　941 F.2d 201 (3d Cir. 1991) ........................................................................20

*Walney v. SWEPI LP*,
　　311 F. Supp. 3d 696 (W.D. Pa. 2018) ...........................................................7

**Rules**

§ R. Civ. P. 57 ...................................................................................................8

Fed. R. Civ. P. 65(c)........................................................................................19

Plaintiff Epsilon Energy USA, Inc. ("Epsilon"), by and through its undersigned counsel, submits the following Reply Brief in Support of Motion for Preliminary Injunction (ECF Nos. 5-6), and in response to Chesapeake Appalachia, LLC's ("CHK") Memorandum in Opposition (ECF No. 53).

## I.   INTRODUCTION

The Court will be confronted with the following questions at the May 11-12 hearing:

> 1. Is Epsilon likely to succeed on the merits based on its interpretation that the Settlement Agreement and Joint Operating Agreements ("the Agreements") allow Epsilon to act as Operator when CHK chooses to non-consent and chooses to not be the Operator?

> 2. Is Epsilon likely to succeed on the merits based on its interpretation that CHK is required to cooperate with Epsilon by allowing Epsilon to utilize the Craige well pad and related water sources to effectuate its well proposals under the Agreements?

> 3. Is Epsilon likely to succeed on the merits based on its interpretation that CHK is required to cooperate with Epsilon by not appealing Epsilon's PaDEP permits to drill the four wells at issue pursuant to the Agreements?

> 4. Has Epsilon shown irreparable harm given the delay, potential for lost opportunities, and potential dilution of Epsilon's property interests if CHK is allowed to continue its uncooperative behavior?

> 5. Has Epsilon proven that the prejudice to CHK is outweighed by the harm to Epsilon and CHK's own obstructionist behavior, and that the public interest weighs in Epsilon's favor?

Common sense, the Settlement Agreement, the Joint Operating Agreements ("JOAs"), the Farmout Agreement, industry custom and usage, CHK's own

documents and the witnesses at the May 11-12 hearing—including two of the oil and

gas industry's top experts—will answer each of the five questions "Yes," and allow

this Court to enter an injunction requiring the same.

## II.    ARGUMENT

### A.    Question 1: Is Epsilon likely to succeed on the merits based on its interpretation that the Agreements allow Epsilon to act as Operator when CHK chooses to non-consent and chooses to not be the Operator?

The Court should not have to look further than the Settlement Agreement

between the parties and common sense to answer the first question, but Epsilon has

significantly more evidence that will satisfy the Court and Epsilon's burden.

#### 1.    The Settlement Agreement supports the answer of "Yes."

The Settlement Agreement is straightforward—CHK is required to cooperate

with Epsilon if it declines to serve as the operator for Epsilon's proposed well.

Specifically, CHK confirmed:



ECF No. 1-5 ¶¶ 8(a), 8(d).   The Settlement Agreement thus enforces Epsilon's argument by laying out the following: (1) Epsilon may propose wells, (2) CHK does not have to consent to those wells or act as the operator, and (3) if CHK exercises its right to decline to serve as the operator, CHK will cooperate with the party designated as operator. On its face, the Settlement Agreement contemplates that the JOA allows another party (other than CHK) to be designated as operator.

CHK's argument that the JOAs do not allow another party to act as the Operator unless CHK is *removed* is only further evidence of CHK's failure to cooperate.   Either (1) Paragraph 8(d) means another party could be designated as operator—Epsilon's interpretation, *or* (2) CHK knew at the time it entered the Settlement Agreement that Paragraph 8(d) was a nullity—because no party other than CHK could ever be designated as the operator under the JOAs' terms—and CHK surreptitiously led Epsilon to believe it would be able to pursue development when CHK declined to operatorship.   As consideration for CHK's promise to cooperate with a party to be designated as operator, Epsilon surrendered its right to propose new wells until 2020. *See Roe v. Chief Expl. & Dev, LLC*, No. 4:11-CV-00579, 2013 WL 4083326, at *5 (M.D. Pa. Aug. 13, 2013) ("The Court . . . seeks to be faithful to the meaning that the parties—given their position at the time of contracting—would have given their words *ex ante*.").   Having received the benefit of the Settlement Agreement, CHK cannot now avoid the bargain it struck with

Epsilon by claiming that CHK's promise to cooperate with Epsilon's designated operator was illusory.

