## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EPSILON ENERGY USA, INC., | : | Civil No. 1:21-CV-00658 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CHESAPEAKE APPALACHIA, LLC, | : | |
| | : | |
| Defendant. | : | Judge Jennifer P. Wilson |

### MEMORANDUM

This is a diversity action that calls upon the court to interpret the language of several contracts between two oil and gas companies. The case is presently before the court on a motion for a mandatory preliminary injunction filed by Plaintiff Epsilon Energy USA, Inc. ("Epsilon") that would significantly alter the current operational "status quo." (Doc. 5.) For the reasons that follow, the motion is denied.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY OF PRIOR CASES

Epsilon is an Ohio corporation with its principal place of business in Texas. (Doc. 4, ¶ 1; Doc. 72, ¶ 1.) Defendant Chesapeake Appalachia, LLC ("Chesapeake") is an Oklahoma corporation with its principal place of business in that state. (Doc. 4, ¶ 4; Doc. 72, ¶ 4.) Beginning in 2009, Epsilon, Chesapeake, and several other oil and gas companies entered into several Joint Operating Agreements ("JOAs") for the purpose of developing natural gas at locations in

1

Pennsylvania.[1]  (*See* Plaintiff's Exhibit 1 – Craige JOA; Plaintiff's Exhibit 28 –

Baltzley South JOA; Plaintiff's Exhibit 29 – Baltzley North JOA.)  Epsilon and

Chesapeake also entered into a Farmout Agreement[2] on February 1, 2010, that

incorporated the parties' earlier Poulsen JOA.  (Plaintiff's Exhibit 18 – Farmout

Agreement.)

Chesapeake is designated as the operator under the JOAs, which accordingly

requires Chesapeake to "conduct and direct and have full control of all operations

on the Contract Area as permitted and required by, and within the limits of [the

JOAs]".  (JOAs, Art. V.A.)[3]  Chesapeake may be permanently removed as operator

under a JOA for good cause upon the affirmative vote of other JOA parties that

own a majority interest of the property that is subject to the JOA.  (JOAs, Art.

V.B.1.)  In order for such a vote to be effective, a written notice must be provided

---

[1] The four JOAs relevant to this case are the Baltzley North JOA, dated October 18, 2010, the Baltzley South JOA, dated October 18, 2010, the Craige JOA, dated December 16, 2010, and the Poulsen JOA, which was a draft model JOA that was subsequently incorporated into the Farmout Agreement between Epsilon and Chesapeake.

[2] A farmout agreement is an agreement between oil and gas operators in which one operator assigns all or part of its oil or gas lease to another operator for the purpose of drilling under the lease.  58 C.J.S. *Mines* § 401 *Farmout Agreement for Transfer of Rights Under Oil and Gas Lease*, Westlaw (database updated March 2021).

[3]  The relevant articles and sections of the four JOAs at issue are identically labeled and the parties agree that the relevant provisions of the JOAs are legally indistinguishable.  (*See* Transcript, May 11, 2021, pp. 90–91.)  Accordingly, the court will cite the JOAs collectively as "JOAs" throughout this opinion.

to Chesapeake detailing its alleged defaults as operator. (*Id.*) Chesapeake then has thirty days in which to cure such defaults. (*Id.*)

Although Chesapeake is the operator, the JOAs provide that any party to the JOAs may propose the drilling of a new well or propose a project to rework, sidetrack, deepen, recomplete, or plug back a well. (*Id.* Art. VI.1.) A party proposing such work is required to provide the other JOA parties with written notice of the proposal "specifying the work to be performed, the location, proposed depth, objective Zone, and the estimated cost of the operation." (*Id.*) The other parties have thirty days after receipt of the notice "within which to notify the party proposing to do the work whether they elect to participate in the cost of the proposed operation." (*Id.*)

The JOAs require different procedures for projects that have received the unanimous consent of the JOA parties and projects that have not received unanimous consent. When a project has received unanimous consent:

> the parties shall be contractually committed to participate therein provided such operations are commenced within the period hereafter set forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of the parties participating therein; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time

3

is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior proposal had been made.

(*Id.* Art. VI.1.) When, on the other hand, a proposal receives less than unanimous support:[4]

the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2 [sic], shall comply with all terms and conditions of this agreement.

---

[4] The parties dispute whether Article VI.2(a), which specifies the procedures for certain projects receiving less than unanimous support, applies to proposals to drill new wells. As set forth below, the court does not need to resolve this dispute for the purpose of ruling on the instant motion because Epsilon's well proposals in the instant case have expired. Accordingly, nothing in this opinion shall be construed as ruling on whether Article VI.2(a) applies to proposals to drill new wells.

(*Id.* Art. VI.2(a).)

In 2018, a dispute arose over whether Chesapeake was complying with the JOAs with regard to wells proposed by Epsilon. The dispute led to Epsilon filing suit against Chesapeake in this district in September 2018. (*See* Plaintiff's Exhibit 6 – *Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, No. 3:18-CV-01852 (M.D. Pa. filed Sept. 20, 2018) [hereinafter *Epsilon I*].) Epsilon moved for preliminary injunctive relief in the suit. (*Epsilon I*, Doc. 2.) United States District Judge Malachy E. Mannion scheduled the case for a preliminary injunction hearing. (*Epsilon I*, Doc. 17.) Before the court conducted the hearing, however, the parties settled the case. (Plaintiff's Exhibit 7 – Settlement Agreement.)

