1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

3
   Epsilon Energy U.S.A., Inc.   :
4                                 :
               vs                 :   1:21-CV-00658-JPW
5                                 :
                                  :
6   Chesapeake Appalachia, LLC    :

7

8

9

10          BEFORE:        HONORABLE JENNIFER P. WILSON

11          PLACE:         Harrisburg, Pennsylvania

12          PROCEEDINGS:   Preliminary Injunction

13          DATE:          Tuesday, May 11, 2021 - VOLUME I

14          REPORTED BY:   Lori A. Fausnaught, RMR/CRR
                           Lori_Fausnaught@pamd.uscourts.gov
15

16

17   APPEARANCES:

18   For the Plaintiff:        Gregory J. Krock, Esquire
                               Elizabeth M. Thomas, Esquire
19                             McGUIRE WOODS, LLP
                               260 Forbes Avenue, Suite 1800
20                             Pittsburgh, PA  15222-3142
                                        - and -
21                             Jonathan T. Blank, Esquire
                               McGUIRE WOODS, LLP
22                             310 Fourth Street, N.E., Ste. 300
                               Charlottesville, VA  22902
23                                      - and -
                               Yasser A. Madriz, Esquire
24                             McGUIRE WOODS, LLP
                               600 Travis Street, Ste. 7500
25                             Houston, TX  77002-2906

1

APPEARANCES: (Continued)

2

For the Defendant:        Daniel T. Brier, Esquire

3                         John B. Dempsey, Esquire
                          Nicholas F. Kravitz, Esquire

4                         Richard A. Armezzani, Esquire
                          MYERS, BRIER & KELLY, LLP

5                         425 Spruce Street, Ste. 200
                          Scranton, PA  18503

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX TO WITNESSES

FOR PLAINTIFF:

MICHAEL RALEIGH                          PAGE:

   Direct by Attorney Krock                43

   Cross by Attorney Dempsey               91

   Redirect by Attorney Krock             124

   Recross by Attorney Dempsey            130

   Court Inquiry                          134


HENRY CLANTON

   Direct by Attorney Madriz              141

   (Cross examination conducted next day, May 12, 2021.)

1  <u>INDEX TO EXHIBITS</u>

2  PLAINTIFF:                                IDENTIFIED   ADMITTED

3  Exhibit No.  1                               53          54
   Exhibit No.  2                               67          67
4  Exhibit No.  3                               72          73
   Exhibit No.  4                               74          75
5  Exhibit No.  5                               76          77
   Exhibit No.  6                               78          79
6  Exhibit No.  7                              162        5/12/21
   Exhibit No.  8                              146         147
7  Exhibit No.  9                              148         150
   Exhibit No. 10                              153
8  Exhibit No. 11                              157         159
   Exhibit No. 12                              160         162
9  Exhibit No. 13                              163         165
   Exhibit No. 14                              165         167
10 Exhibit No. 16                              167         169
   Exhibit No. 17                              169         170
11 Exhibit No. 18                              171         205
   Exhibit No. 19                              174         176
12 Exhibit No. 20                              176         177
   Exhibit No. 21                              178         180
13 Exhibit No. 22                              180         181
   Exhibit No. 23                              181         185
14 Exhibit No. 24                              182         185
   Exhibit No. 25                              187         193
15 Exhibit No. 26                              193         193
   Exhibit No. 27                              194         196
16 Exhibit No. 28                              201         202
   Exhibit No. 29                              202         202
17 Exhibit No. 30                              210         211
   Exhibit No. 31                              211         211
18 Exhibit No. 32                              211         211
   Exhibit No. 33                              211         211
19 Exhibit No. 45                              218         222
   Exhibit No. 46                              192         192

20

21

22 DEFENDANT:                                IDENTIFIED   ADMITTED

   Exhibit No. 2                                91         102

23

24

25

1          (9:00 a.m., convene.)

2          THE COURT:  All right.  This is the case of <u>Epsilon</u>

3  <u>Energy U.S.A., Inc. versus Chesapeake Appalachia</u>, docketed at

4  21-658.  I'm going to ask Counsel for each party to enter your

5  appearances, or state your appearances, rather, and then

6  indicate who will be presenting.  So I'll begin with Plaintiff.

7          ATTORNEY KROCK:  Your Honor, this is Greg Krock on

8  behalf of the Plaintiff, Epsilon Energy.  With me I've got my

9  colleague, Jonathan Blank, who has been admitted pro hac vice

10  to present along with me.  I've got Yasser Madriz.  We had a

11  motion for pro hac vice that we filed.  Yasser came up from

12  Houston and would like to handle one of the witnesses today if

13  Your Honor will grant that motion and admit him pro hac vice.

14  And we have got Elizabeth Thomas, who is also going to be

15  presenting.  She is from our office in Pittsburgh.  She will

16  also handle one of the witnesses today.

17          THE COURT:  Very well.  And for the Defendant?

18          ATTORNEY BRIER:  Good morning, Your Honor.  Dan Brier.

19  I have with me my colleagues Jack Dempsey, Nick Kravitz and

20  Richard Armezzani.

21          THE COURT:  Mr. Armezanni, I can't see you.  So to the

22  extent you wish to be seen -- there you are.  Thank you.  I

23  apologize for the pillar.  It is what it is.  That came with

24  the courtroom.

25          ATTORNEY DEMPSEY:  So Mr. Dempsey and Mr. Kravitz and

1    I are going to be sharing witnesses, as well.

2         THE COURT:  All right.  One preliminary matter I

3    wanted to address is just to get some sense by Counsel, by way

4    of an overview of the proceeding -- and by the way it is a

5    pleasure to see all of you in person.  It's nice to be able to

6    put faces to names.  I'm so glad we're able to convene in the

7    courtroom this morning.

8         As you know, we have two days and I am able to confirm

9    I have two full days at this point.  I had one proceeding

10   tomorrow that was rescheduled.  So I have two full days.  But I

11   do want to ensure fairness in our proceeding and that each side

12   has an adequate opportunity to present the witnesses and

13   evidence that need to be presented.

14        So if I could just get sort of an overview, beginning

15   with Plaintiff, in terms of your order of presentation and

16   number of witnesses, and then I'll ask the same of Defense

17   Counsel.

18        ATTORNEY KROCK:  Your Honor, Epsilon intends to

19   present three witnesses in its case-in-chief; Mike Raleigh,

20   who's the CEO, Henry Clanton is the chief operating officer,

21   and then we have got our chief financial officer, Lane Bond,

22   who is very limited testimony.  His is going to be very short.

23        I appreciate the opportunity to have a brief opening

24   statement because there are so many issues.  And I think we

25   anticipate that we'll certainly finish today.  You know, more

1  than half a day.  It could be three-quarters depending upon the

2  cross-examination.  But we certainly anticipate that at

3  absolute worst, we will be done with our witnesses today,

4  probably earlier in the day.

5          THE COURT:  Very well.  And I'll give both sides an

6  opportunity for opening statement and closing arguments, if you

7  wish.

8          ATTORNEY DEMPSEY:  Jack Dempsey.  Good morning.

9  Judge, what is the protocol for masks?

10         THE COURT:  Right.  So masking protocol, what we are

11  doing in our district is any time you are questioning a witness

12  you can feel free to remove your mask.  And of course, if I

13  haven't said before or if my courtroom deputy didn't say, a

14  little bit of a non-traditional setup.  So witnesses will

15  actually testify from the jury box.  And the witness is free to

16  remove their mask when they are testifying.  And when you are

17  addressing the Court, you can feel free to remove your mask.

18  At all other times you should remain masked.

19         ATTORNEY DEMPSEY:  Thank you, Your Honor.

20         Judge, for purposes of today's proceeding, we are

21  prepared to call two witnesses, Eric Haskins and Josh Lawrence,

22  largely in rebuttal to the case that we anticipate Epsilon will

23  seek to present to the Court.  We have also reserved the right

24  to call rebuttal witnesses to the extent that they raise

25  matters that we did not anticipate or have not heard about

1    before.  We would ask that the Court consider taking a proffer

2    from Epsilon on the water issue, because by now, as the Court

3    knows, there have now been -- there was an initial water brief.

4    We filed a reply brief and then Epsilon filed a third.  The

5    Court conducted lengthy oral argument and then wrote a lengthy

6    opinion on the issue.

7         And to the extent that they're -- and during oral

8    argument, Your Honor asked Counsel for Epsilon a question, if

9    the Court were to deny the request for the water commitment

10   letter, would that moot the case.  And the answer to that

11   question was at least not clear in terms of significance of the

12   water issue.  So we think it may streamline the process; if the

13   water issue is out of the case, we would like to know it.  If

14   the water issue is going to remain in the case, we would like

15   to have a proffer so that we can conform our questioning.

16        We also, Judge, raised in our affirmative defenses and

17   also in our brief opposing the preliminary injunction the fact

18   that we're here essentially on a declaratory judgment claim,

19   which is procedural, and so we would appreciate the opportunity

20   to make argument before the Court takes evidence on the case to

21   point out to the Court that there is no substantive claim

22   before the Court.

23        There was a breach of contract claim in the initial

24   March 10 complaint in this action, which, because it has been

25   released in the bankruptcy proceeding, is not in the case any

1    longer.  So as we pointed out in our papers, we are here on a

2    procedural declaratory judgment claim and a remedial

3    injunctive/specific performance claim.  Without a substantive

4    claim, the Court is not able to grant relief.  There was a

5    substantive claim and that was a breach of contract count which

6    was released as a function of the bankruptcy proceeding and has

7    been taken from the case.

8         So respectfully, we would appreciate the opportunity,

9    if the Court would consider it, to make argument that there is

10   no substantive claim before the Court and so not a likelihood

11   of success.  If the Court prefers to get into the witnesses,

12   you have heard the witnesses that we would call.

13        THE COURT:  Thank you, Mr. Dempsey.  At this point I

14   was merely seeking an overview of testimony to ensure that we

15   have an adequate amount of time allotted to come to a

16   resolution in this case.  So I appreciate that you have also

17   previewed two preliminary matters.

18        You have anticipated my next question, which was once

19   we got to the end of the Court's preliminary matter, I was

20   going to invite Counsel to address any preliminary matters that

21   they wish to address.  So we will come to that in one moment.

22   I am comfortable that we have an adequate amount of time

23   available on the Court's schedule to address -- to provide the

24   opportunity to present testimony and argument.

25        So having heard from Mr.Dempsey, and I will give you

1    an opportunity to respond, Mr. Krock, on the -- I'll just refer

2    to it very generally as the water issue.  But with respect to

3    all of the arguments that Defendant has presented in opposition

4    to the motion for preliminary injunction, I will invite you to

5    address those as you see fit in your opening statement and your

6    closing argument.

7         At this point this case has arrived at a moment in

8    time when we don't have the opportunity to separately address

9    issues and resolve each of them one at a time.  So the Court is

10   in a position where I need to address and come to resolution on

11   the entirety of the issues surrounding the preliminary

12   injunction relief.

13        So, I invite you to make argument, but I'm not going

14   to sort of bifurcate this proceeding to take one issue at a

15   time.  We're going to have testimony and evidence on all of the

16   issues and argument on all of the issues.  And then the Court

17   has enough time remaining to make a ruling and come to a

18   resolution on all of the matters presented by Counsel.

19        That said, Mr. Dempsey has raised as a preliminary

20   matter a question -- it would seem to be a fair one -- with

21   respect to the water issue, which is perhaps a bigger topic.

22        But let me invite a response on that preliminary

23   matter, Mr. Krock.

24        ATTORNEY KROCK:  Your Honor, we did address the SRBC

25   commitment letter and water issue on an expedited basis, and

1    clearly we respect Your Honor's ruling that at that time based

2    on the non-testimony and documents, Your Honor did not believe

3    we had established sufficiently the right to that water source

4    and expressly advised us that at this hearing we could address

5    the issue and we might be able to introduce other evidence that

6    showed what was intended as far as ownership of that permit.

7            So clearly, as far as the likelihood of success on the

8    merits, we anticipate and are prepared to have a witness

9    testify about the ownership and the right to utilize water from

10   that source.

11           As far as the second issue and whether an adverse

12   ruling would moot the remainder of the issues, I think we

13   addressed it on that call and explained that we do not believe

14   an adverse ruling will make it 100 percent impossible for us to

15   move forward with the drilling of our wells.  However, it will

16   make it very, very challenging and would force us to

17   essentially do things that are really inconsistent with good

18   oil field practices.  We would be doing something you wouldn't

19   ever do without the water source lined up.

20           So Your Honor, it took me three hours and 15 minutes

21   the other day to drive from Pittsburgh to get here to

22   Harrisburg.  So if the question was sir, if you don't have

23   three hours and 15 minutes, it's impossible for you to be here

24   on time, and my answer would be no.  I could drive a hundred

25   miles an hour and I could do risky things that are not

1    advisable, but I can't say it's not 100 percent impossible for

2    me to do.

3           That's our position here.  If we don't get that SRBC

4    water permit and we are obligated to scramble and try to do

5    other things, we might be able to, we might not.  But we can't

6    tell this Court that it's not 100 percent impossible that we

7    can't move forward if we don't get that SRBC letter signed by

8    the 22nd.

9           THE COURT:  I understand your position.  As you

10   indicated, and I agree in my essentially preliminary ruling on

11   the SRBC letter, I did reserve the option for Plaintiff to

12   present additional evidence on the issue.  We'll simply

13   proceed.

14          I do understand Defendant's arguments, and I look

15   forward to the presentation from both Counsel with respect to

16   these issues.

17          Are there any preliminary matters that Plaintiff

18   wishes to raise?

19          ATTORNEY KROCK:  Just two housekeeping things.  First,

20   Your Honor, we had a little bit of difficulty with the

21   technology.  I think we're going to be able to present our

22   documents, but we also brought hard copies of the exhibits for

23   the Court, the witness, and we have copies for Counsel.  Is

24   that something that the Court would appreciate and enable us to

25   do, is to supplement the electronic with hard copies?

1    THE COURT:  That would be wonderful, yes.  If you

2    would like, you can tender those now so that one, sort of,

3    housekeeping matter is taken care of.  I would extend the same

4    to Defense Counsel, that if you brought hard copies, you can

5    certainly present those to the Court and each other, and we'll

6    all have our exhibits set and will be able to proceed.

7    ATTORNEY KROCK:  The second housekeeping matter.  It

8    wasn't clear to us, when we saw that all of the information we

9    needed to get Mr. Madriz admitted pro hac vice was appropriate,

10   but I'm not sure we had seen an order that actually granted

11   that.  We certainly wouldn't want him to start examining

12   witnesses until Your Honor has allowed him to do that.

13   THE COURT:  I appreciate you asking.  My courtroom

14   deputy advises me that he is approved.

15   ATTORNEY KROCK:  Thank you, Your Honor.

16   THE COURT:  You're welcome.  And I look forward to

17   your presentation, as well.

18   ATTORNEY KROCK:  Thank you, Your Honor.

19   ATTORNEY MADRIZ:  Thank you.

20   THE COURT:  Absolutely.  Any other preliminary

21   matters?

22   ATTORNEY DEMPSEY:  Judge, just one.  The issue of

23   experts in the case, and the Court ruled on the issue on

24   Friday.  Then there was a motion for reconsideration where

25   opposing Counsel placed before the Court or submitted to the

1    Court expert reports with the request that they be admitted

2    into evidence of themselves without the opportunity to cross as

3    a mechanism, Counsel suggested, to ameliorate the prejudice to

4    Chesapeake that was addressed by the Court's ruling on Friday.

5         We would suggest, Judge, that the Court's ruling on

6    Friday about which there's been a motion for reconsideration,

7    which the Court has denied, was predicated on the unfairness

8    and prejudice of the admission of expert testimony at this late

9    hour.

10        The concept of Epsilon placing before the Court expert

11   reports simply to be admitted into the record in the case

12   actually exaggerates the prejudice on -- that predicated our

13   motion on Friday, which the Court graciously heard argument on

14   so quickly and made such a quick ruling that was so clear as to

15   its basis.

16        We would ask the Court, how does the Court intend to

17   address the issue of the expert written reports which we

18   believe are hearsay, beyond the fact that they are prejudicial?

19   And it takes the prejudice that was addressed in the Court's

20   ruling on Friday and it actually magnifies it to have those

21   reports come in in this proceeding.

22        THE COURT:  Well, thank you, Mr. Dempsey.  I

23   understand the issue.  I'm well acquainted with the issue,

24   having spent some time with it over the past several days.  So

25   the issue technically, as a technical matter, Plaintiff has not

1  yet moved the admission of their expert reports.  The issue of

2  expert testimony has been addressed and resolved, and I am not

3  revisiting that issue.  I was invited to reconsider it and I

4  declined that opportunity.

5       The issue of whether Plaintiff's expert report, which

6  I have not reviewed because they are not in evidence, are

7  admissible is an issue that we will address if they are moved

8  into evidence.

9       At this point, I think all of the issues that have

10  been presented to the Court, other than to grant injunctive

11  relief, have been resolved.  So if there comes an opportunity

12  for Plaintiff to move their expert reports into evidence, I

13  will give you an opportunity to object if you wish or state

14  your position on the record and then I'll rule on that request.

15       That's where things stand with respect -- I'm not

16  addressing it as a preliminary matter.

17       ATTORNEY DEMPSEY:  Thank you, Your Honor.

18       THE COURT:  Absolutely.  All right.  Any other

19  preliminary matters?

20       All right.  Let's proceed.  I'll be glad to hear an

21  opening statement on behalf of Plaintiff.

22       ATTORNEY KROCK:  It's acceptable to do it from here,

23  Your Honor?

24       THE COURT:  Absolutely.

25       ATTORNEY KROCK:  Your Honor, this case involves

several joint operating agreements in which the parties have
agreed to collectively develop their oil and gas interests in
generally northeast Pennsylvania, primarily Susquehanna County.

These written JOAs set forth the procedure that the
parties will follow to decide what activities they have agreed
to undertake.  Now, the evidence is undisputed that Chesapeake
serves as the operator under those written JOAs, so Chesapeake
is the party tasked with carrying out the activities that all
of the JOA parties collectively agree to undertake.

I don't think the evidence is disputed that just
because Chesapeake is named as the operator, that doesn't mean
that Chesapeake has to participate in all of the activities
that are proposed by the parties.  Just like any other owner,
Chesapeake has the right to say I don't want to participate in
that proposed operation.  I am not going to contribute my money
to help develop that activity.

And similarly, Your Honor, I don't think it's disputed
that if Chesapeake elects not to participate in a particular
activity, it doesn't actually have to perform the conduct, even
though it's designated as the operator.  That's a right that
Chesapeake has.

So this dispute involves just that circumstance.  This
is a situation where Epsilon proposed that four new wells be
drilled on the Craige well pad.  Chesapeake exercised its right
not to participate and not to help fund those activities.

1    Chesapeake exercised its right not to drill the wells because

2    it wasn't investing any money in the wells.

3          So the dispute involves what happens next?  Epsilon's

4    position is that the JOAs have a procedure for that, and they

5    allow Epsilon, or any of the other consenting parties that do

6    want to invest their monies in the wells, to assume

7    operatorship just to drill those wells.  That doesn't mean that

8    we are ejecting Chesapeake as the operator under the JOAs.

9    It's going to continue to do everything else that is ongoing.

10   We are only talking about just for the purpose of drilling the

11   four wells that they don't want to drill.

12         Chesapeake's position is that the well's proposals

13   die; because they have not participated and because they won't

14   drill the wells, they essentially have unilateral veto power to

15   prevent those wells from being developed.

16         What's so frustrating to us, Your Honor, is that this

17   is the second time that we have had to file a lawsuit to

18   resolve this specific issue.  Back in 2018, the same thing

19   happened.  Epsilon proposed wells.  Chesapeake exercised its

20   right not to participate and declined to serve as the operator

21   but took the position the wells couldn't go forward.

22         The matter settled on the courthouse steps before a

23   TRO hearing was going to be held.  Counsel read the material

24   terms of the settlement arrangement into the record in court

25   and then memorialized a written settlement agreement signed by

1    the parties.  There's a specific paragraph in that settlement

2    agreement that states that on a going-forward basis, if

3    Chesapeake doesn't want to participate and doesn't want to

4    drill a well that Epsilon has proposed, then it shall

5    reasonably cooperate with the consenting party that is

6    designated as the operator so that Epsilon can drill the wells.

7            Now, the parties even identified a handful of things

8    just as an examples as to what the cooperation meant.  So it

9    agrees to cooperation in permitting.  And it addresses water,

10   because water is such a critical component of drilling a new

11   well.  The settlement agreement states that Chesapeake shall

12   reasonably cooperate by providing access to co-owned water

13   withdrawal sources and co-owned water impoundments.  And that

14   is one of the reasons why it's been particularly frustrating,

15   because we believe this issue has already been resolved.

16           So as far as the evidence you're going to hear, Your

17   Honor, as far as success on the merits and irreparable harm, we

18   don't believe -- and I think it's undisputed that when the

19   parties negotiated these JOAs, they utilized kind of a form or

20   a standard agreement that is common in the industry.  Most

21   people start with a common form.  It is kind of a model JOA

22   form.

23           Under that common JOA form, there is a provision that

24   states that if one party elects not to consent and doesn't want

25   to participate to any operation, whether its drilling a new

1  well or working on an existing well, that the other parties,

2  the consenting parties, have the right to move forward.  If the

3  operator doesn't want to be one of the consenting parties, they

4  can move forward by designating one of the consenting parties

5  to serve as the operator.  That's what the model form says.

6  Based on a single sentence in the JOA in this case

7  that the parties tweaked, they modified it slightly.  It's

8  Chesapeake's position that based on that single sentence, what

9  the parties intended to do was carve drilling out and say you

10  know what, if it's a -- it's not drilling a new well, then it

11  can go forward without unanimous consent of the parties.  But

12  if it's a new well, it can't.  Unanimous consent.  Everybody

13  has to participate in order for a new well to be drilled.

14  Well, the evidence we're going to introduce, Your

15  Honor, is that simply is not the case.  We're going to start

16  with the very sentence upon which Chesapeake relies and point

17  to that sentence.

18  And do you know what that sentence was intended to do

19  in the model form?  It was intended to impose a time

20  limitation; that the consenting parties, if they wanted to move

21  forward without unanimous consent, that sentence says they have

22  to actually commence operations on that activity within 90 days

23  after they decide who is going to pay what.  They have got to

24  work out what their interests are going to be because there's a

25  non-consenting party.  They need to figure out how to fund that

1  without those dollars from the non-consenting party.  And once

2  they figure that out, they have got 90 days to commence

3  operation.

4         The modifications that the parties included in their

5  JOAs in this case, that's what drilling was carved out of.  The

6  drilling is not subject to that 90-day period.  The irony of it

7  is the provision upon which they relied was supposed to make it

8  easier to drill new wells, as opposed to other activities, not

9  to prohibit it.

10        We will further introduce evidence, Your Honor, that

11  it's not just that sentence alone.  If you look further down in

12  the portion of the JOAs that these parties signed that talk

13  about the logistics.  If there's a non-consenting party, how do

14  you fund the operations?  What rights do the consenting parties

15  have?  What rights do the non-consenting parties have in the

16  future to receive profits?  That section repeatedly uses the

17  word drilling.  It talks about handing a new well back to the

18  operator after it's drilled.  If unanimous consent was

19  required, you would never have those provisions for drilling.

20  They wouldn't exist.

21        So we believe that the agreement itself, Your Honor,

22  the only reasonable interpretation is that the parties can

23  proceed with drilling a new well even without consent of all

24  parties.

25        But there is additional evidence to show how do the

1    parties behave.  We're going to introduce evidence that

2    Chesapeake itself has drilled four wells under these JOAs when

3    it did not have consent of all parties.  Chesapeake sent

4    Epsilon letters that said not all parties have consented.  We

5    need to figure out how to move forward and drill this well

6    because of their non-consent.  And the wells were drilled.

7            So the evidence will show that Chesapeake itself

8    utilized those same provisions to drill wells that it proposed

9    without consent of all parties.  It used those provisions when

10   it proposed the wells but is now taking the position with this

11   Court that we are not allowed to use those same provisions.

12           Now, as far as the likelihood of success on the merits

13   on the settlement agreement, Your Honor, we must confess that

14   on Epsilon's team, we are not entirely sure as we stand here

15   today why it is that Chesapeake takes the position that the

16   cooperation provision in the settlement agreement doesn't

17   apply.

18           We think from reading their brief that it returns on

19   the fact that that provision makes -- has a clause that says to

20   the extent permitted under the JOAs.  So it says that

21   Chesapeake will cooperate with the designated party under our

22   well proposals, to the extent permitted under the JOAs.

23           And we'll introduce testimony that says that's a

24   logical provision.  It makes sense, because only a consenting

25   party can serve as -- can be designated as the operator.  So if

1    Chesapeake doesn't want to be the operator for our wells, we

2    can't just pick anyone we want.  It's got to be a consenting

3    party.

4            And you'll hear evidence, Your Honor, that's a logical

5    reason for that.  You want the operator or the person

6    designated as operator to have skin in the game.  If they are

7    going to be operating on behalf of potentially other people,

8    you want to make sure their interests are aligned and they're

9    an owner in the well for which they have been designated as

10   operator.

11           It's our understanding -- and maybe we're wrong, but

12   it's our understanding that Chesapeake is going to take the

13   position that to the extent permitted under the JOA means well,

14   Chesapeake will cooperate if the JOA allows somebody else to be

15   designated as the operator.  But the JOA never allows anybody

16   other than Chesapeake to be the operator.  So yeah, we said we

17   would cooperate if there was a triggering event, but the

18   triggering event can never happen.  So the reality is that's an

19   illusory paragraph.  We promise to cooperate, but there is

20   never any circumstances under which we would ever actually have

21   to honor that commitment.  And if that's the position -- we

22   don't know.  But if that's the position that they are going to

23   assert, Your Honor, it's alarming.

24           Epsilon gave up valuable consideration under that

25   settlement agreement.  We honored the settlement agreement.

1    And a material component of that was to ensure that we weren't

2    here today arguing the same issue.  If someone is going to

3    stand up and say we agreed to cooperate, but what we really

4    meant was there was never going to be an opportunity for us to

5    cooperate, we perceive that as a deception.  It is a deception

6    to us, and unfortunately, if it was read into the record, it's

7    a deception to the Court.

8            As far as irreparable harm, Your Honor, you're going

9    to hear testimony that we're talking about property interests

10   here; the right to develop oil and gas interests in unique

11   properties and drill unique wells.  That's irreparable harm, if

12   those interests are impaired.

13           And we can introduce evidence, Your Honor, that

14   Chesapeake takes the same position we do.  I mean, Chesapeake

15   has got plenty of opportunities where they have got property

16   interests where other people are not allowing them to access

17   the property and develop their property.  And they filed briefs

18   in different courts, including the Middle District of

19   Pennsylvania, in which they come in and say the failure to

20   allow access to our property in and of itself is indisputably

21   irreparable harm.

22           Your Honor, there is also, I think, the notion and

23   what we may hear is that Epsilon may still be able to resubmit

24   these proposals.  If they die, they can just resubmit them

25   later and drill these same wells later.  So it's really just a

1  timing issue; no harm/no foul.

2          And you're going to hear evidence, Your Honor, that's

3  simply not correct.  You know, there's a lot of moving parts to

4  drilling a well and getting equipment and mobilizing things.

5  So you can't necessarily be sure that in the future we're going

6  to be able to drill these wells.  But more importantly, you

7  can't be sure that the wells will be profitable and that they

8  are going to be the same wells that might exist today.

9          And we're going to have testimony that's going to talk

10  about the concept of drainage, because there are other oil and

11  gas companies that have interests in the vicinity of ours.  And

12  those other competing companies are drilling wells and they're

13  operating wells today.  And those wells are potentially

14  competing for some of the same natural gas that our wells would

15  compete with.  And that's okay.  That's under the Rule of

16  Capture in Pennsylvania.  They are allowed to do that.

17          But the reality is if those wells drain some of the

18  same areas that our wells would drain, we have no idea of

19  knowing whether our wells are going to be as successful in the

20  future as they might be now.

21          And you know what?  How do we prove that?  That's what

22  irreparable harm is.  How in the world would we prove that a

23  competing well drained our natural gas that we could have

24  accessed and what are the damages?  That is so challenging to

25  prove and monetize, that's exactly what irreparable harm is

1   for.

2           The last comment that I would like to make, Your

3   Honor, is what we anticipate is an argument that, you know,

4   allowing Epsilon to move forward would require two operators to

5   be on the Craige well pad at the same time.  We would be

6   drilling wells and there are existing wells on the pad.  That

7   simply can't be done.  It can't be performed safely.  It can't

8   be performed without causing catastrophic harm to the

9   environment or the existing Craige well pad.

10          We're going to introduce evidence to show, Your Honor,

11  that while their accusations in a parade of horribles, there is

12  no really no reason to believe that any of that would

13  transpire.

14          Like other oil and gas companies, Epsilon itself is

15  not going to be doing all of the drilling on the Craige well

16  pad.  We hire contractors to subcontract.  And that's

17  consistent with what happens in the industry.  We are going to

18  hire the same subcontractors that most significant oil and gas

19  drillers utilize, including some of the same subcontractors

20  that Chesapeake utilizes.

21          So the notion that those subcontractors can't do an

22  adequate job for us but they do an adequate job for everybody

23  else is certainly unsupported and going to be unsupported.

24          Secondly, Your Honor, you are going to hear that

25  Epsilon does have sophisticated and experienced oil and gas

1    operators.  And they are going to manage these subcontractors,
2    but they have got the ability to do it appropriately.

3          The evidence is going to remind Your Honor that
4    Epsilon owns an interest in those other existing wells on the
5    Craige well pad.  If any harm occurred or if there was any
6    damage in those wells, we own them, as well.  We have the same
7    interest as Chesapeake to make sure that these operations are
8    done correctly.

9          The final comment in that regard, Your Honor, is,
10   again, it just goes back to the settlement agreement.  Less
11   than two -- or approximately two years ago, slightly more than
12   two years ago, the parties signed a settlement agreement that
13   expressly contemplated that Chesapeake would allow Epsilon or
14   some other designated consenting operator onto the same well
15   pad and perform these activities.  So they contemplated that
16   there were going to be more than one operator on the well pads,
17   and they agreed to it in the settlement agreement.

18         To now come forward and to say that can simply never
19   happen because it is too dangerous and it shouldn't be allowed,
20   if that were really the case, they wouldn't have agreed to that
21   language in the settlement agreement in the first place.  The
22   bottom line is the Pennsylvania DEP has issued permits that
23   allow that drilling to move forward.  The Pennsylvania DEP is
24   the regulatory agency to make sure that it goes forward safely
25   and appropriately.

1          And you know what?  The cooperation language in the

2     settlement agreement recognizes that hey, if there are two

3     operators on a well pad, we get it.  There might be issues that

4     we need to work through.  There might be logistics we need to

5     coordinate to make sure.  That's what we expect with the

6     cooperation language.  That's why it's inserted; to say listen,

7     we can't just be designated the operator and say go drill your

8     well.  It's on a well pad that Chesapeake has interests.  As

9     the operator, they have the day-to-day control over a lot of

10    these joint assets that we would need.  They might still need

11    them for their operations.

12         So that's what the reasonable cooperation is for.  And

13    if they reasonably cooperate, there is no reason to believe

14    that these new wells can't be drilled successfully and

15    profitably.

16         So in conclusion, Your Honor, I think the evidence is

17    going to demonstrate that Epsilon has met all of the

18    requirements for a preliminary injunction, and in all fairness,

19    needs to move forward under the terms of the settlement

20    agreement to develop promptly its unique wells.

21         Thank you.

22         THE COURT:  Thank you, Mr. Krock.

23         Defense Counsel.

24         ATTORNEY BRIER:  Good morning, Your Honor.  May it

25    please the Court.

1          THE COURT:  Good morning.

2          ATTORNEY BRIER:  Your Honor, I think the threshold

3     issue that this Court wants to be mindful of is the standard

4     applicable to the request being sought by Epsilon here today.

5     We're here today on an emergency request for an injunction that

6     is totally of Epsilon's own making.  They started the clock.

7     They started the clock with an expectation that they would spud

8     four new wells on a pad that Chesapeake is the operator of by

9     April 22.  April 22 has long come and gone.

10          As Judge Hardiman said very recently in the Hope

11    versus Warden, York County Prison case, when a party petitions

12    for a mandatory injunction, the requiring -- the showing that

13    they must make for a likelihood of success on the merits is

14    that their relief -- and I'm quoting from the opinion, that the

15    relief -- "The right to relief is indisputably clear when you

16    are seeking a mandatory injunction."

17          The Third Circuit has said in the Bennington Group

18    versus St. Croix that when the relief being sought is mandatory

19    in nature that will alter the status quo, the parties seeking

20    the injunction must meet a higher standard of showing

21    irreparable harm in the absence of an injunction.

22          I agree that my colleague's opening statement to the

23    Court was that Chesapeake serves as the operator on the Craige

24    pad.  That's the status quo.  That's the status quo under which

25    we come to this Court.  And we don't serve as the operator on

1    the pad just because Epsilon designated Chesapeake the

2    operator.  We serve on the operator -- as the operator on the

3    pad because in each of the four JOAs that are at issue in this

4    case, all of the JOA parties designated Chesapeake the

5    operator.

6            What does this case boil down to?  What's the essence

7    of it?  The essence of it is that Epsilon seeks to have itself

8    designated the operator on the four new wells that it's

9    proposed.  It seeks to shift operatorship under the JOAs from

10   Chesapeake to itself.

11           Now, you're going to hear there is four proposed

12   wells.  On three of the proposed wells, there is not a JOA

13   party that has decided to participate in Epsilon's development

14   of those wells or that supports those wells.  Not a single JOA

15   party.  So what does it boil down to?  It boils down to one

16   party, Epsilon, proposing, and then when they get no support

17   from the operator and no support from the absent JOA parties,

18   they step forward and say we have the right to develop and

19   serve as operator on those wells.  We want to implement the

20   operator-shifting provision under the JOA.

21           There is one, and only one, operator-shifting

22   provision in the JOA.  It is in Article VI.2(a), the first

23   paragraph.  The plain text of the first paragraph of

24   Article VI.2(a) indicates that, "The model JOA form was

25   modified by the parties to limit its application to the work

1    that's done in an existing wellbore."

2         So all the defining terms that are interlineated into

3    VI.2(a), the word rework, sidetrack, deepened, re-complete or

4    plug back, they're all defined terms in Article I of the JOA.

5    Each of those defined terms relates to work in an existing

6    wellbore.  That's not the relief you are being asked to grant.

7    They are not asking to come onto the pad and shift operatorship

8    to them to rework one of the two producing wells on the pad.

9    If they were, they would have the right, if they followed the

10    JOA Article VI 2(a), to make a claim that they can come in and

11    rework the well, one of the wells.

12         But that's not what they're doing.  That's not what

13    they are doing.  They want to read out of the language the

14    interlineated modification of the model form.  They want to now

15    argue that was added just to create a sequence of schedules

16    that apply when an existing wellbore is being reworked.  That's

17    not a good-faith argument based on the language of the JOA.

18    They are trying to explain it away in a way that's benign,

19    innocuous, irrelevant.

20         But you don't want to believe me, Judge.  You should

21    believe what they said before they brought this lawsuit.  In

22    October of 2020 -- and you'll see this exhibit.  I'm going to

23    read from it.  It's from Mr. Henry Clanton, their chief

24    operating officer.  Now mind you, Judge, this is two years

25    after the settlement agreement that you've heard so much about

it in federal court.  Two years after.  They want to argue the settlement agreement created new rights, created new obligations for Chesapeake.  What I am about to read to you is two years after that settlement agreement when Mr. Clanton says, quote, "Following our internal review of the relevant JOAs, we believe Article VI.B.2, which is a typo, he means Article VI.2, which is titled operations by less than all parties."

Second paragraph, not the first, which is the article that we're here on today with the rework language, the second paragraph is the article in the JOA that will govern the proposals.  October 2020.  "In a scenario where a non-operator (indicating Plaintiff) proposes wells and Chesapeake elects not to participate" -- that's exactly the status we're in today.  They proposed.  We elected not to participate.  Back to the quoted language -- "and there is 100 percent subscription of the proposals, our interpretation, their interpretation of the article is that the incumbent operator, Chesapeake, would serve as the operator on behalf of the consenting parties."

So in October of 2020 after the settlement agreement, after their team reviewed it internally, they knew that Article VI.2(a) first paragraph didn't apply.  If they thought it applied, they would have said it then.  They have come up with this new argument that VI.2(a) applies and that this interlineated language has no relevance because Chesapeake has

1  not agreed to operate -- or to develop the four new wells

2  proposed.

3          So you've heard a lot about the settlement agreement.

4          Let's go back to basics.  There's two parties to the

5  settlement agreement, Epsilon and Chesapeake.  All of the

6  absent JOA parties are not signatories to that settlement

7  agreement.  It is not plausible to suggest that two of the

8  parties to the JOAs got together and changed the contract that

9  applies to everybody, including the parties who didn't sign the

10 settlement agreement.

11         That's why -- that's why article -- or paragraph eight

12 of the settlement agreement makes it abundantly clear that the

13 settlement agreement is subservient to the JOAs.  My colleague

14 said it references the JOAs once.  It doesn't reference them

15 once.  Paragraph eight references the JOAs three times.  It

16 references them in the opening section of paragraph eight.

17         "Chesapeake confirms that Epsilon may propose wells

18 under all of the JOAs between them in accordance with the terms

19 of the JOAs."  They have to do it in accordance with the terms

20 of the JOAs.

21         There's another reference in 8(a) to the JOAs and then

22 in 8(d).  And the language in 8(d) is very intentional.  It's

23 very deliberate.  And you'll note that the documents states

24 that, "Each party was represented by its own counsel in

25 entering into the agreement and that" -- back to 8(d), the

1    analogy I would like to make to the Court is the JOAs are the

2    constitution.

3            The settlement agreement is something entered into

4    between two parties to the constitution.  Everybody else is

5    absent.  And it's an effort between them to resolve a case.

6    And the first seven paragraphs set forth the consideration for

7    the settlement, because it's talking about what wells are going

8    to be developed and what's going to occur as a result of the

9    settlement.

10           And then there's paragraph 8(a) that they want to say

11   creates new rights, new remedies, amends the JOAs.  It doesn't

12   do anything of the kind.  It couldn't.  If we wanted to, we

13   couldn't change the JOAs without having the other parties

14   involved.

15           So the language in 8(d), to the extent permitted under

16   the JOA, means exactly that.  It means that if the JOA permits

17   them to propose an operation, Chesapeake will cooperate with

18   them to the extent permitted.  Well, Section 8.2(a), the first

19   paragraph absolutely allows them to propose operations to

20   rework the existing wellbores.  And we absolutely would have a

21   duty to cooperate with that.  It's not illusory.  The plain

22   text of the document controls.

23           If they thought that by entering into that settlement

24   agreement Chesapeake was rewriting the JOAs to take out that

25   limitation, to give away its authority in the agreement, then

1    they should have said it in the settlement agreement.  Of

2    course, it would have never been acceptable to us because it

3    would have been amending the constitution instead of the JOAs

4    without the other parties present.

5            So we don't think it's illusory at all.  We think it's

6    very clear.  It makes clear that the duty to cooperate is

7    subservient to, conditioned upon, and only to the extent

8    permitted by the JOAs.

9            But again, if they thought in October of 2020 that

10   they have the right that they are asking you to enforce today,

11   which has to be indisputably clear, they would have said in

12   October we have the right under section 8(2)(a).  But they

13   didn't because they knew what the agreement said, and they were

14   referencing the second paragraph of Article VI.2(a).

15           You are also going to hear evidence, Judge, that what

16   you are being asked to do is to profoundly change the status

17   quo.  Why is it profound?  There are two producing wells on the

18   Craige pad.  They produce plus or minus 3 million cubic feet of

19   gas a day.  It's a highly-regulated area.  Chesapeake is the

20   sole operator.

21           And they want you to say, under some vague duty to

22   cooperate, that they have the right to come in and to conduct

23   concurrent operations on a producing well pad, which creates a

24   huge public safety issue.  And as this Court is aware, you have

25   parties before you advocating vigorously against one another.

But this Court also has to be mindful of the public interest. It's May 11.  They want to conduct -- start conducting drilling operations by May 22, eleven days from now.

It's absolutely impossible to convert that producing well pad to a construction site within the next 11 days in order to allow them to come on and to conduct concurrent operations and to do that safely.

And you'll hear testimony about how much time goes into planning for shutting down producing wells, removing the production equipment, putting all kinds of safety equipment around it before anyone is permitted to come onto a producing site to develop new wells.

Now, we didn't create that time problem.  We're not here because Chesapeake slow played anything.  They started the clock.  They came to court in March seeking relief that was prohibited by the bankruptcy court.  Spent weeks trying to advocate that they had the right to do that before the bankruptcy court.  They had to reset the clock.

So now we're back, and this Court has been extraordinary with its time in terms of permitting the parties an opportunity to be heard, but we are here under an emergency of their making.

And by the way, the issue of immediate and irreparable harm, this notion of some vague Rule of Capture and the drainage that may occur is very speculative.  I'm sure you

1    listened to it.  It's possible that development by other

2    entities will diminish their mineral interest.  It's possible?

3    The Court grants an injunction because something might be

4    possible?  And they have known that for how long?  They have

5    been asking us to produce the Craige pad -- or to put producing

6    wells on the Craige pad for a long time.  So their relief not

7    only needs to be irrepairable, it needs to be immediate.

8            They can't sit and wait, wait, wait, and then by their

9    own making create circumstances that cause delay in the

10   presentation of the case and then come to the Court and say we

11   need you to enter this extraordinarily relief in the next 11

12   days.

13           You are going to hear about something, Judge, about an

14   area of review.  An area of review is a regulatory requirement

15   in the Commonwealth of Pennsylvania.  In laymen's terms what it

16   requires is when someone is going to drill and complete new

17   wells, 30 days before they start operations they have to send a

18   questionnaire out to anybody who would have interests within a

19   thousand feet of their wells.  They have to evaluate and

20   monitor how those other wells are going to be affected by their

21   operations.

22           They have to file a report with DEP 30 days before

23   operations are to begin that identifies that they have complied

24   with the rule.  It's not a permitting requirement.  It's

25   post-permitting.  They want to say to you, hey, we have our

permits, so don't worry, Judge, there is no public interest

here. We know what we're doing. We'll be safe.

The area of review requirement is a step after an

entity is permitted that requires them to give notice to

anybody, including Chesapeake or any other operator, that has

wells within a thousand feet of their laterals. They haven't

done that. They can't tell you they have done that.

We checked this morning. There is not an area of

review survey on file with DEP today. So the notion that you

are going to give them permission to start operations by May 22

when they haven't complied with that and even given the notice

out to the other entities that have operating wells is asking

you to overlook a real significant regulatory requirement and

public safety issue. The whole purpose of that is to ensure

the public safety, that everyone who's in the surrounding

vicinity has notice of the intended operations.

THE COURT: Mr. Brier, I want to make sure I

understand this point. Are you saying as an administrative or

regulatory matter that as of today, May 11, it is an

impossibility for Epsilon to drill on May 22? Is that your

position?

ATTORNEY BRIER: Exactly what I'm saying.

THE COURT: Okay.

ATTORNEY BRIER: I'll cite Your Honor to 25 Pa Code,

Section 78a.52a, titled area of review. And I'll read from

1    subsection (d), "The operator shall submit the report required

2    under subsection C to the Department at least 30 days prior to

3    the start of drilling the well."  At least 30 days.  They

4    haven't done that.  I ask if I'm wrong, correct me.  Have you

5    guys filed an area of review?

6            ATTORNEY KROCK:  We have not, Your Honor.  The 30 days

7    that Counsel just mentioned refers to dwelling the well, which

8    is spudding it.  Putting a hole in the ground.  That's not what

9    we have to do by May 22nd.  We have to commence operations on

10   the site.  So I think Counsel is comparing apples and oranges.

11   We can commence operations on the site that is something less

12   than spudding.

13           THE COURT:  I'll allow you to present testimony on

14   that.  Obviously it's a significant issue and you'll need to

15   address that.

16           ATTORNEY BRIER:  And Your Honor, that's a revisionist

17   position.  The proposal, which you'll see, and they are all

18   dated December 22, the anticipated spud date for the well is on

19   or about April 22.  They claim they are entitled to a 30-day

20   extension because of some title defect that's now been

21   identified.  That's how they get from hopscotch from the

22   original spud date of April 22 to May 22.  They don't say to

23   begin operations.  They know that they are required to spud the

24   well.

25           THE COURT:  Well, according to your understanding of

1   the JOA, what are they required to do by April 22, or if an

2   extension is valid, by May 22?  What is required by virtue of

3   the JOA?

4           ATTORNEY BRIER:  Give me one second, Your Honor.

5           THE COURT:  Certainly.

6                   (pause.)

7           ATTORNEY BRIER:  It says, Your Honor, that the

8   operator shall, no later than 90 days after the expiration of

9   the notice period, which was January 22, plus or minus a day,

10  actually commence the proposed operation as proposed.  And it

11  was proposed that they would spud the well by April 22.  So

12  that's the relief that you are being asked to award.

13          THE COURT:  And just so I can follow along very

14  carefully, what paragraph in the JOA is that language found in?

15          ATTORNEY BRIER:  That language is found in

16  paragraph -- Article VI.1.

17          THE COURT:  Thank you.

18          ATTORNEY BRIER:  So's as we come to court today on a

19  schedule that they have created, it's our position that having

20  not filed the area of review survey with DEP or even commenced

21  the process to file one, they haven't even sent out

22  questionnaires, as required by the DEP regulations, that it's

23  impossible to grant the relief sought.  The other --

24          THE COURT:  Mr. Brier, I'm sorry.  Before you move off

25  this point.  I apologize.  We are probably further into the

1    woods than you envisioned in your opening statement, but it

2    will help me in reviewing my notes later.

3          As I understand your argument, paragraph 6.1 of the

4    JOA will be where I look for the language that says that within

5    90 days of the notice date, the operator must commence the

6    proposed operation.  What language do I look for -- do I look

7    at to understand what the proposed operation is, just to be

8    abundantly clear about what your argument is?

9          ATTORNEY BRIER:  Your Honor, it's our position that

10   you would look at their proposals which are dated December 22

11   and which described the operation and identifies that date as

12   the spud date.

13         THE COURT:  And I'm sure I'm going to hear more about

14   this as the hearing unfolds.  Thank you.  You can continue with

15   your argument -- or your statement.

16         ATTORNEY BRIER:  So Your Honor, in terms of likelihood

17   of success on the merits, I don't want to repeat issues that

18   the Court is already aware of, but it's our view, as a matter

19   of law, they can't succeed on merits, given that they don't

20   have a substantive claim and they were prevented from bringing

21   one as a result of the bankruptcy discharge.

22         But it's also our position that a plain reading of the

23   JOA at issue limits the provision that they are asking you to

24   find, gives them the right to designate themselves operator to

25   those circumstances where an existing wellbore is being

1    reworked.  And it does not apply to a subsequent well, as they

2    are asking the Court to apply here.

3         So I think that is everything I wanted to say in the

4    opening, Your Honor.  I appreciate your time.

5         THE COURT:  One issue that has not been addressed in

6    either parties' opening statement is the issue of bond.  And

7    obviously the Court only imposes a bond to the extent

8    preliminary relief would be granted.

9         Shall I assume that there will be a presentation

10   during this hearing on the issue of the appropriate amount of

11   the bond?

12        Is that something you intend to address, Mr. Krock?

13        ATTORNEY KROCK:  Certainly, Your Honor.  I think

14   that's part and parcel of the argument that we addressed as far

15   as the allegations or accusations, that there is significant

16   likelihood of harm on the well pad and to the environment and

17   particularly to the existing Craige wells.  I think we will

18   explain why that is not -- you know, there really is no reason

19   to believe any such harm would exist so that the bond would be

20   commensurate with such a nominal risk.

21        THE COURT:  And Mr. Brier, you argued in your brief in

22   opposition essentially in the alternative, that only if the

23   Court were to, over the opposition of Chesapeake, grant

24   injunctive relief, that a significant bond -- I think that was

25   your language in the brief in opposition.

1       ATTORNEY BRIER:  Yes, Your Honor.

2       THE COURT:  A significant bond will be warranted.

3  Again, I anticipate that the parties will address all issues

4  that the Court may potentially need to address in coming to a

5  resolution.  But does the Defendant intend to substantiate and

6  sort of expand on what you envision would be an appropriate

7  bond?

8       ATTORNEY BRIER:  We do.

9       THE COURT:  Okay.  All right.  Well, thank you for

10  those very comprehensive opening statements.  Are both parties

11  prepared to proceed?

12       ATTORNEY KROCK:  Yes, Your Honor.

13       THE COURT:  All right.  Plaintiff, you can call your

14  first witness.

15       ATTORNEY KROCK:  Your Honor, the Plaintiffs call Mike

16  Raleigh.

17       THE COURT:  Mr. Raleigh, I'll invite you to come

18  forward.  Come around the edge of the jury box and you'll see

19  there's a microphone before the second chair.  And as you make

20  your way toward that seat, I'll invite you, if you are

21  comfortable, to lower your mask.  You can remain standing as we

22  are going to administer an oath.

23       While Mr. Krock gets comfortable, you can direct your

24  attention to Ms. Edleblute, who will administer an oath.

25

RALEIGH - DIRECT

1              MICHAEL RALEIGH,

2   called as a witness on behalf of the Plaintiff, having been

3   duly sworn or affirmed according to law, testified as follows.

4        ATTORNEY KROCK:  Your Honor, we have also got the hard

5   copies of the binders, and we'll provide them to Counsel as

6   well.

7        THE COURT:  Very well.  Thank you.  Mr. Raleigh, if

8   you could just spell your last name for us.

9        THE WITNESS:  R-A-L-E-I-G-H.

10       THE COURT:  Thank you.

11                  DIRECT EXAMINATION

12  BY ATTORNEY KROCK:

13  Q.  Good morning, Mr. Raleigh.

14  A.  Good morning.

15  Q.  Would you please introduce yourself to the Court?

16  A.  My name is Mike Raleigh.  My parents called me Michael.

17  I'm the CEO of Epsilon Energy.

18  Q.  When did you join Epsilon Energy?

19  A.  July of 2013.

20  Q.  Geographically where do you work?  Where is your office?

21  A.  Our head office in is Houston, Texas.

22  Q.  Can you describe for the Court the business in which

23  Epsilon Energy and its related entities are engaged?

24  A.  We're in the business of oil and gas production.  A large

25  part of it is in Susquehanna County, Pennsylvania and we have

1  operations in Oklahoma.

2  Q.  Are you able to approximate kind of the total acreage of

3  the oil and gas interest that Epsilon Energy owns in

4  northeastern Pennsylvania?

5  A.  It's about 5,000 acres.

6  Q.  And those are acres that Epsilon Energy has the right to

7  extract oil and gas?

8  A.  Yes.

9  Q.  Does Epsilon Energy also have ownership interest in

10 pipeline and midstream assets in the business?

11 A.  Yes.  Part of the requirements to produce gas is you need

12 to drill the well, obviously, produce the gas from the

13 reservoir, put it into a gathering line, take the gas into the

14 gathering line to a compressor session, clean the gas up a

15 little bit and put it into sales line that go into the major

16 trunk lines that go across the country.

17 Q.  And what specific ownership interest does Epsilon Energy

18 have in those pipeline assets in northeastern Pennsylvania?

19 A.  With the pipeline and compressor station, about 35 percent.

20 Q.  Are the midstream assets located in the same general

21 vicinity as the ownership interest in the oil and gas?

22 A.  They are coincidently in the same place.

23 Q.  Does Epsilon Energy operate through a number of subsidiary

24 companies?

25 A.  Yeah.  The parent company is called Epsilon Energy, LTD the

1  subs that we own 100 percent of are Epsilon Energy U.S.A.,

2  Epsilon Midstream and Epsilon Operating.

3  Q.  Which of the entities actually owns the assets in

4  northeastern Pennsylvania.

5  A.  Ultimately Epsilon Energy, LTD.

6  Q.  What does Epsilon Operating, LLC do?

7  A.  Epsilon Operating, LLC is established to operate wells.

8  Q.  Does it operate the wells that its affiliated entities own

9  an interest in?

10  A.  No.  Chesapeake operates that.

11  Q.  But as far as what -- if Epsilon Operating, LLC is going to

12  operate wells, who would own those wells?

13  A.  Epsilon.

14  Q.  What is your educational background, Mr. Raleigh?

15  A.  I graduated in 1979 with a bachelor of science in chemical

16  engineering.  I took an MBA, a masters in business

17  administration from the University of Colorado and graduated in

18  '93.

19  Q.  Can you provide just a very brief overview of your

20  employment history?

21  A.  When I graduated I worked as an engineer in a drilling

22  gathering, much like what Epsilon does now, in Alberta, Canada.

23  Started a company that did worldwide consulting for national

24  oil companies, international companies, worked everywhere in

25  the world providing expertise on drilling development plans,

1  economic optimization plans.  That company was purchased by --

2  I started that company with some partners.  We sold that to

3  Schlumberger Oil Field Services.

4           THE COURT REPORTER:  I'm sorry?

5           THE WITNESS:  Oh, yeah.  It's S-C-H-L-U-M-B-E-R-G-E-R.

6  BY ATTORNEY KROCK:

7  Q.  Did you continue to work for Schlumberger after it bought

8  your company?

9  A.  I did.

10 Q.  What type of company is Schlumberger?

11 A.  The number one or number two largest oil field service

12 business in the world.

13 Q.  I may have asked this question, but when did you join

14 Epsilon?

15 A.  In July of 2013.

16 Q.  Since you graduated with your undergraduate degree, have

17 you worked in any other business other than the oil and gas

18 business?

19 A.  I have not.

20 Q.  As the CEO of Epsilon, do you have any responsibilities for

21 managing the relationship with Chesapeake?

22 A.  Yes.  The ultimate responsibility for the relationship with

23 Epsilon, with all of our partnerships, service companies, runs

24 up to me.

25 Q.  Had the JOAs with Chesapeake been signed before you joined

1  the company in 2013?

2  A.  Yes.

3  Q.  Did you undertake any actions to familiarize yourself with

4  those existing agreements?

5  A.  I reviewed -- there was a model form JOA that came with the

6  farmout agreement that established a relationship between

7  Chesapeake and Epsilon.  And with that, there was a number of

8  JOAs that were signed.  So yes, I reviewed those.

9  Q.  Did you also talk to any other individuals at Epsilon who

10  had been dealing with Chesapeake in conjunction with those

11  JOAs?

12  A.  Yes.  I talked with the employees that were familiar with

13  JOAs, as well.

14  Q.  Since you joined Epsilon, have you personally been involved

15  in managing and overseeing the relationship with Chesapeake?

16  A.  I have.

17  Q.  Have you had occasion to actually communicate directly with

18  Chesapeake representatives about the JOA relationship?

19  A.  I have.

20  Q.  How would you generally describe the relationship between

21  Epsilon and Chesapeake?  Has it been harmonious or otherwise?

22  A.  It was a little frustrating to begin with.  They're a busy

23  company with lots of priorities, and it's difficult to get

24  attention to talk to them about certain things.  In general,

25  they have been okay.

RALEIGH - DIRECT

1    Q.  Are you able to approximate how many wells have been

2    drilled under the JOAs collectively?

3    A.  A hundred or more.

4    Q.  Has Chesapeake -- I'm sorry.  Has Epsilon elected to

5    participate in all of the wells that have been drilled?

6    A.  Unfortunately, before I was the CEO there was one well that

7    Epsilon was unfortunately unable to participate in.

8    Q.  What understanding did you gain about why Epsilon did not

9    participate in that well?

10   A.  The oil and gas industry is very capital intensive.  Small

11   companies have difficulty raising capital.  And the timing of

12   when they were raising capital didn't coincide with when the

13   well was being drilled and calls for capital to be contributed.

14   So they had to non-consent the well.

15   Q.  Is that unusual in the industry to have a company, based on

16   its own unique financial situation, that simply doesn't believe

17   it wants to invest in a proposed well?

18   A.  Very common.

19   Q.  With the exception of that one well, has Epsilon consented

20   to participate in all the other roughly hundred wells that have

21   been drilled under the JOAs?

22   A.  Yes.

23   Q.  With respect to the wells that Epsilon participated in, did

24   Chesapeake send invoices asking Epsilon to pay its share of the

25   costs of developing those wells?

1  A.  It did.

2  Q.  Did Epsilon pay those invoices?

3  A.  We did.

4  Q.  Just in general, what are the types -- just give the Court

5  some examples of the types of things that Chesapeake does that

6  it then passes on a portion of the cost to Epsilon.

7  A.  There's a number of things that go into drilling a well.

8  You have to have infrastructure.  You have to have roads.  You

9  have to have water sources, water impoundments, creek

10  crossings.  There's a number of things that go into actually

11  preparing -- actually drilling a well, including constructing

12  what the industry calls a pad, which is a site-specific

13  location preparation for receiving large equipment, big trucks,

14  equipment to sit on the surface.  So you have to prepare the

15  surface to accommodate all of this heavy equipment.

16  Q.  With respect to the wells in which Epsilon participated,

17  were there ever times that other JOA parties elected not to

18  participate in that new well?

19  A.  There is.  There has been.

20  Q.  Have there been recent instances in which a well was

21  drilled in which Epsilon participated but some other party did

22  not?

23  A.  Yeah.  During 2020 there was three wells that Chesapeake

24  proposed and at least one JOA party did not participate.  They

25  call it a non-consent.

RALEIGH - DIRECT

1   Q.  Do those wells, nonetheless, get drilled?

2   A.  They were drilled.

3   Q.  At any point in time, with respect to those three wells,

4  did Chesapeake ever suggest that the well could not be drilled

5  because there were non-consenting parties?

6   A.  No.

7   Q.  With respect to those wells, did any other party in the

8  JOAs ever suggest that the wells could not be drilled because

9  there were non-consenting parties?

10  A.  No.

11  Q.  Mr. Raleigh, are you able to just approximate in your

12  career how many separate written JOAs have you personally

13  examined?

14  A.  They are in the hundreds.  I'm going to guess somewhere

15  between 300 or more.

16  Q.  Have you ever seen a single JOA in which all of the parties

17  had to consent in order for a new well to be drilled?

18  A.  No.

19  Q.  Have you ever seen a single JOA in which the party that was

20  serving as the operator had the power to unilaterally dictate

21  whether a new well could be drilled or not?

22  A.  No.

23  Q.  Would you personally ever sign a JOA in which any other

24  party had the right to unilaterally control whether a new well

25  could be drilled?

1   A.   No.   And that would be crazy, because you are giving up the

2   rights to the property you contributed to the joint operations.

3   Q.   If you could, Mr. Raleigh, I would like you to take a look

4   at what's been marked as Plaintiff's Exhibit 1.

5          If we can pull that up, as well.

6   A.   I hope the font is big enough to read.

7          THE COURT:   You and I both hope for that, Mr. Raleigh.

8          THE WITNESS:   Okay.   I have that.

9          THE COURT:   Mr. Krock, are you -- I don't know what

10  your setup is at counsel table.   Okay.   So you can actually

11  enlarge it on the screen for all of our benefits.

12         ATTORNEY KROCK:   I believe we can try to do that.

13  BY ATTORNEY KROCK:

14  Q.   Before I ask you any specific provisions about the terms of

15  this document, Mr. Raleigh, can you just give the Court a quick

16  overview about under these JOAs, what is the process that is

17  followed for proposing, considering and then drilling a new

18  well?

19  A.   Generally, there has to be somebody initiate the process to

20  propose an activity.   In this case, let's use drilling a well.

21  And drilling a well would require someone to make a proposal.

22  The proposal goes out to all the owners.   They consider the

23  proposal within a specified period of time.   And they then

24  provide an election to determine whether they want to

25  participate in that well.   And that goes to -- it all gets

1   collected and everybody gets notified of whether everyone

2   consented and, therefore, you have 100 percent participation of

3   the JOA parties.

4         In a case where one of those parties has the option to

5   non-consent, that's also provided information to the rest of

6   the parties so that they can determine whether they want to

7   take up that interest.

8         Then there's the third option, where a proposal can be

9   made by any of the parties.  And the operator, the current --

10  the operator can non-consent the operation, which requires a

11  bunch more determinating procedures.  It's all very well

12  formulaically outlined in the JOA.

13  Q.  So if everybody consents, who actually serves as the

14  operator for that activity?

15  A.  In this case it would be Chesapeake.  Whoever the operator

16  is.

17  Q.  If one of the parties elect not to consent, does that mean

18  that the party does not have to contribute any costs to

19  develop, say, that well?

20  A.  Yeah.  There's no -- you're not forced to do anything.  If

21  you don't want to participate in a proposal, you have the

22  option of not participating, not contributing your capital.

23  But then the corollary is you don't participate in any of the

24  benefits.

25  Q.  If the party non-consents and doesn't contribute the

1  capital, who then has to contribute those payments that

2  otherwise would have been made by the non-consenting parties?

3  A.  As I outlined, any other JOA participant has the

4  opportunity to participate, take up more interest and pay for

5  that non-consenting party until they have 100 percent of the

6  capital required.

7  Q.  Now, I would like to pull up Exhibit 1, if you can take a

8  look at that for me, Mr. Raleigh.

9  A.  First page?

10  Q.  Yes.

11  A.  Hang on one sec.

12  Q.  While we're pulling it up, Mr. Raleigh, can you just flip

13  through it.  And my question is going to be do you recognize

14  this document?

15  A.  I do.

16  Q.  What is the document or series of documents, to be fair?

17  A.  There's a declaration of Cole's unit.  There's a model form

18  operating agreement.  I think there is some exhibits attached

19  to that model form operating agreement.

20  Q.  With respect to the model form operating, you are talking

21  about the page that is three or four page in that says AAPL

22  model form 610-1989 model form operating agreement?

23  A.  Yes.

24  Q.  Is this the specific operating agreement that is at issue

25  in this case that involves the Craige unit?

RALEIGH - DIRECT

1   A.  Yes.  And it specifies the contract area being the Craige

2   unit.

3   Q.  Have you seen a copy of this Craige JOA before?

4   A.  I have.

5   Q.  Is this exhibit a true and correct copy of the Craige JOA

6   that governs the relationship with the parties?

7   A.  It looks like that is right.

8   Q.  Is this a document that Epsilon maintains in the ordinary

9   course of business in its offices?

10  A.  It does.

11      ATTORNEY KROCK:  Your Honor, Epsilon moves for

12  admission of Plaintiff's Exhibit 1 into evidence.

13      THE COURT:  Any objection from Defendant?

14      ATTORNEY DEMPSEY:  No objection, Your Honor.

15      THE COURT:  Plaintiff's Exhibit 1 is admitted.

16  BY ATTORNEY KROCK:

17  Q.  Mr. Raleigh, is there a specific provision in this JOA that

18  describes the role of the operator and its duties and

19  responsibilities?

20  A.  Yes.  I think that is Article V.  Let me just go to that

21  section.  Yeah, Article V is titled operator.

22  Q.  And that's on page -- page number seven on the bottom of

23  the page?

24  A.  Yes, sir.

25  Q.  And what specific language in Article V are you referring

1   to that kind of describes the role of the operator?

2   A.  The second sentence, "In its performance of services

3   hereunder for the non-operators, operator shall be an

4   independent contractor and subject to the control or direction

5   of the non-operators except as to the type of operation to be

6   undertaken in accordance with the election procedures contained

7   in this agreement."

8   Q.  As the operator, do the non-operators have the right to

9   dictate the day-to-day activities about how Chesapeake goes

10  about drilling the well?

11  A.  No.  The operator decides how to do things, and then

12  non-operators and JOA participants decides what the contractor

13  does.

14  Q.  Is there a provision in the JOA that addresses which

15  parties are entitled to propose that an operation be

16  undertaken?

17  A.  Yes.  Section VI, drilling and development.  Any party

18  hereto shall desire to drill any well.

19  Q.  That's Article VI.  Is that page nine?

20  A.  That's the top of page nine.

21  Q.  And specifically, where does it say --

22  A.  Excuse me.  With operations in the contract area under

23  drilling and development, number one says, "Proposed operation.

24  If any party hereto should desire to drill any well or"-- it

25  also goes on -- "If any party should desire to rework,

1  sidetrack, deepen, re-complete or plug back a dry hole."

2  Q.  In your experience, is it customary in the industry for any

3  party to be able to propose an operation in a JOA in this area?

4  A.  It's the JOA that's probably been used thousands and

5  thousands of time.

6  Q.  Why is that?  Is there any reason why any party can propose

7  an agreement?

8  A.  Yes.  The purpose of a JOA is the proposal of a joint

9  operating agreement.  If you come together with your land and

10  contribute them so that it is sufficiently developed by, in

11  this case, one operator, which makes it much more efficient and

12  expeditious for that agreement to be put in place to have

13  things developed.

14  Q.  I believe you had indicated earlier that there are -- that

15  the operator is entitled to non-consent.  Is there a particular

16  provision in this JOA that addresses what the other parties do

17  if the operator has elected not to consent and participate in a

18  particular operation?

19  A.  Yes.  Under that same Article VI.2 it refers to -- let me

20  just find the section and line.  So starting on line 20, the

21  sentence, "Operator shall perform all work for the consenting

22  parties.  However, no drilling rig" -- and then it goes on to

23  say, "And if operator is a non-consenting party, the consenting

24  party shall either request the operator perform the work or

25  designate or the" -- "or the consenting parties, romanette two,

1  designate one of the consenting parties to operate and perform

2  the task."

3  Q.  I think the next sentence right below where you are says,

4  "The rights and duties granted to and imposed on the operator

5  under this agreement are granted to and imposed upon the party

6  designated as operator for an operation in which the original

7  operator is a non-consenting party."

8          Do you see that?

9  A.  I'm sorry.  What line were you starting that on?  What line

10 number on the left?

11 Q.  The line number -- at the end of line 22.

12 A.  Yes, I see that now.  Twenty-two, yeah.  "Rights and duties

13 passed on to and imposed upon the operator."  Yes, I see that.

14 Q.  Is that also customary in the industry that if somebody

15 other than the operator is designated to perform an operation

16 that it gets to utilize all of the assets that the operator

17 would have been entitled to use to perform that operation?

18 A.  That's correct.

19 Q.  Is this, in fact, a provision that Epsilon is attempting to

20 invoke in this lawsuit with respect to its proposed well?

21 A.  Yes.

22 Q.  Is there also a provision in this specific JOA that you

23 believe makes clear that new wells can be drilled even if there

24 are non-consenting parties to that new well?

25 A.  Yes.  Drilling is permitted in line -- we talk about

1  drilling in section B, relinquishment of interest for

2  non-participation.  So when you decide who's going to

3  participate in wells -- um...

4  Q.  I just want to make sure that the Court can follow along

5  with this, Mr. Raleigh.  Are we still talking about the section

6  entitled operations by less than all parties, which is number

7  two on page ten?

8  A.  Yeah.  At the top of the second paragraph on page ten on

9  line 26, "If less than all parties approve any proposed

10  operation, proposed operation can be drilling, rework, any of

11  those things that were discussed previously."

12  Q.  I want you to take a look on the next page, which is page

13  11 under Article II, subsection B where it says relinquishment

14  of interest for non-participation.  Do you see that?

15  A.  Yes, sir.

16  Q.  Does that section pertain to what you discussed earlier,

17  which is how the parties' rights are allocated when there is a

18  non-consenting party?

19  A.  Yes.

20  Q.  And is there anything in that paragraph that leads you to

21  believe that drilling activities are among the activities that

22  can proceed without unanimous consent?

23  A.  Yeah, there are several references to drilling in paragraph

24  B.  There's a reference to if any line is drilled on page ten.

25  Page 11, one reference.  Then on line 13, upon commencement of

1   operations for drilling, reworking, et cetera.  Then there are

2   several other instances where the parties to the JOA inserted

3   language on page 11, specifically addressing new wells, such as

4   on line 26, they talk about inserting proposed well or

5   operation.  Then on line 20, if the well to be drilled.

6          So all of this contemplates drilling wells.  Drilling

7   new wells.  Drilling initial wells.  So there is plenty of

8   reference in here for drilling activity.

9   Q.  I want to focus your recollection specifically on the first

10  reference you made, which is, I believe, in the middle of --

11  what's on line ten on the left.  The sentence starts, if any

12  well drilled.

13  A.  I got that.

14  Q.  Do you see that sentence?

15  A.  I do.

16  Q.  Okay.  It says, "If any well drilled, reworked,

17  sidetracked, deepened, re-completed or plugged back, under the

18  provisions of this article results in a well capable of

19  producing oil or gas in paying quantities, the consenting

20  parties shall complete and equip the well to produce at their

21  sole cost and risk, and the well shall then be turned over to

22  the operator, (if the operator did not conduct the operation),

23  and shall be operating by it at the expense and for the account

24  of the consenting parties."

25          Do you see that paragraph -- or that sentence?

1   A.  I do, yes.

2   Q.  Can you explain to the Court when it says that the

3   consenting party shall complete and equip the well before

4   handing it off back to the operator, what does it mean to

5   complete and equip the well?

6   A.  Well, drilling really just means putting a hole in the

7   ground and you have to put pipe in the ground to prevent

8   surface water mingling, isolating the zone you want to produce.

9   Completing the well really means -- you've probably heard the

10  word fracking.  All of this stuff is fracking.  So generally it

11  is fracking.

12       Putting surface equipment on the top of the surface to

13  produce that gas and get it ready to be hooked up into a

14  gathering line has to be all equipped at the surface.  So

15  everything that goes into drilling, completing, equipping the

16  surface, then the parties actually contemplate a disagreement

17  that if the operator wasn't the one doing that, you could then

18  turn it back over to the operator.

19       So there's a very finite sequence where if the

20  operator operates the wells, he gets it for somebody else to

21  drill those wells, clearly.  And when they finish drilling the

22  wells, equipping, they turn them back to the operator to manage

23  the production for the life of the well.  Very well documented.

24  Q.  I want to direct your attention to subparagraph I and

25  subparagraphs (i) on page 11 in the same paragraph, because you

1  mentioned that those provisions also made reference to drilling

2  wells.  Is that correct?

3  A.  Yes, sir.

4  Q.  Are these the paragraphs that talk about, for a lack of a

5  better term, when the parties that didn't consent to a well are

6  ever allowed to enjoy some benefits of that well?

7  A.  Right.  There is two cases that they identify that -- for

8  the specifics, about 200 percent penalty or a 400 percent

9  penalty.  What that simply means is that if I spent $100, all

10  of the consenting parties spent $100, they should be returned

11  $200 in the case of romanette number (i) with those specific

12  conditions, and they should get four times that in romanette

13  number (ii) before all of or each of the non-consenting parties

14  get to participate in the benefits that they didn't even pay

15  for.

16  Q.  If unanimous consent of all parties was necessary to drill

17  a new well, would there be any reason to refer to drilling when

18  we're talking about the penalties or the relinquishments of

19  interest for a non-consenting party that didn't participate?

20       ATTORNEY DEMPSEY:  Objection, Your Honor.  Calls for a

21  legal conclusion.

22       THE COURT:  Would you like to respond, Mr. Krock?

23       ATTORNEY KROCK:  I'm just saying in describing how

24  these JOAs work, from a practical standpoint in the industry

25  where there be any reason for a non-consenting party -- I'm

1  sorry -- for any arrangement to refer to drilling.

2        THE COURT:  I think it is more in the nature of

3  argument.  I think it calls for him to sort of make your

4  argument for you, which is, I think, the basis for the

5  objection.  Is that fair to say, Mr. Dempsey?

6        ATTORNEY DEMPSEY:  That's correct, Your Honor.

7        THE COURT:  I'll sustain the objection.  To be clear,

8  you are free to make the argument, Mr. Krock.

9        ATTORNEY KROCK:  Sure.  Understood, Your Honor.

10  BY ATTORNEY KROCK:

11  Q.  I want you to look back at the prior page, which is page

12  ten of the JOA, and look specifically at Article VI.2, which is

13  the heading, operations by less than all parties.

14  A.  I have that.

15  Q.  Do you see it?

16  A.  I have it.

17  Q.  Okay.  Now, then there's the -- there's a very first

18  sentence there in subsection A.  And you do understand in this

19  case that it's Chesapeake's position that the language in

20  subsection -- the first sentence of subsection A is the

21  language that they believe creates the need to obtain unanimous

22  consent?  You do understand that's Chesapeake's position.

23  Correct?

24  A.  I think I understand Chesapeake's position, yeah.

25  Q.  Let me ask you, what is the purpose of that very first

1    sentence that says determination of participation, the first

2    sentence?

3         ATTORNEY DEMPSEY:  Objection, again, Judge, to the

4    form.

5         THE COURT:  Mr. Krock.  Well, let me just read back

6    the question.

7              (The record was read by the Court.)

8         THE COURT:  I will overrule the objection.  If you are

9    able to answer based on your understanding of the contract.

10        THE WITNESS:  That sentence provides for if there are

11   non-consenting participants that they have to perform that

12   specific work within 90 days.  So it's really just excluding

13   the opportunity to drill because -- and the reason that was put

14   in there is because in 2010 or 2011 --

15        ATTORNEY DEMPSEY:  Objection, Judge.  This witness has

16   testified that he began his employment with Epsilon in 2013.

17   He's offering the Court opinion testimony.  He doesn't have

18   personal knowledge of why matters were put in that contract.

19   Objection.

20        THE COURT:  Mr. Krock, can you lay a foundation?  I'll

21   give you an opportunity to try and lay a foundation.  It is

22   accurate that the witness's testimony did indicate that he did

23   not participate in the formation of these agreements but merely

24   reviewed them for the purposes of familiarizing himself.

25        ATTORNEY KROCK:  Correct.  I will lay a foundation,

1   Your Honor.

2   BY ATTORNEY KROCK:

3   Q.  Mr. Raleigh, if I understood your testimony correctly, is

4   that your review and your understanding of this contract, is

5   that if the operating is something other than drilling that it

6   must be commenced within 90 days.  Correct?

7   A.  Correct.

8   Q.  It's your understanding, based on your review of the

9   document, that if the proposed activity is a new well, that is

10  not subject to the 90 days.  Correct?

11  A.  It is not subject to the 90 days.

12  Q.  In your experience, is there any reason to believe that the

13  drilling of a new well may require more time than operations

14  where the well already existed?

15  A.  Yeah.  I mean, I reviewed investments in this area in 2010.

16  I'm aware that there was no infrastructure, no roads, no water

17  sources, no pads built.  It was a rough, tough, hilly, rocky

18  area.  And so it makes a lot of sense that you would want to

19  build infrastructure and take longer to get those things

20  prepared and ready, in place prior to bringing all of those big

21  heavy equipment into place.

22          So limiting yourself to 90 days didn't make any sense.

23  It is unreasonable to force someone to drill a well in that

24  short space of time when you have had all of these tough

25  conditions.  It's not like Texas or Oklahoma where it's flat.

1   There's lots of infrastructure in the area.  You need to

2   accommodate a reasonable timeframe for which to execute an

3   actual drilling.

4   Q.  If that 90-day period does not apply to the drilling of a

5   new well, is there any time period that might apply for the

6   drilling of a new well that is set forth in this specific JOA?

7   A.  Yeah.  Article XVI describes exactly how and how long you

8   need to propose to commence the drilling of a new well.

9   Q.  So if we can take a look at Article XVI, I believe that is

10  on page 27.

11  A.  Yes, 27, Article XVI, other provisions.  This is all

12  language that was added to the model form operating agreement.

13  So it was specifically addressing well proposals and

14  requirements necessary to propose vertical wells or horizontal

15  wells.  And the very first requirement in each of the proposals

16  is a --

17       THE COURT:  I'm sorry to interrupt your testimony.

18  We're getting a little feedback.

19                    (pause.)

20  BY ATTORNEY KROCK:

21  Q.  Mr. Raleigh, I believe you were at subsection A, well

22  proposal requirements and order of preferences.  And number one

23  required to a vertical well.  Is that right?

24  A.  Number one is a vertical well and number two is a

25  horizontal well.  And the very first item you need to specify

1   is the estimated commencement date.  So they purposefully

2   scheduled new wells to be drilled longer than that 90 days

3   imposed on the specific case where non-consenting participants

4   wanted to rework or re-drill or deepen a well.  It was because

5   there was already existing infrastructure.  There was already a

6   well there.  He didn't need more time to commence.

7   Q.  If a party believed that it needed more than 90 days to

8   commence the operations on a new well, it could establish what

9   the new deadline was in its well proposal.  Is that right?

10  A.  That's correct.  It could have been 120 days.  It could

11  have been 180 days.  They specify the commencement date.  So

12  either a calendar day or something in the future.

13  Q.  I want to shift gears, Mr. Raleigh, and just ask you a few

14  follow-up questions on something you mentioned earlier, which

15  was the fact that there have been wells drilled by Chesapeake

16  without the full consent of all parties.  Is that right?

17  A.  Yes, sir.

18  Q.  Approximately when did you say was the most recent instance

19  of that occurrence taking place?

20  A.  Mid 2020.  July.  June/July-ish timeframe.  I can't

21  remember the exact dates but mid 2020.

22  Q.  Can you please take a look at what has been marked as

23  Plaintiff's Exhibit 2 in that binder?

24  A.  Okay.  I have that.

25  Q.  Have you seen the letter that has been marked as

RALEIGH - DIRECT

1   Plaintiff's Exhibit 2 before?

2   A.  I have.

3   Q.  Did you receive a copy of this letter in July of 2020,

4   around the time it was received from Chesapeake?

5   A.  I did.

6   Q.  And is this a true and accurate copy of the letter that you

7   received?

8   A.  It is.

9        ATTORNEY KROCK:  Your Honor, Epsilon moves for the

10  admission of Plaintiff's Exhibit 2.

11       THE COURT:  Any objection from Defendant?

12       ATTORNEY DEMPSEY:  No objection, Your Honor.

13       THE COURT:  Plaintiff's Exhibit 2 is admitted.

14  BY ATTORNEY KROCK:

15  Q.  Do you see that the regarding line makes reference to the

16  non-consent acreage in the Maris 22HC unit?

17  A.  It's the Maris 22 HC well in the Kipard South unit.

18  Q.  So Maris 22 HC is the well that is referenced in this

19  letter?

20  A.  Yeah, that's a reference to the well Maris 22 HC.

21  Q.  Was the Maris 22 HC one of the wells that Chesapeake

22  drilled without full consent of all parties?

23  A.  Yes.

24  Q.  What specifically did you understand the purpose of this

25  letter to be?

1    A.  It's the memorialization of the JOAs in VI.2 starting on

2    line 27, 28 where they --

3    Q.  Let's take this one step at a time.  The letter states in

4    the middle of the paragraph -- let me strike that and start at

5    the beginning.

6           In this letter does Chesapeake advise that there were

7    non-consenting parties in the Maris well?

8    A.  Right.  It's incumbent on them to tell everybody who is

9    paying, who's not paying, that we have to raise more capital

10   from whoever wants to keep going.

11   Q.  In the middle of that paragraph it says, "Chesapeake

12   respectfully requests that Epsilon select one of the following

13   options in accordance with the JOA."  It lists three items.  Is

14   that right?

15   A.  Yes, sir.

16   Q.  Is this the election process you testified to earlier when

17   the parties that consent have to figure out what they are going

18   to do to pay the costs of the non-consenting parties?

19   A.  Yes, sir.

20   Q.  And you'll see at the bottom of that, the very last page,

21   the bottom sentence of the last paragraph on the page states

22   that, "The failure to elect within the 48 hours shall be deemed

23   an election under option one"?

24   A.  I see that.

25   Q.  Now, do you know where that 48-hour time period came from?

RALEIGH - DIRECT

1   A.   Yeah.  It came from the JOA, second paragraph of VI.2.

2   Q.   If you can go back to Exhibit 1 -- and did you say -- was

3   it Article VI.2, did you say?

4   A.   It's VI.2 and starting on paragraph -- line 27, 28.

5   Q.   Give me one second, Mr. Raleigh.  Did you say line 27?

6   A.   The lines are a little bit off, but it looks like the

7   actual line is between the numbers 27 and 28.

8   Q.   Oh.  I see it.  So it's the provision that says, "Each

9   consenting party, within 48 hours, exclusive of Saturdays,

10  Sundays and legal holidays, after delivery of such notice shall

11  advise the proposing party of its desire to" -- and then it has

12  three options, it has the letters (i), (ii) and (iii).

13  A.   Correct.

14  Q.   Do you see that?

15  A.   Correct.

16  Q.   Is option (i) the same as the option that is set forth as

17  the option that has been marked as Exhibit Number 2 as option

18  number one?

19  A.   "Limit participation in each party's interest."  "Elect to

20  limit participation to Epsilon's interest."  Well, they are

21  saying the same language.

22  Q.   So all three of the options as the JOA are the exact same

23  as the options set forth in the letter?

24  A.   Yeah.  They lifted the words there and put them on the

25  page.

RALEIGH - DIRECT

1   Q.  It looks like there's a sentence that says, "Failure to

2   propose shall be deemed an election under (i)."  Do you see

3   that?

4   A.  In the JOA it says that.  And at the end of the page it

5   says, "Failure to elect within the 48 hours shall be deemed an

6   election under option one."  So same language as the JOA.

7         THE COURT:  Mr. Krock, just so that I understand your

8   argument, and you can ask the witness this question, is the

9   letter in Plaintiff's Exhibit 2 addressing the drilling of a

10   new well?  It's not clear from the face of the letter.

11   Certainly we need to establish that.

12         ATTORNEY KROCK:  Got you.

13   BY ATTORNEY KROCK:

14   Q.  Mr. Raleigh, was the Maris well one of the wells that you

15   testified about earlier that was a new well that was drilled by

16   Chesapeake?

17   A.  Yes.

18   Q.  And it did get drilled.  Right?

19   A.  It did get drilled.

20   Q.  Did it get drilled with less than all participation -- less

21   than full participation by all JOA parties?

22   A.  Yes.

23   Q.  If you recall, which option did Epsilon choose as far as

24   one, two or three?

25   A.  The second page of that letter, when we returned it --

RALEIGH - DIRECT

1  Henry Clanton, the CEO, returned it, "Epsilon hereby elects to

2  carry Epsilon's proportionate part of the non-consenting

3  parties' interest with all or a portion of Epsilon's

4  proportionate part of the non-consenting parties' interest that

5  any non-consenting party did not elect to take", which means if

6  someone didn't want to take their proportionate share, we'll

7  take it.

8  Q.  Is there anything in the JOA that says there has to be more

9  than one consenting party to a proposal?

10  A.  No.

11  Q.  So if a party made a well proposal and said we think it's a

12  good idea and none of the other JOA parties wanted to

13  participate, could they elect to go about it alone?

14       ATTORNEY DEMPSEY:  Objection, Your Honor.  That is a

15  legal opinion.

16       THE COURT:  Are you asking the witness his

17  understanding of the actual JOA at issue?

18       ATTORNEY KROCK:  Yes.

19       THE COURT:  Overruled.

20       ATTORNEY KROCK:  I'm sorry.  I didn't hear your

21  question.

22       THE WITNESS:  Can you repeat the question?

23  BY ATTORNEY KROCK:

24  Q.  If the proposing party is the only consenting party that

25  wants to proceed with drilling the well, is it your

1  understanding that that party can proceed by itself as long as

2  it's willing to pay all the costs?

3  A.  Yes.

4  Q.  And over the course of your career, has that happened

5  periodically where there is only one consenting party to a

6  proposal?

7  A.  Yes.  There is all sorts of those things.

8  Q.  I'm going to ask you some questions about the prior dispute

9  between Chesapeake and Epsilon that led to a prior lawsuit.

10 Can you explain to the Court the circumstances of how that

11 prior dispute arose?

12 A.  For all intents and purposes, exactly the same as what

13 we're talking about here.

14 Q.  Did Epsilon propose new wells that it wanted to drill under

15 certain of these JOAs?

16 A.  Yes.

17 Q.  Did Chesapeake elect not to participate in certain of those

18 wells?

19 A.  Yes.

20 Q.  Did Chesapeake decline to serve as the operator for the

21 wells in which it did not want to participate?

22 A.  They declined to be the operator for the new wells, yes.

23 Q.  I want to direct your attention to the Plaintiff's

24 Exhibit 3.  Have you seen the letter dated May 11th of 2018

25 from Chesapeake to Epsilon that is marked as Exhibit 3?

1   A.  I have.

2   Q.  Did you receive a copy of this letter around May 11th of

3   2018 when it was received by Epsilon?

4   A.  Yes.

5   Q.  Is this a true and accurate copy of the letter that you

6   received?

7   A.  Yes.

8   Q.  Is this letter stored by and maintained by Epsilon in its

9   ordinary course of business?

10  A.  Yes.

11          ATTORNEY KROCK:  Your Honor, we move for admission of

12  Plaintiff's Exhibit 3.

13          THE COURT:  Any objection?

14          ATTORNEY DEMPSEY:  No objection, Your Honor.

15          THE COURT:  Plaintiff's Exhibit 3 is admitted.

16  BY ATTORNEY KROCK:

17  Q.  Does this letter pertain to certain of the wells that

18  Epsilon had proposed in connection with the last lawsuit?

19  A.  Yes, sir.

20  Q.  How do you pronounce the wells, those wells in the

21  regarding line?

22  A.  I'm Canadian, so I pronounce it Baltzley.  But maybe

23  there's an American pronunciation that is different.

24  Q.  Is this the letter in which Chesapeake responded to the

25  proposal to drill those new wells?

1    A.   Yes.

2    Q.   And specifically it says in the middle sentence,

3    "Chesapeake Appalachia, LLC does not consent to the drilling of

4    the above-captioned wells."  Is that right?

5    A.   Yes, sir.

6    Q.   So when you saw this, you understood that they were

7    electing to non-consent?

8    A.   Yes.

9    Q.   And then it says, "And will remain the operator of the

10   contract unit."  Do you see that?

11   A.   Contract area, it says.

12   Q.   I'm sorry.  Contract area.

13   A.   I see that.

14   Q.   And when you read that sentence, was it clear to you

15   whether they were going to operate the wells?

16   A.   It -- it -- there's a certain amount of ambiguity in that

17   sentence.  Operator means are you the operator of the

18   production or are you the operator of drilling of the wells?

19   There is two different things.

20   Q.   Did you direct anyone at Epsilon to follow up to try to

21   resolve this ambiguity?

22   A.   We did.

23   Q.   Please turn to Plaintiff's Exhibit 4.  Do you recognize the

24   letter dated May 16th of 2018 that has been identified as

25   Plaintiff's Exhibit 4?

1   A.  I do.

2   Q.  Did you see a copy of this letter that Epsilon sent to

3   Chesapeake in May of 2018 at the time that was it was authored?

4   A.  Yes.

5   Q.  And is this a true and accurate copy of the May 16th, 2018

6   letter?

7   A.  It is.

8   Q.  Does Epsilon maintain a copy of this correspondence in the

9   ordinary course of its business?

10  A.  We do.

11          ATTORNEY KROCK:  Your Honor, we move for the admission

12  of Plaintiff's Exhibit 4.

13          THE COURT:  Any objection?

14          ATTORNEY DEMPSEY:  No objection, Your Honor.

15          THE COURT:  Plaintiff's 4 is admitted.

16  BY ATTORNEY KROCK:

17  Q.  Mr. Raleigh, is this a copy of the letter that was sent at

18  your direction to try to resolve the ambiguity that was in the

19  prior letter at Exhibit 3?

20  A.  Yes.

21  Q.  Specifically, in the middle paragraph there's a statement

22  that says, "We respect your election to non-consent your

23  participation in these proposed operations."  Do you see that?

24  A.  I do.

25  Q.  That's consistent -- is that consistent with your

1    understanding that Chesapeake didn't have to participate in

2    this well?

3    A.  No obligation for them to.

4    Q.  But then you say, "However, your letter does not fully

5    satisfy the requirements of the election regarding

6    operatorship."  Is that what the letter says?

7    A.  Yes, sir.

8    Q.  And in the final paragraph of this letter, does Epsilon

9    advise Chesapeake that Epsilon believes that it can serve as

10   the operator if Chesapeake elects not to?

11   A.  Yes.

12   Q.  Can you please turn to the next exhibit, which is

13   Plaintiff's Exhibit 5?  Have you seen a copy of the letter

14   dated May 18th of 2018 from Chesapeake that has been designated

15   as Plaintiff's Exhibit 5?

16   A.  I do.

17   Q.  Did you receive a copy of this letter in late May of 2018

18   around the time that it was received by Epsilon?

19   A.  Yes.

20   Q.  Is this a true and accurate copy of the letter that was

21   received by Epsilon in the late May of 2018 time period?

22   A.  Yes.

23   Q.  Is a copy of this letter maintained by Epsilon in its files

24   in its ordinary course of business?

25   A.  It is.

1    ATTORNEY KROCK:  Your Honor, we move for the admission

2  of Plaintiff's Exhibit 5.

3    ATTORNEY DEMPSEY:  No objection.

4    THE COURT:  Plaintiff's 5 is admitted.

5  BY ATTORNEY KROCK:

6  Q.  Is Plaintiff's Exhibit 5 the letter that Epsilon received

7  in response to its request for clarification?

8  A.  Yes.

9  Q.  And is this the letter where Chesapeake made clear that it

10 was not going to serve as the operator to drill the proposed

11 Baltzley wells?

12 A.  Yes.

13 Q.  In the middle of that first paragraph it says, "Further,

14 Chesapeake disputes that the JOA grants Epsilon the unilateral

15 right to take over operatorship and drill the captioned wells."

16 Do you see that?

17 A.  I do.

18 Q.  Was Epsilon trying to take over operatorship of something

19 that Chesapeake was otherwise going to operate?

20 A.  No.

21 Q.  That sentence continues, "Or that the JOA imposes an

22 obligation on Chesapeake, as a non-consent operator, to

23 commence drilling operations."  Do you see that sentence?

24 A.  I do.

25 Q.  Had Epsilon asserted that even though it had non-consented

1  that Chesapeake had an obligation to drill that well?

2  A.  No.  I mean, just for clarity, we asked them if they wanted

3  to.

4  Q.  Had Chesapeake said yes, we're a non-consenting party but

5  we will operate the well, would that have been okay with

6  Epsilon?

7  A.  Of course.

8  Q.  How did you personally react when you got this letter and

9  you realized that this was the position that Chesapeake was

10  taking?

11  A.  Extremely frustrated, disappointed.

12  Q.  What did you do to resolve this issue?

13  A.  Filed the lawsuit.

14  Q.  What court, if you remember; where was that lawsuit filed?

15  A.  I may get this wrong, but it was in Scranton, Pennsylvania

16  in federal court.

17  Q.  If you recall, what was the specific relief you asked for;

18  what were you asking that Scranton court to do?

19  A.  To let Epsilon drill the wells that we had proposed under

20  the JOA.

21  Q.  Can you please turn to the next exhibit, which is

22  Exhibit 6.  Is Exhibit 6 a copy of the complaint that was filed

23  in conjunction with that dispute in 2018?

24  A.  Yes.

25  Q.  Did you read a copy of the complaint before it was filed?

1  A.  Yes.

2  Q.  Were you actually the party that verified the complaint?

3  A.  I signed it on the last page, yes.

4  Q.  And is this a true and correct copy of the complaint --

5          ATTORNEY KROCK:  Admittedly, I am without the

6  exhibits, Your Honor.  We didn't attach the voluminous

7  exhibits.

8  BY ATTORNEY KROCK:

9  Q.  But short of the exhibits, is this a correct copy of the

10  complaint?

11  A.  It is.

12          ATTORNEY KROCK:  Your Honor, we move for admission of

13  Plaintiff's Exhibit 6 into evidence.

14          THE COURT:  Any objection?

15          ATTORNEY DEMPSEY:  No objection, Your Honor.

16          THE COURT:  Plaintiff's 6 is admitted.

17  BY ATTORNEY KROCK:

18  Q.  I'm not going to ask you a lot of questions about this

19  document, Mr. Raleigh.  But I would like to just direct you to

20  the specific count in this complaint that addresses this

21  dispute on the Baltzley wells.  Can you take a look at count

22  number one, which is, I believe, on page 13?

23  A.  I have that page.

24  Q.  And just to yourself, look at the allegations in count one

25  on page 13 and 14.  Can you do that?

1   A.   Thirteen and 14?

2   Q.   Yeah.  Just do that.  There is only a handful of

3   paragraphs.

4                        (pause.)

5   A.   Okay.

6   Q.   Is this the portion of the paragraph -- of the complaint in

7   which you asked the Court to essentially allow Epsilon to be

8   the operator to drill the Baltzley wells?

9   A.   Yes.

10  Q.   Just out of curiosity, Mr. Raleigh; this complaint makes

11  reference to commencing operations within 90 days.  Do you see

12  that?

13  A.   Yes.

14  Q.   If you were deepening an existing well, would you consider

15  that to be proposing a well?

16  A.   No.

17  Q.   What about those spacing requirements; can you explain to

18  the Court what that means?

19  A.   In the rock and the fractures and the inherent nature of

20  the reservoir, it helps optimize the production and the

21  fracking if you line the horizontal well in the direction -- in

22  a specific direction to help encourage the completion of the

23  well when you frack it.  And if you have wells that go in all

24  different directions, that's not optimum and not efficient for

25  the field-wide development.  So you try to line everything up

1   in the same alignment.  So this direction at distances apart,

2   (indicating), all of those things.

3   Q.  If you can take a look at subsection (b) under paragraph

4   eight that talks about proposing wells.  That sentence states,

5   "Should Chesapeake consent and confirm operatorship of a well

6   proposed by Epsilon."  Do you see that?

7   A.  Yes.

8   Q.  And did you understand that that was referring to the

9   proposal for the drilling of a new well?

10  A.  Yes.

11  Q.  And similarly, in the next section where it says, "To the

12  extent that a well proposal is made", did you understand that

13  to be referring to a proposal for a new well?

14  A.  Yes.

15  Q.  Now, I want to just skip subsection (d) for a moment and

16  look back at subsection (e).  It says, "Based on the

17  commitments in paragraphs three and four above, Epsilon will

18  not make any proposals for wells to be drilled before 2020."

19          Do you see that?

20  A.  I do.

21  Q.  Is that the provision you mentioned earlier that there was

22  a period of time that Epsilon had agreed not to make any -- not

23  to propose any wells?

24  A.  Yes.

25  Q.  And again, you understood that -- did you understand that

1  to be proposals for new wells?

2  A.  New wells, correct.

3  Q.  Is that a provision that Epsilon wanted to be included in

4  the settlement agreement?

5  A.  No.

6  Q.  Did Chesapeake propose that term?

7  A.  Yes.

8  Q.  Did Epsilon honor this term of this agreement?

9  A.  Yes.

10  Q.  So before 2020, Epsilon did not propose any new wells?

11  A.  Correct.

12  Q.  Paragraph 8(d) says, "If Chesapeake does not consent to a

13  proposal and will not act as operator for that proposal,

14  Chesapeake will cooperate with the party designated to the

15  extent permitted under the JOA and will not unreasonably

16  withhold cooperation, including but not limited to permitting

17  and access to co-owned assets, such as water withdrawal points

18  and impoundments."  Do you see that?

19  A.  I do.

20  Q.  What do you understand the phrase designated to the extent

21  permitted under the JOA as operator to mean?

22  A.  The party designated as operator had to be one of the

23  consenting parties to the JOAs.  So you couldn't bring somebody

24  else in, for instance.  It had to be people who were part of

25  the JOA and consenting.

1    Q.  Could Epsilon have chosen one of the non-consenting parties

2    who didn't want to invest its money?

3    A.  If they wanted to.

4    Q.  I'm sorry.  Did you say non-consenting party?

5    A.  Consenting or non-consenting party.  Somebody else could

6    have drilled the well if they were better than we were.

7    Q.  So if none of the other JOA parties had non-consented and

8    didn't have any interest in the well, could they serve as the

9    operator?

10   A.  We would have a problem if they didn't have an interest in

11   the well, yes.

12   Q.  I'm sorry if I was confusing.  My question was if it was

13   actually a party that was non-consenting and didn't have an

14   ownership in the well, would they be able to be designated as

15   the operator?

16   A.  Not under the terms of the JOA.

17   Q.  Is there a reason for that?  Is there a reason why parties

18   typically want to have somebody who has an ownership interest

19   to step in and take over as operator?

20   A.  In my business experience, you want somebody that has skin

21   in the game.  If they don't have skin in the game, they lack

22   attention, they lack efficiency, they lack cost control.  It's

23   just not a recipe for success.

24   Q.  Why did Epsilon include a reference to cooperation to

25   providing access to co-owned water withdrawal points?

RALEIGH - DIRECT

1  A.  Because Chesapeake operates water surfaces, impoundment

2  ponds, access roads, pad, all of the things that are required

3  to be constructed prior to actually drilling a well.  So their

4  cooperation was required to at least give us the access to it,

5  let us drill the wells and we would hand it all back to them.

6  Q.  If Chesapeake wasn't going to provide access to some of

7  these co-owned assets, could Epsilon have gone ahead and

8  drilled the well without access to those co-owned --

9  A.  Very difficult.

10  Q.  Specifically, there's a reference to water withdrawal

11  points.  Did Epsilon and Chesapeake co-own any water withdrawal

12  points at the time the settlement agreement was entered into?

13  A.  Yes.

14  Q.  What was the name of that water withdrawal --

15  A.  Wyalusing Creek.

16        ATTORNEY DEMPSEY:  Objection.  Calls for a legal

17  conclusion.

18        THE COURT:  Overruled.

19  BY ATTORNEY KROCK:

20  Q.  I'm sorry.  What was the name of that withdrawal point?

21  A.  Wyalusing Creek.

22  Q.  Other than the co-ownership of the water withdrawal point

23  that is Wyalusing Creek, did Epsilon have any other co-owned

24  water interests with Chesapeake?

25  A.  Their --

RALEIGH - DIRECT

1   Q.   I'm talking about water withdrawal point.

2   A.   Water withdrawal?  Oh.  That would be it.

3   Q.   Did Epsilon have any interest with Chesapeake in any other

4   water source point other than Wyalusing Creek?

5   A.   No.

6   Q.   You also made reference to impoundments in section 8(d).

7   Correct?

8   A.   Yes.

9   Q.   Why did Epsilon agree with reference to access to

10  co-ownership of impoundments in the settlement agreement?

11  A.   For the initial drilling and completion of the wells, the

12  water surface was located adjacent to where you wanted to

13  drill, you had to bring water to the water source and put it

14  into the impoundment, which is a pond really, that was much

15  closer for the drilling operations and the operations you want

16  to execute.  So it's a good use of infrastructure.

17  Q.   Is the use of significant amounts of water necessary and an

18  important component to drill a new well?

19  A.   You need water to drill a well.

20  Q.   Do you recall any of the names of the impoundments that

21  Chesapeake and Epsilon co-owned at the time this settlement

22  agreement was entered into?

23  A.   There was the Marbaker and Lewis impoundments.

24  Q.   If I could, I just want to have one quick follow-up

25  question, I think.  If you can shift back Exhibit 1, which was

1    the JOA for the Craige well pad -- I'm sorry -- the Craige

2    unit.  I want you to look at Article VI, page two and then page

3    11.  I think it's the portion that you testified earlier I, (i)

4    you talked about your example of the $100 and how much had to

5    be recouped before the consenting parties could get any money.

6    Can you find that section?

7    A.  I can.

8    Q.  In (i) at the end there's a reference to each

9    non-consenting parties' share of the cost and equipment that

10   will be that interest which would have been charged to such a

11   non-consenting party had it participated in" -- and it looks

12   like there is language added or modified that says the proposed

13   well or operation.  Do you see that?

14   A.  Yes.

15   Q.  Is there a distinction between the proposed well and an

16   operation?

17   A.  Yes.

18   Q.  What does proposed well refer to?

19   A.  The proposing of a new well to be drilled.

20   Q.  That's the drilling of a new well?

21   A.  Yes.

22   Q.  What does the operation component of this mean?

23   A.  The nomenclature they refer to as rework, sidetrack,

24   deepen, re-complete or plug back.

25   Q.  So that's a reference to the activities that occur on an

1  existing well?

2  A.  Correct.

3  Q.  So in this portion of the agreement the parties

4  distinguished a proposed well as a new well as opposed to work

5  on an existing well, which is the operation?

6  A.  Yeah.

7  Q.  The final area I want to ask you about today, Mr. Raleigh,

8  is the current dispute that brought us here today.  What are

9  just the names of -- not specific names.  Let's say this.  The

10  present dispute involves wells that Epsilon has proposed to be

11  drilled.  Right?  New wells.

12  A.  Correct.

13  Q.  On what pad has Epsilon proposed for those wells to be

14  drilled?

15  A.  The Craige pad.

16  Q.  Do you recall approximately when it was that Epsilon

17  submitted the formal proposal for these Craige wells?

18  A.  December -- late December '21.  No.  Sorry.  What year are

19  we in now?

20  Q.  That would have been late December of 2020.

21  A.  Right.

22  Q.  Did Chesapeake agree to participate in the wells?

23  A.  No.

24  Q.  Did Chesapeake elect to drill the wells on behalf of the

25  consenting parties?

1  A.  No.

2  Q.  Did Chesapeake, once again, take the position that the

3  wells could not be drilled because they elected not to

4  participate?

5  A.  Yes.

6  Q.  What was your reaction when Chesapeake took the exact same

7  position it took in the last lawsuit?

8  A.  It's infuriating.

9  Q.  Did you, once again, authorize Epsilon to file this

10  lawsuit?

11  A.  Yes.

12  Q.  Specifically, once again, what are you asking the Court to

13  do in conjunction with this lawsuit and those wells?

14  A.  We have a settlement agreement and a JOA, and we want you

15  to honor the settlement agreement and JOA and allow Epsilon to

16  proceed as we understand our rights and privileges are.

17  Q.  Are you asking that the Court acknowledge that Epsilon can

18  proceed as the designated operator for those wells?

19  A.  Yes.

20  Q.  And are you asking the Court to force Chesapeake to

21  cooperate in conjunction with those wells?

22  A.  Yes.

23  Q.  And why is that so important?  Why is it so important that

24  Chesapeake actually cooperate with Epsilon in order to drill

25  those wells?

RALEIGH - DIRECT

1  A.  You need to have the cooperation of the person operating

2  the existing wells and the person operating the adjacent

3  infrastructure, water, water impoundment, water sources to

4  allow you all access and to provide their cooperation.

5  Q.  Are there existing wells right now on the Craige well pad

6  that are producing?

7  A.  Yes.

8  Q.  Is Chesapeake acting as kind of the operator to manage

9  those wells?

10  A.  They are.

11  Q.  So you will acknowledge that you will be recognizing that

12  there will be two different parties operating different

13  operations on the Craige well pad?

14  A.  The JOA contemplates if other parties are drilling it and

15  the current operator isn't, that they hand operations back to

16  that operator.  So there is cooperation at the front end to

17  allow the drilling to proceed and hand that operation back to

18  the operator of the pad.

19  Q.  In order to be able to drill the wells on the Craige pad,

20  was it necessary to obtain drilling permits from the

21  Pennsylvania Department of Environmental Protection?

22  A.  It is.

23  Q.  Have those joint permits been obtained?

24  A.  They have.

25  Q.  Is it your understanding that those drilling permits would

1    enable the Craige wells to be drilled?

2    A.  Correct.

3    Q.  Has Chesapeake taken any action to interfere with those

4    drilling permits?

5    A.  They are actively trying to vacate those permits, even

6    though they agreed to help us get permits.  I find that

7    deplorable.

8    Q.  In this lawsuit, are you asking the Court to stop that

9    conduct and prevent them from moving forward trying to

10   eliminate those permits?

11   A.  Absolutely.

12         ATTORNEY KROCK:  Your Honor, those are all of the

13   questions I have for Mr. Raleigh.

14         THE COURT:  Thank you.  We will take a brief recess

15   prior to beginning cross-examination.  It's currently 11:17.

16   We'll return at 11:30.

17         Mr. Raleigh, you are under oath and you are subject to

18   cross examination, so I would ask that you not confer with

19   Plaintiff's Counsel until your examination is concluded.

20         THE WITNESS:  Okay.

21         THE COURT:  Court is in recess until 11:30.

22         THE COURTROOM DEPUTY:  Please rise.

23         (A recess was taken from 11:17 to 11:35 a.m.)

24         THE COURT:  All right.  Counsel for Chesapeake, who

25   will conduct this cross-examination?

1        ATTORNEY DEMPSEY:  I will, Your Honor.

2        THE COURT:  All right.  Mr. Dempsey, you can proceed

3   with your cross-examination.

4        ATTORNEY DEMPSEY:  Your Honor, we have some binders of

5   our own.  We have got some copies for the Court.

6        THE COURT:  Great.  Please proceed.

7        ATTORNEY DEMPSEY:  Thank you, Your Honor.

8                        CROSS EXAMINATION

9   BY ATTORNEY DEMPSEY:

10  Q.  Mr. Raleigh, I'm Jack Dempsey.  I represent Chesapeake.

11  Good to meet you.

12  A.  Good to meet you.

13  Q.  I will represent to you that Exhibit 2 is the Baltzley

14  South joint operating agreement which was attached to your

15  complaint.  Are you familiar with the Baltzley South joint

16  operating agreement, sir?

17  A.  Do you want me to pull it up, this exhibit?

18  Q.  You are welcome to.

19  A.  Yeah.  I'm somewhat familiar with it, yeah.

20  Q.  You just testified to the provisions of the Craige unit

21  during your direct examination.  You will agree with me, sir,

22  that in sum and substance, the provisions that we're asking the

23  Court to evaluate are identical in the Baltzley.  Is that

24  correct?

25  A.  I mean, I don't recall exactly what's in here, but if you

1    say it is, then I believe you.

2    Q.  Okay.  Great.  Chris, will you go to Article V?

3              THE COURT:  Perhaps we could shorten this a bit.

4              Mr. Krock, would you stipulate and agree that the

5    provisions at issue are identical in this agreement?

6              ATTORNEY KROCK:  Your Honor, I haven't looked to say

7    identical, but I will acknowledge they are about substantially

8    similar.

9              THE COURT:  All right.

10   BY ATTORNEY DEMPSEY:

11   Q.  Mr. Raleigh, turn, if you would, to Article F of the

12   Baltzley.  It's up on the screen, if it's easier to access.  I

13   want to be very clear.  Chesapeake Appalachia is the operator

14   of the joint operating units.  True?

15   A.  That's what it says, yeah.

16   Q.  Well, that is the truth, isn't it?

17   A.  It has to.

18   Q.  That's your understanding.  And Article V makes that plain,

19   that, "The parties have agreed that Chesapeake Appalachia shall

20   be the operator of the contract area and shall conduct and

21   direct and have full control of all operations on the contract

22   area as permitted and required by within the limits of this

23   agreement."  Have I read that correctly, sir?

24   A.  You have.

25   Q.  And you agree that is the statement between the parties?

1   A.   True.

2   Q.   Article V also shows a process to remove Chesapeake as

3   operator.  Do you agree with that, sir?

4   A.   Do I agree that it is contained in here, yeah.

5   Q.   It is.  And you do not contend that Epsilon has an issue

6   over the process to remove Chesapeake as operator pursuant to

7   Article V.  True?

8   A.   We are not trying to remove the operator, no.

9   Q.   And Chesapeake has not indicated to Epsilon or anyone else

10  a desire to resign as operator.

11  A.   True.

12  Q.   Is that --

13  A.   True.

14  Q.   And Mr. Raleigh, just for purposes of the record if you'll

15  let me finish, then I'll do the same for you.  Okay?

16  A.   Apologize.

17  Q.   Chesapeake has not indicated a desire to resign, pursuant

18  to Article V of the JOA.  Correct?

19  A.   True.

20  Q.   Chris, would you mind scrolling down to subparagraph two?

21       Subparagraph two of the Article V sort of contemplates

22  a process to appoint a successor operator to Chesapeake should

23  Chesapeake either resign or be removed.  Agreed?

24  A.   Agreed.

25  Q.   And no party, to your knowledge, under JOAs has voted for

1    Chesapeake to be removed as operator, have they?

2    A.   No.

3    Q.   Not Epsilon.  Right?  Epsilon has not voted for that?

4    A.   No.

5    Q.   And has not commenced the process here to begin the removal

6    of Chesapeake pursuant to Article V, has it?

7    A.   Has not.

8    Q.   Let's talk about that a little bit, about what that process

9    requires.

10          Chris, would you move that back up, please?

11          So do you agree, sir, that if Epsilon were to believe

12   that there was good cause to remove Chesapeake as operator,

13   Epsilon could commence a removal procedure pursuant to Article

14   V?

15   A.   Yes.

16   Q.   It could do so.  And it has not.  And the procedure set out

17   in Article V would be to give written notice to Chesapeake

18   about what are your concerns.  Right?

19   A.   Yes.

20   Q.   Give written notice to your other partners about your

21   concerns and to call for a vote.  Right?

22   A.   Right.

23   Q.   But the vote wouldn't come until Chesapeake had 30 days

24   after receiving your written notice in order to cure whatever

25   concern that you would have articulated.  True?

1    A.   True.

2    Q.   And that process has not been initiated by Epsilon, has it?

3    A.   No.

4    Q.   Okay.  Chris, would you mind turning to Article VI.  If you

5    would pull down to VI.2(a).

6         Sir, at paragraph 25 of your complaint -- and you

7    verified the complaint that's at issue in this case.  Correct?

8    A.   Correct.

9    Q.   So you have reviewed it before it was submitted, you

10   approved it, signed it with your verification asserting that

11   the facts were true to the best of your knowledge, and it was

12   filed with this Court.  True?

13   A.   Yes.

14   Q.   And paragraph 25 of the complaint I'm going to read to you.

15   It says, "If Chesapeake elects not to participate in a well

16   proposal and declines to serve as the operator however, one of

17   the consenting JOA parties may serve as the operator in

18   conjunction with that well proposal."

19   A.   I don't have that in front of me.  What number is it --

20   Q.   It's paragraph number 25.  It's a fair point.

21   A.   -- of the complaint.

22   Q.   Let me ask this way.  I don't have the complaint to hand to

23   you.

24   A.   Okay.

25   Q.   Sound about right?  Is that your position?

1  A.  Well, it would be better if I could read it in front of me.

2  It won't be a problem if I can get it in the other binder.

3  Q.  Do you have it in the other binder?

4  A.  I think so.  What number was the verified complaint?

5  Q.  It's at paragraph number 25.

6          ATTORNEY KROCK:  Your Honor, I don't know that we have

7  the complaint identified in our binder.

8          ATTORNEY DEMPSEY:  Judge, I can ask it a different

9  way --

10         THE COURT:  Mr. Dempsey, just a moment.  Do you have

11 your complaint in this case in your materials at counsel's

12 desk?

13         ATTORNEY KROCK:  I don't believe so.  If I did, Your

14 Honor, I'm sure it would have marks and certain things on it

15 that would not be appropriate to share.

16         THE COURT:  I was simply asking if Mr. Dempsey

17 accurately read what was in the complaint.  If you would like

18 to request a recess, Mr. Dempsey, we can make copies and

19 present to opposing Counsel and the witness, or we can proceed

20 by some other means.

21         ATTORNEY DEMPSEY:  I actually have a copy, yes.  I

22 apologize.

23         THE COURT:  The problem is you are the only person in

24 the room with a copy.  So to ask the witness that what you are

25 accurately reading is -- Ms. Edleblute, is there any way you

1  can display it on screen?  Is there a specific paragraph of the

2  redacted verified complaint that you would like us all to see?

3          ATTORNEY DEMPSEY:  It should be 25.

4                          (pause.)

5          THE COURT:  Mr. Dempsey, if you don't mind one moment

6  waiting to pose that question.  We are going to have four

7  copies of that complaint printed for you.  Thank you, Ms.

8  Edleblute.

9          If you want to distribute the rest, and then

10  Mr. Dempsey can distribute from there.  Thank you, Ms.

11  Edleblute.

12          THE COURTROOM DEPUTY:  Sure.

13  BY ATTORNEY DEMPSEY:

14  Q.  Mr. Raleigh, after all that wind-up, I'm simply going to

15  ask you if I had read that sentence properly. "If Chesapeake

16  elects not to participate in the well proposal and declines to

17  serve as the operator however, one of the consenting JOA

18  parties may serve as the operator in conjunction with that

19  proposal."  Have I read that sentence correctly?

20  A.  You skipped well, but yes.

21  Q.  Is that your position?

22  A.  As articulated in the JOA, yes.

23  Q.  The place to which you cite in the JOA is Article VI.2(a).

24  Correct?

25  A.  Yes.  It says Article VI.2(a)

RALEIGH - CROSS

1  Q.  And you made that statement in the compliant, we have

2  verified you have cited each of the JOAs in the case and you

3  have cited us to Article VI.2(a).  Correct?

4  A.  Correct.

5  Q.  Chris, will you pull VI.2(a) back up in the Baltzley?

6      Sir, you agree with me that your complaint does not

7  discuss the limiting language in Article VI.2(a).  Correct?

8  A.  In the first paragraph, correct.

9  Q.  Right.  Nowhere in the pleadings does Epsilon identify that

10  language.

11  A.  No.

12  Q.  Okay.  And you admit that the -- that paragraph -- that

13  first paragraph with the limiting language is the paragraph

14  that's got the language about shifting operator.  Correct?

15  A.  After the first -- after the first sentence it discusses

16  that.

17  Q.  It's in the first paragraph.  True?

18  A.  First paragraph, second sentence.

19  Q.  Right.  And you do not contend in this case that the work

20  that the operations that Epsilon has proposed, the four

21  subsequent wells, you do not contend that that constitutes work

22  to an existing well.  True?

23  A.  True.

24  Q.  You don't contend that it constitutes rework, sidetrack,

25  deepen, re-complete or plug back, do you?

1 A. It's none of those things.

2 Q. You testified on direct examination regarding the joint

3 operation. You also began by explaining your tenure at the

4 company. So I want to make sure that I'm clear on that. The

5 joint operating agreements were entered in 2009 and 2010.

6 Correct?

7 A. This one is October 18th, 2010.

8 Q. To the extent that any of the joint operating agreements at

9 issue in this case were entered before 2013, you were not

10 affiliated with Epsilon. True?

11 A. I was not the CEO.

12 Q. Were you employed by Epsilon?

13 A. We were shareholders.

14 Q. Okay. You were not in a management position at Epsilon.

15 True?

16 A. Right.

17 Q. You did not review these agreements contemporaneous with

18 their execution, did you?

19 A. That's correct.

20 Q. All of the information you talked about, about your views

21 of what the agreement means, that's not based on real-time

22 review of the agreements at the time they were executed, is it?

23 A. Not at the time of their execution.

24 Q. You said you were a shareholder. Are you an attorney, sir?

25 A. No.

RALEIGH - CROSS

1  Q.  Okay.  So you weren't employed by Epsilon to review these

2  agreements contemporaneous with their execution, were you?

3  A.  No.

4  Q.  One of the agreements we heard about in this case was the

5  farmout agreement.  That farmout agreement was dated February

6  1, 2010.  The answers would be the same as to that document,

7  wouldn't they, sir?

8  A.  I had no part of it.  I was not employed at the company to

9  sign the agreement.

10  Q.  So you have no personal knowledge of the conversations that

11  led to the execution, do you?

12  A.  No.

13  Q.  Any information that you would offer to this Court about

14  the meaning of those documents is based on your study when you

15  came on board as a management-level person in Epsilon.  True?

16  A.  True.

17  Q.  2013.  Right?

18  A.  2013.  Yeah.

19  Q.  Mr. Raleigh, can you see the sentence that I have

20  highlighted, sir?

21  A.  I can.

22  Q.  It is this sentence pursuant which it is your position that

23  Epsilon is authorized to operate on the subsequent wells.

24  True?

25  A.  The consenting parties designate one of the consenting

1  parties as operator.

2  Q.  You're asking the Court to confirm that Epsilon is the

3  operator and Epsilon may go and drill the subsequent wells.

4  That's the relief you've asked for in this case.  True?

5  A.  True.

6  Q.  I want to talk to you about the four wells that were

7  proposed.  There were three wells proposed to run north, Craige

8  North wells, and there was one proposed to run south.  Right?

9  A.  Right.

10  Q.  The one that was proposed to run south was the only one

11  that got any other support among the other parties to the joint

12  operating agreements.  True?

13  A.  There was other people who consented to the operation.

14  Q.  And as to the wells that you proposed to run north, no one

15  consented to those except for Epsilon?

16  A.  That's correct.

17  Q.  Okay.  So as to the wells that were running south, when was

18  the vote undertaken to designate Epsilon operator?

19  A.  According to those proposals, if the election to designate

20  the operator is blank, and it's assumed that the proposing

21  party is the operator.

22  Q.  When did Chief vote that Epsilon should be the operator to

23  go and drill the Craige South?

24  A.  As soon as they elected not to confirm anybody.

25  Q.  Okay.  So it was by operation of the document, is your

1  position?

2  A.  The document -- if no one -- if they are silent, then by

3  default the proposing party is the operator.

4  Q.  That's your position?

5  A.  Right.

6  Q.  Okay.  But we're not missing something.  There was not a

7  gathering by the parties who elected to consent to your Craige

8  South proposal getting together and saying we would like

9  Epsilon to drill it.  True?

10  A.  Doesn't the -- the JOA doesn't require you to do that.

11  Q.  That's your position, and I understand that.  I'm asking

12  you, to your knowledge, was such a gathering had where votes

13  were cast to have you operate that well?

14  A.  We followed the JOA as the terms are outlined in that JOA.

15  Q.  Chris, will you pull up Exhibit 17, please?

16       THE COURT:  Mr. Dempsey, are you moving the admission

17  of Defendant's Exhibit 2?

18       ATTORNEY DEMPSEY:  I would, Your Honor.

19       THE COURT:  Is there any objection?

20       ATTORNEY KROCK:  No, Your Honor.

21       THE COURT:  Defendant's 2 is admitted.

22  BY ATTORNEY DEMPSEY:

23  Q.  Do you recognize what this document is, sir?

24  A.  It's an unconventional new well permit.

25  Q.  Is it for the Craige South three that we were just talking

1    about?

2    A.   Yes.

3    Q.   Is it dated, sir?

4    A.   The date issued?  Is that what you're referring to?

5    Q.   Yes.

6    A.   The issuing date was 12/08/2020.

7    Q.   Is it your understanding that 12/08/2020 would be the date

8    that that permit was issued to Epsilon to be the operator?

9    A.   I'm not an expert in that.  But it looks like it.

10   Q.   You just testified that it was the manner in which Chief

11   and the others who elected to participate in your December 2020

12   proposal signed that election that had the effect, in your

13   opinion, of making Epsilon operator under Article VI.  Right?

14   A.   If they're silent and there's a proposal, then it makes

15   sense that we are the operator.

16   Q.   And this permit was issued to Epsilon operate or drill the

17   well was on December 8th, 2020.  Right?

18   A.   That was the date, yes.

19   Q.   So that was three weeks before you ever sent the proposal.

20   A.   Okay.

21   Q.   You hadn't sent the proposal yet.

22   A.   No.

23   Q.   So Epsilon designated Epsilon the operator?

24   A.   No.

25   Q.   Could Chief drill the Craige well to your knowledge?

1   A.   Sure.

2   Q.   Can permits be transferred?

3   A.   Anybody can get permits in.  It doesn't mean the two don't

4   go together.

5   Q.   You talked before about how important it is to you that

6   the people who were going to do the work have skin in the game.

7   Right?  Is that your phrase?

8   A.   That's correct.

9   Q.   This permit is not issued to Epsilon Energy U.S.A., Inc.,

10  is it?

11  A.   It's Epsilon Operating, LLC, a 100 percent owned subsidiary

12  of Epsilon.

13  Q.   Was the permit issued to Epsilon Energy U.S.A., Inc., sir?

14  A.   No.

15  Q.   Did Epsilon Energy U.S.A., Inc., seek the permit to drill

16  the Craige South three?

17  A.   No.

18  Q.   Is Epsilon Operating, LLC a party to the joint operating

19  agreements?

20  A.   No, but we can have any subcontractor we want.

21  Q.   So Epsilon Operating, LLC is a subcontractor?

22  A.   It's a 100 percent owned subsidiary of the Epsilon Energy,

23  LTD.

24  Q.   Okay.  It's the permitted entity to drill the well that

25  Epsilon Energy U.S.A., Inc. proposed under the operating

1    agreement.  True?

2    A.  Epsilon Operating is the permitted entity.

3    Q.  Is there any agreement, written document, between Epsilon

4    Operating, LLC and Epsilon Energy U.S.A., Inc. to conduct this

5    drilling?

6    A.  Apart from the fact that they are 100 percent owned

7    subsidiaries of the same governance team, I'm not sure that's

8    necessary.

9    Q.  You testified before, and I just want to make sure I

10   understand it, that they are a contractor of Epsilon Energy

11   U.S.A., Inc.  And I'm wondering is there a contract?

12   A.  I misspoke.  Contractor was probably an incorrect

13   characterization.  They are a 100 percent owned subsidiary of

14   Epsilon.

15   Q.  So as I understand, there hasn't been a written agreement

16   between the two entities so that Epsilon Operating would carry

17   forward this drilling activity on behalf of Epsilon Energy?

18   A.  They're the same people.

19   Q.  But are distinct legal entities.

20   A.  Distinct legal entities with the same people.

21   Q.  We're arguing about what the law is.  Let's just make sure

22   I understand the facts.  There is no written agreement between

23   the two entities to have Epsilon Operating do the work for

24   Epsilon Energy U.S.A., Inc.  True?

25   A.  If they could, they would.

1    Q.   I'm sorry.  I don't understand your answer.

2              THE COURT:  That wasn't responsive to the question.

3                   (The record was read by the Court.)

4              THE WITNESS:  Not currently, no.

5    BY ATTORNEY DEMPSEY:

6    Q.   Do you intend to enter into one?

7    A.   If we need one.

8    Q.   Do you think the JOA obligates you to have one?

9    A.   I mean, if it was necessary, we would do it.

10   Q.   Okay.  That's not exactly responsive to my question.  Do

11   you think, as you sit here today, that the joint operating

12   agreement obligates there to be an agreement between Epsilon

13   Energy U.S.A. and Epsilon Operating where Epsilon Operating is

14   the permitted entity to do this work?

15   A.   There is nowhere in the operating agreement that requires

16   anybody to have any agreement with anybody.

17   Q.   Okay.  Fair enough.  When was the last well that Epsilon

18   Energy -- has Epsilon Energy U.S.A., Inc. drilled a well in

19   Pennsylvania?

20   A.   Yes.

21   Q.   When?  When was the last time?

22   A.   Probably the same year that the farmout occurred.

23   Q.   Back in 2010?

24   A.   I think that's correct.

25   Q.   You testified earlier, I think when you were asked just

1 about your general -- the general business at Epsilon, that

2 Epsilon is involved in producing in the marcellus. Epsilon is

3 not actively involved in drilling wells in the marcellus.

4 True?

5 A. Not currently.

6 Q. Well, not since 2010.

7 A. Correct.

8 Q. More than a decade ago was the last one.

9 A. Is that a question?

10 Q. Is that correct?

11 A. Yes. Yes.

12 Q. And I don't want to speak very loosely about Epsilon. The

13 entity that drilled the well in 2010, was that Epsilon

14 Operating, LLC?

15 A. I don't recall what the entity was that drilled it in 2010.

16 Q. So not since 2010 has there been a well drilled by any

17 Epsilon entity, to your knowledge? Has -- has Epsilon, any

18 Epsilon entity, ever gone on to an active a well pad that is

19 producing gas and drilled new wells on that pad?

20 A. In Oklahoma, they have.

21 Q. Okay. In the State of Pennsylvania have they done that?

22 A. No.

23 Q. When was that done in Oklahoma?

24 A. Probably 18 months ago, something like that.

25 Q. Okay. Has Epsilon performed a risk analysis of its planned

1  operation on the Craige well pad?

2  A.  That's -- that's not my area of expertise.

3  Q.  Would your answer be the same if I asked whether a

4  collision analysis had been performed?

5  A.  That would be my same answer.

6  Q.  And your lawyer represented during his opening remarks that

7  an area of review had not been filed or sent to individuals or

8  businesses in the area of this well.  You don't dispute that

9  representation that your lawyer made, do you?

10 A.  No.

11 Q.  Does Epsilon operate any producing wells in Pennsylvania,

12 itself operate the producing well?

13 A.  No.

14       THE COURT:  I'm sorry.  Again, were you moving the

15 admission of Defendant's Exhibit 17?

16       ATTORNEY DEMPSEY:  I would move the admission of

17 Defendant's 17, Your Honor.

18       THE COURT:  Any objection?

19       ATTORNEY KROCK:  No objection, Your Honor.

20       THE COURT:  All right.  Defendant's 17 is admitted.

21 BY ATTORNEY DEMPSEY:

22 Q.  Mr. Raleigh, have you been able to access -- have 41 in

23 that binder, sir?

24 A.  I'm looking at it on the screen.

25 Q.  Oh, okay.  Thank you.  Chris, pull to the final page, if

1  you would.

2         Mr. Raleigh, Epsilon filed an initial complaint in the

3  Middle District of Pennsylvania on March the 9th, 2021.  Is

4  that correct, sir?

5  A.  I didn't see the date on here.  But I'm assuming that

6  that's right.

7  Q.  I'll represent to you that's the case.  It definitely filed

8  an initial complaint that was dismissed before we all got back

9  together in this action.

10 A.  I think so.

11 Q.  I'll represent to you it was either March 9th and may have

12 been filed and served on March 10, but it's in that window of

13 time.  Okay?

14 A.  Okay.

15 Q.  In that complaint there's an allegation -- several

16 allegations with regard to ownership of the Chesapeake surface

17 water withdrawal asset.  Do you remember those allegations?

18 A.  Yes.

19 Q.  And the complaint is verified and it's verified by you.

20 True?

21 A.  True.

22 Q.  One of the allegations in the complaint beginning in

23 paragraph 48 is that a subsidiary of Epsilon, a company called

24 Aubmarc, acquired the Chesapeake surface water withdrawal point

25 from Chesapeake in an agreement dated February 2016.  Do you

1   see that, sir?

2   A.   I do.

3   Q.   And that allegation is not true.  Right?

4   A.   There was a mistake made.  I think everybody acknowledged

5   that.

6   Q.   Okay.  Chesapeake did not sell the Wyalusing Creek surface

7   water withdrawal point to Epsilon or its subsidiary in February

8   of 2016.  Do we agree to that?

9   A.   They did not sell their portion that they owned.

10  Q.   Okay.  And when you made the allegation in the initial

11  complaint, it was to advance the position that the surface

12  water withdrawal permit and the infrastructure was a co-owned

13  asset.  True?

14  A.   True.

15  Q.   And you no longer believe that allegation to be true, but

16  you still believe that the surface water withdrawal point is a

17  co-owned asset.  Right?

18  A.   That's right.

19  Q.   What is the vehicle that you believe conferred the asset?

20  A.   In the farmout they -- we transferred 50 percent of the

21  ownership of the Wyalusing Creek water withdrawal point to

22  Chesapeake.

23  Q.   Now, we've looked at the farmout agreement very carefully,

24  and the farmout agreement does not expressly reference the

25  Wyalusing Creek surface water withdrawal point.  Do you agree

1   with me on that?

2   A.  You know, I don't have it memorized.  I apologize.  Its

3   permits and everything that we own of value is transferred

4   50 percent to Chesapeake.

5   Q.  Can we agree that unlike the Aubmarc deal that didn't

6   close, which expressly listed the Chesapeake surface water

7   withdrawal asset as an asset being conferred, in the deal that

8   was not closed from Chesapeake to Aubmarc, that deal listed the

9   surface water withdrawal expressly on a given day.  Would you

10  agree with that?

11  A.  Yes.  We did enter into the surface agreement.  All of

12  those things are true.  But it didn't close.

13  Q.  Unlike the purchase and sale agreement in 2016, the farmout

14  agreement in 2010 does not expressly identify the surface water

15  withdrawal asset.  Can we agree on that?

16  A.  Not those words.  The permits.

17  Q.  Not those words, meaning not the Chesapeake permit granting

18  it access to withdraw water from the Wyalusing Creek and the

19  related infrastructure.  Not those words is what you said?

20  A.  It was permits and whatever assets we owned.

21  Q.  Now, again, when the farmout was entered in 2010, February

22  of 2010, you were not serving with Epsilon in a management

23  role?

24  A.  No.

25  Q.  You did not participate in the negotiating of the agreement

1  and review it before it was signed.  True?

2  A.  True.

3  Q.  Your knowledge of that agreement is based upon your role

4  since 2013?

5  A.  Right.

6  Q.  Have you personally been to the Wyalusing Creek?  Have you

7  seen it?

8  A.  Satellite photos.

9  Q.  You have not physically been present?

10  A.  No.

11  Q.  Do you know where the Chesapeake-permitted withdrawal

12  location is physically located?

13  A.  It's east of the subject area we're talking about.  Excuse

14  me.  West of where we're talking about.

15  Q.  What exactly was it, sir, that was conferred in the farmout

16  agreement; what exactly?

17  A.  Fifty percent.

18  Q.  Do you think that Epsilon conferred?

19  A.  Fifty percent of the interests in all permits, assets,

20  everything that we had in the --

21  Q.  What was the water permit?

22  A.  The Wyalusing Creek water permit, water withdrawal permit.

23  Q.  If I refer to that as the Turm Oil permit, the 20081227

24  SRBC permit number, are we understanding one another?

25  A.  Yeah.

RALEIGH - CROSS

1  Q.  Is that the permit you are talking about?

2  A.  Um-hum.

3  Q.  That permit entitled Epsilon to withdrawal 216,000 gallons

4  a day from the Wyalusing Creek?

5  A.  That's correct.

6  Q.  At a point different from where Chesapeake was permitted to

7  withdraw.  Agreed?

8  A.  I wasn't aware of where Chesapeake was drawing water.

9  Q.  Okay.  Do you dispute that the location of the Epsilon

10  permit and the Chesapeake withdrawal point are different?

11  A.  I think they were different.

12  Q.  Okay.  And then regardless, both of those permits were

13  consolidated into a 2011 permit.  True?

14  A.  True.

15  Q.  And the 2011 permit that did the consolidation, it's got

16  language in the permit at condition 18 that makes it very plain

17  that the 20081227 permit is superseded and rescinded.

18  A.  That's correct.

19  Q.  And before we got to 2011, you don't dispute that documents

20  were filed with the SRBC that completely transferred the 2008

21  permit to Chesapeake.  You don't dispute that, do you?

22  A.  It transferred the operator of the permit?

23  Q.  It transferred title to the permit.

24  A.  No.

25  Q.  No?  You dispute that transferred --

RALEIGH - CROSS

1   A.  It says specifically in the docket order that it does not

2   confer property.  They don't have anything -- they disavow any

3   context of property transfers in that document.  Have you read

4   it?

5   Q.  I have read it.  You read it as reserving some interest to

6   Epsilon?

7   A.  No.  It is silent on who owns what.

8        THE COURT:  Gentlemen, you are having a wonderful

9   conversation.  I don't know what document you are referring to,

10  though.  So to the extent that it's very important for me to

11  understand, maybe you want to shed a little bit more light.

12       ATTORNEY KROCK:  Your Honor, if it would help

13  facilitate, in Plaintiff's document, I think in Plaintiff's

14  Exhibit 23 is an example of one of these.  I'm not sure if it's

15  the one you're interested in.  We have a number of them marked,

16  if Defense does not.

17       ATTORNEY DEMPSEY:  Thank you, Greg.  If it would be

18  okay, we know which ones are in our documents.

19  BY ATTORNEY DEMPSEY:

20  Q.  So Mr. Raleigh, if you would turn to Exhibit 22, please.

21  A.  If you have it on the screen here, I can look at it.

22  Q.  Great.  Chris, would you pull up Exhibit C?

23       So that it's clear to Judge Wilson, when we talk about

24  the Turm Oil docket, the 20081227 docket, this is what we're

25  referring to.  Right?

1  A.  Right.

2  Q.  And the current Chesapeake docket is --

3       Chris, will you scroll down to the 2017 docket?

4       THE COURT:  Okay.  I'm sorry.  I don't mean to be

5  difficult here, Mr. Dempsey, but your Exhibit 22 is a letter

6  that was filed with this Court and then a series of exhibits.

7       ATTORNEY DEMPSEY:  It's Exhibit C.  I apologize.

8       THE COURT:  If you could refer to the ECF header for a

9  page number so this makes sense later and so we all know what

10 page of this document, this exhibit, we're looking at.  So far

11 what I am tracking is that we are within Defendant's Exhibit

12 22, which has been marked but not yet admitted.

13      If you could reference -- I think probably the easiest

14 way to do this is at the top of every page of this exhibit is

15 an ECF header.  If you can direct me to the ECF header that you

16 are referencing, then this record would make sense later.

17      ATTORNEY DEMPSEY:  Thank you, Judge.  I apologize.

18      THE COURT:  Thank you.  Sure.

19      ATTORNEY DEMPSEY:  I'm referring, Judge, to header

20 document 27-3, page two of 38.

21      THE COURT:  Thank you.  That's very helpful.  I'm

22 literally on the same page as you.

23      ATTORNEY KROCK:  I apologize, Your Honor, but I'm not

24 on the same page.  I'm kind of lost.  Are we on Exhibit 22?

25      ATTORNEY DEMPSEY:  Yes.

1    ATTORNEY KROCK:  What is the page number?  We have got

2    it as 38.

3    THE COURT:  So Mr. Krock, if you look at the ECF

4    header and you reference document 27-3 and then further to the

5    right page two of 38, that's the page that's on the screen.

6    Oh, it's not actually.  You have page 26 of 38 on the screen.

7    ATTORNEY DEMPSEY:  It should be two of 38, Chris.  I'm

8    sorry.

9    THE COURT:  I can see your confusion, Mr. Krock.  I

10   was, in fact, not literally on the same page.  There we go.

11   ATTORNEY DEMPSEY:  I apologize, Your Honor, for

12   assuming that people were following what I was displaying on

13   the screen.  I think what Mr. Raleigh and I have agreed to is

14   that this exhibit, this page, the Turm Oil SRBC docket number

15   is the docket number that Mr. Raleigh contends was conferred

16   pursuant to the farmout agreement and Chesapeake contends was

17   conferred 60 days after the farmout agreement in its entirety.

18   What I'm just establishing is that we're talking about

19   the same permit.

20   BY ATTORNEY DEMPSEY:

21   Q.  Mr. Raleigh, if you would turn to page 26 of 38 on the same

22   document, ECF number 27-3.  Do you agree with me, sir, that

23   this is the current Chesapeake water withdrawal permit?  True?

24   A.  I don't know if it's current.  Sorry.  I just know that the

25   approval date is June 16th, 2017.  If you say it's current, I

RALEIGH - CROSS

1   believe you.

2   Q.  Are you the person here to testify about the water issues

3   in this case?

4   A.  No.

5   Q.  Who is that person?

6   A.  Henry Clanton.

7           ATTORNEY DEMPSEY:  Okay.  Judge, before I leave it, I

8   would ask to move into evidence in this case the complaint from

9   March 9th of 2021 which I marked as Exhibit 41.  It was the

10  complaint that was filed in the initial action in this Court.

11          THE COURT:  Mr. Krock, any objection?

12          ATTORNEY KROCK:  I guess, Your Honor, I just don't

13  know what the purpose in what -- since it's not the operative

14  document that governs at this particular time, I guess I'm

15  perplexed as to why the complaint is necessary evidence in this

16  proceeding.

17          THE COURT:  I'll construe that as an objection to the

18  relevance of that exhibit.  Is that fair?

19          ATTORNEY KROCK:  That's fair.

20          THE COURT:  Would you like to respond, Mr. Dempsey?

21          ATTORNEY DEMPSEY:  Yes, Your Honor.  The relevance of

22  the document, it's a contested issue in this case as to who

23  owns the current Chesapeake water withdrawal permit.  When this

24  lawsuit -- Epsilon took the position that it co-owns the

25  permit.

1    When the lawsuit was filed, the basis on which Epsilon

2  rested to establish its co-ownership in March of 2021 was a

3  2016 transaction that it represented in the complaint was

4  between Chesapeake and its subsidiary, Aubmarc, where

5  Chesapeake sold the water withdrawal assets, the current 2017

6  water -- the current 2012, at the time, water asset to Epsilon.

7    That agreement never did close.  And when the -- when

8  Epsilon filed an amended complaint in the case, it withdrew,

9  without explanation, those allegations.  Now it takes a

10  different approach to why there is co-ownership.  And it's

11  relevant to the Court in trying to evaluate that argument.

12    THE COURT:  All right.  I will overrule the objection

13  to Defendant's 41 and admit the exhibit for the purpose

14  represented by Mr. Dempsey.

15    ATTORNEY DEMPSEY:  Your Honor, the Court has heard

16  testimony about the settlement agreement already from this

17  witness.

18  BY ATTORNEY DEMPSEY:

19  Q.  Mr. Raleigh, I'll represent to you that this is a copy of

20  the October 2018 settlement agreement.  And we've added it to

21  our book, as well.  It's our 18.  Take a minute and satisfy

22  yourself that that's what it is.  I have just got a couple of

23  questions for you.  Okay?

24  A.  Yeah.  Go ahead.

25  Q.  Epsilon was represented by counsel at the time it entered

1   this agreement.  True?

2   A.  True.

3   Q.  And the settlement agreement indicates that all parties

4   have read and understood the agreement and relied upon their

5   own understanding and their own counsel prior to signing it.

6   Is that correct?

7   A.  Correct.

8   Q.  None of the other parties to the JOAs were parties to that

9   settlement agreement, were they, sir?

10  A.  True.

11  Q.  The settlement agreement does not say it supersedes the

12  JOAs, does it?

13  A.  No.

14  Q.  In fact, it references in the JOAs that certain things in

15  the JOAs can occur and cannot occur.  True?

16  A.  Correct.

17  Q.  So the settlement agreement is not purporting to supersede

18  the joint operating agreements.  Correct?

19  A.  Correct.

20  Q.  And that was your understanding when you authorized

21  Mr. Clanton to execute it.  Correct?

22  A.  Correct.

23  Q.  You've taken the position in this case, sir -- Epsilon has

24  taken the position in this case -- I apologize -- that the

25  90-day time by which Epsilon believes it needed to initiate, at

RALEIGH - CROSS

1   least according to its proposal on December 22nd, has been

2   extended by 30 days.  Is that your position, sir?

3   A.  It has -- it has, yes.

4        ATTORNEY DEMPSEY:  And Chris, would you mind pulling

5   up Exhibit 2 again, please?

6        THE COURT:  If you could identify what article number

7   and paragraph so we can all understand where this language is

8   situated?

9        ATTORNEY DEMPSEY:  Judge, I'm directing Mr. Raleigh to

10  Roman VI.1.

11       THE COURT:  Thank you.

12  BY ATTORNEY DEMPSEY:

13  Q.  It is the final paragraph of Roman VI.1 of the Baltzley

14  South that we have moved in.  Sir, is this the 30-day extension

15  period that you are invoking?

16  A.  I think so.

17       ATTORNEY KROCK:  Your Honor, if I may object.  This

18  examination is beyond the scope of direct examination.  We have

19  a witness who can testify as to the 30-day extension.  It is

20  not this witness and it's not something that I examined about

21  in our direct examination.

22       THE COURT:  Mr. Dempsey.

23       ATTORNEY DEMPSEY:  I'm happy to direct the questions

24  to the right person.

25

1  BY ATTORNEY DEMPSEY:

2  Q.  Sir, you don't have knowledge of the timing issues?

3  A.  I'm aware of that.

4  Q.  Have you evaluated --

5  A.  I don't know what the details are, but I'm aware of it.

6  Q.  Are you aware that Epsilon --

7          THE COURT:  There were really two objections.  One was

8  to scope.  The objections were beyond the scope of the direct;

9  and the second was this witness doesn't necessarily have

10 knowledge of the subject matter that you are questioning.  I

11 think he just acknowledged that he may have knowledge.  But

12 with respect to the first aspect of the objection, I'll

13 sustain.

14          It is true with the 30-day extension that the 90-day

15 proposal was not covered during the direct examination, and it

16 sounds like it will be covered with another witness.  So I'll

17 sustain the objection to the extent that it's beyond the scope.

18          ATTORNEY DEMPSEY:  Thank you, Your Honor.

19 BY ATTORNEY DEMPSEY:

20 Q.  Mr. Raleigh, attached to your complaint are a series of

21 e-mails between staff at Epsilon and staff at Chesapeake.  Did

22 you review those e-mails before you verified the complaint?

23 A.  I have read them all.

24 Q.  Can we agree that discussions between Chesapeake and

25 Epsilon about development in the Auburn gas field began at

RALEIGH - CROSS

1   least by May of 2020?

2   A.   Could you pull those e-mails up?

3   Q.   Are you aware of -- let me see if I can do it without

4   pulling the e-mails.  When did Epsilon and Chesapeake begin

5   discussions of development in the Auburn gas field?

6   A.   We've been -- we've done it for a number of years.  Ongoing

7   discussion with the technical teams and trying to collaborate

8   in a very reasonable manner.

9   Q.   Okay.  And would you have been doing it back in May of

10  2020, having those types of discussions?

11  A.   I mean, probably.

12  Q.   And the settlement agreement that Mr. Krock asked you

13  about, you testified that the settlement agreement obligated

14  you not to propose wells until 2020.  Right?  You said you

15  honored that.

16  A.   Yeah.

17  Q.   And you've been discussing wells all throughout 2020 with

18  Chesapeake.   True?

19  A.   Well, yes.

20  Q.   Why not propose them?  What was the delay until December

21  proposing the wells?

22  A.   We had a very collaborative and very constructive

23  relationship with the technical people.  We have exchanges of

24  information, ideas.  You know, we don't want to do anything to

25  upset the operator nor do we want to interfere with their

1  operations.  Just sort of what a collaboration of a joint

2  operation is.  You work with the other parties.

3  Q.  You didn't propose these wells until December 22nd.  True?

4  A.  That's --

5  Q.  And you're before -- is that true?

6  A.  That's correct.

7  Q.  And you're before the Court because you are suggesting to

8  the Court that it is now an immediate emergency that the Court

9  should act.  True?

10  A.  There's a time constraint.

11  Q.  What's that?

12  A.  We have to act in pursuit of the proposals.

13  Q.  What's the time -- what changed in December?

14  A.  I misunderstand.

15  Q.  Yeah.  Why did it become an emergency in December?

16  A.  It wasn't an emergency in December.  It is becoming a

17  critical time function for the proposals that we made.

18  Q.  What's critical about that?

19  A.  To begin operations.

20  Q.  Okay.  Anything else?

21  A.  Cooperation from Chesapeake.

22  Q.  Anything else?

23  A.  Stop interfering with our permits.

24  Q.  Okay.  Fair enough.

25       ATTORNEY DEMPSEY:  No further questions, Judge.

RALEIGH - REDIRECT

1    THE COURT:  All right.  Mr. Krock, I assume you have

2    some amount of redirect.  Can you give me just an approximate

3    timeframe?  Because it is 12:30, I'm trying to identify when

4    would be an appropriate lunch break.

5    ATTORNEY KROCK:  Fifteen minutes, twenty most.

6    Fifteen probably more like it, if not.

7    THE COURT:  We'll go ahead and conclude Mr. Raleigh's

8    testimony then before the lunch recess.

9    ATTORNEY KROCK:  Just so the record is clear, he did

10    acknowledge that he wants to have lunch with his counsel.

11    THE COURT:  He nodded.  We'll make sure that's

12    reflected on the transcript.

13    REDIRECT EXAMINATION

14    BY ATTORNEY KROCK:

15    Q.  Mr. Raleigh, I would like you to take a look at what you've

16    been shown Exhibit Number 2, agreement for --

17    THE COURT:  One second, Mr. Krock.  Mr. Dempsey just

18    needs to get some things out of the way and have his materials

19    back at his table.

20    ATTORNEY DEMPSEY:  I apologize.

21    THE COURT:  I would just note that the staff for

22    Defendant has placed Defendant's Exhibit 2 on the screen, and I

23    think he is offering, by doing so, that he could scroll to a

24    particular page, if you would like.

25    ATTORNEY KROCK:  I appreciate that.

1

2  BY ATTORNEY KROCK:

3  Q.  What I just want to do is direct your attention to

4  Article V, which is the operator.  The section especially where

5  it involves resignation or removal of operator.

6  A.  Okay.  I have -- what line number is it?  Excuse me.  It's

7  12 or 13, somewhere in there?

8  Q.  Yes.

9  A.  Yes, resignation or removal of the operator.

10  Q.  Is this section intended to refer to the removal of the

11  operator in totality under the JOA?

12  A.  This is to remove him totally.

13  Q.  So if a non-operator was to invoke this provision, would

14  the operator continue to be able to develop and to operate any

15  of the wells in the entire JOA?

16  A.  If they were successful, no.

17  Q.  In this lawsuit, is Epsilon trying to remove Chesapeake as

18  the operator for all of the 100 plus wells.

19  A.  No.

20  Q.  Does Epsilon have any desire to take over the operatorship

21  of all those 100 plus wells?

22  A.  None.

23       THE COURT:  Mr. Krock, it may be helpful -- the

24  Court's understanding, and simply correct me if I'm wrong, is

25  that Article V, the removal of operator provision provided in

1   Article V in all of the JOAs is not under consideration in this

2   lawsuit.  Is that accurate?

3           ATTORNEY KROCK:  That is accurate.

4           THE COURT:  Is there any disagreement with that

5   statement, Mr. Dempsey?

6           ATTORNEY DEMPSEY:  It's not under consideration

7   because it's not been invoked by Epsilon.

8           THE COURT:  Which was the testimony a few moments ago.

9   The Court is understanding that loud and clear.  You can

10  continue with your questioning, but it may not be necessary.

11          ATTORNEY KROCK:  That's the only purpose I wanted to

12  establish, in case it wasn't clear, which is what we have

13  already established.

14          THE COURT:  Very well.

15  BY ATTORNEY KROCK:

16  Q.  Mr. Raleigh, you were asked a number of questions about the

17  fact that one of the drilling permits for the Craige wells was

18  in the name of Epsilon Operating, LLC as opposed to Epsilon

19  Energy U.S.A.  Do you remember that?

20  A.  Yes.

21  Q.  In your experience is it uncommon for the operator under a

22  JOA to utilize a wholly-owned subsidiary to execute components

23  of its activities?

24  A.  Completely common.

25  Q.  Now, I do want you to take a look at Exhibit 41.

1  A.  Theirs?

2  Q.  In the Defendant's exhibit, which was the original

3  complaint, I believe, that was filed in this lawsuit.  I want

4  to direct your attention to paragraph 48 of the complaint,

5  which is on page 11.

6  A.  I have it.

7  Q.  And when you verified this original complaint, you were

8  aware that the purchase and sale agreement that was attached

9  did not close, weren't you?

10  A.  Yes, absolutely.

11  Q.  In paragraph 48 it says, "In February of 2016, Chesapeake

12  and Aubmarc Properties, LLC, a wholly-owned subsidiary of

13  Epsilon, entered a purchase and sale agreement, a PSA."  Do you

14  see that, sir?

15  A.  Yes, sir.

16  Q.  Did those two entities enter a PSA?

17  A.  They did.

18  Q.  It says under the PSA, Aubmarc agreed to purchase certain

19  properties from Chesapeake.  Do you see that?

20  A.  Yes, sir.

21  Q.  Was that, in fact, a term of the PSA?

22  A.  Yes.

23  Q.  Did you actually remember seeing or anyone stating here

24  that that transaction actually closed?

25  A.  No.

1  Q.  If the transaction had closed, were the assets that the

2  undivided 50 percent of the interests that had been conveyed in

3  the farmout agreement to Chesapeake be conveyed back?

4  A.  That's the intention.

5  Q.  And would the 50 percent interest in Wyalusing Creek that

6  had been conveyed to Chesapeake be conveyed back as part of the

7  PSA?

8  A.  That was what the contemplation was.

9  Q.  Is that your understanding of why there's a reference to

10  the PSA in this agreement?

11  A.  That's right.

12  Q.  The last exhibit I want to show you is Exhibit 22 in the

13  binder that you currently have, which is the Chesapeake binder.

14  A.  Okay.  I have that.

15      ATTORNEY KROCK:  I apologize, Your Honor.  I'm having

16  trouble finding the exhibit that was discussed with Counsel

17  because of this odd numbering on the top.

18      THE COURT:  Within Defendant's 2, Counsel displayed

19  page two of 38 and page 26 of 38, but this exhibit was not

20  moved into evidence.  And I thought we sort of discontinued

21  this line of questioning when you represented that there was a

22  different witness who would address the Wyalusing Creek water

23  rights.  That's just my recollection, though.

24      ATTORNEY KROCK:  Yeah, I don't want to follow up on

25  questions that -- if there was a discontinued -- but I do know

1  this witness made some reference to a particular provision

2  regarding the property interests, and I think that's a fair

3  question.  Again, if I can find the provision it's just one of

4  them.

5          THE COURT:  Certainly.

6          ATTORNEY KROCK:  Here we go.

7  BY ATTORNEY KROCK:

8  Q.  If you can refer to the page that it's got 17 of 38 on the

9  top.

10         THE COURT:  Okay.  Just for the record, we are within

11  Defendant's Exhibit 22, and you are looking at page 17 of 38

12  within document 27-3.  Is that accurate?

13         ATTORNEY KROCK:  Yes, Your Honor.

14         THE WITNESS:  Thank you for spelling that out for me.

15  BY ATTORNEY KROCK:

16  Q.  Are you on page 17 of 38, Mr. Raleigh?

17  A.  Page seventeen of 38.

18  Q.  I only wanted to ask you, Mr. Raleigh, during the

19  cross-examination you made reference to the fact that the

20  documents issued by the SRBC that property rights and the title

21  in and of themselves were not conveyed in these agreements.  Do

22  you remember that testimony?

23  A.  Yes.

24  Q.  Can you please read the first sentence of paragraph number

25  13 at the bottom of that page?

RALEIGH - RECROSS

1  A.  "Commission approval confers no property rights upon the

2  project sponsor."

3  Q.  Is that the provision you were referring to?

4  A.  That's correct.

5         ATTORNEY KROCK:  Your Honor, those are all of the

6  questions I have.

7         THE COURT:  Mr. Raleigh, I do have some questions for

8  you, but I'm going to give Mr. Krock an opportunity to return

9  to his table.

10        ATTORNEY DEMPSEY:  Your Honor, before you ask your

11  questions, may I have some very brief recross?

12        THE COURT:  Yes.

13        ATTORNEY DEMPSEY:  I'm happy to go after Your Honor.

14        THE COURT:  I will have Counsel proceed to question

15  because it may very well be one of my questions that I want to,

16  ask.  Please proceed.

17                    RECROSS-EXAMINATION

18  BY ATTORNEY DEMPSEY:

19  Q.  Is it your testimony that Epsilon Operating, LLC is a

20  subsidiary of Epsilon U.S.A. or Epsilon Energy, Limited?

21  A.  I don't know exactly.  I don't know who owns -- Epsilon

22  Energy, LTD is the top level.  Underneath that is Epsilon

23  Energy U.S.A.  And the operating company may be a 100 percent

24  owned subsidiary of Energy U.S.A., which is 100 percent owned

25  by Energy, LTD.  Nonetheless, the 100 percent ownership

1 transfers back to Epsilon Energy, LTD.

2 Q.   LTD, not Energy U.S.A.?

3 A.   It may be -- it may go from Energy -- excuse me, Epsilon

4 Operating to Epsilon Energy U.S.A. and then to Energy, LTD.   I

5 can't remember the exact chain of who -- what's the sole member

6 of each LLC.

7 Q.   Fair enough.  And I don't want to belabor it.  You're not

8 certain as you sit here right now?

9 A.   I'm not, sir.

10 Q.   You just answered some questions by Mr. Krock.

11        Chris, will you pull up 41?

12        Exhibit 41 was the complaint that was filed in early

13 March 2021 in this court.

14        Chris, will you go to paragraph 48, please?

15        I want to make sure I understand your testimony, sir.

16 Mr. Krock asked you -- pointed you to paragraph 48 and he asked

17 you -- he read it and then he asked it's true that Aubmarc and

18 Chesapeake entered a purchase and sale agreement and you said

19 it did.  Then he asked you in paragraph 49 under the purchase

20 agreement, Aubmarc agreed to purchase certain properties and

21 you said it did.

22        You're not suggesting that the allegations relating to

23 the Aubmarc transaction are accurate in this lawsuit, are you?

24 A.   Aubmarc entered into the PSA, true.  And Aubmarc agreed to

25 purchase certain properties, true.

RALEIGH - RECROSS

1   Q.  My question is are you suggesting to this Court that the

2   allegations regarding the Aubmarc PSA are accurate?

3   A.  Say that again.

4   Q.  Yeah.  So let's turn --

5           Chris, can we look at paragraph 51?  How about 51?

6           THE COURT:  Well, Mr. Dempsey, he indicated he didn't

7   understand your question with respect to paragraphs 48 and 49.

8   So that your question has not been answered, just to be clear.

9   BY ATTORNEY DEMPSEY:

10  Q.  The allegations in your March 9 complaint regarding the

11  Aubmarc transaction, are they accurate?

12  A.  I think, as you pointed out, Aubmarc purchased, but the

13  purchase was never closed.  The PSA agreeing to that purchase

14  was, but not the actual closure.

15  Q.  Had Mr. Krock gotten to paragraph 51, you would have

16  corrected him and said that's not accurate, 51 is wrong because

17  Aubmarc did not purchase.  Right?

18  A.  They purchased it subject to the property encumbrance which

19  were stated as non-consent encumbrance on the property.

20  Q.  They didn't acquire the property because the deal didn't

21  close.

22  A.  The deal didn't close.  That's exactly right.

23  Q.  Okay.  Let's turn to paragraph 93.  The beginning of this

24  paragraph is talking about a water commitment letter, and we

25  have decided that you are not the witness in talking about the

1  water commitment letter.

2        I am most interested in talking about the part of this

3  allegation that you verified in this an asset that Epsilon's

4  subsidiary owns and contributed to the joint operations

5  governed by the JOAs.  Is that correct, sir?

6  A.  Yes.

7  Q.  That's false.  Aubmarc didn't own that.  Correct?

8  A.  Right.

9  Q.  So your -- all I want to make sure that the Court

10  understands is you are not suggesting the allegations regarding

11  the Aubmarc transactions are accurate, are you?

12  A.  Aubmarc didn't purchase.

13  Q.  So if you said in a complaint that is verified that Aubmarc

14  purchased a water asset from Chesapeake, that's not true?

15  A.  Well, Epsilon does own a portion of the Wyalusing Creek at

16  a withdrawal point.

17  Q.  And I appreciate that answer, but that's not my question.

18  Aubmarc did not purchase the water asset from Chesapeake in

19  2016, did it?

20  A.  Aubmarc did not close.

21  Q.  If the complaint that you verified said that it did, that

22  is a mistake?

23  A.  If I made a mistake, I apologize.

24  Q.  It was a mistake.  It is not accurate.

25  A.  About Aubmarc?  Yes.

1  Q.  Okay.  And neither did Aubmarc purchase the water asset and

2  then confer it back to the joint operations covered by the

3  JOAs?

4  A.  That's correct.  We did not acquire the 50 percent that we

5  did not own.

6          ATTORNEY DEMPSEY:  Thank you.

7          THE COURT:  All right.  I just want to go back over a

8  few points, Mr. Raleigh, to make sure I'm understanding your

9  testimony.  At the very beginning of your direct examination,

10  you testified that Epsilon -- and I don't know if it's the

11  parent corporation or a subsidiary, and I'm not as concerned

12  about that, is Epsilon has an ownership interest in 5,000 acres

13  in, I think you said, Susquehanna Township, Pennsylvania.

14          THE WITNESS:  Yes.  Susquehanna County.

15          THE COURT:  I think your testimony was Susquehanna

16  Township.  But anyway, it's in Pennsylvania.  So what is that

17  ownership interest?

18          THE WITNESS:  Well, you lease land and you agree with

19  the mineral owner, pay them some money.  And then you say I

20  promise to pay you royalties from the oil and gas production

21  from these leases.

22          THE COURT:  What I mean, is it pursuant to the joint

23  operating agreements, or do you mean that Epsilon independently

24  has an ownership interest?

25          THE WITNESS:  We own them.  We own them.

1    THE COURT:  Okay.  Then continuing in your direct

2  examination testimony, you were talking about a situation where

3  there is less than full consent among the parties to the joint

4  operating agreement for a particular proposal.  And I

5  understood your testimony to be in that situation the proposing

6  party will need 100 percent of the capital from those parties

7  that do consent.  Did I understand you correctly?

8    THE WITNESS:  I think so.  The consenting parties pay

9  whoever they are -- whatever the capital cost required.

10    THE COURT:  Okay.  And when you referred to the need

11  to accumulate 100 percent of the capital to support a proposal

12  or to fund a proposal, is that the same thing as achieving

13  100 percent subscription?

14    THE WITNESS:  Yes.

15    THE COURT:  So those are synonymous terms?

16    THE WITNESS:  Yes.

17    THE COURT:  And the four proposed wells that are at

18  issue in this lawsuit, does Epsilon have 100 percent

19  subscription for those four proposed wells?

20    THE WITNESS:  Yes.

21    THE COURT:  Is there another witness that can testify

22  to that?

23    THE WITNESS:  I can tell you we have.  Whether or not

24  someone else is going to testify to that, I don't know.  I can

25  tell we have 100 percent subscription and interest.

1    THE COURT:  Okay.  You indicated that the time period

2  for a proposed new well, where I look in the joint operating

3  agreement for that time period is Article XVI.A, which --

4    THE WITNESS:  Well, XVI.B is horizontal.  XVI.A is

5  vertical.

6    THE COURT:  Article XVI.

7    THE WITNESS:  Yes.

8    THE COURT:  You indicated it's the proposal itself per

9  Article XVI that specifies the time period which would be

10  referred to as the estimated commencement date.

11    THE WITNESS:  Yes.

12    THE COURT:  Okay.  So the four new wells at the Craige

13  site, what was the proposed estimated commencement date?

14    THE WITNESS:  I don't recall the exact date, but I

15  think they were -- either they put in -- maybe we could look

16  for them.  But we said we want to do it in 90 days.

17    THE COURT:  All right.  Why was 90 --

18    THE WITNESS:  We want to commence operations within 90

19  days.

20    THE COURT:  And why did Epsilon propose to commence

21  operations in 90 days?

22    THE WITNESS:  Because if you look at when we can

23  actually start to commence the -- we commence and drill the

24  wells and get the wells completed with the frack trucks and

25  organize that from service companies and then get -- increase

1　the capacity of the wellhead surface equipment and exchange any

2　information with the gatherer.  In this case the gatherer is

3　Williams.  They are independent of Chesapeake, but they have

4　got to do whatever expansion of gathering pipelines that they

5　need to because of the flow rates that are going to come from

6　their site.

7　　　　So in order to get that production on this year, to

8　keep our production either flat or slightly growing, we have to

9　move back from near the end of the year to the date that we

10　proposed.  So we thought about all of those things in the

11　proposal.  It's not just a single-letter proposal.  It's a very

12　detailed workup of geoscience, of engineering a permit.  A

13　whole bunch of things go into the proposal.  So there's a

14　significant amount of prework that goes into that.

15　　　　THE COURT:  Okay.  So the four proposed wells that are

16　at issue in this lawsuit are all within the Craige unit.

17　Right?

18　　　　THE WITNESS:  Well, no.  The unit is -- let's just

19　think about a rectangle like this (indicating).  The Craige

20　unit is that rectangle, and there's another rectangle above

21　that called the Baltzley unit.  And then south of the Craige

22　unit is the Poulsen North and the Poulsen South units.  So you

23　can drill a nice, long two mile, 10,000 foot, 11,000 foot, even

24　13,000 foot horizontal route through all of those attached in

25　the adjacent units.

1     THE COURT:  And --

2     THE WITNESS:  Excuse me.  You are drilling it from the

3  Craige pad.

4     THE COURT:  That was actually my next question.  Is

5  the proposal then by Epsilon to utilize the Craige pad for

6  drilling all four of the proposed wells?

7     THE WITNESS:  Yes.

8     THE COURT:  And there is currently an operational well

9  on the Craige pad.  Is that right?

10     THE WITNESS:  There is two producing wells.

11     THE COURT:  All right.  And does Epsilon have an

12  ownership interest in the currently operating or producing

13  wells at the Craige pad?

14     THE WITNESS:  It's 30 percent.  About 30 percent.

15     THE COURT:  Okay.  So then why has Epsilon proposed

16  four new wells at the Craige pad?  Help me understand that.

17     THE WITNESS:  There's plenty of room to add more

18  incremental wells.  It's a -- an existing facility that has

19  more capacity.  So two wells is, quite frankly, underutilizing

20  the location.  We have drilled several wells where there is

21  existing wells and come back and added new wells going north

22  and going south in different units.

23     It's a common practice to extract more of the minerals

24  that are there to -- to -- and you space them apart, meaning

25  you are not drilling a well that's going to suck resource from

1  an adjacent well.  There is plenty of room to... (indicating).

2  I may give you more than you want to know.  But if I drill from

3  this location (indicating), the drilling technology is such

4  that you can drill sideways this way for a while and going

5  deeper and then straight horizontal from there.  So it's not --

6  it's not a new technology.  There is plenty of service

7  companies that do it.

8      Our own people -- we call it geo-steering those wells

9  so you can measure where the bit is drilling through the earth

10 in a 3-D sort of space and then goes horizontal.  Those are all

11 very, very normal everyday sort of occurrences today.  It was

12 difficult 10 to 11 years ago.  But now it's much, much more

13 commonplace.  So there is plenty of access for minerals.  There

14 is minerals that are not being extracted.  There are minerals

15 that a neighboring competitor is drilling, we think, pulling

16 gas from underneath our lease.  Those are the things we need to

17 consider.

18      THE COURT:  Thank you.  So then from your description

19 of the current producing wells on the Craige pad, would I be

20 right to assume that there is a drilling rig or other equipment

21 present on that location; that location being the Craige pad?

22      THE WITNESS:  Not today.  But the pad is a surface

23 area that's been prepared for heavy equipment so that a

24 drilling rig and all of its components can be brought to that

25 location.

1      THE COURT:  So your testimony is there is no drilling

2  rig present?

3      THE WITNESS:  Not now.

4      THE COURT:  What about other equipment?

5      THE WITNESS:  Just the wellhead equipment that allows

6  the production to come to the surface and then be moved into

7  the gathering line.

8      THE COURT:  And that's because it's an operating

9  producing well?

10      THE WITNESS:  Producing.

11      THE COURT:  All right.  Those are my only questions.

12      Do the Court's questions prompt you, Mr. Krock, to

13  want to ask any follow-up questions of your witness?

14      ATTORNEY KROCK:  No, Your Honor.

15      THE COURT:  Mr. Dempsey, any follow-up questions?

16      ATTORNEY DEMPSEY:  No, Your Honor.

17      THE COURT:  All right.  May Mr. Raleigh be excused?

18      ATTORNEY KROCK:  Yes.

19      THE COURT:  All right.  Mr. Raleigh, you are excused.

20  And because you are no longer under oath and testifying, now

21  you are free to resume your seat with counsel and indeed to

22  have lunch with counsel.

23      THE WITNESS:  Thank you.

24      THE COURT:  Speaking of, it is now 12:53.  The Court

25  will now take a luncheon recess, and we will resume at 2:00.

CLANTON - DIRECT

1  Court is in recess.

2      THE COURTROOM DEPUTY:  Please rise.

3      (Whereupon, a luncheon recess was taken from 12:53 to

4  2:00 p.m.)

5      THE COURT:  Thank you.  Please be seated.  Plaintiff

6  may call its next witness.

7      ATTORNEY MADRIZ:  Epsilon calls Henry Clanton.

8      THE COURT:  All right.  Remain standing and we'll

9  administer an oath once you're over by your chair.

10      THE COURTROOM DEPUTY:  Could you please raise your

11  right hand?

12              HENRY CLANTON,

13  called as a witness on behalf of the Plaintiff, having been

14  duly sworn or affirmed according to law, testified as follows.

15      THE COURTROOM DEPUTY:  Would you please state your

16  first and last name and spell your last name for the court

17  reporter?

18      THE WITNESS:  Yes.  It's Henry Clanton, C-L-A-N-T-O-N.

19      THE COURTROOM DEPUTY:  Thank you.

20      THE COURT:  Please be seated.

21              DIRECT EXAMINATION

22  BY ATTORNEY MADRIZ:

23  Q.  Mr. Clanton, what is the name of your employer?

24  A.  Epsilon Energy U.S.A.

25  Q.  What is your title for Epsilon Energy U.S.A.?

CLANTON - DIRECT

1   A.  I started as a chief operating officer.

2   Q.  Please tell us a little bit about your educational

3   background?

4   A.  I am a 1980 graduate of Texas A & M University,

5   engineering, bachelor of science in petroleum engineering.  In

6   1993 I got a master's from Texas A & M with an emphasis in oil

7   and gas.

8   Q.  And can you tell us a little bit about your professional

9   background?

10  A.  Yes.  I've got over 30 years experience, all in the E and P

11  sector that covers drilling completion, director in operations,

12  reserve analysis and business analysis.

13  Q.  What management positions have you held over the last 30

14  years?

15  A.  Most of my career so far has been in management.  Of course

16  this position.  Prior to joining Epsilon, I had formed and

17  served as a managing partner of Ares Energy for 14 years or so

18  years.  Prior to that I was employed with Schlumberger, where I

19  served in the management level for five years while I was with

20  them.

21  Q.  What type of activity did you engage in while you had those

22  management roles for Schlumberger?

23  A.  I was the Gulf of Mexico market manager for what they

24  called their Integrated Project Manager Group, for which I

25  served as a project manager for customers.  Also served as the

CLANTON - DIRECT

1  lead Schlumberger person in what we call the Texaco JBE, which

2  was a joint venture between Texaco and Schlumberger with 15

3  fields, five on land and five on the water and five fields in

4  the Gulf of Mexico.

5  Q.  At the risk of asking the obvious --

6  A.  That project was basically to bring about the remaining

7  development potential of those fields.

8  Q.  At the risk of asking the obvious, what is Schlumberger?

9  A.  Schlumberger is one of, if not the largest oil field

10  services in the country.

11  Q.  What did you do after Schlumberger?

12  A.  After I left Schlumberger, that's when I formed my private

13  company, Ares Energy.  That was an E and P company that

14  acquired producing properties as well as took acreage and took

15  property from owners.

16  Q.  How many acres did Ares acquire while it was in existence?

17  A.  Ares is still in existence.  I am no longer with the

18  company, but during my time there we leased over 50,000 acres.

19  Q.  Can you put up a price to the amount of acreage?

20  A.  It was about $60 million, all in.

21  Q.  How many wells did Ares drill?

22  A.  During my time?

23  Q.  Yes, sir.

24  A.  We drilled a little over 50 wells.  And of those 50, 15 of

25  those are current-generation horizontal wells, similar to what

1  we're looking at in the marcellus.

2  Q.  What was your role in connection with drilling those wells?

3  A.  I served in management as a managing partner.  I also,

4  because of my technical background and my experience, served as

5  somewhat of a peer review, plug-and-play technical expert from

6  time to time, should there need to be issues worked out.

7  Q.  And did Ares use any operating agreements in connection

8  with its business operations?

9  A.  We did.  For the producing properties that we purchased,

10  most of them -- no, all of them really were bound by existing

11  joint operating agreements.  And so when we acquired those

12  assets, they had the JOAs that we had to be compliant with.

13        For the projects where we took new leases and formed

14  drilling units and drilled wells, we worked under what we

15  called the joint development agreement that sets out the bigger

16  picture of what the partners want to invest in and had a model

17  form JOA that once a unit was formed and we initiated the first

18  well, we kind of -- similar to the farmout agreement here, the

19  partners had all agreed to, upfront, a joint operating

20  agreement that would suit that drilling unit.

21  Q.  And how did the operating agreements that were utilized by

22  Ares compare to the ones that Epsilon uses?

23  A.  They are very similar.  We operated under the AAPL 1982

24  form, similar to what Epsilon and Chesapeake are dealing with

25  in these units here.

CLANTON - DIRECT

1  Q.  I want to shift to Epsilon at this point.  Thank you for

2  that background.  When did you join Epsilon again?

3  A.  It was in January of 2017.

4  Q.  Where are Epsilon's interests located?

5  A.  Their interests are predominantly in Pennsylvania, in the

6  northeast in Susquehanna County.

7  Q.  As Epsilon COO, what are your oversight responsibilities

8  for drilling, competition, production, land ops and geosciences

9  in Susquehanna County?

10  A.  The easiest way to explain my role is I'm responsible for

11  reserve development and oversight.  So I have geoscience,

12  engineering, land, business analysis functions that report

13  through me.  We identify the remaining potential of our

14  holdings, whether they be operated or non-operated.  And we

15  develop a plan to get them developed.

16  Q.  Can you explain what the relationship that exists between

17  Epsilon Operating, LLC and Epsilon U.S.A., Inc. is?

18  A.  Epsilon Operating, LLC is a 100 percent owned subsidiary of

19  Epsilon U.S.A., Inc.

20  Q.  What is your familiarity with the farmout agreement and the

21  JOAs in this case?

22  A.  I have read it and reviewed it.

23  Q.  Do you know how much land Epsilon attributed under the

24  farmout agreement?

25  A.  It was a little over 10,000 acres.

1  Q.  I'm going to direct your attention to Plaintiff's

2  Preliminary Injunction Exhibit 8.  Are you familiar with this

3  document?

4  A.  I am.

5  Q.  Can you tell me what it is?

6  A.  Yes.  This is an exhibit that shows, highlighted in yellow,

7  the lease position, the acreage that was contributed to the

8  farmout in 2010.  It also sets out the drilling units that have

9  been formed since the farmout agreement has been developed and

10  our interest position in those units.  It also outlines what we

11  call the Auburn gas gathering system boundary.

12  Q.  Does that fairly and accurately depict the Epsilon acreage

13  as it exists?

14  A.  It does.

15  Q.  How many units are on this map?

16  A.  A little over 40.

17  Q.  And how much acreage?

18  A.  It's around 5,000 acres.

19  Q.  What portion of that is Epsilon's acreage?

20  A.  I'm talking about net.  So it's 5,000 acres net to Epsilon.

21  Q.  How does the acreage relate to the JOAs at issue in this

22  case?

23  A.  Well, the acreage that are within formed units are subject

24  to those joint operating agreements.

25        ATTORNEY MADRIZ:  Your Honor, Epsilon moves

CLANTON - DIRECT

1   Plaintiff's Preliminary Injunction Exhibit 8.

2        THE COURT:  Any objection?

3        ATTORNEY DEMPSEY:  Yes, Your Honor.  I'm going to

4   object.  I'm not certain he has laid the proper foundation for

5   this document, and I, quite frankly, have not seen it.  So I'm

6   going to object to the admissibility of that document.

7        ATTORNEY MADRIZ:  Permission to lay the proper

8   predicate, Your Honor.

9        THE COURT:  Certainly.

10  BY ATTORNEY MADRIZ:

11  Q.  Sir, are you familiar with the scene that's represented in

12  this map?

13  A.  I'm sorry?

14  Q.  Are you familiar with the area that's represented in this

15  map?

16  A.  Yes, I am.  Um-hum.

17  Q.  And do you recognize this area that's depicted in this map,

18  and can you tell this Court whether this is a fair and accurate

19  representation of the area as you know it?

20  A.  This is a fair and accurate representation of the area as I

21  know it, um-hum.

22  Q.  To the best of your knowledge, is this map drawn to scale?

23  A.  Yes.

24       ATTORNEY MADRIZ:  Your Honor, Plaintiff moves to admit

25  Plaintiff's Preliminary Injunction Exhibit 8.

1    THE COURT:  The exhibit is admitted.

2    ATTORNEY MADRIZ:  Thank you, Your Honor.

3  BY ATTORNEY MADRIZ:

4  Q.  What is the Auburn gathering system, sir?

5  A.  The Auburn gathering system is the system of pipelines and

6  compressor stations that gather the gas from the Auburn unit.

7  Q.  Who owns the Auburn gathering system?

8  A.  It's co-owned by multiple parties, Epsilon being about

9  35 percent.

10  Q.  Can you describe the other parties that own the system?

11  A.  The other parties are -- one of the other working partners

12  are Equinor and Williams own the rest of it.  So the three of

13  us represent the Auburn gathering system.

14  Q.  What is Chesapeake's relationship with the Auburn gas

15  gathering system?

16  A.  Well, Chesapeake serves as the operator of the drilling

17  that produces the gas that goes into the Auburn gas gathering

18  system.

19  Q.  I'm now going to direct your attention to Plaintiff's

20  Preliminary Injunction 9.  Are you familiar with this document?

21  A.  I am.

22  Q.  Can you tell me what it is?

23  A.  Yes.  Similar to the previous exhibit, this is an exhibit

24  that sets to display the gathering system.  So you'll see the

25  common Auburn gas gathering system boundary in green.  You'll

1    see the drilling units that we spoke about earlier.  And you'll

2    see depicted the pipeline, the Auburn gas gathering system

3    pipelines as well as two other gathering systems, the Rome and

4    the Overfield pipelines.

5    Q.  Are you -- I'm sorry.  Go ahead.  Are you familiar with

6    this area, sir?

7    A.  I am.

8    Q.  Does this map fairly depict the gathering system as it

9    existed at the time this map was created?

10   A.  Yes, it does.

11   Q.  And is it drawn to scale?

12   A.  It is.

13        ATTORNEY MADRIZ:  Your Honor, Plaintiff moves to admit

14   Plaintiff's Exhibit Number 9 into evidence.

15        THE COURT:  Any objection?

16        ATTORNEY DEMPSEY:  Your Honor, our objection to this

17   -- yes, we object.  The proper foundation has not been laid.

18   This witness has not explained when was the document created,

19   whether he oversaw the creation of it, what is represented by

20   the color system.  And so we simply -- we object to the

21   admission of it into the record.

22        ATTORNEY MADRIZ:  Your Honor, the witness doesn't have

23   to oversee the creation of the document.  They just have to be

24   familiar with the general area.  They have to be able to attest

25   that the document accurately reflects the area as of the time

1  that it was created and that it's drawn to scale.  That's a

2  proper predicate.

3          THE COURT:  All right.  Well, the one question asked

4  by Defense Counsel, which is the same as my question, which is

5  you said at the time created.  But you haven't asked the

6  witness when it was created and what time period it was

7  created.

8          ATTORNEY MADRIZ:  Sure.  Good point, Your Honor.

9  BY ATTORNEY MADRIZ:

10  Q.  Can you describe the time period when this was created,

11  sir?

12  A.  This was created in the last six months.

13  Q.  And does this document accurately depict the area as it

14  exists in the last six months?

15  A.  It does.

16          ATTORNEY MADRIZ:  Move to admit, Your Honor.

17          THE COURT:  Plaintiff's Exhibit 9 is admitted.  And

18  Counsel, you can just refer to it as Plaintiff's Exhibit 9.

19  You don't have to include the extra language.

20          ATTORNEY MADRIZ:  Thank you, Your Honor.

21  BY ATTORNEY MADRIZ:

22  Q.  Can you tell me what we're looking at in this depiction,

23  sir?

24  A.  Well, it's the depiction again of the gathering system as

25  it relates to the drilling units and where the pipelines are

1  run to connect the producing wells to the gathering system.

2  Q.  With regards to the four well proposals at issue in this

3  case, what gathering system do they -- are they related to?

4  A.  They will tie in and produce into the Auburn gathering

5  system.

6  Q.  What is the significance of the Auburn gathering system to

7  Epsilon, Chesapeake and the other joint operating agreement

8  parties' business production and gathering and processing cost?

9  A.  The Auburn gas gathering system has a commercial model

10  associated to it, tied to volume throughput of gas put into the

11  system.  Those owners of the production, Chesapeake, Equinor,

12  Epsilon and others that produce gas into that gathering system,

13  are subject to that gathering and transportation fee.

14       That gathering and transportation fee again is based

15  on the amount of throughput, both current and projected

16  throughput.  So it's a very significant cost component to the

17  production of the wells, as well as the production of the

18  existing wells and all of the reserves that are associated with

19  those.

20  Q.  What role does volume throughput projection play in

21  Epsilon's decision to propose new wells?

22  A.  It's one of the most, if not the most, significant elements

23  in our planning process.  New production has to continue to be

24  developed and put into this gathering system, such that the

25  volume throughput will maintain or actually lower the gathering

1    and transportation fee related to producing our gas.  This

2    operating cost component, gathering and transportation, is the

3    single largest operating cost component of producing gas.  So

4    it leads our thinking in terms of understanding what the

5    remaining potential is of the area and the timing of developing

6    the remaining potential of the area, such that we can get it

7    into the gathering system at a scheduled, regular basis to

8    maintain the cost of the gathering and transportation fee that

9    is established from that volume throughput as well as the

10   projected throughput.

11   Q.  And what happens if the pace of development fails to meet

12   the target -- the target volume throughput?

13   A.  The gathering and transportation fee, the commercial model

14   raises the gathering and transportation fee.  All parties that

15   own an interest in that gas, they are paying more for the

16   gathering and transport of that gas than they would have prior.

17   Q.  And if the --

18   A.  That applies across the total volume balance going into the

19   gathering system.

20   Q.  If the four wells come on-line and the production comes

21   on-line and the pace of development meets the anticipated

22   volume throughput, how does that impact the JOA's bottom line?

23   A.  It benefits them.  All parties are about reducing the

24   gathering and transportation fees.  So it serves to benefit all

25   of the working interest owners as the development is scheduled

1  and the gas is put on-line and put into the gathering system.

2  Q.  I want to shift your attention now to Epsilon's experience

3  in drilling wells, if that's okay with you, sir.

4  A.  Um-hum.

5  Q.  I'm going to direct your attention now to Plaintiff's

6  Exhibit Number 10.  Have you seen this document before, sir?

7  A.  I have.

8  Q.  If you could -- I'm now going to show you page three of the

9  document.  If you take a look at the second to the last

10  sentence in the last paragraph, after the preface beginning --

11  it's three lines up from the very end of it.  It starts with

12  Epsilon.

13      Can you highlight that for me?  Thank you.

14      It reads, "Epsilon's proposed conduct creates a real

15  and present danger to the health and safety of individuals

16  living and working in the area of the Craige well pad,

17  particularly given its lack of operational experience since it

18  presently operates no wells in Pennsylvania."

19      Did I read that correctly?

20  A.  You did.

21  Q.  What is Epsilon's response to that statement?

22  A.  It's inaccurate.

23  Q.  How is it untrue?

24  A.  Well, I think we need to begin by restating for the record

25  that Chesapeake was given the opportunity to operate those well

1    proposals and they elected not to.  And when they elected not

2    to, that obligation of duty falls upon the consenting parties.

3    In this case Epsilon is quite capable of drilling these wells

4    in a safe and legal manner.

5           There is three major areas; well planning, well

6    execution, oversight and management.  On the well planning,

7    which includes building the well plan, the drilling prognosis

8    as well as the completion prognosis, as has been stated

9    earlier, we own an interest in over 100 wells in this field.

10   We have the complete record of how those wells were drilled,

11   including, in many cases, the drilling prognosis and the

12   completion prognosis.

13          So it's a quite-developed area as compared to, say,

14   new, virgin areas that operators are having to go in not really

15   understanding all of the operational challenges related to it.

16   We have a very good data set and understand completely what

17   the -- what to expect in drilling these wells and preparing our

18   plan.  Secondly, there is two wells actually on the pad site

19   that we have an interest in.  And we have those records, as

20   well.

21          So we have the support of not only in-house but

22   service providers that have participated in the construction of

23   this well plan.  And I would submit to the Court that it is as

24   safe as any of the operators currently operating in the

25   marcellus well construction.  You take that plan, and then you

1    go basically and drill the well.

2         Epsilon's mode will be similar to the other operators

3    in the area, including the Defendant, including Cabot,

4    Southwestern, Repsol, BKV, a variety of others.  The operators

5    serve, for the most part, as the general contractor and they

6    subcontract out the equipment and services that are needed in

7    the execution of that well plan.

8         The vendors and service providers in this area now

9    have hundreds of wells drilled and all operators are very clear

10   about what the fit-for-purpose equipment is needed.  For

11   instance, a drilling rig.  We would have access -- equal access

12   to the same equipped drilling rig as any of the other operators

13   in the area, including well control equipment.  So the rollout

14   preventers provided with these drilling rigs are virtually the

15   same exact -- may be the exact same equipment used by the

16   vendors that drill up to a hundred wells that are currently

17   operational in the field.

18        The directional drilling service, including the

19   downhill equipment needed to steer the wells is, again, a

20   service that is quite evolved.  There is many excellent

21   directional drilling companies to procure those services from.

22        So we would submit to you that our management and

23   oversight of the execution of the construction of that well is

24   not that far off than be some of the more active drillers in

25   our area.

CLANTON - DIRECT

1    Q.  So how would you describe the Epsilon's operational --

2    A.  Yes, what I was going to mention before that in terms of

3    the management and oversight, there are two forms of oversight.

4    You have the management oversight that I'm referring to, and

5    then the local boots-on-the-ground oversight and management

6    with in-house expertise, including myself and our CEO and

7    others, as well as support that we have from other consulting

8    firms that are quite versed in these projects.  They are quite

9    active in these projects.  They are familiar with these types

10   of wells and support clients in many other projects around,

11   including projects in northeastern Pennsylvania actively

12   drilling these wells.

13        So we have a team, a management team, that will have

14   oversight over the execution phase.  And that management team,

15   last I looked, had well over 100 years of combined experience.

16   Several hundred wells drilling.

17        Secondly, the personnel, boots-on-the-ground, on the

18   drilling rig are what we call well site consultants that are --

19   have a function and role to play on the drilling rig tied to

20   the well plan that we have prepared.

21        Those well site consultants are available for

22   providing services.  We will require they have experience in

23   the area.  In some cases these well site consultants may have,

24   in fact, worked for the Defendant drilling some of these

25   hundred wells that we're talking about drilling.

CLANTON - DIRECT

1      We also have experience-based criteria, including

2  environmental safety health, well control requirements of the

3  on-site management to be able to even serve in that capacity

4  for us.  So planning, we have got a huge data set.

5      Execution is from a skilled and experienced industry

6  that all operators have equal access to those service providers

7  and equipment as well as our ability to look over the overall

8  project management, which I have spent personally almost 20

9  years of my career in project management.

10      But we also have field site management and well site

11  management that will be equivalent to and will take a back seat

12  to no other operators in the area.  So I'm quite confident and

13  hope that we can explain to the Court that that -- that mere

14  accusation is invalid.

15  Q.  I'm going to refer your attention to Plaintiff's Exhibit

16  Number 11.  Do you recognize this document?

17  A.  I do.

18  Q.  Do you know when this document was created?

19  A.  Within the last six months.

20  Q.  Were you familiar with the area that's depicted in this map

21  as of the time it was created?

22  A.  I am.

23  Q.  Do you know if this map fairly and accurately depicts the

24  areas that existed during that time?

25  A.  It does.

CLANTON - DIRECT

1    ATTORNEY MADRIZ:  Move to admit this exhibit, Your

2  Honor.

3    THE COURT:  Any objection?

4    ATTORNEY DEMPSEY:  Yes, Judge.  I think the question

5  for the witness was does it fairly and accurately depict.  The

6  exhibit includes text boxes which this witness has not

7  explained what they are or what they reflect.  So I would

8  object.  Lack of foundation.

9    ATTORNEY MADRIZ:  I'm happy to go over that if it's

10  necessary, Your Honor.

11    THE COURT:  Please do.

12  BY ATTORNEY MADRIZ:

13  Q.  Could you please tell us what we're looking at, sir?

14  A.  Yeah.  So this exhibit depicts the drilling units that were

15  shown on the previous exhibits as well as the Auburn gas

16  gathering system boundary, as was depicted on the previous

17  exhibit, as well as the wells that Epsilon had drilled prior to

18  to the farmout agreement with Chesapeake.

19  Q.  How many wells has Epsilon drilled?

20  A.  Epsilon drilled these eight wells.

21  Q.  Can you tell us where the eight wells are identified on

22  this exhibit?

23  A.  Yeah.  You can see the wells there.  You may have to expand

24  it.  They are in the Larue unit.  They're in the Hardick unit,

25  Pierson unit, Poulsen South unit and then Poulsen North unit.

1      THE COURT:  Can you ask him to specify a timeframe?

2  You said before the farmout agreement.  I didn't hear a year.

3      THE WITNESS:  They were drilled prior to 2010.  The

4  farmout agreement was February of 2010.  So it was prior to

5  February of 2010.

6      THE COURT:  Can you provide any other specificity than

7  2010?

8      THE WITNESS:  2008-2009 timeframe.

9      ATTORNEY MADRIZ:  Your Honor, we move to admit this

10 exhibit into evidence as Exhibit 11.

11     ATTORNEY DEMPSEY:  No objection.

12     THE COURT:  All right.  Plaintiff's Exhibit 11 is

13 admitted.

14 BY ATTORNEY MADRIZ:

15 Q.  Were these wells commercially productive?  These wells that

16 Epsilon drilled, were they commercially productive?

17 A.  They were.

18 Q.  When Epsilon drilled the wells before the farmout and the

19 JOAs were signed, what differences existed between how Epsilon

20 and Chesapeake operated to drill and operate wells?

21 A.  Well, as I described, not much different.  We both serve as

22 a general contractor procuring services from subcontractors and

23 service providers.  So quite the same capacity.

24 Q.  Can you tell me what your experience is with drilling

25 wells?

1    A.   Yes.   Personally I've been involved in over 450 wells,

2    drilling.   As I mentioned, the most current experience involves

3    this -- what we call latest generation of horizontal

4    development.   I am familiar with all of the aspects of the

5    drilling; the completion, production of those types of wells.

6    Q.   And those 450 wells that you just described, was that over

7    the course of your career?

8    A.   That was over my entire career.

9    Q.   And what portion of that was during your time at Epsilon?

10   A.   I've not drilled any wells in Epsilon.

11   Q.   With regards to horizontal wells that are proposed in this

12   case, how many like wells have you been responsible for

13   drilling and operating?

14   A.   About 15.

15   Q.   And in addition to you, what is the current experience of

16   those working at Epsilon in drilling these type of wells?

17   A.   So we have assembled a team of people, both in-house and

18   outsource, that have over a hundred years collective experience

19   drilling these types of wells.

20   Q.   We're now going to turn to Plaintiff's Exhibit Number 12.

21   Are you familiar with this document, sir?

22   A.   I am.

23   Q.   What is it?

24   A.   This is the Pennsylvania DEP granted drilling permit.   The

25   first one is for the Craige North 1 UHC.

CLANTON - DIRECT

1    Q.  For brevity, is it okay if I refer to the Pennsylvania

2    Department of Environmental Protection as Pa. DEP?

3    A.  Please.

4    Q.  What efforts did Epsilon take to secure the Pa. DEP to

5    drill the wells?

6    A.  Well, you have to be a licensed operator in the state,

7    which we are.  And then you have to submit the requisite

8    information for permits.

9    Q.  What financial security is required from Epsilon in order

10   to get the permit?

11   A.  All licensed operators have to demonstrate surety

12   requirements on behalf of the Pennsylvania DEP, and we have

13   done that.

14   Q.  What does the permit authorize Epsilon to do?

15   A.  Drill the wells.  Be the operator of wells and drill from

16   Craige pad.

17   Q.  What criteria and obligations is the Pa. DEP Gas Management

18   Program for permits is Epsilon capable of satisfying?

19   A.  We are capable of meeting all regulatory and legal

20   requirements in drilling and completing these wells.

21   Q.  One thing I note here is that the permit is in the name of

22   Epsilon Operating, LLC rather than Epsilon Energy U.S.A.  Why

23   is that?

24   A.  Epsilon Energy U.S.A., Inc. will use a 100 percent-owned

25   subsidiary, like Epsilon Operating, to do portions of the well

CLANTON - DIRECT

1   phase, well operations.

2   Q.  What is -- what is Epsilon's understanding as to how

3   Chesapeake is reacting to Epsilon receiving this permit?  What

4   steps is Chesapeake -- what judicial or related type of actions

5   is Chesapeake taking in response to this permit?

6   A.  Well, in response to these permits, they are attempting to

7   file an action to have these to appeal the issuance of these

8   drilling permits.

9           ATTORNEY MADRIZ:  Can we put up Plaintiff's Exhibit

10  Number 7, section 8(d).

11          THE COURT:  Counsel, were you moving the admission of

12  Plaintiff's 12?

13          ATTORNEY MADRIZ:  I had not done so, Your Honor.

14  BY ATTORNEY MADRIZ:

15  Q.  But is this a document that's kept in the ordinary course

16  of Epsilon's business, sir?

17  A.  Are we talking about Exhibit 12 now?

18  Q.  Yes, sir.

19  A.  Yes.

20          ATTORNEY MADRIZ:  Plaintiff's moves to admit.

21          THE COURT:  Is there any objection?

22          ATTORNEY DEMPSEY:  No objection.

23          THE COURT:  Plaintiff's 12 is admitted.

24  BY ATTORNEY MADRIZ:

25  Q.  This is a document that was admitted earlier this morning,

1  sir.  Are you familiar with this settlement agreement?

2  A.  I am.

3  Q.  Are you familiar with section 8(d) of the settlement

4  agreement?

5  A.  I am.

6  Q.  Have you reviewed it before?

7  A.  Yes, I have.

8  Q.  What is Epsilon's -- you just mentioned that Epsilon is

9  appealing the issuance of a permit to Epsilon.  Correct?  Do

10  you remember that?

11  A.  Chesapeake's appealing the issuance of the permit, yes.

12  Q.  Thank you.  What is Epsilon's view about Chesapeake

13  pursuing an appeal of that permit with respect to 8(d) of the

14  agreement?

15  A.  We find it to be a direct breach.

16  Q.  Why is that?

17  A.  Because the settlement agreement sets out that Chesapeake

18  will cooperate with the party designated, to the extent

19  permitted under the JOA, and will not unreasonably withhold

20  cooperation, including, but not limited to, permitting.

21  Q.  I'm now going to direct your attention to Plaintiff's

22  Exhibit Number 13.  Are you familiar with this document, sir?

23  A.  Yes, I am.

24  Q.  Can you tell us what we're looking at?

25  A.  This is an image -- a satellite image taken from Google

CLANTON - DIRECT

1  Earth that sets out a photograph of the Craige unit.  We also

2  overlaid the Craige unit boundary onto this photo.

3  Q.  Do you know when this satellite photo was taken?

4  A.  Well, so let me explain.  We created this image within the

5  last six months.  We pulled down off of Google Earth this

6  image.  Google Earth posts what the date is.  And I believe the

7  date of this particular image, as shown in the picture at the

8  bottom, is 9/16/2019.  So this is a 9/16/2019 satellite photo

9  of the image that we pulled together in the last six months.

10  Q.  Thank you.  Can you tell me, where is the Craige well pad?

11  A.  That's the road and the pad where the Craige two producing

12  wells are as well as the production equipment.

13  Q.  In what unit is the Craige well pad located?

14  A.  It's within the Craige unit boundary.

15  Q.  Where is that Craige unit?

16  A.  This Craige unit is in Susquehanna County in Pennsylvania.

17  Q.  What JOA exists for the Craige unit?

18  A.  It's the Craige unit JOA.

19  Q.  And who paid for the Craige well pad?

20  A.  The working interest partners.

21  Q.  What interest does Epsilon own in the Craige well pad?

22  A.  We have approximately 30 percent working interest in the

23  unit and the two producing wells.

24  Q.  Are you familiar with the area that's depicted in this

25  satellite photo, sir?

CLANTON - DIRECT

1    A.  I am.

2    Q.  Is the location of the Craige pad fairly accurately

3    depicted in this satellite photo as it exists today?

4    A.  It is.

5         ATTORNEY MADRIZ:  Your Honor, we move to admit

6    Plaintiff's Exhibit Number 13.

7         THE COURT:  Any objection?

8         ATTORNEY DEMPSEY:  Your Honor, just to confirm.  The

9    witness has testified he's familiar with it.  I don't -- I'm

10   not certain I understand how that is; whether it's familiar by

11   looking at a Google Earth image or if he has physically been on

12   the Craige pad.

13        THE COURT:  Well, Counsel, do you actually dispute

14   that this image fairly and accurately depicts the Craige well

15   pad?

16        ATTORNEY DEMPSEY:  I do not, Judge.

17        THE COURT:  Is that the purpose for admitting this

18   exhibit?

19        ATTORNEY MADRIZ:  That's it, Your Honor.

20        THE COURT:  Okay.  Plaintiff's 13 is admitted.

21        Obviously you can follow up with cross-examination

22   with respect to this witness's familiarity with the site.

23   BY ATTORNEY MADRIZ:

24   Q.  Now we're going to turn to Plaintiff's Exhibit Number 14.

25   Are you familiar with the satellite photo, sir?

CLANTON - DIRECT

1  A.  Yes, I am.

2  Q.  Can you tell me what it depicts?

3  A.  Yes.  This is a satellite photo taken from Google Earth

4  that captures the Marbaker impoundment.

5  Q.  What is the Marbaker impoundment?

6  A.  The Marbaker impoundment is one of the co-owned facilities

7  used in the drilling and completion activities of the wells in

8  development.

9          THE COURT:  I'm sorry.  One of the what facilities?

10         THE WITNESS:  The water management facility.

11         THE COURT:  Did you say coned?  I just didn't hear the

12 word.

13         THE WITNESS:  Co-owned.

14         THE COURT:  So what is the function of an impoundment?

15         THE WITNESS:  The function of the impoundment

16 primarily is to hold a volume of water.  The drilling and

17 completion of these wells require such intensive volumes, maybe

18 as much as half a million barrels.  The surface water permits

19 and other access to water, you can outrun.

20         So what operators will do is they will build storage

21 containment and fill these; we call them impoundments, such

22 that they can be -- such that the volume can be used within a

23 short period of time, primarily during the completion process.

24         THE COURT:  Thank you.

25

CLANTON - DIRECT

1   BY ATTORNEY MADRIZ:

2   Q.  Can you tell us how that water is used?

3   A.  For the drilling and completion of the wells.

4   Predominantly the fracking.

5   Q.  And where does that water come from?

6   A.  Well, it can come from a variety of sources.  But the major

7   source for this particular impoundment is the Wyalusing Creek

8   surface water -- surface water withdrawal.

9   Q.  Is the Marbaker impoundment within the Craige JOA?

10  A.  It is not.

11  Q.  Where is it?

12  A.  It's on the western boundary of the field.

13         ATTORNEY MADRIZ:  Your Honor, we move to admit this

14  exhibit for purposes of reflecting where it's located.

15         THE COURT:  Any objection?

16         ATTORNEY DEMPSEY:  No objection, Your Honor.

17         THE COURT:  Plaintiff's 14 is admitted.

18  BY ATTORNEY MADRIZ:

19  Q.  You just testified, sir, that the water from the

20  impoundment comes from the Wyalusing Creek water source.

21  Correct?

22  A.  In part it comes from that.  There may be other sources

23  that backfill it.  But the predominant source is the Wyalusing

24  Creek.

25  Q.  I want to take a look at that.  Can you turn to Exhibit

CLANTON - DIRECT

1   Number 16?  Are you familiar with this document?

2   A.   I am.

3   Q.   And can you tell us what we're looking at?

4   A.   Similar to some of the previous exhibits, this is a Google

5   Earth-sourced satellite photo showing the Wyalusing Creek water

6   withdrawal facility as well as the creek.

7   Q.   Can you tell us what else we're looking at?

8   A.   Also included is the SRBC coordinates; longitude, latitude,

9   where the actual withdrawal site in the water is.  Also

10  depicted, if you can see above the state highway there, which

11  states highway 706, yellow line with the white 706 circle in

12  it, right there north of the 706 sign is the beginning of the

13  facility.

14          And you can see that there is tankage there and there

15  is manifold suction header there and there is road improvements

16  to be able to get water transport vehicles in and out of the

17  facility.

18  Q.   Which facility are you referring to?

19  A.   This is the Wyalusing Creek water withdrawal site.

20  Q.   Before we leave this picture, how does the current location

21  of the Wyalusing Creek water withdrawal under permit 201209,

22  which is in Chesapeake's name right now, compare with the

23  location of the Wyalusing Creek water withdrawal when the

24  permit was in Epsilon's name under docket permit 20081227?

25  A.   Based on the information that we have received from the

CLANTON - DIRECT

1   SRBC, they are one in the same.

2          ATTORNEY MADRIZ:  Your Honor, we move to admit this

3   exhibit for purposes of just showing how -- where the Wyalusing

4   Creek is located with respect to the water facility.

5          THE COURT:  Any objection?

6          ATTORNEY DEMPSEY:  Not to the fact that it depicts the

7   creek, Judge.  But the question of the location of the

8   withdrawal points is contested.  But no objection to the fact

9   that the image depicts the Wyalusing Creek.

10         THE COURT:  All right.  I will admit Plaintiff's

11  Exhibit 16.  And obviously again, you can cross-examine

12  regarding the coordinates issue and the location of the water

13  withdrawal.

14  BY ATTORNEY MADRIZ:

15  Q.  How did Epsilon actually -- you just testified, sir, that

16  the -- the coordinates and location of the water permit as it

17  exists for Chesapeake is the same as the location as it existed

18  when it was in Epsilon's name.  Correct?  Do you remember that?

19  A.  Yes.

20  Q.  How did you confirm that that's the case?

21  A.  We inquired from the SRBC what the coordinates were, and

22  they provided us those coordinates.

23  Q.  Can you turn to Plaintiff's Exhibit Number 17, sir?

24  A.  Yes.

25  Q.  Is this the communication that you were just referring to?

CLANTON - DIRECT

1  A.  It is.

2  Q.  Who is Paula Ballaron?

3  A.  She's an employee of the SRBC.

4  Q.  And as you can see, the e-mail is dated Monday, March 29th,

5  2021 at 5:44 p.m.  It's to Walter Jenko, but you're copied in

6  this e-mail.  That's correct?

7  A.  That's correct.

8  Q.  Is this a true and correct copy of the e-mail that you

9  received?

10  A.  It is.

11      ATTORNEY MADRIZ:  Your Honor, we move to admit this as

12  Plaintiff's Exhibit Number 17.

13      THE COURT:  Any objection?

14      ATTORNEY DEMPSEY:  No, objection, Your Honor.

15      THE COURT:  Plaintiff's 17 is admitted.

16  BY ATTORNEY MADRIZ:

17  Q.  Can you read the portion of the e-mail that confirms that

18  the two locations are one in the same?

19  A.  Right.  So when we sought support of confirmation of the

20  coordinates from the SRBC, we asked them and this is the

21  response that they got.  They pulled up dockets number

22  20081227, 20090610 and 20110607 and told us that based on the

23  records that they have got in their database from their

24  compliant group that the coordinates for that permit are

25  41.789, and all the remaining numbers, and 76.0001, which are

1  identical to the current docket that is in Chesapeake's name.

2  Q.  What significance does Epsilon place on the fact that the

3  coordinates are the same?

4  A.  It means that the water withdrawal permit that was granted

5  to Epsilon and later have interest conferred to Chesapeake is,

6  in the eyes of the SRBC, in the same spot in the creek.

7  Q.  What does that mean?

8  A.  That means that the current docket under which Chesapeake

9  is serving as operator is pulling water out of the creek.  Part

10 of that water withdrawal authorization emanates from the permit

11 that we conveyed to them and half ownership in.

12 Q.  What percent -- what ownership percentage does Epsilon

13 believe it still retains with respect to that permit?

14 A.  We still own our -- we believe we still own our 50 percent,

15 half of the authorization under docket 20081227.

16 Q.  I'm now going to refer your attention to Plaintiff's

17 Exhibit Number 18, sir.  Do you recognize this document?

18 A.  I do.

19 Q.  Can you tell me what it is?

20 A.  It's the farmout agreement between Epsilon U.S.A. --

21 Epsilon Energy U.S.A. and Chesapeake Appalachia.

22 Q.  What's the date of this agreement?

23 A.  It's February 1st, 2010.

24 Q.  Let's take a look at section 1.1 entitled property subject

25 to farmout.

1        Can we blow it up, please?

2        Can you tell me what Epsilon conveyed to Chesapeake in

3   order that Chesapeake agreed to acquire under this agreement?

4   A.  Yes.  Epsilon conveyed right, title and interest in our

5   mineral leases; mineral interests, royalty interests, service

6   fees, et cetera.

7   Q.  What percentage interest?

8   A.  Undivided 50 percent interest.

9   Q.  How is -- what type of property interests were conveyed?

10  A.  Real property interest.

11  Q.  Where -- if you take a look at the last sentence in 1.1, it

12  says the term property means --

13  A.  Well, the location of the properties, they were

14  predominantly in Susquehanna County.  But there were some in

15  Bradford and Wyoming Counties, as well.

16  Q.  The provision reads, "With respect to certain oil and gas

17  interests and properties located in Susquehanna, Bradford and

18  Wyoming Counties, Pennsylvania."  Right?

19  A.  Right.

20  Q.  Which of those counties is at issue here?

21  A.  Susquehanna.

22  Q.  Let's take a look now at section 1.1.1.  Can you describe

23  to the Court the type of property interests that were at issue

24  in this conveyance?  Why don't you go ahead and read the

25  provision?

CLANTON - DIRECT

1    A.  "All of Epsilon's right, title and interest in and to all

2    oil, gas and mineral leases, operating rights, working

3    interests, net revenue interests, mineral interests, royalty

4    interests, surface fee interests, payments out of production

5    and other similar agreements and rights, whether producing or

6    non-producing, and any other oil or gas or other leasehold or

7    mineral rights of any type, including, without limitation,

8    those described in Exhibit A attached hereto and made a part

9    hereof, any working interests and net revenue interests in the

10   mineral interests, leasehold interests, oil and gas interests

11   and any rights to acquire any of the foregoing interests by

12   contract, pooling order or otherwise (the real property

13   interests)."

14   Q.  So why are these two provisions important to Epsilon for

15   this dispute?

16   A.  Because it shows what the parties agreed were going to be

17   subject to this farmout agreement.

18   Q.  How does that relate to SRBC docket number 20081227 that

19   was issued to Epsilon?

20   A.  According to this, that we agreed to convey half our

21   interest in that permit.

22   Q.  Can you please turn to Plaintiff's Exhibit Number 19?

23   Actually, let's go back.  My apologies.  Actually I want to

24   refer your attention to section 1.1.9.  Can you read that?

25   I'll read it.

1    Section 1.1.9 is entitled easements.  It reads, "All
2  easements, permits, licenses, servitudes, rights-of-way and all
3  other rights and appurtenances situated on or used in
4  connection with the real property interests, wells or any
5  interests pooled or unitized therewith, including, without
6  limitation, those easements and rights-of-way as described on
7  Exhibit A (collectively, the easements)."
8    Why is that important?
9  A.   Because it is an explanation of the types of conveyances,
10  including basically the docket, the water withdrawal permit.
11  Q.   I'm going to have to turn to Exhibit 19.  Actually if you
12  could flip to 19 in your binder, as well, that would be great.
13    Are you familiar with this document?
14  A.   I am.
15  Q.   What is this document?
16  A.   This document is a copy of the original oil and gas lease
17  taken for the Craige minerals, Harold Craige and Gloria Craige,
18  taken on behalf of Cabot at the time.
19  Q.   What is the history of leasing between Epsilon and Cabot?
20  A.   Well, after the original landgrab was over, so to speak,
21  companies start trying to core up their position.  And often
22  times they will engage in acreage trades and swaps to core up
23  their position and get a larger leasehold interest in the area
24  that they're interested in, in exchange for giving up leasehold
25  interest in other areas that they're not focusing on.

1    We did engage with Cabot and went through a similar

2  type of transaction where we exchanged leases, and one of the

3  leases that we acquired as a part of that transaction was this

4  Craige lease.

5  Q.  And when was it assigned?

6  A.  I don't have that date on the top of my head.

7  Q.  Do you know approximately when it was assigned?

8  A.  It was assigned prior to the farmout agreement.  So it was

9  prior to February of 2010.

10  Q.  Do you know why that lease was assigned?

11  A.  Why it was assigned to Epsilon?

12  Q.  Yes.

13  A.  Because we exchanged interest with Cabot.  And this was one

14  of the leases that were involved in that property trade.

15  Q.  And what rights --

16    Mary, can you actually increase the size of section

17  one and highlight the language starting with exploring at the

18  end of the second sentence, all the way through oil and gas?

19    Can you tell us what type of rights were made to

20  Epsilon under the lease?

21  A.  Well, we had been granted all of the rights as set out

22  under this lease agreement, which includes the right to develop

23  the minerals.

24  Q.  What interest in this lease was conveyed to Chesapeake?

25  A.  Those same rights were conveyed to Chesapeake as serving as

CLANTON - DIRECT

1    the operator of the pad site.

2    Q.  If this oil and gas lease didn't exist, what rights would

3    any of the JOA parties have to actually drill on the Craige

4    well pad?

5    A.  They wouldn't have any rights.

6    Q.  Is this a document that Epsilon kept in the ordinary course

7    of business?

8    A.  It is.

9         ATTORNEY MADRIZ:  Your Honor, we move to admit

10   Plaintiff's Exhibit Number 19.

11        THE COURT:  Any objection?

12        ATTORNEY DEMPSEY:  No objection, Your Honor.

13        THE COURT:  Plaintiff's Exhibit 19 is admitted.

14   BY ATTORNEY MADRIZ:

15   Q.  Could you please turn to Plaintiff's Exhibit Number 20?  Do

16   you recognize this document, sir?

17   A.  I do.

18   Q.  What is it?

19   A.  This is a filing of a memorandum in Susquehanna County.

20   Q.  Who are the parties to this agreement?

21   A.  Epsilon and Harold and Gloria Craige.

22   Q.  And what is the date?

23   A.  The date --

24   Q.  You can turn to page four.

25   A.  -- is March 5th, 2021.

1   Q.  Is that your signature?

2   A.  It is.

3       ATTORNEY MADRIZ:  Your Honor, we move to admit

4   Plaintiff's Exhibit Number 20.

5       THE COURT:  Any objection?

6   BY ATTORNEY MADRIZ:

7   Q.  Why did Epsilon --

8       THE COURT:  I'm sorry.  So, he hasn't responded yet.

9       ATTORNEY MADRIZ:  Oh, I'm sorry.

10      ATTORNEY DEMPSEY:  No objection, Your Honor.

11      THE COURT:  All right.  Plaintiff's Exhibit 20 is

12  admitted.

13  BY ATTORNEY MADRIZ:

14  Q.  Why did Epsilon go through the steps to actually get this

15  document?

16  A.  Three of the four well proposals that would be drilled from

17  the Craige unit did not develop the Craige minerals.  So we

18  were seeing subsurface easement rights from the Craiges for use

19  to develop the three wells to the north from the pad site on

20  their property.

21  Q.  Where was that document signed?

22  A.  When?

23  Q.  Where?

24  A.  Where was it signed?

25  Q.  Do you know how this document came to be?

1  A.  Oh.  Well, yes.  We sent our representative to their

2  residence.

3  Q.  Why their residence?  Isn't that an unusual place to

4  execute an agreement with a counter-party?

5  A.  You have to catch the landowners sometimes where they live.

6  But no, we have a working familiarity with them.  They have a

7  working familiarity with us.  So they're fine with us coming to

8  their house to execute these kinds of agreements.

9  Q.  I want to turn our attention now to SRBC docket numbers and

10  the Wyalusing Creek water source before we get to the JOAs, if

11  that's okay with you.

12  A.  Okay.

13  Q.  Can you please turn to Plaintiff's Exhibit 21?  Do you

14  recognize this document?

15  A.  I do.

16  Q.  What is it?

17  A.  This is a copy of the master services agreement between

18  Turm Oil, Incorporated and Epsilon Energy U.S.A., Incorporated.

19  Q.  Who are the parties in this agreement?

20  A.  Turm Oil, Inc. and Epsilon Energy U.S.A.

21  Q.  Let me turn to page 20.  Do you know who David Heinz is?

22  A.  I do not know him, no.

23  Q.  It was signed by both counter-parties.  Right?

24  A.  Yes.

25  Q.  What was the purpose of this master services agreement?

CLANTON - DIRECT

1   A.   It's an agreement that sets out how a service provider will

2   work for and engage with their customer.

3   Q.   What type of services did Turm Oil provide Epsilon?

4   A.   Turm Oil provided contract operating services, including

5   drilling and completion.

6   Q.   What role did they play in terms of actually procuring

7   permits for Epsilon?

8   A.   On behalf of Epsilon they procured surface water withdrawal

9   permits, including docket 20081227.

10  Q.   If you would turn to section eight on page ten, please.

11  A.   Okay.

12  Q.   Can you tell us what the significance of section eight is?

13  A.   Section eight is a part of the master services agreement

14  that sets out that Epsilon has all ownership of any of the

15  permits Turm Oil acquired or filed for and was granted while

16  working under this master services agreement with Epsilon.

17  Q.   Can you read the sentence that actually makes that clear?

18  A.   Well, I'll just start, "Services provider and client

19  understand and agree that all materials relating to this

20  agreement and each project including, but not limited to, any

21  documents, plans, geoscience data or materials, well logs, well

22  data, drilling and/or completion techniques, permits and other

23  regulatory approvals, leases and lands, computer programs,

24  disks and software, and all other information related thereto,

25  whether prepared or obtained by or on behalf of the client, are

1  and shall remain the exclusive property of client."

2  Q.  Why is this provision significant to Epsilon's relationship

3  with Turm?

4  A.  It sets out that we are the equity owner of that water

5  withdrawal right, as granted under docket number 20181227 only.

6  Q.  Is this document kept in the ordinary course of business of

7  Epsilon, sir?

8  A.  It is.

9       ATTORNEY MADRIZ:  Your Honor, we move to admit

10  Plaintiff's Exhibit 21.

11       THE COURT:  Any objection?

12       ATTORNEY DEMPSEY:  No objection.

13       THE COURT:  All right.  Plaintiff's Exhibit 21 is

14  admitted.

15  BY ATTORNEY MADRIZ:

16  Q.  Can you please turn to Plaintiff's Exhibit Number 22,

17  please?

18  A.  Okay.

19  Q.  Do you recognize this document?

20  A.  I do.

21  Q.  Is this the document that you were just referring to?

22  A.  Yes.

23  Q.  Can you tell us what this is?

24  A.  Yeah.  This is the example of the docket that was issued by

25  the SRBC to Turm Oil related to the surface water withdrawal

1  rights that they acquired in Wyalusing Creek.

2  Q.  What is the docket number that's cited on this document?

3  A.  It's docket number 20081227.

4  Q.  What's the approval date?

5  A.  December 4th, 2008.

6  Q.  So just to be clear, who owns the property interest in

7  docket number 20081227?

8  A.  Epsilon Energy U.S.A., Inc.

9  Q.  As of this time, as of December 4th, 2008?

10  A.  Correct.

11  Q.  Who currently owns it now?

12  A.  We still own our 50 percent piece of this.

13  Q.  Is this a document that's kept in the ordinary course of

14  Epsilon's business, sir?

15  A.  It is.

16      ATTORNEY MADRIZ:  Your Honor, we move to admit

17  Plaintiff's Exhibit 22.

18      THE COURT:  Any objection?

19      ATTORNEY DEMPSEY:  No objection, Judge.  This is, in

20  fact, the 2008 docket.

21      THE COURT:  And I understand that you have questions

22  regarding some of the representations made by Counsel.  But

23  I'll admit Plaintiff's Exhibit 22.

24  BY ATTORNEY MADRIZ:

25  Q.  Let's turn to Exhibit Number 23, sir.  Do you recognize

1  this document?

2  A.  Yes.

3  Q.  What is this document?

4  A.  This is also a docket issuance from the SRBC, docket number

5  20110607.

6  Q.  And what is the date of this permit?

7  A.  June 23rd, 2011.

8  Q.  What is the significance of this document?

9  A.  The significance of this docket is -- this docket issuance

10 is that two active dockets, one in Turm Oil's, later Epsilon

11 Energy's name, 20081227 was consolidated with another nearby

12 permit, 20090610, together to make up this consolidated docket

13 20110607.

14 Q.  And what is the docket number that's referenced in this

15 permit on the first page?

16 A.  20110607 is the docket number on the first page.

17 Q.  And what is the date of it?

18 A.  June 23rd, 2011.

19 Q.  And can you now turn to Plaintiff's Exhibit Number 24

20 please?  Do you recognize this document, sir?

21 A.  I do.

22 Q.  What is the docket number that's stated at the top of this

23 document?

24 A.  20121209.

25 Q.  And what's the approval date?

1  A.  December 4th -- I'm sorry.  December 14th, 2012.

2  Q.  And what's the name stated underneath?

3  A.  It's a docket issued to Chesapeake Appalachia.

4  Q.  I want to direct your attention to the second full

5  paragraph.

6      Can we bring that up?  I'm going to read it because

7  I'm going to ask you about this.

8      "This approval is a renewal of a project originally

9  approved under Commission docket number 20081227.  As a result

10  of the transfer of Commission docket number 20090610, the

11  project sponsor owned two approvals in close proximity to each

12  other.  The two approvals, Commission docket numbers 20090610

13  and 20081227, were subsequently consolidated into one approval

14  for the combined quantity on June 23rd, 2011 under Commission

15  number 20110607 and authorized to operate at the location

16  reviewed and approved under Commission docket number 20081227."

17      Did I read that correctly?

18  A.  You did.

19  Q.  What I just read specifically said that these documents,

20  these referenced permits were consolidated as opposed to

21  superseded or rescinded.  Why is that?  What is your

22  understanding of how that language relates to Chesapeake's

23  argument that the 2008 docket number is rescinded and

24  superseded?

25  A.  Well, the actual grant of the right to pull water out of

1  that creek has not been rescinded.  The docket number has been

2  rescinded.  So the volume that was originally granted under the

3  permit, under the docket for Epsilon, combined with the

4  authorization under the docket with Chesapeake combined into a

5  consolidated docket, which is the consolidated docket, still

6  has active the same water -- daily water withdrawal rights that

7  were granted originally under the Epsilon 20081227 docket.

8  Q.  So I want to --

9  A.  So it did not rescind the rights.  It rescinded the docket

10  number.

11  Q.  I want to focus on that, because it gets technical and it's

12  confusing.  What does that mean, it rescinds the docket number

13  but not the rights?  Isn't -- if you rescind the docket number,

14  doesn't that rescind the permit itself?

15  A.  Not if the docket is -- not if that water withdrawal right

16  is moved forward to a different renewal docket.  What happened

17  was the consolidation of the two permits into the one, into

18  20110607, when that occurred and the docket was issued with the

19  consolidated permits, they had to extinguish the two existing

20  dockets.  Otherwise, the grant would be the water withdrawal

21  rights for the two existing dockets and the new consolidated

22  docket.

23  Q.  Can you take us over the volume of water that relates to

24  each original docket permit?

25  A.  Yes.  It states it in the docket.  So Epsilon's original

1  docket 20081227 was a grant for, I think, just over 200,000

2  barrels of water a day.  Let me see if I can -- if memory

3  serves, it's .216 million gallons a day.  And that was

4  consolidated with Chesapeake's volume under their docket number

5  20090610 of .499 million gallons a day.  So the total

6  authorization now together is .715 million gallons a day, which

7  is inclusive of our original .216 million gallons a day.

8  Q.  So why is that important to you?

9  A.  Because it represents that our rights that we procured are

10  still active and are a part of the current docket.

11  Q.  Let me turn to Plaintiff's Exhibit 25, please, sir.

12      ATTORNEY MADRIZ:  I'm sorry, Your Honor.  We also move

13  to admit Plaintiff's Exhibit Numbers 23 and 24.

14      THE COURT:  Any objection?

15      ATTORNEY DEMPSEY:  No objection.

16      THE COURT:  I'm sorry.  Just before we move on to

17  Plaintiff's 25, Mr. Clanton, you were pulling the numbers for

18  the approved gallons per day from somewhere in a document.

19  Could you specify that for me?

20      THE WITNESS:  I can, yes.  So on the -- if you'll turn

21  back to Exhibit, I guess, 22, which is the -- yes, there you

22  go.  So that's docket 20081227, with the approval date

23  December 4, 2008 to Turm Oil, Inc.  And that first instance

24  thereafter it shows surface water withdrawal up to .216 million

25  gallons a day.  So that position on the other dockets is where

1   that volume grant is displayed.

2   BY ATTORNEY MADRIZ:

3   Q.  Can you show us the equivalent in the following exhibit,

4   Exhibit Number 23?

5   A.  Exhibit 23 is docket number 20110607.  And if you'll turn

6   to page three, there's a table that sets out the existing

7   approved surface water withdrawals, and it shows the peak day

8   withdrawal rate authorization that is linked to the Commission

9   number, the docket number.

10          THE COURT:  Okay.  Thank you.

11          THE WITNESS:  Um-hum.

12  BY ATTORNEY MADRIZ:

13  Q.  I guess to put a bow on it, can you look at Plaintiff's

14  Exhibit 24, and can you tell us where it is identified -- it

15  reflects that both of those dockets that you just discussed are

16  combined into one?

17  A.  Right.  So, the 20110610 docket was renewed into 20121209.

18  One important understanding of that renewal requirement is that

19  the original .216 million gallons a day authorization that was

20  granted to Epsilon was going to expire.  They are five-year

21  grants.  And so it required a renewal from the docket number

22  2011 to 20121219, because our five-year grant was set to expire

23  and they would have lost the .216 million gallons a day

24  authorization.

25          So it says here on the face of the docket, it restates

1  that where -- second page, midway through, which is what

2  Counsel already read to me.  "Authorized operative location

3  reviewed and under approval under Commission docket 20081227."

4  It also shows the renewal of Chesapeake's docket number

5  20090610 into the consolidated permit 20120607.

6  Q.  Mr. Clanton, can you tell us where it is that you are

7  looking at right now so we can have it on the screen?

8  A.  You have it on the screen.  It's that middle paragraph

9  right there.

10  Q.  Can you turn to Exhibit 25, please?  Do you recognize this

11  document, sir?  I represent to you that this letter was an

12  attachment to one of Chesapeake's motions.  Have you seen this

13  document before?

14  A.  I have.

15  Q.  I'm going to ask you to now turn to page, I believe it is

16  four of five on the -- if you go by the ECF numbering on the

17  upper right-hand corner.  This is a letter from Dan Ward on

18  behalf of the Epsilon.  Who is Dan Ward?

19  A.  Dan Ward is a former employee of Epsilon Energy U.S.A.

20  Q.  The letter is dated March 31st, 2010.  It's to Mr. Douglas

21  J. Jacobson at Chesapeake.  It reads, "Dear Mr. Jacobson, this

22  letter is acknowledgment that Epsilon Energy U.S.A., Inc.

23  intends to transfer its ownership of surface water approvals

24  for the East Branch of Wyalusing Creek, Wyalusing Creek, Elk

25  Lake Stream and Deer Lick Creek to Chesapeake Appalachia, LLC."

CLANTON - DIRECT

1      Did I read that correctly?

2   A.  You did.

3   Q.  Does this document -- what is your understanding as to

4   whether this document effectuated a transfer of Epsilon's

5   interests in its water right permits to Chesapeake?

6   A.  It did not.

7      ATTORNEY DEMPSEY:  Your Honor, objection.  This lacks

8   personal knowledge and doesn't --

9      ATTORNEY MADRIZ:  Your Honor, I just asked what his

10  understanding of this is.

11     THE COURT:  Okay.  Overruled.

12     ATTORNEY MADRIZ:  You can answer, sir.

13     THE WITNESS:  My understanding is that this is the

14  type of explanation to the SRBC as to the title transfer of the

15  docket.  The SRBC does not represent any equity rights in those

16  transfers.  And so while this was related to the farmout

17  agreement and Epsilon providing to Chesapeake all of the

18  interests that were to be conveyed, this is a conveyance of

19  just the docket.  It's not a conveyance of any ownership.

20  BY ATTORNEY MADRIZ:

21  Q.  It does say it intends to transfer.  Why did Epsilon state

22  in this letter that it intended to transfer its ownership of

23  surface water approvals to Chesapeake?

24     THE COURT:  Well, to be clear, he wasn't employed at

25  Epsilon at this point in time.  I don't know that it's fair for

1   you to ask the witness what was intended in a March 31, 2010

2   letter several years before he was employed there.

3          ATTORNEY MADRIZ:  Fair enough.

4          THE COURT:  You asked before what his understanding

5   was, which was different.

6   BY ATTORNEY MADRIZ:

7   Q.  What is your understanding as to why this letter was

8   prepared by Epsilon to Chesapeake?

9   A.  It is a transfer of these dockets to Chesapeake.

10  Q.  What is Epsilon's reaction to Chesapeake's argument that

11  this letter transferred Epsilon's ownership interests in its

12  water rights to Chesapeake?

13  A.  It doesn't agree.  The SRBC has from time to time, in my

14  experience so far, used project sponsors and owners

15  synonymously.  As we pointed out earlier, they show directly on

16  their docket face that they're not conveying any equity rights

17  at all.

18         So I assume that this verbiage was used in that vein

19  of understanding.

20  Q.  What bill of sale exists between Epsilon and Chesapeake for

21  docket number 20081227?

22  A.  I'm not aware of any bill of sale.

23  Q.  What bill of sale exists between Epsilon and Chesapeake for

24  any water withdrawal points?

25  A.  I'm not aware of any bill of sale for water withdrawal

CLANTON - DIRECT

1    points.

2           ATTORNEY MADRIZ:  Your Honor, at this point I would

3    like to offer a declaration of Mr. Daniel Ward.  May I approach

4    the bench with a copy?

5           THE COURT:  Have you provided it to --

6           ATTORNEY MADRIZ:  No, I haven't.  But I will.

7           THE COURT:  Provide it to opposing Counsel first.

8           Mr. Dempsey, is there any objection to Counsel

9    tendering a declaration to the Court?

10          ATTORNEY DEMPSEY:  There is an objection.

11          THE COURT:  Why don't you go ahead and explain your

12   objection?

13          ATTORNEY DEMPSEY:  Sure, Judge.  The declaration which

14   Counsel has proffered to the Court is written by an individual

15   who is not any longer an employee of Epsilon Energy U.S.A.

16          Most importantly, the declaration constitutes hearsay.

17   It's offered to prove the truth of what's stated in a letter

18   that he drafted more than a decade ago.  The letter is plain on

19   its face.

20          In addition to being hearsay, the Court should not

21   receive extrinsic evidence from Mr. Ward regarding a letter

22   that he wrote back in March of 2010 that is plain.  The letter

23   indicates that Epsilon Energy U.S.A. intends to transfer its

24   ownership of surface water withdrawal approvals.

25          Intends is a word that connotes an action that will

1   be taken in the future, not two months ago when the farmout

2   agreement was signed.  And that is, in fact, what Epsilon

3   Energy did.  Because we took that letter and we filed a notice

4   of request to transfer with the Susquehanna River Basin

5   Commission on April 12th, 13 days later, and effectuated, in

6   the eyes of the State of Pennsylvania, exactly what Mr. Ward

7   says in this unambiguous letter.

8           What Counsel is proffering to the Court is extrinsic

9   evidence of what Mr. Ward meant in a letter that is very clear

10  on its face.  The Court should not receive it.  It's hearsay

11  and it is inadmissible extrinsic evidence on a document that is

12  plain.

13          ATTORNEY MADRIZ:  If I may respond, Your Honor.

14          THE COURT:  Please.

15          ATTORNEY MADRIZ:  It's clear established law.  These

16  Rules of Evidence do not apply to preliminary injunctions.

17  Affidavits and other hearsay materials are frequently received

18  in preliminary proceedings.

19          The purpose of this exhibit is to demonstrate that

20  contrary to Chesapeake's assertion that this letter actually

21  effectuated a transfer, that's what they maintain, that the

22  letter effectuated the transfer of Epsilon's ownership rights

23  in the water permits to Chesapeake.  So I think this is

24  directly relevant.

25          This is not in a contract, an unambiguous contract

CLANTON - DIRECT

1   where extrinsic evidence is not allowed.  This is just a

2   statement by the party who signed this letter as to what the

3   meaning of this letter was.

4          THE COURT:  The Court will accept the declaration.

5   And obviously, I'll be glad to hear argument from both counsel

6   with respect to the weight I should accord the declaration to

7   the extent that it's consistent or inconsistent with what is

8   stated on the face of the 2010 letter.

9          You can tender that to my courtroom deputy.

10         ATTORNEY MADRIZ:  Your Honor, I don't intend to go

11  over this with the witness.  But I do want to direct the

12  attention of the Court to paragraphs six through ten.  And it

13  basically is Mr. Ward's statements that the letter that he

14  drafted that we just reviewed did not effectuate a transfer of

15  the ownership rights of Epsilon to Chesapeake.

16         THE COURT:  All right.  The declaration is part of the

17  record.

18         ATTORNEY MADRIZ:  Your Honor, can we admit it into

19  evidence as Plaintiff's Exhibit Number 46?

20         THE COURT:  I'm sorry.  Did you say -- oh, you want to

21  mark this as Plaintiff's Exhibit 46?

22         ATTORNEY MADRIZ:  Yes, Your Honor.  Your Honor, thank

23  you.

24         THE COURT:  All right.  I understand Defense Counsel's

25  objections.  The objection is overruled.  Plaintiff's Exhibit

CLANTON - DIRECT

1  46 is admitted.

2  　　　ATTORNEY MADRIZ:  Your Honor, we would also like to

3  admit Plaintiff's Exhibit Number 25 into evidence.

4  　　　THE COURT:  Any objection?

5  　　　ATTORNEY DEMPSEY:  No, Your Honor.

6  　　　THE COURT:  Plaintiff's 25 is admitted.

7  BY ATTORNEY MADRIZ:

8  Q.  Can you turn to Plaintiff's Exhibit Number 26, please, sir?

9  I'm handing you an e-mail trail between Epsilon and SRBC

10 regarding the commitment letter.  Do you see that?

11 A.  I do.

12 Q.  The e-mail is from Glenda Miller to you and Jenko, Walter.

13 Is that right?

14 A.  Yes.

15 Q.  And it's dated January 29th, 2021 at 11:15 a.m.?

16 A.  Yes.

17 Q.  Did you receive this letter?

18 A.  I did.

19 　　　ATTORNEY MADRIZ:  Plaintiff moves to admit this

20 document into evidence, Your Honor.

21 　　　THE COURT:  Is there any objection to Plaintiff's

22 Exhibit 26?

23 　　　ATTORNEY DEMPSEY:  No, Your Honor.

24 　　　THE COURT:  All right.  Plaintiff's 26 is admitted.

25 BY ATTORNEY MADRIZ:

1  Q.  Mr. Clanton, can you tell me what is the purpose of this

2  e-mail trail?

3  A.  We were wanting to, in working with the SRBC, understand

4  exactly what their requirement was in terms of securing a

5  commitment letter for use of the Wyalusing Creek water

6  withdrawal permit, and we just reached out to them directly and

7  said your requirement to us is we have to have a commitment

8  letter from the docket holder, which is Chesapeake Appalachia.

9        "What is it that this letter needs to state ,and can

10  you provide us with a draft?"

11        This is her response to that request.

12  Q.  And what did the SRBC require?

13  A.  Well, they require this letter, as she states, and she has

14  got five, you know, items; letter must be on Chesapeake

15  letterhead, docket number must be listed, date of the docket

16  approval and expiration date, the gas company name, and then

17  it's got to be signed by that representative.

18  Q.  How did Epsilon end up using this information that was

19  provided by SRBC?

20  A.  It formed the basis of our requested commitment letter from

21  Chesapeake.

22  Q.  Can you turn to Plaintiff's Exhibit Number 27, sir?

23  A.  Um-hum.

24  Q.  You just testified that the language in the exhibit that we

25  just reviewed formed the basis of your commitment letter.  Is

1  this the letter that you were referring to?

2  A.  It is.

3  Q.  Can you tell us what we're looking at?

4  A.  This is a draft, what we're calling a commitment letter

5  that we prepared on behalf of Chesapeake to seek their approval

6  in executing this draft.  That would be compliant with the

7  SRBC's request.

8  Q.  And this, again, relates to the -- to Epsilon's water

9  needs, correct, the water permits, the use of the water permits

10  to be able to operate -- conduct operations for the four

11  proposed wells.  Is that right?

12  A.  That's right.  So for us to get our water management plan

13  approved by both the DEP and the SRBC and for the SRBC to grant

14  Epsilon an approval by rule for the consumptive use of water on

15  the Craige pad site, they are requiring this commitment letter

16  from the docket holder for the source water that we have

17  included in our water management plan, which is Chesapeake.

18  Q.  I want to direct your attention to the second paragraph.

19  The second paragraph mentions that the water -- the supply of

20  water would be -- will be subject to terms and conditions of a

21  water-sharing agreement entered between Chesapeake and Epsilon.

22      Why is that; if Epsilon is a co-owner in the water

23  permit, why is there a need to enter into a water-sharing

24  agreement?

25  A.  A couple reasons.  One, the SRBC would like to see a

1  business-to-business relationship.  Although they don't review

2  it, they are comforted that there is a defined agreement

3  between the parties.

4       The second thing is we wanted to also set out the

5  requirements of both parties related to our usage of this

6  co-owned facility.

7  Q.  Did Epsilon end up providing this draft letter to

8  Chesapeake?

9  A.  They have not.

10  Q.  No?  I'm sorry.

11  A.  Yes.  Yes.  We provided this to them and requested that

12  they execute it.

13  Q.  What was Chesapeake's response?

14  A.  They have not executed it and provided it to us.

15  Q.  As of today?

16  A.  Correct.

17       ATTORNEY MADRIZ:  Your Honor, Plaintiff moves to admit

18  Plaintiff's Exhibit 27.

19       THE COURT:  Any objection?

20       ATTORNEY DEMPSEY:  No objection, Your Honor.

21       THE COURT:  Plaintiff's 27 is admitted.

22       ATTORNEY MADRIZ:  Can you put up Plaintiff's Exhibit

23  Number -- oh, it's the settlement agreement.

24  BY ATTORNEY MADRIZ:

25  Q.  Sir, how does Epsilon construe Chesapeake's failure to sign

1   the letter contained in Plaintiff's Exhibit 27 with respect to

2   Chesapeake's obligations under section 8(d) of the settlement

3   agreement?

4   A.  We find it to be, again, a direct breach of our settlement

5   agreement.  And it intended to set out in our settlement

6   agreement, 8(d) includes -- and I'm paraphrasing in the bottom

7   sentence down there.  Including, but not limited to, permitting

8   and access to co-owned assets, such as water withdrawal permits

9   and impoundments.

10          For us to be able to make use of the water

11  impoundments that we paid our proportionate share for that have

12  been used to develop the wells in Auburn, we have to have this

13  commitment letter executed by Chesapeake because they are the

14  docket holder.

15  Q.  And what happens if Chesapeake refuses -- continues to

16  refuse to execute this letter?

17  A.  The SRBC will not grant our approval by rule for the

18  consumptive use of water on our pad site and preventing us from

19  drilling.

20          ATTORNEY MADRIZ:  Your Honor -- I think it's been

21  admitted.

22          THE COURT:  By it, I think you are referring to

23  Plaintiff's Exhibit 7, the settlement agreement.  Plaintiff's 7

24  has been admitted.

25          ATTORNEY MADRIZ:  No, Your Honor.  I was referring

CLANTON - DIRECT

1  to --

2          THE COURT:  You displayed --

3          ATTORNEY MADRIZ:  You're right.  It was not clear.

4          THE COURT:  And Plaintiff's 27 has been admitted.

5          ATTORNEY MADRIZ:  Thank you.

6  BY ATTORNEY MADRIZ:

7  Q.  Can you now turn back to Plaintiff's Exhibit Number 10,

8  sir?

9  A.  Okay.

10 Q.  Again, I'm referring you to the letter that was drafted by

11 Chesapeake.

12 A.  Okay.

13 Q.  If you take a look at the third to last paragraph and it's

14 the second to last sentence that starts, And finally.

15 A.  What page are we on?

16 Q.  It's on page three.

17 A.  Oh.  Okay.

18 Q.  Third to last paragraph.

19 A.  Right.

20 Q.  It's on your screen.

21 A.  Okay.

22 Q.  I'm going to read it for you.  It says, "And finally,

23 although Epsilon has not disclosed it to the Court, Epsilon

24 received SRBC approval in permit number 20190606 to withdraw

25 750,000 (sic) gallons of water per day from the East Branch of

CLANTON - DIRECT

1 the Wyalusing Creek at a location half the distance from the

2 Craige well pad.  See Exhibit A."

3 A.  Okay.

4 Q.  "That Epsilon seeks to avoid the cost of designing and

5 constructing a withdrawal facility hardly justifies a finding

6 of irreparable harm."

7    THE COURT:  Counsel, I just wanted to give you an

8 opportunity.  You said 750,000 but I believe it's written

9 715,000.  Just to clarify.

10    ATTORNEY MADRIZ:  Yes, 715.

11 BY ATTORNEY MADRIZ:

12 Q.  Why don't Epsilon simply use the water from the East

13 Wyalusing Creek water withdrawal mentioned in this permit

14 number to support its operations with respect to its operations

15 for the four proposed wells?

16 A.  Based on the feedback we have back based on the SRBC, we

17 cannot co-mingle our water source with other water sources

18 without a commitment letter for those other waters sources.  So

19 the water being provided under the Chesapeake docket into these

20 impoundments, if we were to take our surface water grant and

21 also co-mingle those waters, we still would have to have a

22 commitment letter from Chesapeake.

23 Q.  Putting that aside, why would Epsilon spend the money to

24 build infrastructure to charge back to the JOA participants

25 when Epsilon has secured Chesapeake's cooperation for the use

1    of water impoundments in the 2018 settlement agreement?

2    A.  Well, you wouldn't.  We have paid our proportionate share

3    all along for the development of these facilities.  They were

4    built for the purposes of developing these wells.  To now claim

5    that for the additional development going forward, that that

6    additional development going forward can't derive the benefit

7    of the facilities that were built to develop the wells today is

8    an unfair burden that shouldn't be applied to those consenting

9    parties.

10           For us to have to go now and completely build separate

11   but equal, if you will, impoundments would render at this time

12   the proposed development uneconomic.

13   Q.  What reasons has Chesapeake provided to Epsilon for

14   refusing to cooperate with Epsilon in the use of the Marbaker

15   water impoundment?

16   A.  They're claiming they're not obligated to provide that

17   water to us.

18   Q.  Do you understand their basis for their refusal to

19   cooperate?

20   A.  (Witness indicated in the negative.)

21   Q.  Sitting here today, can you tell us why they are refusing

22   to cooperate with respect to Marbaker?

23   A.  I can't speculate on why they are not being cooperative.

24   Q.  Sitting here today, you don't understand?

25   A.  It does not make sense to me that an operator that has

1    developed a water facility, water withdrawal area and

2    impoundments, for the benefit of all parties, now claims to

3    have sole and total control over that and does not want to

4    share those assets with the consenting parties for potential

5    development.

6    Q.  I'm going to turn your attention now to the JOAs, sir.

7    There's three of them.  Correct?  There is three applicable

8    JOAs, I believe you testified earlier.  Correct, sir?

9    A.  There are three JOAs applicable to Craige, Baltzley South

10   and Baltzley North.

11   Q.  I believe one of those have already been admitted into

12   evidence.  It's located in Plaintiff's Exhibit 1.  Can you take

13   a look and confirm that's one of them?

14   A.  Okay.

15   Q.  Is that one of the JOAs?

16   A.  This is one of the JOAs, yes.

17   Q.  Can you take a look at Plaintiff's Exhibit Number 28?

18   A.  Okay.

19   Q.  Is this one of the other JOAs, sir?

20   A.  It is.

21   Q.  To which area does this operating agreement apply?

22   A.  To the Baltzley South unit.

23            ATTORNEY MADRIZ:  Your Honor, we move to admit this

24   Plaintiff's Exhibit 28 into evidence.

25            THE COURT:  Any objection?

CLANTON - DIRECT

1    ATTORNEY DEMPSEY:  No objection, Your Honor.  If

2  Counsel is representing this is the version that was attached

3  to the complaint, we have no objection.

4    THE COURT:  All right.  Is this -- is Plaintiff's 28

5  the same as the Defendant's Exhibit -- the JOA that the

6  Defendant has admitted as an exhibit?

7    ATTORNEY MADRIZ:  It is, Your Honor.

8    THE COURT:  What is the Defendant's exhibit number,

9  just to clear this up?

10    ATTORNEY MADRIZ:  Number 2, Your Honor.

11    THE COURT:  Defendant's Exhibit 2.

12    ATTORNEY MADRIZ:  Yes, Your Honor.

13    THE COURT:  Okay.  Plaintiff's Exhibit 28 is admitted.

14  BY ATTORNEY MADRIZ:

15  Q.  And lastly, can you take a look at Plaintiff's Exhibit

16  Number 29?

17  A.  Okay.

18  Q.  Can you tell me if that's the third and last JOA at issue?

19  A.  It is.

20  Q.  To which area is this JOA applicable?

21  A.  This JOA applies to the Baltzley North unit.

22    ATTORNEY MADRIZ:  Your Honor, we move to admit

23  Plaintiff's Exhibit 29 into evidence.

24    THE COURT:  Any objection?

25    ATTORNEY DEMPSEY:  No objection Your Honor.

CLANTON - DIRECT

1    THE COURT:  Plaintiff's 29 is admitted.

2   BY ATTORNEY MADRIZ:

3   Q.  Okay.  Which of the three JOAs is at issue in this case in

4   particular?

5   A.  The Craige unit.

6   Q.  Is that the one that's located in Plaintiff's Exhibit

7   Number 1?

8   A.  It is.

9   Q.  Can you please direct your attention to that one.  That's

10   the one we're going to be using.  Is there any difference in

11   the language found in the three JOAs other than the names of

12   the unit's acreage and maps?  In other words, are they

13   substantially similar?

14   A.  They are substantially similar.

15   Q.  What is -- what property interests are covered by each JOA?

16   A.  What section are you referring to in the JOA?

17   Q.  Turn -- actually turn to Article III.B on be page three.

18   A.  Okay.

19   Q.  Actually, it's going to be page three at the start of the

20   joint operating agreement, which is well into the agreement.

21    ATTORNEY MADRIZ:  I apologize, Your Honor.  These

22   documents haven't been labeled yet.

23    THE COURT:  It's helpful, to me at least, if you

24   indicate what Article number --

25    ATTORNEY MADRIZ:  Article III.B.

1    THE COURT:  So that's at the bottom of page three.

2    ATTORNEY MADRIZ:  Yes, Your Honor, page three of the

3  actual joint operating agreement.  It's entitled interest of

4  the parties in costs of production.

5    THE WITNESS:  Okay.

6  BY ATTORNEY MADRIZ:

7  Q.  Can you explain who owns the equipment and materials

8  required in operations on the contract area?

9  A.  The working interest partners under this JOA.

10  Q.  Fair enough.  Let's turn now to Article VI.

11    ATTORNEY BRIER:  Excuse me one second.  I apologize

12  for interrupting.  Judge, are we taking a rest room break this

13  afternoon, or isn't it that time?

14    THE COURT:  Well, we certainly can.  I think that's a

15  fine idea.  I don't want to interrupt.  I think there's

16  currently a question pending.

17    ATTORNEY MADRIZ:  I can withdraw the question and I

18  can pick back up, Your Honor, after --

19    ATTORNEY BRIER:  It's not urgent.

20    THE COURT:  Actually before we take a brief afternoon

21  break, if I could get sort of an estimate as to the remaining

22  duration of this direct.

23    ATTORNEY MADRIZ:  I'm getting close, Your Honor.  I

24  would say another 30 minutes, maybe.

25    THE COURT:  I won't hold you to it.  I just want to

1    sort of round out the afternoon.  Estimated length of cross

2    based on the questioning so far?

3         ATTORNEY DEMPSEY:  I'm not certain, Judge.  Maybe one

4    hour.

5         THE COURT:  So we're obviously not going to finish

6    Plaintiff's witness's today, just for everyone's planning

7    purposes.  So we'll certainly conclude Mr. Clanton's testimony,

8    and then we will conclude for the day.

9         So at this point we will take a 12-minute break and we

10   will be in recess until 4:00.

11        THE COURTROOM DEPUTY:  Please rise.

12        (A recess was taken from 3:48 to 4:00 p.m.)

13        ATTORNEY MADRIZ:  Before we start, may I address one

14   housekeeping matter?  It's been brought to my attention that I

15   did not admit Plaintiff's Exhibit 18 into evidence.  We move to

16   admit it.

17        THE COURT:  Let me just go back in my notes.  Indeed.

18   That's the farmout agreement?

19        ATTORNEY MADRIZ:  Yes, ma'am.

20        THE COURT:  Any objection?

21        ATTORNEY DEMPSEY:  No objection.

22        THE COURT:  Plaintiff's 18 is admitted.  You can

23   resume your direct examination.

24        ATTORNEY MADRIZ:  Thank you, Your Honor.

25

CLANTON - DIRECT

1  BY ATTORNEY MADRIZ:

2  Q.  Sir, I would like to direct your attention to page 11 of

3  Exhibit 1.  That's page 11 in the joint operating agreement.

4  A.  Okay.

5  Q.  Earlier in this temporary injunction hearing, Epsilon's CEO

6  testified that Epsilon obtained 100 percent subscription with

7  respect to the four well proposals.  Do you recall that?

8  A.  Yes, I do.

9  Q.  Is that your understanding?

10  A.  It is.

11  Q.  Can you highlight the first three lines?

12       If you take a look at the very top, I'm going to read

13  that language for you.  "If 100 percent subscription to the

14  proposed operation is obtained, the proposing party shall

15  promptly notify the consenting parties of their proportionate

16  interests."  Coincidently, was --

17  A.  I'm sorry.  I'm not following.  Would you redirect me?

18  Where are you reading from?  Page 11?

19  Q.  Yes.  It's on your screen.  And in addition, it's page 11.

20  A.  Got you.

21  Q.  I'll start again.  "If 100 percent subscription to the

22  proposed operation is obtained, the proposing party shall

23  promptly notify the consenting parties of their proportionate

24  interests in the operation, and the party serving as operator

25  shall commence such operation within the period provided in

1   Article VI.B.1 subject to the same extension right as provided

2   therein."

3         Was Chesapeake a consenting party with respect to the

4   four proposed -- the four wells that Epsilon was proposing?

5   A.  No.  They declined to participate in all four well

6   proposals.

7   Q.  What does that mean in the context of the provision I just

8   read?

9   A.  That means that they're not a participating party to the

10  proposals.

11  Q.  What does that mean in the context of providing notice to

12  Chesapeake?

13  A.  They're not required to be notified.

14  Q.  Okay.  What is the significance of this provision with

15  respect to timeframes?

16  A.  Well, this provision is consistent and ties to the well

17  proposal.  So the timing set forth in the well proposal.

18  Q.  Let me see if I can tie things together.  And you can help

19  me out.

20        Could we go to the preceding page?

21        The provision that we just read stated that if

22  100 percent subscription was obtained that the parties serving

23  as operator shall commence such operation within the period

24  provided in a different section.  Correct?

25  A.  Right.

CLANTON - DIRECT

1   Q.  Can you highlight three all the way to ten?

2           How does the provision that we just finished reading

3   relate to this one that we are highlighting right now on page

4   ten, which starts on line three and goes all the way through

5   line ten?

6   A.  Okay.  I'm sorry.  Re-ask the question.

7   Q.  Sure.  We just finished reviewing three sentences on the

8   top of page 11.  Correct?

9   A.  Um-hum.

10  Q.  Basically the provision said if 100 percent subscription

11  was obtained, then the operator shall commence operations

12  within the time specified in a particular -- in a different

13  provision.  Correct?

14          What I have highlighted, that's the provision that

15  it's referring to.  Correct?

16  A.  Okay.

17          THE COURT:  Well, Counsel, that's not as clear to me

18  as it is to you.  The language you began with on the top of

19  page 11 at lines one to three refers to Article VI, and that's

20  Roman numeral six, capital B.1.  And you are now reading

21  language from page ten, but it is not clear to the Court that

22  that is Roman numeral six, capital B.1.

23  BY ATTORNEY MADRIZ:

24  Q.  Let me see if I can clarify it.  Can you explain, sir, why

25  in the previous provision that we just reviewed there's a

1  reference to Article VI.B.1 and there does not appear to be a

2  VI.B.1 in this agreement?

3  A.  I can't explain that.

4  Q.  Okay.  Do you know which -- to which provision that -- to

5  which time provision the language on page 11 is referring to?

6  A.  The language on page 11 is referring to the time set out on

7  the well proposals.

8  Q.  Okay.  And where is that -- there's a timeframe -- there's

9  a manner to calculate the time period by which well operations

10 need to get started.  Right?

11 A   (Witness nodded in the affirmative.)

12 Q.  Where is that language located in this JOA?

13 A.  It's in section XVI.

14 Q.  Okay.  Can you tell me -- can you tell me what that

15 language says?

16 A.  The language in section XVI sets out that you've got to

17 commence operations in accordance with the timing set out in

18 the well proposal.

19 Q.  What allows Epsilon to extend the time by which well

20 operations must start by 30 days?  Where is that language

21 located?

22      THE COURT:  I'm sorry.  Counsel, I apologize.  But you

23 lost me back at the top of page 11.  I'm not sure how we're

24 going from the top --

25      ATTORNEY MADRIZ:  I'm going to --

CLANTON - DIRECT

1    THE COURT:  Let me finish.

2    You asked the witness a question about a time period

3    provided on the top of page 11.  The plain language in the

4    contract references a particular section of the joint operating

5    agreement.  And the witness's answer was well, but you look at

6    Article XVI.  And I think this may be an important point in

7    your case, and you've lost me.  So I'm not understanding that

8    connection.  I understood the witness's answer, but I'm not

9    understanding how you get there based on the plain language of

10   the contract.

11   ATTORNEY MADRIZ:  To be fair, Your Honor, I think I

12   did a poor job.

13   THE COURT:  Maybe try that again.

14   ATTORNEY MADRIZ:  Let me try that again.  I think I

15   can make it easier.  It's getting late in the day.  I

16   apologize.

17   THE COURT:  Okay.

18   BY ATTORNEY MADRIZ:

19   Q.  Sir.  I'm going to direct your attention to Plaintiff's

20   Exhibits 30, 31, 32 and 33.  I'm going to try to do this as

21   briefly as possible.  We can start with Plaintiff's Exhibit 30.

22   A.  Okay.

23   Q.  Are you there?

24   A.  Yes.

25   Q.  Can you tell me what this document is?

CLANTON - DIRECT

1  A.  This is our well proposal to Chesapeake for the Craige

2  North 1LH.

3  Q.  Is that one of the four proposed wells by Epsilon?

4  A.  It is.

5  Q.  Can you take a look at Plaintiff's Exhibit 31, Plaintiff's

6  Exhibit 32 and Plaintiff's Exhibit 33, and can you tell me if

7  those are the proposals for the other three remaining proposed

8  wells?

9  A.  That is correct.

10  Q.  Okay.

11       ATTORNEY MADRIZ:  Your Honor, Plaintiff seeks to admit

12  these into evidence as Plaintiff's Exhibits 30 through 33

13  respectively.

14       THE COURT:  Any objection?

15       ATTORNEY DEMPSEY:  None, Your Honor.

16       THE COURT:  Plaintiff's 30 through 33 are admitted.

17  BY ATTORNEY MADRIZ:

18  Q.  Sir, what's the date of the letter that's located on

19  Plaintiff's Exhibit 30?

20  A.  December 22nd.

21  Q.  And by what date does -- do well operations need to get

22  initiated, based on the date of this letter?

23  A.  April 22nd.

24  Q.  How do we get -- how did you arrive at that calculation?

25  A.  So the joint operating agreement sets out the 30-day

CLANTON - DIRECT

1   election period beginning December 22nd.  The parties have 30

2   days to respond to the well proposals, and then after that

3   you're to commence operations within the timeframe set out in

4   the well proposal.

5   Q.  Okay.  And you specified that Epsilon must start well

6   operations by -- what number of days are you using?

7   A.  This turned out to be 90 days beyond the 30-day election

8   period, for a total of 120 days from when the well proposal was

9   submitted to the partners.

10  Q.  So there's a 30-day period and then there's a 90-day period

11  that adds up to 120?

12  A.  In these well proposals, there is a 90-day period that we

13  submitted as a part of the well proposal process.

14  Q.  I want you to remember this discussion about the 30 and

15  90-day period because we're going to go back to it once we go

16  to the JOA, and I think that will be helpful.

17       THE COURT:  Thank you.

18  BY ATTORNEY MADRIZ:

19  Q.  You mentioned that your letter from December 22nd through

20  April 22nd, 2021, through that 90-plus-30-day analysis.  Right?

21  A.  Correct.

22  Q.  And I think you testified that Epsilon has to initiate well

23  operations by April 22nd, 2021.  Correct?

24  A.  Yes.  That's what the JOA sets out.  Um-hum.

25  Q.  If it's -- what do you mean by initiate well operations?

1  What does that mean?

2  A.  Well, it is a gray area.  But you know, I think a

3  simplistic way to put it is boots-on-the-ground, conducting

4  operations on the pad site, initiating operations on the pad

5  site.

6  Q.  If you take a look at the last sentence in the first

7  paragraph.

8  A.  Okay.

9  Q.  It starts with, the anticipated.  Do you see that?

10  A.  I do.

11  Q.  It says, "The anticipated spud date for the well is on or

12  about April 22nd, 2021."

13  A.  Correct.

14  Q.  That's the key date.  Right?  That's the 90-plus-30-days by

15  which well operations need to get started?

16  A.  Correct.

17  Q.  What happens, by the way, if Epsilon fails to initiate well

18  operations by April 22nd, 2021?

19  A.  The proposals expire.

20  Q.  Meaning?

21  A.  Meaning they -- they expire.  That the election to

22  participate and the parties that are going to join in on this

23  particular investment, their proposal expires.

24  Q.  Why is it that in this letter Epsilon ties the spudding

25  date with the April 22nd, 2021 deadline?

1       In other words, why didn't it say Epsilon must get

2    boots-on-the-ground by April 22nd, 2021?  Why did it say

3    spudding?  Why did Epsilon seemingly create a bigger burden for

4    itself?

5    A.  We believed that we would be prepared to spud at that time.

6    Q.  If Epsilon does not spud by April 22nd, 2021, what happens?

7    A.  The proposals expire.

8    Q.  So the only way for Epsilon to -- the only way for Epsilon

9    to actually satisfy that 120-day period is for Epsilon to spud,

10   or are there lesser activities that can --

11   A.  You can -- like I said, it's a gray area.  You can commence

12   operations.  And for us, that means boots-on-the-ground.

13   Q.  Why did Epsilon mention the anticipated spud date?

14   A.  Because we felt like we would be far enough along to be

15   able to spud at that time.

16   Q.  Is there a reason that you believe Epsilon has not gotten

17   as far along as it thought it would?

18   A.  Yeah.  We have not had cooperation from the existing

19   operator.

20   Q.  What is -- is there any mechanism by which Epsilon can

21   extend the April 22nd, 2021 date?

22   A.  There is.

23   Q.  What mechanism is that?

24   A.  There is, as provided in the JOA, an additional 30-day

25   extension that can be applied.

CLANTON - DIRECT

1  Q.  We're about to go now to the JOA.  But before I leave, I

2  just want to make sure that I ask you something.

3        Is it fair to say that the -- that the letters

4  contained in the four exhibits that we just went over, they are

5  very similar?

6  A.  Yes, they are very similar.

7  Q.  Let's go to the JOA.  Now I'm on Plaintiff's Exhibit Number

8  1.  Can we go to -- actually, can we go to page nine first?

9  While we're reviewing the letters, sir, you identified a 90-day

10 period, a 30-day period.  Do you know where the -- those

11 periods are specified within the JOA?

12 A.  Well, the 30-day period appears in section VI.1.  The

13 90-day period is also in section I.

14 Q.  Can you direct me?  Can you show me where in VI.1 that

15 language is located?

16 A.  So it's, I guess, line three. "If all parties to whom such

17 notice is delivered elect to participate in such proposed

18 operations, a party shall contractually commit to participate

19 therein --

20        THE COURT REPORTER:  Excuse me.  Commit to participate

21 therein...

22        ATTORNEY MADRIZ:  You have got to slow down.  You know

23 what you could do is you could point the court reporter to the

24 lines that you're referring to.  Maybe that will make it easier

25 for her, too.

CLANTON - DIRECT

1     THE WITNESS:  Lines three, four and five don't really

2  line up.  The beginning of the paragraph, that first full

3  sentence.

4  BY ATTORNEY MADRIZ:

5  Q.  Okay.  And can -- I think now that you've identified where

6  that language is located, can you tell me -- can you just

7  interpret it for me?  Can you explain the way that works based

8  on your understanding?  How does the 30-day period apply?

9  A.  It's the election period.

10 Q.  What does that mean?

11 A.  It means that the parties have 30 days to respond to the

12 well proposal.

13 Q.  From what date?

14 A.  From the date it's submitted to them.

15 Q.  Okay.  And what happens after those 30 days?

16 A.  If there's 100 percent subscription of all of the available

17 interest, then the parties that consented and the operator

18 working on their behalf has to commence operations within 90

19 days.

20 Q.  Now I want to focus on the sentence that starts off on line

21 seven after the semicolon.  It says provided.  Do you see that?

22 A.  Um-hum.

23 Q.  I understand that you just testified that the first part of

24 that sentence talks about the 30 and 90-days period which adds

25 up to 120, which takes us through, I believe it was April 22nd.

217

CLANTON - DIRECT

1  Correct?

2  A.  Correct.

3  Q.  Can you read that highlighted area that starts with

4  provided, slowly?

5  A.  Sure.  Line seven is "Provided, however, that said

6  commitment date may be extended upon written notice by same of

7  operator to the other parties for a period of up to an

8  additional 30 days if, in the sole opinion of the operator,

9  such additional time is reasonably necessary to obtain permits

10  from governmental authorities, surface rights, including

11  rights-of-way, or appropriate drilling equipment, or to

12  complete title examination or curative matter required for

13  title approval or acceptance."

14  Q.  What is the significance of that provision?

15  A.  It just grants the proposing parties the additional time

16  necessary to make sure that the prospects are drill ready, the

17  proposals are drill ready.

18  Q.  By additional time, what do you mean, an extension?

19  A.  Yes.  Your -- in the opinion of the operators, it is

20  allowed to extend the 90-day life of the well proposal beyond

21  the 90 days as set out in these well proposals.

22  Q.  So now I want to go back to Plaintiff's Exhibit Number 30.

23  I want to see what that means with respect to the letter we

24  were reviewing as an example.  Okay.  The stated deadline is

25  located on the last sentence of the first paragraph.  Right?

CLANTON - DIRECT

1   A.  Right.

2   Q.  According to that extension, assuming that that extension

3   was triggered, how would that change, if at all, the

4   April 22nd, 2021 deadline?

5   A.  It would extend it for 30 days.

6   Q.  Thank you.  Sir, I want to briefly --

7         ATTORNEY MADRIZ:  I'm going to try to do this as

8   briefly as possible, Your Honor.  Permission to approach

9   opposing Counsel?

10        THE COURT:  Yes.

11  BY ATTORNEY MADRIZ:

12  Q.  Do you recognize this document, sir?

13  A.  I do.

14  Q.  Can we put on Plaintiff's Exhibit 45?

15        Let's start on page one.

16        THE COURT:  The document that's just been distributed

17  are you marking as Plaintiff's 45?

18        ATTORNEY MADRIZ:  Yes, Your Honor.

19        THE COURT:  Okay.

20  BY ATTORNEY MADRIZ:

21  Q.  Do you recognize these set of e-mails?

22  A.  I do.

23  Q.  It's actually one e-mail.  Right?  One very long e-mail.

24  The first e-mail at the very top is dated -- it's from Julie

25  Woodard to you.  Correct?

1    A.  Yes.

2    Q.  And it's dated Tuesday, October 20th, 2020 at 4:19 p.m.?

3    A.  Yes.

4          ATTORNEY MADRIZ:  Your Honor, we move to admit

5    Plaintiff's Exhibit Number 45 into evidence.

6          THE COURT:  Mr. Dempsey?

7          ATTORNEY DEMPSEY:  Judge, they have attached a string

8    of e-mails.  Can I just get a proffer that this is the string

9    of e-mails that were attached to the complaint?

10          ATTORNEY MADRIZ:  Were these attached to the

11   complaint?

12          (Discussion between Counsel.)

13          THE COURT:  For what purpose are you introducing this?

14   Let me do it that way.

15          ATTORNEY MADRIZ:  Sure.  This is the back and forth

16   between Epsilon and Chesapeake.  This is where the rubber meets

17   the road ,where Epsilon is seeking cooperation from Chesapeake

18   stemming back all the way early last year in 2020 and

19   culminating all the way through where we are -- well,

20   October 20th.

21          THE COURT:  Well, I'll give Mr. Dempsey an opportunity

22   to review the document.  I mean, this is a long series of

23   e-mails.

24          ATTORNEY MADRIZ:  It's one e-mail, Your Honor, and

25   it's between Julie Woodard, Chesapeake -- one of the Chesapeake

1   employees and the witness.

2           THE COURT:  Okay.  Respectfully, it's not one e-mail.

3   It's a thread, perhaps.

4           ATTORNEY MADRIZ:  Right.  It's a thread.  That's what

5   I --

6           THE COURT:  With multiple pages.

7           ATTORNEY MADRIZ:  Yes, Your Honor.  It's one very long

8   thread.  I'm going to do my best not to go through all of it in

9   detail and just highlight the key points.  As you can see from

10  the lines, it isn't -- it is very long.

11          THE COURT:  Understood.  Mr. Dempsey, I'll give you as

12  much time as you need before you state your position with

13  respect to this exhibit.

14          ATTORNEY MADRIZ:  I could help you with something,

15  too.  It was the e-mail that was referenced by your colleague

16  during his opening statement.

17          ATTORNEY BRIER:  I referenced the October 15, 2020

18  e-mail.  I didn't reference this packet.

19          ATTORNEY MADRIZ:  The October 15th e-mail is part of

20  this whole thing.

21          ATTORNEY BRIER:  That's your representation.  That's

22  what we're trying to ascertain.

23          ATTORNEY MADRIZ:  Right.  I was just going to ask the

24  witness about --

25          THE COURT:  Well, where we are procedurally is you

1　have moved to admit the exhibit.  I'm giving them an

2　opportunity to review it before they state a position.  I

3　actually don't know that there's an objection yet.

4　　　　　ATTORNEY MADRIZ:  Sure.  Okay.

5　　　　　　　　　(pause.)

6　　　　　ATTORNEY BRIER:  Has the document been redacted at the

7　top?

8　　　　　ATTORNEY KROCK:  There was just a redaction at the top

9　because the e-mail -- the only copy we have was forwarded to

10　counsel, and we redacted counsel's e-mail thread at the top.

11　　　　　ATTORNEY BRIER:  But it wasn't noted that it was

12　redacted.  There is nothing on the document that would inform

13　us that it was redacted.  Right?

14　　　　　ATTORNEY KROCK:  There's not a redaction stamp at the

15　top, correct.

16　　　　　ATTORNEY BRIER:  That's why we would like some time,

17　Judge.

18　　　　　THE COURT:  Certainly.

19　　　　　　　　　(pause.)

20　　　　　ATTORNEY MADRIZ:  Your Honor, in the interest of

21　making the most use of our time, I could try to move forward

22　with some of the examination, if this Court would prefer, while

23　someone reviews the e-mail.

24　　　　　THE COURT:  Well, are you at some point, during this

25　witness's testimony, planning to move the admission of

1    Plaintiff's 45?

2           ATTORNEY MADRIZ:  I am at some point, but I could

3    always come back.  I'm fine waiting, but I wanted to make the

4    most use of this Court's time.

5           THE COURT:  I appreciate that.  That's a very generous

6    offer.  I would prefer to come to a resolution on this issue

7    because I can't ask Counsel to simultaneously do two things.

8           ATTORNEY MADRIZ:  Okay.  Fair enough, Your Honor.

9           THE COURT:  We'll just wait a moment.

10                          (pause.)

11          ATTORNEY BRIER:  Your Honor, thank you for the time.

12   It does appear to be the same one that was attached to the

13   complaint.  We have no problem.

14          THE COURT:  Okay.  The Plaintiff's 45 is admitted.

15          ATTORNEY MADRIZ:  Thank you, Your Honor.

16   BY ATTORNEY MADRIZ:

17   Q.  Mr. Clanton, this is a very, very long e-mail.  Can you

18   tell us, just generally, what this e-mail string is about?

19   A.  Yes.  Following the expiration of the proposal moratorium

20   that we agreed to in the settlement agreement, and because of

21   our ongoing and continued interest to continue to develop wells

22   in Auburn and to bring on new production to be processed

23   through the Auburn gathering system, we reached out to

24   Chesapeake to better understand what their development plan --

25   the multi-year development plan was related to Auburn.

1    So the appropriate discipline, if you will, to have

2    those engagements is through their land department.  So I

3    reached out to Julie early in the year, as early as we could,

4    possibly to find out what Chesapeake's planned development was

5    for Auburn.  We initiated this to better understand how

6    diligent they were being in terms of identifying remaining

7    wells to be drilled in the project and specifically bringing

8    proposals forward to the partners for development of new wells

9    that would tie into the Auburn gathering system.

10   And so this e-mail thread is the initiation of that

11   exchange, and at least it is Ms. Woodard's level and I

12   communication as to how the companies were integrating with

13   each other, trying to understand what the development planning

14   was occurring and what development plans may come out of that

15   development planning.

16   Q.  I'm going to do my best to try to not go over the entire

17   substance of this very long e-mail.  But I do want to go and

18   look at the very start of the communications.  So can you turn

19   to page 16?

20   A.  Okay.

21   Q.  It's page 16 of Plaintiff's Exhibit 45.

22   A.  Okay.

23   Q.  It's at the very bottom.  As you can see, it's an e-mail

24   from you dated Tuesday, May 12th, 2020 at 4:17 p.m. to

25   Ms. Woodard.  The subject line reads Auburn development

1  planning.

2  A.   Right.

3  Q.   Who is Julie Woodard, by the way?

4  A.   Julie Woodard is the land manager for Chesapeake

5  Appalachia.  This area is part of her responsibility.

6  Q.   It reads, "Julie, I wanted to reach out to you and check

7  your availability this week for a follow-up conversation

8  regarding well planning in Auburn."

9       Why is well planning in Auburn important to this

10  e-mail and to Epsilon?

11  A.   It's because there is a throughput requirement in the

12  Auburn gas gathering system that is very important to us and

13  very important to all of the working interest partners.  There

14  has to be a continuing, ongoing development in Auburn that

15  generates production that can be gathered and processed through

16  Auburn to keep or reduce the single most expensive lease,

17  operating expense, gathering and transportation fees.

18       If there is not continuing and ongoing development

19  through the Auburn gathering system, that gathering and

20  transportation fee is increased to the detriment to all of the

21  working interest partners.  So at the top of our list, because

22  the majority of our acreage is subject to and committed to the

23  Auburn gathering system, we are very keen to understand and are

24  very diligent at watching what the remaining development

25  planning is.

1       And so, here is where I reached out to Julie.  This

2   was after we had convened our teams -- multi-disciplinary teams

3   in Oklahoma City, post-expiration of our moratorium for

4   proposing wells to convene the teams cooperatively to

5   understand okay, tell us what your development plans are for

6   Auburn.  They had their geoscience teams in there.  They had

7   their engineering teams in there.  They had their land teams in

8   there.  They had their facility teams in there.  I think they

9   had an attorney represented.

10      And so we asked at the on-site meeting in Oklahoma

11  City as a working interest owner in Auburn, in these 40-plus

12  units, what are your development plans for this year.  Because

13  it is important to continue to bring well proposals forward so

14  that gathering and transportation fees through the Auburn

15  system don't escalate on us.

16      So I said in May, after we had been there -- if memory

17  serves, I think it was Q-1, at the end of Q-1 that we were --

18  and the reason that's significant is because we were wanting

19  them to get through their budgeting process to understand what

20  kind of capital may be allocated to wells, well proposals in

21  Auburn.  So we waited.  We had the meeting.  We didn't get any

22  clear, direct guidance from Chesapeake as to what the

23  development planning was.

24      And this is the initiation of me reaching out to her

25  saying, you know, hey, can we sit down.  We obviously have not

1    made much progress toward understanding your plans or our plans

2    or whomever plans they are going to be, as to what wells are

3    next up for proposal and development in Auburn.  I was reaching

4    out to her to understand where they were.

5    Q.  You just testified about the next wells up.  Where were you

6    getting that language from?  I want --

7    A.  That's just my vernacular.  I was just saying what wells

8    are your teams working on that you might be bringing well

9    proposals forward to present to the working interest owners in

10   Auburn.

11   Q.  If you take a look at the second sentence in this e-mail,

12   it says, "Since we came to Oklahoma City and met with you guys,

13   which seems like a lifetime ago now, we have not made much

14   progress towards finalizing the next wells up for Auburn."

15        That's what you were referring to.  Correct?

16   A.  Yes.

17   Q.  There's an exchange.  There's a back-and-forth over a

18   period of -- over a period of several pages.  I'm not going to

19   go into them.  I'm going to choose some examples.

20        If you take a look at page 15 and you look -- I will

21   direct your attention to the second to the last e-mail.  It's

22   from you and is dated May 26, 2020.

23   A.  Yes.

24   Q.  At 1:00 p.m. to Julie.  Right?

25   A.  Yes.

CLANTON - DIRECT

1  Q.  It says, "Julie, Shannon has reported to me that she shared

2  with Nick last week our development ideas for the Craige pad.

3  He mentioned to her that he had what was needed to evaluate the

4  wells.  When would you expect these wells to be presented to

5  the Chesapeake leadership team for consideration?"

6          Did I read that correctly?

7  A.  You did.

8  Q.  Why was it important for those ideas to be presented to the

9  Chesapeake leadership team for consideration?

10 A.  Well, I think what is helpful to understand here first is

11 Shannon is an employee of ours.  She is a geoscience person and

12 is responsible for identifying and characterizing the remaining

13 potential upside in Auburn, which she and we have done.  Nick

14 is her counterpart in Chesapeake on the geoscience side.  My

15 understanding, his role is similar to Shannon's and that is to

16 identify the remaining development potential in Auburn.

17         So the attempt here was to have the two prospect

18 generators, if you will, proposal generators, if you will --

19 this is where well proposals begin, this is the discipline they

20 begin in, to be communicating with each other.  Following our

21 e-mail exchange and understanding that there wasn't really many

22 wells that Chesapeake was looking at developing in Auburn, we

23 said well, we have some ideas, and we would like to share those

24 ideas with you.

25         And this is our acknowledgment to Julie.  I said

1  Julie, Shannon has gotten with your guy Nick and has shared

2  what our development plans are in Auburn for your

3  consideration.  And our understanding was that those

4  development ideas, which basically tied to these four well

5  proposals we're speaking about today, were going to be

6  presented to -- internally to Chesapeake to see if projects of

7  that type would be of interest to Chesapeake and if they might,

8  could earmark some budgeted capital for making those proposals.

9         And my understanding from Julie was that the

10  opportunity set that they had within Chesapeake had to be

11  presented to their leadership team for consideration, because

12  they had obviously many other projects that were available for

13  them to consider in a limited capital budget environment.

14         So that's what I was asking; when should we expect

15  that our well concepts would be presented to your Chesapeake

16  leadership to see if these are going to be prospects that you

17  guys have interest in carrying a ball on.

18  Q.  Okay.  If you take a look at her response above, it is

19  dated May 26th, 2020 at 3:09 p.m., what is her response?

20  A.  I'm sorry.  Which response?  Just the very next one above

21  it?

22  Q.  Yes.

23  A.  At 3:09 p.m.?

24  Q.  Yes, sir.

25  A.  Yes.  So she responded that she just sent Nick an e-mail to

1    check in, and he said that -- or she reported that she knew

2    that Nick had forwarded to their technical team our development

3    ideas for review and that they'll -- they will discuss it with

4    their management team.

5            She didn't -- she didn't set out that she would

6    describe for me what that timeframe would be when they would

7    present it to their management team.

8    Q.   Okay.  Can you look at the e-mail above that, as well?

9    A.   Okay.

10   Q.   It's dated 3:30 p.m.  I mean, May 26th, 2020 at 3:30 p.m.,

11   an e-mail from Julie Woodard.

12   A.   Um-hum.

13   Q.   Can you just quickly tell me the substance of it?

14   A.   So about 20 minutes later, she responded in an e-mail

15   saying -- basically giving us a timeframe, saying that they

16   were hoping to hear from their technical team early the next

17   week and then planned to get back with us shortly thereafter.

18   Q.   I want to direct your attention to the e-mail immediately

19   above that, but it starts on page 14.  As you can see, the

20   e-mail is from you and it's to Julie Woodard.  It's dated

21   June 2nd, 2020 at 1:44 p.m.

22           You're checking back with her again.  Right?

23   A.   Yes.

24   Q.   You are asking for an update.  Why is it that you're

25   following up with her so consistently?

1   A.   The clock is ticking.  I mean, every six months that goes

2   by, every three months that goes by, every month that goes by

3   that development is not incurring, we are exposed to increased

4   gathering and transportation costs on the throughput in Auburn,

5   which, again, is the single largest operating cost we face.

6           It's very important to understand that development --

7   timely development annually is needed.  These projects require

8   time to prepare.  And if the teams, the functional teams; the

9   geoscience teams, engineering teams, land teams aren't working

10  on those projects, then it's just going to delay when well

11  proposals can be brought forward.

12  Q.   So the e-mail that you just finished -- we just finished

13  discussing is dated June the 2nd.  I want to move ahead without

14  going into the intervening ones.  There's a lot of

15  back-and-forth.  I want you to turn to page 12.  And it's the

16  second e-mail from the top.  It's from you dated Monday,

17  June 15th, 2020 at 2:46 p.m. to Ms. Woodard.

18          Can you tell me what is -- what are you doing in this

19  e-mail?

20  A.   This -- on June 15th, 2:46 p.m.?

21  Q.   Yes.

22  A.   Okay.  Yes.  So by June 15th, we -- after presenting our

23  development ideas to the asset team for Chesapeake, it became

24  obvious to us that they were not interested in proceeding with

25  that development, that they had other priorities and that it is

1  unlikely that these development ideas that we had for the

2  Craige pad would be supported internally to Chesapeake and

3  maybe able to capture funding for well proposals.

4       So we said fine; given that feedback, we just wanted

5  to share with you that we, in fact, like those projects and

6  we're going to proceed under our rights under the JOAs to make

7  proposals and start the permitting process for wells like this.

8  For these wells, as a matter of fact.

9       Now, our recognition at the time was that should we

10  receive permits in our name, that didn't mean that they

11  couldn't be transferred to Chesapeake and allow Chesapeake to

12  drill those wells if Chesapeake later decided to be active and

13  want to participate both in investment and operatorship of

14  these wells.

15  Q.  Can you turn now to page 11?  It's the second e-mail from

16  the bottom.  It's an e-mail again from you to Ms. Woodard on

17  July 1st, 2020 at 3:01 p.m.  Do you see it?

18  A.  Um-hum.

19  Q.  What are you doing in this e-mail?  What are you

20  communicating to Ms. Woodard?

21  A.  That we're going to need their cooperation.  And we were

22  setting out -- after we have had some preliminary dialogue with

23  the regulators, it is obvious that our water management plan

24  was going to have to be, and is for all operators, approved by

25  the Pa. DEP as well as the SRBC.  That's a part of the

1   permitting process.  We were going to need their support for

2   getting that done.

3            And I was then asking -- because we hadn't really

4   interfaced with any of the regulatory folks at that time, I

5   asked if there was somebody in the regulatory group that she

6   might direct us to to participate and assist us with these

7   permitting issues.

8   Q.  Could you please jump two e-mails to the top of the page?

9   It's dated August 7th, 2020 at 1:25 p.m.  Again, it's from you

10  to Ms. Woodard.  You're communicating with her and attaching a

11  document and making a request.  What is it that you are

12  attaching and what are you requesting?

13  A.  Yes.  So when we originally were interfacing with the Pa.

14  DEP, you know, part of the requirement for a drilling permit is

15  to -- and as a part of the application process, you have to

16  have an erosion, sediment control general permit.  ESCGP, they

17  call it.

18           After informal meetings with them, their

19  representation to us is that if there was an ESCGP active at

20  the time that Epsilon would have to become a co-permittee to

21  that ESCGP that was active.  And they actually have a form for

22  it.  So they provided us a form and said here is the form that

23  needs to be filled out to allow you to become a co-permittee of

24  this erosion and sediment control general permit.

25           At that time the Department had not done enough

1    research.  Well, that's what the form was.  We requested that

2    form at that time to the appropriate regulatory person who

3    Julie directed us to, this Mr. Eric Haskins.

4    Q.  Did that document ultimately get signed?

5    A.  It did not.  In further discussions with the DEP, we were

6    shown that Chesapeake requested and was issued a notice of

7    termination of that ESCGP.  And since there was no longer the

8    requirement of an erosion and sediment control general permit

9    for that pad site, we didn't have to become co-permittees of a

10   notice of termination that had already been granted by the DEP.

11   Q.  Take a look at the bottom of page ten.  It's the e-mail

12   from you to Ms. Woodard dated August 14th, 2020 at 2:11 p.m.

13   Is that what you're referring to?

14   A.  Yes.  This was -- yes, I sent it to -- well, I addressed it

15   to Eric and I sent it to Julie and copied Mr. Haskins.  Yes,

16   that's where I was saying please disregard the previous

17   request.  The Pa. DEP is no longer requiring that of us because

18   the ESCGP has been terminated at the request of the operator.

19   Q.  If you turn to the bottom of page nine.  Can you summarize

20   the substance of your e-mail to Ms. Woodard?

21   A.  In this same arena, you know, preparing for all of the

22   requisite regulatory filings and permits, we became aware

23   through the SRBC that we had to have this commitment letter.

24   And so I set out saying that, you know, regarding our well

25   permitting process for the Auburn/Craige development, please

1    find attached basically this draft SRBC commitment letter that

2    we needed Chesapeake to execute on our behalf so that we could

3    be able to get final approval of our water management plan as

4    well as the SRBC's approval by rule for the consumptive use of

5    water on the Craige pad site.

6          So that's what that request was for, was the first

7    time we reached out to say hey, the SRBC is going to need this;

8    between us, here's a draft of it and let me know if you have

9    any questions.

10    Q.  Now I want you to jump to the top of the page.  The

11    beginning of the e-mail starts on page eight.  It's from you to

12    Ms. Woodard.  It is dated September 25th, 2020 at 10:40 a.m.

13    You seem to be following up but I really want to --

14    A.  I'm sorry.  It's on the top of page seven?

15    Q.  The top e-mail on page nine.  But the header actually

16    starts at the bottom of page eight.  Do you see that?

17    A.  Yes.

18    Q.  And you seem to be following up with respect to the

19    commitment letter.  And I'm going to read what you state.  You

20    said at the very end of the first sentence, you start with, "We

21    need it to move forward with well permitting.  It's a simple,

22    one-page, self-explanatory form, really just an administrative

23    filing to allow SRBC to check a box."

24          You seem to be snappy.  Why is it that you responded

25    in that way?

CLANTON - DIRECT

1   A.  I don't know that snappy is an appropriate

2   characterization.

3        THE COURT:  Counsel, what is the relevance of the tone

4   of the e-mail in the context of this case?

5        ATTORNEY MADRIZ:  It's that it's culminating -- it's

6   reaching a crescendo where Epsilon is starting to get upset

7   with the lack of responsiveness and the lack of cooperation.

8   And I'm about to bring it to a head with this next e-mail.

9        THE COURT:  Okay.  This is taking an extraordinary

10  amount of time.  Can I get a proffer generally about where we

11  are going with this?

12       ATTORNEY MADRIZ:  Sure.  I can limit it to two more

13  e-mails and that's it.

14       THE COURT:  I've read the whole e-mail thread.  Why

15  don't you focus in on what's particularly relevant?

16  BY ATTORNEY MADRIZ:

17  Q.  Page eight, Mr. Clanton, second e-mail from the top.

18  A.  Okay.

19  Q.  Can you tell me the substance of this e-mail?  Can you tell

20  me why it is that you referenced section eight via the

21  settlement agreement?

22  A.  Our understanding was Chesapeake had gone through a

23  reorganization and there was different management that had been

24  put in place, and we wanted to ensure that the new management

25  was aware of their obligations under the settlement agreement.

CLANTON - DIRECT

1    Q.  And why is that?

2    A.  Because we need the ongoing development in Auburn.  As we

3    set out, no development is not good for anybody.

4    Q.  Can you turn to page seven now and take a look at the first

5    full e-mail from the top dated September 28th, 4:42 p.m.?

6    A.  Yes.

7    Q.  Can you summarize this e-mail briefly?

8    A.  Yes.  You know, this is where we were stating that we were

9    really not -- we're not interested really in who operates, just

10   so long as the development occurred.  We prioritized

11   development of Auburn because that's the majority of our

12   holding and it benefits our company.

13          So we wanted to explain what we saw, the opportunities

14   and the options that were available to Chesapeake if we came

15   forward and proposed wells.  So we set out that our

16   interpretation of the JOAs was they had three opportunities;

17   they could consent and operate; they could non-consent but

18   operate on behalf of the consenting parties; or they could

19   decline to participate or decline to operate.

20          In that scenario Chesapeake, if they declined to

21   operate, the consenting parties would have the right to

22   operate.  And we need to understand why Chesapeake would

23   transfer operatorship and cooperate with a designated operator,

24   no matter whom.

25   Q.  Now I want to focus your attention to page one, the second

1    e-mail on the first page.

2    A.  Okay.

3    Q.  In this e-mail you are highlighting -- in the e-mail we

4    just reviewed you identified three different options.  This

5    e-mail only identifies one.  Why is that?

6    A.  Well, that was one of the three options that were available

7    to Chesapeake at the time.

8    Q.  And you reference Article VI.B.2, and it's entitled

9    operations by less than all parties.  I submit to you that that

10   section does not exist in the JOA that's located in Plaintiff's

11   Exhibit 1.  Why is it that you identified that article number?

12   A.  Well, Chesapeake had asked us under what provision did we

13   think we had the rights to propose wells, and that's what I was

14   trying to convey to her.  I -- I mean, that is a mistake there

15   because there wasn't a B section.  So that was my mistake.

16        But we were trying to direct her, answer her question

17   as to why we felt like under the JOA we had rights to propose

18   wells.

19   Q.  And the last e-mail -- and the last sentence in that e-mail

20   reads, "In a scenario where a non-operator proposes wells and

21   elects -- and Chesapeake elects not to participate and there's

22   100 percent subscription of the proposals, our interpretation

23   of the article is that the incumbent operator would serve as

24   operator on behalf of the consenting parties."

25        Do you agree with that statement?

CLANTON - DIRECT

1   A.   That was available to them.   There may have been concern at

2   that time that they didn't want anybody else operating but

3   them.   We were setting out that you can serve as operator even

4   if you choose not to participate, although there is not real

5   good alignment related to that.   As has been testified to

6   already, we're fine with that outcome.

7   Q.   Is that statement still true today?

8   A.   Yes.

9   Q.   What happens if Chesapeake doesn't want to be the operator?

10  What happens in that situation?

11  A.   That's their option.

12  Q.   And what happens?

13  A.   Then the consenting parties designate an operator.   But

14  development occurs.

15         ATTORNEY MADRIZ:   Your Honor, I have one more quick

16  item I want to address.

17  BY ATTORNEY MADRIZ:

18  Q.   I want to turn to irreparable harm.   In this lawsuit

19  Epsilon is maintaining that if it does not get injunctive

20  relief, it stands to suffer significant irreparable harm.

21         Can you describe the type of damages that Epsilon will

22  suffer absent this Court actually issuing the injunctive relief

23  it seeks?

24  A.   So we have emphasized the clock is ticking on.   The volume

25  throughput in Auburn and the need for continued development

1    through the Auburn gas gathering system so that that cost of

2    services, which is the single most expensive lease operating

3    component of producing this gas, will not escalate.

4            If we have no development and no routine, predictable

5    annual development of a certain volume, then those costs will

6    go up.

7            Secondly, we have got -- on the Craige pad in

8    particular, we have offset operators that have got wells

9    drilled and completed and currently on production that are

10   draining a potential resource, because the first right of

11   capture that we need to get in there and get our wellbores in

12   place and start producing our resource on behalf of ourselves

13   and our mineral owners.

14           As well as if we're unable to move forward, it's just

15   yet another setback as an example of just the ongoing problem

16   that we have had with the current operator getting routine

17   annual development done in Auburn.

18   Q.  How can Epsilon calculate the amounts that are potentially

19   being drained while the four proposed wells are not --

20   operations do not start with respect to those four wells in the

21   future?  Is there a mechanism that Epsilon can specifically and

22   accurately identify the volume and the quantity of drainage

23   that will occur?

24   A.  It cannot.

25   Q.  Is there a monetary value that Epsilon can put to the

1  damage you will incur if this Court does not grant injunctive

2  relief?

3  A.  No.

4      ATTORNEY MADRIZ:  Your Honor, those are all of the

5  questions I have.  I pass the witness.

6      THE COURT:  All right.  Thank you.  It is now 5:00.

7  Can you give me just a rough estimate of how long your

8  cross-examination will track, Mr. Brier?

9      ATTORNEY BRIER:  Yes.  Thank you, Your Honor.

10      Your Honor, given the more expansive nature of the

11  direct -- I think he's been on direct for about three hours

12  with a break, a brief break -- I expect the cross to go between

13  two and two and a half hours.  So I would respectfully ask that

14  we be permitted to start in the morning.  I think it would be

15  more efficient.  And we would strive to keep it -- I think if

16  we have time to organize, we can get through it more quickly.

17      THE COURT:  All right.  We will recess for the

18  evening.  And so what that will mean for you, Mr. Clanton, is

19  that you are going to remain under oath.  And when you return

20  tomorrow, you'll be cross-examined by Defense Counsel.  I may

21  have a few questions, as well.  So you cannot confer with

22  Counsel overnight.  So that's what that means for you.

23      In terms of overall where that puts us is -- as I

24  said, it is 5:00 on day one.  We are significantly behind where

25  I think we all anticipated we would be.  That is what it is.

1    So let me get some sort of estimate from Plaintiff's

2    Counsel for your third witness, approximately how long would

3    you anticipate the direct?

4    ATTORNEY KROCK:  Thirty to 40 minutes on direct, Your

5    Honor.

6    THE COURT:  All right.

7    ATTORNEY BRIER:  Your Honor, if we could get a

8    proffer.  The --

9    THE COURT:  Who is the third witness for tomorrow?

10    ATTORNEY KROCK:  The CFO.

11    ATTORNEY THOMAS:  It's the CFO of Epsilon, Mr. Lane

12    Bond.

13    THE COURT:  Of which Epsilon?  We have had two.

14    ATTORNEY THOMAS:  Epsilon Energy U.S.A.

15    THE COURT:  Okay.  And the scope of his testimony

16    would be, very, very briefly, what?

17    ATTORNEY THOMAS:  He will be going over the audit

18    process on the JOAs and on the Marbaker, Auburn pad and Craige

19    pad.

20    THE COURT:  To prove what?

21    ATTORNEY THOMAS:  To show that Epsilon has made

22    payments for those pads and does have an interest in those

23    facilities.

24    THE COURT:  All right.  Is that a disputed fact in

25    this case?

1      ATTORNEY BRIER:  We could stipulate that they made

2  payments as part of a working interest arrangement.  So I don't

3  know that that testimony is necessary.

4      THE COURT:  Okay.  I'm going to encourage Counsel to

5  communicate overnight, because I am concerned.  I do not have

6  any additional trial days for this hearing.  So we have to

7  conclude this proceeding at the close of business tomorrow.

8      If you can come to a stipulation to address the

9  financial contribution by Epsilon to the operating facilities,

10  and I will just shorten it to that, that would be

11  extraordinarily helpful to the schedule.  I think we need to

12  aim to conclude Plaintiff's case-in-chief by no later than the

13  lunch break tomorrow, which hopefully is realistic.

14      Defense Counsel, where does that put you in terms of

15  your ability to present your case-in-chief?

16      ATTORNEY BRIER:  I think we'll be able to finish

17  tomorrow.  If their case-in-chief is concluded tomorrow in the

18  morning, I'm confident that we can conclude tomorrow.

19      THE COURT:  Okay.  And I do want to save some time for

20  oral argument.  The Court, I think, made this point on a phone

21  call, is working under an extraordinarily compressed time

22  schedule in order to avoid this matter becoming moot.

23      So you know, we all need to work together to

24  streamline this process to some extent.

25      If there are exhibits, like Plaintiff's 45, that speak

1    for themselves, perhaps simply introduce the exhibit and then

2    in argument draw the Court's attention to the specific aspects

3    that you think are particularly significant.  I think that

4    would be a much more efficient use of our time.

5            So, okay.  What time is everyone comfortable starting

6    tomorrow?  I could begin, frankly, a little bit earlier than 9

7    in order to make best use of our time.

8            ATTORNEY BRIER:  Whatever works for the Court.

9                        (pause.)

10           THE COURT:  Would anyone have difficulty beginning at

11   8:30 tomorrow morning?

12           ATTORNEY BRIER:  We would not.

13           ATTORNEY MADRIZ:  We would not, Your Honor.

14           THE COURT:  And my staff?

15           THE LAW CLERK:  I can be here early.

16           THE COURTROOM DEPUTY:  I'm good, Judge.

17           THE COURT REPORTER:  It's okay with me.

18           THE COURT:  Okay.  We will begin court at 8:30

19   tomorrow morning then.  I think that will enable us to -- well,

20   I will be much more confident starting at 8:30 that we will

21   conclude Plaintiff's case before the lunch break.

22           Are there any other matters anyone would like to

23   address this afternoon before we part ways?

24           ATTORNEY BRIER:  I may have been distracted.  But the

25   witness will be instructed that he can't confer with anybody

1  about his testimony.

2        THE COURT:  He has been so instructed.  Any other

3  questions before we adjourn for the day?

4        ATTORNEY BRIER:  No.  Thank you, Judge.

5        ATTORNEY KROCK:  No.  Thank you.

6        THE COURT:  All right.  Thank you.  Court is

7  adjourned.  We will resume at 8:30 tomorrow morning.

8        THE COURTROOM DEPUTY:  All rise.

9              (5:13  p.m., court adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      REPORTER'S CERTIFICATE

2

3          I, Lori A. Fausnaught, RMR, CRR, Official Court

4   Reporter for the United States District Court for the Middle

5   District of Pennsylvania, appointed pursuant to the provisions

6   of Title 28, United States Code, Section 753, do hereby certify

7   that the foregoing is a true and correct transcript of the

8   within-mentioned proceedings had in the above-mentioned and

9   numbered cause on the date or dates hereinbefore set forth; and

10  I do further certify that the foregoing transcript has been

11  prepared by me or under my supervision.

12

13                              s/Lori A. Fausnaught, RMR, CRR

14                              -----------------------------
                                Lori A. Fausnaught, RMR, CRR
15                              Official Court Reporter

16

17  REPORTED BY:

18      LORI A. FAUSNAUGHT, RMR, CRR
        Official Court Reporter
19      United States District Court
        Middle District of Pennsylvania
20      Lori_Fausnaught@pamd.uscourts.gov

21

22          (The foregoing certificate of this transcript does
    not apply to any reproduction of the same by any means unless
23  under the direct control and/or supervision of the certifying
    reporter.)

24

25

**ATTORNEY BRIER:**
**[30]** 5/18 27/24 28/2
37/22 37/24 38/16 39/4
39/7 39/15 39/18 40/9
40/16 42/1 42/8 204/11
204/19 220/17 220/21
221/6 221/11 221/16
222/11 240/9 241/7
242/1 242/16 243/8
243/12 243/24 244/4
**ATTORNEY**
**DEMPSEY: [73]** 5/25
7/8 7/19 13/22 15/17
54/14 61/20 62/6 63/3
63/15 67/12 71/14
73/14 75/14 77/3 79/15
84/16 91/1 91/4 91/7
96/8 96/21 97/3 102/18
108/16 114/17 115/7
115/17 115/19 115/25
116/7 116/11 117/7
117/21 118/15 120/4
120/9 120/23 121/18
123/25 124/20 126/6
130/10 130/13 134/6
140/16 147/3 149/16
158/4 159/11 162/22
165/8 165/16 167/16
169/6 170/14 176/12
177/10 180/12 181/19
185/15 188/7 190/10
190/13 193/5 193/23
196/20 202/1 202/25
205/3 205/21 211/15
219/7
**ATTORNEY KROCK:**
**[57]** 5/7 6/18 10/24
12/19 13/7 13/15 13/18
15/22 15/25 38/6 41/13
42/12 42/15 43/4 51/12
54/11 61/23 62/9 63/25
67/9 70/12 71/18 71/20
73/11 75/11 77/1 79/5
79/12 90/12 92/6 96/6
96/13 102/20 108/19
114/12 115/23 116/1
117/12 117/19 120/17
124/5 124/9 124/25
126/3 126/11 128/15
128/24 129/6 129/13
130/5 140/14 140/18
221/8 221/14 241/4
241/10 244/5
**ATTORNEY MADRIZ:**
**[86]** 13/19 141/7
146/25 147/7 147/24
148/2 149/13 149/22
150/8 150/16 150/20
158/1 158/9 159/9
162/9 162/13 162/20
165/5 165/19 167/13
169/2 170/11 176/9
177/3 177/9 180/9

181/16 185/12 188/9
188/12 189/3 190/2
190/6 191/13 191/15
192/10 192/18 192/22
193/2 193/19 196/17
196/22 197/20 197/25
198/3 198/5 199/10
201/23 202/7 202/10
202/12 202/22 203/21
203/25 204/2 204/17
204/23 205/13 205/19
205/24 209/25 210/11
210/14 211/11 215/22
218/7 218/18 219/4
219/10 219/15 219/24
220/4 220/7 220/14
220/19 220/23 221/4
221/20 222/2 222/8
222/15 235/5 235/12
238/15 240/4 243/13
**ATTORNEY THOMAS:**
**[4]** 241/11 241/14
241/17 241/21
**THE COURT**
**REPORTER: [3]** 46/4
215/20 243/17
**THE COURT: [257]**
**THE COURTROOM**
**DEPUTY: [9]** 90/22
97/12 141/2 141/10
141/15 141/19 205/11
243/16 244/8
**THE LAW CLERK: [1]**
243/15
**THE WITNESS: [44]**
43/9 46/5 51/8 63/10
71/22 90/20 106/4
129/14 134/14 134/18
134/25 135/8 135/14
135/16 135/20 135/23
136/4 136/7 136/11
136/14 136/18 136/22
137/18 138/2 138/7
138/10 138/14 138/17
139/22 140/3 140/5
140/10 140/23 141/18
159/3 159/8 166/10
166/13 166/15 185/20
186/11 188/13 204/5
216/1

**$**

**$100 [3]** 61/9 61/10
86/4
**$200 [1]** 61/11
**$60 [1]** 143/20
**$60 million [1]** 143/20

**'21 [1]** 87/18
**'93 [1]** 45/18

**,**

**,and [1]** 194/9

,where **[1]** 219/17

**.**

**.216 [5]** 185/3 185/7
185/24 186/19 186/23
**.216 million gallons [4]**
185/3 185/7 186/19
186/23
**.499 [1]** 185/5
**.499 million gallons [1]**
185/5
**.715 [1]** 185/6
**.715 million gallons [1]**
185/6

**1**

**1.1 [2]** 171/24 172/11
**1.1.1 [1]** 172/22
**1.1.9 [2]** 173/24 174/1
**10 [6]** 4/7 8/24 109/12
139/12 153/6 198/7
**10,000 [1]** 137/23
**10,000 acres [1]**
145/25
**100 [5]** 105/13 125/18
125/21 154/9 156/15
**100 percent [26]** 111/24
12/1 12/6 31/16 45/1
52/2 53/5 104/11
104/22 105/6 130/23
130/24 130/25 135/6
135/11 135/13 135/18
135/25 145/18 206/6
206/13 206/21 207/22
208/10 216/16 237/22
**100 percent-owned [1]**
161/24
**102 [1]** 4/22
**10:40 a.m [1]** 234/12
**11 [27]** 1/13 4/8 35/2
35/5 36/11 37/19 58/13
58/25 59/3 60/25 86/3
127/5 139/12 157/16
159/10 159/12 206/2
206/3 206/18 206/19
208/8 208/19 209/5
209/6 209/23 210/3
231/15
**11,000 [1]** 137/23
**11:15 a.m [1]** 193/15
**11:17 [2]** 90/15 90/23
**11:30 [2]** 90/16 90/21
**11:35 [1]** 90/23
**11th of [2]** 72/24 73/2
**12 [8]** 3/13 4/8 125/7
160/20 162/12 162/17
162/23 230/15
**12-minute [1]** 205/9
**12/08/2020 [2]** 103/6
103/7
**120 [4]** 66/10 212/8
212/11 216/25
**120-day [1]** 214/9
**124 [1]** 3/7

**12:30 [1]** 124/3
**12:53 [2]** 140/24 141/3
**12th [2]** 191/5 223/24
**13 [10]** 4/9 58/25 79/22
79/25 125/7 129/25
163/22 165/6 165/20
191/5
**13,000 foot [1]** 137/24
**130 [1]** 3/8
**134 [1]** 3/9
**14 [7]** 4/9 79/25 80/1
142/17 165/24 167/17
229/19
**141 [1]** 3/12
**146 [1]** 4/6
**147 [1]** 4/6
**148 [1]** 4/7
**14th [2]** 183/1 233/12
**15 [7]** 11/20 11/23
143/2 143/24 160/14
220/17 226/20
**150 [1]** 4/7
**15222-3142 [1]** 1/20
**153 [1]** 4/7
**157 [1]** 4/8
**159 [1]** 4/8
**15th [4]** 220/19 230/17
230/20 230/22
**16 [5]** 4/10 168/1
169/11 223/19 223/21
**160 [1]** 4/8
**162 [2]** 4/6 4/8
**163 [1]** 4/9
**165 [2]** 4/9 4/9
**167 [2]** 4/9 4/10
**169 [2]** 4/10 4/10
**16th [2]** 75/5 116/25
**16th of [1]** 74/24
**17 [11]** 4/10 102/15
108/15 108/17 108/20
129/8 129/11 129/16
169/23 170/12 170/15
**170 [1]** 4/10
**171 [1]** 4/11
**174 [1]** 4/11
**176 [2]** 4/11 4/12
**177 [1]** 4/12
**178 [1]** 4/12
**18 [7]** 4/11 107/24
113/16 118/21 171/17
205/15 205/22
**180 [3]** 4/12 4/13 66/11
**1800 [1]** 1/19
**181 [2]** 4/13 4/13
**182 [1]** 4/14
**185 [2]** 4/13 4/14
**18503 [1]** 2/5
**187 [1]** 4/14
**18th [1]** 99/7
**18th of [1]** 76/14
**19 [6]** 4/11 173/22
174/11 174/12 176/10
176/13
**192 [2]** 4/19 4/19

**193 [3]** 4/14 4/15 4/15
**194 [1]** 4/15
**196 [1]** 4/15
**1979 [1]** 45/15
**1980 [1]** 142/4
**1982 [1]** 144/23
**1989 [1]** 53/22
**1993 [1]** 142/6
**1:00 p.m [1]** 226/24
**1:21-CV-00658-JPW [1]**
1/4
**1:25 p.m [1]** 232/9
**1:44 p.m [1]** 229/21
**1LH [1]** 211/2
**1st [2]** 171/23 231/17

**2**

**20 [9]** 4/12 56/20 59/5
157/8 176/15 177/4
177/11 178/21 229/14
**200 [1]** 2/5
**200 percent [1]** 61/8
**200,000 [1]** 185/1
**2008 [6]** 113/20 181/5
181/9 181/20 183/23
185/23
**2008-2009 [1]** 159/8
**20081227 [19]** 112/23
113/17 114/24 168/24
170/22 171/15 173/18
179/9 181/3 181/7
182/11 183/9 183/13
183/16 184/7 185/1
185/22 187/3 189/21
**2009 [2]** 99/5 159/8
**20090610 [6]** 170/22
182/12 183/10 183/12
183/15 187/5
**201 [1]** 4/16
**2010 [24]** 63/14 64/15
99/5 99/7 100/6 106/23
107/6 107/13 107/15
107/16 111/14 111/21
111/22 146/8 159/3
159/4 159/5 159/7
171/23 175/9 187/20
189/1 190/22 192/8
**2011 [8]** 63/14 113/13
113/15 113/19 182/7
182/18 183/14 186/22
**20110607 [7]** 170/22
182/5 182/13 182/16
183/15 184/18 186/5
**20110610 [1]** 186/17
**2012 [2]** 118/6 183/1
**20120607 [1]** 187/5
**201209 [1]** 168/21
**20121209 [2]** 182/24
186/17
**20121219 [1]** 186/22
**2013 [8]** 43/19 46/15
47/1 63/16 99/9 100/17
100/18 112/4
**2016 [6]** 109/25 110/8

**2**

**2016... [4]** 111/13 118/3 127/11 133/19
**2017 [4]** 115/3 116/25 118/5 145/3
**2018 [12]** 17/18 72/24 73/3 74/24 75/3 75/5 76/14 76/17 76/21 78/23 118/20 200/1
**20181227 [1]** 180/5
**2019 [2]** 164/8 164/8
**20190606 [1]** 198/24
**202 [3]** 4/16 4/16 4/16
**2020 [32]** 30/22 31/12 31/20 34/9 49/23 66/20 66/21 67/3 81/18 82/10 87/20 103/6 103/7 103/11 103/17 122/1 122/10 122/14 122/17 219/2 219/18 220/17 223/24 226/22 228/19 229/10 229/21 230/17 231/17 232/9 233/12 234/12
**2021 [18]** 1/13 3/13 109/3 117/9 118/2 131/13 170/5 176/25 193/15 212/20 212/23 213/12 213/18 213/25 214/2 214/6 214/21 218/4
**205 [1]** 4/11
**20th [2]** 219/2 219/20
**21 [5]** 4/6 4/12 178/13 180/10 180/13
**21-658 [1]** 5/4
**210 [1]** 4/17
**211 [7]** 4/17 4/17 4/17 4/18 4/18 4/18 4/18
**216,000 [1]** 113/3
**218 [1]** 4/19
**22 [30]** 4/13 28/9 28/9 35/3 37/10 37/20 38/18 38/19 38/22 38/22 39/1 39/2 39/9 39/11 40/10 57/11 67/17 67/18 67/20 67/21 114/20 115/5 115/12 115/24 128/12 129/11 180/16 181/17 181/23 185/21
**222 [1]** 4/19
**22902 [1]** 1/22
**22HC [1]** 67/16
**22nd [17]** 12/8 38/9 120/1 123/3 211/20 211/23 212/1 212/20 212/23 213/12 213/18 213/25 214/2 214/6 214/21 216/25 218/4
**23 [6]** 4/13 114/14 181/25 185/13 186/4 186/5
**23rd [3]** 182/7 182/18 183/14

**24 [4]** 4/14 182/19 185/13 186/14
**25 [12]** 4/14 37/24 95/6 95/14 95/20 96/5 97/3 185/11 185/17 187/10 193/3 193/6
**25th [1]** 234/12
**26 [10]** 4/15 58/9 59/4 116/6 116/21 128/19 193/8 193/22 193/24 226/22
**260 [1]** 1/19
**26th [2]** 228/19 229/10
**27 [12]** 4/15 65/10 65/11 68/2 69/4 69/5 69/7 194/22 196/18 196/21 197/1 198/4
**27-3 [4]** 115/20 116/4 116/22 129/12
**28 [9]** 4/16 68/2 69/4 69/7 201/17 201/24 202/4 202/13 245/6
**28th [1]** 236/5
**29 [4]** 4/16 202/16 202/23 203/1
**2906 [1]** 1/25
**29th [2]** 170/4 193/15
**2:00 [2]** 140/25 141/4
**2:11 p.m [1]** 233/12
**2:46 p.m [2]** 230/17 230/20
**2nd [2]** 229/21 230/13

**3**

**3 million [1]** 34/18
**3-D [1]** 139/10
**30 [25]** 4/17 36/17 36/22 38/2 38/3 38/6 94/23 120/2 142/10 142/13 204/24 209/20 210/20 210/21 211/12 211/16 211/19 212/1 212/14 216/11 216/15 216/24 217/8 217/22 218/5
**30 percent [3]** 138/14 138/14 164/22
**30-day [11]** 38/19 120/14 120/19 121/14 211/25 212/7 212/10 214/24 215/10 215/12 216/8
**300 [2]** 1/22 50/15
**31 [4]** 4/17 189/1 210/20 211/5
**310 [1]** 1/22
**3142 [1]** 1/20
**31st [1]** 187/20
**32 [3]** 4/18 210/20 211/6
**33 [5]** 4/18 210/20 211/6 211/12 211/16
**35 percent [2]** 44/19 148/9

**38 [12]** 115/20 116/2 116/5 116/6 116/7 116/21 128/19 128/19 129/8 129/11 129/16 129/17
**3:01 p.m [1]** 231/17
**3:09 p.m [2]** 228/19 228/23
**3:30 p.m [2]** 229/10 229/10
**3:48 [1]** 205/12

**4**

**40 [2]** 146/16 241/4
**40-plus [1]** 225/11
**400 percent [1]** 61/8
**41 [6]** 108/22 117/9 118/13 126/25 131/11 131/12
**41.789 [1]** 170/25
**425 [1]** 2/5
**43 [1]** 3/5
**45 [8]** 4/19 218/14 218/17 219/5 222/1 222/14 223/21 242/25
**450 [2]** 160/1 160/6
**46 [4]** 4/19 192/19 192/21 193/1
**48 [9]** 68/22 69/9 70/5 109/23 127/4 127/11 131/14 131/16 132/7
**48-hour [1]** 68/25
**49 [2]** 131/19 132/7
**4:00 [2]** 205/10 205/12
**4:17 [1]** 223/24
**4:19 p.m [1]** 219/2
**4:42 p.m [1]** 236/5
**4th [3]** 181/5 181/9 183/1

**5**

**5,000 acres [4]** 44/5 134/12 146/18 146/20
**5/12/21 [1]** 4/6
**50 [2]** 143/24 143/24
**50 percent [8]** 110/20 111/4 128/2 128/5 134/4 171/14 172/8 181/12
**50,000 acres [1]** 143/18
**51 [4]** 132/5 132/5 132/15 132/16
**53 [1]** 4/3
**54 [1]** 4/3
**5:00 [1]** 240/6
**5:00 on [1]** 240/24
**5:13 [1]** 244/9
**5:44 p.m [1]** 170/5
**5th [1]** 176/25

**6**

**6.1 [1]** 40/3
**60 [1]** 116/17

**600 [1]** 1/24
**610-1989 [1]** 53/22
**658 [1]** 5/4
**67 [2]** 4/3 4/3

**7**

**706 [3]** 168/11 168/11 168/12
**715 [1]** 199/10
**715,000 [1]** 199/9
**72 [1]** 4/4
**73 [1]** 4/4
**74 [1]** 4/4
**75 [1]** 4/4
**750,000 [2]** 198/25 199/8
**7500 [1]** 1/24
**753 [1]** 245/6
**76 [1]** 4/5
**76.0001 [1]** 170/25
**77 [1]** 4/5
**77002-2906 [1]** 1/25
**78 [1]** 4/5
**78a.52a [1]** 37/25
**79 [1]** 4/5
**7th [1]** 232/9

**8**

**8.2 [1]** 33/18
**8:30 [4]** 243/11 243/18 243/20 244/7
**8th [1]** 103/17

**9**

**9/16/2019 [2]** 164/8 164/8
**90 [19]** 19/22 20/2 39/8 40/5 63/12 64/6 64/10 64/11 64/22 66/2 66/7 80/11 136/16 136/17 136/18 136/21 212/7 216/18 217/21
**90-day [10]** 20/6 65/4 119/25 121/14 212/10 212/12 212/15 215/9 215/13 217/20
**90-days [1]** 216/24
**90-plus-30-day [1]** 212/20
**90-plus-30-days [1]** 213/14
**91 [2]** 3/6 4/22
**93 [1]** 132/23
**9:00 [1]** 5/1
**9th [3]** 109/3 109/11 117/9

**A**

**a.m [4]** 5/1 90/23 193/15 234/12
**AAPL [2]** 53/21 144/23
**ability [3]** 26/2 157/7 242/15
**able [28]** 6/5 6/6 6/8 9/4 11/5 12/5 12/21

**13/6 23/23 24/6 44/2 48/1 50/11 56/3 63/9 83/14 89/19 108/22 125/14 149/24 157/3 168/16 195/10 197/10 214/15 231/3 234/3 242/16
**about [112]** 7/25 11/9 14/6 17/10 20/13 20/17 23/9 24/10 30/25 31/3 32/3 33/7 35/8 36/13 36/13 38/19 40/8 40/13 44/5 44/19 47/18 47/24 48/8 51/14 51/16 53/21 55/9 55/10 57/25 58/5 59/4 61/4 61/8 61/18 70/15 71/13 72/8 72/13 79/18 80/17 81/4 85/1 86/4 87/7 92/7 94/8 94/8 94/18 94/20 95/25 98/14 99/20 99/20 100/4 100/13 101/6 103/1 104/5 105/21 107/1 107/12 112/13 112/14 113/1 114/23 116/18 117/2 118/16 120/20 121/25 122/13 123/18 126/16 132/5 132/24 132/25 133/2 133/25 134/12 135/2 137/10 137/19 138/14 140/4 142/2 142/8 143/6 143/20 146/20 148/8 149/1 152/23 155/10 156/25 160/14 162/17 163/12 183/7 210/2 212/14 213/12 215/1 216/24 220/24 222/18 226/5 228/5 229/14 235/8 235/10 240/11 244/1
**above [9]** 74/4 81/17 137/20 168/10 228/18 228/20 229/8 229/19 245/8
**above-captioned [1]** 74/4
**above-mentioned [1]** 245/8
**absence [1]** 28/21
**absent [4]** 29/17 32/6 33/5 238/22
**absolute [1]** 7/3
**absolutely [8]** 13/20 15/18 15/24 33/19 33/20 35/4 90/11 127/10
**abundantly [2]** 32/12 40/8
**accept [1]** 192/4
**acceptable [2]** 15/22 34/2
**acceptance [1]** 217/13
**access [20]** 18/12

# A

**access...** **[19]** 23/16 23/20 82/17 83/25 84/2 84/4 84/6 84/8 85/9 89/4 92/12 108/22 111/18 139/13 155/11 155/11 157/6 166/19 197/8
**accessed** **[1]** 24/24
**accommodate** **[2]** 49/15 65/2
**accord** **[1]** 192/6
**accordance** **[5]** 32/18 32/19 55/6 68/13 209/17
**according** **[7]** 38/25 43/3 101/19 120/1 141/14 173/20 218/2
**account** **[1]** 59/23
**accumulate** **[1]** 135/11
**accurate** **[16]** 63/22 67/6 73/5 75/5 76/20 126/2 126/3 129/12 131/23 132/2 132/11 132/16 133/11 133/24 147/18 147/20
**accurately** **[10]** 96/17 96/25 146/12 149/25 150/13 157/23 158/5 165/2 165/14 239/22
**accusation** **[1]** 157/14
**accusations** **[2]** 25/11 41/15
**achieving** **[1]** 135/12
**acknowledge** **[4]** 88/17 89/11 92/7 124/10
**acknowledged** **[2]** 110/4 121/11
**acknowledgment** **[2]** 187/22 227/25
**acquainted** **[1]** 14/23
**acquire** **[5]** 132/20 134/4 143/16 172/3 173/11
**acquired** **[6]** 109/24 143/14 144/11 175/3 179/15 181/1
**acreage** **[13]** 44/2 67/16 143/14 143/19 146/7 146/12 146/17 146/19 146/21 146/23 174/22 203/12 224/22
**acres** **[8]** 44/5 44/6 134/12 143/16 143/18 145/25 146/18 146/20
**across** **[2]** 44/16 152/18
**act** **[3]** 82/13 123/9 123/12
**acting** **[1]** 89/8
**action** **[6]** 8/24 90/3 109/9 117/10 162/7 190/25
**actions** **[2]** 47/3 162/4

**active** **[9]** 107/18 155/24 156/9 182/10 184/6 185/10 231/12 232/19 232/21
**actively** **[3]** 90/5 107/3 156/11
**activities** **[13]** 16/5 16/8 16/12 16/25 20/8 26/15 55/9 58/21 58/21 86/25 126/23 166/7 214/10
**activity** **[9]** 16/16 16/19 19/22 51/20 52/14 59/8 64/9 105/17 142/21
**actual** **[7]** 65/3 69/7 71/17 132/14 168/9 183/25 204/3
**actually** **[48]** 7/15 13/10 14/12 14/20 16/19 19/22 22/20 39/10 45/3 47/17 49/10 49/11 51/10 52/13 60/16 79/2 83/13 84/3 88/24 96/21 116/6 127/23 127/24 136/23 138/4 151/25 154/18 165/13 169/15 173/23 173/23 174/11 175/16 176/3 177/14 179/6 179/17 191/20 203/17 203/19 204/20 214/9 215/8 218/23 221/3 232/21 234/15 238/22
**add** **[1]** 138/17
**added** **[5]** 30/15 65/12 86/12 118/20 138/21 190/20 206/19
**addition** **[3]** 160/15 190/20 206/19
**additional** **[10]** 12/12 20/25 200/5 200/6 214/24 217/8 217/9 217/15 217/18 242/6
**address** **[20]** 6/3 9/20 9/21 9/23 10/5 10/8 10/10 10/24 11/4 14/17 15/7 38/15 41/12 42/3 42/4 128/22 205/13 238/16 242/8 243/23
**addressed** **[7]** 11/13 14/4 14/19 15/2 41/5 41/14 233/14
**addresses** **[4]** 18/9 55/14 56/14 56/16 79/20
**addressing** **[5]** 7/17 15/16 59/3 65/13 70/9
**adds** **[2]** 212/11 216/24
**adequate** **[5]** 6/12 9/15 9/22 25/22 25/22
**adjacent** **[4]** 85/12 89/2 137/25 139/1
**adjourn** **[1]** 244/3
**adjourned** **[2]** 244/7 244/9
**administer** **[3]** 42/22

42/24 141/9
**administration** **[1]** 45/17
**administrative** **[2]** 37/18 234/22
**admissibility** **[1]** 147/6
**admissible** **[1]** 15/7
**admission** **[14]** 14/8 15/1 54/12 67/10 73/11 75/11 77/1 79/12 102/16 108/15 108/16 149/21 162/11 221/25
**admit** **[31]** 5/13 98/12 118/13 147/24 149/13 150/16 158/1 159/9 162/20 165/5 167/13 169/2 169/10 170/11 176/9 177/3 180/9 181/16 181/23 185/13 192/18 193/3 193/19 196/17 201/23 202/22 205/15 205/16 211/11 219/4 221/1
**admitted** **[40]** 4/2 4/21 5/9 13/9 14/1 14/11 54/15 67/13 73/15 75/15 77/4 79/16 102/21 108/20 115/12 148/1 150/17 159/13 162/23 162/25 165/20 167/17 170/15 176/13 177/12 180/14 193/1 193/6 193/24 196/21 197/21 197/24 198/4 201/11 202/6 202/13 203/1 205/22 211/16 222/14
**Admittedly** **[1]** 79/5
**admitting** **[1]** 165/17
**advance** **[1]** 110/11
**adverse** **[2]** 11/11 11/14
**advisable** **[1]** 12/1
**advise** **[3]** 68/6 69/11 76/9
**advised** **[1]** 11/4
**advises** **[1]** 13/14
**advocate** **[1]** 35/17
**advocating** **[1]** 34/25
**affected** **[1]** 36/20
**Affidavits** **[1]** 191/17
**affiliated** **[2]** 45/8 99/10
**affirmative** **[2]** 8/16 209/11
**affirmed** **[2]** 43/3 141/14
**after** **[30]** 19/23 20/18 30/25 31/1 31/4 31/20 31/21 37/3 39/8 46/7 69/10 94/24 97/14 98/15 98/15 116/17 130/13 143/11 143/12 153/10 174/20 204/18 212/2 216/15 216/21

225/2 225/16 230/22 231/22 232/18
**afternoon** **[4]** 204/13 204/20 205/1 243/23
**again** **[28]** 26/10 34/9 42/3 63/3 81/25 88/2 88/9 88/12 108/14 111/21 120/5 129/3 132/3 145/2 150/24 151/14 155/19 169/11 195/8 197/4 198/10 206/21 210/13 210/14 229/22 230/5 231/16 232/9
**against** **[1]** 34/25
**agency** **[1]** 26/24
**ago** **[9]** 26/11 26/12 107/8 107/24 126/8 139/12 190/18 191/1 226/13
**agree** **[23]** 12/10 16/9 28/22 85/9 87/22 91/21 92/4 92/25 93/3 93/4 94/11 98/6 110/8 110/25 111/5 111/10 111/15 116/22 121/24 134/18 179/19 189/13 237/25
**agreed** **[21]** 16/2 16/5 23/3 26/17 26/20 32/1 81/22 90/6 92/19 93/23 93/24 113/7 116/13 127/18 131/20 131/24 144/19 172/3 173/16 173/20 222/20
**agreeing** **[1]** 132/13
**agreement** **[149]** 17/25 18/2 18/11 18/20 20/21 21/13 21/16 22/25 22/25 26/10 26/12 26/17 26/21 27/2 27/20 30/25 31/2 31/4 31/20 32/3 32/5 32/7 32/10 32/12 32/13 32/25 33/3 33/24 33/25 34/1 34/13 47/6 53/18 53/19 53/22 53/24 55/7 56/7 56/9 56/12 57/5 65/12 82/4 82/8 84/12 85/10 85/22 87/3 88/14 88/15 91/14 91/16 92/5 92/23 99/21 100/5 100/5 100/9 105/1 105/3 105/15 105/22 106/12 106/12 106/15 106/16 109/25 110/23 110/24 111/11 111/13 111/14 111/25 112/3 112/16 116/16 116/17 118/7 118/18 118/20 119/1 119/3 119/4 119/9 119/11 119/17 122/12 122/13 124/16 127/8 127/13 128/3 128/10 131/18

131/20 135/4 136/3 144/15 144/18 144/20 145/20 145/24 146/9 151/7 158/18 159/2 159/4 163/1 163/4 163/14 163/17 171/20 171/22 172/3 173/17 175/8 175/22 176/20 178/4 178/17 178/19 178/25 179/1 179/1 179/16 179/20 188/17 191/2 195/21 195/24 196/2 196/23 197/3 197/5 197/6 197/23 200/1 201/23 201/23 203/20 204/3 205/18 206/3 209/2 210/5 211/25 222/20 235/21 235/25
**agreements** **[20]** 16/1 47/4 63/23 99/5 99/8 99/17 99/22 100/2 100/4 101/12 104/19 119/18 129/21 134/23 144/7 144/11 144/21 146/24 173/5 178/8
**agrees** **[1]** 18/9
**ahead** **[7]** 84/7 118/24 124/7 149/5 172/24 190/11 230/13
**aim** **[1]** 242/12
**alarming** **[1]** 22/23
**Alberta** **[1]** 45/22
**aligned** **[1]** 22/8
**alignment** **[1]** 81/1 238/5
**all** **[168]** 5/2 6/2 6/5 7/18 10/3 10/15 10/16 10/18 13/6 13/8 15/9 15/18 15/20 16/8 16/12 20/23 21/3 21/4 21/9 25/15 27/17 27/18 29/4 30/2 30/4 31/7 32/5 32/18 34/5 35/10 38/17 42/3 42/9 42/13 46/23 48/5 48/20 49/15 50/16 51/11 51/22 51/25 52/11 56/21 57/16 58/6 58/9 59/6 60/10 60/14 61/9 61/13 61/16 62/13 64/20 64/24 65/11 66/16 67/22 69/22 70/20 70/21 71/3 72/2 72/7 72/12 80/23 81/2 84/2 84/5 89/4 90/12 90/24 91/2 92/9 92/21 97/2 97/14 99/20 108/20 109/8 111/11 112/19 115/9 118/12 119/3 120/7 121/23 122/17 124/1 125/18 125/21 126/1 130/5 133/9 134/7 136/17 137/10 137/16 137/24

# A

**all... [68]** 138/6 138/11 139/10 139/24 140/11 140/17 140/19 141/8 144/19 150/3 151/18 152/14 152/23 152/24 154/15 155/9 157/6 159/12 160/4 161/11 161/19 169/10 170/25 173/1 173/1 174/1 174/2 175/18 175/21 177/11 179/14 179/19 179/24 180/13 188/17 189/17 192/16 192/24 193/24 200/3 201/2 202/4 207/5 208/1 208/4 215/16 216/16 218/3 219/18 219/19 220/8 224/13 224/20 231/24 233/21 237/9 240/4 240/6 240/17 240/25 241/6 241/24 242/23 244/6 244/8
**allegation [5]** 109/15 110/3 110/10 110/15 133/3
**allegations [10]** 41/15 79/24 109/16 109/17 109/22 118/9 131/22 132/2 132/10 133/10
**allocated [2]** 58/17 225/20
**allotted [1]** 9/15
**allow [13]** 17/5 23/20 26/13 26/23 35/6 38/13 80/7 88/15 89/4 89/17 231/11 232/23 234/23
**allowed [7]** 13/12 21/11 24/16 26/19 61/6 192/1 217/20
**allowing [2]** 23/16 25/4
**allows [5]** 22/14 22/15 33/19 140/5 209/19
**almost [1]** 157/8
**alone [2]** 20/11 71/13
**along [6]** 5/10 39/13 58/4 200/3 214/14 214/17
**already [11]** 18/15 40/18 64/14 66/5 66/5 118/16 126/13 187/2 201/11 233/10 238/6
**also [38]** 5/14 5/16 7/23 8/16 8/17 9/16 12/22 23/22 34/15 35/1 40/22 43/4 44/9 47/9 52/5 55/25 57/14 57/22 61/1 85/6 93/2 99/3 142/25 144/3 146/8 146/10 157/1 157/10 164/1 168/8 168/9 182/4 185/12 187/4 193/2 196/4 199/21

215/13
**alter [1]** 28/19
**alternative [1]** 41/22
**although [3]** 196/1 198/23 238/4
**always [1]** 222/3
**am [26]** 6/8 9/22 15/2 16/15 31/3 79/5 115/11 133/2 142/4 143/17 146/4 147/16 148/21 149/7 157/22 160/4 160/22 163/2 163/5 163/23 165/1 166/1 168/2 174/14 222/2 242/5
**ambiguity [3]** 74/16 74/21 75/18
**ameliorate [1]** 14/3
**amended [1]** 118/8
**amending [1]** 34/3
**amends [1]** 33/11
**American [1]** 73/23
**among [3]** 58/21 101/11 135/3
**amount [9]** 9/15 9/22 41/10 74/16 124/2 137/14 143/19 151/15 235/10
**amounts [2]** 85/17 239/18
**analogy [1]** 33/1
**analysis [6]** 107/25 108/4 142/12 142/12 145/12 212/20
**annual [2]** 239/5 239/17
**annually [1]** 230/7
**another [9]** 32/21 34/25 112/24 121/16 135/21 137/20 182/11 204/24 239/15
**answer [11]** 8/10 11/24 63/9 106/1 108/3 108/5 133/17 188/12 210/5 210/8 237/16
**answered [2]** 131/10 132/8
**answers [1]** 100/6
**anticipate [8]** 6/25 7/2 7/22 7/25 11/8 25/3 42/3 241/3
**anticipated [7]** 9/18 38/18 152/21 213/9 213/11 214/13 240/25
**any [138]** 7/11 8/25 9/20 12/17 13/20 15/18 16/13 17/2 17/5 18/25 22/20 25/12 26/5 26/5 37/5 41/19 46/17 46/20 47/3 47/9 50/3 50/7 50/23 51/14 52/9 52/18 52/23 53/3 54/13 55/17 55/18 55/24 55/24 55/25 56/2 56/6 56/6

58/9 58/10 58/24 59/11 59/16 61/17 61/25 62/1 64/12 64/22 65/5 67/11 71/5 73/13 75/13 79/14 81/18 81/22 81/23 82/10 83/8 84/11 84/23 85/3 85/3 85/20 86/5 90/3 96/25 99/8 100/13 101/11 102/19 104/20 105/3 106/16 107/16 107/17 108/11 108/18 114/2 117/11 125/14 125/20 126/4 137/1 140/13 140/15 144/7 147/2 149/15 154/24 155/12 158/3 159/6 160/10 162/21 165/7 167/15 169/5 170/13 173/6 173/7 173/9 173/11 173/11 174/4 176/3 176/5 176/11 177/5 179/14 179/20 180/11 181/18 185/14 188/15 188/19 189/16 189/22 189/24 189/25 190/8 190/15 193/4 193/21 196/19 201/25 202/24 203/10 205/20 211/14 214/20 225/21 232/4 234/9 234/22 243/22 244/2 245/22 245/22
**anybody [10]** 22/15 36/18 37/5 101/24 104/3 106/16 106/16 236/3 238/2 243/25
**anyone [7]** 22/2 35/11 74/20 93/9 127/23 243/10 243/22
**anything [9]** 33/12 35/14 52/20 58/20 71/8 114/2 122/24 123/20 123/22
**anyway [1]** 134/16
**apart [5]** 81/1 105/6 138/24
**apologies [1]** 173/23
**apologize [17]** 5/23 39/25 93/16 96/22 111/2 115/7 115/17 115/23 116/11 119/24 124/20 128/15 133/23 203/21 204/11 209/22 210/16
**Appalachia [10]** 1/6 5/3 74/3 92/13 92/19 171/21 183/3 187/25 194/8 224/5
**appeal [2]** 162/7 163/13
**appealing [2]** 163/9 163/11
**appear [2]** 209/1 222/12

**appearances [4]** 1/17 2/1 5/5 5/5
**appears [1]** 215/12
**apples [1]** 38/10
**applicable [4]** 28/4 201/7 201/9 202/20
**application [2]** 29/25 232/15
**applied [3]** 31/23 200/8 214/25
**applies [4]** 31/24 32/9 152/18 202/21
**apply [11]** 21/17 30/16 31/22 41/1 41/2 65/4 65/5 191/16 201/21 216/8 245/22
**appoint [1]** 93/22
**appointed [2]** 245/5
**appreciate [10]** 6/23 8/19 9/8 9/16 12/24 13/13 41/4 124/25 133/17 222/5
**approach [3]** 118/10 190/3 218/8
**appropriate [9]** 13/9 41/10 42/6 96/15 124/4 217/11 223/1 233/2 235/1
**appropriately [2]** 26/2 26/25
**approval [16]** 116/25 130/1 181/4 182/25 183/8 183/13 185/22 187/3 194/16 195/5 195/14 197/17 198/24 217/13 234/3 234/4
**approvals [6]** 179/23 183/11 183/12 187/23 188/23 190/24
**approve [1]** 58/9
**approved [8]** 13/14 95/10 183/9 183/16 185/18 186/7 195/13 231/24
**approximate [4]** 44/2 48/1 50/11 124/2
**approximately [6]** 26/11 66/18 87/16 164/22 175/7 241/2
**appurtenances [1]** 174/3
**April [18]** 28/9 28/9 38/19 38/22 39/1 39/11 191/5 211/23 212/20 212/23 213/12 213/18 213/25 214/2 214/6 214/21 216/25 218/4
**April 12th [1]** 191/5
**April 22 [6]** 28/9 28/9 38/19 38/22 39/1 39/11
**April 22nd [11]** 211/23 212/20 212/23 213/12 213/18 213/25 214/2 214/6 214/21 216/25

218/4
**are [323]**
**area [53]** 34/19 36/14 36/14 37/3 37/8 37/25 38/5 39/20 54/1 55/22 56/3 64/15 64/18 65/1 74/11 74/12 87/7 92/20 92/22 108/2 108/7 108/8 112/13 139/23 147/14 147/17 147/19 147/20 149/6 149/24 149/25 150/13 152/5 152/6 153/16 154/13 155/3 155/8 155/13 155/25 156/23 157/12 157/20 164/24 174/23 201/1 201/21 202/20 204/8 213/2 214/11 217/3 224/5
**areas [5]** 24/18 154/5 154/14 157/24 174/25
**aren't [1]** 230/9
**arena [1]** 233/21
**Ares [7]** 142/17 143/13 143/16 143/17 143/21 144/7 144/22
**argue [2]** 30/15 31/1
**argued [1]** 41/21
**arguing [2]** 23/2 105/21
**argument [26]** 8/5 8/8 8/20 9/9 9/24 10/6 10/13 10/16 14/13 25/3 30/17 31/24 40/3 40/8 40/15 41/14 62/3 62/4 62/8 70/8 118/11 183/23 189/10 192/5 242/20 243/2
**arguments [3]** 7/6 10/3 12/14
**Armezanni [1]** 5/21
**Armezzani [2]** 2/4 5/20
**arose [1]** 72/11
**around [7]** 35/11 42/18 67/4 73/2 76/18 146/18 156/10
**arrangement [3]** 17/24 62/1 242/2
**arrive [1]** 211/24
**arrived [1]** 10/7
**article [60]** 29/22 29/24 30/4 30/10 31/6 31/7 31/9 31/11 31/18 31/22 32/11 34/14 39/16 54/20 54/21 54/25 55/19 56/19 58/13 59/18 62/12 65/7 65/9 65/11 69/3 86/2 92/2 92/11 92/18 93/2 93/7 93/18 93/21 94/6 94/13 94/17 95/4 97/23 97/25 98/3 98/7 103/13 120/6 125/4 125/25 126/1 136/3 136/6 136/9

## A

**article... [11]** 203/17 203/24 203/25 204/10 207/1 208/19 209/1 210/6 237/8 237/11 237/23
**Article V [2]** 93/7 125/4
**Article VI [2]** 86/2 95/4
**Article VI.2 [7]** 29/22 29/24 31/22 34/14 62/12 98/3 98/7
**Article XVI [2]** 65/9 136/9
**articulated [2]** 94/25 97/22
**as [305]**
**ascertain [1]** 220/22
**aside [1]** 199/23
**ask [31]** 5/4 6/16 8/1 14/16 38/4 51/14 62/25 66/13 70/8 72/8 79/18 87/7 90/18 95/22 96/8 96/24 97/15 117/8 129/18 130/10 130/16 140/13 159/1 183/7 187/15 189/1 208/6 215/2 220/23 222/7 240/13
**asked [26]** 8/8 30/6 34/16 39/12 46/13 78/2 78/17 80/7 101/4 106/25 108/3 122/12 126/16 131/16 131/16 131/17 131/19 150/3 150/5 170/20 188/9 189/4 210/2 225/10 232/5 237/12
**asking [23]** 13/13 30/7 34/10 36/5 37/12 40/23 41/2 48/24 71/16 78/18 88/12 88/17 88/20 90/8 91/22 96/16 101/2 102/11 143/5 143/8 228/14 229/24 232/3
**aspect [1]** 121/12
**aspects [2]** 160/4 243/2
**assembled [1]** 160/17
**assert [1]** 22/23
**asserted [1]** 77/25
**asserting [1]** 95/10
**assertion [1]** 191/20
**asset [13]** 109/17 110/13 110/17 110/19 111/7 111/7 111/15 118/6 133/3 133/14 133/18 134/1 230/23
**assets [15]** 27/10 44/10 44/18 44/20 45/3 57/16 82/17 84/7 111/20 112/19 118/5 128/1 144/12 197/8 201/4
**assigned [5]** 175/5

175/7 175/8 175/10 175/11
**assist [1]** 232/6
**associated [2]** 151/10 151/18
**assume [5]** 17/6 41/9 124/1 139/20 189/18
**assumed [1]** 101/20
**assuming [3]** 109/5 116/12 218/2
**attach [1]** 79/6
**attached [12]** 53/18 91/14 121/20 127/8 137/24 173/8 202/2 219/7 219/9 219/10 222/12 234/1
**attaching [2]** 232/10 232/12
**attachment [1]** 187/12
**attempt [1]** 227/17
**attempting [2]** 57/19 162/6
**attention [28]** 42/24 47/24 60/24 72/23 83/22 125/3 127/4 146/1 148/19 153/2 153/5 157/15 163/21 171/16 173/24 178/9 183/4 192/12 195/18 201/6 203/9 205/14 206/2 210/19 226/21 229/18 236/25 243/2
**attest [1]** 149/24
**attorney [7]** 3/5 3/6 3/7 3/8 3/12 99/24 225/9
**attributed [1]** 145/23
**Aubmarc [23]** 109/24 111/5 111/8 118/4 127/12 127/18 131/17 131/20 131/23 131/24 131/24 132/2 132/11 132/12 132/17 133/7 133/11 133/12 133/13 133/18 133/20 133/25 134/1
**Auburn [49]** 121/25 122/5 146/11 148/4 148/5 148/6 148/7 148/13 148/14 148/17 148/25 149/2 151/4 151/6 151/9 158/15 197/12 222/22 222/23 222/25 223/5 223/9 223/25 224/8 224/9 224/12 224/14 224/16 224/19 224/23 225/6 225/11 225/14 225/21 226/3 226/10 226/14 227/13 227/16 227/22 228/2 230/4 233/25 236/2 236/11 238/25 239/1 239/17 241/18
**Auburn/Craige [1]** 233/25

**audit [1]** 241/17
**August [2]** 232/9 233/12
**August 14th [1]** 233/12
**August 7th [1]** 232/9
**authored [1]** 75/3
**authorities [1]** 217/10
**authority [1]** 33/25
**authorization [7]** 171/10 171/15 184/4 185/6 186/8 186/19 186/24
**authorize [2]** 88/9 161/14
**authorized [4]** 100/23 119/20 183/15 187/2
**availability [1]** 224/7
**available [7]** 9/23 156/21 216/16 228/12 236/14 237/6 238/1
**Avenue [1]** 1/19
**avoid [2]** 199/4 242/22
**award [1]** 39/12
**aware [13]** 34/24 40/18 64/16 113/8 121/3 121/5 121/6 122/3 127/8 189/22 189/25 233/22 235/25
**away [2]** 30/18 33/25

## B

**B.1 [2]** 208/20 208/22
**bachelor [2]** 45/15 142/5
**back [55]** 17/18 20/17 26/10 30/4 31/15 32/4 32/25 35/19 56/1 59/17 60/4 60/18 60/22 62/11 63/5 69/2 81/16 84/5 85/25 86/24 89/15 89/17 94/10 98/5 98/25 106/23 109/8 122/9 124/19 128/3 128/6 131/1 134/2 134/7 137/9 138/21 157/11 173/23 185/21 190/22 198/7 199/16 199/24 204/18 205/17 209/23 212/15 217/22 219/15 219/18 222/3 226/17 229/17 229/22 230/15
**backfill [1]** 167/23
**background [5]** 45/14 142/3 142/9 144/4 145/2
**balance [1]** 152/18
**ball [1]** 228/17
**Ballaron [1]** 170/2
**Baltzley [15]** 73/22 77/11 79/21 80/8 91/13 91/15 91/23 92/12 98/5 120/13 137/21 201/9 201/10 201/22 202/21
**bankruptcy [5]** 8/25

9/6 35/16 35/18 40/21
**barrels [2]** 166/18 185/2
**based [21]** 11/1 19/6 19/8 30/17 48/15 63/9 64/8 81/16 99/21 100/14 112/3 151/14 157/1 168/25 170/22 199/16 199/16 205/2 210/9 211/22 216/7
**basically [8]** 143/6 155/1 174/10 192/13 208/10 228/4 229/15 234/1
**basics [1]** 32/4
**Basin [1]** 191/4
**basis [9]** 10/25 14/15 18/2 62/4 118/1 152/7 194/20 194/25 200/18
**be [262]**
**became [2]** 230/23 233/22
**because [72]** 6/24 8/2 8/24 15/6 16/11 17/1 17/13 17/13 18/10 18/15 19/24 21/6 21/24 24/10 26/19 29/1 29/3 31/25 33/7 34/2 34/13 35/14 36/3 38/20 50/5 50/8 51/1 60/25 63/13 63/14 66/4 84/1 88/3 123/7 124/3 126/7 128/17 130/15 132/16 132/20 136/22 137/5 140/8 140/20 144/4 163/17 173/16 174/9 175/13 183/6 184/11 185/9 186/22 191/3 197/13 212/15 214/14 221/9 222/7 222/20 224/11 224/21 225/12 225/18 228/11 232/3 233/17 236/2 236/11 237/15 239/10 242/5
**become [4]** 123/15 232/20 232/23 233/9
**becoming [2]** 123/16 242/22
**been [95]** 5/9 8/3 8/24 9/7 14/6 15/2 15/10 15/11 18/14 18/15 22/9 34/2 34/3 35/19 36/5 38/20 41/5 43/2 46/25 47/10 47/14 47/21 47/25 48/1 48/5 48/21 49/19 49/20 51/4 53/2 56/4 57/17 66/10 66/11 66/15 66/22 66/25 69/17 74/24 76/14 78/5 86/10 87/20 89/23 95/2 105/15 107/16 108/4 108/7 108/22 109/12 112/6 112/9 115/12 120/1 122/6 122/9

122/17 124/16 126/7 128/2 128/6 132/8 139/23 141/13 142/15 146/9 146/9 149/17 154/8 160/1 160/12 165/11 175/21 184/1 184/1 197/12 197/20 197/24 198/4 201/11 203/22 205/14 218/16 221/6 225/16 233/10 233/18 235/23 238/1 238/5 240/11 243/24 244/2 245/10
**before [61]** 1/10 7/13 8/1 8/20 8/22 9/10 13/25 14/10 17/22 30/21 34/25 35/11 35/17 36/17 36/22 39/24 42/19 46/25 48/6 51/14 54/3 60/3 61/13 67/1 78/25 81/18 82/10 86/5 95/9 99/9 103/19 104/5 105/9 109/8 112/1 113/19 117/7 121/22 123/5 123/7 124/8 130/10 153/6 156/2 159/2 159/18 163/6 168/20 178/10 185/16 187/13 189/2 189/4 204/20 205/13 215/1 220/12 221/2 243/21 243/23 244/3
**began [4]** 63/16 99/3 121/25 208/18
**begin [12]** 5/6 36/23 38/23 47/22 94/5 122/4 123/19 153/24 227/19 227/20 243/6 243/18
**beginning [12]** 6/14 68/5 90/15 109/22 132/23 134/9 153/10 168/12 212/1 216/2 234/11 243/10
**behalf [19]** 5/8 15/21 22/7 31/19 43/2 87/24 105/17 141/13 161/12 174/18 179/8 179/25 187/18 195/5 216/18 234/2 236/18 237/24 239/12
**behave [1]** 21/1
**behind [1]** 240/24
**being [19]** 17/15 28/4 28/18 30/6 30/16 34/16 39/12 40/25 48/13 54/1 111/7 139/14 139/21 148/8 190/20 199/19 200/23 223/6 239/19
**belabor [1]** 131/7
**believe [40]** 11/2 11/13 14/18 18/15 18/18 20/21 25/12 27/13 30/20 30/21 31/6 41/19 48/16 51/12 56/14

(5) article... - believe

# B

**believe... [25]** 57/23
58/21 59/10 62/21
64/12 65/9 65/21 79/22
92/1 94/11 96/13
110/15 110/16 110/19
117/1 127/3 164/6
171/13 171/14 187/15
199/8 201/8 201/11
214/16 216/25
**believed [2]** 66/7 214/5
**believes [2]** 76/9
119/25
**below [1]** 57/3
**bench [1]** 190/4
**benefit [3]** 152/24
200/6 201/2
**benefits [6]** 51/11
52/24 61/6 61/14
152/23 236/12
**benign [1]** 30/18
**Bennington [1]** 28/17
**best [5]** 95/11 147/22
220/8 223/16 243/7
**better [5]** 61/5 83/6
96/1 222/24 223/5
**between [33]** 32/18
33/4 33/5 47/6 47/20
50/15 69/7 72/9 86/15
92/25 105/3 105/16
105/22 106/12 118/4
121/21 121/24 143/2
145/16 159/19 171/20
174/19 178/17 189/20
189/23 193/9 195/21
196/3 219/12 219/16
219/25 234/8 240/12
**beyond [6]** 14/18
120/18 121/8 121/17
212/7 217/20
**bifurcate [1]** 10/14
**big [3]** 49/13 51/6
64/20
**bigger [3]** 10/21 144/15
214/3
**bill [4]** 189/20 189/22
189/23 189/25
**binder [8]** 66/23 96/2
96/3 96/7 108/23
128/13 128/13 174/12
**binders [2]** 43/5 91/4
**bit [11]** 7/14 12/20
44/15 69/6 92/3 94/8
114/11 139/9 142/2
142/8 243/6
**BKV [1]** 155/4
**blank [3]** 1/21 5/9
101/20
**blow [1]** 172/1
**board [1]** 100/15
**boil [2]** 29/6 29/15
**boils [1]** 29/15
**bond [9]** 6/21 41/6 41/7
41/11 41/19 41/24 42/2
42/7 241/12
**book [1]** 118/21
**boots [5]** 156/5 156/17
213/3 214/2 214/12
**both [14]** 7/5 12/15
42/10 51/7 113/12
151/15 159/21 160/17
178/23 186/15 192/5
195/13 196/5 231/13
**bottom [14]** 26/22
54/22 68/20 68/21
129/25 152/22 164/8
197/6 204/1 223/23
231/16 233/11 233/19
234/16
**bought [1]** 46/7
**bound [1]** 146/10
**boundary [6]** 146/11
148/25 158/16 164/2
164/14 167/12
**bow [1]** 186/13
**box [3]** 7/15 42/18
234/23
**boxes [1]** 158/6
**Bradford [2]** 172/15
172/17
**Branch [2]** 187/24
198/25
**breach [4]** 8/23 9/5
163/15 197/4
**break [8]** 124/4 204/12
204/21 205/9 240/12
240/12 242/13 243/21
**brevity [1]** 161/1
**brief [12]** 6/23 8/3 8/4
8/17 21/18 41/21 41/25
45/19 90/14 130/11
204/20 240/12
**briefly [5]** 210/21 218/6
218/8 236/7 241/16
**briefs [1]** 23/17
**Brier [7]** 2/2 2/4 5/18
37/17 39/24 41/21
240/8
**bring [7]** 82/23 85/13
143/6 183/6 222/22
225/13 235/8
**bringing [4]** 40/20
64/20 223/7 226/8
**brought [7]** 12/22 13/4
30/21 87/8 139/24
205/14 230/11
**budget [1]** 228/13
**budgeted [1]** 228/8
**budgeting [1]** 225/19
**build [4]** 64/19 166/20
199/24 200/10
**building [1]** 154/7
**built [3]** 64/17 200/4
200/7
**bunch [2]** 52/11 137/13
**burden [2]** 200/8 214/3
**business [24]** 43/22
43/24 44/10 45/16
46/12 46/17 46/18 54/9
73/9 75/9 76/24 83/20
107/1 142/12 144/8
145/12 151/8 162/16
176/7 180/6 181/14
196/1 196/1 242/7
**businesses [1]** 108/8
**busy [1]** 47/22

# C

**C-L-A-N-T-O-N [1]**
141/18
**Cabot [5]** 155/3 174/18
174/19 175/1 175/13
**calculate [2]** 209/9
239/18
**calculation [1]** 211/24
**calendar [1]** 66/12
**call [17]** 7/21 7/24 9/12
11/13 42/13 42/15
49/25 94/21 139/8
141/6 143/1 146/11
156/18 160/3 166/21
232/17 242/21
**called [8]** 43/2 43/16
44/25 109/23 137/21
141/13 142/24 144/15
**calling [1]** 195/4
**calls [6]** 48/13 49/12
61/20 62/3 84/16 141/7
**came [10]** 5/11 5/23
35/15 47/5 68/25 69/1
100/15 177/25 226/12
236/14
**can [238]** 7/12 7/17
8/15 13/2 13/4 18/6
19/4 19/11 20/22 21/25
21/25 22/18 23/13
23/24 26/18 30/10 36/8
37/7 38/11 39/13 40/14
40/19 42/13 43/21
42/23 43/22 45/19 51/5
51/10 51/12 51/15 52/6
52/8 52/10 53/7 53/12
56/6 57/23 58/4 58/10
58/22 60/2 63/20 65/9
66/22 69/2 70/8 71/22
72/1 72/10 76/9 76/12
78/21 79/21 79/25
80/17 81/3 85/25 86/6
86/7 88/17 91/2 96/2
96/8 96/18 96/19 97/1
97/10 100/19 100/21
104/2 104/13 104/20
111/5 111/15 114/21
115/15 116/9 119/15
120/7 120/19 121/24
122/3 124/2 126/9
129/3 129/8 129/14
132/5 135/21 135/23
135/24 136/22 137/23
139/4 139/9 139/24
142/8 143/19 145/16
146/5 147/18 148/10
148/2 150/10 150/18
150/22 152/6 153/13
157/13 158/21 158/23
159/1 159/6 159/24
162/9 163/24 164/10
165/21 166/12 166/19
166/22 166/22 167/2
167/6 167/25 168/3
168/7 168/10 168/14
169/11 169/23 170/4
170/17 171/19 172/1
172/2 172/22 173/22
173/24 175/16 175/19
176/24 178/13 179/12
179/17 180/16 180/23
182/19 183/6 184/23
185/2 185/20 186/3
186/13 186/14 187/6
187/7 187/10 188/12
192/9 192/18 193/8
194/1 194/9 194/22
195/3 196/22 198/7
200/21 201/12 201/17
202/15 202/18 203/9
204/7 204/14 204/17
204/18 205/22 206/11
207/18 207/18 208/1
208/24 208/24 209/14
209/14 210/15 210/21
210/25 211/5 211/6
214/10 214/11 214/11
214/20 214/25 215/8
215/8 215/14 215/14
216/5 216/6 216/6
216/7 217/3 218/14
219/8 220/9 222/17
223/18 223/23 224/15
225/25 229/8 229/13
229/19 230/11 230/18
231/15 233/19 235/10
235/12 235/19 235/19
236/4 236/7 238/3
238/21 239/18 239/21
239/25 240/7 240/16
242/8 242/18 243/15
**can't [21]** 5/21 12/1
12/5 12/7 19/12 22/22
24/5 24/7 25/7 25/7
25/7 25/21 27/7 27/14
66/20 131/5 200/6
200/23 209/3 222/7
243/25
**Canada [1]** 45/22
**Canadian [1]** 73/22
**cannot [4]** 119/15
199/17 239/24 240/21
**capable [4]** 59/18
154/3 161/18 161/19
**capacity [4]** 137/1
138/19 157/3 159/23
**capital [16]** 48/10
48/11 48/12 48/13
52/22 53/1 53/6 68/9
135/6 135/9 135/11
148/2 150/10 150/18
150/22 152/6 153/13
157/13 158/21 158/23
159/1 159/6 159/24
162/9 163/24 164/10
165/21 166/12 166/12
166/22 166/22 167/2
167/6 167/25 168/3
168/7 168/10 168/14
169/11 169/23 170/4
170/17 171/19 172/1
172/2 172/22 173/22
173/24 175/16 175/19
176/24 178/13 179/12
179/17 180/16 180/23
182/19 183/6 184/23
185/2 185/20 186/3
186/13 186/14 187/6
187/7 187/10 188/12
192/9 192/18 193/8
194/1 194/9 194/22
195/3 196/22 198/7
200/21 201/12 201/17
202/15 202/18 203/9
204/7 204/14 204/17
204/18 205/22 206/11
207/18 207/18 208/1
208/24 208/24 209/14
209/14 210/15 210/21
210/25 211/5 211/6
214/10 214/11 214/11
214/20 214/25 215/8
215/8 215/14 215/14
216/5 216/6 216/6
216/7 217/3 218/14
219/8 220/9 222/17
223/18 223/23 224/15
225/25 229/8 229/13
229/19 230/11 230/18
231/15 233/19 235/10
235/12 235/19 235/19
236/4 236/7 238/3
238/21 239/18 239/21
239/25 240/7 240/16
242/8 242/18 243/15

**208/20 208/22 225/20**
228/8 228/13
**captioned [2]** 74/4
77/15
**capture [4]** 24/16 35/24
231/3 239/11
**captures [1]** 166/4
**care [1]** 13/3
**career [6]** 50/12 72/4
142/15 157/9 160/7
160/8
**carefully [1]** 39/14
110/23
**carry [2]** 71/2 105/16
**carrying [2]** 16/8
228/17
**carve [1]** 19/9
**carved [1]** 20/5
**case [61]** 5/2 6/19 7/22
8/10 8/13 8/14 8/20
8/25 9/7 9/16 10/7
13/23 14/11 15/25 19/6
19/15 20/5 26/20 28/11
29/4 29/6 33/5 36/10
51/20 52/4 52/15 53/25
56/11 61/11 62/19 66/3
95/7 96/11 98/2 98/19
99/9 100/4 101/4 109/7
117/3 117/8 117/22
118/8 119/23 119/24
126/12 137/2 145/21
146/22 151/3 154/3
160/12 169/20 203/3
210/7 235/4 241/25
242/12 242/15 242/17
243/21
**cases [3]** 61/7 154/11
156/23
**cast [1]** 102/13
**catastrophic [1]** 25/8
**catch [1]** 178/5
**cause [3]** 36/9 94/12
245/9
**causing [1]** 25/8
**CEO [8]** 6/20 43/17
46/20 48/6 71/1 99/11
156/6 206/5
**certain [16]** 47/24
72/15 72/17 73/17
74/16 96/14 119/14
127/18 131/8 131/20
131/25 147/4 165/10
172/16 205/3 239/5
**certainly [6]** 6/25 7/2
13/5 13/11 25/23 39/5
41/13 70/11 129/5
147/9 204/14 205/7
221/18
**certificate [2]** 245/1
245/22
**certify [2]** 245/6 245/10
**certifying [1]** 245/23
**cetera [2]** 59/1 172/6
**CFO [2]** 241/10 241/11

# C

**chain [1]** 131/5
**chair [2]** 42/19 141/9
**challenges [1]** 154/15
**challenging [2]** 11/16 24/24
**change [3]** 33/13 34/16 218/3
**changed [2]** 32/8 123/13
**characterization [2]** 105/13 235/2
**characterizing [1]** 227/12
**charge [1]** 199/24
**charged [1]** 86/10
**Charlottesville [1]** 1/22
**check [3]** 224/6 229/1 234/23
**checked [1]** 37/8
**checking [1]** 229/22
**chemical [1]** 45/15
**Chesapeake [238]** 1/6 5/3 14/4 16/6 16/7 16/11 16/12 16/14 16/18 16/21 16/24 17/1 17/8 17/19 18/3 18/11 19/16 21/2 21/3 21/7 21/15 21/21 22/1 22/12 22/14 22/16 23/14 23/14 25/20 26/7 26/13 27/8 28/8 28/23 29/1 29/4 29/10 31/3 31/13 31/18 31/25 32/5 32/17 33/17 33/24 34/19 35/14 37/5 41/23 45/10 46/21 46/25 47/7 47/10 47/15 47/18 47/21 48/4 48/24 49/5 49/23 50/4 52/15 55/9 66/15 67/4 67/21 68/6 68/11 70/16 72/9 72/17 72/20 72/25 73/24 74/3 75/3 76/1 76/9 76/10 76/14 77/9 77/14 77/19 77/22 78/1 78/4 78/9 81/5 82/6 82/12 82/14 84/1 84/6 84/11 84/24 85/3 85/21 87/22 87/24 88/2 88/6 88/20 88/24 89/8 90/3 90/24 91/10 92/13 92/19 93/2 93/6 93/9 93/17 93/22 93/23 94/1 94/6 94/12 94/17 94/23 95/15 97/15 109/16 109/24 109/25 110/6 110/22 111/4 111/6 111/8 111/17 112/11 113/6 113/8 113/10 113/21 115/2 116/16 116/23 117/23 118/4 118/5 121/21 121/24 122/4 122/18 123/21 125/17 127/11 127/19
128/3 128/6 128/13 131/18 133/14 133/18 137/3 144/24 148/16 151/7 151/11 153/25 158/18 159/20 162/3 162/4 162/5 163/12 163/17 169/17 171/5 171/8 171/21 172/2 172/3 175/24 175/25 183/3 184/4 187/21 187/25 188/5 188/17 188/23 189/8 189/9 189/12 189/20 189/23 191/23 192/15 194/8 194/14 194/21 195/5 195/17 195/21 196/8 197/13 197/15 198/11 199/19 199/22 200/13 207/3 207/12 211/1 219/16 219/17 219/25 219/25 222/24 224/4 225/22 227/5 227/9 227/14 227/22 228/6 228/7 228/10 228/15 230/23 231/2 231/11 231/11 231/12 233/6 234/2 235/22 236/14 236/20 236/22 237/7 237/12 237/21 238/9
**Chesapeake's [20]** 17/12 19/8 62/19 62/22 62/24 148/14 163/11 168/22 171/1 183/22 185/4 187/4 187/12 189/10 191/20 196/13 196/25 197/2 199/25 223/4
**Chesapeake-permitted [1]** 112/11
**chief [11]** 6/19 6/20 6/21 30/23 101/22 103/10 103/25 142/1 242/12 242/15 242/17
**choose [3]** 70/23 226/19 238/4
**chosen [1]** 83/1
**Chris [14]** 92/2 93/20 94/10 95/4 98/5 102/15 108/25 114/22 115/3 116/7 120/4 131/11 131/14 132/5
**circle [1]** 168/11
**Circuit [1]** 28/17
**circumstance [1]** 16/22
**circumstances [4]** 22/20 36/9 40/25 72/10
**cite [2]** 37/24 97/23
**cited [3]** 98/2 98/3 181/2
**City [3]** 225/3 225/11 226/12
**claim [12]** 8/18 8/21 8/23 9/2 9/3 9/4 9/5
9/10 30/10 38/19 40/20 200/4
**claiming [1]** 200/16
**claims [1]** 201/2
**CLANTON [17]** 3/11 6/20 30/23 31/4 71/1 117/6 119/21 141/7 141/12 141/18 141/23 185/17 187/6 194/1 222/17 235/17 240/18
**Clanton's [1]** 205/7
**clarification [1]** 77/7
**clarify [2]** 199/9 208/24
**clarity [1]** 78/2
**clause [1]** 21/19
**clean [1]** 44/14
**clear [32]** 8/11 13/8 14/14 28/15 32/12 34/6 34/6 34/11 40/8 57/23 62/7 70/10 74/14 77/9 92/13 99/4 114/23 124/9 126/9 126/12 132/8 155/9 179/17 181/6 188/24 191/9 191/15 198/3 202/9 208/17 208/21 225/22
**clearly [3]** 11/1 11/7 60/21
**client [3]** 179/18 179/25 180/1
**clients [1]** 156/10
**clock [6]** 28/6 28/7 35/15 35/18 230/1 238/24
**close [10]** 111/6 111/12 118/7 127/9 132/21 132/22 133/20 183/11 204/23 242/7
**closed [4]** 111/8 127/24 128/1 132/13
**closer [1]** 85/15
**closing [2]** 7/6 10/6
**closure [1]** 132/14
**co [27]** 18/12 18/13 82/17 83/25 84/7 84/8 84/11 84/22 84/23 85/10 85/21 110/12 110/17 117/24 118/2 118/10 148/8 166/6 166/13 195/22 196/6 197/8 199/17 199/21 232/20 232/23 233/9
**co-mingle [2]** 199/17 199/21
**co-own [1]** 84/11
**co-owned [15]** 18/12 18/13 82/17 83/25 84/7 84/8 84/23 85/21 110/12 110/17 148/8 166/6 166/13 196/6 197/8
**co-owner [1]** 195/22
**co-ownership [4]** 84/22 85/10 118/2
118/10
**co-owns [1]** 117/24
**co-permittee [2]** 232/20 232/23
**co-permittees [1]** 233/9
**Code [2]** 37/24 245/6
**coincide [1]** 48/12
**coincidently [2]** 44/22 206/16
**Cole's [1]** 53/17
**collaborate [1]** 122/7
**collaboration [1]** 123/1
**collaborative [1]** 122/22
**colleague [3]** 5/9 32/13 220/15
**colleague's [1]** 28/22
**colleagues [1]** 5/19
**collected [1]** 52/1
**collective [1]** 160/18
**collectively [4]** 16/2 16/9 48/2 174/7
**collision [1]** 108/4
**color [1]** 149/20
**Colorado [1]** 45/17
**combined [5]** 156/15 183/14 184/3 184/4 186/16
**come [31]** 9/15 9/21 10/10 10/17 14/21 23/19 26/18 28/9 28/25 30/7 30/10 31/23 34/22 35/6 35/11 36/10 39/18 42/17 42/18 56/9 94/23 137/5 138/21 140/6 152/20 167/5 167/6 222/3 222/6 223/14 242/8
**comes [4]** 15/11 152/20 167/20 167/22
**comfortable [4]** 9/22 42/21 42/23 243/5
**comforted [1]** 196/2
**coming [2]** 42/4 178/7
**commence [22]** 19/22 20/2 38/9 38/11 39/10 40/5 65/8 66/6 66/8 77/23 94/13 136/18 136/20 136/23 136/23 206/25 207/23 208/11 209/17 212/3 214/11 216/18
**commenced [3]** 39/20 64/6 94/5
**commencement [5]** 58/25 66/1 66/11 136/10 136/13
**commencing [1]** 80/11
**commensurate [1]** 41/20
**comment [2]** 25/2 26/9
**commercial [2]** 151/9 152/13
118/10
**co-owns [1]** 117/24
**commercially [2]** 159/15 159/16
**Commission [9]** 130/1 183/9 183/10 183/12 183/14 183/16 186/8 187/3 191/5
**commit [2]** 215/18 215/20
**commitment [19]** 8/9 10/25 22/21 132/24 133/1 193/10 194/5 194/7 194/20 194/25 195/4 195/15 197/13 199/18 199/22 217/6 233/23 234/1 234/19
**commitments [1]** 81/17
**committed [1]** 224/22
**common [7]** 18/20 18/21 18/23 48/18 126/24 138/23 148/25
**commonplace [1]** 139/13
**Commonwealth [1]** 36/15
**communicate [2]** 47/17 242/5
**communicating [3]** 227/20 231/20 232/10
**communication [2]** 169/25 223/12
**communications [1]** 223/18
**companies [13]** 24/11 24/12 25/14 44/24 45/24 45/24 46/23 48/11 136/25 139/7 155/21 174/21 223/12
**company [18]** 44/25 45/23 46/1 46/2 46/8 46/10 47/1 47/23 48/15 99/4 100/8 109/23 130/23 143/13 143/13 143/18 194/16 236/12
**compare [2]** 144/22 168/22
**compared [1]** 154/13
**comparing [1]** 38/10
**compete [1]** 24/15
**competing [3]** 24/12 24/14 24/23
**competition [1]** 145/8
**competitor [1]** 139/15
**complaint [46]** 8/24 78/22 78/25 79/2 79/4 79/10 79/20 80/6 80/10 91/15 95/6 95/7 95/14 95/21 95/22 96/4 96/7 96/11 96/17 97/2 97/7 98/6 109/2 109/8 109/15 109/19 109/22 110/11 117/8 117/10 117/15 118/3 118/8 121/20 121/22 127/3

# C

**complaint... [10]** 127/4
127/7 131/12 132/10
133/13 133/21 202/3
219/9 219/11 222/13
**complete [10]** 30/3
36/16 56/1 59/20 60/3
60/5 86/24 98/25
154/10 217/12
**completed [3]** 59/17
136/24 239/9
**completely [4]** 113/20
126/24 154/16 200/10
**completing [3]** 60/9
60/15 161/20
**completion [12]** 80/22
85/11 142/11 154/8
154/12 160/5 166/7
166/17 166/23 167/3
179/5 179/22
**compliant [4]** 98/1
144/12 170/24 195/6
**complied [2]** 36/23
37/11
**component [8]** 18/10
23/1 85/18 86/22
151/16 152/2 152/3
239/3
**components [2]**
126/22 139/24
**comprehensive [1]**
42/10
**compressed [1]**
242/21
**compressor [3]** 44/14
44/19 148/6
**computer [1]** 179/23
**concept [2]** 14/10
24/10
**concepts [1]** 228/15
**concern [2]** 94/25
238/1
**concerned [2]** 134/11
242/5
**concerns [2]** 94/18
94/21
**conclude [7]** 124/7
205/7 205/8 242/7
242/12 242/18 243/21
**concluded [2]** 90/19
242/17
**conclusion [3]** 27/16
61/21 84/17
**concurrent [2]** 34/23
35/6
**condition [1]** 113/16
**conditioned [1]** 34/7
**conditions [3]** 61/12
64/25 195/20
**conduct [11]** 16/19
34/22 35/2 35/6 59/22
90/9 90/25 92/20 105/4
153/14 195/10
**conducted [2]** 3/13 8/5

**conducting [2]** 35/2
213/3
**coned [1]** 166/11
**confer [5]** 90/18 114/2
134/2 240/21 243/25
**conferred [7]** 110/19
111/7 112/15 112/18
116/15 116/17 171/5
**confers [1]** 130/1
**confess [1]** 21/13
**confident [3]** 157/12
242/18 243/20
**confirm [7]** 6/8 81/5
101/2 101/24 165/8
169/20 201/13
**confirmation [1]**
170/19
**confirms [2]** 32/17
170/17
**conform [1]** 8/15
**confusing [2]** 83/12
184/12
**confusion [1]** 116/9
**conjunction [6]** 47/10
78/23 88/13 88/21
95/18 97/18
**connect [1]** 151/1
**connection [5]** 73/18
144/2 144/7 174/4
210/8
**connotates [1]** 190/25
**consent [37]** 18/24
19/11 19/12 19/21
20/18 20/23 21/3 21/6
21/9 48/14 49/25 50/17
52/5 52/10 52/17 56/15
56/17 58/22 61/5 61/16
62/22 66/16 67/16
67/22 68/17 74/3 74/7
75/22 77/22 81/5 82/12
102/7 132/19 135/3
135/7 236/17 236/17
**consented [8]** 21/4
48/19 52/2 77/25 83/7
101/13 101/15 216/17
**consenting [72]** 17/5
18/5 19/2 19/3 19/4
19/20 19/25 20/1 20/13
20/14 20/15 21/24 22/2
26/14 31/19 50/5 50/9
53/2 53/5 56/21 56/23
56/23 56/25 57/1 57/7
57/24 58/18 59/19
59/24 60/3 61/10 61/13
61/19 61/25 63/11 66/3
68/7 68/18 69/9 71/2
71/4 71/5 71/9 71/24
72/5 78/4 82/23 82/25
83/1 83/4 83/5 83/5
83/13 86/5 86/9 86/11
87/25 95/17 97/17
100/25 100/25 135/8
154/2 200/8 201/4
206/15 206/23 207/3

236/18 236/21 237/24
238/13
**consents [2]** 52/13
52/25
**consider [6]** 8/1 9/9
51/22 80/14 139/17
228/13
**consideration [8]**
22/24 33/6 126/1 126/6
227/5 227/9 228/3
228/11
**considering [1]** 51/17
**consistent [5]** 25/17
75/25 75/25 192/7
207/16
**consistently [1]** 229/25
**consolidated [11]**
113/13 182/11 182/12
183/13 183/20 184/5
184/5 184/19 184/21
185/4 187/5
**consolidation [2]**
113/15 184/17
**constitutes [3]** 98/21
98/24 190/16
**constitution [1]** 33/2
33/4 34/3
**constraint [1]** 123/10
**constructed [1]** 84/3
**constructing [2]** 49/11
199/5
**construction [3]** 35/5
154/22 154/25 155/23
**constructive [1]**
122/22
**construe [2]** 117/17
196/25
**consultants [3]** 156/18
156/21 156/23
**consulting [2]** 45/23
156/7
**consumptive [3]**
195/14 197/18 234/4
**contained [4]** 55/6 93/4
197/1 215/4
**containment [1]**
166/21
**contemplate [1]** 60/16
**contemplated [2]**
26/13 26/15
**contemplates [3]** 59/6
89/14 93/21
**contemplation [1]**
128/8
**contemporaneous [2]**
99/17 100/2
**contend [4]** 93/5 98/19
98/21 98/24
**contends [2]** 116/15
116/16
**contested [2]** 117/22
169/8
**context [4]** 114/3 207/7
207/11 235/4

**continue [8]** 17/9 40/14
46/7 125/14 126/10
151/23 222/21 225/13
**continued [3]** 2/1
222/21 238/25
**continues [2]** 77/21
197/15
**continuing [3]** 135/1
224/14 224/18
**contract [21]** 8/23 9/5
32/8 54/1 55/22 63/9
63/18 64/4 74/10 74/11
74/12 92/20 92/21
105/11 173/12 179/4
191/25 191/25 204/8
210/4 210/10
**contractor [6]** 55/4
55/12 105/10 105/12
155/5 159/22
**contractors [1]** 25/16
**contractually [1]**
215/18
**contrary [1]** 191/20
**contribute [5]** 16/15
52/18 52/25 53/1 56/10
**contributed [4]** 48/13
51/2 133/4 146/7
**contributing [1]** 52/22
**contribution [1]** 242/9
**control [12]** 27/9 50/24
55/4 83/22 92/21
155/13 157/2 201/3
232/16 232/24 233/8
245/23
**controls [1]** 33/22
**convene [1]** 5/1 6/6
225/4
**convened [1]** 225/2
**conversation [2]** 114/9
224/7
**conversations [1]**
100/10
**convert [1]** 35/4
**convey [2]** 173/20
237/14
**conveyance [3]** 172/24
188/18 188/19
**conveyances [1]** 174/9
**conveyed [12]** 128/2
128/3 128/6 128/6
129/21 171/11 172/2
172/4 172/9 175/24
175/25 188/18
**conveying [1]** 189/16
**COO [1]** 145/7
**cooperate [21]** 18/5
18/12 21/21 22/14
22/17 22/19 23/3 23/5
27/13 33/17 33/21 34/6
34/22 82/14 88/21
88/24 163/18 200/14
200/19 200/22 236/23
**cooperation [19]** 18/8
18/9 21/16 27/1 27/6

27/12 82/16 83/24 84/4
89/1 89/4 89/16 123/21
163/20 199/25 214/18
219/17 231/21 235/7
**cooperative [1]** 200/23
**cooperatively [1]**
225/4
**coordinate [1]** 27/5
**coordinates [8]** 168/8
169/12 169/16 169/21
169/22 170/20 170/24
171/3
**copied [2]** 170/5
233/15
**copies [8]** 12/22 12/23
12/25 13/4 43/5 91/5
96/18 97/7
**copy [26]** 54/3 54/5
67/3 67/6 73/2 73/5
75/2 75/5 75/8 75/17
76/13 76/17 76/20
76/23 78/22 78/25 79/4
79/9 96/21 96/24
118/19 170/8 174/16
178/17 190/4 221/9
**core [2]** 174/21 174/22
**corner [1]** 187/17
**corollary [1]** 52/23
**corporation [1]** 134/11
**correct [81]** 24/3 38/4
54/5 57/18 61/2 62/6
62/23 63/25 64/6 64/7
64/10 66/10 69/13
69/15 79/4 79/9 82/2
82/11 85/7 87/2 87/12
90/2 91/24 93/18 95/7
95/8 97/24 98/3 98/4
98/7 98/8 98/14 99/6
99/19 101/16 104/8
106/24 107/7 107/10
109/4 113/5 113/18
119/6 119/7 119/16
119/18 119/19 119/21
119/22 123/6 125/24
130/4 133/5 133/7
134/4 163/9 167/21
169/18 170/6 170/7
170/8 181/10 195/9
196/16 201/7 201/8
207/24 208/8 208/13
208/15 211/9 212/21
212/23 213/13 213/16
217/1 217/2 218/25
221/15 226/15 245/7
**corrected [1]** 132/16
**correctly [9]** 26/8 64/3
92/23 97/19 135/7
153/19 183/17 188/1
227/6
**correspondence [1]**
75/8
**cost [13]** 49/6 59/21
83/22 86/9 135/9 151/8
151/16 152/2 152/3

## C

**cost... [4]** 152/8 199/4 230/5 239/1
**costs [7]** 48/25 52/18 68/18 72/2 204/4 230/4 239/5
**could [59]** 6/14 7/1 11/4 11/24 11/25 24/23 43/8 50/4 50/8 50/21 50/25 51/3 60/17 66/8 66/10 66/10 71/13 83/1 83/5 83/8 84/7 85/24 86/5 88/3 92/3 94/13 94/16 96/1 103/25 105/25 115/8 115/13 120/6 122/2 124/23 136/15 141/10 153/8 158/13 174/12 176/15 185/19 204/21 207/20 215/23 215/23 220/14 221/21 222/2 223/3 228/8 232/8 234/2 236/17 236/17 236/18 241/7 242/1 243/6
**couldn't [5]** 17/21 33/12 33/13 82/23 231/11
**counsel [54]** 5/4 6/3 6/17 8/8 9/20 10/18 12/15 12/23 13/4 13/25 14/3 17/23 27/23 32/24 38/7 38/10 43/5 51/10 90/19 90/24 96/19 118/25 119/5 124/10 128/16 128/18 130/14 140/21 140/22 150/4 150/18 162/11 165/13 181/22 187/2 190/7 190/8 190/14 191/8 192/5 199/7 202/2 208/17 209/22 218/9 219/12 221/10 222/7 235/3 240/20 240/22 241/2 242/4 242/14
**counsel's [3]** 96/11 192/24 221/10
**count [4]** 9/5 79/20 79/21 79/24
**counter [2]** 178/4 178/23
**counter-parties [1]** 178/23
**counter-party [1]** 178/4
**counterpart [1]** 227/14
**counties [3]** 172/15 172/18 172/20
**country [2]** 44/16 143/10
**County [9]** 16/3 28/11 43/25 134/14 145/6 145/9 164/16 172/14 176/19
**couple [2]** 118/22

195/25
**course [14]** 7/12 34/2 54/9 72/4 73/9 75/9 76/24 78/7 142/15 160/7 162/15 176/6 180/6 181/13
**court [119]** 1/1 3/9 7/17 7/23 8/1 8/2 8/5 8/9 8/20 8/21 8/22 9/4 9/9 9/10 9/11 10/9 10/16 12/6 12/23 12/24 13/5 13/23 13/25 14/1 14/7 14/10 14/13 14/16 14/16 15/10 17/24 21/11 23/7 27/25 28/3 28/23 28/25 31/1 33/1 34/24 35/1 35/15 35/16 35/18 35/19 36/3 36/10 39/18 40/18 41/2 41/7 41/23 42/4 43/15 43/22 49/4 51/15 58/4 60/2 63/7 63/17 72/10 78/14 78/16 78/18 80/7 80/18 88/12 88/17 88/20 90/8 90/21 91/5 91/23 95/12 100/13 101/2 106/3 115/6 117/10 118/11 118/15 123/7 123/8 123/8 126/9 131/13 132/1 133/9 140/24 141/1 141/16 147/18 154/23 157/13 172/23 190/9 190/14 190/20 191/8 191/10 192/4 192/12 198/23 208/21 215/23 221/22 238/22 240/1 242/20 243/8 243/18 244/6 244/9 245/15 245/4 245/15 245/18 245/19
**Court's [9]** 9/19 9/23 14/4 14/5 14/19 125/24 140/12 222/4 243/2
**courthouse [1]** 17/22
**courtroom [5]** 5/24 6/7 7/13 13/13 192/9
**courts [1]** 23/18
**covered [4]** 121/15 121/16 134/2 203/15
**covers [1]** 142/11
**Craige [80]** 16/24 25/5 25/9 25/15 26/5 28/23 34/18 36/5 36/6 41/17 53/25 54/1 54/3 54/5 86/1 86/1 87/15 87/17 89/5 89/13 89/19 90/1 91/20 101/7 101/23 102/7 102/25 103/25 104/16 108/1 126/17 136/12 137/16 137/19 137/21 138/3 138/5 138/9 138/13 138/16 139/19 139/21 153/16 160/25 161/16 164/1

164/2 164/10 164/11 164/13 164/14 164/15 164/16 164/17 164/18 164/19 164/21 165/2 165/12 165/14 167/9 174/17 174/17 174/17 175/4 176/3 176/21 177/17 177/17 195/15 199/2 201/9 203/5 211/1 227/2 231/2 233/25 234/5 239/7 241/18
**Craiges [1]** 177/18
**crazy [1]** 51/1
**create [4]** 30/15 35/13 36/9 214/3
**created [14]** 31/2 31/2 39/19 149/9 149/18 150/1 150/5 150/6 150/7 150/10 150/12 157/18 157/21 164/4
**creates [4]** 33/11 34/23 62/21 153/14
**creation [2]** 149/19 149/23
**creek [37]** 49/9 84/15 84/21 84/23 85/4 110/6 110/21 110/25 111/18 112/6 112/22 113/4 128/5 128/22 133/15 167/7 167/20 167/24 168/5 168/6 168/19 168/21 168/23 169/4 169/7 169/9 171/6 171/19 178/10 181/1 184/1 187/24 187/24 187/25 194/5 199/1 199/13
**crescendo [1]** 235/6
**criteria [2]** 157/1 161/17
**critical [3]** 18/10 123/17 123/18
**Croix [1]** 28/18
**cross [16]** 3/6 3/13 7/2 14/2 90/15 90/18 90/25 91/3 91/8 129/19 165/11 169/11 205/1 240/8 240/12 240/20
**cross-examination [7]** 7/2 90/15 90/25 91/3 129/19 165/21 240/8
**cross-examine [1]** 169/11
**cross-examined [1]** 240/20
**crossings [1]** 49/10
**CRR [5]** 1/14 245/3 245/13 245/14 245/18
**cubic [1]** 34/18
**culminating [2]** 219/19 235/5
**curative [1]** 217/12
**cure [1]** 94/24

**curiosity [1]** 80/10
**current [20]** 52/9 87/8 89/15 115/2 116/23 116/24 116/25 117/23 118/5 118/6 139/19 143/25 151/15 160/2 160/15 168/20 171/1 171/8 185/10 239/16
**current-generation [1]** 143/25
**currently [11]** 90/15 106/4 107/5 128/13 138/8 138/12 154/24 155/16 181/11 204/16 239/9
**customary [2]** 56/2 57/14
**customer [1]** 179/2
**customers [1]** 142/25
**CV [1]** 1/4

## D

**daily [1]** 184/6
**damage [2]** 26/6 240/1
**damages [2]** 24/24 238/21
**Dan [4]** 5/18 187/17 187/18 187/19
**danger [1]** 153/15
**dangerous [1]** 26/19
**Daniel [2]** 2/2 190/3
**data [4]** 154/16 157/4 179/21 179/22
**database [1]** 170/23
**date [43]** 1/13 38/18 38/22 40/5 40/11 40/12 66/1 66/11 103/4 103/6 103/7 103/18 109/5 116/25 136/10 136/13 136/14 137/9 164/6 164/7 171/22 175/6 176/22 176/23 181/4 182/6 182/17 182/25 185/22 194/15 194/16 211/18 211/21 211/22 213/11 213/14 213/25 214/13 214/21 216/13 216/14 217/6 245/9
**dated [24]** 38/18 40/10 72/24 74/24 76/14 100/5 103/3 109/25 170/4 187/20 193/15 218/24 219/2 223/24 226/22 228/19 229/10 229/20 230/13 230/16 232/9 233/12 234/12 236/5
**dates [2]** 66/21 245/9
**David [1]** 178/21
**day [51]** 3/13 7/1 7/4 11/21 20/6 27/9 27/9 34/19 38/19 39/9 55/9 55/9 65/4 66/12 111/9 113/4 119/25 120/14

120/19 121/14 121/14 185/2 185/3 185/5 185/6 185/7 185/18 185/25 186/7 186/19 186/23 198/25 205/8 210/15 211/25 212/7 212/10 212/10 212/12 212/15 212/20 214/9 214/24 215/9 215/10 215/12 215/13 216/8 217/20 240/24 244/3
**days [47]** 6/8 6/9 6/10 14/24 19/22 20/2 35/3 35/5 36/12 36/17 36/22 38/2 38/3 38/6 39/8 40/5 63/12 64/6 64/10 64/11 64/22 66/2 66/7 66/10 66/11 80/11 94/23 116/17 120/2 136/16 136/19 136/21 191/5 209/20 212/2 212/6 212/7 212/8 213/14 216/11 216/15 216/19 216/24 217/8 217/21 218/5 242/6
**deadline [4]** 66/9 213/25 217/24 218/4
**deal [5]** 111/5 111/7 111/8 132/20 132/22
**dealing [2]** 47/10 144/24
**Dear [1]** 187/21
**decade [2]** 107/8 190/18
**December [21]** 38/18 40/10 87/18 87/18 87/20 103/11 103/17 120/1 122/20 123/3 123/13 123/15 123/16 181/5 181/9 183/1 183/1 185/23 211/20 212/1 212/19
**December 14th [1]** 183/1
**December 2020 [1]** 103/11
**December 22 [1]** 40/10
**December 22nd [4]** 120/1 123/3 211/20 212/1
**December 22nd through [1]** 212/19
**December 4 [1]** 185/23
**December 4th [3]** 181/5 181/9 183/1
**December 8th [1]** 103/17
**deception [3]** 23/5 23/5 23/7
**decide [3]** 16/5 19/23 58/2
**decided [3]** 29/13 132/25 231/12
**decides [2]** 55/11

# D

**decides... [1]** 55/12
**decision [1]** 151/21
**declaration [8]** 53/17
190/3 190/9 190/13
190/16 192/4 192/6
192/16
**declaratory [2]** 8/18
9/2
**decline [3]** 72/20
236/19 236/19
**declined [5]** 15/4 17/20
72/22 207/5 236/20
**declines [2]** 95/16
97/16
**deemed [3]** 68/22 70/2
70/5
**deepen [4]** 56/1 66/4
86/24 98/25
**deepened [2]** 30/3
59/17
**deepening [1]** 80/14
**deeper [1]** 139/5
**Deer [1]** 187/25
**default [1]** 102/3
**defect [1]** 38/20
**Defendant [11]** 2/2
4/21 5/17 10/3 42/5
54/13 67/11 124/22
155/3 156/24 202/6
**Defendant's [15]** 12/14
102/17 102/21 108/15
108/17 108/20 115/11
118/13 124/22 127/2
128/18 129/11 202/5
202/8 202/11
**Defense [8]** 6/16 13/4
27/23 114/16 150/4
192/24 240/20 242/14
**defenses [1]** 8/16
**defined [3]** 30/4 30/5
196/2
**defining [1]** 30/2
**definitely [1]** 109/7
**degree [1]** 46/16
**delay [3]** 36/9 122/20
230/10
**deliberate [1]** 32/23
**delivered [1]** 215/17
**delivery [1]** 69/10
**demonstrate [3]** 27/17
161/11 191/19
**Dempsey [30]** 2/3 3/6
3/8 5/19 5/25 7/8 9/13
10/19 14/22 62/5 91/2
91/10 96/10 96/16
96/18 97/5 97/10
102/16 115/5 117/20
118/14 120/22 124/17
126/5 132/6 140/15
190/8 219/6 219/21
220/11
**denied [1]** 14/7
**deny [1]** 8/9

**DEP [17]** 26/22 26/23
36/22 37/9 39/20 39/22
160/24 161/2 161/4
161/12 161/17 195/13
231/25 232/14 233/5
233/10 233/17
**department [5]** 38/2
89/21 161/2 223/2
232/25
**depending [1]** 7/1
**depict [4]** 146/12 149/8
150/13 158/5
**depicted [2]** 147/17
149/2 157/20 158/16
164/24 165/3 168/10
**depiction [2]** 150/22
150/24
**depicts [6]** 157/23
158/14 165/14 166/2
169/6 169/9
**deplorable [1]** 90/7
**deputy [3]** 7/13 13/14
192/9
**derive [1]** 200/6
**describe [8]** 43/22
47/20 148/10 150/10
156/1 172/22 229/6
238/21
**described [5]** 40/11
159/21 160/6 173/8
174/6
**describes [3]** 54/18
55/1 65/7
**describing [1]** 61/23
**description [1]** 139/18
**designate [7]** 40/24
56/25 57/1 100/25
101/18 101/19 238/13
**designated [23]** 16/20
18/6 21/21 21/25 22/6
22/9 22/15 26/14 27/7
29/1 29/4 29/8 57/6
57/15 76/14 82/14
82/20 82/22 83/14
88/18 103/23 163/18
236/23
**designating [1]** 19/4
**designing [1]** 199/4
**desire [7]** 55/18 55/24
55/25 69/11 93/10
93/17 125/20
**desk [1]** 96/12
**detail [1]** 220/9
**detailed [1]** 137/12
**details [1]** 121/5
**determinating [1]**
52/11
**determination [1]** 63/1
**determine [2]** 51/24
52/6
**detriment [1]** 224/20
**develop [17]** 16/2
16/16 23/10 23/17
27/20 29/18 32/1 35/12

52/19 125/14 145/15
175/22 177/17 177/19
197/12 200/7 222/21
**developed [9]** 17/15
33/8 56/10 56/13
145/15 146/9 151/24
154/13 201/1
**developing [4]** 48/25
152/5 200/4 227/22
**development [57]**
29/13 36/1 45/25 55/17
55/23 80/25 121/25
122/5 143/7 144/15
145/11 152/11 152/21
152/25 160/4 166/8
200/3 200/5 200/6
200/12 201/5 222/24
222/25 223/4 223/8
223/13 223/14 223/15
223/25 224/14 224/18
224/24 225/5 225/12
225/23 226/3 227/2
227/16 228/2 228/4
229/2 230/3 230/6
230/7 230/23 230/25
231/1 233/25 236/2
236/3 236/10 236/11
238/14 238/25 239/4
239/5 239/17
**dialogue [1]** 231/22
**dictate [2]** 50/20 55/9
**did [142]** 7/25 10/24
11/2 12/11 21/3 43/18
45/23 46/7 46/9 46/13
47/3 47/9 48/8 48/8
48/23 49/1 49/2 49/3
49/21 49/24 50/4 50/7
59/22 63/22 63/22
66/18 67/3 67/5 67/24
69/2 69/3 69/5 70/18
70/19 70/20 70/23 71/5
72/14 72/17 72/20
72/21 73/2 74/20 74/22
75/2 76/17 78/8 78/12
78/25 81/8 81/12 81/25
82/6 82/8 82/10 83/4
83/24 84/11 84/23 85/3
85/9 87/22 87/24 88/2
88/9 96/13 99/17 99/18
101/22 104/15 110/6
110/9 111/11 111/25
113/15 118/7 121/21
122/4 123/15 124/9
127/9 127/16 127/17
127/23 131/19 131/21
132/17 133/18 133/19
133/20 133/21 134/1
134/4 134/5 135/7
136/20 142/21 143/11
143/16 143/21 144/7
144/9 144/21 145/2
153/19 153/20 161/4
166/11 169/15 169/20
175/1 177/7 177/14

177/17 179/3 179/6
183/17 183/18 184/9
188/1 188/2 188/6
188/21 191/3 192/14
192/20 193/17 193/18
194/12 194/18 196/7
205/15 210/12 211/24
214/2 214/3 214/13
227/6 227/7 233/4
233/5 237/12
**didn't [40]** 7/13 31/22
32/9 34/13 35/13 48/12
61/5 61/14 61/19 64/22
66/6 71/6 71/20 76/1
79/6 83/2 83/8 83/10
83/13 109/5 111/5
111/12 123/3 132/6
132/20 132/20 132/22
133/7 133/12 159/2
166/11 176/2 214/1
220/18 225/21 229/5
229/5 231/10 233/9
238/2
**die [2]** 17/13 23/24
**difference [1]** 203/10
**differences [1]** 159/19
**different [20]** 23/18
73/23 74/19 80/24
89/12 89/12 96/8 113/6
113/10 113/11 118/10
128/22 138/22 159/21
184/16 189/5 207/24
208/12 235/23 237/4
**difficult [4]** 47/23 84/9
115/5 139/12
**difficulty [3]** 12/20
48/11 243/10
**diligent [2]** 223/6
224/24
**diminish [1]** 36/2
**direct [47]** 3/5 3/12
42/23 43/11 60/24
72/23 74/20 79/19
91/21 92/21 99/2
115/15 120/18 120/21
120/23 121/8 121/15
125/3 127/4 134/9
135/1 141/21 146/1
148/19 153/5 163/15
163/21 183/4 192/11
195/18 197/4 203/9
204/22 205/23 206/2
210/19 215/14 225/22
226/21 229/18 232/6
237/16 240/11 240/11
241/3 241/4 245/23
**directed [1]** 233/3
**directing [1]** 120/9
**direction [5]** 55/4
75/18 80/21 80/22 81/1
**directional [2]** 155/18
155/21
**directions [1]** 80/24
**directly [4]** 47/17

189/15 191/24 194/6
**director [1]** 142/11
**disagreement [2]**
60/16 126/4
**disappointed [1]** 78/11
**disavow [1]** 114/2
**discharge [1]** 40/21
**disciplinary [1]** 225/2
**discipline [2]** 223/1
227/19
**disclosed [1]** 198/23
**discontinued [2]**
128/20 128/25
**discuss [2]** 98/7 229/3
**discussed [4]** 58/11
58/16 128/16 186/15
**discusses [1]** 98/15
**discussing [2]** 122/17
230/13
**discussion [3]** 122/7
212/14 219/12
**discussions [4]** 121/24
122/5 122/10 233/5
**disks [1]** 179/24
**dismissed [1]** 109/8
**display [2]** 97/1 148/24
**displayed [3]** 128/18
186/1 198/2
**displaying [1]** 116/12
**dispute [15]** 16/22 17/3
72/8 72/11 78/23 79/21
87/8 87/10 108/8 113/9
113/19 113/21 113/25
165/13 173/15
**disputed [3]** 16/10
16/17 241/24
**disputes [1]** 77/14
**disregard [1]** 233/16
**distance [1]** 199/1
**distances [1]** 81/1
**distinct [2]** 105/19
105/20
**distinction [1]** 86/15
**distinguished [1]** 87/4
**distracted [1]** 243/24
**distribute [2]** 97/9
97/10
**distributed [1]** 218/16
**district [9]** 1/1 1/2 7/11
23/18 109/3 245/4
245/5 245/19 245/19
**do [209]** 6/11 11/13
11/17 11/19 11/25 12/2
12/4 12/14 12/25 13/12
15/22 17/5 17/9 19/9
19/18 19/18 20/13
20/14 20/15 20/25
23/14 24/16 24/21
25/21 25/22 26/2 32/19
33/12 34/16 35/7 35/17
38/9 39/1 40/6 40/6
42/8 43/20 45/6 46/20
50/1 51/12 52/20 53/13
53/15 55/8 55/11 56/16

# D

**do... [162]** 57/8 58/14
59/14 59/15 59/25 60/1
62/15 62/18 62/22
67/15 68/18 68/25
69/14 70/2 73/20 74/10
74/23 75/1 75/10 75/23
75/24 76/16 77/16
77/17 77/23 77/24
78/12 78/18 79/25 80/2
80/11 81/6 81/19 81/20
82/18 82/19 82/20
85/20 86/13 87/16
88/13 91/17 93/3 93/4
93/5 93/15 94/11 94/16
96/3 96/10 98/19 98/21
98/25 100/11 102/10
102/23 104/6 105/23
106/6 106/8 106/9
106/10 106/14 108/9
109/17 109/25 110/2
110/8 110/25 112/11
112/18 113/9 113/21
115/14 116/22 122/3
122/24 122/25 125/3
126/19 126/25 127/13
127/19 128/25 129/21
130/7 134/23 135/7
136/16 137/4 139/7
140/12 143/11 145/23
147/17 151/3 157/16
157/17 157/18 157/23
158/11 161/14 161/25
163/9 164/3 165/13
165/16 166/20 169/18
171/17 171/18 175/7
175/10 176/15 176/17
177/25 178/13 178/15
178/21 178/22 180/19
180/20 181/25 182/20
182/21 187/10 191/16
192/11 193/10 193/11
200/18 206/7 206/8
209/4 210/20 211/21
211/24 212/25 213/9
213/10 215/10 215/23
216/21 217/18 218/7
218/12 218/13 218/21
218/22 219/14 220/8
222/7 223/16 223/17
231/17 234/16 237/25
239/20 242/5 242/19
245/6 245/10
**docket [71]** 114/1
114/24 114/24 115/2
115/3 116/14 116/15
168/24 171/1 171/8
171/15 173/18 174/10
178/9 179/9 180/5
180/24 181/2 181/3
181/7 181/20 182/4
182/4 182/9 182/9
182/12 182/14 182/16
182/22 183/3 183/9

183/10 183/12 183/16
183/23 184/1 184/3
184/4 184/5 184/5
184/7 184/9 184/12
184/13 184/15 184/16
184/18 184/22 184/24
184/25 185/1 185/4
185/10 185/22 186/5
186/9 186/17 186/21
186/25 187/3 187/4
188/15 188/19 189/16
189/21 194/8 194/15
194/15 195/16 197/14
199/19
**docketed [1]** 5/3
**dockets [7]** 170/21
182/10 184/20 184/21
185/25 186/15 189/9
**document [74]** 33/22
51/15 53/14 53/16 54/8
64/9 79/19 100/6
101/25 102/2 102/23
105/3 114/3 114/9
114/13 115/10 115/20
116/4 116/22 117/14
117/22 129/12 146/3
147/5 147/6 148/20
149/18 149/23 149/25
150/13 153/6 153/9
157/16 157/18 160/21
162/15 162/25 163/22
168/1 171/17 174/13
174/15 174/16 176/6
176/16 177/15 177/21
177/25 178/14 180/6
180/19 180/21 181/2
181/13 182/1 182/3
182/8 182/20 182/23
185/18 187/11 187/13
188/3 188/4 191/11
193/20 210/25 218/12
218/16 219/22 221/6
221/12 232/11 233/4
**documented [1]** 60/23
**documents [11]** 11/2
12/22 32/23 53/16
100/14 113/19 114/18
129/20 179/21 183/19
203/22
**does [86]** 14/16 25/25
29/6 29/15 41/1 42/5
44/9 44/17 44/23 45/6
45/8 45/22 49/5 52/17
52/18 54/10 55/13
55/21 58/16 60/4 65/4
68/6 73/17 74/3 75/8
76/4 76/8 82/12 86/18
86/22 98/6 98/9 108/11
110/24 111/14 114/1
114/16 119/11 119/12
125/20 133/15 135/18
138/11 146/12 146/14
146/21 149/8 149/10
150/13 150/15 151/20

152/22 157/25 158/5
161/14 164/21 167/5
168/20 171/2 171/7
171/12 173/18 184/12
188/3 188/15 188/21
196/25 200/25 201/3
201/21 207/7 207/11
208/2 209/1 211/21
213/1 214/6 216/8
216/10 222/12 237/10
238/19 240/1 241/22
242/14 245/22
**doesn't [23]** 16/11
16/19 17/7 18/3 18/3
18/24 19/3 21/16 22/1
32/14 33/11 48/16
52/25 63/17 102/10
102/10 104/3 121/9
149/22 184/14 188/8
189/13 238/9
**doing [11]** 7/11 11/18
25/15 30/12 30/13 37/2
60/17 122/9 124/23
230/18 231/19
**dollars [1]** 20/1
**don [3]** 96/13 106/1
115/4
**don't [65]** 10/8 11/22
12/3 12/7 16/10 16/14
16/17 17/11 18/18
22/22 28/25 30/20 34/5
37/1 38/22 40/17 40/19
51/9 52/21 52/23 83/21
91/25 95/19 95/22 96/6
97/5 98/24 104/3
107/12 107/15 108/8
111/2 113/19 113/21
114/2 114/9 116/24
117/12 121/2 121/5
122/24 128/24 130/21
130/21 131/7 134/10
135/24 136/14 150/19
165/9 172/24 175/6
188/25 190/11 192/10
196/1 199/12 200/24
204/15 216/1 221/3
225/15 235/1 235/15
242/2
**done [16]** 7/3 25/7 26/8
30/1 37/7 37/7 38/4
107/21 107/23 122/6
161/13 162/13 227/10
232/2 232/25 239/17
**Douglas [1]** 187/20
**down [12]** 20/11 29/6
29/15 29/15 35/9 93/20
95/5 115/3 164/5 197/7
215/22 225/25
**downhill [1]** 155/19
**draft [6]** 194/10 195/4
195/6 196/7 234/1
234/8
**drafted [3]** 190/18
192/14 198/10

**drain [2]** 24/17 24/18
**drainage [3]** 24/10
35/25 239/22
**drained [2]** 24/23
239/19
**draining [1]** 239/10
**draw [1]** 243/2
**drawing [1]** 113/8
**drawn [3]** 147/22
149/11 150/1
**drill [59]** 17/1 17/7
17/11 17/14 18/6 18/16
20/8 21/5 21/8 23/11
23/25 24/6 27/7 36/16
37/20 44/12 55/18
55/24 60/21 61/16
63/13 64/23 66/4 72/14
73/25 77/10 77/15 78/1
78/19 80/8 84/5 85/13
85/18 85/19 87/24
88/24 89/19 101/3
101/23 102/9 103/16
103/25 104/15 104/24
136/23 137/23 139/2
139/4 143/21 155/1
155/16 159/20 161/5
161/15 161/15 176/3
217/16 217/17 231/12
**drilled [58]** 16/24 19/13
20/18 21/2 21/6 27/14
48/2 48/5 48/13 48/21
49/21 50/1 50/2 50/4
50/8 50/17 50/21 50/25
57/23 58/24 59/5 59/12
59/16 66/2 66/15 67/22
70/15 70/18 70/19
70/20 81/18 83/6 84/8
86/19 87/11 87/14 88/3
90/1 106/18 107/13
107/15 107/16 107/19
138/20 143/24 144/14
154/10 155/9 158/17
158/19 158/20 159/3
159/16 159/18 160/10
177/16 223/7 239/9
**drillers [2]** 25/19
155/24
**drilling [122]** 11/15
17/10 18/10 18/25 19/9
19/10 20/5 20/6 20/17
20/19 20/23 24/4 24/12
25/6 25/15 26/23 35/2
38/3 45/21 45/25 49/7
49/11 51/17 51/20
51/21 55/10 55/17
55/23 56/22 57/25 58/1
58/10 58/21 58/23 59/1
59/6 59/6 59/7 59/8
60/6 60/15 60/21 61/1
61/17 62/1 64/5 64/13
65/3 65/4 65/6 65/8
70/9 71/25 74/3 74/18
77/23 81/9 84/3 85/11
85/15 86/20 89/14

89/17 89/20 89/25 90/4
105/5 105/17 107/3
126/17 138/2 138/6
138/25 139/3 139/9
139/15 139/20 139/24
140/1 142/11 144/2
144/14 144/20 145/8
146/8 148/16 149/1
150/25 153/3 154/3
154/7 154/11 154/17
155/11 155/12 155/14
155/18 155/21 156/12
156/16 156/18 156/19
156/24 156/25 158/14
159/24 160/2 160/5
160/13 160/16 160/19
160/24 161/20 162/8
166/7 166/16 167/3
179/5 179/22 197/19
217/11 232/14
**drive [2]** 11/21 11/24
**dry [1]** 56/1
**duly [2]** 43/3 141/14
**duration [1]** 204/22
**during [4]** 8/7 41/10
49/23 91/21 108/6
121/15 129/18 143/18
143/22 157/24 160/9
166/23 220/16 221/24
**duties [3]** 54/18 57/4
57/12
**duty [4]** 33/21 34/6
34/21 154/2
**dwelling [1]** 38/7

# E

**e-mail [56]** 170/4 170/6
170/8 170/17 193/9
193/12 194/2 218/23
218/23 218/24 219/24
220/2 220/15 220/18
220/19 221/9 221/10
221/23 222/17 222/18
223/10 223/17 223/23
224/10 226/11 226/21
227/21 228/25 229/8
229/11 229/14 229/18
229/20 230/12 230/16
230/19 231/15 231/16
231/19 233/11 233/20
234/11 234/15 235/4
235/8 235/14 235/17
235/19 236/5 236/7
237/1 237/3 237/3
237/5 237/19 237/19
**e-mails [10]** 121/21
121/22 122/2 122/4
218/21 219/8 219/9
219/23 232/8 235/11
**each [20]** 5/4 6/11 10/9
13/5 29/3 30/5 32/24
61/13 65/15 69/8 69/19
86/8 98/2 131/6 179/20
183/11 184/24 203/15

# E

**each... [2]** 223/13
227/20

**earlier [16]** 7/4 56/14
58/16 66/14 68/16
70/15 81/21 86/3
106/25 149/1 154/9
162/25 189/15 201/8
206/5 243/6

**early [6]** 131/12 219/18
223/3 223/3 229/16
243/15

**earmark [1]** 228/8

**earth [7]** 139/9 164/1
164/5 164/6 165/11
166/3 168/5

**Earth-sourced [1]**
168/5

**easement [1]** 177/18

**easements [4]** 174/1
174/2 174/6 174/7

**easier [4]** 20/8 92/12
210/15 215/24

**easiest [2]** 115/13
145/10

**east [4]** 112/13 187/24
198/25 199/12

**ECF [6]** 115/8 115/15
115/15 116/3 116/22
187/16

**economic [1]** 46/1

**edge [1]** 42/18

**Edleblute [4]** 42/24
96/25 97/8 97/11

**educational [2]** 45/14
142/2

**effect [1]** 103/12

**effectuate [1]** 192/14

**effectuated [4]** 188/4
191/5 191/21 191/22

**efficiency [1]** 83/22

**efficient [4]** 56/11
80/24 240/15 243/4

**effort [1]** 33/5

**efforts [1]** 161/4

**eight [13]** 32/11 32/15
32/16 81/4 158/20
158/21 179/10 179/12
179/13 234/11 234/16
235/17 235/20

**either [7]** 41/6 56/24
66/12 93/23 109/11
136/15 137/8

**ejecting [1]** 17/8

**elect [9]** 52/17 68/22
69/19 70/5 71/5 71/13
72/17 87/24 215/17

**elected [10]** 31/15 48/4
49/17 56/17 88/3
101/24 102/7 103/11
154/1 154/1

**electing [1]** 74/7

**election [14]** 51/24
55/6 68/16 68/23 70/2
70/6 75/22 76/5 101/19
103/12 212/1 212/7
213/21 216/9

**electronic [1]** 12/25

**elects [9]** 16/18 18/24
31/13 71/1 76/10 95/15
97/16 237/21 237/21

**elements [1]** 151/22

**eleven [1]** 35/3

**eliminate [1]** 90/10

**Elizabeth [2]** 1/18 5/14

**Elk [1]** 187/24

**else [13]** 17/9 22/14
25/23 33/4 60/20 82/24
83/5 93/9 123/20
123/22 135/24 168/7
238/2

**emanates [1]** 171/10

**emergency [5]** 28/5
35/21 123/8 123/15
123/16

**emphasis [1]** 142/6

**emphasized [1]** 238/24

**employed [6]** 99/12
100/1 100/8 142/18
188/24 189/2

**employee [4]** 170/3
187/19 190/15 227/11

**employees [2]** 47/12
220/1

**employer [1]** 141/23

**employment [2]** 45/20
63/16

**enable [3]** 12/24 90/1
243/19

**encourage [2]** 80/22
242/4

**encumbrance [2]**
132/18 132/19

**end [12]** 9/19 57/11
70/4 86/8 89/16 137/9
153/11 175/18 194/18
196/7 225/17 234/20

**Energy [53]** 1/3 5/3 5/8
43/17 43/18 43/23 44/3
44/6 44/9 44/17 44/23
44/25 45/1 45/5 104/9
104/13 104/15 104/22
104/25 105/4 105/10
105/17 105/24 106/13
106/18 106/18 126/19
130/20 130/22 130/23
130/24 130/25 131/1
131/2 131/3 131/4
131/4 141/24 141/25
142/17 143/13 161/22
161/24 171/21 178/18
178/20 181/8 187/19
187/22 190/15 190/23
191/3 241/14

**Energy's [1]** 182/11

**enforce [1]** 34/10

**engage [4]** 142/21
174/22 175/1 179/2

**engaged [1]** 43/23

**engagements [1]**
223/2

**engineer [1]** 45/21

**engineering [7]** 45/16
137/12 142/5 142/5
145/12 225/7 230/9

**enjoy [1]** 61/6

**enlarge [1]** 51/11

**enough [10]** 10/17 51/6
106/17 123/24 131/17
189/3 204/10 214/14
222/8 232/25

**ensure [5]** 6/11 9/14
23/1 37/14 235/24

**enter [6]** 5/4 36/11
106/6 111/11 127/16
195/23

**entered [11]** 33/3 84/12
85/22 99/5 99/9 111/21
118/25 127/13 131/18
131/24 195/21

**entering [2]** 32/25
33/23

**entire [3]** 125/15 160/8
223/16

**entirely [1]** 21/14

**entirety [2]** 10/11
116/17

**entities [10]** 36/2 37/12
43/23 45/3 45/8 105/16
105/19 105/20 105/23
127/16

**entitled [10]** 38/19
55/15 56/15 57/17 58/6
113/3 171/24 174/1
204/3 237/8

**entity [8]** 37/4 104/24
105/2 106/14 107/13
107/15 107/17 107/18

**environment [3]** 25/9
41/16 228/13

**environmental [3]**
89/21 157/2 161/2

**envision [1]** 42/6

**envisioned [1]** 40/1

**Epsilon [349]**

**Epsilon's [32]** 17/3
21/14 28/6 29/13 69/20
71/2 71/3 133/3 145/4
146/19 151/21 153/2
153/14 153/21 155/2
156/1 162/2 162/16
163/8 163/12 168/24
169/18 173/1 180/2
181/14 184/25 188/4
189/10 189/11 191/22
195/8 206/5

**equal [3]** 155/11 157/6
200/11

**Equinor [2]** 148/12
151/11

**equip [3]** 59/20 60/3
60/5

**equipment [23]** 24/4
35/10 35/10 49/13
49/14 49/15 60/12
64/21 86/9 137/1
139/20 139/23 140/4
140/5 156/6 155/10
155/13 155/15 155/19
157/7 164/12 204/7
217/11

**equipped [2]** 60/14
155/12

**equipping [2]** 60/15
60/22

**equity [3]** 180/4 188/15
189/16

**equivalent [2]** 157/11
186/3

**Eric [3]** 7/21 233/3
233/15

**erosion [3]** 232/16
232/24 233/8

**escalate [2]** 225/15
239/3

**ESCGP [5]** 232/16
232/19 232/21 233/7
233/18

**especially [1]** 125/4

**Esquire [8]** 1/18 1/18
1/21 1/23 2/2 2/3 2/3
2/4

**essence [2]** 29/6 29/7

**essentially [6]** 8/18
11/17 12/10 17/14
41/22 80/7

**establish [4]** 66/8
70/11 118/2 126/12

**established [6]** 11/3
45/7 47/6 126/13 152/9
191/15

**establishing [1]** 116/18

**estimate [3]** 204/21
240/7 241/1

**estimated [4]** 66/1
136/10 136/13 205/1

**et [2]** 59/1 172/6

**evaluate [4]** 36/19
91/23 118/11 227/3

**evaluated [1]** 121/4

**even [13]** 16/19 18/7
20/23 37/11 39/20
39/21 57/23 61/14
77/25 90/5 137/23
157/3 238/3

**evening [1]** 240/18

**event [2]** 22/17 22/18

**ever [11]** 11/19 22/20
49/17 50/4 50/8 50/16
50/19 50/23 61/6
103/19 107/18

**every [4]** 115/14 230/1
230/2 230/2

**everybody [8]** 19/12
25/22 32/9 33/4 52/1
52/13 68/8 110/4

**everyday [1]** 139/11

**everyone [3]** 37/15
52/1 243/5

**everyone's [1]** 205/6

**everything [6]** 17/9
41/3 60/15 80/25 111/3
112/20

**everywhere [1]** 45/24

**evidence [45]** 6/13
8/20 10/15 11/5 12/12
14/2 15/6 15/8 15/12
16/6 16/10 18/16 19/14
20/10 20/25 21/1 21/7
22/4 23/13 24/2 25/10
26/3 27/16 34/15 54/12
79/13 117/8 117/15
128/20 149/14 159/10
190/21 191/9 191/11
191/16 192/1 192/19
193/3 193/20 201/12
201/24 202/23 205/15
211/12 219/5

**evolved [1]** 155/20

**exact [7]** 66/21 69/22
88/6 131/5 136/14
155/15 155/15

**exactly [14]** 24/25
31/14 33/16 37/22 65/7
72/12 91/25 106/10
112/15 112/16 130/21
132/22 191/6 194/4

**exaggerates [1]** 14/12

**examination [26]** 3/13
7/2 43/11 90/15 90/18
90/19 90/25 91/3 91/8
91/21 99/2 120/18
120/18 120/21 121/15
124/13 129/19 130/17
134/9 135/2 141/21
165/21 205/23 217/12
221/22 240/8

**examine [1]** 169/11

**examined [3]** 50/13
120/20 240/20

**examining [1]** 13/11

**example [5]** 86/4
114/14 180/24 217/24
239/15

**examples [3]** 18/8 49/5
226/19

**excellent [1]** 155/20

**except [2]** 55/5 101/15

**exception [1]** 48/19

**exchange [1]** 137/1
174/24 223/11 226/17
227/21

**exchanged [2]** 175/2
175/13

**exchanges [1]** 122/23

**excluding [1]** 63/12

**exclusive [2]** 69/9
180/1

**excuse [7]** 55/22
112/13 125/6 131/3

## E

**excuse... [3]** 138/2
204/11 215/20
**excused [2]** 140/17
140/19
**execute [9]** 65/2 85/16
119/21 126/22 178/4
178/8 196/12 197/16
234/2
**executed [3]** 99/22
196/14 197/13
**executing [1]** 195/6
**execution [9]** 99/18
99/23 100/2 100/11
154/6 155/7 155/23
156/14 157/5
**exercised [3]** 16/24
17/1 17/19
**exhibit [196]** 4/3 4/3
4/4 4/4 4/5 4/5 4/6
4/7 4/7 4/8 4/8 4/9 4/9
4/10 4/10 4/11 4/11
4/12 4/12 4/13 4/13
4/14 4/14 4/15 4/15
4/16 4/16 4/17 4/17
4/18 4/18 4/19 4/19
4/22 30/22 51/4 53/7
54/5 54/12 54/15 66/23
67/1 67/10 67/13 69/2
69/17 70/9 72/24 72/25
73/12 73/15 74/23
74/25 75/12 75/19
76/12 76/13 76/15 77/2
77/6 78/21 78/22 78/22
79/13 85/25 91/13
91/17 102/15 102/17
108/15 114/14 114/20
114/22 115/5 115/7
115/10 115/11 115/14
115/24 116/14 117/9
117/18 118/13 120/5
124/16 124/22 126/25
127/2 128/12 128/12
128/16 128/19 129/11
131/12 146/2 146/6
147/1 147/25 148/1
148/23 148/23 149/14
150/17 150/18 153/6
157/15 158/1 158/6
158/14 158/17 158/22
159/10 159/10 159/12
160/20 162/9 162/17
163/22 165/6 165/18
165/24 167/14 167/25
169/3 169/11 169/23
170/12 171/17 173/8
173/22 174/7 174/11
176/10 176/13 176/15
177/4 177/11 178/13
180/10 180/13 180/16
181/17 181/23 181/25
182/19 185/11 185/13
185/21 186/3 186/4
186/5 186/14 187/10

191/19 192/19 192/21
192/25 193/3 193/8
193/22 194/22 194/24
196/18 196/22 197/1
197/23 198/7 199/2
201/12 201/17 201/24
202/5 202/6 202/8
202/11 202/13 202/15
202/23 203/6 205/15
206/3 210/21 211/5
211/6 211/6 211/19
215/7 217/22 218/14
219/5 220/13 221/1
223/21 237/11 243/1
**Exhibit 1 [4]** 53/7 69/2
85/25 206/3
**Exhibit 11 [1]** 159/10
**Exhibit 12 [1]** 162/17
**Exhibit 17 [1]** 102/15
**Exhibit 19 [1]** 174/11
**Exhibit 2 [4]** 66/23
91/13 102/17 120/5
**Exhibit 22 [4]** 114/20
115/5 115/24 128/12
**Exhibit 23 [1]** 186/5
**Exhibit 24 [1]** 186/14
**Exhibit 25 [1]** 187/10
**Exhibit 3 [3]** 72/24
72/25 75/19
**Exhibit 41 [2]** 117/9
126/25
**Exhibit 6 [2]** 78/22
78/22
**Exhibit 8 [2]** 146/2
147/25
**exhibits [14]** 4/1 12/22
13/6 53/18 79/6 79/7
79/9 115/6 158/15
168/4 210/20 211/12
215/4 242/25
**exist [5]** 20/20 24/8
41/19 176/2 237/10
**existed [5]** 64/14 149/9
157/24 159/19 169/17
**existence [2]** 143/16
143/17
**existing [26]** 19/1 25/6
25/9 26/4 30/1 30/5
30/16 33/20 40/25
41/17 47/4 66/5 80/14
87/1 87/5 89/2 89/5
98/22 138/18 138/21
144/10 151/18 184/19
184/21 186/6 214/18
**exists [8]** 145/16
146/13 150/14 164/17
165/3 169/17 189/20
189/23
**expand [2]** 42/6 158/23
**expansion [1]** 137/4
**expansive [1]** 240/10
**expect [5]** 27/5 154/17
227/4 228/14 240/12
**expectation [1]** 28/7

**expedited [1]** 10/25
**expeditious [1]** 56/12
**expense [2]** 59/23
224/17
**expensive [2]** 224/16
239/2
**experience [16]** 56/2
64/12 83/20 126/21
142/10 144/4 153/2
153/17 156/15 156/22
157/1 159/24 160/2
160/15 160/18 189/14
**experience-based [1]**
157/1
**experienced [2]** 25/25
157/5
**expert [10]** 14/1 14/8
14/10 14/17 15/1 15/2
15/5 15/12 103/9 144/5
**expertise [2]** 45/25
108/2 156/6
**experts [1]** 13/23
**expiration [4]** 39/8
194/16 222/19 225/3
**expire [5]** 186/20
186/22 213/19 213/21
214/7
**expires [1]** 213/23
**explain [15]** 30/18
41/18 60/2 72/10 80/17
145/10 145/16 157/13
164/4 190/11 204/7
208/24 209/3 216/7
236/13
**explained [3]** 11/13
149/18 158/7
**explaining [1]** 99/3
**explanation [3]** 118/9
174/9 188/14
**explanatory [1]** 234/22
**exploring [1]** 175/17
**exposed [1]** 230/3
**expressly [6]** 11/4
26/13 110/24 111/6
111/9 111/14
**extend [5]** 13/3 209/19
214/21 217/20 218/5
**extended [2]** 120/2
217/6
**extension [10]** 38/20
39/2 120/14 120/19
121/14 207/1 214/25
217/18 218/2 218/2
**extent [19]** 5/22 7/24
8/7 21/20 21/22 22/13
33/15 33/18 34/7 41/7
81/12 82/15 82/20 99/8
114/10 121/17 163/18
192/7 242/24
**extinguish [1]** 184/19
**extra [1]** 150/19
**extract [2]** 44/7 138/23
**extracted [1]** 139/14
**extraordinarily [3]**

36/11 242/11 242/21
**extraordinary [2]** 35/20
235/9
**Extremely [1]** 78/11
**extrinsic [4]** 190/21
191/8 191/11 192/1
**eyes [2]** 171/6 191/6

## F

**face [7]** 70/10 186/25
189/16 190/19 191/10
192/8 230/5
**faces [1]** 6/6
**facilitate [1]** 114/13
**facilities [6]** 166/6
166/9 200/3 200/7
241/23 242/9
**facility [11]** 138/18
166/10 168/6 168/13
168/17 168/18 169/4
196/6 199/5 201/1
225/8
**fact [20]** 8/17 14/18
21/19 57/19 66/15
105/6 116/10 119/14
126/17 127/21 129/19
156/24 169/6 169/8
171/2 181/20 191/2
231/5 231/8 241/24
**facts [22]** 95/11 105/22
**fails [2]** 152/11 213/17
**failure [5]** 23/19 68/22
70/1 70/5 196/25
**fair [18]** 10/20 53/16
62/5 95/20 106/17
117/18 117/19 123/24
129/2 131/7 147/18
147/20 188/25 189/3
204/10 210/11 215/3
222/8
**fairly [6]** 146/12 149/8
157/23 158/5 165/2
165/14
**fairness [2]** 6/11 27/18
**faith [1]** 30/17
**falls [1]** 154/2
**false [1]** 133/7
**familiar [22]** 47/12
91/15 91/19 146/2
147/11 147/14 148/20
149/5 149/24 156/9
157/20 160/4 160/21
163/1 163/3 163/22
164/24 165/9 165/10
165/25 168/1 174/13
**familiarity [4]** 145/20
165/22 178/6 178/7
**familiarize [1]** 47/3
**familiarizing [1]** 63/24
**far [17]** 11/6 11/7 11/11
18/16 18/17 21/12 23/8
41/14 45/11 70/23
115/10 142/15 155/24
189/14 205/2 214/14

214/17
**farmout [29]** 47/6
100/5 100/5 106/22
110/20 110/23 110/24
111/13 111/21 112/15
116/16 116/17 128/3
144/18 145/20 145/24
146/8 146/9 158/18
159/2 159/4 159/18
171/20 171/25 173/17
175/8 188/16 191/1
205/18
**Fausnaught [7]** 1/14
1/14 245/3 245/13
245/14 245/18 245/20
**February [9]** 100/5
109/25 110/7 111/21
127/11 159/4 159/5
171/23 175/9
**February 1st [1]**
171/23
**February 2016 [1]**
109/25
**federal [2]** 31/1 78/16
**fee [8]** 151/13 151/14
152/1 152/8 152/13
152/14 173/4 224/20
**feedback [3]** 65/18
199/16 231/4
**feel [2]** 7/12 7/17
**fees [4]** 152/24 172/6
224/17 225/14
**feet [3]** 34/18 36/19
37/6
**felt [2]** 214/14 237/17
**few [4]** 66/13 126/8
134/8 240/21
**field [11]** 11/18 46/3
46/11 80/25 121/25
122/5 143/9 154/9
155/17 157/10 167/12
**field-wide [1]** 80/25
**fields [3]** 143/3 143/3
143/7
**Fifteen [2]** 124/5 124/6
**Fifty [2]** 112/17 112/19
**Fifty percent [2]**
112/17 112/19
**figure [4]** 19/25 20/2
21/5 68/17
**file [6]** 17/17 36/22
37/9 39/21 88/9 162/7
**filed [24]** 5/11 8/4 8/4
23/17 38/5 39/20 78/13
78/14 78/22 78/25
95/12 108/7 109/2
109/7 109/12 113/20
115/6 117/10 118/1
118/8 127/23 131/12
179/15 191/3
**files [1]** 76/23
**filing [2]** 176/19 234/23
**filings [1]** 233/22
**fill [1]** 166/21

# F

**filled [1]** 232/23
**final [6]** 26/9 76/8 87/7 108/25 120/13 234/3
**finalizing [1]** 226/14
**finally [2]** 198/14 198/22
**financial [4]** 6/21 48/16 161/9 242/9
**find [9]** 40/24 56/20 86/6 90/6 129/3 163/15 197/4 223/4 234/1
**finding [2]** 128/16 199/5
**fine [5]** 178/7 204/15 222/3 231/4 238/6
**finish [6]** 6/25 60/21 93/15 205/5 210/1 242/16
**finished [4]** 208/2 208/7 230/12 230/12
**finite [1]** 60/19
**firms [1]** 156/8
**first [46]** 12/19 26/21 29/22 29/23 31/9 31/22 33/6 33/18 42/14 53/9 59/9 62/17 62/20 62/25 63/1 65/15 65/25 77/13 98/8 98/13 98/15 98/15 98/17 98/18 121/12 129/24 141/16 144/17 160/25 182/15 182/16 185/23 190/7 206/11 213/6 215/8 216/2 216/23 217/25 218/24 227/10 234/6 234/20 236/4 237/1 239/10
**fit [2]** 10/5 155/10
**five [9]** 142/19 143/3 143/3 143/3 186/20 186/22 187/16 194/14 216/1
**five-year [2]** 186/20 186/22
**flat [2]** 64/25 137/8
**flip [2]** 53/12 174/12
**flow [1]** 137/5
**focus [5]** 59/9 184/11 216/20 235/15 236/25
**focusing [1]** 174/25
**folks [1]** 232/4
**follow [11]** 16/5 39/13 58/4 66/14 74/20 85/24 128/24 140/13 140/15 165/21 224/7
**follow-up [5]** 66/14 85/24 140/13 140/15 224/7
**followed [3]** 30/9 51/17 102/14
**following [10]** 31/5 68/12 116/12 186/3 206/17 222/19 227/20 229/25 234/13 234/18

**follows [2]** 43/3 141/14
**font [1]** 51/6
**foot [3]** 137/23 137/23 137/24
**Forbes [1]** 1/19
**force [3]** 11/16 64/23 88/20
**forced [1]** 52/20
**foregoing [4]** 173/11 245/7 245/10 245/22
**form [24]** 18/19 18/21 18/22 18/23 19/5 19/19 29/24 30/14 47/5 53/17 53/19 53/20 53/22 53/22 63/4 65/12 144/17 144/24 232/21 232/22 232/22 233/1 233/2 234/22
**formal [1]** 87/17
**formation [1]** 63/23
**formed [8]** 142/16 143/12 144/13 144/17 146/9 146/23 194/20 194/25
**former [1]** 187/19
**forms [1]** 156/3
**formulaically [1]** 52/12
**forth [10]** 16/4 33/6 65/6 69/16 69/23 207/17 219/15 226/17 230/15 245/9
**forward [31]** 11/15 12/7 12/15 13/16 17/21 18/2 19/2 19/4 19/11 19/21 21/5 25/4 26/18 26/23 26/24 27/19 29/18 42/18 90/9 105/17 184/16 200/5 200/6 221/21 223/8 225/13 226/9 230/11 234/21 236/15 239/14
**forwarded [2]** 221/9 229/2
**foul [1]** 24/1
**found [3]** 39/14 39/15 203/11
**foundation [6]** 63/20 63/21 63/25 147/4 149/17 158/8
**four [37]** 16/23 17/11 21/2 28/8 29/3 29/8 29/11 32/1 53/21 61/12 81/17 97/6 98/20 101/6 135/17 135/19 136/12 137/15 138/6 138/16 151/2 152/20 176/24 177/16 187/16 195/10 199/15 206/7 207/4 207/4 207/5 211/3 215/4 216/1 228/4 239/19 239/20
**Fourth [1]** 1/22
**frack [2]** 80/23 136/24
**fracking [5]** 60/10

60/10 60/11 80/21 167/4
**fractures [1]** 80/19
**frankly [3]** 138/19 147/5 243/6
**free [5]** 7/12 7/15 7/17 62/8 140/21
**frequently [1]** 191/17
**Friday [5]** 13/24 14/4 14/6 14/13 14/20
**front [3]** 89/16 95/19 96/1
**frustrated [1]** 78/11
**frustrating [3]** 17/16 18/14 47/22
**full [10]** 6/9 6/10 66/16 67/22 70/21 92/21 135/3 183/4 216/2 236/5
**fully [1]** 76/4
**function [5]** 9/6 123/17 156/19 166/14 166/15
**functional [1]** 230/8
**functions [1]** 145/12
**fund [4]** 16/25 19/25 20/14 135/12
**funding [1]** 231/3
**further [8]** 20/10 20/11 39/25 77/13 116/4 123/25 233/5 245/10
**future [6]** 20/16 24/5 24/20 66/12 191/1 239/21

# G

**gain [1]** 48/8
**gallons [10]** 113/3 185/3 185/5 185/6 185/7 185/18 185/25 186/19 186/23 198/25
**game [4]** 22/6 83/21 83/21 104/6
**gas [55]** 16/2 23/10 24/11 24/14 24/23 25/14 25/18 25/25 34/19 43/24 44/3 44/7 44/11 44/12 44/13 44/14 44/21 46/17 48/10 59/19 60/13 107/19 121/25 122/5 134/20 139/16 142/7 146/11 148/6 148/14 148/17 148/17 148/25 149/2 151/9 151/10 151/12 152/1 152/3 152/15 152/16 153/1 158/15 161/17 172/16 173/2 173/6 173/10 174/16 175/18 176/2 194/16 224/12 239/1 239/3
**gather [1]** 148/6
**gathered [1]** 224/15
**gatherer [2]** 137/2

137/2
**gathering [52]** 44/13 44/14 45/22 60/14 102/7 102/12 137/4 140/7 146/11 148/4 148/5 148/7 148/13 148/15 148/17 148/24 148/25 149/2 149/3 149/8 150/24 151/1 151/3 151/4 151/6 151/8 151/9 151/12 151/13 151/14 151/24 151/25 152/2 152/7 152/8 152/13 152/14 152/16 152/19 152/24 153/1 158/16 222/23 223/9 224/12 224/17 224/19 224/23 225/14 230/4 239/1
**gave [1]** 22/24
**gears [1]** 66/13
**general [11]** 44/20 47/24 49/4 107/1 107/1 149/24 155/5 159/22 232/16 232/24 233/8
**generally [7]** 10/2 16/3 47/20 51/19 60/10 222/18 235/10
**generates [1]** 224/15
**generation [2]** 143/25 160/3
**generators [2]** 227/18 227/18
**generous [1]** 222/5
**Gentlemen [1]** 114/8
**geo [1]** 139/8
**geo-steering [1]** 139/8
**Geographically [1]** 43/20
**geoscience [7]** 137/12 145/11 179/21 225/6 227/11 227/14 230/9
**geosciences [1]** 145/8
**get [57]** 6/3 6/14 9/11 11/21 12/3 12/7 13/9 27/3 29/16 38/21 47/23 50/1 60/13 61/12 61/14 64/19 70/18 70/19 70/20 78/15 86/5 90/6 96/2 104/3 124/18 136/24 136/25 137/7 145/15 152/6 161/10 168/16 174/23 177/14 178/10 195/12 204/21 209/10 210/9 211/21 211/24 213/15 214/1 219/8 225/19 225/21 229/17 233/4 234/3 235/6 235/10 238/19 239/11 239/11 240/16 241/1 241/7
**gets [6]** 42/23 51/25 52/1 57/16 60/20 184/11

137/2
**gathering [52]**

**getting [8]** 24/4 65/18 102/8 204/23 210/15 226/6 232/2 239/16
**give [21]** 7/5 9/25 15/13 33/25 37/4 37/10 39/4 49/4 51/15 63/21 69/5 84/4 94/17 94/20 124/2 130/8 139/2 199/7 219/21 220/11 240/7
**given [7]** 37/11 40/19 111/9 153/17 153/25 231/4 240/10
**gives [1]** 40/24
**giving [4]** 51/1 174/24 221/1 229/15
**glad [3]** 6/6 15/20 192/5
**Glenda [1]** 193/12
**Gloria [2]** 174/17 176/21
**go [52]** 17/21 19/11 27/7 32/4 44/15 44/16 49/7 49/10 54/20 69/2 71/13 80/23 92/2 101/3 101/23 104/4 116/10 118/24 124/7 129/6 130/13 131/3 131/14 134/7 137/13 149/5 154/14 155/1 158/9 172/24 173/23 177/14 185/22 187/16 190/11 192/10 200/10 205/17 207/20 212/15 212/15 215/1 215/17 215/8 215/8 217/22 220/8 223/16 223/17 226/19 239/6 240/12
**goes [16]** 26/10 26/24 35/8 51/22 51/25 55/9 55/25 56/22 60/15 137/14 139/10 148/17 208/4 230/1 230/2 230/2
**going [128]** 5/4 5/14 6/1 6/22 8/14 9/20 10/13 10/15 12/21 16/15 17/9 17/23 18/2 18/16 19/14 19/15 19/23 19/24 21/1 22/7 22/12 22/22 23/2 23/4 23/8 24/2 24/5 24/8 24/9 24/9 24/19 25/10 25/15 25/17 25/23 25/24 26/1 26/3 26/16 27/17 29/11 30/22 33/7 33/8 34/15 36/13 36/16 36/20 37/10 40/13 42/22 45/11 50/14 53/13 58/2 68/10 68/17 72/8 74/15 77/10 77/19 79/18 84/6 95/14 97/6 97/14 104/6 130/8 135/24 137/5 138/21

# G

**going... [57]** 138/22
138/25 139/4 146/1
147/3 147/6 148/19
152/18 153/5 153/8
156/2 157/15 160/20
163/21 165/24 171/16
173/16 174/11 183/6
183/7 186/20 187/15
198/22 200/5 200/6
201/6 203/10 203/19
205/5 206/12 209/24
209/25 210/19 210/20
212/15 213/22 218/7
220/8 220/23 223/16
226/2 226/18 226/19
228/5 228/16 230/10
230/14 231/6 231/21
231/24 232/1 234/7
234/19 235/11 240/19
241/17 242/4
**going-forward [1]** 18/2
**gone [4]** 28/9 84/7
107/18 235/22
**good [18]** 5/18 7/8
11/17 27/24 28/1 30/17
43/13 43/14 71/12
85/16 91/11 91/12
94/12 150/8 154/16
236/3 238/5 243/16
**good-faith [1]** 30/17
**Google [6]** 163/25
164/5 164/6 165/11
166/3 168/4
**got [38]** 5/8 5/10 5/14
6/21 9/19 19/23 20/2
22/2 23/15 23/15 26/2
32/8 43/4 59/13 70/12
78/8 91/5 98/14 101/11
109/8 113/15 113/19
116/1 118/22 129/8
137/4 142/6 142/10
157/4 170/21 170/23
194/14 194/17 206/20
209/16 215/22 239/7
239/8
**gotten [3]** 132/15
214/16 228/1
**govern [1]** 31/11
**governance [1]** 105/7
**governed [1]** 133/5
**governmental [1]**
217/10
**governs [2]** 54/6
117/14
**graciously [1]** 14/13
**graduate [1]** 142/4
**graduated [4]** 45/15
45/17 45/21 46/16
**grant [15]** 5/13 9/4
15/10 30/6 39/23 41/23
183/25 184/20 185/1
186/1 186/22 195/13
197/17 199/20 240/1

**granted [13]** 13/10
41/8 57/4 57/5 160/24
171/4 175/21 179/15
180/5 184/2 184/7
186/20 233/10
**granting [1]** 111/17
**grants [4]** 36/3 77/14
186/21 217/15
**gray [2]** 213/2 214/11
**great [4]** 91/6 92/2
114/22 174/12
**green [1]** 148/25
**Greg [2]** 5/7 114/17
**Gregory [1]** 1/18
**ground [8]** 38/8 60/7
60/7 156/5 156/17
213/3 214/2 214/12
**group [4]** 28/17 142/24
170/24 232/5
**growing [1]** 137/8
**guess [6]** 50/14 117/12
117/14 185/21 186/13
215/16
**guidance [1]** 225/22
**Gulf [2]** 142/23 143/4
**guy [1]** 228/1
**guys [3]** 38/5 226/12
228/17

# H

**hac [4]** 5/9 5/11 5/13
13/9
**had [83]** 5/10 6/9 11/3
12/20 13/10 17/17
35/17 35/18 46/25
47/10 47/17 48/14
50/17 50/20 50/24
56/14 64/24 73/18
77/25 77/25 78/1 78/4
78/19 81/22 82/22
82/24 83/7 85/13 86/4
86/11 94/23 97/15
100/8 102/12 103/12
108/4 108/7 112/20
122/22 128/1 128/2
128/6 132/15 142/16
142/21 144/12 144/12
144/16 144/19 156/15
158/17 162/13 175/21
184/19 214/18 225/2
225/6 225/6 225/7
225/8 225/9 225/16
225/21 227/3 228/10
228/10 228/12 229/2
230/25 231/1 231/22
232/25 233/10 233/23
235/22 235/23 236/16
237/12 237/13 237/17
239/16 241/13 245/8
**hadn't [2]** 103/21 232/3
**half [7]** 7/1 166/18
171/11 171/15 173/20
199/1 240/13
**hand [6]** 84/5 89/15

89/17 95/22 141/11
187/17
**handful [2]** 18/7 80/2
**handing [3]** 20/17 60/4
193/9
**handle [2]** 5/12 5/16
**Hang [1]** 53/11
**happen [2]** 22/18 26/19
**happened [3]** 17/19
72/4 184/16
**happens [10]** 17/3
25/17 152/11 197/15
213/17 214/6 216/15
238/9 238/10 238/12
**happy [3]** 120/23
130/13 158/9
**hard [4]** 12/22 12/25
13/4 43/4
**Hardick [1]** 158/24
**Hardiman [1]** 28/10
**hardly [1]** 199/5
**harm [16]** 18/17 23/8
23/11 23/21 24/1 24/22
24/25 25/8 26/5 28/21
35/24 41/16 41/19
199/6 238/18 238/20
**harm/no [1]** 24/1
**harmonious [1]** 47/21
**Harold [2]** 174/17
176/21
**Harrisburg [2]** 1/11
11/22
**has [131]** 5/9 6/12 8/24
9/6 10/3 10/7 10/17
10/19 13/12 14/7 14/25
15/2 16/12 16/14 16/21
18/4 18/15 19/13 21/2
21/19 23/15 26/22 27/8
31/25 31/25 34/11 35/1
35/19 37/5 37/16 41/5
44/6 47/21 48/4 48/4
48/19 49/19 51/19 52/4
53/1 53/3 56/17 60/14
63/15 66/22 66/25
69/11 69/12 69/17 71/8
72/4 74/24 76/14 83/18
83/20 87/10 87/13 90/3
92/17 93/5 93/9 93/17
93/25 94/3 94/5 94/6
94/7 94/16 95/2 95/2
98/20 106/18 107/16
107/17 107/17 107/25
115/12 118/15 119/23
120/1 120/3 120/3
124/22 132/8 134/12
134/24 138/15 138/18
142/15 146/9 147/4
149/17 149/18 151/9
151/23 154/8 158/6
158/19 165/9 165/11
179/14 184/1 184/1
184/6 189/13 190/14
194/13 197/24 198/4

198/23 199/25 200/13
200/25 202/6 212/22
214/16 216/18 221/6
224/14 227/1 228/1
228/1 233/18 238/5
241/21 244/2 245/10
**Haskins [3]** 7/21 233/3
233/15
**hasn't [2]** 105/15 177/8
**have [368]**
**haven't [4]** 37/6 37/11
38/4 39/21
**haven't [5]** 7/13 92/6
150/5 190/6 203/22
**having [10]** 9/25 14/24
33/13 39/19 43/2 114/8
122/10 128/15 141/13
154/14
**HC [4]** 67/17 67/18
67/20 67/21
**he [36]** 12/25 13/14
31/6 60/20 63/16 63/17
63/22 66/6 121/11
121/11 124/9 124/10
124/11 124/23 124/23
131/16 131/17 131/17
131/19 132/6 132/6
147/4 149/19 165/11
177/8 188/24 189/2
190/18 190/22 192/13
227/3 227/3 229/1
241/17 243/25 244/2
**he's [3]** 63/17 165/9
240/11
**head [4]** 43/21 175/6
235/8
**header [7]** 115/8
115/15 115/15 115/19
116/4 168/15 234/15
**heading [1]** 62/13
**health [2]** 153/15 157/2
**hear [19]** 15/20 18/16
22/4 23/9 23/23 24/2
25/24 29/11 34/15 35/8
36/13 40/13 71/20
159/2 166/11 192/5
229/16
**heard [10]** 7/25 9/12
9/25 14/13 30/25 32/3
35/21 60/9 100/4
118/15
**hearing [6]** 11/4 17/23
40/14 41/10 206/5
242/6
**hearsay [5]** 14/18
190/16 190/20 191/10
191/17
**heavy [3]** 49/15 64/21
139/23
**Heinz [1]** 178/21
**held [2]** 17/23 142/13
**help [9]** 16/16 16/25
40/2 80/22 90/6 114/12
138/16 207/18 220/14

**helpful [6]** 115/21
125/23 203/23 212/16
227/10 242/11
**helps [1]** 80/20
**HENRY [8]** 3/11 6/20
30/23 71/1 117/6 141/7
141/12 141/18
**her [5]** 194/11 215/25
224/5 225/24 226/4
227/3 227/14 228/18
228/19 229/22 229/25
232/10 237/14 237/16
237/16
**here [42]** 8/18 9/1
11/21 11/23 12/3 15/22
21/14 23/2 23/10 28/4
28/5 31/10 35/14 35/21
37/2 41/2 59/8 72/13
87/8 91/25 93/4 94/5
106/11 109/5 114/21
115/5 117/2 127/23
129/6 131/8 144/18
144/25 161/21 172/20
186/25 200/21 200/24
225/1 227/10 227/17
232/22 243/15
**here's [1]** 234/8
**hereby [2]** 71/1 245/6
**hereinbefore [1]** 245/9
**hereof [1]** 173/9
**hereto [3]** 55/18 55/24
173/8
**hereunder [1]** 55/3
**hey [4]** 27/2 36/25
225/25 234/7
**higher [1]** 28/20
**highlight [5]** 153/13
175/17 206/11 208/1
220/9
**highlighted [4]** 100/20
146/6 208/14 217/3
**highlighting [2]** 208/3
237/3
**highly [1]** 34/19
**highly-regulated [1]**
34/19
**highway [2]** 168/10
168/11
**hilly [1]** 64/17
**him [8]** 5/13 13/11
13/12 62/3 125/12
132/16 159/1 178/21
**himself [1]** 63/24
**hire [2]** 25/16 25/18
**his [14]** 6/22 63/16
71/16 108/6 124/10
124/18 124/19 130/9
188/9 189/4 220/16
227/15 241/15 244/1
**history [2]** 45/20
174/19
**hold [2]** 166/16 204/25
**holder [3]** 194/8 195/16
197/14

# H

holding [1] 236/12
holdings [1] 145/14
hole [3] 38/8 56/1 60/6
holidays [1] 69/10
honor [173] 5/7 5/13
5/18 6/18 7/19 8/8
10/24 11/2 11/20 12/20
13/12 13/15 13/18
15/17 15/23 15/25
16/17 17/16 18/17
19/15 20/10 20/21
21/13 22/4 22/21 22/23
23/8 23/13 23/22 24/2
25/3 25/10 25/24 26/3
26/9 27/16 27/24 28/2
37/24 38/6 38/16 39/4
39/7 40/9 40/16 41/4
41/13 42/1 42/12 42/15
43/4 54/11 54/14 61/20
62/6 62/9 64/1 67/9
67/12 71/14 73/11
73/14 75/11 75/14 77/1
79/6 79/12 79/15 82/8
88/15 90/12 91/1 91/4
91/7 92/6 96/6 96/14
102/18 102/20 108/17
108/19 114/12 115/23
116/11 117/12 117/21
118/15 120/17 121/18
128/15 129/13 130/5
130/10 130/13 140/14
140/16 146/25 147/3
147/8 147/24 148/2
149/13 149/16 149/22
150/8 150/16 150/20
158/2 158/10 159/9
162/13 165/5 165/8
165/19 167/13 167/16
169/2 170/11 170/14
176/9 176/12 177/3
177/10 180/9 181/16
185/12 188/7 188/9
190/2 191/13 192/10
192/18 192/22 192/22
193/2 193/5 193/20
193/23 196/17 196/20
197/20 197/25 201/23
202/1 202/7 202/10
202/12 202/22 202/25
203/21 204/2 204/18
211/11 211/15 218/8
218/18 219/4 219/24
220/7 221/20 222/8
222/11 222/15 238/15
240/4 240/9 240/10
241/5 241/7 243/13
Honor's [1] 11/1
HONORABLE [1] 1/10
honored [2] 22/25
122/15
hooked [1] 60/13
hope [4] 28/10 51/6

51/7 157/13
hopefully [1] 242/13
hoping [1] 229/16
hopscotch [1] 38/21
horizontal [10] 65/14
65/25 80/21 136/4
137/24 139/5 139/10
143/25 160/3 160/11
horribles [1] 25/11
hour [4] 11/25 14/9
68/25 205/4
hours [7] 11/20 11/23
68/22 69/9 70/5 240/11
240/13
house [4] 154/21 156/6
160/17 178/8
housekeeping [4]
12/19 13/3 13/7 205/14
Houston [3] 1/25 5/12
43/21
how [66] 14/16 19/25
20/13 20/25 21/5 24/21
24/22 35/8 36/4 36/20
38/21 47/20 48/1 50/12
55/9 55/11 58/17 61/23
65/7 65/7 72/10 73/20
78/8 86/4 104/5 132/5
143/16 143/21 144/21
145/23 146/15 146/17
146/21 152/22 153/23
154/10 156/1 158/19
159/19 160/12 162/2
165/10 167/2 168/20
169/3 169/15 169/20
172/9 173/18 177/25
179/1 183/22 194/18
196/25 208/2 209/23
210/9 211/24 211/24
216/8 218/3 223/5
223/12 239/18 240/7
241/2
however [6] 11/15
56/22 76/4 95/16 97/17
217/5
huge [2] 34/24 157/4
hum [11] 113/2 147/16
147/21 153/4 186/11
194/23 208/9 212/24
216/22 229/12 231/18
hundred [7] 11/24 48/3
48/20 155/16 156/16
156/25 160/18
hundreds [2] 50/14
155/9

# I

I'll [27] 5/6 6/16 7/5
10/1 15/14 15/20 37/24
37/25 38/13 42/17
42/20 62/7 63/20 93/15
109/7 109/11 117/17
118/19 121/12 121/16
173/25 179/18 181/23
192/5 206/21 219/21

220/11
I'm [133] 5/4 6/6 10/13
13/10 14/23 15/15
28/14 30/22 35/25
37/22 38/4 39/24 40/13
40/13 43/17 46/4 48/4
50/14 57/9 61/23 61/25
64/16 65/17 71/20 72/8
73/22 74/17 78/18 83/4
83/12 84/20 85/1 86/1
91/10 91/19 95/14
96/14 97/14 99/4
102/11 103/9 105/7
105/11 106/1 108/14
108/24 109/5 114/14
115/4 115/19 115/21
115/23 115/24 116/7
116/18 117/14 120/9
120/23 121/3 121/5
124/3 125/24 128/15
130/8 130/13 131/9
134/8 134/11 145/10
146/1 146/20 147/3
147/4 147/5 147/13
148/19 149/5 153/5
153/8 156/4 157/12
157/15 158/9 163/21
165/9 166/9 171/16
174/11 177/8 177/9
183/1 183/6 183/7
185/12 185/16 187/15
189/22 189/25 192/20
193/9 196/10 197/6
198/10 198/22 201/6
204/23 205/3 206/12
206/17 206/17 208/6
209/22 209/23 209/25
210/7 210/8 210/19
210/20 215/7 218/7
220/8 221/1 222/3
223/16 226/18 226/19
228/20 234/14 234/19
235/8 242/4 242/18
243/16
I've [6] 5/8 5/10 142/10
160/1 160/10 235/14
idea [3] 24/18 71/12
204/15
ideas [9] 122/24 227/2
227/8 227/23 227/24
228/4 229/3 230/23
231/1
identical [4] 91/23 92/5
92/7 171/1
identified [12] 4/2 4/21
18/7 38/21 74/24 96/7
158/21 186/14 215/9
216/5 237/4 237/11
identifies [3] 36/23
40/11 237/5
identify [8] 61/7 98/9
111/14 120/6 124/3
145/13 227/16 239/22
identifying [2] 223/6

227/12
ii [3] 58/13 61/13 69/12
iii [1] 69/12
III.B [2] 203/17 203/25
illusory [3] 22/19 33/21
34/5
image [9] 163/25
163/25 164/4 164/6
164/7 164/9 165/11
165/14 169/9
immediate [3] 35/23
36/7 123/8
immediately [1] 229/18
impact [1] 152/22
impaired [1] 23/12
implement [1] 29/19
important [16] 85/18
88/23 88/23 104/5
114/10 173/14 174/8
185/8 186/18 210/6
224/9 224/12 224/13
225/13 227/8 230/6
importantly [2] 24/6
190/16
impose [1] 19/19
imposed [4] 57/4 57/5
57/13 66/3
imposes [2] 41/7 77/21
impossibility [1] 37/20
impossible [6] 11/14
11/23 12/1 12/6 35/4
39/23
impoundment [12]
84/1 85/14 89/3 164/4
166/5 166/6 166/14
166/15 167/7 167/9
167/20 200/15
impoundments [14]
18/13 49/9 82/18 85/6
85/10 85/20 85/23
166/21 197/9 197/11
199/20 200/1 200/11
201/2
improvements [1]
168/15
inaccurate [1] 153/22
inadmissible [1]
191/11
Inc [17] 1/3 5/3 104/9
104/13 104/15 104/25
105/4 105/11 105/24
106/18 145/17 145/19
161/24 178/20 181/8
185/23 187/22
include [2] 83/24
150/19
included [4] 20/4 82/3
168/8 195/17
includes [4] 154/7
158/6 175/22 197/6
including [23] 23/18
25/19 32/9 37/5 49/11
82/16 154/11 155/3
155/3 155/13 155/18

156/6 156/11 157/1
163/20 173/7 174/5
174/10 179/4 179/9
179/20 197/7 217/10
inclusive [1] 185/7
inconsistent [2] 11/17
192/7
Incorporated [2]
178/18 178/18
incorrect [1] 105/12
increase [2] 136/25
175/16
increased [2] 224/20
230/3
incremental [1] 138/18
incumbent [3] 31/18
68/8 237/23
incur [1] 240/1
incurring [1] 230/3
indeed [2] 140/21
205/17
independent [2] 55/4
137/3
independently [1]
134/23
INDEX [2] 2/8 3/22
indicate [3] 5/6 63/22
203/24
indicated [8] 12/10
56/14 93/9 93/17 132/6
136/1 136/8 200/20
indicates [3] 29/24
119/3 190/23
indicating [5] 31/13
81/2 137/19 139/1
139/3
indisputably [3] 23/20
28/15 34/11
individual [1] 190/14
individuals [3] 47/9
108/7 153/15
industry [9] 18/20
25/17 48/10 48/15
49/12 56/2 57/14 61/24
157/5
inform [1] 221/12
informal [1] 232/18
information [10] 13/8
52/5 99/20 100/13
122/24 137/2 161/8
168/25 179/24 194/18
infrastructure [10]
49/8 64/16 64/19 65/1
66/5 85/16 89/3 110/12
111/19 199/24
infuriating [1] 88/8
inherent [1] 80/19
initial [8] 8/3 8/23 59/7
85/11 109/2 109/8
110/10 117/10
initiate [5] 51/19
119/25 212/22 212/25
213/17
initiated [4] 95/2

**I**

**initiated... [3]** 144/17
211/22 223/5
**initiating [1]** 213/4
**initiation [2]** 223/10
225/24
**injunction [16]** 1/12
8/17 10/4 10/12 27/18
28/5 28/12 28/16 28/20
28/21 36/3 146/2 147/1
147/25 148/20 206/5
**injunctions [1]** 191/16
**injunctive [6]** 9/3 15/10
41/24 238/19 238/22
240/1
**injunctive/specific [1]**
9/3
**innocuous [1]** 30/19
**inquired [1]** 169/21
**Inquiry [1]** 3/9
**inserted [2]** 27/6 59/2
**inserting [1]** 59/4
**instance [4]** 66/18
82/24 155/11 185/23
**instances [2]** 49/20
59/2
**instead [1]** 34/3
**instructed [2]** 243/25
244/2
**Integrated [1]** 142/24
**integrating [1]** 223/12
**intend [5]** 14/16 41/12
42/5 106/6 192/10
**intended [9]** 11/6 19/9
19/18 19/19 37/16
125/10 188/22 189/1
197/5
**intends [5]** 6/18 187/23
188/21 190/23 190/25
**intensive [2]** 48/10
166/17
**intention [1]** 128/4
**intentional [1]** 32/22
**intents [1]** 72/12
**interest [64]** 26/4 26/7
35/1 36/2 37/1 44/3
44/9 44/17 44/21 45/9
52/7 53/4 58/1 58/14
61/19 69/19 69/20 71/3
71/4 83/8 83/10 83/18
85/3 86/10 114/5 128/5
134/12 134/17 134/24
135/25 138/12 146/10
152/15 152/25 154/9
154/19 164/20 164/21
164/22 171/5 172/4
172/7 172/8 172/10
173/1 173/21 174/23
174/25 175/13 175/24
181/6 204/3 204/9
216/17 221/20 222/21
224/13 224/21 225/11
226/9 228/7 228/17
241/22 242/2

**interested [5]** 114/15
133/2 174/24 230/24
236/9
**interests [41]** 16/2
19/24 22/8 23/9 23/10
23/12 23/16 24/11 27/8
36/18 84/24 112/19
128/2 129/2 145/4
145/5 172/5 172/5
172/9 172/17 172/23
173/3 173/3 173/3
173/4 173/4 173/9
173/9 173/10 173/10
173/10 173/11 173/13
174/4 174/5 188/5
188/18 189/11 203/15
206/16 206/24
**interfaced [1]** 232/4
**interfacing [1]** 232/13
**interfere [2]** 90/3
122/25
**interfering [1]** 123/23
**interlineated [3]** 30/2
30/14 31/25
**internal [1]** 31/5
**internally [3]** 31/21
228/6 231/2
**international [1]** 45/24
**interpret [1]** 216/7
**interpretation [5]**
20/22 31/17 31/17
236/16 237/22
**interrupt [2]** 65/17
204/15
**interrupting [1]** 204/12
**intervening [1]** 230/14
**introduce [9]** 11/5
19/14 20/10 21/1 21/23
23/13 25/10 43/15
243/1
**introducing [1]** 219/13
**invalid [1]** 157/14
**invest [4]** 17/6 48/17
83/2 144/16
**investing [1]** 17/2
**investment [2]** 213/23
231/13
**investments [1]** 64/15
**invite [6]** 9/20 10/4
10/13 10/22 42/17
42/20
**invited [1]** 15/3
**invoices [2]** 48/24 49/2
**invoke [2]** 57/20
125/13
**invoked [1]** 126/7
**invoking [1]** 120/15
**involved [6]** 33/14
47/14 107/2 107/3
160/1 175/14
**involves [7]** 15/25
16/22 17/3 53/25 87/10
125/5 160/2
**irony [1]** 20/6

**irrelevant [1]** 30/19
**irreparable [1]** 36/7
**irreparable [11]** 18/17
23/8 23/11 23/21 24/22
24/25 28/21 35/23
199/6 238/18 238/20
**is [876]**
**ish [1]** 66/20
**isn't [6]** 89/15 92/16
178/3 184/13 204/13
220/10
**isolating [1]** 60/8
**issuance [5]** 162/7
163/9 163/11 182/4
182/9
**issue [54]** 8/2 8/6 8/12
8/13 8/14 10/2 10/14
10/21 10/25 11/5 11/11
12/12 13/22 13/23
14/17 14/23 14/23
14/25 15/1 15/3 15/5
15/7 17/18 18/15 23/2
24/1 28/3 29/3 34/24
35/23 37/14 38/14
40/23 41/5 41/6 41/10
53/24 71/17 78/12 92/5
93/5 95/7 99/9 117/22
135/18 137/16 146/21
151/2 169/12 172/20
172/23 202/18 203/3
222/6
**issued [12]** 26/22
103/4 103/8 103/16
104/9 104/13 129/20
173/19 180/24 183/3
184/18 233/6
**issues [15]** 6/24 10/9
10/11 10/16 10/16
11/12 12/16 15/9 27/3
40/17 42/3 117/2 121/2
144/6 232/7
**issuing [2]** 103/6
238/22
**it [579]**
**it's [208]** 6/5 11/23
12/1 12/6 15/22 16/17
16/20 17/9 18/14 18/18
19/7 19/10 19/10 19/12
20/11 20/18 22/2 22/11
22/12 22/23 23/6 23/25
27/6 27/8 29/8 30/23
32/22 33/5 33/7 33/21
34/5 34/5 34/19 35/2
35/4 36/1 36/2 36/24
36/24 38/14 39/19
39/22 40/9 40/18 40/22
44/5 46/5 47/23 52/11
56/4 62/19 63/12 64/8
64/25 64/25 67/17 68/1
68/8 69/4 69/8 70/10
71/11 72/2 83/22 85/16
86/3 88/8 90/15 92/12
92/12 95/20 95/20 96/5
98/17 99/1 101/20

102/24 104/11 104/22
104/24 109/12 109/19
112/13 113/15 114/10
114/14 114/23 115/7
116/6 116/24 116/25
117/13 117/22 118/10
118/21 120/20 121/17
125/6 126/6 126/7
129/3 129/8 131/17
134/10 134/16 136/8
137/11 137/11 138/14
138/18 138/23 139/5
139/6 139/12 140/8
141/18 146/18 146/20
148/8 150/1 150/24
151/16 151/22 153/11
153/22 154/13 158/9
164/14 164/18 165/10
167/12 167/14 170/5
171/20 171/23 179/1
181/3 183/3 184/11
185/3 187/8 187/20
188/19 188/25 190/17
191/10 191/15 192/7
193/15 194/17 196/23
197/20 198/13 198/16
198/20 199/8 201/12
203/19 203/23 204/3
204/19 205/14 206/19
206/19 208/15 209/13
210/15 212/25 214/11
215/16 216/9 216/14
218/23 218/24 219/2
219/24 219/25 220/2
220/3 220/4 220/7
223/21 223/23 223/23
224/11 226/21 229/10
229/20 229/20 230/6
230/10 230/15 230/16
231/15 231/16 232/9
232/9 233/11 234/11
234/14 234/15 235/5
235/5 235/5 237/8
239/14 241/11 243/17
**item [2]** 65/25 238/16
**items [2]** 68/13 194/14
**its [48]** 6/19 14/15
16/24 17/1 17/19 18/25
27/20 29/25 32/24
33/25 35/20 43/23 45/8
48/16 48/24 54/9 54/18
55/2 57/20 66/9 69/11
73/8 75/9 76/23 76/24
77/7 83/2 107/25 110/7
111/2 116/17 118/2
118/4 120/1 126/23
139/24 141/6 144/8
153/17 187/23 188/5
188/22 189/11 190/19
190/23 191/10 199/14
199/14
**itself [12]** 20/21 21/2
21/7 23/20 25/14 29/7
29/10 72/1 108/12

136/8 184/14 214/4

**J**

**Jack [3]** 5/19 7/8 91/10
**Jacobson [2]** 187/21
187/21
**January [3]** 39/9 145/3
193/15
**January 22 [1]** 39/9
**January 29th [1]**
193/15
**JBE [1]** 143/1
**Jenko [2]** 170/5 193/12
**JENNIFER [1]** 1/10
**JOA [105]** 16/9 18/21
18/23 19/6 22/23 22/14
22/15 29/4 29/12 29/14
29/17 29/20 29/22
29/24 30/4 30/10 30/17
31/11 32/6 33/16 33/16
39/1 39/3 39/14 40/4
40/23 47/5 47/18 49/17
49/24 50/16 50/19
50/23 52/3 52/12 53/3
54/3 54/5 54/17 55/12
55/14 56/3 56/4 56/8
56/16 57/22 59/2 62/12
65/6 68/13 69/1 69/22
70/4 70/6 70/21 71/8
71/12 71/17 77/14
77/21 78/20 82/15
82/21 82/25 83/7 83/16
86/1 88/14 88/15 89/14
93/18 95/17 97/17
97/22 97/23 102/10
102/14 102/14 106/8
125/11 125/15 126/22
144/17 163/19 164/17
164/18 167/9 176/3
199/24 202/5 202/18
202/20 202/21 203/15
203/16 204/9 209/12
212/16 212/24 214/24
215/1 215/17 215/11
237/10 237/17
**JOA's [1]** 152/22
**JOAs [65]** 16/4 16/7
17/4 17/8 18/19 20/5
20/12 21/2 21/20 21/22
29/3 29/9 31/6 32/8
32/13 32/14 32/15
32/18 32/19 32/20
32/21 33/1 33/11 33/13
33/24 34/3 34/8 46/25
47/8 47/11 47/13 48/2
48/21 50/8 50/12 51/16
61/24 68/1 72/15 82/23
93/25 98/2 119/8
119/12 119/14 119/15
126/1 133/5 134/3
144/12 145/21 146/21
159/19 178/10 201/6
201/8 201/9 201/15
201/16 201/19 203/3

**J**

**JOAs... [4]** 203/11
231/6 236/16 241/18
**job [3]** 25/22 25/22
210/12
**John [1]** 2/3
**join [4]** 43/18 46/13
145/2 213/22
**joined [2]** 46/25 47/14
**joining [1]** 142/16
**joint [32]** 16/1 27/10
51/2 56/8 89/23 91/14
91/15 92/14 99/2 99/5
99/8 101/11 104/18
106/11 119/18 123/1
133/4 134/2 134/22
135/3 136/2 143/2
144/11 144/15 144/19
146/24 151/7 203/20
204/3 206/3 210/4
211/25
**Jonathan [2]** 1/21 5/9
**Josh [1]** 7/21
**JPW [1]** 1/4
**Judge [31]** 7/9 7/20
8/16 13/22 14/5 28/10
30/20 30/24 34/15
36/13 37/1 63/3 63/15
96/8 114/23 115/17
115/19 117/17 120/9
123/25 158/4 165/16
169/7 181/19 190/13
204/12 205/3 219/7
221/17 243/16 244/4
**judgment [2]** 8/18 9/2
**judicial [1]** 162/4
**Julie [16]** 218/24
219/25 223/3 224/3
224/4 224/6 225/1
226/24 227/1 227/25
228/1 228/9 229/11
229/20 233/3 233/15
**July [6]** 43/19 46/15
66/20 66/20 67/3
231/17
**July 1st [1]** 231/17
**jump [2]** 232/8 234/10
**June [10]** 66/20 116/25
182/7 182/18 183/14
229/21 230/13 230/17
230/20 230/22
**June 15th [3]** 230/17
230/20 230/22
**June 16th [1]** 116/25
**June 23rd [3]** 182/7
182/18 183/14
**June 2nd [1]** 229/21
**June/July-ish [1]** 66/20
**jury [2]** 7/15 42/18
**just [139]** 6/3 6/14 10/1
12/19 13/22 16/10
16/13 16/22 17/7 17/10
18/8 20/11 22/2 23/24
23/25 26/10 27/7 29/1

30/15 38/7 39/13 40/7
43/8 45/19 49/4 49/4
50/11 51/15 53/12
54/20 56/20 58/4 60/6
61/23 63/5 63/12 66/13
70/7 78/2 79/19 79/24
80/2 80/10 81/15 83/23
85/24 87/9 91/20 93/14
96/10 102/25 103/10
105/9 105/21 106/25
116/18 116/24 117/12
118/22 121/11 123/1
124/2 124/9 124/17
124/21 125/3 128/23
129/3 129/10 131/10
132/8 134/7 137/11
137/18 140/5 149/23
150/18 160/6 163/8
165/8 166/11 167/19
169/3 169/15 169/25
179/18 180/21 181/6
183/19 185/1 185/16
186/15 188/9 188/19
192/1 192/14 194/6
194/24 194/25 199/7
199/9 202/9 204/25
205/6 205/17 207/7
207/21 208/2 208/7
208/25 215/2 215/4
216/6 216/23 217/15
218/16 219/8 220/9
220/23 221/8 222/9
222/18 226/5 226/7
226/7 228/20 228/25
229/13 230/10 230/12
230/12 231/4 234/22
236/9 237/4 239/14
239/15 240/7 242/10
**justifies [1]** 199/5

**K**

**keen [1]** 224/23
**keep [4]** 68/10 137/8
224/16 240/15
**KELLY [1]** 2/4
**kept [4]** 162/15 176/6
180/6 181/13
**key [2]** 213/14 220/9
**kind [9]** 18/19 18/21
33/12 44/2 55/1 89/8
115/24 144/18 225/20
**kinds [2]** 35/10 178/8
**Kipard [1]** 67/17
**knew [3]** 31/21 34/13
229/1
**know [59]** 6/8 6/25
8/13 19/10 19/18 22/22
24/3 24/21 25/3 27/1
37/2 38/23 41/18 51/9
68/25 96/6 111/2
112/11 114/9 114/18
115/9 116/24 116/24
117/13 121/5 122/24
128/25 130/21 130/21

134/10 135/24 139/2
145/23 147/19 147/21
157/18 157/23 164/3
175/7 175/10 177/25
178/21 178/22 188/25
194/14 209/4 213/2
215/10 215/22 221/3
225/25 232/14 233/21
233/24 234/8 235/1
236/8 242/3 242/23
**knowing [1]** 24/19
**knowledge [13]** 63/18
93/25 95/11 100/10
102/12 103/25 107/17
112/3 121/2 121/10
121/11 147/22 188/8
**known [1]** 36/4
**knows [1]** 8/3
**Kravitz [3]** 2/3 5/19
5/25
**Krock [28]** 1/18 3/5 3/7
5/7 10/1 10/23 27/22
41/12 42/23 51/9 61/22
62/8 63/5 63/20 70/7
92/4 116/3 116/9
117/11 122/12 124/1
124/17 125/23 130/8
131/10 131/16 132/15
140/12

**L**

**labeled [1]** 203/22
**lack [8]** 61/4 83/21
83/22 83/22 153/17
158/8 235/7 235/7
**lacks [1]** 188/7
**laid [2]** 147/4 149/17
**Lake [1]** 187/25
**land [10]** 56/9 134/18
143/3 145/8 145/12
145/23 223/2 224/4
225/7 230/9
**landgrab [1]** 174/20
**landowners [1]** 178/5
**lands [1]** 179/23
**Lane [2]** 6/21 241/11
**language [48]** 26/21
27/1 27/6 30/13 30/17
31/10 31/16 31/25
32/22 33/15 39/14
39/15 40/4 40/6 41/25
54/25 59/3 62/19 62/21
65/12 69/21 70/6 86/12
98/7 98/10 98/13 98/14
113/16 120/7 150/19
175/17 183/22 194/24
203/11 206/13 208/18
208/21 209/5 209/6
209/12 209/15 209/16
209/20 210/3 210/9
215/15 216/6 226/6
**large [2]** 43/24 49/13
**largely [1]** 7/22
**larger [1]** 174/23

**largest [4]** 46/11 143/9
152/3 230/5
**Larue [1]** 158/24
**last [34]** 25/2 43/8
68/20 68/21 73/18 79/3
88/7 106/17 106/21
107/8 128/12 141/16
141/16 142/13 150/12
150/14 153/9 153/10
156/15 157/19 164/5
164/9 172/11 198/13
198/14 198/18 202/18
213/6 217/25 219/18
226/21 227/2 237/19
237/19
**lastly [1]** 202/15
**late [6]** 14/8 76/17
76/21 87/18 87/20
210/15
**later [12]** 23/25 23/25
39/8 40/2 115/9 115/16
171/5 182/10 191/5
229/14 231/12 242/12
**laterals [1]** 37/6
**latest [1]** 160/3
**latitude [1]** 168/8
**law [5]** 40/19 43/3
105/21 141/14 191/15
**Lawrence [1]** 7/21
**lawsuit [20]** 17/17
30/21 57/20 72/9 73/18
78/13 78/14 88/7 88/10
88/13 90/8 117/24
118/1 125/17 126/2
127/3 131/23 135/18
137/16 238/18
**lawyer [2]** 108/6 108/9
**lay [4]** 63/20 63/21
63/25 147/7
**laymen's [1]** 36/15
**lead [1]** 143/1
**leadership [4]** 227/5
227/9 228/11 228/16
**leads [2]** 58/20 152/4
**lease [12]** 134/18
139/16 146/7 174/16
175/4 175/10 175/20
175/22 175/24 176/2
224/16 239/2
**leased [1]** 143/18
**leasehold [4]** 173/6
173/10 174/23 174/24
**leases [8]** 134/21
144/13 172/5 173/2
175/2 175/3 175/14
179/23
**leasing [1]** 174/19
**least [9]** 8/11 38/2 38/3
49/24 84/4 120/1 122/1
203/23 223/11
**leave [3]** 117/7 168/20
215/1
**led [2]** 72/9 100/11
**left [3]** 57/10 59/11

143/12
**legal [8]** 61/21 69/10
71/15 84/16 105/19
105/20 154/4 161/19
**length [1]** 205/1
**lengthy [2]** 8/5 8/5
**less [10]** 26/10 31/7
38/11 58/6 58/9 62/13
70/20 70/20 135/3
237/9
**lesser [1]** 214/10
**let [23]** 10/22 54/20
56/19 62/25 63/5 68/4
78/19 84/5 93/15 95/22
122/3 164/4 178/21
185/2 185/11 205/17
207/18 208/24 210/1
210/14 219/14 234/8
241/1
**let's [17]** 15/20 32/4
51/20 68/3 87/9 94/8
105/21 132/4 132/23
137/18 171/24 172/22
173/23 181/25 204/10
215/7 218/15
**letter [88]** 8/10 10/25
12/7 12/11 66/25 67/3
67/6 67/19 67/25 68/3
68/6 69/23 70/9 70/10
70/25 72/24 73/2 73/5
73/8 73/17 73/24 74/24
75/2 75/6 75/17 75/19
76/4 76/6 76/8 76/13
76/17 76/20 76/23 77/6
77/9 78/8 115/5 132/24
133/1 137/11 187/11
187/17 187/20 187/22
188/22 189/2 189/7
189/11 190/17 190/18
190/21 190/22 191/3
191/7 191/9 191/20
191/22 192/2 192/3
192/8 192/13 193/10
193/17 194/5 194/8
194/9 194/13 194/14
194/20 194/25 195/1
195/4 195/15 196/7
197/1 197/13 197/16
198/10 199/18 199/22
211/18 211/22 212/19
213/24 217/23 233/23
234/1 234/19
**letterhead [1]** 194/15
**letters [4]** 21/4 69/12
215/3 215/9
**level [4]** 100/15 130/22
142/19 223/11
**Lewis [1]** 85/23
**licensed [2]** 161/6
161/11
**licenses [1]** 174/2
**Lick [1]** 187/25
**life [2]** 60/23 217/20
**lifetime [1]** 226/13

## L

**lifted [1]** 69/24
**light [1]** 114/11
**like [45]** 5/12 8/13 8/14 13/2 16/13 25/2 25/14 33/1 45/22 51/3 53/7 54/7 61/22 64/25 69/6 70/1 79/19 86/12 96/17 97/2 102/8 103/9 107/24 117/20 121/16 124/6 124/15 124/24 137/19 160/12 161/25 190/3 193/2 195/25 206/2 214/11 214/14 221/16 226/13 227/23 231/5 231/7 237/17 242/25 243/22
**likelihood [6]** 9/10 11/7 21/12 28/13 40/16 41/16
**limit [4]** 29/25 69/19 69/20 235/12
**limitation [4]** 19/20 33/25 173/7 174/6
**limited [7]** 6/22 82/16 130/20 163/20 179/20 197/7 228/13
**limiting [3]** 64/22 98/7 98/13
**limits [2]** 40/23 92/22
**line [41]** 26/22 44/13 44/14 44/15 56/20 56/20 57/9 57/9 57/11 57/11 57/25 58/9 58/24 58/25 59/4 59/5 59/11 60/14 67/15 68/2 69/4 69/5 69/7 73/21 80/21 80/25 125/6 128/21 140/7 152/20 152/21 152/22 153/1 168/11 208/4 208/5 215/16 216/2 216/20 217/5 223/25
**lined [1]** 11/19
**lines [8]** 44/16 69/6 153/11 206/11 208/19 215/24 216/1 220/10
**linked [1]** 186/8
**list [1]** 224/21
**listed [3]** 111/6 111/8 194/15
**listen [1]** 27/6
**listened [1]** 36/1
**lists [1]** 68/13
**literally [2]** 115/22 116/10
**little [14]** 7/14 12/20 44/15 47/22 65/18 69/6 94/8 114/11 142/2 142/8 143/24 145/25 146/16 243/6
**live [1]** 178/5
**living [1]** 153/16
**LLC [18]** 1/6 45/6 45/7
45/11 74/3 104/11 104/18 104/21 105/4 107/14 126/18 127/12 130/19 131/6 145/17 145/18 161/22 187/25
**LLP [4]** 1/19 1/21 1/24 2/4
**local [1]** 156/5
**located [17]** 44/20 85/12 112/12 145/4 164/13 167/14 169/4 172/17 201/12 203/6 209/12 209/21 211/18 215/15 216/6 217/25 237/10
**location [19]** 49/13 112/12 113/9 138/20 139/3 139/21 139/21 139/25 165/2 168/20 168/23 169/7 169/12 169/16 169/17 172/13 183/15 187/2 199/1
**locations [1]** 170/18
**logical [2]** 21/24 22/4
**logistics [2]** 20/13 27/4
**logs [1]** 179/21
**long [15]** 28/9 36/4 36/6 65/7 72/1 137/23 218/23 219/22 220/7 220/10 222/17 223/17 236/10 240/7 241/2
**longer [9]** 9/1 64/19 66/2 110/15 140/20 143/17 190/15 233/7 233/17
**longitude [1]** 168/8
**look [50]** 12/14 13/16 20/11 40/4 40/6 40/6 40/10 51/3 53/8 58/12 62/11 62/12 65/9 66/22 79/21 79/24 81/3 81/16 86/2 114/21 116/3 124/15 126/25 132/5 136/2 136/15 136/22 153/9 157/7 167/25 171/24 172/11 172/22 186/13 198/13 201/13 201/17 202/15 206/12 210/5 211/5 213/6 223/18 226/11 226/20 226/20 228/18 229/8 233/11 236/4
**looked [3]** 92/6 110/23 156/15
**looking [13]** 108/24 115/10 129/11 144/1 150/22 158/13 163/24 165/11 168/3 168/7 187/7 195/3 227/22
**looks [5]** 54/7 69/6 70/1 86/11 103/9
**loosely [1]** 107/12
**Lori [7]** 1/14 1/14 245/3 245/13 245/14 245/18
245/20
**lost [4]** 115/24 186/23 209/23 210/7
**lot [6]** 24/3 27/9 32/3 64/18 79/18 230/14
**lots [2]** 47/23 65/1
**loud [1]** 126/9
**lower [2]** 42/21 151/25
**LTD [8]** 44/25 45/5 104/23 130/22 130/25 131/1 131/2 131/4
**lunch [6]** 124/4 124/8 124/10 140/22 242/13 243/21
**luncheon [2]** 140/25 141/3

## M

**ma'am [1]** 205/19
**made [25]** 14/14 52/9 53/2 59/10 61/1 71/11 77/9 81/12 85/6 98/1 108/9 110/4 110/10 123/17 129/1 129/19 133/23 173/8 175/19 181/22 226/1 226/13 241/21 242/1 242/20
**Madriz [4]** 1/23 3/12 5/10 13/9
**magnifies [1]** 14/20
**mail [56]** 170/4 170/6 170/8 170/17 193/9 193/12 194/2 218/23 218/23 218/24 219/24 220/2 220/15 220/18 220/19 221/9 221/10 221/23 222/17 222/18 223/10 223/17 223/23 224/10 226/11 226/11 227/21 228/25 229/8 229/11 229/14 229/18 229/20 230/12 230/16 230/19 231/15 231/16 231/19 233/11 233/20 234/11 234/15 235/4 235/8 235/14 235/17 235/19 236/5 236/7 237/1 237/3 237/3 237/5 237/19 237/19
**mails [10]** 121/21 121/22 122/2 122/4 218/21 219/8 219/9 219/23 232/8 235/13
**maintain [5]** 75/8 151/25 152/8 191/21
**maintained [2]** 73/8 76/23
**maintaining [1]** 238/19
**maintains [1]** 54/8
**major [3]** 44/15 154/5 167/6
**majority [2]** 224/22 236/11
**make [43]** 8/20 9/9
10/13 10/17 11/14 11/16 20/7 22/8 25/2 26/7 26/24 27/5 28/13 30/10 33/1 37/17 42/19 51/21 58/4 62/3 62/8 64/22 81/18 81/22 96/18 99/4 105/9 105/21 115/16 124/11 131/15 133/9 134/8 182/12 197/10 200/25 210/15 215/2 215/24 217/16 222/3 231/6 243/7
**makes [14]** 21/19 21/24 32/12 34/6 56/11 57/23 64/18 67/15 80/10 92/18 103/14 113/16 115/9 179/17
**making [7]** 28/6 35/22 36/9 103/13 221/21 228/8 232/11
**manage [3]** 26/1 60/22 89/8
**management [30]** 99/14 100/15 111/22 142/13 142/15 142/19 142/22 144/3 154/6 155/22 156/3 156/4 156/5 156/13 156/14 157/3 157/8 157/9 157/10 157/11 161/17 166/10 195/12 195/17 229/4 229/7 231/23 234/3 235/23 235/24
**management-level [1]** 100/15
**manager [2]** 142/3 142/24 142/25 224/4
**managing [4]** 46/21 47/15 142/17 144/3
**mandatory [3]** 28/12 28/16 28/18
**manifold [1]** 168/15
**manner [4]** 103/10 122/8 154/4 209/9
**many [13]** 6/24 48/1 50/12 143/16 143/21 146/15 154/11 155/20 156/10 158/19 160/12 227/21 228/12
**map [9]** 146/15 147/12 147/15 147/17 147/22 149/8 149/9 157/20 157/23
**maps [1]** 203/12
**Marbaker [8]** 85/23 166/4 166/5 166/6 167/9 200/14 200/22 241/18
**marcellus [4]** 107/2 107/3 144/1 154/25
**March [44]** 8/24 35/15 109/3 109/11 109/12 117/9 118/2 131/13
132/10 170/4 176/25 187/20 189/1 190/22
**March 10 [2]** 8/24 109/12
**March 2021 [1]** 131/13
**March 5th [1]** 176/25
**March 9 [1]** 132/10
**March 9th [2]** 109/11 117/9
**Maris [7]** 67/16 67/17 67/18 67/20 67/21 68/7 70/14
**mark [1]** 192/21
**marked [8]** 51/4 66/22 66/25 69/17 72/25 114/15 115/12 117/9
**market [1]** 142/23
**marking [1]** 218/17
**marks [1]** 96/14
**Mary [1]** 175/16
**mask [4]** 7/12 7/16 7/17 42/21
**masked [1]** 7/18
**masking [1]** 7/10
**masks [1]** 7/9
**master [4]** 178/17 178/25 179/13 179/16
**master's [1]** 142/6
**masters [1]** 45/16
**material [2]** 17/23 23/1
**materials [6]** 96/11 124/18 179/19 179/21 191/17 204/7
**matter [17]** 6/2 9/19 10/20 10/23 13/3 13/7 14/25 15/16 17/22 37/19 40/18 121/10 205/14 217/12 231/8 236/24 242/22
**matters [9]** 7/25 9/17 9/20 10/18 12/17 13/21 15/19 63/18 243/22
**may [65]** 1/13 3/13 8/12 23/23 23/23 27/24 32/17 35/2 35/3 35/25 37/10 37/19 37/20 38/9 38/22 39/2 42/4 46/13 64/13 72/24 73/2 74/24 75/3 75/5 76/14 76/17 76/21 78/15 95/17 97/18 101/3 109/11 120/17 121/11 122/1 122/9 125/23 126/10 130/11 130/15 130/23 131/3 131/3 139/2 140/17 141/6 155/15 156/23 158/23 167/22 190/3 191/13 205/13 210/6 217/6 223/14 223/24 225/16 225/20 226/22 228/19 229/10 238/1 240/20 243/24
**May 22 [1]** 37/20
**maybe [10]** 22/11

# M

**maybe... [9]** 73/22
114/11 136/15 166/17
204/24 205/3 210/13
215/24 231/3
**MBA [1]** 45/16
**McGUIRE [3]** 1/19 1/21
1/24
**me [94]** 5/8 5/10 5/19
10/22 11/20 12/2 13/14
30/20 38/4 39/4 40/2
43/16 46/24 53/8 54/20
55/22 56/19 62/25 63/5
68/4 69/5 91/17 91/21
93/15 95/19 95/22 96/1
98/6 111/1 112/14
114/10 115/15 116/22
122/3 124/2 125/6
125/24 129/14 131/3
138/2 138/16 145/13
146/5 148/22 150/22
153/13 159/24 164/4
164/10 166/2 171/19
172/2 178/21 185/2
185/11 185/19 187/2
194/1 200/25 202/18
203/23 204/11 205/17
206/17 207/18 207/19
208/17 208/24 209/14
209/14 209/23 210/1
210/7 210/14 210/25
211/6 215/14 215/14
215/20 216/6 216/7
219/14 225/24 227/1
229/6 229/13 230/18
234/8 235/19 235/20
240/7 241/1 243/17
245/11
**mean [30]** 16/11 17/7
23/14 52/17 60/4 64/15
78/2 82/21 86/22 91/25
104/3 106/9 115/4
122/11 134/22 134/23
171/7 184/12 207/7
207/11 212/25 213/1
216/10 217/18 219/22
229/10 230/1 231/10
237/14 240/18
**meaning [6]** 100/14
111/17 138/24 192/3
213/20 213/21
**means [21]** 22/13 31/6
33/16 33/16 60/6 60/9
61/9 71/5 74/17 80/18
96/20 99/21 171/4
171/8 172/12 207/9
214/12 216/11 217/23
240/22 245/22
**meant [3]** 18/8 23/4
191/9
**measure [1]** 139/9
**mechanism [4]** 14/3
214/20 214/23 239/21
**meet [4]** 28/20 91/11

91/12 152/11
**meeting [3]** 161/19
225/10 225/21
**meetings [1]** 232/18
**meets [2]** 152/21
219/16
**member [1]** 131/5
**memorandum [1]**
176/19
**memorialization [1]**
68/1
**memorialized [1]** 17/25
**memorized [1]** 111/2
**memory [2]** 185/2
225/16
**mention [2]** 156/2
214/13
**mentioned [11]** 38/7
61/1 66/14 81/21 160/2
163/8 199/13 212/19
227/3 245/8 245/8
**mentions [1]** 195/19
**mere [1]** 157/13
**merely [2]** 9/14 63/23
**merits [6]** 11/8 18/17
21/12 28/13 40/17
40/19
**met [2]** 27/17 226/12
**Mexico [2]** 142/23
143/4
**MICHAEL [3]** 3/4 42/25
43/16
**microphone [1]** 42/19
**mid [2]** 66/20 66/21
**middle [12]** 1/2 23/18
59/10 68/4 68/11 74/2
75/21 77/13 109/3
187/8 245/4 245/19
**midstream [3]** 44/10
44/20 45/2
**midway [1]** 187/1
**might [13]** 11/5 12/5
12/5 24/8 24/20 27/3
27/4 27/10 36/3 65/5
226/8 228/7 232/6
**Mike [3]** 6/19 42/15
43/16
**mile [1]** 137/23
**miles [1]** 11/25
**Miller [1]** 193/12
**million [10]** 34/18
143/20 166/18 185/3
185/5 185/6 185/7
185/24 186/19 186/23
**mind [5]** 30/24 93/20
95/4 97/5 120/4
**mindful [2]** 28/3 35/1
**mineral [9]** 36/2 134/19
172/5 172/5 173/2
173/3 173/7 173/10
239/13
**minerals [7]** 138/23
139/13 139/14 139/14
174/17 175/23 177/17

**mingle [2]** 199/17
199/21
**mingling [1]** 60/8
**minus [2]** 34/18 39/9
**minute [2]** 118/21
205/9
**minutes [6]** 11/20
11/23 124/5 204/24
229/14 241/4
**missing [1]** 102/6
**misspoke [1]** 105/12
**mistake [6]** 110/4
133/22 133/23 133/24
237/14 237/15
**misunderstand [1]**
123/14
**mobilizing [1]** 24/4
**mode [1]** 155/2
**model [15]** 18/21 19/5
19/19 29/24 30/14 47/5
53/17 53/19 53/20
53/22 53/22 65/12
144/16 151/9 152/13
**modification [1]** 30/14
**modifications [1]** 20/4
**modified [3]** 19/7 29/25
86/12
**moment [6]** 9/21 10/7
81/15 96/10 97/5 222/9
**moments [1]** 126/8
**Monday [2]** 170/4
230/16
**monetary [1]** 239/25
**monetize [1]** 24/25
**money [6]** 16/15 17/2
83/2 86/5 134/19
199/23
**monies [1]** 17/6
**monitor [1]** 36/20
**month [1]** 230/2
**months [9]** 107/24
150/12 150/14 157/19
164/5 164/9 191/1
230/1 230/2
**moot [3]** 8/10 11/12
242/22
**moratorium [2]** 222/19
225/3
**more [34]** 6/25 24/6
26/11 26/16 40/13 48/3
50/15 52/11 53/4 56/11
62/2 64/13 66/6 66/7
68/9 71/8 107/8 114/11
124/6 138/17 138/19
138/23 139/2 139/12
152/15 155/24 190/18
235/12 238/15 240/10
240/15 240/16 243/4
243/20
**morning [14]** 5/18 6/7
7/8 27/24 28/1 37/8
43/13 43/14 162/25
240/14 242/18 243/11
243/19 244/7

**most [16]** 18/20 25/18
66/18 124/5 133/2
142/15 144/10 151/22
151/22 155/5 160/2
190/16 221/21 222/4
224/16 239/2
**motion [6]** 5/11 5/13
10/4 13/24 14/6 14/13
101/1 187/12
**motions [1]** 187/12
**move [41]** 11/15 12/7
15/12 19/2 19/14 19/20
21/5 25/4 26/23 27/19
39/24 73/11 75/11 77/1
79/12 94/10 108/16
117/8 137/9 150/16
158/1 159/9 165/5
167/13 169/2 170/11
176/9 177/3 180/9
181/16 185/12 185/16
201/23 202/22 205/15
219/4 221/21 221/25
230/13 234/21 239/14
**moved [7]** 15/1 15/7
120/14 128/20 140/6
184/16 221/1
**moves [8]** 54/11 67/9
146/25 147/24 149/13
162/20 193/19 196/17
**moving [5]** 24/3 90/9
102/16 108/14 162/11
**Mr [8]** 5/21 13/9 37/17
51/9 62/5 96/18 129/18
240/8
**Mr. [114]** 5/25 5/25
9/13 10/1 10/19 10/23
14/22 27/22 30/23 31/4
39/24 41/12 41/21
42/17 42/23 43/7 43/13
45/14 50/11 51/3 51/7
51/15 53/8 53/12 54/17
58/5 61/22 62/8 63/5
63/20 64/3 65/21 66/13
69/5 70/7 70/14 75/17
79/19 80/10 87/7 90/13
90/17 91/2 91/10 92/4
92/11 93/14 96/10
96/16 97/5 97/10 97/14
100/19 102/6 108/22
109/2 114/20 110/5
116/3 116/9 116/13
116/15 116/21 117/11
117/20 118/14 118/19
119/21 120/9 120/22
121/20 122/12 124/1
124/7 124/15 124/17
124/17 125/23 126/5
126/16 129/16 130/7
130/8 131/10 131/16
132/6 132/15 134/8
140/12 140/15 140/17
140/19 141/23 185/17
187/6 187/20 187/21
190/3 190/8 190/21
191/6 191/9 192/13

194/1 205/7 219/6
219/21 220/11 222/17
233/3 233/15 235/17
240/18 241/11
**Mr. Brier [2]** 39/24
41/21
**Mr. Clanton [9]** 31/4
119/21 141/23 185/17
187/6 194/1 222/17
235/17 240/18
**Mr. Clanton's [1]** 205/7
**Mr. Daniel [1]** 190/3
**Mr. Dempsey [22]** 5/25
9/13 10/19 14/22 91/2
96/10 96/16 97/5 97/10
102/16 115/5 117/20
118/14 120/22 124/17
126/5 132/6 140/15
190/8 219/6 219/21
220/11
**Mr. Douglas [1]** 187/20
**Mr. Eric [1]** 233/3
**Mr. Haskins [1]** 233/15
**Mr. Henry [1]** 30/23
**Mr. Jacobson [1]**
187/21
**Mr. Kravitz [1]** 5/25
**Mr. Krock [23]** 10/1
10/23 27/22 41/12
42/23 61/22 62/8 63/5
63/20 70/7 92/4 116/3
116/9 117/11 122/12
124/1 124/17 125/23
130/8 131/10 131/16
132/15 140/12
**Mr. Lane [1]** 241/11
**Mr. Raleigh [44]** 42/17
43/7 43/13 45/14 50/11
51/3 51/7 51/15 53/8
53/12 54/17 58/5 64/3
65/21 66/13 69/5 70/14
75/17 79/19 80/10 87/7
90/13 90/17 91/10
92/11 93/14 97/14
100/19 108/22 109/2
114/20 116/13 116/15
116/21 118/19 120/9
121/20 124/15 126/16
129/16 130/7 134/8
140/17 140/19
**Mr. Raleigh's [1]** 124/7
**Mr. Ward [3]** 190/21
116/9 191/9
**Mr. Ward's [1]** 192/13
**Mr.Dempsey [1]** 9/25
**Ms [4]** 42/24 96/25 97/7
97/10
**Ms. [9]** 223/11 223/25
230/17 231/16 231/20
232/10 233/12 233/20
234/12
**Ms. Woodard [8]**
223/25 230/17 231/16
231/20 232/10 233/12

## M

**Ms. Woodard... [2]** 233/20 234/12
**Ms. Woodard's [1]** 223/11
**much [17]** 30/25 35/8 45/22 56/11 85/14 86/4 139/12 139/12 145/23 146/17 159/21 166/18 220/12 226/1 226/13 243/4 243/20
**multi [2]** 222/25 225/2
**multi-disciplinary [1]** 225/2
**multi-year [1]** 222/25
**multiple [2]** 148/8 220/6
**must [40]** 21/13 28/13 28/20 40/5 64/6 194/14 194/15 209/20 212/5 214/1
**my [50]** 5/8 5/19 7/13 9/18 11/24 12/10 13/13 16/15 28/22 32/13 40/2 43/16 43/16 53/13 83/12 83/20 106/10 108/2 108/5 128/23 130/15 132/1 133/17 138/4 140/11 142/15 143/12 143/18 143/22 144/4 144/4 145/10 150/4 157/9 160/8 173/23 175/6 188/13 189/13 192/9 205/14 205/17 220/8 223/16 226/7 227/14 228/9 237/15 243/14 245/11
**MYERS [1]** 2/4
**myself [1]** 156/6

## N

**N.E [1]** 1/22
**name [17]** 43/8 43/16 84/14 84/20 126/18 141/16 141/16 141/23 161/21 168/22 168/24 169/18 171/1 182/11 183/2 194/16 231/10
**named [1]** 16/11
**names [5]** 6/6 85/20 87/9 87/9 203/11
**national [1]** 45/23
**natural [5]** 24/14 24/24 23/1
**nature [4]** 28/19 62/2 80/19 240/10
**near [1]** 137/9
**nearby [1]** 182/11
**necessarily [2]** 24/5 121/9
**necessary [12]** 61/16 65/14 85/17 89/20 105/8 106/9 117/15 126/10 158/10 217/9 217/16 242/3

**need [42]** 6/13 10/10 19/25 21/5 27/4 27/4 27/10 27/10 36/11 38/14 42/4 44/11 62/21 65/1 65/8 65/25 66/6 70/11 85/19 89/1 106/7 135/6 135/10 137/5 139/16 144/6 153/24 195/23 209/10 211/21 213/15 220/12 231/21 232/1 234/7 234/21 236/2 236/22 238/25 239/11 242/11 242/23
**needed [9]** 13/9 66/7 119/25 155/6 155/10 155/19 227/3 230/7 234/2
**needs [7]** 27/19 36/7 36/7 124/18 194/9 195/9 232/23
**negative [1]** 200/20
**negotiated [1]** 18/19
**negotiating [1]** 111/25
**neighboring [1]** 139/15
**neither [1]** 134/1
**net [4]** 146/20 146/20 173/3 173/9
**never [9]** 20/19 22/15 22/18 22/20 23/4 26/18 34/2 118/7 132/13
**new [68]** 16/23 18/10 18/25 19/10 19/12 19/13 20/8 20/17 20/23 27/14 28/8 29/8 31/2 31/2 31/24 32/1 33/11 33/11 35/12 36/16 49/18 50/17 50/21 50/24 51/17 57/23 57/24 59/3 59/7 61/17 64/9 64/13 65/5 65/6 65/8 66/2 66/8 66/9 70/10 70/15 72/14 72/22 73/25 81/9 81/13 82/1 82/2 82/10 85/18 86/19 86/20 87/4 87/11 102/24 107/19 136/2 136/12 138/16 138/21 139/6 144/13 151/21 151/23 154/14 184/21 222/22 223/8 235/24
**next [18]** 3/13 9/18 17/3 35/5 36/11 57/3 58/12 76/12 78/21 81/11 138/4 141/6 226/3 226/5 226/14 228/20 229/16 235/8
**nice [2]** 6/5 137/23
**Nicholas [1]** 2/3
**Nick [6]** 5/19 227/2 227/13 228/1 228/25 229/2
**nine [5]** 55/19 55/20 215/8 233/19 234/15
**no [160]** 4/3 4/3 4/4 4/4

4/5 4/5 4/6 4/6 4/7 4/7 4/8 4/8 4/9 4/9 4/10 4/10 4/11 4/11 4/12 4/12 4/13 4/13 4/14 4/14 4/15 4/15 4/16 4/16 4/17 4/17 4/18 4/18 4/19 4/19 4/22 8/21 9/10 11/24 24/1 24/1 24/18 25/12 25/12 27/13 29/16 29/17 31/25 37/1 39/8 41/18 45/10 50/6 50/10 50/18 50/22 51/1 52/20 54/14 55/11 56/22 64/16 64/16 64/16 64/17 67/12 71/10 73/14 75/14 76/3 77/3 77/20 78/2 79/15 80/16 82/5 85/5 87/18 87/23 88/1 93/8 93/25 94/2 94/4 95/3 98/11 99/25 100/3 100/8 100/10 100/12 101/14 102/2 102/20 103/22 103/24 104/14 104/17 104/20 105/22 106/4 107/22 108/10 108/13 108/19 110/15 111/24 112/10 113/24 113/25 114/7 117/4 119/13 123/25 125/16 125/19 127/25 130/1 137/18 140/1 140/14 140/16 140/20 143/17 144/10 153/18 157/12 159/11 162/22 167/16 169/8 170/14 176/12 177/10 178/6 178/22 180/12 181/19 185/15 190/6 193/5 193/23 196/10 196/20 197/25 202/1 202/3 202/25 205/21 207/5 222/13 233/7 233/17 236/3 236/24 239/4 239/4 240/3 242/12 244/4 244/5
**nodded [2]** 124/11 209/11
**nomenclature [1]** 86/23
**nominal [1]** 41/20
**non [57]** 7/14 11/2 19/25 20/1 20/13 20/15 21/6 31/12 48/14 49/25 50/5 50/9 52/5 52/10 52/25 53/2 53/5 55/3 55/5 55/7 57/24 58/2 58/14 58/18 61/13 61/19 63/11 66/3 67/16 68/7 68/18 71/2 71/4 71/5 74/7 75/22 77/22 77/25 78/4 83/1 83/4 83/5 83/7 83/13

86/9 86/11 125/13 132/19 145/14 173/6 236/17 237/20
**non-consent [12]** 21/6 48/14 49/25 52/5 52/10 56/15 67/16 74/7 75/22 77/22 132/19 236/17
**non-consented [2]** 77/25 83/7
**non-consenting [29]** 19/25 20/1 20/13 20/15 50/5 50/9 53/2 53/5 56/23 57/7 57/24 58/18 61/13 61/19 61/25 63/11 66/3 68/7 68/18 71/2 71/4 71/5 78/4 83/1 83/4 83/5 83/13 86/9 86/11
**non-consents [1]** 52/25
**non-operated [1]** 145/14
**non-operator [3]** 31/12 125/13 237/20
**non-operators [4]** 55/3 55/5 55/8 55/12
**non-participation [2]** 58/2 58/14
**non-producing [1]** 173/6
**non-testimony [1]** 11/2
**non-traditional [1]** 7/14
**none [6]** 71/12 83/7 99/1 119/8 125/22 211/15
**nonetheless [2]** 50/1 130/25
**normal [1]** 139/11
**north [12]** 101/7 101/8 101/14 137/22 138/21 158/25 160/25 168/12 177/19 201/10 202/21 211/2
**northeast [2]** 16/3 145/6
**northeastern [4]** 44/4 44/18 45/4 156/11
**not [306]**
**note [3]** 32/23 124/21 161/21
**noted [1]** 221/11
**notes [2]** 40/2 205/17
**nothing [1]** 221/12
**notice [15]** 37/4 37/11 37/16 39/9 40/5 69/10 94/17 94/20 94/24 191/3 207/11 215/17 217/6 233/6 233/10
**notified [2]** 52/1 207/13
**notify [2]** 206/15 206/23
**notion [4]** 23/22 25/21 35/24 37/9

86/9 86/11 125/13 132/19 145/14 173/6 236/17 237/20
**now [73]** 8/2 8/3 13/2 16/6 18/7 21/10 21/12 24/20 26/18 29/11 30/14 30/24 35/3 35/15 35/19 38/20 45/22 53/7 57/12 62/17 68/25 81/15 87/19 89/5 110/23 111/21 118/9 123/8 126/25 131/8 139/12 140/3 140/20 140/24 140/25 148/19 153/2 153/5 153/8 155/8 160/20 162/17 163/21 165/24 168/22 171/16 172/22 178/9 181/11 182/19 185/6 187/7 187/15 198/7 200/4 200/10 201/2 201/6 204/10 208/3 208/20 215/1 215/7 216/5 216/20 217/22 226/13 231/9 231/15 234/10 236/4 236/25 240/6
**nowhere [2]** 98/9 106/15
**number [103]** 6/16 44/23 46/11 46/11 47/7 49/7 49/10 54/22 55/23 57/10 57/11 58/6 61/11 61/13 65/22 65/24 65/24 69/17 69/18 79/22 95/19 95/20 96/4 96/5 112/24 114/15 115/9 116/1 116/14 116/15 116/22 120/6 122/6 124/16 125/6 126/16 129/24 149/14 153/6 157/16 160/20 162/10 163/22 165/6 165/24 168/1 169/23 170/12 170/21 171/17 173/18 173/22 176/10 176/15 177/4 180/5 180/16 181/2 181/3 181/17 181/25 182/4 182/14 182/16 182/19 182/22 183/9 183/10 183/15 183/16 183/23 184/1 184/10 184/12 184/13 185/4 186/4 186/5 186/9 186/9 186/21 187/4 189/21 192/19 193/3 193/8 194/15 194/22 196/23 198/7 198/24 199/14 201/17 202/8 202/10 202/16 203/7 203/24 212/6 215/7 217/22 219/5 237/11
**numbered [1]** 245/9
**numbering [2]** 128/17 187/16
**numbers [6]** 69/7

# N

**numbers... [5]** 170/25
178/9 183/12 185/13
185/17
**numeral [2]** 208/20
208/22

# O

**oath [6]** 42/22 42/24
90/17 140/20 141/9
240/19
**object [7]** 15/13 120/17
147/4 147/6 149/17
149/20 158/8
**objection [70]** 54/13
54/14 61/20 62/5 62/7
63/3 63/8 63/15 63/19
67/11 67/12 71/14
73/13 73/14 75/13
75/14 77/3 79/14 79/15
84/16 102/19 108/18
108/19 117/11 117/17
118/12 121/12 121/17
147/2 149/15 149/16
158/3 159/11 162/21
162/22 165/7 167/15
167/16 169/5 169/8
170/13 170/14 176/11
176/12 177/5 177/10
180/11 180/12 181/18
181/19 185/14 185/15
188/7 190/8 190/10
190/12 192/25 193/4
193/21 196/19 196/20
201/25 202/1 202/3
202/24 202/25 205/20
205/21 211/14 221/3
**objections [3]** 121/7
121/8 192/25
**obligated [3]** 12/4
122/13 200/16
**obligates [2]** 106/8
106/12
**obligation [4]** 76/3
77/22 78/1 154/2
**obligations [4]** 31/3
161/17 197/2 235/25
**obtain [3]** 62/21 89/20
217/9
**obtained [7]** 89/23
179/25 206/6 206/14
206/22 207/22 208/11
**obvious [4]** 143/5
143/8 230/24 231/23
**obviously [9]** 38/14
41/7 44/12 165/21
169/11 192/5 205/5
225/25 228/12
**occasion [1]** 47/17
**occur [6]** 33/8 35/25
86/25 119/15 119/15
239/23
**occurred [4]** 26/5
106/22 184/18 236/10

**occurrence [1]** 66/19
**occurrences [1]**
139/11
**occurring [1]** 223/14
**occurs [1]** 238/14
**October [11]** 30/22
31/12 31/20 34/9 34/12
99/7 118/20 219/2
219/20 220/17 220/19
**October 18th [1]** 99/7
**October 2018 [1]**
118/20
**October 2020 [1]** 31/12
**October 20th [2]** 219/2
219/20
**odd [1]** 128/17
**off [6]** 39/24 60/4 69/6
155/24 164/5 216/20
**offer [3]** 100/13 190/3
222/6
**offered [1]** 190/17
**offering [2]** 63/17
124/23
**office [3]** 5/15 43/20
43/21
**officer [4]** 6/20 6/21
30/24 142/1
**offices [1]** 54/9
**Official [3]** 245/3
245/15 245/18
**offset [1]** 239/8
**often [1]** 174/21
**oh [10]** 46/5 69/8 85/2
108/25 116/6 177/9
178/1 192/20 196/23
198/17
**oil [37]** 11/18 16/2
23/10 24/10 25/14
25/18 25/25 43/24 44/3
44/7 44/21 45/24 46/3
46/11 46/17 48/10
59/19 112/23 114/24
116/14 134/20 142/6
143/9 172/16 173/2
173/6 173/10 174/16
175/18 176/2 178/18
178/20 179/3 179/4
179/15 180/25 185/23
**Oil's [1]** 182/10
**okay [110]** 24/15 37/23
42/9 47/25 51/8 51/10
59/16 62/17 66/24 78/5
80/5 90/20 92/2 93/15
95/4 95/24 98/12 99/14
100/1 101/17 101/25
102/6 103/20 104/24
106/10 106/17 107/21
107/25 108/25 109/13
109/14 110/6 110/10
113/9 113/12 114/18
115/4 117/7 118/23
122/9 123/20 123/24
125/6 128/14 129/10
132/23 134/1 135/1

135/10 136/1 136/12
137/15 138/15 153/3
161/1 165/20 178/11
178/12 179/11 180/18
186/10 188/11 198/9
198/12 198/17 198/21
199/3 201/14 201/18
202/13 202/17 203/3
203/18 204/5 206/4
207/14 208/6 208/16
209/4 209/8 209/14
210/17 210/22 211/10
212/5 213/8 216/5
216/15 217/24 218/19
220/2 221/4 222/8
222/14 223/20 223/22
225/5 228/18 229/8
229/9 230/22 235/9
235/18 237/2 241/15
242/4 242/19 243/5
243/17 243/18
**Oklahoma [7]** 44/1
64/25 107/20 107/23
225/3 225/10 226/12
**once [10]** 9/18 20/1
32/14 32/15 88/2 88/9
88/12 141/9 144/17
212/15
**one [128]** 5/12 5/16 6/2
6/9 9/21 10/9 10/14
10/20 13/2 13/22 18/14
18/24 19/3 19/4 26/16
29/15 29/21 29/21 30/8
30/11 34/25 39/4 39/21
40/21 41/5 46/11 48/6
48/19 49/24 52/4 52/17
53/11 55/23 56/11 57/1
58/25 60/17 65/22
65/24 67/21 68/3 68/12
68/23 69/5 69/18 70/6
70/14 70/24 71/9 72/5
79/22 79/24 82/22 83/1
85/24 95/16 97/5 97/17
99/7 100/4 100/25
101/8 101/10 101/10
101/14 102/2 106/6
106/7 106/8 107/8
109/22 112/24 114/14
114/15 121/7 124/17
126/17 129/3 130/15
143/9 148/11 150/3
151/22 160/25 161/21
166/6 166/9 169/1
170/18 175/2 175/13
175/17 182/10 183/13
184/17 186/16 186/18
187/12 195/25 201/11
201/13 201/15 201/16
201/19 203/6 203/9
203/10 204/11 205/3
205/13 208/3 208/19
211/3 218/15 218/23
218/23 219/24 219/25
220/2 220/7 222/12

228/20 234/22 236/25
237/5 237/6 238/15
240/24
**one-page [1]** 234/22
**ones [3]** 114/18 144/22
230/14
**ongoing [7]** 17/9 122/6
222/21 224/14 224/18
236/2 239/15
**only [22]** 17/10 20/22
21/24 29/21 34/7 36/7
41/7 41/22 71/24 72/5
80/2 96/23 101/10
126/11 129/18 140/11
154/21 180/5 214/8
214/8 221/9 237/5
**opening [12]** 6/23 7/6
10/5 15/21 28/22 32/16
40/1 41/4 41/6 42/10
108/6 220/16
**operate [24]** 32/1 44/23
45/7 45/8 45/12 57/1
74/15 77/19 78/5
100/23 102/13 103/16
108/11 108/12 125/14
153/25 159/20 183/15
195/10 236/17 236/18
236/19 236/21 236/22
**operated [4]** 144/23
145/14 145/14 159/20
**operates [5]** 45/10
60/20 84/1 153/18
236/9
**operating [80]** 6/20
16/1 22/7 24/13 30/24
37/12 45/2 45/6 45/7
45/11 53/18 53/19
53/20 53/22 53/24 56/9
59/23 64/5 65/12 89/1
89/2 89/12 91/14 91/16
92/14 99/5 99/8 101/12
104/11 104/18 104/18
104/21 104/25 105/2
105/4 105/16 105/23
106/11 106/13 106/16
106/15 107/14 119/18
126/18 130/19 130/23
131/4 134/23 135/4
136/2 138/12 140/8
142/1 144/7 144/11
144/19 144/21 145/17
145/18 146/24 151/7
152/2 152/3 154/24
160/13 161/22 161/25
173/2 179/4 201/21
203/20 204/3 206/3
210/4 211/25 224/17
230/5 238/2 239/2
242/9
**operation [36]** 16/15
18/25 20/3 33/17 39/10
40/6 40/7 41/1 52/10
55/5 55/15 55/23 56/3
56/18 57/6 57/15 57/17

58/10 58/10 59/5 59/22
86/13 86/16 86/22 87/5
89/17 99/3 101/13
101/25 108/1 123/2
206/14 206/22 206/24
206/25 207/23
**operational [5]** 138/8
153/17 154/15 155/17
156/1
**operations [65]** 19/22
20/14 26/7 27/11 31/7
33/19 34/23 35/3 35/7
36/17 36/21 36/23
37/10 37/16 38/9 38/11
38/23 44/1 51/2 55/22
58/6 59/1 62/13 64/13
66/8 75/23 77/23 80/11
85/15 85/15 89/13
89/15 92/21 98/20
123/1 123/19 133/4
134/2 136/18 136/21
142/11 144/8 162/1
195/10 199/14 199/14
204/8 208/11 209/9
209/17 209/20 211/21
212/3 212/6 212/23
212/25 213/4 213/4
213/15 213/18 214/12
215/18 216/18 237/9
237/20
**operative [2]** 117/13
187/2
**operator [150]** 16/7
16/11 16/20 17/8 17/20
18/6 19/3 19/5 20/18
21/25 22/1 22/5 22/6
22/10 22/15 22/16
26/14 26/16 27/7 27/9
28/8 28/23 28/25 29/2
29/2 29/2 29/5 29/8
29/17 29/19 29/20
29/21 31/12 31/18
31/19 34/20 37/5 38/1
39/8 40/5 40/24 50/20
52/9 52/10 52/14 52/15
54/18 54/21 55/1 55/3
55/8 55/11 56/11 56/15
56/17 56/21 56/23
56/24 57/4 57/6 57/7
57/13 57/15 57/16
59/22 59/22 60/4 60/17
60/18 60/20 60/22
72/20 72/22 74/9 74/17
74/17 74/18 76/10
77/10 77/22 80/8 82/13
82/21 82/22 83/9 83/15
83/19 88/18 89/8 89/15
89/16 89/18 92/13
92/20 93/3 93/6 93/8
93/10 93/22 94/1 94/12
95/16 95/17 97/17
97/18 98/14 101/1
101/3 101/18 101/20
101/21 101/22 102/3

# O

**operator... [37]** 103/8
103/13 103/15 103/23
113/22 122/25 125/4
125/5 125/9 125/11
125/13 125/14 125/18
125/25 126/21 148/16
161/6 161/15 171/9
176/1 200/25 206/24
207/23 208/11 214/19
216/17 217/7 217/8
233/18 236/23 237/20
237/23 237/24 238/3
238/9 238/13 239/16
**operator-shifting [2]**
29/20 29/21
**operators [20]** 25/4
26/1 27/3 55/3 55/5
55/8 55/12 154/14
154/24 155/2 155/4
155/9 155/12 157/6
157/12 161/11 166/20
217/19 231/24 239/8
**operatorship [10]** 17/7
29/9 30/7 76/6 77/15
77/18 81/5 125/20
231/13 236/23
**opinion [7]** 8/6 28/14
63/17 71/15 103/13
217/8 217/19
**opportunities [3]** 23/15
236/13 236/16
**opportunity [23]** 6/12
6/23 7/6 8/19 9/8 9/24
10/1 10/8 14/2 15/4
15/11 15/13 23/4 35/21
53/4 63/13 63/21 130/8
153/25 199/8 219/21
221/2 228/10
**opposed [4]** 20/8 87/4
126/18 183/20
**opposing [5]** 8/17
13/25 96/19 190/7
218/9
**opposition [4]** 10/3
41/22 41/23 41/25
**ops [1]** 145/8
**optimization [1]** 46/1
**optimize [1]** 80/20
**optimum [1]** 80/24
**option [12]** 12/11 52/4
52/8 52/22 68/23 69/16
69/16 69/17 69/17 70/6
70/23 238/11
**options [7]** 68/13 69/12
69/22 69/23 236/14
237/4 237/6
**oral [3]** 8/5 8/7 242/20
**oranges [1]** 38/10
**order [16]** 6/15 13/10
19/13 35/6 50/17 65/22
88/24 89/19 94/24
114/1 137/7 161/9
172/3 173/12 242/22

243/7
**ordinary [8]** 54/8 73/9
75/9 76/24 162/15
176/6 180/6 181/13
**organize [2]** 136/25
240/16
**original [10]** 38/22 57/6
127/2 127/7 174/16
174/20 184/24 184/25
185/7 186/19
**originally [4]** 183/8
184/2 184/7 232/13
**other [96]** 7/18 11/5
11/21 12/5 13/5 13/20
15/10 15/18 16/13 17/5
19/1 20/8 22/7 22/16
23/16 24/10 24/12
25/14 26/4 26/14 33/13
34/4 36/1 36/20 37/5
37/12 39/23 46/17
46/17 47/9 48/20 49/17
49/21 50/7 50/23 53/3
56/16 57/15 59/2 64/5
65/11 71/12 83/7 84/22
84/23 85/3 85/4 89/14
94/20 96/2 96/3 96/20
101/11 101/11 101/13
119/8 123/2 139/20
140/4 148/10 148/11
148/11 149/3 151/7
155/2 155/12 156/7
156/10 157/12 159/6
166/19 167/22 173/5
173/6 173/6 174/3
174/25 179/22 179/24
183/12 185/25 191/17
199/17 199/18 201/19
203/11 203/12 211/7
214/1 217/7 223/13
227/20 228/12 230/25
243/22 244/2
**others [4]** 103/11
151/12 155/4 156/7
**otherwise [5]** 47/21
53/2 77/19 173/12
184/20
**our [110]** 5/15 6/11
6/21 7/3 7/11 8/15 8/16
8/17 9/1 11/15 12/3
12/21 13/6 14/12 21/21
22/1 22/11 22/12 23/20
24/14 24/18 24/19
24/23 31/5 31/17 36/25
39/19 40/9 40/18 40/22
43/21 46/23 51/11
88/16 91/5 96/7 114/18
118/21 118/21 120/21
123/23 137/8 139/8
139/16 145/13 146/10
149/16 151/23 152/1
152/4 154/17 155/22
155/25 156/6 157/7
171/14 171/14 172/4
173/20 178/1 178/9

181/12 185/7 185/9
186/22 194/20 195/12
195/17 196/5 197/4
197/5 197/11 197/17
197/18 199/17 199/20
200/2 211/1 221/21
222/1 224/21 224/22
225/2 225/3 226/1
227/2 227/20 227/25
228/2 228/3 228/15
229/2 230/22 231/6
231/9 231/10 231/23
233/24 234/2 234/3
235/22 236/11 236/12
236/15 237/22 239/11
239/12 239/13 243/4
243/7
**ours [2]** 24/11 227/11
**ourselves [1]** 239/12
**out [67]** 8/13 8/21 9/1
16/8 19/9 19/24 19/25
20/2 20/5 21/5 30/13
33/24 36/18 37/12
39/21 51/22 68/17
80/10 94/16 124/18
129/14 132/12 144/6
144/15 146/8 155/6
163/17 164/1 168/16
171/9 173/4 175/21
179/1 179/14 180/4
183/25 186/6 189/15
194/6 196/4 197/5
205/1 207/19 209/6
209/16 209/17 211/25
212/3 212/7 212/24
217/21 222/23 223/3
223/4 223/14 224/6
225/1 225/24 226/4
229/5 231/22 232/23
233/24 234/7 236/3
236/15 238/3
**outcome [1]** 238/6
**outlined [3]** 52/12 53/3
102/14
**outlines [1]** 146/10
**outrun [1]** 166/19
**outsource [1]** 160/18
**over [38]** 14/24 27/9
41/23 59/21 60/18 72/4
77/15 77/18 83/19 93/6
125/20 134/7 141/9
142/10 142/13 143/18
143/24 145/25 146/16
154/9 156/14 156/15
157/7 158/9 160/1
160/6 160/8 160/18
174/20 184/23 185/1
192/11 201/3 215/4
223/16 226/17 226/18
241/17
**overall [2]** 157/7
240/23
**Overfield [1]** 149/4
**overlaid [1]** 164/2

**overlook [1]** 37/13
**overnight [2]** 240/22
242/5
**overrule [2]** 63/8
118/12
**overruled [4]** 71/19
84/18 188/11 192/25
**oversaw [1]** 149/19
**oversee [1]** 149/23
**overseeing [1]** 47/15
**oversight [9]** 145/7
145/11 154/6 155/23
156/3 156/3 156/4
156/5 156/14
**overview [5]** 6/4 6/14
9/14 45/19 51/16
**own [27]** 26/6 28/6
32/24 36/9 45/1 45/8
45/12 48/16 84/11 91/5
111/3 119/5 119/5
133/7 133/15 134/5
134/25 134/25 139/8
148/10 148/12 152/15
154/9 164/21 171/14
171/14 181/12
**owned [28]** 18/12
18/13 82/17 83/25 84/7
84/8 84/23 85/21
104/11 104/22 105/6
105/13 110/9 110/12
110/17 111/20 126/22
127/12 130/24 130/24
145/18 148/8 161/24
166/6 166/13 183/11
196/6 197/8
**owner [6]** 16/13 22/9
134/19 180/4 195/22
225/11
**owners [7]** 51/22
143/15 151/11 152/25
189/14 226/9 239/13
**ownership [28]** 11/6
11/9 44/9 44/17 44/21
83/14 83/18 84/22
85/10 109/16 110/21
118/2 118/10 130/25
134/12 134/17 134/24
138/12 171/11 171/12
179/14 187/23 188/19
188/22 189/11 190/24
191/22 192/15
**owns [2]** 26/4 44/3
45/3 114/7 117/23
117/24 130/21 133/4
148/7 181/6 181/11
204/7

# P

**p.m [18]** 141/4 170/5
205/12 219/2 223/24
226/24 228/19 228/23
229/10 229/10 229/21
230/17 230/20 231/17
232/9 233/12 236/5

244/9
**PA [9]** 1/20 2/5 37/24
161/2 161/4 161/17
231/25 232/13 233/17
**pace [2]** 152/11 152/21
**packet [1]** 220/18
**pad [67]** 16/24 25/5
25/6 25/9 25/16 26/5
26/15 27/3 27/8 28/8
28/24 29/1 29/3 30/7
30/8 34/18 34/23 35/5
36/5 36/6 41/16 49/12
84/2 86/1 87/13 87/15
89/5 89/13 89/18 89/19
107/18 107/19 108/1
138/3 138/5 138/9
138/13 138/16 139/19
139/21 139/22 153/16
154/18 161/16 164/10
164/11 164/13 164/19
164/21 165/2 165/12
165/15 176/1 176/4
177/19 195/15 197/18
199/2 213/4 213/4
227/2 231/2 233/9
234/5 239/7 241/18
**pads [3]** 26/16 64/17
241/22
**page [103]** 3/4 53/9
53/21 53/21 54/22
54/22 54/23 55/19
55/20 58/7 58/8 58/12
58/12 58/24 58/25 59/3
60/5 62/11 62/11
65/10 68/20 68/21
69/25 70/4 70/25 79/3
79/22 79/23 79/25 86/2
86/2 108/25 115/9
115/10 115/14 115/20
115/22 115/24 116/1
116/5 116/5 116/6
116/10 116/14 116/21
124/24 127/5 128/19
128/19 129/8 129/11
129/16 129/17 129/25
153/8 176/24 178/21
179/10 182/15 182/16
186/6 187/1 187/15
198/15 198/16 203/17
203/19 204/1 204/2
206/2 206/3 206/18
206/19 207/20 208/3
208/8 208/19 208/21
209/5 209/6 209/23
210/3 215/8 218/15
223/19 223/21 226/20
229/19 230/15 231/15
232/8 233/11 233/19
234/10 234/11 234/14
234/15 234/16 234/22
235/17 236/4 236/25
237/1
**pages [2]** 220/6 226/18

# P

**paid [3]** 164/19 197/11 200/2
**pamd.uscourts.gov [2]** 1/14 245/20
**papers [1]** 9/1
**parade [1]** 25/11
**paragraph [66]** 18/1 22/19 29/23 29/23 31/9 31/11 31/22 32/11 32/15 32/16 33/10 33/19 34/14 39/14 39/16 40/3 58/8 58/20 58/23 59/25 60/25 68/4 68/11 68/21 69/1 69/4 75/21 76/8 77/13 80/6 81/3 82/12 95/6 95/14 95/20 96/5 97/1 98/8 98/12 98/13 98/13 98/17 98/18 109/23 120/7 120/13 127/4 127/11 129/24 131/14 131/16 131/19 132/5 132/15 132/23 132/24 153/10 183/5 187/8 195/18 195/19 198/13 198/18 213/7 216/2 217/25
**paragraphs [6]** 33/6 61/4 80/3 81/17 132/7 192/12
**paraphrasing [1]** 197/6
**parcel [1]** 41/14
**parent [2]** 44/25 134/11
**parents [1]** 43/16
**part [26]** 41/14 43/25 44/11 71/2 71/4 82/24 100/8 128/6 133/2 155/5 167/22 171/9 173/8 175/3 179/13 185/10 192/16 212/13 216/23 220/19 224/5 231/25 232/14 232/15 242/2 243/23
**participant [1]** 53/3
**participants [4]** 55/12 63/11 66/3 199/24
**participate [46]** 16/12 16/14 16/18 16/25 17/20 18/3 18/25 19/13 29/13 31/14 31/15 48/5 48/7 48/9 48/20 49/18 49/24 51/25 52/21 52/23 53/4 56/17 58/3 61/14 61/19 63/23 71/13 72/17 72/21 76/1 87/22 88/4 95/15 97/16 103/11 111/25 207/5 213/22 215/17 215/18 215/20 231/13 232/6 236/19 237/21 238/4
**participated [6]** 17/13 48/23 49/16 49/21 86/11 154/22

**participating [2]** 52/22 207/9
**participation [9]** 52/2 58/2 58/14 63/1 69/19 69/20 70/20 70/21 75/23
**particular [14]** 16/18 56/15 56/18 117/14 124/24 129/1 135/4 164/7 167/7 203/4 208/12 210/4 213/23 239/8
**particularly [5]** 18/14 41/17 153/17 235/15 243/3
**parties [135]** 16/1 16/5 16/9 16/13 17/5 18/1 18/7 18/19 19/1 19/2 19/3 19/4 19/7 19/9 19/11 19/20 20/4 20/12 20/14 20/15 20/22 20/24 21/1 21/3 21/4 21/9 26/12 28/19 29/4 29/17 29/25 31/8 31/19 32/4 32/6 32/8 32/9 33/4 33/13 34/4 34/25 35/20 42/1 42/10 49/17 50/5 50/9 50/16 52/3 52/4 52/6 52/9 52/17 53/2 54/6 55/15 56/16 56/22 56/25 57/1 57/24 58/6 58/9 59/2 59/20 59/24 60/16 61/5 61/10 61/13 61/16 62/13 66/16 67/22 68/7 68/17 68/18 70/21 71/12 82/23 83/1 83/7 83/17 86/5 87/3 87/25 89/12 89/14 92/19 92/25 95/17 97/18 100/25 101/1 101/11 102/7 119/3 119/8 119/8 123/2 135/3 135/6 135/8 148/8 148/10 148/11 152/14 152/23 154/2 173/16 176/3 176/20 178/19 178/23 196/3 196/5 200/9 201/2 201/4 204/4 206/15 206/23 207/22 212/1 213/22 215/16 216/11 216/17 217/7 217/15 236/18 236/21 237/9 237/24 238/13
**parties' [6]** 41/6 58/17 71/3 71/4 86/9 151/8
**partner [2]** 142/17 144/3
**partners [11]** 46/2 94/20 144/16 144/19 148/11 164/20 204/9 212/9 223/8 224/13 224/21
**partnerships [1]** 46/23

**parts [1]** 24/3
**party [68]** 5/4 16/8 18/5 18/24 19/25 20/1 20/13 21/21 21/25 22/3 28/11 29/13 29/15 29/16 32/24 49/21 49/24 50/7 50/19 50/24 52/18 52/25 53/5 55/17 55/24 55/25 56/3 56/6 56/23 56/24 57/5 57/7 58/18 60/3 61/19 61/25 66/7 69/9 69/11 71/5 71/9 71/11 71/24 71/24 72/1 72/5 78/4 79/2 82/14 82/22 83/4 83/5 83/13 86/11 93/25 101/21 102/3 104/18 135/6 163/18 178/4 192/2 206/14 206/22 206/24 207/3 207/9 215/18
**party's [1]** 69/19
**pass [1]** 240/5
**passed [1]** 57/13
**passes [1]** 49/6
**past [1]** 14/24
**Paula [1]** 170/2
**pause [8]** 39/6 65/19 80/4 97/4 221/5 221/19 222/10 243/9
**pay [10]** 19/23 48/24 49/2 53/4 61/14 68/18 72/2 134/19 134/20 135/8
**paying [4]** 59/19 68/9 68/9 152/15
**payments [4]** 53/1 173/4 241/22 242/2
**peak [1]** 186/7
**peer [1]** 144/5
**penalties [1]** 61/18
**penalty [2]** 61/8 61/9
**pending [1]** 204/16
**PENNSYLVANIA [31]** 1/2 1/11 16/3 23/19 24/16 26/22 26/23 36/15 43/25 44/4 44/18 45/4 78/15 89/21 106/19 107/21 108/11 109/3 134/13 134/16 145/5 153/18 156/11 160/24 161/1 161/12 164/16 172/18 191/6 245/5 245/19
**people [12]** 18/21 22/7 23/16 82/24 101/13 104/6 105/18 105/20 116/12 122/23 139/8 160/17
**per [3]** 136/8 185/18 198/25
**perceive [1]** 23/5
**percent [46]** 11/14 12/1 12/6 31/16 44/19 45/1 52/2 53/5 61/8 61/8

104/11 104/22 105/6 105/13 110/20 111/4 112/17 112/19 128/2 128/5 130/23 130/24 130/25 134/4 135/6 135/11 135/13 135/18 135/25 138/14 138/14 145/18 148/9 161/24 164/22 171/12 171/14 172/8 181/12 206/6 206/13 206/21 207/22 208/10 216/16 237/22
**percentage [2]** 171/12 172/7
**perform [8]** 16/19 26/15 56/21 56/24 57/1 57/15 57/17 63/11
**performance [2]** 9/3 55/2
**performed [4]** 25/7 25/8 107/25 108/4
**perhaps [4]** 10/21 92/3 220/3 243/1
**period [36]** 20/6 39/9 51/23 65/4 65/5 68/25 76/21 81/22 120/15 136/1 136/3 136/3 136/9 150/6 150/10 166/23 206/25 207/23 209/9 210/2 212/1 212/8 212/10 212/10 212/12 212/15 214/9 215/10 215/10 215/12 215/13 216/8 216/9 216/24 217/7 226/18 226/18
**periodically [1]** 72/5
**periods [1]** 215/11
**permission [3]** 37/10 147/7 218/8
**permit [64]** 11/6 12/4 102/24 103/8 103/16 104/9 104/13 104/15 110/12 111/17 112/21 112/22 112/22 112/23 112/24 113/1 113/3 113/10 113/13 113/15 113/16 113/17 113/21 113/22 113/23 116/19 116/23 117/23 117/25 137/12 160/24 161/10 161/14 161/21 162/3 162/5 163/9 163/11 163/13 168/21 168/24 168/24 169/16 170/24 171/4 171/10 171/13 173/21 174/10 182/6 182/12 182/15 184/3 184/14 184/24 187/5 194/6 195/23 198/24 199/13 232/14 232/16 232/24 233/8
**permits [40]** 26/22 33/16 37/1 89/20 89/23 89/25 90/4 90/5 90/6

90/10 104/2 104/3 111/3 111/16 111/20 112/19 113/12 123/23 126/17 161/8 161/18 162/6 162/8 166/18 174/2 179/7 179/9 179/15 179/22 183/20 184/17 184/19 188/5 191/23 195/9 195/9 197/8 217/9 231/10 233/22
**permitted [19]** 21/20 21/22 22/13 33/15 33/18 34/8 35/11 37/4 57/25 82/15 82/21 92/22 104/24 105/2 106/14 112/11 113/6 163/19 240/14
**permittee [2]** 232/20 232/23
**permittees [1]** 233/9
**permitting [12]** 18/9 35/20 36/24 36/25 82/16 163/20 197/7 231/7 232/1 232/7 233/25 234/21
**perplexed [1]** 117/15
**person [12]** 6/5 22/5 89/1 89/2 96/23 100/15 117/2 117/5 120/24 143/1 227/11 233/2
**personal [3]** 63/18 100/10 188/8
**personally [7]** 47/14 50/12 50/23 78/8 112/6 157/8 160/1
**personnel [1]** 156/17
**pertain [2]** 58/16 73/17
**petitions [1]** 28/11
**petroleum [1]** 142/5
**phase [2]** 156/14 162/1
**phone [1]** 242/20
**photo [8]** 164/2 164/3 164/8 164/25 165/3 165/25 166/3 168/5
**photograph [1]** 164/1
**photos [1]** 112/8
**phrase [2]** 82/20 104/7
**physically [1]** 112/9 112/12 165/11
**pick [2]** 22/2 204/10
**picture [3]** 144/16 164/7 168/20
**piece [1]** 181/12
**Pierson [1]** 158/25
**pillar [1]** 5/23
**pipe [1]** 60/7
**pipeline [4]** 44/10 44/18 44/19 149/2
**pipelines [5]** 137/4 148/5 149/3 149/4 150/25
**Pittsburgh [3]** 1/20 5/15 11/21

# P

**place [12]** 1/11 26/21
44/22 56/12 64/20
64/21 66/19 97/23
171/2 178/3 235/24
239/12
**placed [2]** 13/25
124/22
**placing [1]** 14/10
**plain [10]** 29/23 33/21
40/22 92/18 113/16
190/18 190/22 191/12
210/3 210/9
**Plaintiff [21]** 1/18 3/2
4/2 5/6 5/8 6/15 12/11
12/17 14/25 15/12
15/21 31/13 42/13 43/2
141/5 141/13 147/24
149/13 193/19 196/17
211/11
**Plaintiff's [118]** 15/5
51/4 54/12 54/15 66/23
67/1 67/10 67/13 70/9
72/23 73/12 73/15
74/23 74/25 75/12
75/15 76/13 76/15 77/2
77/4 77/6 79/13 79/16
90/19 114/13 114/13
146/1 147/1 147/25
148/19 149/14 150/17
150/18 153/5 157/15
159/12 160/20 162/9
162/12 162/20 162/23
163/21 165/6 165/20
165/24 167/17 169/10
169/23 170/12 170/15
171/16 173/22 176/10
176/13 176/15 177/4
177/11 178/13 180/10
180/13 180/16 181/17
181/23 182/19 185/11
185/13 185/17 186/13
192/19 192/21 192/25
193/3 193/6 193/8
193/21 193/24 194/22
196/18 196/21 196/22
197/1 197/23 197/23
198/4 198/7 201/12
201/17 201/24 202/4
202/13 202/15 202/23
203/1 203/6 205/6
205/15 205/22 210/19
210/21 211/5 211/5
211/6 211/12 211/16
211/19 215/7 217/22
218/14 218/17 219/5
222/1 222/14 223/21
237/10 241/1 242/12
242/25 243/21
**Plaintiffs [1]** 42/15
**plan [13]** 145/15 154/7
154/18 154/23 154/25
155/7 156/20 195/12
195/17 222/24 222/25

**planned [3]** 107/25
223/4 229/17
**planning [14]** 35/9
151/23 154/5 154/6
157/4 205/6 221/25
223/13 223/15 224/1
224/8 224/9 224/25
225/23
**plans [10]** 45/25 46/1
179/21 223/14 225/5
225/12 226/1 226/1
226/2 228/2
**plausible [1]** 32/7
**play [4]** 144/5 151/20
156/19 179/6
**played [1]** 35/14
**pleadings [1]** 98/9
**please [41]** 27/25
43/15 66/22 74/23
76/12 78/21 90/22 91/6
94/10 102/15 114/20
120/5 129/24 130/16
131/14 141/2 141/5
141/10 141/15 141/20
142/2 158/11 158/13
161/3 172/1 173/22
176/15 178/13 179/10
180/16 180/17 182/20
185/11 187/10 191/14
193/8 203/9 205/11
232/8 233/16 233/25
**pleasure [1]** 6/5
**plenty [6]** 23/15 59/7
138/17 139/1 139/6
139/13
**plug [5]** 30/4 56/1
86/24 98/25 144/5
**plugged [1]** 59/17
**plus [7]** 34/18 39/9
125/18 125/21 212/20
213/14 225/11
**point [32]** 6/9 8/21 9/13
10/7 15/9 19/16 37/18
39/25 50/3 84/20 84/22
85/1 85/4 95/20 109/24
110/7 110/16 110/21
110/25 113/6 113/10
133/16 145/1 150/8
188/25 190/2 205/9
210/6 215/23 221/24
222/2 242/20
**pointed [4]** 9/1 131/16
132/12 189/15
**points [9]** 82/17 83/25
84/11 84/12 134/8
169/8 189/24 190/1
220/9
**pond [1]** 85/14
**ponds [1]** 84/2
**pooled [1]** 174/5
**pooling [1]** 173/12
**poor [1]** 210/12
**portion [11]** 20/12 49/6

71/3 80/6 86/3 87/3
110/9 133/15 146/19
160/9 170/17
**portions [1]** 161/25
**pose [1]** 97/6
**position [45]** 10/10
12/3 12/9 15/14 17/4
17/12 17/21 19/8 21/10
21/15 22/13 22/21
22/22 23/14 37/21
38/17 39/19 40/9 40/22
62/19 62/22 62/24 78/9
88/2 88/7 95/25 97/21
99/14 100/22 102/1
102/4 102/11 110/11
117/24 119/23 119/24
120/2 142/16 146/7
146/10 174/21 174/23
185/25 220/12 221/2
**positions [1]** 142/13
**possible [5]** 36/1 36/2
36/4 210/21 218/8
**possibly [1]** 223/4
**post [2]** 36/25 225/3
**post-expiration [1]**
225/3
**post-permitting [1]**
36/25
**posts [1]** 164/6
**potential [8]** 143/7
145/13 152/5 152/6
201/4 227/13 227/16
239/10
**potentially [4]** 22/7
24/13 42/4 239/18
**Poulsen [1]** 137/22
137/22 158/25 158/25
**power [2]** 17/14 50/20
**practical [1]** 61/24
**practice [1]** 138/23
**practices [1]** 11/18
**preceding [1]** 207/20
**predicate [2]** 147/8
150/2
**predicated [2]** 14/7
14/12
**predictable [1]** 239/4
**predominant [1]**
167/23
**predominantly [3]**
145/5 167/4 172/14
**preface [1]** 153/10
**prefer [2]** 221/22 222/6
**preferences [1]** 65/22
**prefers [1]** 9/11
**prejudice [4]** 14/3 14/8
14/12 14/19
**prejudicial [1]** 14/18
**preliminary [24]** 1/12
6/2 8/17 9/17 9/19 9/20
10/4 10/11 10/19 10/22
12/10 12/17 13/20
15/16 15/19 27/18 41/8
146/2 147/1 147/25

148/20 191/16 191/18
231/22
**preparation [1]** 49/13
**prepare [2]** 49/14
230/8
**prepared [11]** 7/21
11/8 42/11 64/20
139/23 156/20 179/25
189/8 195/5 214/5
245/11
**preparing [3]** 49/11
154/17 233/21
**present [19]** 5/10 6/12
6/19 7/23 9/24 12/12
12/21 13/5 34/4 38/13
87/10 96/19 112/9
139/21 140/2 153/15
226/9 229/7 242/15
**presentation [5]** 6/15
12/15 13/17 36/10 41/9
**presented [9]** 6/13
10/3 10/18 15/10 227/4
227/8 228/6 228/11
228/15
**presenting [3]** 5/6 5/15
230/22
**presently [1]** 153/18
**prevent [3]** 17/15 60/7
90/9
**prevented [1]** 40/20
**preventers [1]** 155/14
**preventing [1]** 197/18
**previewed [1]** 9/17
**previous [6]** 148/23
158/15 158/16 168/4
208/25 233/16
**previously [1]** 58/11
**prework [1]** 137/14
**price [1]** 143/19
**primarily [3]** 16/3
166/16 166/23
**printed [1]** 97/7
**prior [18]** 38/2 62/11
64/20 72/8 72/9 72/11
75/19 84/3 90/15 119/5
142/16 142/18 152/16
158/17 159/3 159/4
175/8 175/9
**priorities [2]** 47/23
230/25
**prioritized [1]** 236/10
**Prison [1]** 28/11
**private [1]** 143/12
**privileges [1]** 88/16
**pro [4]** 5/9 5/11 5/13
13/9
**probably [10]** 7/4
39/25 56/4 60/9 105/12
106/22 107/24 115/13
122/11 124/6
**problem [6]** 35/13
83/10 96/2 96/23
222/13 239/15
**procedural [2]** 8/19 9/2

**procedurally [1]**
220/25
**procedure [4]** 16/4
17/4 94/13 94/16
**procedures [2]** 52/11
55/6
**proceed [17]** 12/13
13/6 15/20 20/23 42/11
58/22 71/25 72/1 88/16
88/18 89/17 91/2 91/6
96/19 130/14 130/16
231/6
**proceeding [11]** 6/4
6/9 6/11 7/20 8/25 9/6
10/14 14/21 117/16
230/24 242/7
**proceedings [3]** 1/12
191/18 245/8
**process [21]** 8/12
39/21 51/16 51/19
68/16 93/2 93/6 93/22
94/5 94/8 95/2 151/23
166/23 212/13 225/19
231/7 232/1 232/15
233/25 241/18 242/24
**processed [2]** 222/22
224/15
**processing [1]** 151/8
**procure [1]** 155/21
**procured [2]** 179/8
185/9
**procuring [2]** 159/22
179/6
**produce [9]** 34/18 36/5
44/11 44/12 59/20 60/8
60/13 151/4 151/12
**produces [1]** 148/17
**producing [29]** 30/8
34/17 34/23 35/4 35/9
35/11 36/5 59/19 89/6
107/2 107/19 108/11
108/12 138/10 138/12
139/19 140/9 140/10
143/14 144/9 151/1
152/1 152/3 164/11
164/23 173/5 173/6
239/3 239/12
**production [23]** 35/10
43/24 60/23 74/18
80/20 134/20 137/7
137/8 140/6 145/8
151/8 151/11 151/17
151/17 151/23 152/20
160/5 164/12 173/4
204/4 222/22 224/15
239/9
**productive [2]** 159/15
159/16
**professional [1]** 142/8
**proffer [5]** 8/1 8/15
219/8 235/10 241/8
**proffered [1]** 190/14
**proffering [1]** 191/8
**profitable [1]** 24/7

## P

**profitably [1]** 27/15
**profits [1]** 20/16
**profound [1]** 34/17
**profoundly [1]** 34/16
**prognosis [4]** 154/7
154/8 154/11 154/12
**Program [1]** 161/18
**programs [1]** 179/23
**progress [2]** 226/1
226/14
**prohibit [1]** 20/9
**prohibited [1]** 35/16
**project [11]** 130/2
142/24 142/25 143/6
157/8 157/9 179/20
183/8 183/11 189/14
223/7
**projected [2]** 151/15
152/10
**projection [1]** 151/20
**projects [10]** 144/13
156/8 156/9 156/10
156/11 228/6 228/12
230/7 230/10 231/5
**promise [2]** 22/19
134/20
**prompt [1]** 140/12
**promptly [3]** 27/20
206/15 206/23
**pronounce [2]** 73/20
73/22
**pronunciation [1]**
73/23
**proper [4]** 147/4 147/7
149/17 150/2
**properly [1]** 97/15
**properties [9]** 23/11
127/12 127/19 131/20
131/25 143/14 144/9
172/13 172/17
**property [27]** 23/9
23/15 23/17 23/17
23/20 51/2 114/2 114/3
129/2 129/20 130/1
132/18 132/19 132/20
143/15 171/24 172/9
172/10 172/12 172/23
173/12 174/4 175/14
177/20 180/1 181/6
203/15
**proportionate [1]** 71/2
71/4 71/6 197/11 200/2
206/15 206/23
**proposal [51]** 38/17
51/21 51/22 51/23 52/8
52/21 56/8 65/22 66/9
71/9 71/11 72/6 73/25
81/9 81/12 81/13 82/13
82/13 87/17 95/16
95/18 97/16 97/19
102/8 103/12 103/14
103/19 103/21 120/1
121/15 135/4 135/11

135/12 136/8 137/11
137/11 137/13 138/5
207/17 207/17 209/18
211/1 212/4 212/8
212/13 213/23 216/12
217/20 222/19 226/3
227/18
**proposals [38]** 17/12
21/22 23/24 31/12
31/17 40/10 65/13
65/15 81/18 82/1
101/19 123/12 123/17
151/2 154/1 177/16
206/7 207/6 207/10
209/7 211/7 212/2
212/12 213/19 214/7
217/17 217/21 223/8
225/13 225/20 226/9
227/19 228/5 228/8
230/11 231/3 231/7
237/22
**propose [21]** 32/17
33/17 33/19 55/20
55/15 56/3 56/6 65/8
65/14 70/2 72/14 81/23
82/6 82/10 122/14
122/20 123/3 136/20
151/21 237/13 237/17
**proposed [64]** 16/13
16/15 16/23 17/19 18/4
21/8 21/10 29/9 29/11
29/12 31/15 32/2 39/10
39/10 39/11 40/6 40/7
48/17 49/24 55/23
57/20 58/9 58/10 59/4
64/9 73/18 75/23 77/10
78/19 81/6 86/12 86/15
86/18 87/4 87/10 87/13
98/20 101/7 101/7
101/8 101/10 101/14
104/25 135/17 135/19
136/2 136/13 137/10
137/15 138/6 138/15
153/14 160/11 195/11
199/15 200/12 206/14
206/22 207/4 211/3
211/7 215/17 236/15
239/19
**proposes [2]** 31/13
237/20
**proposing [16]** 29/16
51/17 69/11 71/24
80/15 81/4 86/19
101/20 102/3 122/21
135/5 206/14 206/22
207/4 217/15 225/4
**prospect [1]** 227/17
**prospects [2]** 217/16
228/16
**Protection [2]** 89/21
161/2
**protocol [2]** 7/9 7/10
**prove [5]** 24/21 24/22
24/25 190/17 241/20

**provide [11]** 9/23 43/5
45/19 51/24 84/6 89/4
159/6 179/3 190/7
194/10 200/16
**provided [20]** 52/5
125/25 155/14 169/22
179/4 190/5 194/19
196/11 196/14 199/19
200/13 206/25 207/1
207/24 210/3 214/24
216/21 217/4 217/5
232/22
**provider [2]** 179/1
179/18
**providers [4]** 154/22
155/8 157/6 159/23
**provides [1]** 63/10
**providing [7]** 18/12
45/25 83/25 156/22
188/17 196/7 207/11
**provision [37]** 18/23
20/7 21/16 21/19 21/24
29/20 29/22 40/23
54/17 55/14 56/16
57/19 57/22 69/8 81/21
82/3 125/13 125/25
129/1 129/3 130/3
172/16 172/25 180/2
207/7 207/14 207/16
207/21 208/2 208/10
208/13 208/14 208/25
209/4 209/5 217/14
237/12
**provisions [13]** 20/19
21/8 21/9 21/11 51/14
59/18 61/1 65/11 91/20
91/22 92/5 173/14
245/5
**proximity [1]** 183/11
**PSA [9]** 127/13 127/16
127/18 127/21 128/7
128/10 131/24 132/2
132/13
**public [5]** 34/24 35/1
37/1 37/14 37/15
**pull [11]** 51/5 53/7
91/17 95/5 98/5 102/15
108/25 114/22 122/2
131/11 183/25
**pulled [3]** 164/5 164/9
170/21
**pulling [6]** 53/12 120/4
122/4 139/15 171/9
185/17
**purchase [14]** 111/13
127/8 127/13 127/18
131/18 131/19 131/20
131/25 132/13 132/13
132/17 133/12 133/18
134/1
**purchased [5]** 46/1
132/12 132/18 133/14
144/9
**purporting [1]** 119/17

**purpose [14]** 17/10
37/14 56/8 62/25 67/24
117/13 118/13 126/11
155/10 165/17 178/25
191/19 194/1 219/13
**purposefully [1]** 66/1
**purposes [8]** 7/20
63/24 72/12 93/14
167/14 169/3 200/4
205/7
**pursuant [8]** 93/6
93/17 94/6 94/13
100/22 116/16 134/22
245/5
**pursuing [1]** 163/13
**pursuit [1]** 123/12
**put [24]** 6/6 36/5 44/13
44/15 56/12 60/7 63/13
63/18 69/24 85/13
136/15 143/19 151/10
151/24 153/1 153/1
162/9 186/13 196/22
213/3 218/14 235/24
239/25 242/14
**puts [1]** 240/23
**putting [5]** 35/10 38/8
60/6 60/12 199/23

## Q

**Q-1 [2]** 225/17 225/17
**quantities [1]** 59/19
**quantity [2]** 183/14
239/22
**quarters [1]** 7/1
**question [33]** 8/8 8/11
9/18 10/20 11/22 46/13
53/13 63/6 70/8 71/21
71/22 83/12 85/25 97/6
106/2 106/10 107/9
129/3 130/14 132/1
132/7 132/8 133/17
138/4 150/3 150/4
158/4 169/7 204/16
204/17 208/6 210/2
237/16
**questioning [6]** 7/11
8/15 121/10 126/10
128/21 205/2
**questionnaire [1]**
36/18
**questionnaires [1]**
39/22
**questions [23]** 66/14
72/8 79/18 90/13
118/23 120/23 123/25
126/16 128/25 130/6
130/7 130/11 130/15
131/10 140/11 140/12
140/13 140/15 181/21
234/9 240/5 240/21
244/3
**quick [4]** 14/14 51/15
85/24 238/15
**quickly [3]** 14/14

229/13 240/16
**quite [9]** 138/19 147/5
154/3 154/13 155/20
156/8 156/8 157/12
159/23
**quite-developed [1]**
154/13
**quo [4]** 28/19 28/24
28/24 34/17
**quote [1]** 31/5
**quoted [1]** 31/16
**quoting [1]** 28/14

## R

**R-A-L-E-I-G-H [1]** 43/9
**raise [4]** 7/24 12/18
68/9 141/10
**raised [2]** 8/16 10/19
**raises [1]** 152/14
**raising [2]** 48/11 48/12
**RALEIGH [50]** 3/4 6/19
42/16 42/17 43/1 43/7
43/13 43/16 45/14
50/11 51/3 51/7 51/15
53/8 53/12 54/17 58/5
64/3 65/21 66/13 69/5
70/14 75/17 79/19
80/10 87/7 90/13 90/17
91/10 92/11 93/14
97/14 100/19 108/22
109/2 114/20 116/13
116/15 116/21 118/19
120/9 121/20 124/15
126/16 129/16 129/18
130/7 134/8 140/17
140/19
**Raleigh's [1]** 124/7
**rate [1]** 186/8
**rates [1]** 137/5
**rather [2]** 5/5 161/22
**re [7]** 30/3 56/1 59/17
66/4 86/24 98/25 208/6
**Re-ask [1]** 208/6
**re-complete [4]** 30/3
56/1 86/24 98/25
**re-completed [1]** 59/17
**re-drill [1]** 66/4
**reach [1]** 224/6
**reached [5]** 194/6
222/23 223/3 225/1
234/7
**reaching [3]** 225/24
226/3 235/6
**react [1]** 78/8
**reacting [1]** 162/3
**reaction [2]** 88/6
189/10
**read [45]** 17/23 23/6
30/13 30/23 31/3 37/25
51/6 63/5 63/7 74/14
78/25 92/23 95/14 96/1
96/17 97/15 97/19
106/3 114/3 114/5
114/5 119/4 121/23

# R

**read... [22]** 129/24
131/17 145/22 153/19
170/17 172/24 173/24
173/25 179/17 183/6
183/17 183/19 187/2
188/1 198/22 206/12
207/8 207/21 217/3
227/6 234/19 235/14
**reading [6]** 21/18 40/22
96/25 206/18 208/2
208/20
**reads [7]** 153/14
172/16 174/1 187/21
223/25 224/6 237/20
**ready [4]** 60/13 64/20
217/16 217/17
**real [7]** 37/13 99/21
153/14 172/10 173/12
174/4 238/4
**real-time [1]** 99/21
**realistic [1]** 242/13
**reality [2]** 22/18 24/17
**realized [1]** 78/9
**really [20]** 11/17 23/3
23/25 25/12 26/20
41/18 60/6 60/9 63/12
85/14 121/7 144/10
154/14 216/1 227/21
232/3 234/13 234/22
236/9 236/9
**reason [13]** 22/5 25/12
27/13 41/18 56/6 61/17
61/25 63/13 64/12
83/17 83/17 214/16
225/18
**reasonable [4]** 20/22
27/12 65/2 122/8
**reasonably [4]** 18/5
18/12 27/13 217/9
**reasons [3]** 18/14
195/25 200/13
**rebuttal [2]** 7/22 7/24
**recall [8]** 70/23 78/17
85/20 87/16 91/25
107/15 136/14 206/7
**receive [6]** 20/16 67/3
73/2 76/17 190/21
191/10 193/17 231/10
**received [11]** 4/7 67/7
73/3 73/6 76/18 76/21
77/6 168/25 170/9
191/17 198/24
**receiving [3]** 49/13
94/24 162/3
**recent [2]** 49/20 66/18
**recently [1]** 28/10
**recess [11]** 90/14
90/21 90/23 96/18
124/8 140/25 141/1
141/3 205/10 205/12
240/17
**recipe [1]** 83/23
**recognition [1]** 231/9

**recognize [14]** 53/13
74/23 102/23 147/17
157/16 171/17 176/16
178/14 180/19 181/25
182/20 187/10 218/12
218/21
**recognizes [1]** 27/2
**recognizing [1]** 89/11
**recollection [2]** 59/9
128/23
**reconsider [1]** 15/3
**reconsideration [2]**
13/24 14/6
**record [14]** 14/11
15/14 17/24 23/6 63/7
93/14 106/3 115/16
124/9 129/10 149/21
153/24 154/10 192/17
**records [2]** 154/19
170/23
**recouped [1]** 86/5
**recross [1]** 3/8 130/11
130/17
**RECROSS-EXAMINATI
ON [1]** 130/17
**rectangle [3]** 137/19
137/20 137/20
**redacted [5]** 97/2 221/6
221/10 221/12 221/13
**redaction [2]** 221/8
221/14
**redirect [4]** 3/7 124/2
124/13 206/17
**reduce [1]** 224/16
**reducing [1]** 152/23
**refer [14]** 10/1 61/17
62/1 86/18 86/23
112/23 115/8 125/10
129/8 150/18 157/15
161/1 171/16 173/24
**reference [25]** 32/14
32/21 58/24 58/25 59/8
59/10 61/1 67/15 67/20
80/11 83/24 84/10 85/6
85/9 86/8 86/25 110/24
115/13 116/4 128/9
129/1 129/19 209/1
220/18 237/8
**referenced [6]** 67/18
182/14 183/20 220/15
220/17 235/20
**references [6]** 32/14
32/15 32/16 58/23
119/14 210/4
**referencing [2]** 34/14
115/16
**referred [2]** 135/10
136/10
**referring [23]** 54/25
81/8 81/13 103/4 114/9
114/25 115/19 130/3
156/4 168/18 169/25
180/21 195/1 197/22
197/25 198/10 203/16

208/15 209/5 209/6
215/24 226/15 233/13
**refers [3]** 38/7 56/19
208/19
**reflect [1]** 158/7
**reflected [1]** 124/12
**reflecting [1]** 167/14
**reflects [2]** 149/25
186/15
**refusal [1]** 200/18
**refuse [1]** 197/16
**refuses [1]** 197/15
**refusing [2]** 200/14
200/21
**regard [2]** 26/9 109/16
**regarding [14]** 67/15
73/21 76/5 99/2 129/2
132/2 132/10 133/10
169/12 181/22 190/21
193/10 224/8 233/24
**regardless [1]** 113/12
**regards [2]** 151/2
160/11
**regular [1]** 152/7
**regulated [1]** 34/19
**regulations [1]** 39/22
**regulators [1]** 231/23
**regulatory [10]** 26/24
36/14 37/13 37/19
161/19 179/23 232/4
232/5 233/2 233/22
**relate [3]** 146/21
173/18 208/3
**related [12]** 43/23
111/19 151/3 152/1
154/15 162/4 179/24
180/25 188/16 196/5
222/25 238/5
**relates [5]** 30/5 150/25
183/22 184/23 195/8
**relating [2]** 131/22
179/19
**relationship [12]** 46/21
46/22 47/6 47/15 47/18
47/20 54/6 122/23
145/16 148/14 180/2
196/1
**released [2]** 8/25 9/6
**relevance [4]** 31/25
117/18 117/21 235/3
**relevant [4]** 31/5
118/11 191/24 235/15
**relied [2]** 20/7 119/4
**relief [20]** 9/4 10/12
15/11 28/14 28/15
28/15 28/18 30/6 35/15
36/6 36/11 39/12 39/23
41/8 41/24 78/17 101/4
238/20 238/22 240/2
**relies [1]** 19/16
**relinquishment [2]**
58/1 58/13
**relinquishments [1]**
61/18

**remain [7]** 7/18 8/14
42/21 74/9 141/8 180/1
240/19
**remainder [1]** 11/12
**remaining [12]** 10/17
143/6 145/13 152/5
152/6 170/25 204/21
211/7 223/6 224/24
227/12 227/16
**remarks [1]** 108/6
**remedial [1]** 9/2
**remedies [1]** 33/11
**remember [10]** 66/21
78/14 109/17 126/19
127/23 129/22 131/5
163/10 169/18 212/14
**remind [1]** 26/3
**removal [6]** 94/5 94/13
125/5 125/9 125/10
125/25
**remove [9]** 7/12 7/16
7/17 93/2 93/6 93/8
94/12 125/12 125/17
**removed [2]** 93/23 94/1
**removing [1]** 35/9
**render [1]** 200/11
**renewal [5]** 183/8
184/16 186/18 186/21
187/4
**renewed [1]** 186/17
**reorganization [1]**
235/23
**repeat [2]** 40/17 71/22
**repeatedly [1]** 20/16
**reply [1]** 8/4
**report [4]** 15/5 36/22
38/1 145/12
**reported [4]** 1/14 227/1
229/1 245/17
**reporter [6]** 141/17
215/23 245/4 245/15
245/18 245/23
**REPORTER'S [1]**
244/10
**reports [6]** 14/1 14/11
14/17 14/21 15/1 15/12
**represent [8]** 91/10
91/13 109/7 109/11
118/19 148/13 187/11
188/15
**representation [5]**
108/9 147/19 147/20
220/21 232/19
**representations [1]**
181/22
**representative [2]**
178/1 194/17
**representatives [1]**
47/18
**represented [10]** 32/24
108/6 118/3 118/14
118/25 128/21 147/11
147/14 149/19 225/9
**representing [1]** 202/2

**represents [1]** 185/9
**reproduction [1]**
245/22
**Repsol [1]** 155/4
**request [5]** 8/9 14/1
15/14 28/4 28/5 56/24
77/7 96/18 191/4
194/11 195/7 232/11
233/17 233/18 234/6
**requested [4]** 194/20
196/11 233/1 233/6
**requesting [1]** 232/12
**requests [1]** 68/12
**require [9]** 25/4 51/21
64/13 102/10 156/22
166/17 194/12 194/13
230/7
**required [17]** 20/19
38/1 38/23 39/1 39/2
39/22 53/6 65/23 84/2
84/4 92/22 135/9 161/9
186/21 204/8 207/13
217/12
**requirement [11]** 36/14
36/24 37/3 37/13 65/15
186/18 194/4 194/7
224/11 232/14 233/8
**requirements [10]**
27/18 44/11 65/14
65/22 76/5 80/17 157/2
161/12 161/20 196/5
**requires [5]** 36/16 37/4
52/10 94/9 106/15
**requiring [3]** 28/12
195/15 233/17
**requisite [1]** 161/7
233/22
**rescheduled [1]** 6/10
**rescind [3]** 184/9
184/13 184/14
**rescinded [6]** 113/17
183/21 183/23 184/1
184/2 184/9
**rescinds [1]** 184/12
**research [1]** 233/1
**reserve [3]** 12/11
142/12 145/11
**reserved [1]** 7/23
**reserves [1]** 151/18
**reserving [1]** 114/5
**reservoir [2]** 44/13
80/20
**reset [1]** 35/18
**residence [2]** 178/2
178/3
**resign [3]** 93/10 93/17
93/23
**resignation [2]** 125/5
125/9
**resolution [5]** 9/16
10/10 10/18 42/5 222/6
**resolve [6]** 10/9 17/18
33/5 74/21 75/18 78/12
**resolved [3]** 15/2 15/11

## R

**resolved... [1]** 18/15
**resource [3]** 138/25
239/10 239/12
**respect [30]** 10/2 10/21
11/1 12/15 15/15 48/23
49/16 50/3 50/7 53/20
57/20 75/22 121/12
132/7 163/13 165/22
169/4 171/13 172/16
192/6 197/1 199/14
200/22 206/7 207/3
207/15 217/23 220/13
234/18 239/20
**respectfully [4]** 9/8
68/12 220/2 240/13
**respectively [1]** 211/13
**respond [6]** 10/1 61/22
117/20 191/13 212/2
216/11
**responded [5]** 73/24
177/8 228/25 229/14
234/24
**response [11]** 10/22
77/7 153/21 162/5
162/6 170/21 194/11
196/13 228/18 228/19
228/20
**responsibilities [3]**
46/20 54/19 145/7
**responsibility [2]**
46/22 224/5
**responsible [3]** 145/10
160/12 227/12
**responsive [2]** 106/2
106/10
**responsiveness [1]**
235/7
**rest [4]** 52/5 97/9
148/12 204/12
**restates [1]** 186/25
**restating [1]** 153/24
**rested [1]** 118/2
**resubmit [2]** 23/23
23/24
**result [1]** 33/8 40/21
183/9
**results [1]** 59/18
**resume [4]** 140/21
140/25 205/23 244/7
**retains [1]** 171/13
**return [3]** 90/16 130/8
240/19
**returned [3]** 61/10
70/25 71/1
**returns [1]** 21/18
**revenue [2]** 173/3
173/9
**review [21]** 31/5 36/14
36/14 37/3 37/9 37/25
38/5 39/20 64/4 64/8
99/17 99/22 100/1
108/7 112/1 121/22
144/5 196/1 219/22

221/2 229/3
**reviewed [15]** 15/6
31/21 47/5 47/8 63/24
64/15 95/9 145/22
163/6 183/16 187/3
192/14 194/25 208/25
237/4
**reviewing [4]** 40/2
208/7 215/9 217/24
**reviews [1]** 221/23
**revisionist [1]** 38/16
**revisiting [1]** 15/3
**rework [10]** 30/3 30/8
30/11 31/10 33/20
55/25 58/10 66/4 86/23
98/24
**reworked [3]** 30/16
41/1 59/16
**reworking [1]** 59/1
**rewriting [1]** 33/24
**Richard [2]** 2/4 5/20
**rig [8]** 56/22 139/20
139/24 140/2 155/11
155/12 156/18 156/19
**right [142]** 5/2 6/2 7/10
7/23 11/3 11/9 15/18
15/20 16/14 16/20
16/24 17/1 17/20 19/2
23/10 28/15 29/18 30/9
34/10 34/12 34/22
35/17 40/24 42/9 42/13
44/6 50/24 54/7 55/8
57/3 61/7 65/23 66/9
66/16 68/8 68/14 70/18
74/4 77/15 87/11 87/21
89/5 90/24 91/2 92/9
94/3 94/18 94/21 94/22
95/25 98/9 98/19 99/16
100/17 101/8 101/9
102/5 103/13 103/17
104/7 108/20 109/6
110/3 110/17 110/18
112/5 114/25 115/1
116/5 118/12 120/24
122/14 124/1 128/11
131/8 132/17 132/22
133/8 134/7 136/17
137/17 138/9 138/11
139/20 140/11 140/17
140/19 141/8 141/11
150/3 159/12 168/12
168/22 169/10 170/19
172/4 172/18 172/19
173/1 175/22 177/11
178/23 180/5 180/13
183/25 184/15 186/17
187/7 187/9 187/17
188/5 192/16 192/24
193/13 193/24 195/11
195/12 198/3 198/19
202/4 207/1 207/25
208/3 209/10 212/20
213/14 217/25 218/1
218/23 220/4 220/23

221/13 224/2 226/24
229/22 236/21 239/10
240/6 240/17 241/6
241/24 244/6
**right-hand [1]** 187/17
**rights [42]** 20/14 20/15
31/2 33/11 51/2 57/4
57/12 58/17 88/16
128/23 129/20 130/1
173/2 173/5 173/7
173/11 174/2 174/3
174/6 175/15 175/19
175/21 175/25 176/2
176/5 177/18 181/1
184/6 184/9 184/13
184/21 185/9 188/15
189/12 189/16 191/22
192/15 217/10 217/11
231/6 237/13 237/17
**rigs [1]** 155/14
**rise [4]** 90/22 141/2
205/11 244/8
**risk [5]** 41/20 59/21
107/25 143/5 143/8
**risky [1]** 11/25
**River [1]** 191/4
**RMR [5]** 1/14 245/3
245/13 245/14 245/18
**RMR/CRR [1]** 1/14
**road [3]** 164/11 168/15
219/17
**roads [3]** 49/8 64/16
84/2
**rock [1]** 80/19
**rocky [1]** 64/17
**role [10]** 54/18 55/1
111/23 112/3 144/2
145/10 151/20 156/19
179/6 227/15
**roles [1]** 142/22
**rollout [1]** 155/13
**Roman [4]** 120/10
120/13 208/20 208/22
**romanette [3]** 56/25
61/11 61/12
**Rome [1]** 149/3
**room [4]** 96/24 138/17
139/1 204/12
**rough [2]** 64/17 240/7
**roughly [1]** 48/20
**round [1]** 205/1
**route [1]** 137/24
**routine [2]** 239/4
239/16
**royalties [1]** 134/20
**royalty [2]** 172/5 173/3
**rubber [1]** 219/16
**rule [7]** 15/14 24/15
35/24 36/24 195/14
197/17 234/4
**ruled [1]** 13/23
**Rules [1]** 191/16
**ruling [9]** 10/17 11/1
11/12 11/14 12/10 14/4

14/5 14/14 14/20
**run [5]** 101/7 101/8
101/10 101/14 151/1
**running [1]** 101/17
**runs [1]** 46/23

## S

**S-C-H-L-U-M-B-E-R-G-**
**E-R [1]** 46/5
**s/Lori [1]** 245/13
**safe [3]** 37/2 154/4
154/24
**safely [3]** 25/7 26/24
35/7
**safety [6]** 34/24 35/10
37/14 37/15 153/15
157/2
**said [40]** 7/13 10/19
21/4 22/16 28/10 28/17
30/21 31/23 32/14 34/1
34/11 34/13 71/11 78/4
99/24 111/19 122/14
131/18 131/21 132/16
133/13 133/21 134/13
136/16 150/5 159/2
183/19 194/7 199/8
208/10 214/11 217/5
225/16 227/23 227/25
229/1 231/4 232/22
234/20 240/24
**sale [8]** 111/13 127/8
127/13 131/18 189/20
189/22 189/23 189/25
**sales [1]** 44/15
**same [59]** 6/16 13/3
17/18 21/8 21/11 23/2
23/14 23/25 24/8 24/14
24/18 25/5 25/18 25/19
26/6 26/14 44/20 44/22
56/19 60/25 69/16
69/21 69/22 70/6 72/12
81/1 88/6 93/15 100/6
105/7 105/18 105/20
106/22 108/3 108/5
115/22 115/24 116/10
116/19 116/21 135/12
150/4 155/12 155/15
155/15 159/23 169/1
169/17 170/18 171/3
171/6 175/25 184/6
202/5 207/1 217/6
222/12 233/21 245/22
**satellite [9]** 112/8
163/25 164/3 164/8
164/25 165/3 165/25
166/3 168/5
**satisfy [3]** 76/5 118/21
214/9
**satisfying [1]** 161/18
**Saturdays [1]** 69/9
**save [1]** 242/19
**saw [3]** 13/8 74/6
236/13
**say [42]** 7/13 12/1

16/14 19/9 23/3 23/19
26/18 27/6 27/7 29/18
33/10 34/21 36/10
36/25 38/22 41/3 52/19
55/21 56/23 62/5 66/18
69/2 69/3 69/5 76/4
83/4 87/9 92/1 92/6
116/25 119/11 132/3
134/19 154/13 166/11
188/21 192/20 204/24
214/1 214/2 215/3
234/7
**saying [11]** 37/18
37/22 61/23 69/21
102/8 225/25 226/7
229/15 229/15 233/16
233/24
**says [46]** 19/5 19/21
21/19 21/20 21/23 31/5
39/7 40/4 53/21 55/23
57/3 58/13 59/16 60/2
63/1 68/11 69/8 70/1
70/4 70/5 71/8 74/2
74/9 74/11 75/22 76/6
77/13 81/11 81/16
82/12 86/12 92/15
95/15 97/25 114/1
127/11 127/18 172/12
186/25 191/7 198/22
209/15 213/11 216/21
226/12 227/1
**scale [3]** 147/22 149/11
150/1
**scenario [3]** 31/12
236/20 237/20
**scene [1]** 147/11
**schedule [4]** 9/23
39/19 242/11 242/22
**scheduled [3]** 66/2
152/7 152/25
**schedules [1]** 30/15
**Schlumberger [11]**
46/3 46/7 46/10 142/18
142/22 143/1 143/2
143/8 143/9 143/11
143/12
**science [2]** 45/15
142/5
**scope [5]** 120/18 121/8
121/8 121/17 241/15
**scramble [1]** 12/4
**Scranton [2]** 2/5 78/15
78/18
**screen [13]** 51/11
92/17 97/1 108/24
114/21 116/5 116/6
116/13 124/22 187/7
187/8 198/20 206/19
**scroll [2]** 115/3 124/23
**scrolling [1]** 93/20
**seat [3]** 42/20 140/21
157/11
**seated [2]** 141/5
141/20

# S

**sec [1]** 53/11
**second [31]** 11/11 13/7 17/17 31/9 31/10 34/14 39/4 42/19 55/2 58/8 69/1 69/5 70/25 98/18 121/9 124/17 153/9 175/18 183/4 187/1 195/18 195/19 196/4 198/14 204/11 226/11 226/21 230/16 231/15 235/17 236/25
**Secondly [4]** 25/24 154/18 156/17 239/7
**section [38]** 20/16 32/16 33/18 34/12 37/25 54/21 55/17 56/20 58/1 58/5 58/16 81/11 85/6 86/6 125/4 125/10 162/10 163/3 171/24 172/22 173/24 174/1 175/16 179/10 179/12 179/13 197/2 203/16 207/24 209/13 209/16 210/4 215/12 215/13 235/20 237/10 237/15 245/6
**sector [1]** 142/11
**secure [1]** 161/4
**secured [1]** 199/25
**securing [1]** 194/4
**security [1]** 161/9
**sediment [3]** 232/16 232/24 233/8
**see [61]** 5/21 6/5 10/5 30/22 38/17 42/18 57/8 57/12 57/13 58/14 59/14 59/25 62/15 67/15 68/20 68/24 69/8 69/14 70/2 74/10 74/13 75/2 75/23 77/16 77/23 80/11 81/6 81/19 82/18 86/13 97/2 100/19 109/5 110/1 116/9 122/3 127/14 127/19 148/24 149/1 149/2 158/23 168/10 168/14 170/4 185/2 193/10 195/25 199/2 207/18 208/24 213/9 216/21 217/23 220/9 223/23 228/6 228/16 229/19 231/17 234/16
**seeing [2]** 127/23 177/18
**seek [3]** 7/23 104/15 195/5
**seeking [5]** 9/14 28/16 28/19 35/15 219/17
**seeks [5]** 29/7 29/9 199/4 211/11 238/23
**seem [4]** 10/20 234/13 234/18 234/24
**seemingly [1]** 214/3

**seems [1]** 226/13
**seen [12]** 5/22 13/10 50/16 50/19 54/3 66/25 72/24 76/13 112/7 147/5 153/6 187/12
**select [1]** 68/12
**self [1]** 234/22
**self-explanatory [1]** 234/22
**sell [2]** 110/6 110/9
**semicolon [1]** 216/21
**send [2]** 36/17 48/24
**sense [8]** 6/3 21/24 64/18 64/22 103/15 115/9 115/16 200/25
**sent [11]** 21/3 39/21 75/2 75/17 103/19 103/21 108/7 178/1 228/25 233/14 233/15
**sentence [47]** 19/6 19/8 19/16 19/17 19/18 19/21 20/11 55/2 56/21 57/3 59/11 59/14 59/25 62/18 62/20 63/1 63/2 63/10 68/21 70/1 74/2 74/14 74/17 77/21 77/23 81/4 97/15 97/19 98/15 98/18 100/19 100/22 129/24 153/10 172/11 175/18 179/17 197/7 198/14 213/6 216/3 216/20 216/24 217/25 226/11 234/20 237/19
**sentences [1]** 208/7
**separate [2]** 50/12 200/10
**separately [1]** 10/8
**September [2]** 234/12 236/5
**September 25th [1]** 234/12
**September 28th [1]** 236/5
**sequence [2]** 30/15 60/19
**series [4]** 53/16 115/6 121/20 219/22
**serve [20]** 17/20 19/5 21/25 28/25 29/2 29/19 31/18 72/20 76/9 77/10 83/8 95/16 95/17 97/17 97/18 155/5 157/3 159/21 237/23 238/3
**served [7]** 109/12 142/17 142/19 142/25 142/25 144/3 144/4
**serves [7]** 16/7 28/23 52/13 148/16 152/24 185/3 225/17
**service [12]** 46/11 46/23 136/25 139/6 154/22 155/8 155/18 155/20 157/6 159/23

172/5 179/1
**services [15]** 46/3 55/2 143/10 155/6 155/21 156/22 159/22 178/17 178/25 179/3 179/4 179/13 179/16 179/18 239/2
**serving [6]** 50/20 111/22 171/9 175/25 206/24 207/22
**servitudes [1]** 174/2
**session [1]** 44/14
**set [25]** 13/6 16/4 33/6 65/6 69/16 69/23 94/16 154/16 157/4 175/21 186/22 196/4 197/5 207/17 209/6 209/17 212/3 217/21 218/21 228/10 229/5 233/24 236/3 236/15 245/9
**setback [1]** 239/15
**sets [12]** 144/15 146/8 148/24 163/17 164/1 179/1 179/14 180/4 186/6 209/16 211/25 212/24
**setting [2]** 231/22 238/3
**settled [1]** 17/22
**settlement [55]** 17/24 17/25 18/1 18/11 21/13 21/16 22/25 22/25 26/10 26/12 26/17 26/21 27/2 27/19 30/25 31/2 31/4 31/20 32/3 32/5 32/6 32/10 32/12 32/13 33/3 33/7 33/9 33/23 34/1 82/4 84/12 85/10 85/21 88/14 88/15 118/16 118/20 119/3 119/9 119/11 119/17 122/12 122/13 163/1 163/3 163/17 196/23 197/2 197/4 197/5 197/23 200/1 222/20 235/21 235/25
**setup [2]** 7/14 51/10
**seven [6]** 33/6 54/22 216/21 217/5 234/14 236/4
**seventeen [1]** 129/17
**several [9]** 14/24 16/1 58/23 59/2 109/15 138/20 156/16 189/2 226/18
**shall [26]** 18/4 18/11 38/1 39/8 41/9 55/3 55/18 56/21 56/24 59/20 59/21 59/23 60/3 68/22 69/10 70/2 70/5 92/19 92/20 180/1 206/14 206/22 206/25 207/23 208/11 215/18
**Shannon [3]** 227/1

227/11 228/1
**Shannon's [1]** 227/15
**share [9]** 48/24 71/6 86/9 96/15 197/11 200/2 201/4 227/23 231/5
**shared [2]** 227/1 228/1
**shareholder [1]** 99/24
**shareholders [1]** 99/13
**sharing [3]** 6/1 195/21 195/23
**she [16]** 5/15 5/15 194/13 194/13 227/1 227/11 227/13 228/25 228/25 229/1 229/1 229/5 229/5 229/5 229/14 232/5
**She's [1]** 170/3
**shed [1]** 114/11
**shift [6]** 29/9 30/7 66/13 85/25 145/1 153/2
**shifting [3]** 29/20 29/21 98/14
**short [4]** 6/22 64/24 79/9 166/23
**shorten [2]** 92/3 242/10
**shortly [1]** 229/17
**should [7]** 7/18 30/20 34/1 55/24 55/25 61/10 61/12 81/5 93/22 97/3 101/22 116/7 123/9 144/6 190/20 191/10 192/6 228/14 231/9
**shouldn't [2]** 26/19 200/8
**show [9]** 20/25 21/7 25/10 128/12 153/8 186/3 189/15 215/14 241/21
**showed [1]** 11/6
**showing [4]** 28/12 28/20 168/5 169/3
**shown [4]** 124/16 158/15 164/7 233/6
**shows [6]** 93/2 146/6 173/16 185/24 186/7 187/4
**shutting [1]** 35/9
**sic [1]** 198/25
**side [2]** 6/11 227/14
**sides [1]** 7/5
**sidetrack [4]** 30/3 56/1 86/23 98/24
**sidetracked [1]** 59/17
**sideways [1]** 139/4
**sign [5]** 32/9 50/23 100/9 168/12 196/25
**signatories [1]** 32/6
**signature [1]** 177/1
**signed [18]** 12/7 17/25 20/12 26/12 46/25 47/8 79/3 95/10 103/12

112/1 159/19 177/21 177/24 178/23 191/2 192/2 194/17 233/4
**significance [8]** 8/11 151/6 171/2 179/12 182/8 182/9 207/14 217/14
**significant [14]** 25/18 37/13 38/14 41/15 41/24 42/2 85/17 137/14 151/16 151/22 180/2 225/18 238/20 243/3
**significantly [1]** 240/24
**signing [1]** 119/5
**silent [3]** 102/2 103/14 114/7
**similar [15]** 92/8 143/25 144/18 144/23 144/24 148/23 155/2 168/4 173/5 175/1 203/13 203/14 215/5 215/6 227/15
**similarly [2]** 16/17 81/11
**simple [1]** 234/21
**simplistic [1]** 213/3
**simply [14]** 12/12 14/11 19/15 24/3 25/7 26/18 48/16 61/9 96/16 97/14 125/24 149/20 199/12 243/1
**simultaneously [1]** 222/7
**since [10]** 46/16 47/14 107/6 107/16 112/4 117/13 146/9 153/17 226/12 233/7
**single [10]** 19/6 19/8 29/14 50/16 50/19 137/11 152/3 224/16 230/5 239/2
**single-letter [1]** 137/11
**sir [82]** 11/22 54/24 58/15 61/3 66/17 68/15 68/19 73/19 74/5 76/7 91/16 91/21 92/23 93/3 94/11 95/6 98/6 99/24 100/7 100/20 102/23 103/3 104/13 108/23 109/4 110/1 112/15 116/22 119/9 119/23 120/2 120/14 121/2 127/14 127/15 127/20 131/9 131/15 133/5 143/23 147/11 148/4 149/6 150/11 150/23 153/3 153/6 158/13 160/21 162/16 162/18 163/1 163/22 164/25 165/25 167/19 169/15 169/23 171/17 176/16 180/7 181/14 181/25 182/20 185/11 187/11

# S

**sir... [16]** 188/12 193/8 194/22 196/25 198/8 201/6 201/8 201/19 206/2 208/24 210/19 211/18 215/9 218/6 218/12 228/24
**sit [5]** 36/8 49/14 106/11 131/8 225/25
**site [26]** 35/5 35/12 38/10 38/11 49/12 136/13 137/6 154/18 156/18 156/21 156/23 157/3 157/10 157/10 165/22 168/9 168/19 176/1 177/19 195/15 197/18 213/4 213/5 225/10 233/9 234/5
**site-specific [1]** 49/12
**Sitting [2]** 200/21 200/24
**situated [2]** 120/8 174/3
**situation [5]** 16/23 48/16 135/2 135/5 238/10
**six [9]** 150/12 150/14 157/19 164/5 164/9 192/12 208/20 208/22 230/1
**size [1]** 175/16
**skilled [1]** 157/5
**skin [4]** 22/6 83/20 83/21 104/6
**skip [1]** 81/15
**skipped [1]** 97/20
**slightly [3]** 19/7 26/11 137/8
**slow [2]** 35/14 215/22
**slowly [1]** 217/4
**Small [1]** 48/10
**snappy [2]** 234/24 235/1
**so [269]**
**So's [1]** 39/18
**software [1]** 179/24
**sold [2]** 46/2 118/5
**sole [5]** 34/20 59/21 131/5 201/3 217/8
**some [44]** 6/3 14/24 24/14 24/17 25/19 26/14 34/21 35/24 38/20 46/2 49/5 49/21 53/18 61/6 72/8 84/6 91/4 91/5 96/20 114/5 124/2 124/18 129/1 130/7 130/11 131/10 134/19 155/24 156/23 156/24 168/4 172/14 181/22 221/16 221/22 221/24 222/2 226/19 227/23 228/8 231/22 241/1 242/19 242/24
**somebody [9]** 22/14

51/19 57/14 60/20 82/23 83/5 83/18 83/20 232/5
**someone [7]** 23/2 36/16 51/21 64/23 71/6 135/24 221/23
**something [16]** 11/18 12/24 33/3 36/3 36/13 38/11 41/12 64/5 66/12 66/14 77/18 102/6 107/24 120/20 215/2 220/14
**sometimes [1]** 178/5
**somewhat [2]** 91/19 144/5
**somewhere [3]** 50/14 125/7 185/18
**soon [1]** 101/24
**sophisticated [1]** 25/25
**sorry [33]** 39/24 46/4 48/4 57/9 62/1 65/17 71/20 74/12 83/4 83/12 84/20 86/1 87/18 106/1 108/14 115/4 116/8 116/24 147/13 149/5 166/9 177/8 177/9 183/1 185/12 185/16 192/20 196/10 206/17 208/6 209/22 228/20 234/14
**sort [13]** 6/14 10/14 13/2 42/6 62/3 93/21 123/1 128/20 139/10 139/11 204/21 205/1 241/1
**sorts [1]** 72/7
**sought [4]** 28/4 28/18 39/23 170/19
**Sound [1]** 95/25
**sounds [1]** 121/16
**source [11]** 11/3 11/10 11/19 85/4 85/13 167/7 167/20 167/23 178/10 195/16 199/17
**sourced [1]** 168/5
**sources [8]** 18/13 49/9 64/17 89/3 167/6 167/22 199/17 199/18
**south [17]** 67/17 91/14 91/15 101/8 101/10 101/17 101/23 102/8 102/25 104/16 120/14 137/21 137/22 138/22 158/25 201/9 201/22
**Southwestern [1]** 155/4
**space [3]** 64/24 138/24 139/10
**spacing [1]** 80/17
**speak [3]** 107/12 174/20 242/25
**speaking [2]** 140/24 228/5

**specific [20]** 9/3 17/18 18/1 44/17 49/12 51/14 53/24 54/17 54/25 57/22 61/11 63/12 65/6 66/3 78/17 79/20 80/22 87/9 97/1 243/2
**specifically [14]** 55/21 59/3 59/9 62/12 65/13 67/24 74/2 75/21 84/10 88/12 114/1 183/19 223/7 239/21
**specificity [1]** 159/6
**specifics [1]** 61/8
**specified [4]** 51/23 208/12 212/5 215/11
**specifies [2]** 54/1 136/9
**specify [4]** 65/25 66/11 159/1 185/19
**speculate [1]** 200/23
**speculative [1]** 35/25
**spell [2]** 43/8 141/16
**spelling [1]** 129/14
**spend [1]** 199/23
**spent [5]** 14/24 35/16 61/9 61/10 157/8
**spoke [1]** 149/1
**sponsor [2]** 130/2 183/11
**sponsors [1]** 189/14
**spot [1]** 171/6
**Spruce [1]** 2/5
**spud [12]** 28/7 38/18 38/22 38/23 39/11 40/12 213/11 214/5 214/6 214/9 214/13 214/15
**spudding [4]** 38/8 38/12 213/24 214/3
**SRBC [36]** 10/24 12/3 12/7 12/11 112/24 113/20 116/14 129/20 168/8 169/1 169/21 170/3 170/20 171/6 173/18 178/9 180/25 182/4 188/14 188/15 189/13 193/9 194/3 194/12 194/19 195/13 195/15 195/25 197/17 198/24 199/16 231/25 233/23 234/1 234/7 234/23
**SRBC's [2]** 195/7 234/4
**St [1]** 28/18
**staff [4]** 121/21 121/21 124/21 243/14
**stamp [1]** 221/14
**stand [3]** 15/15 21/14 22/3
**standard [3]** 18/20 28/3 28/20
**standing [2]** 42/21 141/8

**standpoint [1]** 61/24
**stands [1]** 238/20
**start [24]** 13/11 18/21 19/15 35/2 36/17 37/10 38/3 68/4 136/23 174/21 179/18 203/19 205/13 206/21 209/20 210/21 212/5 218/15 223/18 231/7 234/20 239/12 239/20 240/14
**started [8]** 28/6 28/7 35/14 45/23 46/2 142/1 209/10 213/15
**starting [8]** 56/20 57/9 68/1 69/4 175/17 235/6 243/5 243/20
**starts [10]** 59/11 153/11 198/14 208/4 213/9 216/20 217/3 229/19 234/11 234/16
**state [12]** 5/5 15/13 107/21 141/15 161/6 168/10 188/21 191/6 194/9 220/12 221/2 234/19
**stated [8]** 132/19 154/8 182/22 183/2 190/17 192/8 207/21 217/24
**statement [17]** 6/24 7/6 10/5 15/21 28/22 40/1 40/15 41/6 75/21 92/25 98/1 126/5 153/21 192/2 220/16 237/25 238/7
**statements [2]** 42/10 192/13
**states [14]** 1/1 18/2 18/11 18/24 32/23 68/3 68/21 81/4 168/11 184/25 194/13 245/4 245/6 245/19
**stating [2]** 127/23 236/8
**station [1]** 44/19
**stations [1]** 148/6
**status [5]** 28/19 28/24 28/24 31/14 34/16
**Ste [3]** 1/22 1/24 2/5
**steer [1]** 155/19
**steering [1]** 139/8
**stemming [1]** 219/18
**step [4]** 29/18 37/3 68/3 83/19
**steps [3]** 17/22 162/4 177/14
**still [13]** 23/23 27/10 58/5 110/16 143/17 171/13 171/14 171/14 181/12 184/5 185/10 199/21 238/7
**stipulate [2]** 92/4 242/1
**stipulation [1]** 242/8
**stop [2]** 90/8 123/23
**storage [1]** 166/20

**stored [1]** 73/8
**straight [1]** 139/5
**Stream [1]** 187/25
**streamline [2]** 8/12 242/24
**Street [3]** 1/22 1/24 2/5
**strike [1]** 68/4
**string [3]** 219/7 219/8 222/18
**strive [1]** 240/15
**study [1]** 100/14
**stuff [1]** 60/10
**subcontract [2]** 25/16 155/6
**subcontractor [2]** 104/20 104/21
**subcontractors [5]** 25/18 25/19 25/21 26/1 159/22
**subject [16]** 20/6 55/4 64/10 64/11 90/17 112/13 121/10 132/18 146/23 151/13 171/24 173/17 195/20 207/1 223/25 224/22
**submit [5]** 38/1 154/23 155/22 161/7 237/9
**submitted [6]** 13/25 87/17 95/9 212/9 212/13 216/14
**subparagraph [3]** 60/24 93/20 93/21
**subparagraphs [1]** 60/25
**subs [1]** 45/1
**subscription [11]** 31/16 135/13 135/19 135/25 206/6 206/13 206/21 207/22 208/10 216/16 237/22
**subsection [10]** 38/1 38/2 58/13 62/18 62/20 62/20 65/21 81/3 81/15 81/16
**subsequent [4]** 41/1 98/21 100/23 101/3
**subsequently [1]** 183/13
**subservient [2]** 32/13 34/7
**subsidiaries [1]** 105/7
**subsidiary [15]** 44/23 104/11 104/22 105/13 109/23 110/7 118/4 126/22 127/12 130/20 130/24 133/4 134/11 145/18 161/25
**substance [5]** 91/22 223/17 229/13 233/20 235/19
**substantially [3]** 92/7 203/13 203/14
**substantiate [1]** 42/5
**substantive [5]** 8/21

# S

**substantive... [4]** 9/3
9/5 9/10 40/20
**subsurface [1]** 177/18
**succeed [1]** 40/19
**success [7]** 9/11 11/7
18/17 21/12 28/13
40/17 83/23
**successful [2]** 24/19
125/16
**successfully [1]** 27/14
**successor [1]** 93/22
**such [21]** 14/14 18/10
41/19 41/20 59/3 69/10
82/17 86/10 102/12
139/3 151/24 152/6
166/17 166/21 166/22
197/8 206/25 207/23
215/16 215/17 217/9
**suck [1]** 138/25
**suction [1]** 168/15
**suffer [2]** 238/20
238/22
**sufficiently [2]** 11/3
56/10
**suggest [4]** 14/5 32/7
50/4 50/8
**suggested [1]** 14/3
**suggesting [4]** 123/7
131/22 132/1 133/10
**suit [1]** 144/20
**Suite [1]** 1/19
**sum [1]** 91/22
**summarize [2]** 233/19
236/7
**Sundays [1]** 69/10
**supersede [1]** 119/17
**superseded [3]** 113/17
183/21 183/24
**supersedes [1]** 119/11
**supervision [2]** 245/11
245/23
**supplement [1]** 12/25
**supply [1]** 195/19
**support [10]** 29/16
29/17 101/11 135/11
154/21 156/7 156/10
170/19 199/14 232/1
**supported [1]** 231/2
**supports [1]** 29/14
**supposed [1]** 20/7
**sure [36]** 13/10 21/14
22/8 24/5 24/7 26/7
26/24 27/5 35/25 37/17
40/13 58/4 62/9 96/14
97/12 99/4 104/1 105/7
105/9 105/21 114/14
115/18 124/11 131/15
133/9 134/8 150/8
190/13 208/7 209/23
215/2 217/5 217/16
219/15 221/4 235/12
**surety [1]** 161/11
**surface [34]** 49/14

49/15 60/8 60/12 60/12
60/14 60/16 85/12
109/16 109/24 110/6
110/11 110/16 110/25
111/6 111/9 111/11
111/14 137/1 139/22
140/6 166/18 167/8
167/8 173/4 179/8
180/25 185/24 186/7
187/23 188/23 190/24
199/20 217/10
**surfaces [1]** 84/1
**surrounding [2]** 10/11
37/15
**survey [2]** 37/9 39/20
**Susquehanna [13]**
16/3 43/25 134/13
134/14 134/15 145/6
145/9 164/16 172/14
172/17 172/21 176/19
191/4
**sustain [3]** 62/7 121/13
121/17
**swaps [1]** 174/22
**sworn [2]** 43/3 141/14
**synonymous [1]**
135/15
**synonymously [1]**
189/15
**system [34]** 146/11
148/4 148/5 148/5
148/7 148/10 148/13
148/15 148/18 148/24
148/25 149/2 149/8
149/20 150/24 151/1
151/3 151/5 151/6
151/9 151/11 151/12
151/24 152/7 152/19
153/1 158/16 222/23
223/9 224/12 224/19
224/23 225/15 239/1
**systems [1]** 149/3

# T

**table [4]** 51/10 124/19
130/9 186/6
**take [52]** 10/14 22/12
33/24 44/13 51/3 52/7
53/4 53/7 58/12 64/19
65/9 66/22 68/3 71/5
71/6 71/7 77/15 77/18
79/21 81/3 83/19 88/2
90/14 118/21 124/15
125/20 126/25 140/25
153/9 154/25 157/11
161/4 167/25 171/24
172/11 172/22 184/23
198/13 199/20 201/12
201/17 202/15 204/20
205/9 206/12 211/5
213/6 226/11 226/20
228/18 233/11 236/4
**taken [14]** 9/7 13/3
90/3 90/23 119/23

119/24 141/3 163/25
164/3 166/3 174/17
174/18 191/1 205/12
**takes [6]** 8/20 14/19
21/15 23/14 118/9
216/25
**taking [7]** 8/1 21/10
66/19 78/10 162/5
204/12 235/9
**talk [10]** 20/12 24/9
47/9 47/24 57/25 59/4
61/4 94/8 101/6 114/23
**talked [4]** 47/12 86/4
99/20 104/5
**talking [20]** 17/10 23/9
33/7 53/20 58/5 61/18
72/13 85/1 102/25
112/13 112/14 113/1
116/18 132/24 132/25
133/2 135/2 146/20
156/25 162/17
**talks [3]** 20/17 81/4
216/24
**tankage [1]** 168/14
**target [2]** 152/12
152/12
**task [1]** 57/2
**tasked [1]** 16/8
**team [15]** 21/14 31/21
105/7 156/13 156/13
156/14 160/17 227/5
227/9 228/11 229/2
229/4 229/7 229/16
230/23
**teams [14]** 122/7 225/2
225/2 225/4 225/6
225/7 225/7 225/8
226/8 230/8 230/8
230/9 230/9 230/9
**technical [8]** 14/25
122/7 122/23 144/4
144/5 184/11 229/2
229/16
**technically [1]** 14/25
**techniques [1]** 179/22
**technology [3]** 12/21
139/3 139/6
**tell [42]** 12/6 37/7 68/8
135/23 135/25 142/2
142/8 146/5 147/18
148/22 150/22 158/13
158/21 159/24 163/24
164/10 166/2 167/2
168/3 168/7 171/19
172/2 175/19 179/12
180/23 186/14 187/6
194/1 195/3 200/21
202/18 209/14 209/14
210/25 211/6 216/6
222/18 225/5 229/13
230/18 235/19 235/19
**temporary [1]** 206/5
**ten [12]** 58/7 58/8
58/24 59/11 62/12

179/10 192/12 208/1
208/4 208/5 208/21
233/11
**tender [2]** 13/2 192/9
**tendering [1]** 190/9
**tenure [1]** 99/3
**term [5]** 61/5 82/6 82/8
127/21 172/12
**terminated [1]** 233/18
**termination [2]** 233/7
233/10
**terms [24]** 6/15 8/11
17/24 27/19 30/2 30/4
30/5 32/18 32/19 35/20
36/15 40/16 51/14
83/16 102/14 135/15
152/4 156/2 179/6
194/4 195/20 223/6
240/23 242/14
**testified [23]** 43/3
63/16 68/16 70/15 86/3
91/20 99/2 103/10
105/9 106/25 122/13
134/10 141/14 165/9
167/19 169/15 194/24
201/8 206/6 212/22
216/23 226/5 238/5
**testify [6]** 7/15 11/9
117/2 120/19 135/21
135/24
**testifying [2]** 7/16
140/20
**testimony [32]** 6/22
9/14 9/24 10/15 11/2
14/8 15/2 21/23 23/9
24/9 35/8 38/13 63/17
63/22 64/3 65/17
118/16 124/8 126/8
129/22 130/19 131/15
134/9 134/15 135/22
135/5 140/1 205/7
221/25 241/15 242/3
244/1
**Texaco [2]** 143/1 143/2
**Texas [4]** 43/21 64/25
142/4 142/6
**text [3]** 29/23 33/22
158/6
**than [37]** 7/1 15/10
22/16 26/11 26/11
26/16 31/7 38/12 39/8
40/1 46/17 57/15 58/6
58/9 62/13 64/5 64/13
66/2 66/7 70/20 70/21
71/9 83/6 84/22 85/4
107/8 135/3 139/2
152/16 155/24 159/6
161/22 190/18 203/11
237/9 242/12 243/6
**thank [52]** 5/22 7/19
9/13 13/15 13/18 13/19
14/22 15/17 27/21
27/22 39/17 40/14 42/9
43/7 43/10 90/14 91/7

97/7 97/10 108/25
114/17 115/17 115/18
115/21 120/11 121/18
129/14 134/6 139/18
140/23 141/5 141/19
145/1 148/2 150/20
153/13 163/12 164/10
166/24 186/10 192/22
198/5 205/24 212/17
218/6 222/11 222/15
240/6 240/9 244/4
244/5 244/6
**that [1414]**
**that's [153]** 12/3 15/15
16/20 19/5 20/5 21/23
22/4 22/18 22/21 22/22
23/11 24/2 24/9 24/15
24/15 24/21 24/25
25/16 27/5 27/6 27/12
28/24 28/24 30/1 30/6
30/12 30/12 30/16
30/18 31/14 32/11
32/11 38/8 38/16 38/20
38/21 39/12 41/14 52/5
54/22 55/19 55/20 56/4
57/18 62/6 62/22 66/10
67/20 75/25 80/24
86/20 86/25 92/15
92/18 95/7 98/14 99/19
99/21 101/4 101/16
102/4 102/11 104/8
105/7 106/10 106/24
108/2 108/2 109/6
109/7 110/18 113/5
113/18 115/21 116/5
116/5 117/19 118/22
123/4 123/6 124/11
126/11 128/4 128/11
128/23 129/2 130/4
132/16 132/22 133/7
133/14 133/17 134/4
138/25 139/23 140/8
143/12 147/11 147/14
147/17 150/1 153/3
157/20 162/15 164/11
164/24 165/19 169/20
170/6 170/7 178/11
181/2 181/13 182/14
182/22 185/22 191/21
195/12 201/13 202/18
203/6 203/9 204/1
204/14 205/18 206/3
208/14 208/17 208/19
211/18 212/24 213/14
213/14 218/16 220/4
220/21 220/21 221/16
222/5 225/18 226/7
226/15 228/14 231/25
233/1 233/16 234/6
235/13 236/1 237/10
237/13 238/11 240/22
**their [77]** 5/16 15/1
15/12 16/2 17/6 19/24
20/4 21/6 21/18 22/8

# T

**their... [67]** 23/17 25/11
27/11 28/14 30/23
31/17 31/21 35/22 36/2
36/6 36/8 36/19 36/20
37/6 40/10 59/20 71/6
84/3 84/25 89/4 99/18
99/23 100/2 110/9
119/4 119/5 122/25
137/6 142/24 145/5
170/23 170/23 174/21
174/23 177/20 178/1
178/3 178/8 179/2
185/4 189/16 194/4
195/5 200/18 200/18
206/15 206/23 213/23
216/18 222/24 223/2
225/6 225/7 225/7
225/8 225/19 228/11
229/2 229/4 229/7
229/16 231/21 232/1
232/18 235/25 238/11
242/17
**Theirs [1]** 127/1
**them [58]** 10/9 23/16
23/24 26/6 27/11 30/8
32/14 32/16 32/18 33/5
33/17 33/18 33/19 35/6
37/4 37/10 40/24 43/5
47/24 56/10 60/22
63/24 68/8 69/24 76/3
78/2 84/5 90/9 114/15
121/23 122/20 129/4
134/19 134/25 134/25
136/16 138/24 142/20
144/10 144/10 145/15
152/23 166/21 170/20
171/11 178/6 194/6
196/11 201/7 201/13
216/14 221/17 225/19
226/19 228/13 232/18
238/1 238/3
**themselves [4]** 14/2
40/24 129/21 243/1
**then [78]** 5/5 6/16 6/21
8/4 8/5 10/16 13/24
15/14 17/25 18/4 19/10
29/16 31/23 32/21
33/10 33/25 36/8 36/10
49/6 51/17 51/23 52/8
52/23 53/1 55/11 56/22
58/25 59/1 59/5 59/21
60/16 60/17 62/17
69/11 74/9 76/4 86/2
92/1 93/15 97/9 102/2
103/14 113/12 115/6
115/16 116/4 124/8
131/4 131/17 131/19
134/2 134/19 135/1
136/25 137/21 138/5
138/15 139/5 139/10
139/18 140/6 154/25
156/5 158/25 161/7
194/16 205/8 208/11

212/2 212/10 216/17
229/17 230/10 232/3
238/13 239/5 243/1
243/19
**there [190]** 5/22 6/24
8/3 8/3 8/21 8/23 9/4
9/9 12/17 13/24 15/11
18/23 20/25 22/17
22/19 23/4 23/22 24/10
25/6 25/11 26/5 26/16
27/2 27/3 27/4 27/13
29/11 29/12 29/21
31/16 34/17 37/1 37/8
41/9 41/15 41/18 47/5
47/7 48/6 49/17 49/19
49/19 49/20 49/23 50/5
50/9 51/19 53/18 54/17
55/14 56/6 56/14 56/15
57/22 57/23 58/17
58/20 58/23 59/1 59/7
61/7 61/17 61/25 62/18
63/10 63/14 64/12
64/16 65/5 66/5 66/5
71/8 71/8 72/5 72/7
74/19 80/2 81/21 83/17
83/17 85/23 86/12
86/15 89/5 89/12 89/16
94/12 96/25 97/1 97/10
101/7 101/8 101/13
102/6 102/19 105/3
105/11 105/15 105/22
106/12 106/15 107/16
110/4 116/10 118/10
121/7 125/7 126/4
128/21 128/25 135/3
135/21 138/8 138/10
138/20 138/24 139/1
139/5 139/6 139/13
139/13 139/14 139/20
140/1 143/18 144/6
154/5 154/18 155/20
156/3 158/23 162/21
167/22 168/10 168/12
168/14 168/14 168/14
168/15 168/15 172/14
185/21 187/9 189/2
190/8 190/10 193/21
195/23 196/2 197/7
201/7 201/9 203/10
209/1 210/9 210/23
212/12 214/10 214/16
214/20 214/22 214/24
221/8 221/12 224/11
224/13 224/18 225/6
225/7 225/8 225/8
225/16 227/21 232/5
232/19 233/7 235/23
237/14 237/15 238/1
238/4 239/11 239/21
239/25 242/25 243/22
**there's [48]** 14/6 18/1
19/24 20/13 24/3 32/4
32/21 33/10 42/19 49/7

49/10 52/8 52/20 53/17
53/17 58/24 60/19
62/17 62/17 65/1 70/1
73/23 74/16 75/21
84/10 86/8 103/14
109/15 123/10 128/9
137/13 137/20 138/17
186/6 201/7 204/15
208/25 209/8 209/8
212/10 212/10 216/16
221/3 221/14 226/17
226/17 230/14 237/21
**thereafter [2]** 185/24
229/17
**therefore [1]** 52/2
**therein [3]** 207/2
215/19 215/21
**thereto [1]** 179/24
**therewith [1]** 174/5
**these [73]** 12/16 16/4
18/19 20/12 21/2 23/24
23/25 24/6 26/1 26/7
26/15 27/10 27/14
51/16 61/4 61/24 63/23
64/24 72/15 75/23 84/7
87/17 99/17 100/1
114/14 123/3 129/21
134/21 144/25 154/3
154/17 155/14 156/8
156/9 156/9 156/12
156/23 156/24 158/20
159/15 159/15 160/16
160/19 161/20 162/6
162/7 162/7 166/17
166/21 173/14 178/8
183/19 183/20 189/9
191/15 199/19 200/3
200/4 203/21 211/12
212/12 217/21 218/21
219/10 225/11 227/4
228/4 228/16 230/7
231/1 231/8 231/14
232/6
**they [289]**
**they'll [1]** 229/3
**they're [17]** 8/7 22/8
24/12 30/4 30/12 47/22
103/14 105/18 158/24
174/24 174/25 178/7
189/16 200/16 200/16
207/9 207/13
**thing [5]** 17/18 135/12
161/21 196/4 220/20
**things [29]** 11/17 11/25
12/5 12/19 15/15 18/7
24/4 47/24 49/5 49/7
49/10 55/11 56/13
58/11 64/19 72/7 74/19
81/2 84/2 96/14 99/1
111/12 119/14 124/18
137/10 137/13 139/16
207/18 222/7
**think [81]** 6/24 8/12
11/12 12/21 15/9 16/10

16/17 18/18 21/18
23/22 27/16 28/2 34/5
34/5 38/10 41/13 41/13
41/17 41/24 53/18
54/20 57/3 62/2 62/3
62/4 62/24 71/11 85/25
86/3 96/4 106/8 106/11
106/24 106/25 109/10
110/4 112/18 113/11
114/13 115/13 116/13
120/16 121/11 124/23
129/2 132/12 134/13
134/15 135/8 136/15
137/19 139/15 153/24
158/4 185/1 191/23
197/20 197/22 204/14
204/15 210/6 210/11
210/14 212/16 212/22
213/2 216/5 225/8
225/17 227/10 237/13
240/11 240/14 240/15
240/25 242/11 242/16
242/20 243/3 243/3
243/19
**thinking [1]** 152/4
**third [8]** 8/4 28/17 52/8
198/13 198/18 202/18
241/2 241/9
**Thirteen [1]** 80/1
**Thirty [1]** 241/4
**this [466]**
**Thomas [2]** 1/18 5/14
**those [138]** 10/5 13/2
13/5 14/20 16/7 16/25
17/7 17/15 20/1 20/19
21/8 21/9 21/11 23/12
24/12 24/13 24/17
25/21 26/4 26/6 29/14
29/14 29/19 30/5 36/20
40/25 42/10 44/6 44/18
45/12 47/4 47/8 47/10
48/25 49/2 50/1 50/3
50/7 52/4 53/1 58/11
60/21 61/1 61/11 64/19
64/20 72/7 72/17 73/20
73/25 80/17 81/2 84/8
87/13 88/13 88/18
88/21 88/25 89/9 89/23
89/25 90/3 90/5 90/10
90/12 99/1 100/14
101/15 101/19 109/17
111/12 111/16 111/17
111/19 113/12 118/9
121/22 122/2 122/10
125/21 127/16 130/5
135/6 135/15 135/19
137/10 137/24 139/8
139/10 139/16 140/11
142/21 143/7 143/24
143/25 144/2 144/11
146/10 146/24 151/11
151/19 153/25 154/10
154/19 155/21 156/21
157/6 160/5 160/6

160/16 169/22 172/20
173/8 174/6 175/25
186/15 188/15 199/18
199/21 200/8 201/4
201/11 211/7 215/10
216/15 223/2 227/8
227/23 228/3 228/8
230/10 231/5 231/12
239/5 239/20 240/4
241/22 241/22
**though [5]** 16/20 77/25
90/6 114/10 128/23
**thought [6]** 31/22
33/23 34/9 128/20
137/10 214/17
**thousand [2]** 36/19
37/6
**thousands [2]** 56/4
56/5
**thread [6]** 220/3 220/4
220/8 221/10 223/10
235/14
**three [48]** 6/19 7/1
11/20 11/23 29/12
32/15 49/23 50/3 53/21
68/13 69/12 69/22
70/24 81/17 101/7
102/25 103/19 104/16
148/12 153/8 153/11
154/5 177/16 177/19
186/6 198/16 201/7
201/7 201/9 203/3
203/11 203/17 203/19
204/1 204/2 206/11
208/1 208/4 208/7
208/19 211/7 215/16
216/1 230/2 236/16
237/4 237/6 240/11
**three-quarters [1]** 7/1
**threshold [1]** 28/2
**through [29]** 27/4
44/23 53/13 137/24
139/9 145/13 175/1
175/18 177/14 187/1
192/12 208/4 211/12
211/16 212/19 212/20
216/25 219/19 220/8
222/23 223/2 224/15
224/19 225/14 238/25
**ticking [2]** 230/1
238/24
**tie [3]** 151/4 207/18
223/9
**tied [3]** 151/10 156/19
228/4
**ties [2]** 207/16 213/24

# T

**time [101]** 7/11 9/15 9/22 10/8 10/9 10/15 10/17 11/1 11/24 14/24 17/17 19/19 25/5 35/8 35/13 35/20 36/6 41/4 50/3 51/23 56/5 64/13 64/24 65/5 66/6 67/4 68/3 68/25 75/3 76/18 76/21 81/22 84/12 85/21 99/21 99/22 99/23 106/21 109/13 117/14 118/6 118/25 119/25 123/10 123/13 136/9 143/18 143/22 144/6 144/6 149/9 149/25 150/5 150/6 150/10 157/21 157/24 160/9 166/23 174/18 181/9 188/25 189/13 189/13 200/11 204/13 208/12 209/5 209/6 209/9 209/19 210/2 214/5 214/15 217/9 217/15 217/18 220/12 221/16 221/21 222/4 222/11 230/8 231/9 232/4 232/20 232/25 233/2 234/7 235/10 237/7 238/2 240/16 242/19 242/21 243/4 243/5 243/7
**timeframe [9]** 65/2 66/20 124/3 159/1 159/8 209/8 212/3 229/6 229/15
**timeframes [1]** 207/16
**timely [1]** 230/7
**times [5]** 7/18 32/15 49/17 61/12 174/22
**timing [6]** 24/1 48/11 121/2 152/5 207/17 209/17
**title [10]** 38/20 113/23 129/20 141/25 172/4 173/1 188/14 217/12 217/13 245/6
**titled [3]** 31/7 37/25 54/21
**today [29]** 5/12 5/16 6/25 7/3 21/15 23/2 24/8 24/13 28/4 28/5 31/10 31/14 34/10 37/9 37/19 39/18 87/7 87/8 106/11 139/11 139/22 165/3 196/15 200/7 200/21 200/24 205/6 228/5 238/7
**today's [1]** 7/20
**together [10]** 32/8 56/9 102/8 104/4 109/9 164/9 182/12 185/6 207/18 242/23

**told [1]** 170/22
**tomorrow [12]** 6/10 240/20 241/9 242/7 242/13 242/17 242/17 242/18 243/6 243/11 243/19 244/7
**tone [1]** 235/3
**too [3]** 26/19 215/25 220/15
**took [10]** 11/20 17/21 45/16 88/6 88/7 117/24 143/14 143/14 144/13 191/3
**top [28]** 55/20 58/8 60/12 115/14 128/17 129/9 130/22 175/6 182/22 206/12 208/8 208/18 209/23 209/24 210/3 218/24 221/7 221/8 221/10 221/15 224/21 230/16 232/8 234/10 234/14 234/15 235/17 236/5
**topic [1]** 10/21
**total [5]** 44/2 152/18 185/5 201/3 212/8
**totality [1]** 125/11
**totally [2]** 28/6 125/12
**tough [2]** 64/17 64/24
**toward [2]** 42/20 226/1
**towards [1]** 226/14
**Township [2]** 134/13 134/16
**track [1]** 240/8
**tracking [1]** 115/11
**trade [1]** 175/14
**trades [1]** 174/22
**traditional [1]** 7/14
**trail [2]** 193/9 194/2
**transaction [7]** 118/3 127/24 128/1 131/23 132/11 175/2 175/3
**transactions [1]** 133/11
**transcript [4]** 124/12 245/7 245/10 245/22
**transfer [13]** 183/10 187/23 188/4 188/14 188/21 188/22 189/9 190/23 191/4 191/21 191/22 192/14 236/23
**transferred [9]** 104/2 110/20 111/3 113/20 113/22 113/23 113/25 189/11 231/11
**transfers [3]** 114/3 131/1 188/16
**transpire [1]** 25/13
**transport [2]** 152/16 168/16
**transportation [12]** 151/13 151/14 152/1 152/2 152/8 152/13 152/14 152/24 224/17

224/20 225/14 230/4
**Travis [1]** 1/24
**trial [1]** 242/6
**triggered [1]** 218/3
**triggering [2]** 22/17 22/18
**TRO [1]** 17/23
**trouble [1]** 128/16
**trucks [2]** 49/13 136/24
**true [59]** 54/5 67/6 73/5 75/5 76/20 79/4 92/14 93/1 93/7 93/11 93/13 93/19 94/25 95/1 95/11 95/12 98/17 98/22 98/23 99/10 99/15 100/15 100/16 100/24 101/4 101/5 101/12 102/9 105/1 105/24 107/4 109/20 109/21 110/3 110/13 110/14 110/15 111/12 112/1 112/2 113/13 113/14 116/23 119/1 119/2 119/10 119/15 121/14 122/18 123/3 123/5 123/9 131/17 131/24 131/25 133/14 170/8 238/7 245/7
**trunk [1]** 44/16
**truth [2]** 92/16 190/17
**try [12]** 12/4 51/12 63/21 74/20 75/18 80/25 210/13 210/14 210/20 218/7 221/21 223/16
**trying [15]** 30/18 35/16 77/18 90/5 90/9 93/8 118/11 122/7 124/3 125/17 174/21 220/22 223/13 237/14 237/16
**Tuesday [3]** 1/13 219/2 223/24
**Turm [12]** 112/23 114/24 116/14 178/18 178/20 179/3 179/4 179/15 180/3 180/25 182/10 185/23
**turn [43]** 60/18 60/22 74/23 76/12 78/21 92/11 114/20 116/21 132/4 132/23 160/20 165/24 167/25 169/23 173/22 174/11 176/15 176/24 178/9 178/13 178/21 179/10 180/16 181/25 182/19 185/11 185/20 186/5 187/10 187/15 193/8 194/22 198/7 201/6 203/17 203/17 204/10 223/18 230/15 231/15 233/19 236/4 238/18
**turned [2]** 59/21 212/7
**turning [1]** 95/4

**tweaked [1]** 19/7
**twenty [2]** 57/12 124/5
**Twenty-two [1]** 57/12
**two [64]** 6/8 6/9 6/10 7/21 9/17 12/19 25/4 26/11 26/11 26/12 27/2 30/8 30/24 31/1 31/4 32/4 32/7 33/4 34/17 46/11 56/25 57/12 58/7 61/7 65/24 70/24 74/19 86/2 89/12 93/20 93/21 104/3 105/16 105/23 115/20 116/5 116/7 121/7 127/16 128/19 137/23 138/10 138/19 149/3 154/18 156/3 164/11 164/23 170/18 173/14 182/10 183/11 183/12 184/17 184/19 184/21 191/1 222/7 227/17 232/8 235/12 240/13 240/13 241/13
**TX [1]** 1/25
**type [14]** 46/10 55/5 142/21 160/16 162/4 172/9 172/23 173/7 175/2 175/19 179/3 188/14 228/7 238/21
**types [7]** 49/4 49/5 122/10 156/9 160/5 160/19 174/9
**typically [1]** 83/18
**typo [1]** 31/6

# U

**U.S.A [34]** 1/3 5/3 45/1 104/9 104/13 104/15 104/25 105/4 105/11 105/24 106/13 106/18 126/19 130/20 130/23 130/24 131/2 131/4 141/24 141/25 145/17 145/19 161/22 161/24 171/20 171/21 178/18 178/20 181/8 187/19 187/22 190/15 190/23 241/14
**UHC [1]** 160/25
**ultimate [1]** 46/22
**ultimately [2]** 45/5 233/4
**um [12]** 58/3 113/2 147/16 147/21 153/4 186/11 194/23 208/9 212/24 216/22 229/12 231/18
**um-hum [11]** 113/2 147/16 147/21 153/4 186/11 194/23 208/9 212/24 216/22 229/12 231/18
**unable [2]** 48/7 239/14
**unambiguous [2]** 191/7 191/25

**unanimous [7]** 19/11 19/12 19/21 20/18 58/22 61/16 62/21
**uncommon [1]** 126/21
**unconventional [1]** 102/24
**under [84]** 16/7 17/8 18/23 21/2 21/20 21/21 21/22 22/13 22/20 22/24 24/15 27/19 28/24 29/9 29/20 32/18 33/15 34/12 34/21 35/21 38/2 48/2 48/21 51/16 55/22 56/19 57/5 58/13 59/17 68/23 70/2 70/6 72/14 78/19 81/3 82/15 82/21 83/16 90/17 93/25 103/13 104/25 125/11 126/1 126/6 126/21 127/18 131/19 140/20 144/14 144/23 145/23 163/19 168/21 168/24 171/8 171/15 172/3 175/20 175/22 179/16 180/5 183/9 183/14 183/16 184/2 184/3 184/4 184/7 185/4 187/3 187/3 197/2 199/19 204/9 231/6 231/6 235/25 237/12 237/17 240/19 242/21 245/11 245/23
**undergraduate [1]** 46/16
**underneath [3]** 130/22 139/16 183/2
**understand [46]** 12/9 12/14 14/23 37/18 40/3 40/7 62/18 62/22 62/24 62/24 70/7 81/8 81/12 81/25 82/20 88/16 102/11 105/10 105/15 105/22 106/1 114/11 120/7 131/15 132/7 135/7 138/16 154/16 165/10 179/19 181/21 192/24 194/3 200/18 200/24 216/23 222/24 223/5 223/13 224/23 225/5 225/19 226/4 227/10 230/6 236/22
**understanding [41]** 22/11 22/12 38/25 48/8 63/9 64/4 64/8 71/17 72/1 76/1 89/25 92/18 103/7 112/24 119/5 119/20 125/24 126/9 128/9 134/8 152/4 154/15 162/2 183/22 186/18 188/3 188/10 188/13 189/4 189/7 189/19 206/9 210/7 210/9 216/8 226/1

## U

**understanding... [5]**
227/15 227/21 228/3
228/9 235/22
**understands [1]**
133/10
**understood [8]** 62/9
64/3 74/6 81/25 119/4
135/5 210/8 220/11
**undertake [3]** 16/6
16/9 47/3
**undertaken [3]** 55/6
55/16 101/18
**underutilizing [1]**
138/19
**undisputed [2]** 16/6
18/18
**undivided [2]** 128/2
172/8
**uneconomic [1]**
200/12
**unfair [1]** 200/8
**unfairness [1]** 14/7
**unfolds [1]** 40/14
**unfortunately [3]** 23/6
48/6 48/7
**unilateral [2]** 17/14
77/14
**unilaterally [2]** 50/20
50/24
**unique [4]** 23/10 23/11
27/20 48/16
**unit [34]** 53/17 53/25
54/2 67/16 67/17 74/10
86/2 91/20 137/16
137/18 137/20 137/21
137/22 144/17 144/20
148/6 158/24 158/24
158/25 158/25 158/25
164/1 164/2 164/13
164/14 164/15 164/16
164/17 164/18 164/23
177/17 201/22 202/21
203/5
**unit's [1]** 203/12
**UNITED [4]** 1/1 245/4
245/6 245/19
**unitized [1]** 174/5
**units [14]** 92/14 137/22
137/25 138/22 144/14
144/25 146/8 146/10
146/15 146/23 149/1
150/25 158/14 225/12
**University [2]** 45/17
142/4
**unless [1]** 245/22
**unlike [2]** 111/5 111/13
**unlikely [1]** 231/1
**unreasonable [1]**
64/23
**unreasonably [2]**
82/15 163/19
**unsupported [2]** 25/23
25/23

**until [9]** 13/12 53/5
90/19 90/21 94/23
122/14 122/20 123/3
205/10
**untrue [1]** 153/23
**unusual [2]** 48/15
178/3
**up [61]** 5/11 11/19
22/24 23/3 31/23 44/14
46/24 51/1 51/5 52/7
53/4 53/7 53/12 60/13
66/14 74/20 80/25
85/24 91/17 92/12
94/10 97/14 98/5
102/15 114/22 120/5
122/2 128/24 131/11
140/13 140/15 143/19
153/11 155/16 162/9
165/21 170/21 172/1
174/21 174/22 174/24
182/12 183/6 185/24
194/18 196/7 196/22
202/9 204/18 212/11
216/2 216/25 217/7
224/7 226/3 226/5
226/14 229/25 234/13
234/18 239/6
**update [1]** 229/24
**upfront [1]** 144/19
**upon [12]** 7/1 19/16
20/7 34/7 57/5 57/13
58/25 112/3 119/4
130/1 154/2 217/6
**upper [1]** 187/17
**upset [2]** 122/25 235/6
**upside [1]** 227/13
**urgent [1]** 204/19
**us [69]** 11/4 11/14
11/16 12/24 13/8 17/16
23/4 23/6 25/22 34/2
36/5 43/8 84/4 84/5
87/8 90/6 97/2 98/3
142/2 142/8 148/13
157/4 158/13 158/21
163/24 167/2 168/3
168/7 169/22 170/22
175/19 178/7 178/7
179/12 180/23 184/23
186/3 186/14 187/6
194/7 194/10 195/3
195/12 196/14 197/10
197/18 200/10 200/17
200/21 214/12 216/25
221/13 222/18 224/12
225/5 225/15 229/15
229/17 230/24 232/6
232/6 232/19 232/22
233/3 233/17 234/8
237/12 240/23 243/19
**usage [1]** 196/5
**use [21]** 21/11 51/20
57/17 85/16 85/17
144/7 161/24 177/18
194/5 195/9 195/14

197/10 197/18 199/12
199/25 200/14 221/21
222/4 234/4 243/4
243/7
**used [10]** 21/9 56/4
155/15 166/7 166/22
167/2 174/3 189/14
189/18 197/12
**uses [2]** 20/16 144/22
**using [3]** 194/18
203/10 212/6
**utilize [5]** 11/9 25/19
57/16 126/22 138/5
**utilized [3]** 18/19 21/8
144/21
**utilizes [1]** 25/20

## V

**VA [1]** 1/22
**vacate [1]** 90/5
**vague [1]** 34/21 35/24
**valid [1]** 39/2
**valuable [1]** 22/24
**value [2]** 111/3 239/25
**variety [2]** 155/4 167/6
**vehicle [1]** 110/19
**vehicles [1]** 168/16
**vein [1]** 189/18
**vendors [2]** 155/8
155/16
**venture [1]** 143/2
**verbiage [1]** 189/18
**verification [1]** 95/10
**verified [12]** 79/2 95/7
96/4 97/2 98/2 109/19
109/19 121/22 127/7
133/3 133/13 133/21
**vernacular [1]** 226/7
**versed [1]** 156/8
**version [1]** 202/2
**versus [3]** 5/3 28/11
28/18
**vertical [4]** 65/14 65/23
65/24 136/5
**very [72]** 5/17 6/22
6/22 7/5 10/2 11/16
11/16 19/16 28/10
32/22 32/23 34/6 35/25
39/13 42/10 43/7 45/19
48/10 48/18 52/11
60/19 60/23 62/17
62/25 65/15 65/25
68/20 84/9 92/13
107/12 110/23 113/16
114/10 115/21 122/8
122/22 122/22 126/14
130/11 130/15 134/9
137/11 139/11 139/11
144/23 151/16 153/11
154/16 155/9 191/9
206/12 215/25 215/6
218/23 218/24 220/7
220/10 222/5 222/17
222/17 223/17 223/18

223/23 224/12 224/13
224/23 224/24 228/20
230/6 234/20 241/16
241/16
**veto [1]** 17/14
**VI [8]** 30/10 55/17
55/19 86/2 95/4 103/13
204/10 208/19
**VI.1 [5]** 39/16 120/10
120/13 215/12 215/14
**VI.2 [19]** 29/22 29/24
30/3 31/7 31/22 31/24
34/14 56/19 62/12 68/1
69/1 69/3 69/4 95/5
97/23 97/25 98/3 98/5
98/7
**VI.B.1 [3]** 207/1 209/1
209/2
**VI.B.2 [2]** 31/6 237/8
**via [1]** 235/20
**vice [4]** 5/9 5/11 5/13
13/9
**vicinity [3]** 24/11 37/16
44/21
**view [2]** 40/18 163/12
**views [1]** 99/20
**vigorously [1]** 34/25
**virgin [1]** 154/14
**virtually [1]** 155/14
**virtue [1]** 39/2
**volume [17]** 1/13
151/10 151/20 151/25
152/9 152/12 152/18
152/22 166/16 166/22
184/2 184/23 185/4
186/1 238/24 239/5
239/22
**volumes [1]** 166/17
**voluminous [1]** 79/6
**vote [4]** 94/21 94/23
101/18 101/22
**voted [2]** 93/25 94/3
**votes [1]** 102/12
**vs [1]** 1/4

## W

**wait [4]** 36/8 36/8 36/8
222/9
**waited [1]** 225/21
**waiting [1]** 97/6 222/3
**Walter [2]** 170/5 193/12
**want [107]** 6/11 13/11
16/14 17/6 17/11 18/3
18/3 18/24 19/3 22/1
22/2 22/5 22/8 29/19
30/13 30/14 30/20 31/1
33/10 34/21 35/25
37/17 40/17 51/24 52/6
52/21 58/4 58/12 59/9
60/8 60/24 62/11 64/18
66/13 71/6 72/21 72/23
81/15 83/2 83/18 83/20
85/15 85/24 86/2 87/7
88/14 91/17 92/13 97/9

99/4 101/6 104/20
105/9 107/12 114/11
122/24 122/25 125/3
126/25 127/3 128/12
128/24 130/15 131/7
131/15 133/9 134/7
136/16 136/18 139/2
140/13 144/16 145/1
153/2 167/25 173/23
178/9 183/4 184/8
184/11 192/11 192/20
195/18 201/3 204/15
204/25 212/14 215/2
216/20 217/22 217/23
218/6 223/17 226/6
229/18 230/13 230/15
231/13 234/10 234/13
236/25 238/2 238/9
238/16 238/18 242/19
**wanted [20]** 6/3 19/20
33/12 41/3 66/4 71/12
72/14 78/2 82/3 83/3
85/12 126/11 129/18
196/4 199/7 222/3
224/6 231/4 235/24
236/13
**wanting [2]** 194/3
225/18
**wants [5]** 28/3 48/17
68/10 71/25 124/10
**Ward [7]** 187/17 187/18
187/19 190/3 190/21
191/6 191/9
**Ward's [1]** 192/13
**Warden [1]** 28/11
**warranted [1]** 42/2
**was [332]**
**wasn't [12]** 13/8 17/2
60/17 84/6 106/2 113/8
123/16 126/12 188/24
221/11 227/21 237/15
**watching [1]** 224/24
**water [143]** 8/2 8/3 8/9
8/12 8/13 8/14 10/2
10/21 10/25 11/3 11/9
11/19 12/4 18/9 18/10
18/12 18/13 49/9 49/9
60/8 64/16 82/17 83/25
84/1 84/10 84/11 84/14
84/22 84/24 85/1 85/2
85/4 85/12 85/13 85/15
85/17 85/19 89/3 89/3
89/3 109/17 109/24
110/7 110/12 110/16
110/21 110/25 111/6
111/9 111/14 111/18
112/21 112/22 112/22
113/8 116/23 117/2
117/23 118/5 118/6
118/6 128/22 132/24
133/1 133/14 133/18
134/1 143/3 166/10
166/16 166/18 166/19
167/2 167/5 167/8

# W

**water... [68]** 167/8
167/19 167/20 168/5
168/9 168/16 168/19
168/21 168/23 169/4
169/12 169/16 171/4
171/9 171/10 174/10
178/10 179/8 180/4
180/25 183/25 184/6
184/6 184/15 184/20
184/23 185/2 185/24
186/7 187/23 188/5
188/23 189/12 189/24
189/25 190/24 191/23
194/5 195/8 195/9
195/9 195/12 195/14
195/16 195/17 195/19
195/20 195/21 195/22
195/23 197/8 197/10
197/18 198/25 199/12
199/13 199/17 199/17
199/19 199/20 200/1
200/15 200/17 201/1
201/1 231/23 234/3
234/5
**water-sharing [2]**
195/21 195/23
**waters [2]** 199/18
199/21
**way [28]** 6/3 6/4 30/18
35/23 42/20 95/22 96/9
96/25 115/14 124/18
139/4 145/10 174/2
174/6 175/18 208/1
208/4 213/3 213/17
214/8 214/8 216/7
217/11 219/14 219/18
219/19 224/3 234/25
**ways [1]** 243/23
**we [480]**
**we'll [14]** 6/25 12/12
13/5 21/23 37/2 43/5
71/6 90/16 124/7
124/11 141/8 205/7
222/9 242/16
**we're [56]** 6/6 8/18
10/15 12/21 19/14
19/15 21/1 22/11 23/9
24/5 24/9 25/10 28/5
31/10 31/14 35/13
35/19 37/2 43/24 53/12
61/18 65/18 72/13 78/4
91/22 102/6 105/21
112/13 112/14 114/24
115/10 116/18 144/1
150/22 156/25 158/13
160/20 163/24 165/24
168/3 168/7 195/3
195/4 203/10 205/5
209/23 212/15 215/1
215/9 220/22 228/5
231/6 231/21 236/9
238/6 239/14
**we've [4]** 110/23

118/20 122/6 122/6
**week [3]** 224/7 227/2
229/17
**weeks [2]** 35/16 103/19
**weight [1]** 192/6
**welcome [2]** 13/16
91/18
**well [311]**
**well's [1]** 17/12
**wellbore [4]** 30/1 30/6
30/16 40/25
**wellbores [2]** 33/20
239/11
**wellhead [2]** 137/1
140/5
**wells [251]**
**went [2]** 175/1 215/4
**were [122]** 8/9 21/6
26/16 26/20 30/9 34/13
40/20 41/23 47/8 47/12
48/12 49/17 50/2 50/5
50/9 57/9 58/11 63/18
65/21 68/6 74/6 74/15
78/18 79/2 80/14 82/24
83/6 83/6 94/11 95/11
99/5 99/9 99/9 99/12
99/13 99/14 99/22
99/24 100/2 101/6
101/7 101/17 102/13
102/25 104/6 106/25
108/14 111/22 113/11
113/12 113/20 116/12
119/8 119/9 121/7
121/8 125/16 126/16
127/7 128/1 129/21
130/3 132/19 135/2
136/15 144/10 144/21
154/10 157/20 158/14
159/3 159/15 159/16
159/17 159/19 162/11
169/21 169/25 172/9
172/13 172/14 172/23
173/16 175/14 175/19
175/25 177/18 180/21
183/13 183/20 184/7
185/17 188/18 194/3
195/1 199/20 200/3
200/7 217/24 219/9
219/10 223/6 223/12
225/17 225/18 226/4
226/5 226/15 228/5
228/12 229/16 230/24
231/21 232/1 232/13
233/5 236/8 236/8
236/14 237/6 237/16
238/3
**weren't [3]** 23/1 100/1
127/9
**West [1]** 112/14
**western [1]** 167/12
**what [334]**
**what's [17]** 17/16 29/6
33/8 51/4 59/11 91/25
123/11 123/13 123/18

131/5 171/22 181/4
182/25 183/2 190/17
211/18 235/15
**whatever [5]** 94/24
111/20 135/9 137/4
243/8
**when [85]** 7/16 7/16
10/8 13/8 18/18 21/2
21/9 28/11 28/15 28/18
29/16 30/16 31/4 36/16
37/11 43/18 45/21
46/13 48/12 48/12 58/2
58/17 60/2 60/21 61/5
61/17 64/24 66/18
68/16 70/25 73/3 74/6
74/14 78/8 80/23 87/16
88/6 100/14 101/17
101/22 106/17 106/21
106/21 106/25 107/23
110/10 111/21 114/23
117/23 118/1 118/7
118/7 119/20 122/4
124/3 127/7 128/21
135/10 136/22 143/12
144/11 145/2 149/18
150/6 150/10 154/1
157/18 159/18 164/3
168/23 169/18 170/19
175/5 175/7 177/22
184/18 191/1 199/25
212/8 227/4 228/14
229/6 230/10 232/13
240/19
**where [88]** 10/10 13/24
15/15 16/23 23/15
23/16 31/12 40/4 40/25
43/20 43/20 52/4 52/8
55/21 57/3 58/13 59/2
60/19 61/25 64/14
64/25 66/3 68/2 68/25
72/5 77/9 78/14 81/11
85/12 102/12 106/13
112/11 112/14 113/6
113/8 118/4 120/7
125/4 135/2 136/2
138/20 139/9 142/18
144/13 145/4 150/25
158/21 164/10 164/11
164/15 167/5 167/11
167/14 168/9 169/3
172/11 175/2 177/21
177/23 177/24 178/5
185/25 186/14 187/1
187/6 192/1 206/18
209/8 209/12 209/20
215/10 215/14 216/5
219/16 219/19 220/25
225/1 226/4 226/5
227/19 233/16 235/6
235/10 236/8 237/20
240/23 240/24 242/14
**Whereupon [1]** 141/3
**whether [19]** 11/11
15/5 18/25 24/19 50/21

50/24 51/24 52/1 52/6
74/15 108/3 135/23
145/14 147/18 149/19
165/10 173/5 179/25
188/4
**which [126]** 8/19 8/24
9/5 9/18 10/21 14/6
14/7 14/13 14/17 15/5
16/1 19/16 20/7 22/9
22/20 23/19 28/24 31/6
31/7 31/9 34/11 34/23
38/7 38/17 39/9 40/10
40/11 43/22 45/3 49/12
49/16 49/20 49/21
50/16 50/19 50/23
52/10 55/14 56/11 57/6
58/6 58/12 58/17 59/10
62/4 62/11 62/12 65/2
66/14 70/23 71/5 72/21
73/24 76/12 78/21
79/22 80/7 85/14 85/25
86/10 87/5 91/14 97/23
100/22 103/10 111/6
114/18 115/12 117/9
118/1 119/25 125/4
126/8 126/12 127/2
127/5 128/13 130/24
132/18 136/3 136/9
142/24 143/1 150/4
150/4 154/7 157/8
158/6 161/7 168/10
168/18 168/22 170/25
171/8 172/20 175/22
184/5 185/6 185/21
187/1 189/5 190/13
194/8 195/17 201/21
202/20 203/3 203/20
208/4 209/4 209/4
209/5 209/9 209/19
213/15 214/20 216/24
216/25 226/13 227/13
228/4 228/20 230/5
239/2 241/13 242/13
**while [12]** 25/11 42/23
53/12 139/4 142/19
142/21 143/16 179/15
188/16 215/9 221/22
239/19
**white [1]** 168/11
**who [44]** 5/6 5/9 5/14
6/22 19/23 32/9 36/18
42/24 45/12 47/9 52/13
53/1 68/8 82/24 83/2
83/18 90/24 101/13
102/7 103/11 104/6
114/7 117/5 117/22
120/19 128/22 130/21
131/5 148/7 164/19
170/2 176/20 178/19
178/21 181/6 181/11
187/18 190/15 192/2
204/7 224/3 233/2
236/9 241/9
**who's [4]** 6/20 37/15

58/2 68/9
**whoever [3]** 52/15
68/10 135/9
**whole [4]** 37/14 137/13
220/20 235/14
**wholly [1]** 126/22
127/12
**wholly-owned [2]**
126/22 127/12
**whom [2]** 215/16
236/24
**whomever [1]** 226/2
**why [64]** 18/14 21/15
27/6 32/11 32/11 34/17
41/18 48/8 56/6 56/6
63/18 83/17 83/24 85/9
88/23 88/23 117/15
118/10 122/20 123/15
128/9 136/17 136/20
138/15 161/22 163/16
172/24 173/14 174/8
175/10 175/11 177/7
177/14 178/3 180/2
183/21 185/8 188/21
189/7 190/11 195/22
195/23 199/12 199/23
200/21 200/23 208/24
213/24 214/1 214/2
214/3 214/13 221/16
224/9 227/8 229/24
234/24 235/14 235/20
236/1 236/22 237/5
237/11 237/17
**wide [1]** 80/25
**will [108]** 5/6 5/13 5/15
7/3 7/14 7/22 9/21 9/25
10/4 11/14 11/15 13/6
15/7 15/13 16/5 20/10
21/7 21/21 22/14 24/7
28/19 31/11 33/17 36/2
40/2 40/4 41/9 41/17
42/2 42/3 42/24 63/8
63/25 74/9 78/5 81/17
82/13 82/14 82/15
86/10 89/11 89/11
89/12 90/14 90/25 91/1
91/13 91/21 92/2 92/7
98/5 102/15 115/3
118/12 121/16 130/14
131/11 131/14 135/6
140/25 140/25 151/4
151/25 155/2 156/13
156/22 157/11 157/11
161/24 163/18 163/19
166/20 166/20 169/10
174/22 179/1 190/6
190/25 192/4 195/20
197/17 200/11 205/8
205/9 205/10 212/16
215/24 223/1 226/20
227/18 227/18 229/3
238/21 239/3 239/5
239/23 240/1 240/8
240/17 240/18 241/17

**W**

**will... [7]** 242/10 243/18 243/19 243/20 243/20 243/25 244/7
**Williams [2]** 137/3 148/12
**willing [1]** 72/2
**WILSON [2]** 1/10 114/23
**wind [1]** 97/14
**wind-up [1]** 97/14
**window [1]** 109/12
**wish [4]** 5/22 7/7 9/21 15/13
**wishes [1]** 12/18
**withdraw [4]** 111/18 113/7 198/24 204/17
**withdrawal [55]** 18/13 82/17 83/25 84/10 84/11 84/14 84/20 84/22 85/1 85/2 109/17 109/24 110/7 110/12 110/16 110/21 110/25 111/7 111/9 111/15 112/11 112/22 113/3 113/10 116/23 117/23 118/5 133/16 167/8 168/6 168/9 168/19 168/21 168/23 169/8 169/13 171/4 171/10 174/10 179/8 180/5 180/25 184/6 184/15 184/20 185/24 186/8 189/24 189/25 190/24 194/6 197/8 199/5 199/13 201/1
**withdrawals [1]** 186/7
**withdrew [1]** 118/8
**withhold [2]** 82/16 163/19
**within [33]** 19/22 35/5 36/18 37/6 40/4 51/23 63/12 64/6 68/22 69/9 70/5 80/11 92/22 115/11 128/18 129/10 129/12 136/18 137/16 146/23 157/19 164/4 164/14 166/22 167/9 206/25 207/23 208/12 212/3 215/11 216/18 228/10 245/8
**within-mentioned [1]** 245/8
**without [22]** 9/3 11/19 14/2 19/11 19/21 20/1 20/23 21/9 25/8 33/13 34/4 58/22 66/16 67/22 79/5 84/8 118/9 122/3 173/7 174/5 199/18 230/13
**witness [40]** 7/11 7/15 11/8 12/23 42/14 43/2 63/15 70/8 71/16 96/19 96/24 118/17 120/19

120/20 121/9 121/16 128/22 129/1 132/25 135/21 140/13 141/6 141/13 149/18 149/22 150/6 158/5 158/6 165/9 189/1 192/11 200/20 209/11 210/2 220/1 220/24 240/5 241/2 241/9 243/25
**witness's [6]** 63/22 165/22 205/6 210/5 210/8 221/25
**witnesses [14]** 3/1 5/12 5/16 6/1 6/12 6/16 6/19 7/3 7/14 7/21 7/24 9/11 9/12 13/12
**won't [3]** 17/13 96/2 204/25
**wonderful [2]** 13/1 114/8
**wondering [1]** 105/11
**Woodard [14]** 218/25 219/25 223/25 224/3 224/4 229/11 229/20 230/17 231/16 231/20 232/10 233/12 233/20 234/12
**Woodard's [1]** 223/11
**woods [4]** 1/19 1/21 1/24 40/1
**word [5]** 20/17 30/3 60/10 166/12 190/25
**words [6]** 69/24 111/16 111/17 111/19 203/12 214/1
**work [19]** 19/24 27/4 29/25 30/5 43/20 46/7 56/21 56/24 61/24 63/12 87/4 98/19 98/21 104/6 105/23 106/14 123/2 179/2 242/23
**worked [6]** 45/21 45/24 46/17 144/6 144/14 156/24
**working [23]** 19/1 148/11 152/25 153/16 160/16 164/20 164/22 173/2 173/9 178/6 178/7 179/16 194/3 204/9 216/18 224/13 224/21 225/11 226/8 226/9 230/9 242/2 242/21
**works [2]** 216/7 243/8
**workup [1]** 137/12
**world [3]** 24/22 45/25 46/12
**worldwide [1]** 45/23
**worry [1]** 37/1
**worst [1]** 7/3
**would [178]** 5/12 8/1 8/10 8/13 8/14 8/19 9/8 9/9 9/12 10/20 11/12 11/16 11/18 11/24

12/24 13/1 13/2 13/3 14/5 14/16 20/19 22/17 22/20 24/14 24/18 24/22 25/2 25/4 25/5 25/12 26/13 27/10 28/7 30/9 31/18 31/23 33/1 33/20 34/2 34/3 34/11 36/18 39/11 40/10 41/8 41/19 41/19 42/6 43/15 45/12 47/20 50/23 51/1 51/3 51/21 52/15 53/2 53/7 57/17 61/17 61/22 64/18 78/5 79/19 80/14 83/10 83/14 84/5 85/2 86/10 87/20 89/25 90/18 92/4 92/11 93/20 94/10 94/17 94/25 95/4 95/5 96/1 96/14 96/15 96/17 97/2 100/6 100/13 102/8 102/18 103/7 105/16 105/25 106/9 108/3 108/5 108/16 109/1 111/9 114/12 114/17 114/20 114/22 115/16 116/21 117/8 117/20 120/4 122/9 124/4 124/15 124/21 124/24 125/13 128/5 128/22 132/15 136/9 139/19 141/15 144/20 152/16 154/23 155/11 155/22 156/1 158/7 174/12 176/2 177/16 179/10 184/20 186/23 190/2 193/2 195/6 195/20 195/25 199/21 199/23 200/11 204/24 206/2 206/17 214/5 214/14 214/17 218/3 218/5 221/12 221/16 221/22 222/6 223/9 227/4 227/23 228/7 228/15 229/5 229/6 229/6 231/2 232/20 236/21 236/22 237/23 240/13 240/14 240/15 240/25 241/2 241/16 242/10 243/4 243/10 243/12 243/13 243/22
**wouldn't [8]** 11/18 13/11 20/20 26/20 94/23 100/7 176/5 200/2
**written [14]** 14/17 16/4 16/7 17/25 50/12 94/17 94/20 94/24 105/3 105/15 105/22 190/14 199/8 217/6
**wrong [5]** 22/11 38/4 78/15 125/24 132/16
**wrote [2]** 8/5 190/22
**Wyalusing [30]** 84/15 84/21 84/23 85/4 110/6

110/21 110/25 111/18 112/6 112/22 113/4 128/5 128/22 133/15 167/7 167/20 167/23 168/5 168/19 168/21 168/23 169/3 169/9 178/10 181/1 187/24 187/24 194/5 199/1 199/13
**Wyoming [2]** 172/15 172/18

**X**

**XVI [8]** 65/7 65/9 65/11 136/6 136/9 209/13 209/16 210/6
**XVI.A [2]** 136/3 136/4
**XVI.B [1]** 136/4

**Y**

**Yasser [3]** 1/23 5/10 5/11
**yeah [32]** 22/16 44/25 46/5 49/23 52/20 54/21 57/12 58/8 58/23 62/24 64/15 65/7 67/20 69/1 69/24 80/2 87/6 91/19 91/19 92/15 93/4 100/18 112/25 118/24 122/16 123/15 128/24 132/4 158/14 158/23 180/24 214/18
**year [11]** 87/18 106/22 137/7 137/9 159/2 186/20 186/22 219/18 222/25 223/3 225/12
**years [16]** 26/11 26/12 30/24 31/1 31/4 122/6 139/12 142/10 142/14 142/17 142/18 142/19 156/15 157/9 160/18 189/2
**yellow [2]** 146/6 168/11
**yes [187]** 13/1 42/1 42/12 44/8 44/11 46/22 47/2 47/8 47/12 48/22 53/10 53/23 54/1 54/20 54/24 55/17 56/8 56/19 57/12 57/13 57/21 57/25 58/15 58/19 60/1 61/3 65/11 66/17 67/23 68/15 68/19 70/17 70/22 71/18 72/3 72/7 72/16 72/19 72/22 73/4 73/7 73/10 73/19 74/1 74/5 74/8 75/4 75/20 76/7 76/11 76/19 76/22 77/8 77/12 78/8 78/24 79/1 79/3 80/9 80/13 81/7 81/10 81/14 81/24 82/7 82/9 83/11 84/13 85/8 86/14 86/17 86/21 88/5 88/11 88/19 88/22

89/7 94/15 94/19 95/13 96/21 97/20 97/22 97/25 103/2 103/5 103/18 106/20 107/11 107/11 109/18 111/11 115/25 117/21 120/3 122/19 125/8 125/9 126/20 127/10 127/15 127/20 127/22 129/13 129/23 130/12 133/6 133/25 134/14 135/14 135/16 135/20 136/7 136/11 138/7 140/18 141/18 142/10 143/23 146/6 147/3 147/16 147/23 148/23 149/10 149/17 156/2 158/4 160/1 162/18 162/19 163/7 163/11 163/23 166/1 166/3 169/19 169/24 172/4 175/12 178/1 178/24 180/22 182/2 184/25 185/20 185/21 192/22 193/14 193/16 196/11 196/11 199/10 201/16 202/12 204/2 205/19 206/8 206/19 210/24 212/24 215/6 217/19 218/10 218/18 219/1 219/3 220/7 222/19 226/16 226/23 226/25 228/22 228/24 228/25 229/23 230/21 230/22 232/13 233/14 233/14 233/15 234/17 236/6 236/8 238/8 240/9
**yet [7]** 15/1 103/21 115/12 177/8 203/22 221/3 239/15
**York [1]** 28/11
**you [924]**
**you'll [15]** 22/4 30/22 32/23 35/8 38/14 38/17 42/18 68/20 93/14 148/24 148/25 149/1 185/20 186/5 240/20
**you're [22]** 13/16 18/16 23/8 24/2 29/11 52/20 101/2 103/4 114/15 123/5 123/7 131/7 131/22 141/9 170/5 198/3 212/3 215/24 229/22 229/24 232/10 233/13
**you've [10]** 30/25 32/3 60/9 101/4 119/23 122/17 124/15 209/16 210/7 216/5
**your [361]**
**yourself [5]** 43/15 47/3 64/22 79/24 118/22