### 2.    The JOAs support the answer of "Yes."

Contrary to CHK's assertions, Epsilon is not seeking to remove CHK as the Operator under the JOAs.  CHK voluntarily elected not to act as the Operator for the Proposed Wells.  Accordingly, Epsilon merely seeks to enforce the JOA provisions that enable it to designate an operator for drilling when CHK declines to do so.

A common sense reading of the JOA language belies CHK's contention that new wells can only be drilled if all JOA parties agree to participate.  *See Bollinger v. Palmerton Area Communities Endeavor, Inc.*, 361 A.2d 676, 684 (Pa. Super. 1976) ("There is no canon against using common sense in construing a contract, so that a strained construction does not defeat its intent and purpose").  Under Article VI.2(a):

> If any party to whom such notice to Rework, Sidetrack, Deepen, Recomplete or Plug Back is delivered as provided in Article VI.B.1 or VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operations shall, no later than ninety (90) days after the expiration of the thirty (30) days…actually commence the proposed operation and complete it with due diligence.

ECF Nos. 1-1 – 1-4. CHK focuses on the language "Rework, Sidetrack, Deepen, Recomplete or Plug Back," contending that Article VI.2 only applies to those

4

operations.  This reading, however, is inconsistent with a common sense reading of the JOAs, the purpose of the JOAs, and the other provisions of the JOAs.

First, the sentence is an if/then clause. The inserted language does not modify the type of operations that may be taken by less than all parties but instead only establishes a time period for certain operations. The modification retains the 90-day commencement period for the listed operations but carves the drilling of new wells out of this 90-day commencement requirement *if* a drilling commencement date in excess of ninety (90) days is specified in the well proposal as provided for and allowed in Article XVI.A of the JOAs.

The following analogy supports Epsilon's interpretation.  If the standard agreement to rent a bicycle states that all minors must wear a helmet in order to ride the bike, but the parties insert "under the age of 15" after the word "minors," it is obvious the parties intended to remove a limitation (wearing a helmet) from a subset of minors (those 15 and over).  It would be absurd to conclude the added language was intended to prevent minors 15 and over from riding the bike.

In this instance, the first sentence in Section VI.2 of the Model Form imposes a limitation on the right to conduct any operation with fewer than all parties—the operation must commence within 90 days after the elections. Exhibit 1. The language the parties inserted in the JOAs was similarly intended to remove the

5

limitation (commencing the operation within 90 days) from a subset of operations (drilling a new well).

Second, the purpose of a JOA is to encourage joint development by the parties to the JOA. CHK's reading, allowing it unilateral decision-making power over development, is contrary to that purpose. *Franklin Sugar Ref. Co. v. Howell*, 118 A. 109, 110 (Pa. 1922) (recognizing "that every agreement is made and to be construed with due regard to the known characteristics of the business to which it relates . . . and hence the language used in the contract will be construed according to its purpose in a particular business . . .").

Finally, the parties did not modify or delete several other provisions in the JOAs that indicate (1) proposals to drill new wells may proceed even if one or more parties elect not to participate in the new well and (2) one of the consenting parties to the new well proposal may act as the operator if CHK elects not to conduct the drilling. For example, the very same Article VI.2(b) that CHK claims to exclude "drilling" expressly states:

- "If any well *drilled*, Reworked, Sidetracked, Deepened, Recompleted, or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in paying quantities, the *Consenting Parties* shall complete and equip the well to produce at their sole cost and risk, and then turned over to the Operator (*if the Operator did not conduct the operation*) and shall be operated by it at the expense and for the account of the Consenting Parties." (emphasis added).

6

- "Upon commencement of operations for the ***drilling***, Reworking, Sidetracking, Deepening, Recompleting, or Plugging Back" — once again, refers to ***drilling***. (emphasis added).

- "If the ***well to be drilled*** is the initial well in the Drilling Unit, the penalties in this subparagraph (ii) shall be 600/600% instead of 400/400%." (emphasis added).

In addition, Article XVI allows the addition of provisions to the JOAs and discusses drilling operations but does not include any language regarding a veto power held by the operator.[1]

Theses inconsistencies cannot be read out of the JOAs. When determining whether the language of an agreement is clear and unambiguous, the Court assumes the parties intend "all provisions in the agreement [to] be construed together and . . . given effect." *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 469

_____

[1] Epsilon will present the testimony of two of the leading experts in the oil and gas industry, Bruce Kramer and Dorsey Roach, at the hearing. Epsilon's experts will use industry custom and usage to support Epsilon's interpretations.