As part of the settlement agreement, the parties agreed that Epsilon could propose new wells under the JOAs "in accordance with the terms of the JOAs." (*Id.* ¶ 8.) The parties further agreed that if Chesapeake did not consent to a proposal and did not agree to act as the operator, Chesapeake would "cooperate with the party designated, to the extent permitted under the JOA, as operator" and would "not unreasonably withhold cooperation, including but not limited to, permitting and access to co-owned assets, such as water withdrawal points and impoundments." (*Id.* ¶ 8.d.)

The present dispute arises from well proposals that Epsilon made in December 2020.  (*See* Doc. 1.)  Epsilon and Chesapeake began discussing the proposed wells via email in May 2020.  (*See* Plaintiff's Exhibit 26 – Emails Between Henry Clanton and Julie Woodard.)  Discussions between the parties as to the proposed wells continued throughout 2020, with the parties disagreeing as to whether Epsilon would be allowed to proceed with the proposal without Chesapeake's consent.  (*See id.*)

Epsilon formally proposed the four new wells on December 22, 2020, which would be located on the Craige Well Pad in Rush Township, Susquehanna County. (*See* Plaintiff's Exhibits 30–33 – Craige Well Proposals.)  The proposed wells were labeled as Craige N 1LH, Craige N 1UHC, Craige N 4UHC (collectively, "the Craige North Wells"), and Craige S 3LHC ("the Craige South Well").  (*Id.*) Epsilon Operating LLC, a wholly owned subsidiary of Epsilon, applied for drilling permits with the Pennsylvania Department of Environmental Protection ("DEP") in connection with the well proposals on December 8, 2020.  (*See* Plaintiff's Exhibit 12.)

JOA parties Chief Oil & Gas LLC ("Chief"), Radler 2000 Limited Partnership ("Radler"), and Tug Hill Marcellus, LLC ("Tug Hill") elected to participate in the Craige South Well, but the other parties to the JOA governing the Craige South Well—namely Equinor Onshore Properties, Inc. ("Equinor"),

Jamestown Resources, LLC ("Jamestown"), Enerplus Resources (USA) Corp. ("Enerplus"), and Unconventionals Natural Gas, LLC ("Unconventionals")— elected not to participate in the Craige South Well. (Doc. 1, ¶ 76; Doc. 72, ¶ 76.) The other parties to the JOA governing the Craige North Wells—namely Equinor and Jamestown—similarly elected not to participate in the Craige North Wells. (Doc. 1, ¶ 77; Doc. 72, ¶ 77.)

On January 19, 2021, Chesapeake advised that it would not participate in the drilling of the proposed Craige Wells and that it would not serve as the operator on the projects. (Doc. 1, ¶ 80.) Chesapeake also stated its position that Epsilon was not allowed to serve as the operator with regard to the proposed wells and refused to grant Epsilon access to the Craige Well Pad on that basis. (*Id.*) In a separate communication on January 19, 2021, Chesapeake proposed a separate well, labeled the Koromlan 107HC ("Koromlan Well"), which Chesapeake asserted would conflict with the proposed Craige Wells. (Doc. 1, ¶¶ 81–82.) Chesapeake announced plans to drill the Koromlan Well in January 2022. (*Id.* ¶ 83.)

Subsequent to the proposal of the Craige Wells, Epsilon sent a draft commitment letter ("SRBC Letter") to Chesapeake that sought confirmation that Chesapeake was willing to provide water to Epsilon for the Craige Wells in accordance with permits that Chesapeake held with the Susquehanna River Basin Commission ("SRBC"). (*See* Plaintiff's Exhibit 27 – SRBC Letter.) Chesapeake

informed Epsilon on February 11, 2021 that it would not sign the letter. (Doc. 1, ¶ 98.)

Epsilon brought suit against Chesapeake on March 10, 2021, seeking a declaration that if Chesapeake does not participate in the proposed Craige Wells, Epsilon has the right to drill the wells, Chesapeake is required to allow Epsilon to access and use jointly owned assets, and Chesapeake must cooperate with the operator of the proposed wells in order to facilitate the drilling of the wells. (*See* Defendant's Exhibit 41 – *Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, No. 1:21-CV-00433 (M.D. Pa. filed Mar. 10, 2021) [hereinafter *Epsilon II*].) The complaint also brought claims for breach of the parties' JOAs and breach of the parties' settlement agreement in *Epsilon I*, sought a declaration that Chesapeake's proposed Koromlan Well did not comply with the terms of the JOAs, and sought specific performance and injunctive relief. (*Epsilon II*, Doc. 5.)

Epsilon filed a motion for preliminary injunction in *Epsilon II* on March 10, 2021. (Doc. 7.) The court conducted a status conference with the parties on March 26, 2021 to discuss a briefing schedule for the preliminary injunction motion and to schedule a hearing on the motion. During that call, the parties discussed the fact that Chesapeake's filing for Chapter 11 bankruptcy was currently being litigated in the United States Bankruptcy Court for the Southern District of Texas ("the Bankruptcy Court") and that Chesapeake had recently filed

a motion for emergency relief in the bankruptcy court seeking to enjoin Epsilon from proceeding with a suit against Chesapeake in this district.

Following the March 26, 2021 conference, the court issued a scheduling order that set a briefing scheduled for Epsilon's motion for preliminary injunction, scheduled a preliminary injunction hearing, and set an expedited schedule for letter briefs on the issue of whether Chesapeake should be compelled to sign the SRBC Letter. (*Epsilon II*, Doc. 25.)