Epsilon may rely on extrinsic evidence to support its interpretation because courts are permitted to consider industry custom in interpreting the meaning of a contract, even if the contract is unambiguous. *See M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 439 (2015); *Walney v. SWEPI LP*, 311 F. Supp. 3d 696, 717 (W.D. Pa. 2018) ("Under Pennsylvania law, custom in the industry or usage in trade is always relevant and admissible in construing commercial contracts, even where no ambiguity otherwise exists.") (internal quotation marks omitted)).

In addition, courts are permitted to consider parol evidence if the contract is ambiguous. *American Eagle Outfitters v. Lyle & Scott, Ltd.*, 584 F.3d 575, 587-588 (3d Cir. 2009). While both parties contend the Agreements' language at issue is unambiguous, the interpretations proffered by Epsilon and CHK diverge sharply.

(Pa. 2006).  Under such a reading, CHK's interpretation fails.

Moreover, CHK's claim that Article VI.2's procedure for proceeding with operations when there is less than 100% participation does not apply to drilling new wells is inconsistent with its own conduct.  CHK itself has drilled at least four wells that it proposed even though other parties elected not to participate.  Exhibits 2 – 6 (election documents showing less than 100% participation for four CHK-proposed wells).  CHK drilled three of those in 2020, thus, this is a recent and familiar phenomenon that CHK has itself taken part.  CHK cannot claim rights for itself and then obstruct the exercise of those same rights for other JOA parties.

### 3.   CHK cannot make a collateral motion to dismiss argument, and otherwise, Epsilon's claims are adequately pleaded.

Whether Epsilon may seek injunctive, declaratory, and specific performance as forms of relief without a separate claim for breach of contract is a collateral argument CHK should have pursued in a motion to dismiss.  This Court should disregard these arguments as procedurally improper.

Even so, CHK's contentions fail.  First, Epsilon may pursue a declaratory judgment before or after breach of a written instrument—a breach is not required to pursue such a claim.  Fed. R. Civ. P. 57, Advisory Committee Notes.  Additionally, the "existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate."  *Id.*  The only requirement is that there be an actual "case or controversy," and CHK does not claim this does not exist and cannot make

such a claim. *See Larson Texts, Inc. v. O'Neil*, 1:19-cv-297-SPB, 2020 WL 5203617, at *5-6 (W.D. Pa. Sep. 1, 2020) (denying motion to dismiss an action with only a single claim for declaratory relief).

Second, Epsilon does not need to tie its specific performance claim to a breach of contract; a declaratory judgment action can support it. *Stambaugh v. PNC Bank, N.A.*, 532 B.R. 572, 578 (M.D. Pa. Bankr. 2015) ("A declaratory judgment action seeking specific performance, or injunctive relief, is clearly equitable in nature. A declaratory judgment action seeking damages, or another legal remedy, is a legal claim.") (citation omitted); *Owens-Illinois, Inc. v. Lake Shore Land Co.*, 610 F.2d 1185, 1190 (3d Cir. 1979) (finding the availability of declaratory judgment allowed plaintiff to accelerate a specific performance suit).

Finally, the pairing of injunctive and declaratory judgment relief is something this Court has allowed before as noted in the authority cited by CHK in its opposition (ECF No. 53, at 12). *See CBM Ministries of S. Cent. Pa. v. Richards*, 2017 WL 4150904, at *2 (M.D. Pa. Sep. 19, 2017) (noting the Court granted the preliminary injunction because plaintiff "demonstrated a likelihood of success on its claim under the Pennsylvania Declaratory Judgments Act."). Accordingly, while this Court is not required to consider them, CHK's arguments are unfounded.

**B.**     **Question 2: Is Epsilon likely to succeed on the merits based on its interpretation that CHK is required to cooperate with Epsilon by allowing Epsilon to utilize the Craige well pad and related water sources to effectuate its well proposal under the Agreements?**

The answer to Question 2 under either of the Agreements is "Yes."