The Bankruptcy Court granted Chesapeake's motion for emergency relief on March 30, 2021, ordering Chesapeake to dismiss the case in this district without prejudice and specifying that Chesapeake could refile the case subject to conditions laid out by the Bankruptcy Court. (*See Epsilon II*, Doc. 30-1; *see also In re Chesapeake Energy Corp.*, No. 20-33233 (Bankr. S.D. Tex. hearing held Mar. 30, 2021).) Chesapeake complied with the Bankruptcy Court's order on April 5, 2021 and filed a notice of voluntary dismissal. (*Epsilon II*, Docs. 31–32.) This court accepted the notice of voluntary dismissal on April 6, 2021 and formally closed the case. (*Epsilon II*, Doc. 33.)

## PROCEDURAL HISTORY OF THE PRESENT CASE

Epsilon filed the instant case on April 9, 2021, moving for a preliminary injunction and expedited discovery on the same day. (Docs. 4–5, 7.) On April 12, 2021, the court scheduled a status conference for April 19, 2021. (Doc. 13.) Prior

to the conference, Epsilon filed a letter brief on the SRBC Letter issue in conformity with the requirements that the court had previously imposed in *Epsilon II*. (Doc. 15.)  The court accordingly set an expedited schedule for an opposition letter brief and reply letter brief on that issue.  (Doc. 16.)

On April 16, 2021, Chesapeake moved to dismiss the case for failure to join an indispensable party under Federal Rule of Civil Procedure 12(b)(7).  (Doc. 22.) The motion sought dismissal on the grounds that Epsilon had failed to join the other parties to the JOAs, which Chesapeake contended were indispensable parties under Federal Rule of Civil Procedure 19.  (*Id.*)

The court conducted the scheduled status conference on April 19, 2021, after which the court issued an order that (a) set briefing schedules as to the motion to dismiss, the motion for preliminary injunction, and the motion for expedited discovery; (b) scheduled oral argument on the SRBC Letter issue; and (c) scheduled a preliminary injunction hearing for May 11, 2021 and May 12, 2021. (Doc. 26.)

On April 26, 2021, the court denied Chesapeake's motion to dismiss for failure to join an indispensable party, concluding that the absent JOA parties were necessary parties under Federal Rule of Civil Procedure 19(a), but that they were not indispensable parties under Rule 19(b).  (Docs. 33–34.)  On April 27, 2021, the court denied Epsilon's request for preliminary injunctive relief on the SRBC Letter

issue without prejudice, concluding that Epsilon had not shown a sufficient likelihood of success on the merits as to that issue. (Docs. 44–45.) The court then denied Epsilon's motion for expedited discovery on May 3, 2021. (Docs. 50–51.)

Chesapeake filed a brief in opposition to the motion for preliminary injunction on May 3, 2021, and Epsilon filed a reply brief in support of the motion on May 7, 2021. (Docs. 53, 55.) Immediately thereafter, Chesapeake filed a motion to strike Epsilon's reply brief and to preclude Epsilon from calling two expert witnesses—Dorsey Roach and Bruce Kramer—during the preliminary injunction hearing. (Doc. 56.) The court conducted a status conference with counsel later on May 7, 2021, during which the court conducted oral argument on the motion to strike and/or preclude expert testimony. (*See* Doc. 62.) During the status conference, the court set a briefing schedule as to the portion of the motion that sought to strike Epsilon's reply brief and granted the motion to the extent that it sought to preclude expert testimony during the preliminary injunction hearing scheduled on May 11 and May 12, 2021. (*See id.*) The court accordingly gave Epsilon a choice to either proceed on May 11, 2021 without expert testimony or to postpone the hearing until July 2021. (*See id.*) The court subsequently memorialized its directions to counsel via an order on May 8, 2021. (*Id.*)

Epsilon moved for reconsideration of the court's order regarding the expert testimony of Roach and Kramer on May 9, 2021. (Doc. 64.) Epsilon's motion

sought two forms of relief: (1) reconsideration by the court as to the decision to exclude Epsilon's expert witnesses from testifying during the preliminary injunction hearing and (2) a ruling that Epsilon may introduce its experts' written reports as part of the preliminary injunction record.  (Doc. 65.)  On May 10, 2021, the court denied the motion as moot to the extent that it sought reconsideration of the decision to bar Roach and Kramer from testifying during the May 11, 2021 hearing and deferred ruling on the admissibility of the expert reports pending a decision during the hearing.  (Doc. 71.)  Chesapeake then filed an answer to Epsilon's complaint later on May 10, 2021.  (Doc. 72.)

The court conducted the preliminary injunction hearing as scheduled on May 11, 2021 and May 12, 2021.  The court heard testimony in the hearing from Michael Raleigh ("Raleigh"), Epsilon's Chief Executive Officer, and Henry Clanton ("Clanton"), Epsilon's Chief Operating Officer.  The parties also proffered a stipulation to the court in lieu of testimony from Lane Bond, Epsilon's Chief Financial Officer.  The court received into evidence declarations from Daniel J. Ward, who was formerly employed by Epsilon as a geophysicist and expiration manager; Scott Glenn, Chesapeake's Project Manager for the Northern Region; and Paul Atwood, Epsilon's Vice President of Financial Planning and Analysis. During the hearing, Epsilon admitted forty-nine exhibits into evidence, and Chesapeake admitted six exhibits into evidence.  The court admitted Roach's

expert report into evidence, but ruled that Kramer's expert report was inadmissible. On May 13, 2021, Chesapeake filed a reply brief in support of its motion to strike Epsilon's reply brief. (Doc 78.) The motion for preliminary injunction and the corresponding motion to strike are accordingly ripe for the court's disposition.

## JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1332, which allows a district court to exercise subject matter jurisdiction where the parties are citizens of different states and the amount in controversy exceeds $75,000.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 65 allows a district court to enter a preliminary injunction. To obtain a preliminary injunction, plaintiffs must establish (1) that they are likely to prevail on the merits of the case; (2) that they would suffer irreparable harm if preliminary injunctive relief were denied; (3) that the harm defendants would suffer from the issuance of an injunction would not outweigh the harm plaintiffs would suffer if an injunction were denied; and (4) that the public interest weighs in favor of granting the injunction. *Holland v. Rosen*, 895 F.3d 272, 285–86 (3d Cir. 2018) (citing *Del. Strong Families v. Att'y Gen. of Del.*, 793 F.3d 304, 308 (3d Cir. 2015)). The first two factors are "gateway factors": if the plaintiffs have not established those factors, the court need not consider the last two factors. *Greater Phila. Chamber of Commerce v. City of*

*Phila.*, 949 F.3d 116, 133 (3d Cir. 2020) (quoting *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017)). If the plaintiffs do establish the first two factors, "[t]he court then determines 'in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief.'" *Id.* (quoting *Reilly*, 858 F.3d at 179).

A party seeking mandatory injunctive relief that would alter, rather than preserve, the status quo, "must meet a higher standard of showing irreparable harm in the absence of an injunction." *Bennington Foods LLC v. St. Croix renaissance, Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008) (citing *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995)). To obtain a mandatory injunction, the party seeking a mandatory injunction must show that its right to relief is "indisputably clear." *Hope v. Warden York Cty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020) (quoting *Trinity Indus., Inc. v. Chicago Bd. & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013)).

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Benisek v. Lamone*, 585 U.S. __, 138 S. Ct. 1942, 1943 (2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). Thus, a preliminary injunction should only be awarded in the "limited circumstances" where "the movant, by a clear showing, carries the burden of persuasion." *Holland*, 895 F.3d at 285. Ultimately, the decision of whether to issue a preliminary injunction is left

to the sound discretion of the district court. *Pennsylvania v. President of United States*, 930 F.3d 543, 565 (2019) (citing *Winter*, 555 U.S. at 24).

D<span style="font-variant:small-caps">ISCUSSION</span>

## A. Chesapeake's Motion to Strike Is Granted in Part

At the outset, the court will consider Chesapeake's motion to strike because it affects which arguments the court may consider in resolving the motion for preliminary injunction. Chesapeake seeks to strike Epsilon's reply brief in support of the motion for preliminary injunction because it raises arguments that were not previously raised in Epsilon's supporting brief in violation of Local Rule 7.7. (Doc. 57.) Epsilon argues that the arguments raised in its reply brief responded to the arguments that Chesapeake made and do not constitute new arguments. (Doc. 67.) Chesapeake reiterates in its reply brief that the underlying reply brief should be stricken for its noncompliance with Local Rule 7.7. (Doc. 78.)

Upon review of the underlying reply brief, *see* Doc. 69, the court finds that some of the arguments raised in the brief were newly raised in violation of Local Rule 7.7. Accordingly, the court will grant the motion to strike but only to the extent that the court will not consider the portions of the reply brief that run afoul of Local Rule 7.7. The motion to strike the reply brief will otherwise be denied.

## B. The Parties' Preliminary Injunction Arguments

In its brief in support of its preliminary injunction motion, Epsilon first argues that it has a likelihood of success on the merits given the language of the JOAs. Epsilon's reading of the JOAs is that under Article VI.1, any JOA party may propose the drilling and completion of a well and Chesapeake is the default operator of the proposed well, but if Chesapeake elects not to participate in the well proposal, "one of the consenting parties can act as the operator" in place of Chesapeake under Article VI.2(a). (Doc. 12-1, p. 8.) According to Epsilon's argument, Chesapeake agreed in the parties' 2018 settlement that if it did not consent to a well proposal and declined to act as the operator, it would cooperate with the operator designated by Epsilon. (*Id.* at 18.)

Epsilon argues that Chesapeake is asserting a veto power over wells proposed by Epsilon that is contrary to the plain language of the JOAs. (*Id.* at 19.) Epsilon further argues that even if the JOAs did give Chesapeake such veto power, Chesapeake surrendered that power in the parties' 2018 settlement. (*Id.*)

Turning to the remaining elements of the preliminary injunction analysis, Epsilon argues that it will suffer irreparable harm if preliminary injunctive relief is denied because it will likely be unable to drill the proposed Craige Wells without a preliminary injunction. (*Id.* at 20–22.) Epsilon argues that this harm outweighs any harm to Chesapeake because the only harm that Chesapeake could suffer "is

the delay in production and development of the Koromlan Well." (*Id.* at 22.) Epsilon further argues that any harm that Chesapeake would suffer should be discounted in the court's analysis because Chesapeake brought the harm on itself by allegedly failing to conform to the terms of the JOAs and the settlement. (*Id.* at 23.) Finally, Epsilon argues that a preliminary injunction is in the public interest because it facilitates the efficient development of oil and gas. (*Id.* at 25.)