**1.     Epsilon has a contractual right to access the Craige Well Pad.**

Again, CHK was required to "comply with all obligations under the JOAs" and agreed it would not "unreasonably withhold cooperation." ECF No. 1-5, ¶¶ 8(a), 8(d).  The JOAs address how a proposed operation will proceed if the operator—here, CHK—does not wish to act as operator for an operation in which it has elected not to participate.  In those circumstances, the JOAs require that CHK provide access to all property interests available to develop the Contract Area.  ECF Nos. 1-1 – 1-4, at Art. VI.2(a), V.D.5, VII.A.  In the oil and gas industry, the operator customarily is the "record owner" of certain jointly-owned assets and exercises day-to-day control over assets like well pads, access roads, and water impoundments.  A temporary operator, like Epsilon, will need access to those jointly-owned assets to drill its wells.  As such, both the terms of the Agreements and industry custom and practice support a finding that CHK must grant Epsilon access to the Craige Well Pad.

Even if that was not the case, Epsilon and CHK have joint-interests in the Craige Well Pad because Epsilon contributed to the development and maintenance of the Craige Well Pad and has a net revenue interest of almost 30% in the Craige

1H & Craige 2H, the two wells currently producing from the Craige Well Pad—almost matching CHK (Epsilon has 29.166532%, CHK has 30.212873%). In the JOAs, "all equipment and materials acquired in operations on the Contract Area shall be owned by the parties as their interests are set forth in Exhibit A." ECF Nos. 1-1 – 1-4., Art. III.B. The Craige Well Pad was acquired in operations on the Contract Area and is therefore owned by the JOA parties, including Epsilon.[2] Consequently, Epsilon has a jointly-owned interest to access the Craige well pad.

### 2. Epsilon has a joint or co-owned interest in the applicable water sources.

First, the Settlement Agreement constitutes an admission that co-owned impoundments and water withdrawal points exist. While CHK omits the end of paragraph 8(d) of the Settlement Agreement from its opposition, the final phrase is pivotal to answering this question. ECF No. 53, at 5. CHK agreed that its cooperation would include providing ██████████████████████████ ████████████████████████ ECF No. 1-5 (emphasized text designates the language omitted by CHK). CHK likely omitted this language because it does not make sense that CHK would agree to provide access to co-owned impoundments

---

2 Further, Epsilon also contributed a 50% interest in the lease to the Craige property through the Farmout Agreement; the JOA parties (including CHK) would not have built the Craige Well Pad but for Epsilon's lease interest.

11

and water withdrawal points, like the Marbaker Impoundment and Wyalusing Creek water withdrawal ("Wyalusing Creek"), if no such co-owned assets actually exist.

Second, the reference to co-owned water withdrawal points in the Settlement Agreement could only refer to Wyalusing Creek. At the time of the Settlement Agreement, the only water withdrawal source that Epsilon owned was Wyalusing Creek, which it co-owned with CHK. Further, as Epsilon has previously presented to the Court, CHK charged Epsilon for the construction and use of the Marbaker Impoundment in conjunction with the drilling of wells under the JOAs. ECF No. 29. The Settlement Agreement's reference to co-owned impoundments referred to impoundments like the Marbaker Impoundment, which Epsilon paid to construct.

Third, Epsilon has set forth the chain of docketing from the SRBC for Wyalusing Creek. ECF Nos. 15, 29. CHK has focused on three issues it claims proves Epsilon is not a co-owner of Wyalusing Creek: (1) the March 31, 2010 letter from Epsilon to CHK, (2) the language in Docket No. 20110607, and (3) the language in the SRBC Commitment Letter.

As to the March 31, 2010 letter, Epsilon has obtained the declaration of Daniel Ward, the signatory of the March 31, 2010 letter CHK relies on for its claim that Epsilon transferred equitable ownership of Wyalusing Creek. Mr. Ward clarifies the letter only transferred the docket because Epsilon was no longer acting as the SRBC project sponsor, and the docket therefore had to be in CHK's name. Exhibit 7,

May 3, 2021 Declaration of Daniel J. Ward.