Chesapeake argues that Epsilon does not have a likelihood of success on the merits because the plain language of the JOAs defeats Epsilon's claims. Chesapeake notes that operatorship under the JOAs can be shifted under either Article V.B.1 or Article VI, but operator shifting under Article V.B.1 requires written notice, an opportunity to cure, good cause, and a majority vote of non-operators—procedures that Epsilon has not initiated and does not allege that it has initiated. (Doc. 53, p. 10.) Chesapeake notes that Epsilon's argument for operator shifting in this case is exclusively based on Article VI, but argues that operator shifting under Article VI "is expressly limited to proposed operations constituting 'rework, sidetrack, deepen, recomplete, or plug back.'" (*Id.* (quoting JOAs at Art. VI.2.(a).)) Chesapeake argues that the JOAs "do not account for any scenario where a non-operator like Epsilon can propose a subsequent well, receive less than 100% participation from the other JOA Parties, and – if Chesapeake elects not to

participate or operate – remove Chesapeake and have itself appointed 'Operator.'"
(*Id.* at 11.)

Chesapeake offers several other arguments as to why Epsilon has failed to establish a likelihood of success on the merits. First, Chesapeake argues that because Epsilon withdrew any breach of contract claim when it voluntarily dismissed *Epsilon II*, Epsilon's claims for declaratory relief, injunctive relief, and specific performance are not tied to any independent substantive claim and must be dismissed on that basis. (*Id.* at 17–20.) Second, Chesapeake argues that Epsilon has not performed its obligations under the JOAs because the JOAs require drilling to begin no more than 90 days after the notice period has expired, which would have required Epsilon to begin drilling on the Craige Wells no later than April 22, 2021. (*Id.* at 22–23.) Chesapeake notes that Epsilon has claimed a thirty-day extension of that deadline based on a purported title defect, but argues that such an extension may only be obtained if written notice of the title defect has been provided to the other JOA parties, which notice Epsilon has not provided in this case. (*Id.* at 23.) Third, Chesapeake argues that Epsilon has not established a likelihood of success on the merits as to whether the Wyalusing Creek Water Source is a jointly owned asset, for the reasons previously expressed by the court. (*Id.* at 23–25.) Finally, Chesapeake argues that Epsilon does not have the right to

drill the wells because the relevant permits that Epsilon has acquired actually belong to non-party Epsilon Operating, LLC. (*Id.* at 25–26.)

Turning to the other factors of the preliminary injunction analysis, Chesapeake argues that Epsilon cannot establish irreparable harm because it previously acknowledged through its pleadings in *Epsilon II* that its harms could be remedied by money damages. (*Id.* at 27–29.) Chesapeake further argues that Epsilon's proposed injuries to its mineral rights do not establish irreparable harm. (*Id.* at 29–31.) By contrast, Chesapeake argues that preliminary injunctive relief would cause significant monetary harm to Chesapeake and the absent JOA parties. (*Id.* at 32–35.)

In relevant part, Epsilon argues in reply that the plain language of the 2018 settlement agreement and the JOAs allow Epsilon to propose new wells and specify that if Chesapeake does not consent to the proposals, it still must cooperate with the party designated as operator. (Doc. 69, pp. 8–9.) Epsilon characterizes Chesapeake's argument as asserting that new wells can only be drilled with the unanimous consent of the parties, an assertion that Epsilon contends is contrary to the plain language of the JOAs. (*Id.* at 9–13.) Epsilon argues that Chesapeake's dismissal argument should have been raised in a motion to dismiss but that the argument fails in any event. (*Id.* at 13–14.) Epsilon further argues that it is entitled to use the Craige Well Pad and the Wyalusing Creek water source because

they are jointly owned assets and that Chesapeake is obligated not to interfere with Epsilon's permitting efforts.  (*Id.* at 15–20.)

Turning to the issue of irreparable harm, Epsilon argues that it will suffer irreparable harm if preliminary injunctive relief is denied because it is losing its right to propose wells and have Chesapeake cooperate with its proposals.  (*Id.* at 22.)  Epsilon notes that although it could re-propose the wells, doing so could cause irreparable harm because the conditions that gave rise to its original proposals might not be present at the time that it re-proposes them.  (*Id.*)  Epsilon additionally notes that it could suffer irreparable harm because the mineral interests it seeks to mine could be drained by neighboring properties.[5]  (*Id.*)  Finally, Epsilon argues that any harm to Chesapeake or the public that would purportedly be caused by the proposed Craige Wells is "imagined and speculative" because there is no evidence that adding additional wells on the Craige Well Pad would cause harm or that the Koromlan Well would be less harmful than the proposed Craige Wells.  (*Id.* at 23–24.)

## C. Chesapeake's Argument for Dismissal of Epsilon's Claims Is Denied

Having resolved the motion to strike, the court will address Chesapeake's argument that the court must dismiss Epsilon's claims because they are not tied to

---

[5] Epsilon also advanced this drainage argument during the preliminary injunction hearing.  (*See, e.g.*, Transcript, May 11, 2021, pp. 23–24.)

an independent substantive claim.  (Doc. 53, pp. 17–20.)  Chesapeake's argument is without merit.

Chesapeake's argument is based on a line of cases beginning with *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950), that stands for the proposition that the Declaratory Judgment Act does not extend the jurisdiction of federal courts.  The Declaratory Judgment Act "does not itself create an independent basis for federal jurisdiction but instead provides a remedy for controversies otherwise properly within the court's subject matter jurisdiction." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 394 (3d Cir. 2016). Thus, a party seeking a declaratory judgment must establish that there is a justiciable case or controversy giving rise to the declaratory judgment claim. *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 95 (1993) (citing *Aetna Life Ins. Co. v. Hartford, Conn. v. Haworth*, 300 U.S. 227, 240–41 (1937)).