CHK's claim regarding Docket No. 20110607 fairs no better. Docket No. 20110607, when paired with the other applicable SRBC dockets and SRBC's regulations and advice to Epsilon, cannot be read to foreclose Epsilon's co-ownership rights. While Docket No. 20110607 states it "supersedes and rescinds" Docket Nos. 20081227 and 20090610 (ECF No. 27-3, at § 7-Condition 18), the SRBC later stated: "[b]ecause this approval is consolidating the *existing* approved withdrawals listed above [Docket Nos. 20081227 and 20090610], and as specified in Condition 18 in Section 7, all conditions of the dockets referenced above are superseded by this approval." *Id.* at § 5. Moreover, as Epsilon previously set out for the Court, Docket No. 20121209, and the SRBC's own records, indicate Docket No. 20081227 was consolidated into Docket No. 20121209. ECF No. 29.

Finally, the SRBC Commitment Letter does not support that CHK exclusively owns the water source simply because of a reference to a "Water Sharing Agreement" or CHK to "sell water" to Epsilon. ECF No. 1-6; Exhibit 8. The right to take water is separate from the obligation to pay for any water taken. Epsilon's use of the Water Sharing Agreement was a proactive approach to reimburse CHK for those fees for the water that Epsilon takes.

### 3. The Court's decision does not change that the water source is a joint or co-owned interest.

CHK spends significant time parroting this Court's decision denying

13

expedited relief related to the SRBC Commitment Letter. CHK fails to discuss, however, that the Court denied Epsilon's request *without prejudice*, ECF No. 44, at 1, and also found: "Epsilon could seek to introduce extrinsic evidence to allow the court to reach [the] conclusion" that Epsilon did not transfer its entire interest in Wyalusing Creek. *Id.* at 21. That is precisely what Epsilon will do at the hearing through various witnesses and documentary evidence. *See id.* at 22 ("evidence may subsequently come to light that would support the conclusion that the Wyalusing Creek water source is not exclusively owned by Chesapeake").

C.   **Question 3: Is CHK required to cooperate with Epsilon by not appealing Epsilon's PaDEP permits to drill the four wells at issue? –*The Settlement Agreement says "yes."***

In addition to providing access to co-owned assets, CHK's obligation under Paragraph 8(d) of the Settlement Agreement requires it to assist the designated operator with permitting. CHK breached this obligation by appealing the drilling permits that Epsilon obtained from the PaDEP for the Proposed Wells. Epsilon maintained contact with CHK throughout the fall and winter of 2020 regarding its Proposed Wells and the permitting process, provided this information with its December 22, 2020 Well Proposals, and then again had correspondence with CHK about them in January 2021. CHK was well aware of Epsilon's process and belatedly waited until March 2021 to file an untimely Environmental Hearing Board ("EHB") appeal with little substantive support—if any. These actions speak only to

14

delay and this Court should find CHK has not fulfilled its good faith cooperation obligations.

Despite its duty to cooperate, CHK forwards an illusory argument when it claims Epsilon cannot drill its proposed wells because it is not the permitted entity of the corresponding well permits, instead Epsilon Operating LLC ("Epsilon Operating") is the entity on those permits. Article XV.B of the JOAs states that the JOAs are binding and may benefit "the parties hereto and their respective . . . legal representatives." ECF No. 1-1 – 1-4. Epsilon Operating is a 100% wholly owned subsidiary of Epsilon. Exhibit 9, Epsilon Operating's LLC Agreement, at § 3.1 (indicating the sole member of Epsilon Operating is Epsilon). Epsilon Operating is engaged as a legal representative of Epsilon. Regardless, there is nothing in the JOAs requiring Epsilon to complete everything for the drilling of proposed wells in its own name.

Finally, CHK's claim that Epsilon has failed to submit an area review survey again reinforces CHK's bad faith failure to cooperate with Epsilon's permitting. If CHK believes Epsilon failed to follow any permitting requirement, CHK was obligated to cooperate and not file an appeal with the EHB to torpedo the permit.[3]

_____

3 CHK repeats this argument to support its claim that Epsilon is not irreparably harmed. However, the PaDEP has issued the permits and CHK's appeal does not negate the permits' effectiveness. *See NE Hub Partners, L.P. v. CNG Transmission*

15

**D.   Question 4: Has Epsilon shown irreparable harm given the delay, potential for lost opportunities, and potential dilution of Epsilon's property interests if CHK is allowed to continue its uncooperative behavior?**