Notably, however, a plaintiff seeking a declaratory judgment in federal court does not have to also bring a substantive claim in order for the court to have jurisdiction over the declaratory judgment claim.  *See, e.g.*, *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 197 (2014) (noting that a court considering whether it has jurisdiction over a declaratory judgment claim often must look to the "character" of a potential coercive judgment claim between the parties to determine whether it has subject matter jurisdiction over the declaratory

judgment claim). Rather, a federal court has jurisdiction over a declaratory judgment claim if there is a case or controversy between the parties that could give rise to a coercive judgment action for which the court would have subject matter jurisdiction. *Id.* (citing *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 19 (1983)).

That standard is met here. Although Chesapeake is correct that Epsilon has dismissed its backward-looking breach of contract claim at the direction of the Bankruptcy Court, Epsilon still brings a forward-looking claim for injunctive relief seeking to enjoin Chesapeake to comply with the JOAs and the settlement agreement going forward. Such a claim presents a sufficient basis to invoke the jurisdiction of a federal court assuming that the requirements of diversity jurisdiction are otherwise met. *See, e.g.*, *Skelly Oil*, 339 U.S. at 671 (noting that the Declaratory Judgment Act did not modify or extend a federal court's jurisdiction and that, prior to the act, "a federal court would entertain a suit on a contract only if the plaintiff asked for an immediately enforceable remedy like money damages or an injunction").

Furthermore, even setting aside Epsilon's injunctive relief claim, the fact that the breach of contract claim was dismissed does not preclude Epsilon from bringing a declaratory judgment action. The jurisdictional question that the court must answer is whether a hypothetical coercive judgment action could be brought

between the same parties that would itself present a justiciable case or controversy. *See Medtronic*, 571 U.S. at 197; *Franchise Tax Bd.*, 463 U.S. at 19.  The breach of contract claim in this case was dismissed because it did not comply with the Bankruptcy Court's prior orders and not because it failed to present a justiciable case or controversy.  Thus, there is still a case or controversy that could give rise to a coercive judgment action between the parties, and this is sufficient for the court to exercise jurisdiction over Epsilon's declaratory judgment claim.

### D. Epsilon Does Not Have a Likelihood of Success on the Merits Because Its Claim for Preliminary Injunctive Relief Is Moot

The court will next consider whether Epsilon has established a likelihood of success on the merits.  Because Epsilon proposed the Craige Wells on December 22, 2020 and provided an anticipated commencement date of April 22, 2021 for the proposal, the court will first analyze whether Epsilon's motion for preliminary injunction is moot given that the anticipated commencement date has now passed. Although the JOAs and the 2018 settlement agreement are both at issue in this case, the language of the settlement agreement is immaterial to this mootness analysis, as it does not contain any timing provisions for proposals to drill new wells and does not modify the JOAs.  (Plaintiff's Exhibit 7 – Settlement Agreement.)

The JOAs have two timing provisions that are relevant to the court's

mootness discussion.  First, Article VI.1 provides that if "all parties" that have

been given notice of a proposed operation elect to participate in the proposed

operation, the operator:

> shall, no later than ninety (90) days after expiration of the notice period
> of thirty (30) days (or as promptly as practicable after the expiration of
> the forty-eight (48) hour period when a drilling rig is on location, as the
> case may be), actually commence the proposed operation and thereafter
> complete it with due diligence at the risk and expense of the parties
> participating therein; provided, however, said commencement date may
> be extended upon written notice of same by Operator to the other
> parties, for a period of up to thirty (30) additional days if, in the sole
> opinion of Operator, such additional time is reasonably necessary to
> obtain permits from governmental authorities, surface rights (including
> rights-of-way) or appropriate drilling equipment, or to complete title
> examination or curative matter required for title approval or acceptance.
> If the actual operation has not been commenced within the time
> provided (including any extension thereof specifically permitted herein
> or in the force majeure provisions of Article XI) and if any party hereto
> still desires to conduct said operation, written notice proposing same
> must be resubmitted to the other parties in accordance herewith as if no
> prior proposal had been made.

(JOA, Art. VI.1.)  Second, Article VI.2(a) provides that if any party who has been

provided notice of a proposed operation elects not to participate in the proposed

operation:

> the party or parties giving the notice and such other parties as shall elect
> to participate in the operation shall, no later than ninety (90) days after
> the expiration of the notice period of thirty (30) days (or as promptly as
> practicable after the expiration of the forty-eight (48) hour period when
> a drilling rig is on location, as the case may be) actually commence the
> proposed operation and complete it with due diligence.

(JOA, Arti. VI.2(a).)

Although the ninety-day period under both Article VI.1 and Article VI.2 expired on April 22, 2021, *see* Transcript, May 11, 2021, p. 212:3–5,[6] Epsilon asserts that it is entitled to a 30-day extension of the deadline under Article VI.1 because of a title defect it has identified. (*See* Doc. 69, p. 22.)[7] Chesapeake argues that the thirty-day extension provision under Article VI.1 only applies when all JOA parties have consented to the proposal. (Doc. 53, p. 23.) Chesapeake additionally argues that even if a thirty-day extension could be obtained for a proposal that has not received unanimous consent, Epsilon still could not obtain such an extension because it has not complied with the notice provisions of Article VI.1 because it did not serve written notice on all other JOA parties. (*Id.*)

Upon review of the relevant timing provisions, the court finds that Epsilon is not entitled to a 30-day extension under Article VI.1 because the plain language of Article VI.1 limits its applicability to proposals that have received the unanimous consent of the JOA parties. Article VI.1 specifically states that "*[i]f all parties to*

---

[6] At the court's request, the assigned court reporter provided an unofficial transcript of the preliminary injunction hearing. All citations to the transcript in this opinion are to the unofficial version.