CHK weakly attempts to dissuade this Court from applying the principles set forth in *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236 (3d Cir. 2011) and *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203 (10th Cir. 2009). Epsilon never argued *Minard Run* set forth a *per se* rule, instead Epsilon highlighted the *Minard Run* court's holding that where "interests involving real property are at stake, preliminary injunctive relief can be particularly appropriate because of the unique nature of the property interest." *Minard Run*, 670 F.3d at 256 (depriving mineral right owners of their "unique oil and gas extraction opportunities" constituted irreparable injury). Epsilon's real property interests *are* at stake and thus preliminary injunctive relief is "particularly appropriate." *Id.*

Additionally, CHK cursorily attempts to address *RoDa Drilling*. ECF No. 53, at 25 n.16. However, as CHK quoted, the Court found irreparable harm because the defendant's action "resulted in delays, missed opportunities, and most, importantly, unquantifiable damages." *Roda Drilling*, 552 F.3d at 1211. Epsilon faces delays, potential missed opportunities, and unquantifiable damages. And, despite CHK's

---

*Corp.*, 239 F.3d 333, 346 (3d Cir. 2001) (recognizing that PADEP permits are valid even when state administrative appeals are filed).

superficial contention Epsilon has not been denied the right to "participate in everyday operations of its own interest," *id.*; that is precisely what CHK has done.

CHK's lack of cooperation has led to Epsilon being unable to exercise its contractually granted rights under the Agreements to propose wells and to have CHK cooperate. Epsilon cannot simply re-propose because the same conditions that existed in December and January when it determined to make the proposals and received consent from other JOA parties, and now in May for drilling, may not exist once its proposals finally proceed—dissipating Epsilon's development opportunities. Epsilon's mineral interests are also subject to potential depletion by neighboring wells drilled by Cabot Oil that may be causing drainage from the underlying Craige Unit. In addition, Epsilon's proposal would then be second to CHK's Koromlan Well Proposal. While Epsilon believes the Koromlan Well Proposal does not meet the JOA requirements, if it were found to be sufficient, Epsilon's proposals would then be second in time.

Additionally, CHK's allegation that Epsilon has not fulfilled JOA requirements for seeking a 30-day extension for its well proposals, placing its deadline at May 22, 2021, does not apply to other Non-Consenting Parties such as CHK. For three of the four well proposals, there are no other Consenting Parties so no notice is required. Even if CHK can object, it is not fatal to the fourth well proposal because Epsilon is serving the notice required under Article VI.

Finally, CHK also attempts to contend that because Epsilon previously sought monetary damages and filed a Reservation of Rights in CHK's bankruptcy proceeding, Epsilon cannot prove it faces irreparable harm. ECF No. 53 at 21-22. However, as Epsilon has maintained all along, a party may pursue claims in the alternative. Epsilon initially made monetary damages claims in the event this Court denied it injunctive and equitable relief. CHK cannot reasonably argue the opposite.

**E.    Question 5: Has Epsilon proven that the prejudice to CHK is outweighed by the harm to Epsilon and CHK's own obstructionist behavior, and that the public interest weighs in Epsilon's favor?**

CHK's claims that if displaced as the operator it would have significant financial harm and that the public interest is better served by the drilling of the Koromlan Well are imagined and speculative. First, CHK *chose* not to act as operator, Epsilon did not seek to displace CHK. CHK's allegation of harm is one created by its uncooperative posture.

Second, CHK has no evidence or proof wells developed under the JOA from the Craige Well Pad (which are jointly-owned by the JOA parties, including Epsilon)[4] are more likely to be damaged if Epsilon were operator than if CHK acted as operator. Epsilon will provide contrary proof, and cooperation by CHK will allay any issues that could arise with two operators on the Craige well pad. Additionally,

---

4 Epsilon owns almost a matching interest to CHK (Epsilon has 29.166532%, CHK has 30.212873%).

CHK has at least conceded that another JOA party may act as operator to "rework, sidetrack, deepen, recomplete or plug back operations" under Article VI.2(a). ECF No. 53, at 4. Those are all operations that must be performed from the existing well pad for the drilled well and undermines CHK's argument that it owns and has exclusive control to the pad. Further, these operations require the same expertise needed to drill a well and involve the same challenges, which belies CHK's contention it may prohibit others from using the pad.