[7] Although Epsilon did not offer any arguments regarding a thirty-day extension in its supporting brief and instead raised them in its reply brief and during the preliminary injunction hearing, the court deems the arguments properly raised because the original deadline of April 22, 2021 had not yet expired when Epsilon filed its supporting brief. (*See* Doc. 6.)

*whom such notice is delivered elect to participate in such a proposed operation*, . . . Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days . . . actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of the parties participating therein." (JOA, Art. VI.1 (emphasis added).) As the emphasized language makes clear, the timeline set forth in Article VI.1 is conditioned on all parties to the JOA electing to participate in the proposal. The provision allowing the operator to extend the deadline by thirty days is contained within the same sentence in Article VI.1 and is therefore also conditioned on the unanimous consent of the JOA parties. Thus, in a situation like the present one where a proposal has not received unanimous consent, the thirty-day extension provision under Article VI.1 does not apply.

Furthermore, even if a thirty-day extension could be obtained for a proposal that has received less than unanimous consent, Epsilon would still not be entitled to such an extension for two reasons. First, Epsilon did not provide any evidence of the title defect that purportedly allows it to extend the deadline. Second, Epsilon has not provided "written notice" of the title defect to all of the other JOA parties as required by Article VI.1. (*See* Transcript, May 12, 2021, p. 9:13–23.)

Epsilon argues to the contrary that it has provided all the notice required to obtain a thirty-day extension because it has provided notice of the purported title

defects to the other parties that have consented to its proposals. (Doc. 69, p. 22.) In its closing argument, Epsilon argued that the provision requiring "written notice of [the title defect] by Operator to the other parties" only requires notice to the other consenting parties and does not require notice to all JOA parties. This conclusion follows, according to Epsilon, because Article VI.1 only contemplates a situation in which all JOA parties have consented to a proposal. Thus, Epsilon argues, because all parties would be consenting parties in the situation contemplated by Article VI.1, "the other parties" must refer only to consenting parties.

Epsilon's argument is contrary to the plain language of the JOAs. Article VI.1 states that notice must be provided to "the other parties," and does not expressly limit the notice requirement to other consenting parties, despite the fact that several other provisions of the JOAs expressly apply only to "Consenting Parties." *See, e.g.*, JOA Art. VI.2(a) ("Operator shall perform all work for the account of the Consenting Parties . . . ."); Art. VI.2(b) ("The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph."). The parties therefore knew how to limit a provision to consenting parties but did not do so in Article VI.1. The court must presume that such a drafting decision was intentional and give effect to the plain meaning of the

contract, which requires that notice be provided to all JOA parties and not just those that have consented to the proposal. Because Epsilon did not provide such notice, it would not be entitled to a thirty-day extension.

Moreover, Epsilon's notice argument hinges on the fact that Article VI.1 only contemplates unanimous consent by the JOA parties, but Epsilon simultaneously argues that Article VI.1 *does not* require unanimous consent in order for it to obtain a thirty-day extension in the first place. Apparently, then, the court is meant to treat Article VI.1 as simultaneously requiring unanimous consent and not requiring unanimous consent. This is not a reasonable reading of the JOAs.

During the preliminary injunction hearing, Epsilon raised an additional argument as to why it was entitled to a thirty-day extension under the language of the JOAs.[8] Specifically, Clanton testified that Epsilon is entitled to a thirty-day extension based on the last sentence of Article VI.2(a), which states, "If 100% subscription[9] to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties of their proportionate interests in the

---

[8] This argument was not included in Epsilon's supporting brief or reply brief, but the court will address it for the sake of completeness.

[9] "Subscription" refers to the amount of capital committed to a proposed project. (Transcript, May 11, 2021, pp. 133–34.) Thus, a project receiving 100% subscription means that the consenting JOA parties have committed 100% of the capital necessary for the project. (*Id.*)

operation and the party serving as Operator shall commence such operation within the period provided in Article VI.B.1, subject to the same extension right as provided therein." (*See* Transcript, May 11, 2021, pp. 205–06; JOAs, Art. VI.2(a).)  According to Clanton's testimony, Epsilon interprets this provision to mean that the thirty-day extension in Article VI.1 applies in the context when not all parties consent but there is 100% subscription to a proposal.  (Transcript, May 11, 2021, pp. 205–06.)  Clanton additionally testified that Epsilon interprets this language to mean that the designated operator only needs to provide written notice to the consenting parties in order to get a thirty-day extension.  (*Id.*)

This argument also fails.  Assuming for the sake of argument that Article VI.2(a) allows a thirty-day extension in a situation where there is less than unanimous consent but the proposing party has obtained 100% subscription, the language of Article VI.2(a) still refers back to VI.1,[10] and, as noted above, the plain language of Article VI.1 requires that notice be provided to all JOA parties before a thirty-day extension can be obtained.  Because Epsilon has not provided such notice, it is not entitled to a thirty-day extension under Article VI.1.