Third, CHK's arguments that the public interest is better served by drilling the Koromlan Well is an unsupported straw man. Other JOA parties consented to Epsilon's Craige South Well, essentially cancelling CHK's argument that other JOA parties have consented to its Koromlan well proposal.[5]

**F.    CHK must provide more support than speculation for a bond.**

CHK is unclear about what amount it is seeking for a bond, regardless, its claim that it "will be harmed millions" is speculative. ECF No. 53, at 28. As this Court is well aware, it has wide discretion in setting the amount of an injunction bond. Fed. R. Civ. P. 65(c). Epsilon hopes this Court sees CHK's blatant attempt to strong-arm Epsilon and continue willfully disregarding the Agreements in setting

---

5 Additionally, CHK's claim that "other parties to the JOAs have elected against Epsilon's Proposed Wells…" is inaccurate. ECF No. 53, 26-27. A party cannot elect against a proposal, it can only consent, non-consent, or non-consent with a conflicting well proposal.

an appropriate bond amount.  Epsilon is a smaller entity seeking to enjoin CHK from willfully violating the Agreements.  *See Temple Univ. v. White*, 941 F.2d 201, 219-20 (3d Cir. 1991) (considering applicant's ability to pay); *see also Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 3:06-CV-1105, 2011 WL 4916397, at *5 (M.D. Pa. 2011) (analyzing whether a requested bond amount was "excessive" or "speculative").

"Moreover, damages claimed under an injunction bond must are those that arise from the operation of the injunction itself and not from damages occasioned by the suit independently of the injunction." *Lever Bros. Co. v. International Chem. Workers Union*, 554 F.2d 115, 120 (4th Cir. 1976).  Consequently, this Court should not consider CHK's speculative allegation that something will happen to wells developed under the JOA from the Craige Well Pad (which are jointly-owned by the JOA parties, including Epsilon) because it is independent of the injunctive relief sought.

## III.   CONCLUSION

For these reasons, as well as those set forth in Epsilon's principal Brief in Support, Epsilon requests that the Court grant the relief requested in Epsilon's Motion for Preliminary Injunction and Proposed Order.

Dated: May 6, 2021                              Respectfully submitted,

                                                /s/     *Gregory J. Krock*_____.
                                                Gregory J. Krock
                                                Pa. I.D. No. 78308
                                                Elizabeth M. Thomas
                                                Pa. I.D. No. 322002

                                                MCGUIREWOODS LLP
                                                Tower Two-Sixty
                                                260 Forbes Avenue, Suite 1800
                                                Pittsburgh, PA 15222-3142
                                                (412) 667-6000 (Telephone)
                                                (412) 667-6050 (Facsimile)
                                                gkrock@mcguirewoods.com
                                                ethomas@mcguirewoods.com

                                                Jonathan T. Blank
                                                Admitted *Pro Hac Vice*
                                                MCGUIREWOODS LLP
                                                652 Peter Jefferson Parkway
                                                Suite 350
                                                Charlottesville, VA 22911
                                                (434) 977-2500 (Telephone)
                                                (434) 980-2222 (Facsimile)
                                                jblank@mcguirewoods.com

                                                *Counsel for Plaintiff*
                                                *Epsilon Energy USA, Inc.*

## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

EPSILON ENERGY USA, INC.,

               Plaintiff,

     v.

CHESAPEAKE APPALACHIA, LLC,

               Defendant.

Civil Action No. 1:21-cv-00658

District Court Judge Wilson

### CERTIFICATE OF COMPLIANCE REGARDING BRIEF

The undersigned hereby certifies that this Memorandum of Law complies with the word–count limitations contained in Rule 7.8(b)(2) of the Local Rules for the United States District Court for the Middle District of Pennsylvania. Exclusive of the tables of contents and authorities, the Memorandum of Law contains 4,966 words according to the word count function the Microsoft Word 2010 software with which the memorandum was produced.

               /s/     *Gregory J. Krock*

               Gregory J. Krock
               Pa. I.D. No. 78308

               MCGUIREWOODS LLP
               Tower Two-Sixty
               260 Forbes Avenue, Suite 1800
               Pittsburgh, PA 15222-3142
               (412) 667-6000 (Telephone)
               (412) 667-6050 (Facsimile)
               gkrock@mcguirewoods.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing

**Reply Brief in Support of Motion for Preliminary Injunction** has been

electronically served on the parties via the CM/ECF filing system.

*/s/ Gregory J. Krock*_____
Gregory J. Krock