---

[10] Article VI.2(a) technically cross-references to Article VI.B.1, a provision that does not actually exist in any of the parties' JOAs.  The court will assume without deciding that the provision is meant to cross-reference to Article VI.1.

Even assuming that a thirty-day extension could be obtained in this situation and that Epsilon's well proposals were therefore subject to a deadline of May 22, 2021 rather than April 22, 2021, its claim for injunctive relief would be still be moot. Epsilon's December 22, 2020 proposals specify that Epsilon will "spud"[11] by the deadline, *see* Plaintiff's Exhibits 30–33 ("The anticipated spud date for the Well is on or about April 22, 2020"), but under 25 Pa. Code § 78a.52a an operator must complete an area of review report at least thirty days before spudding. *See* Defendant's Exhibit 40 – 25 Pa. Code § 78a.52a. By Clanton's admission, Epsilon has not begun the area of review process. (Transcript, May 11, 2021, p. 106:18–23.) It is therefore impossible for Epsilon to spud by the deadline without violating the provisions of 25 Pa. Code § 78a.52a.

Epsilon acknowledges that it has not begun the area of review process, but argues that it is only required to commence activities on the site by the deadline and is not required to spud. (*See* Transcript, May 11, 2021, p. 30:10–14.) Even assuming this is true, however, Epsilon has not shown a realistic likelihood that it can commence operations by May 22, 2021. There are several crucial steps that Epsilon has not completed that are necessary in order to commence operations. Most notably, Epsilon has not contacted Rush Township in order to complete a

---

[11] According to Clanton's testimony, "spudding" refers to the time when a drill rig is on site with the drill bit prepared to hit the ground.

road maintenance plan for the site, and it has not hired contractors to perform the work on the site. (*see* Transcript, May 12, 2021, p. 43:10–23.) In fact, Raleigh testified that Epsilon does not currently operate any wells in Pennsylvania and has not done so since 2010. (Transcript, May 11, 2021, p. 105:13–20.) Testimony from Clanton also revealed that Epsilon only has nine employees, none of whom are involved in the actual drilling of wells. (Transcript, May 12, 2021, pp. 40–41.) Epsilon will therefore need to engage subcontractors for every aspect of operation on the proposed well, a critically important step that it has not yet begun. Thus, although Epsilon repeatedly asserted during the preliminary injunction hearing that "boots on the ground" is a sufficient step to commence operations under the JOAs, the court shares the skepticism expressed by Chesapeake's counsel: whose boots?

Although Epsilon continually asserted that it has not taken any of these steps because of Chesapeake's purported non-cooperation, it has not credibly shown that Chesapeake's actions have actually interfered with its ability to proceed. The record reflects that Epsilon applied for permits to drill the proposed wells with the DEP in December 2020, *see* Plaintiff's Exhibit 12, and that it entered into a subsurface easement with the Craiges on March 5, 2021, *see* Plaintiff's Exhibit 20. Epsilon has not credibly explained why it was able to take these actions but could not engage contractors, contact Rush Township to complete a road maintenance plan, or complete the area of review process.

Clanton's testimony during the preliminary injunction hearing is that Epsilon can get some unspecified boots on the ground by May 22, 2021 and then complete all the necessary steps after that date. (*See* Transcript, May 12, 2021, p. 76.) Clanton also testified, however, that Epsilon has no experience with a joint well-drilling operation like the ones proposed here. In light of that lack of experience combined with the fact that Epsilon has not drilled any wells in Pennsylvania in the last ten years, Clanton's testimony amounts to a statement that the court should take it on faith that Epsilon will be able to complete the necessary steps after May 22, 2021. This is simply not sufficient for the court to grant a mandatory preliminary injunction that would have the effect of halting existing drilling operations to the detriment of other parties as well as Chesapeake.

Furthermore, Epsilon has not proven that it would be able to obtain approval from the SRBC by May 22 for its proposed wells. Epsilon previously asserted that SRBC approval was a necessary step in obtaining approval for its water management plan and therefore in its ability to proceed with the proposed wells, *see* Doc. 15, and this court addressed the SRBC Letter issue on an expedited basis based on Epsilon's representation that it needed sufficient lead time to obtain the SRBC approval. During the preliminary injunction hearing, however, Epsilon did not introduce any evidence to show that it would be able to obtain SRBC approval in the extremely limited period of time between the hearing and the May 22

deadline, nor did it explain why an additional month was previously needed to obtain SRBC approval but the approval could now be obtained in approximately 7–10 days.  In fact, other than some speculative oral argument by Epsilon's counsel that Epsilon might be able to timely obtain SRBC approval—counsel compared the efforts Epsilon would have to take to obtain SRBC approval to speeding in order to drive from Pittsburgh to Harrisburg in less than three hours, suggesting that it would be difficult and possibly dangerous, but not impossible— Epsilon offered nothing to prove that it can actually timely obtain SRBC approval. This speculation, again, is not sufficient for the court to grant a mandatory preliminary injunction.

In sum, Epsilon is not entitled to a thirty-day extension under Article VI.1, and even if it were entitled to such an extension, its request for preliminary injunctive relief is still moot.  Epsilon therefore has not shown a likelihood of success on the merits, and the court will deny the motion for preliminary injunction on that basis without considering the remaining elements of the preliminary injunction analysis.

## CONCLUSION

For the foregoing reasons, Epsilon's motion for preliminary injunction is denied as moot and Chesapeake's motion to strike is granted in part and denied in part. An appropriate order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: May 14, 2021