1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

3
Epsilon Energy U.S.A., Inc.,   :
4                                :
               vs               :    1:21-CV-00658-JPW
5                                :
                                 :
6  Chesapeake Appalachia, LLC    :

7

8

9

10         BEFORE:        HONORABLE JENNIFER P. WILSON

11         PLACE:         Harrisburg, Pennsylvania

12         PROCEEDINGS:   Preliminary Injunction

13         DATE:          Tuesday, May 12, 2021 - VOLUME II

14         REPORTED BY:   Lori A. Fausnaught, RMR/CRR
                          Lori_Fausnaught@pamd.uscourts.gov
15

16

17  APPEARANCES:

18  For the Plaintiff:      Gregory J. Krock, Esquire
                            Elizabeth M. Thomas, Esquire
19                          McGUIRE WOODS, LLP
                            260 Forbes Avenue, Suite 1800
20                          Pittsburgh, PA  15222-3142
                                     - and -
21                          Jonathan T. Blank, Esquire
                            McGUIRE WOODS, LLP
22                          310 Fourth Street, N.E., Ste. 300
                            Charlottesville, VA  22902
23                                   - and -
                            Yasser A. Madriz, Esquire
24                          McGUIRE WOODS, LLP
                            600 Travis Street, Ste. 7500
25                          Houston, TX  77002-2906

APPEARANCES: (Continued)

For the Defendant:        Daniel T. Brier, Esquire
                          John B. Dempsey, Esquire
                          Nicholas F. Kravitz, Esquire
                          Richard A. Armezzani, Esquire
                          MYERS, BRIER & KELLY, LLP
                          425 Spruce Street, Ste. 200
                          Scranton, PA  18503

INDEN TO WITNESSES


<u>INDEX TO WITNESSES</u>

FOR PLAINTIFF:                                    PAGE:

HENRY CLANTON

  (Direct by Attorney Madriz conducted on May 11, 2021)

   Cross by Attorney Brier                 5

   Redirect by Attorney Madriz            55

   Recross by Mr. Brier                   67

   Court Inquiry                          71

   Recross by Mr. Brier                   80

INDEX TO EXHIBITS

| PLAINTIFF: | IDENTIFIED | ADMITTED |
|---|---|---|
| Exhibit No. 36 | 82 | 83 |
| Exhibit No. 37 | 82 | 83 |
| Exhibit No. 38 | 82 | 83 |
| Exhibit No. 39 | 82 | 83 |
| Exhibit No. 40 | 82 | 83 |
| Exhibit No. 41 | 82 | 83 |
| Exhibit No. 42 | 82 | 83 |
| Exhibit No. 47 | 93 | 93 |
| Exhibit No. 48 | 93 | 93 |
| Exhibit No. 49 | 93 | 93 |
| Exhibit No. 50 | 93 | 93 |
| Exhibit No. 51 | 100 | 102 |
| Exhibit No. 52 | 112 | 112 |

| DEFENDANT: | IDENTIFIED | ADMITTED |
|---|---|---|
| Exhibit No. 40 | 35 | 107 |
| Exhibit No. 42 | 109 | 109 |

CLANTON - CROSS

1          (8:41 a.m., convene.)

2          THE COURT:  Welcome back everyone.  Mr. Clanton, I

3   remind you that you remain under oath, and we'll now proceed

4   this morning and pick up with cross on behalf of Defendant.

5          Good morning, Mr. Clanton.

6          THE WITNESS:  Good morning.

7                        CROSS EXAMINATION

8   BY ATTORNEY BRIER:

9   A.  Mr. Clanton, you have before you the Plaintiff's exhibit

10  binder.  Could you please turn to the Plaintiff's Exhibit 30.

11  Plaintiff's 30 is the December 22 proposal for the Craige 1HL

12  well.  Correct?

13         THE COURT:  Mr. Clanton, I think just based on the

14  size of the ring in that binder, I believe you have Defendant's

15  binder in front of you rather than Plaintiff's binder.

16         THE WITNESS:  Oh.  Exhibit 30?

17         ATTORNEY BRIER:  Yes, sir.

18         THE WITNESS:  There's nothing in Exhibit 30 here.

19         ATTORNEY BRIER:  Let's see if we can try another

20  exhibit.  How about 31?

21         THE COURT:  It's on the screen.

22         THE WITNESS:  I can read it on the screen here.

23         ATTORNEY BRIER:  All right.  Thank you, Mary, for

24  putting it on the screen.

25

1  BY ATTORNEY BRIER:

2  Q.  So we're looking at Exhibit 30 on the screen, which is the

3  Craige North 1 LH well.  Correct?

4  A.  Correct.

5  Q.  And that was proposed on December 22 of 2020 by Epsilon.

6  Right.

7  A.  Yes.

8  Q.  To be clear, Epsilon had plenary control over when it

9  decided to make that proposal.  Correct?

10 A.  We did.

11 Q.  And Epsilon had plenary control in terms of not just

12 deciding when to propose but calculating the 120 days out from

13 the date from when they anticipated to spud the well.  Correct?

14 A.  Correct.

15 Q.  And in each of the proposals, Plaintiff's Exhibit 31 -- I'm

16 sorry -- 30, 31, 32 and 33, they are all proposed on

17 December 22, and they all have an anticipated spud date of

18 April 22.  Correct?

19 A.  That's correct.

20 Q.  And that's because -- as you testified yesterday, that's to

21 give the JOA parties 30 days to decide whether to participate,

22 which takes you to January 22.  And then you add the 90 days to

23 be prepared to spud.  Correct?

24 A.  Yes.

25 Q.  Now, to be fair, the four proposals, none of them make

1  reference to anything other than an anticipated spud date.

2  Correct?

3  A.  Yes.

4  Q.  There's no reference to boots-on-the-ground.  Correct?

5  A.  That's correct.

6  Q.  There is no reference to commencing operations.  Correct?

7  A.  Correct.

8  Q.  It's a spud date.  And in the industry, a spud date is when

9  the drill bit hits the ground.  Correct?

10  A.  Generally accepted as that, yes.

11  Q.  So you have the rigs on the site?

12  A.  You have a rig on-site, yes.

13  Q.  The site has been prepared.  Correct?

14  A.  The site is prepared for drill, yes.

15  Q.  All of the necessary work that would need to be done to

16  spud, including whatever work needs to be done to protect and

17  shut in the two operating wells on the site, would need to be

18  done by the time you spud.  Correct?

19  A.  That is correct.

20  Q.  Now, April 22 has passed.  We can agree that on April 22 of

21  2021 Epsilon didn't spud any wells on the Craige pad.  Correct?

22  A.  Yes.

23  Q.  And we can agree that Epsilon didn't have

24  boots-on-the-ground on April 22, 2021 on the Craige pad.

25  Correct?

1   A.  Right.  We had not been allowed to access the site.  Yes.

2   Q.  You didn't do anything by April 22 on the Craige pad.

3   Correct?

4   A.  We couldn't because we were unable to access the site.

5   Yes.

6   Q.  So has -- so the proposals on April 22, 2021, according to

7   your testimony yesterday, expired, didn't they?

8   A.  No.  The actual commencement of operations would, in fact,

9   extend the April 22nd timing related to the JOA.  Plus, we

10   have, as is a right under the JOA, extended and exercised the

11   right to use an additional 30 days to handle permitting,

12   surface easements as well as curing title.

13   Q.  Do you recall testifying yesterday under oath?

14   A.  I do.

15   Q.  Do you recall that your own counsel asked you a question

16   that is, and I quote, "If Epsilon does not spud by April 22nd,

17   2021, what happens?"  Do you remember that question?

18   A.  I should have said commencement of operations.

19   Q.  What you said is the proposals expire.  Do you recall

20   saying that?

21   A.  I do.  That was a misstatement.

22   Q.  Now, your testimony today is it didn't expire because you

23   have, under the JOAs, in your view, the opportunity to add 30

24   more days to April 22.  Correct?

25   A.  That's correct.

CLANTON - CROSS

1          ATTORNEY BRIER:  Mary, would you please put on
2     Plaintiff's Exhibit 1?  And specifically the Craige unit JOA
3     and specifically page ten.  Thank you.
4          Your Honor, this is Plaintiff's Exhibit 1.  And I'm on
5     page ten at the top.
6     BY ATTORNEY BRIER:
7     Q.  And in your testimony yesterday, sir, when you referenced
8     the fact that you have the opportunity for 30 more days, you
9     were referring to the language that's at the top of page ten of
10    Exhibit 1 under Article VI which is -- begins on page nine.
11    Correct?
12    A.  Yes.
13    Q.  Okay.  And the sentence you're referring to is the sentence
14    that makes reference to the fact that the deadline can be
15    extended upon written notice of same by operator to other
16    parties for a period of up to 30 additional days.  Right?
17    A.  Correct.
18    Q.  Now, that written notice wasn't sent to Chesapeake, was it?
19    A.  It was not.
20    Q.  It wasn't sent to Equinor, was it?
21    A.  It was not.
22    Q.  It wasn't sent to any JOA parties.
23    A.  It has been sent to the consenting JOA parties.
24    Q.  Well, the language says -- am I reading it correctly, "Upon
25    written notice of same by operator to the other parties."  It

1  doesn't say the consenting parties.  It says to the other

2  parties, doesn't it?

3  A.  Our interpretation is that requirement notice is to the

4  consenting parties not to the non-consenting parties.

5  Q.  But that's not what it says.  It says to the other parties,

6  doesn't it?

7  A.  That's what that says, yes.  Our interpretation is that

8  applies to consenting parties, not non-consenting parties.

9  Q.  So as you sit in this courtroom today, Equinor, who you

10 didn't sue, who is not here, has no idea that you have taken an

11 interpretation of the JOA that entitles you to 30 more days to

12 begin to spud these wells.  Correct?

13 A.  That's correct.

14 Q.  And you are in active litigation with Chesapeake, and you

15 didn't send a notice to Chesapeake telling them you were

16 extending by 30 days.  Correct?

17 A.  Right.  Part of the reason why we had to extend it for 30

18 days is because we have not had cooperation from Chesapeake and

19 we were unable to secure our permits.

20 Q.  Why didn't you send it to Equinor?

21 A.  They are a non-consenting party.

22 Q.  But it doesn't say anything about consenting or

23 non-consenting.  We can agree on that?

24 A.  I think we have answered that.

25 Q.  What?

CLANTON - CROSS

1  A.  I think we have answered that.

2  Q.  More importantly, that language that you are relying on is

3  part of a sentence that starts with the following on line

4  three.  Please read along with me.  "If all parties to whom

5  such notice is delivered elect to participate in such a

6  proposed operation, the parties shall be contractually

7  committed to participate therein."  And the sentence doesn't

8  end until down on line ten.  That's all one sentence, from line

9  three to line ten.  Correct?

10 A.  Correct.

11 Q.  And you're asking this Court to interpret this JOA to say

12 that that's the sentence that gives you the right unilaterally

13 to extend the April 22 deadline by 30 more days.  Correct?

14 A.  That is the provision that we have exercised and called

15 upon to exercise, the 30 days.

16 Q.  Let's talk about the four wells at issue.  Isn't it true

17 that not all parties that received the December 22 notices have

18 elected to participate?

19 A.  In other words, that are non-consenting parties to the well

20 proposal?

21 Q.  Right.

22 A.  Yes.

23 Q.  And in fact, for the three proposals that are the Craige

24 North proposals, three run north and one runs south.  Right?

25 A.  Yes.

CLANTON - CROSS

1  Q.  For the three that run north, nobody has elected to

2  participate.  Correct?

3  A.  Epsilon has elected to participate.  Obviously we proposed

4  the well, so the other parties --

5  Q.  No other JOA party has elected to participate?

6  A.  That's right.

7  Q.  And despite that, it's this provision that says as a

8  condition to everything that follows in the sentence, "If all

9  parties to whom such notice is delivered elect to participate

10 in such a proposed operation" -- then it goes on.  Later in the

11 sentence it says that the operator can extend it by 30 days by

12 giving written notice.  Correct?

13 A.  Right.

14 Q.  There is no provision in this JOA that speaks to the

15 situation where a proposal is made, there are non-consenting

16 parties, and the person that makes the proposal wants to

17 unilaterally extend its own deadline by 30 days.  Isn't that

18 true?

19 A.  I don't know that I share that interpretation, no.

20 Q.  Your interpretation is that the language at the beginning

21 of the sentence, "If all parties to whom such notice is

22 delivered elect to participate" is applicable here even though

23 on each one of these proposed wells there are parties who

24 didn't elect to participate.  Right?

25 A.  There are non-consenting parties in the proposals, yes.

1    Q.  What do you think that language means, "If all parties to

2    whom such notice is delivered elect to participate"?  What do

3    you think it means?  Does it mean anything to you?

4    A.  We have provided notice to the consenting parties who had

5    elected to participate.

6    Q.  Please try to answer my question.  It says, "If all parties

7    to whom such notice is delivered" -- and to be clear, we're now

8    talking about the June -- I'm sorry -- the December 22

9    proposals, Exhibits 30 to 33.  Correct?

10   A.  Um-hum.  Correct.

11   Q.  That's the notice.  And the next clause is, elect to

12   participate.  Correct?

13   A.  Correct.

14   Q.  All parties that receive the notice elect to participate.

15   And it's your position that even though there are

16   non-consenting parties who didn't elect to participate, this

17   sentence gives you the right to add on 30 days.  Right?

18   A.  Yes.

19   Q.  If you didn't have that provision that gives you the right

20   to add on 30 days, in your world view, these proposals expired

21   on April 22, didn't they?

22   A.  I guess.

23   Q.  I don't want to belabor it, but the other part of the

24   sentence that we disagree about is the part that says written

25   notice.  And this is in lines -- I'm sorry.  I lost my place.

CLANTON - CROSS

1         ATTORNEY KROCK:  Seven.

2         ATTORNEY BRIER:  Thank you.

3  BY ATTORNEY BRIER:

4  Q.  The end of line seven it says, "Written notice of same by

5  operator to the other parties."  That's the language we

6  disagreed about.  You said that only applies to consenting

7  parties.  But the JOA doesn't say consenting parties, it says

8  to other parties.

9  A.  My interpretation of the obligation set out in the JOAs

10  that notice is required for the consenting parties.

11  Q.  Okay.  Now, if you would, sir, if you look at the top of

12  page 11 of the same JOA.  And you were asked about this

13  yesterday at lines one through three.  The Judge actually had

14  some questions about this.

15         And it says, "If 100 percent subscription of the

16  proposed operation is obtained, the proposing party" -- that's

17  Epsilon.  Right?

18  A.  Yes.

19  Q.  -- "shall promptly notify the consenting parties of their

20  proportionate interest in the operation, and the party serving

21  as operator shall commence such operation within the period

22  provided by Article, Roman numeral, VI.B.1, subject to the same

23  extension as provided herein."  Right?

24  A.  Yes.

25  Q.  And I think the Judge asked you or Counsel asked you

1  what -- would you agree that there is no Article VI.B.1 in this

2  JOA?

3  A.  That's right.

4  Q.  As of today, who's the operator on the Craige pad?

5  A.  Chesapeake Appalachia.

6  Q.  And they're still serving as operator today.  Right?

7  A.  Correct.

8  Q.  And about that point, if you would look back on page ten of

9  the JOA, it talks about -- and this is, again, at lines --

10  never mind.  I'll skip that.

11       You also made reference to Article XVI of the JOA.

12  Said that that gives Epsilon some authority to control the

13  pacing of its drilling and completion operations.  Correct?

14  A.  What do you mean by pacing?

15  Q.  Well, let's look at Article XVI.  Pacing is my word so I

16  understand why you want to clarify.  If you would look at page

17  27, please, sir.

18       Thank you, Mary, for helping follow along here.

19       This is Article XVI, page 27 of Exhibit 1.  2(a) at

20  the bottom, it says, "Proposal for horizontal well operation

21  shall include the following, the estimated commencement date."

22  Right?

23  A.  Yes.

24  Q.  What estimated commencement date did Epsilon pick in the

25  four proposed wells that we're here about?

1   A.   We chose the commencement date of April 22nd.

2   Q.   Okay.  So irrespective of whether you picked it under

3   Article XVI as April 22nd or under some other calculation of

4   the JOA, you guys picked April 22nd?

5   A.   That's correct.

6   Q.   I'm sorry.  I'm jumping back to page ten one last time.

7            Mary, if you could put page ten on the screen, please.

8            And I'm looking at line ten.  Please read along with

9   me, sir.  It says, "If the actual operation has not been

10  commenced within the time provided, including any extension

11  thereof as specifically permitted herein or in the force

12  majeure provisions of Article XI, and if any party hereto still

13  desires to conduct said operation, written notice proposing

14  same must be resubmitted to the other parties in accordance

15  herewith as if no prior proposal had been made."

16           Correct?

17  A.   Right.

18  Q.   Is it your understanding that if this Court denies

19  Epsilon's request, nothing to prevent Epsilon from starting the

20  clock over and from re-proposing these wells, is there?

21  A.   Well, since we're still under the valid proposal timeframe,

22  we still have the opportunity to file a force majeure so these

23  proposals can remain active.

24  Q.   You have the opportunity to what?

25  A.   To extend these proposals due to the outcome of this case.

CLANTON - CROSS

1   Q.  So are you telling this Court that you guys are going to

2   view the ruling of this Court as a force majeure?  Is that the

3   decision that's been made?

4   A.  You asked me in context if the actual operation had not

5   been commenced within the time provided, it sets out there a

6   stipulation provided, including the extension thereof, as

7   specifically permitted hereunder or in the force majeure

8   provisions of Article XI.

9       I was answering that in the context of your question.

10  Q.  But my question is, is that the position of your company

11  today, that if the Court doesn't grant the relief, you are

12  going to take the position that the deadline is extended under

13  the force majeure?

14      ATTORNEY MADRIZ:  Your Honor, I'm going to object to

15  that question.  Mr. Clanton is here in his personal capacity.

16  He's not here as the corporate representative of Epsilon.  He

17  can't answer that question.

18      ATTORNEY BRIER:  Your Honor, this gentleman is the

19  chief operating officer.  He just injected an issue into the

20  case that I didn't inject.  And he's suggesting that there's an

21  interpretation that the company is going to invoke.  It feels

22  like it would go to the heart of the issue before this Court,

23  and I think it's a totally fair question.

24      ATTORNEY MADRIZ:  Your Honor, permission to respond

25  again.

1    THE COURT:  Please.

2    ATTORNEY MADRIZ:  The question was about his

3  understanding of the provision, and Mr. Clanton responded.

4  Right now we're delving into what will the company do if an

5  unspecified set of events occurs.  That's -- he's actually --

6  opposing Counsel is actually asking the witness to speculate.

7    THE COURT:  Well, inasmuch as I have to determine if

8  there would be irreparable harm from denying the preliminary

9  injunctive relief, and inasmuch as we have spent a great deal

10  of time questioning Mr. Clanton about this precise issue;

11  namely, what happens if the proposal expires, I think the

12  question is fair on cross-examination and necessary to this

13  Court's analysis.

14    The first time I've heard that Mr. Clanton is here in

15  his individual capacity is in your objection.  So, this is not

16  a 30(b)(6) deposition.  You introduced him as the chief

17  operating officer of the Plaintiff.  So I'm not understanding

18  your argument that he can't testify to the company's position.

19    ATTORNEY MADRIZ:  My apologies, Your Honor.  I

20  actually thought I was presenting him in his individual

21  capacity.  But my objection doesn't -- I guess the heart of my

22  objection goes to the fact of what the question is asking is

23  what will Epsilon do if this Court denies the temporary

24  injunction request.  And one of the issues that Mr. Clanton

25  raised is that there is an exception on how to extend based on

1  force majeure.

2          They're asking for a legal interpretation of that

3  provision.  I'm not 100 percent sure Mr. Clanton has the

4  ability to testify on that issue because we haven't, as their

5  lawyers, actually been involved in that process.

6          THE COURT:  Okay.  I'll overrule your objection.  I

7  don't have the benefit of real-time right at the moment.  My

8  understanding was that the question was -- the question posed

9  to Mr. Clanton was what will you do in the event that the Court

10  denies injunctive relief.  And I think Mr. Brier was asking

11  would you agree that you, on behalf of Epsilon, that Epsilon

12  would resubmit a proposal.  And Mr. Clanton's answer, as I

13  understood it so far, was no, I don't think we would be

14  required to do that.  We would invoke the force majeure

15  provision in the JOA.  That's the testimony thus far.

16          So the objection is overruled.

17  BY ATTORNEY BRIER:

18  Q.  Let me reframe this so that we're clear.  Would you agree

19  with me that if the Court denies your injunctive request, under

20  the terms of the JOA you have the right to re-propose as if no

21  prior proposal had been made?

22  A.  Correct.

23  Q.  And the practical effect of that is if the Court denies it,

24  the next day, based on all the work you've already done, you

25  can re-propose and reset the clock and move the spud date out

1  120 days.  Right?

2  A.  Right.

3  Q.  Is it correct, sir, that Epsilon applied for the permits to

4  drill the four proposed wells from the Pennsylvania Department

5  of Environmental Protection before it even proposed the wells

6  to the JOA party?

7  A.  That's correct.

8  Q.  I'm going to move away from the JOAs, sir.  If we could

9  look at Exhibit 7.  Plaintiff's Exhibit 7, this is the

10  settlement agreement that's been admitted into evidence.

11       If you could put paragraph eight on the screen,

12  please.  It's page three.

13       You were present when the chief executive officer

14  testified yesterday, weren't you, sir?

15  A.  I was.

16  Q.  Did you hear him testify that the settlement agreement did

17  not modify, amend or revise the JOAs between the parties?

18  A.  I did.

19  Q.  Do you agree with that?

20  A.  I do.

21  Q.  So whatever rights Chesapeake had as the operator before

22  the settlement agreement was entered into, it had after the

23  settlement agreement was entered into because the JOA was not

24  amended.  Right?

25  A.  The JOA was not amended.

CLANTON - CROSS

1    Q.  Whatever rights Equinor had, it had before and after the

2    settlement agreement.

3    A   (Witness nodded in the affirmative.)

4    Q.  Correct?

5    A.  All parties under that JOA still had their rights, yes.

6    Q.  And the other parties, the absent JOA parties weren't even

7    involved in the settlement agreement, had no opportunity to

8    have any input into it, did they?

9    A.  I don't believe they did.

10   Q.  And it's not your position -- well, I'll strike that.

11          If we could look at Plaintiff's Exhibit 45, please.

12   This was one that was not in the binder, Judge.  It was handed

13   up towards the end of Mr. Clanton's direct.

14          THE COURT:  Yes.

15          ATTORNEY BRIER:  It's the string e-mail.

16          THE COURT:  Yes.

17   BY ATTORNEY BRIER:

18   Q.  I don't know if you have that one, do you, Mr. Clanton?

19   A.  No, sir.  But you can put it on the screen here, I think.

20   Q.  And if you could please -- yeah, we're on the right page.

21          So Mr. Clanton, on October 15, 2020 you sent an e-mail

22   to Julie Woodard, and this is after an exchange that started as

23   early as May of 2020, about your company's interest in

24   developing the Auburn gas gathering system.  Correct?

25   A.  Developing wells within the Auburn gas gathering system,

1  yes.

2  Q.  That's definitely more precise.  Thank you.  And that

3  process started in May, and there was a lot of back and forth.

4  It became clear that there had been a disagreement between

5  Chesapeake and Epsilon regarding the JOAs.  Correct?

6  A.  It actually started before May.  It was Q-1.

7  Q.  Q-1 of 2020?

8  A.  Yes.

9  Q.  So we're now here a full year later.  Right?  It's May of

10  '21.  Was it such an emergency in May of '20 about the

11  irreparable harm that you are claiming you're going to suffer

12  that you put it in an e-mail, that you went to court or asked

13  for immediate relief?

14  A.  I think it's evidenced by our attentiveness to development

15  and our ongoing dialogue; direct, constant, continual dialogue

16  that the development in Auburn is a priority and was not

17  receiving priority status by the operator.

18          Yes, it's obvious there is damage potentially

19  occurring here, I think one would agree.  We also stated that

20  verbally to personnel within Chesapeake as we were having these

21  discussions.

22  Q.  I will always give you an opportunity to explain, but I

23  want you to first answer my question.

24  A.  Okay.

25  Q.  My question was as early as Q-1 2020, Epsilon was concerned

1  that Chesapeake disagreed with Epsilon's rights under the JOA.

2  Right?

3  A.  That we disagreed with Chesapeake's right under the JOA?

4  Q.  Chesapeake and Epsilon disagreed about their rights under

5  the JOA.

6  A.  I think we disagreed about the pace of development of

7  Auburn.

8  Q.  Okay.  My question is if it's an emergency today, this

9  Court has to make a determination as to whether there's

10  immediate and irreparable harm about to be visited upon

11  Epsilon.

12      My question is you didn't go to court in Q-1, 2020 to

13  ask for relief because of some immediate or irreparable harm

14  that was going to happen, did you?

15  A.  We did not.

16  Q.  You did not go in Q-2, 2020, did you?

17  A.  We did not.

18  Q.  You didn't go in Q-3, 2020, did you?

19  A.  We did not.

20  Q.  You didn't go in Q-4, 2020, did you?

21  A.  We did not.

22  Q.  But in Q-1, 2021 you went to court?

23  A.  During all four of those timeframes, we were still

24  unaware -- can I respond?

25  Q.  Yeah, go ahead.

1    A.  So you're making the point that development was not

2    important to us in Q-1 of 2020.  I disagree.  You were making

3    the point that development in Auburn is not important to us in

4    Q-2, 2020. I disagree.  You made the point that development in

5    Auburn in Q-3, 2020 was not important.  I disagree.  You made

6    the point that in Q-4, 2020 development in Auburn was not

7    important to Epsilon.  I disagree.

8              I think these e-mail exchanges point out the need for

9    development -- our need for development in Auburn.

10             Now, we were unaware of what potential development

11   plans, and we were trying to gain discovery and understanding

12   of what those might be, to keep open and available to us all

13   types of actions necessary, including lawsuits, if, in fact,

14   Chesapeake was not going to develop Auburn or if Chesapeake was

15   going to obstruct us from trying to get development in Auburn.

16             I hope that answers your question.

17   Q.  I am afraid it didn't.  But let me focus on what I wanted

18   to focus on.  There is no dispute that Epsilon, in every one of

19   the quarters of 2020, had an interest in developing Auburn.

20   That's not what this case is about.

21             This case is about whether there is immediate and

22   irreparable harm about to be visited upon Epsilon if the Court

23   denies the request.

24             My point is you didn't view it as immediate and

25   irreparable all the way through 2020 during this e-mail

1  exchange.  And the first time you came to court and said that

2  there was immediate and irreparable harm was in the first

3  quarter of this case.  Correct?  That's a yes --

4  A.  No, that's not correct.

5  Q.  -- or no.

6  A.  Just because we did --

7  Q.  Sir --

8  A.  -- not state to Chesapeake in -- this e-mail string does

9  not indicate that because there was not irreparable harm

10  potentially occurring doesn't mean that that was not the case.

11  Q.  My question was you didn't go to court, did you?

12  A.  We were understanding what development plans or lack

13  thereof --

14  Q.  Why didn't you answer the question that you didn't go to

15  court.  Did you go to court?

16  A.  We did not go to court.

17  Q.  And the same drainage concerns that you talked about

18  yesterday on the offsetting wells of a competitor existed in

19  the fourth quarter of 2020.  Correct?

20  A.  We made Chesapeake aware of those.

21  Q.  The same drainage concerns.  Right?

22  A.  Yes.

23  Q.  And they existed in the third quarter of '20?

24  A.  And the fourth quarter.

25  Q.  And the second quarter of '20.

CLANTON - CROSS

1   A.  All quarters.

2   Q.  And that's the drainage concern that you say this Court

3   should drop everything, re-do its schedule and grant you relief

4   now, because that drainage concern is so critical to you and

5   can't be quantified in money damages.  Right?

6   A.  Yes.

7   Q.  Now, can we agree that of the four proposed wells, the

8   three Craige North wells that run north off the pad all go into

9   leased territory that is leased by Epsilon and Chesapeake?

10  A.  Yes.

11  Q.  So there is no drainage concern going north, because to the

12  extent you are capturing minerals, you're not hurting yourself.

13  You have the least minerals in the proposed wellbores.

14  Correct?

15  A.  Correct.  There is no risk of loss of reserves to offset

16  operators in that case.

17  Q.  So this Court doesn't need to concern itself with whether

18  you have suffered some immeasurable damage by the delay on the

19  three Craige North wells, because to the extent there's been

20  delay, those minerals are still there, and to the extent they

21  are being captured by anybody, they are being captured by

22  Chesapeake and Epsilon in the leased properties.  Correct?

23  A.  There is a consideration -- yes, there is no loss of that

24  reserve to offset operators in the scenario you have painted.

25  There is a reduction of value for the production and capture of

1   those reserves.

2           And to the extent development can occur timely, the

3   lack of development is causing us loss of value.

4   Q.  Well, that's -- doesn't that depend on the strip price, the

5   commodity price of gas?

6   A.  There are considerations to include; time, value, money

7   being the predominant factor.

8   Q.  Isn't the strip price higher than it was in 2020?

9   A.  Yes, it is.

10  Q.  You want this Court to believe that because they weren't

11  developed in 2020 and they're still there, there has been a

12  loss of value even though the strip price is higher today than

13  --

14  A.  There is other considerations.  For instance, the costs of

15  services may go down.  So our return on capital during those

16  lower price environments may actually improve the

17  profitability.

18          So while there may be lower gas price, we may get to

19  develop those reserves at a lower cost and actually have

20  improved profitability.  So you cannot hold out commodity

21  prices as a one-and-only exclusive measure of profitability.

22  Q.  And it's a very significant one?

23  A.  It is.

24  Q.  And it has gone up?

25  A.  It has.

1  Q.  To the extent there are other costs, you have not

2  quantified them, and you are not here telling the Court that if

3  you developed these wells in 2020, you would have saved money?

4  A.  No.  You had indicated a hypothetical, and I was responding

5  to the hypothetical.

6  Q.  I appreciate that.  But the Court needs to decide whether

7  there is anything before it that it can hold onto to make a

8  decision.  You haven't quantified any economic harm as resulted

9  from the delay of the development of the minerals, have you?

10  A.  It's difficult to quantify.

11  Q.  So we can agree on this, though.  Of the three of the four

12  wells, they go into your own leased territory.  The fourth well

13  that's the Craige South well has Cabot property, property that

14  Cabot currently has a lease interest in that is next to where

15  the Craige South wellbore would go.  Correct?

16  A.  That is correct.

17  Q.  And you sold Cabot that property in 2019, didn't you?

18  Didn't Epsilon sell Cabot that property?

19  A.  We exchanged properties.

20  Q.  And you were paid $1.375 million for that property, weren't

21  you?

22  A.  I'm not aware of the dollar amount of that transaction.

23  Q.  Well, you signed the assignment of the lease interest to

24  Cabot in 2019 and it's for the property immediately next to

25  where the proposed Craige South well is, isn't it?

1  A.  We have sold properties to Cabot, yes.

2  Q.  Immediately next to where the Craige South wellbore is

3  proposed.  Correct?

4  A.  Correct.

5  Q.  Good.  And you were paid for that, weren't you?

6  A.  Yes.

7  Q.  That didn't come out in your testimony yesterday, did it,

8  when you were talking about drainage?

9  A.  I don't remember that being asked of me, no.

10 Q.  So looking at Exhibit 45, sir, your e-mail to Julie

11 Woodard.  This is going to take a little bit of concentration,

12 and I hope I don't overly complicate it.  But your e-mail

13 starts with the phrase, "Julie, sorry for the delay in

14 responding to your question on September 29th."

15      So this October 15 e-mail is a response to a question

16 Julie asked you on September 29th.  Right?

17 A.  Yes.

18 Q.  So if we could go to pages six and seven of Exhibit 45.  On

19 the bottom of six, there's a September 29 e-mail from Julie to

20 you where she says, "Thanks for the quick response, Henry.  I

21 certainly understand what your goals are.  I know those haven't

22 changed."  Then over on the top of seven, "Can you verify which

23 article of the JOA you are relying on?"

24      That's the question that you are responding to on

25 October 15 on page one of P-45, isn't it?

CLANTON - CROSS

1  A.  That's correct.

2  Q.  And Julie is asking you what question of the -- I'm sorry.

3  Which article in the JOA are we relying on, because she's

4  responding to your e-mail below, the September 28 e-mail where

5  you layout the three options that you talked about yesterday;

6  one of them being that if Chesapeake elects not to participate

7  and declines to operate, the consenting party or parties have

8  the right to operate.  Correct?

9  A.  Yes.

10  Q.  So you assert that position to her in Q-3 of 2020.  She

11  asks you which article in the JOA are we relying on, and on

12  October 15 you give her your answer?

13  A.  Um-hum.

14  Q.  Correct?

15  A.  Correct.

16  Q.  And you track her language -- I'm sorry.  You tracked the

17  language where it says, "If Chesapeake elects not to

18  participate and declines to operate" in your response on

19  October 15.  "If Chesapeake elects not to participate and there

20  is 100 percent subscription of the proposals" --

21  A.  Excuse me.  Do we have a paper copy that I can refer to the

22  entire document while this line of questioning is occurring?

23  Q.  I apologize.

24       ATTORNEY MADRIZ:  That exhibit may be in your --

25       THE WITNESS:  It's not.

CLANTON - CROSS

1          THE COURT:  He has already indicated that it is not,
2   nor are several others.
3          THE WITNESS:  Can we make a copy of that?  It's hard
4   to follow along on the screen.
5          THE LAW CLERK:  I have a copy.
6          THE COURT:  Is it unmarked?
7          THE LAW CLERK:  Yes.
8          THE COURT:  My law clerk will provide a copy to the
9   witness.
10          THE WITNESS:  Thank you.
11          THE COURT:  Thank you, Mr. Thomas.
12          ATTORNEY BRIER:  Let me know when you are ready, sir.
13          THE WITNESS:  Yes, please proceed.
14   BY ATTORNEY BRIER:
15   Q.  My point was in your response to Julie on October 15, you
16   are tracking the scenario where a non-operator proposes,
17   Chesapeake elects not to participate.
18          Then you say, "If there is 100 percent subscription of
19   wells, our interpretation of the article" -- what article are
20   you talking about there, VI?
21   A.  VI, yes.
22   Q.  -- "of the article is that the incumbent operator,
23   Chesapeake, would serve as operator on behalf of the consenting
24   parties."  That was your opinion on October 15?
25   A.  That was one of the three alternatives, yes.

1  Q.  Well, it doesn't say anything about the three alternatives.

2  You answer her question, don't you, which is which article in

3  the JOA are you relying on?

4  A.  VI.

5  Q.  And then you reference the language that's on the top of

6  page 11 of the JOA, which is when there's 100 percent

7  subscription -- let me be precise.  "If there is 100 percent

8  subscription to the proposed operation, the proposing party

9  shall promptly notify the consenting parties of their

10  proportionate interest in the operation, and the party serving

11  as operator shall commence operation."

12        That's what you quote back to her, don't you?

13  A.  Where were you quoting that from?

14  Q.  From the JOA, page 11.

15  A.  Please put that on the screen.

16  Q.  Lines one to three, sir, on the screen.

17  A.  Yes.

18  Q.  And to eliminate all doubt, you actually identified

19  Chesapeake as the incumbent operator in your response to Julie.

20  Right?

21  A.  Yes.

22  Q.  This was after the settlement agreement in federal court,

23  wasn't it?

24  A.  Yes.

25  Q.  October 15, 2020?

CLANTON - CROSS

1    A.   Um-hum.

2    Q.   And you're careful in here to say, "Following our internal

3    review of the relevant JOAs."  Who is our?  Who was involved in

4    this?

5    A.   Our company.

6    Q.   Mr. Raleigh?

7    A.   Mr. Raleigh is involved.

8    Q.   So he shared this view?

9    A.   This was the company view.

10   Q.   You were involved?

11   A.   I was.

12   Q.   You guys are the two most senior people in the company?

13   A.   We are.

14   Q.   Now, can we agree that the October 15 e-mail to Julie makes

15   no reference whatsoever to Article VI.2(a) of the JOAs that you

16   are asking this Court to determine allows you to go ahead as

17   the operator on these wells?

18   A.   Yeah.  That may have been my omission on the location of

19   the article there.  But yes, we did not mention it in an

20   e-mail.

21   Q.   Well, it's not just an admission of the location.  You

22   quote language from a separate part of the article.  Right?

23   "If there is 100 percent subscription."

24   A.   We were showing one of the three alternatives that we had

25   set out to Julie on September 28th.  The three options as we

CLANTON - CROSS

1   set out in our understanding of the JOA were Chesapeake as the
2   incumbent operator had to -- on proposals submitted by
3   non-operators had the right to consent and operate.  They had
4   the right to --
5   Q.  I don't want to interrupt you, but we're not here on that.
6   Is that right?  That's not what this case is about.
7   A.  That's the basis for which I was answering these questions
8   to Julie.
9   Q.  The scenario we're here on is you proposed Chesapeake
10  elected not to participate and Chesapeake also has decided not
11  to operate.
12  A.  And we didn't know that at the time I responded to Julie.
13  We then filed the well proposals, and that's when Chesapeake,
14  as is their option, elected not to operate.  That was not
15  necessarily the scenario under consideration between us and
16  Julie at the time.
17  Q.  It's what your September 28 e-mail says.  It says, "In the
18  scenario where Chesapeake elects not to participate and
19  declines to operate, the consenting party or parties have the
20  right to operate."  Right?
21  A.  Right.
22  Q.  And she is --
23  A.  But we didn't know at that point if Chesapeake was going to
24  decline to operate.
25  Q.  But that's what you were speaking to, that scenario?

CLANTON - CROSS

1   A.   What scenario?

2   Q.   And she says what article of the JOA are you relying on,

3   and you don't cite Article VI.2(a) and you don't even make

4   reference to the language in VI.2(a) in the first paragraph.

5   Correct?

6   A.   Right.

7   Q.   I'm going to ask -- in the other binder, sir, if you would

8   look at Exhibit 40.

9        ATTORNEY BRIER:  Judge, this is in the Defense binder,

10  40.

11       THE COURT:  In the future, two binders might have been

12  easier.  I have to say the D-rings are giving me trouble.  Just

13  word to the wise, two smaller binders might be easier for

14  everybody.

15       ATTORNEY BRIER:  Judge, it's proof positive that I

16  have no authority in our law firm.

17       THE COURT:  You prefer the smaller ones, too.

18       ATTORNEY BRIER:  I have shared your view for a long

19  time, and I cannot get people to buy smaller binders.

20       THE COURT:  Perhaps I will reconsider a revision to my

21  preferences on the website.

22  BY ATTORNEY BRIER:

23  Q.   I hope everybody has before them a section of the

24  Pennsylvania Code.  Do you have that in front of you, sir?

25  A.   I do, sir.

1  Q.  Let's just take a look at where this is housed.  On the top

2  of the paper on the screen, this is part of the DEP

3  Environmental Protection Code.  The subpart C is protection of

4  the natural resources.  Correct?

5  A.  Right.

6  Q.  And then subchapter (c) is environmental protection

7  performance standards.  Do you see that?

8  A.  Yes.

9  Q.  You would agree if Epsilon were to be permitted, under some

10 interpretation of the JOAs, to have the right to go in and

11 drill and operate these wells, you would be subject to this

12 area of review regulation.  Correct?

13 A.  Yes.

14 Q.  Now, I want to spend just a minute on it.  Subparagraph (a)

15 says, "The operator shall identify the source and bottomhole

16 locations of any of the following; having wellbore paths within

17 1,000 feet measured horizontally from the vertical wellbore and

18 1,000 feet from the surface above the entire length of the

19 horizontal wellbore."

20       And then you have to look at the five subparts of (a),

21 and it's active wells, inactive wells, orphan wells, abandoned

22 wells and plugged and abandoned wells.

23       Now, as you sit here today, has Epsilon identified all

24 of those wells within 1,000 feet of the vertical and horizontal

25 bores on the four proposed wells?

CLANTON - CROSS

1   A.   Yes.

2   Q.   You have?

3   A    (Witness nodded in the affirmative.)

4   Q.   Have you complied with section three, which says that you

5   must submit a questionnaire by certified mail on forms provided

6   by the Department to landowners whose property is within the

7   area identified in (a)?

8   A.   We have not.

9   Q.   So today is May 12th.  Right?

10  A.   Right.

11  Q.   You want this Court to grant your relief by May 22, if I

12  understand your position.  Right?

13  A    (Witness nodded in the affirmative.)

14  Q.   You've known about this regulation because you have just

15  said you complied with section subpart (a).  Correct?

16  A    (Witness nodded in the affirmative.)  Yes.

17  Q.   But you haven't sent the questionnaires to the landowners,

18  as required by the regulation?

19  A.   No.  We have to have cooperation from the operator in many

20  of these matters, this being one of them.  So we need to be

21  able to cooperate with each other, and we're not getting that

22  cooperation from Chesapeake.

23  Q.   You can't tell from public records who the landowners are

24  within the property defined?

25  A.   Right.  We are not ready to send the notice out until we

1   are clear as to when we can have -- be granted access to the

2   site. And Chesapeake has not been granting us access with a

3   clear line of sight of when we would have access to the site.

4   Q. My question --

5   A. So these notices are not necessary until we have clear

6   access of site.

7   Q. My question is very simple. Epsilon has the ability to

8   identify the landowners without any help from Chesapeake, don't

9   they?

10   A. They do.

11   Q. You haven't done it, have you?

12   A. We have identified the wells. I'm not sure if we have got

13   it all the way to the landowner list, but I can't respond that

14   to that.

15   Q. You are the chief operating officer. Are you able to tell

16   the Court whether you have sent the questionnaire --

17   A. The questionnaires have not been sent.

18   Q. Now there's a lot of paper in this case. I haven't seen

19   any paper where anyone from Epsilon wrote to Chesapeake and

20   said we need your cooperation to complete Title 25 of the

21   Pennsylvania Code, Section 78a.52a. There is no letter like

22   that, is there?

23   A. Yes. We were seeking support from Chesapeake on a

24   multitude of matters across the functional groups, including

25   regulatory.

1  Q.  You are under oath.  Did you send a letter to Chesapeake

2  asking them to help you complete this?

3  A.  Not that specific form, but we did request help on

4  regulatory matters.

5  Q.  Now, if you would turn to the second page of Exhibit --

6  Defense Exhibit 40.

7       At the top subpart (c)(3), it says, "The operator

8  shall submit a report summarizing the review, including" -- and

9  then (3) is -- "a monitoring plan for wells required to be

10  monitored, including the methods the operator will employ to

11  monitor these wells."  You haven't done that, have you?

12  A.  We have not.

13  Q.  And subpart (d) says, "You, shall within at least 30 days

14  prior to the start of drilling, submit the required report

15  under subsection C."  You haven't done that either, have you?

16  A.  Correct.

17  Q.  Now, subpart (e) says the following, and tell me if I'm

18  reading this correctly.  "The Department may require other

19  information necessary to review the report submitted under

20  subsection C.  The Department may make a determination that

21  additional measures are needed on a case-by-case basis to

22  ensure the protection of the waters of the Commonwealth."

23       Did I read that right?

24  A.  Yes.

25  Q.  So this is a regulation that operators have to comply with

CLANTON - CROSS

1  to protect the public safety of the waters of the Commonwealth.

2  Isn't that true?

3  A.  Um-hum.

4  Q.  Is that a yes?

5  A.  Yes, that's a yes.

6  Q.  And the Department has no ability to determine whether it

7  needs more information from you to decide whether you can go

8  forward, because you haven't even submitted the report required

9  for their review.  Correct?

10  A.  That's correct.

11        ATTORNEY MADRIZ:  Your Honor, I'm going to object.

12  The witness was asked and answered this line of questioning

13  repeatedly.

14        ATTORNEY BRIER:  I'm not going to ask it again, Judge.

15  I just want to ask --

16        THE COURT:  The objection is sustained, for what it's

17  worth.  It may be a moot point.

18  BY ATTORNEY BRIER:

19  Q.  I want to talk to you, sir, about some testimony from

20  yesterday.  By the way, did I read Epsilon's 10(q) correctly;

21  that Epsilon has nine employees?

22  A.  Yes.

23  Q.  So at the end of December of 2020, Epsilon had nine

24  full-time employees?

25        THE COURT:  I'm sorry.  Mr. Brier, which Epsilon are

1    you referring to?

2            ATTORNEY BRIER:  That's my next question.

3            THE COURT:  Okay.

4    BY ATTORNEY BRIER:

5    Q.  That's the entire family of Epsilon entities, isn't it?

6    A.  Yes.

7    Q.  That's the parent LTD and then Epsilon Energy U.S.A.,

8    Epsilon Operating and Epsilon Gathering.  Those four corporate

9    entities have a grand total of nine employees?

10   A.  Correct.

11   Q.  A third of this company has been in this courtroom.  Right?

12   A.  Yes.

13   Q.  Now, do you know what a collision survey is?

14   A.  Yes.

15   Q.  Have you prepared one for the proposed wells?

16   A.  Yes.

17   Q.  Where is it?

18   A.  We have it.

19   Q.  Has it been sent to anybody?

20   A.  Who does it need to be sent to?

21   Q.  Has it been shared with any of the joint operating parties?

22   A.  Who does -- nobody has requested it.

23           THE COURT:  Sir, the question was a yes or no.  If it

24   has not been sent, it would be a no.

25           THE WITNESS:  Thank you.  No.

CLANTON - CROSS

1  BY ATTORNEY BRIER:

2  Q.  Have you performed a risk assessment of the four proposed

3  wells?

4  A.  Yes.

5  Q.  Has that been shared with any of the joint operating

6  parties?

7  A.  No.

8  Q.  Have you produced a rig layout?

9  A.  Yes.

10  Q.  Has that been shared with anybody?

11  A.  No.

12  Q.  Including Chesapeake, who currently operates the pad.

13  Right?

14  A.  Correct.

15  Q.  So you have done a rig layout of a pad that has two

16  producing wells on it, and you have not shared it with the

17  company that's operating the wells?

18  A.  Correct.  Now I can say --

19  Q.  There is no question.  You can be asked on redirect if you

20  want.

21          THE COURT:  Your attorney will have an opportunity.

22          THE WITNESS:  Thank you.

23  BY ATTORNEY BRIER:

24  Q.  So if the four Epsilon corporate entities have a total of

25  nine employees and you want to go on-site and drill and

1 frack -- drill and complete these four wells in ten days, you

2 would have to go out and engage contractors to do that,

3 wouldn't you?

4 A.  That's correct.

5 Q.  Have you engaged any, as we sit here?

6 A.  Yes.

7 Q.  Who have you engaged?

8 A.  We have engaged consultants personnel.

9 Q.  But they don't drill and complete wells, do they?

10 A.  They help perform the duties of drill and completing a

11 well.

12 Q.  Have you engaged a contractor to go on the pad and drill

13 and complete the four proposed wells?

14 A.  No.

15 Q.  No?

16 A.  No, we have not.

17 Q.  Certainly, the nine employees of Epsilon aren't going to do

18 it.  Right?

19 A.  That's not their role.  No, sir.

20 Q.  And you've known since December 22 that you had an

21 anticipated spud date of April 22.  Right?

22 A   (Witness nodded in the affirmative.)

23 Q.  You have a road maintenance agreement with Rush Township?

24 A.  We have not engaged Rush Township yet for a road

25 maintenance agreement.

CLANTON - CROSS

1   Q.  You know one is required to perform these operations, don't

2   you?

3   A.  Yes, we do.

4   Q.  And so that the Court understands the relevance of a road

5   maintenance agreement; there is so much heavy traffic going to

6   this construction site that the township requires the operator

7   to sign a contract before you can bring that heavy equipment in

8   so that the contractor shares responsibility for maintaining

9   the public roads.  Correct?

10   A.  That's correct.

11   Q.  And it's May 12 and you want to start operations on May 22,

12   and you haven't gone to Rush Township to get a road maintenance

13   agreement.  Correct?

14   A.  That's correct.

15   Q.  Do you have any idea how many tractor-trailers would be

16   accessing this site if you were permitted to drill and complete

17   these wells on a daily basis?

18   A.  I could give an estimate.

19   Q.  What's your estimate?

20   A.  Well, for instance, the mobilization of the rig would

21   probably be a 30-load rig, a 30-truckload rig.

22   Q.  Thirty tractor-trailers.  Right?

23   A.  Yes.  Um-hmm.

24   Q.  Just to get the rig on-site?

25   A.  Um-hmm.

CLANTON - CROSS

1  Q.  How about the sand?

2  A.  The completion site?

3  Q.  Right.

4  A.  It would be probably substantially more, obviously.

5  Q.  Hundreds of tractor-trailers.  Right?

6  A.  Could be.

7          ATTORNEY BRIER:  I'm going to go back to Plaintiff's

8  exhibits.  Judge, this is in Plaintiff's exhibit binder.  And I

9  want to start with Plaintiff's Exhibit 16.

10          Could you please put that on the screen?  If you can

11  enlarge it so we can read the coordinates.  Thank you.

12  BY ATTORNEY BRIER:

13  Q.  Do you remember seeing this exhibit yesterday?

14  A.  I do.

15  Q.  And this exhibit purports to show the Wyalusing Creek water

16  withdrawal point in the Wyalusing Creek.  That's where the red

17  drop-pin is.  Right?

18  A.  Yes.

19  Q.  And it was your testimony under oath that that -- those

20  coordinates are the same coordinates of the 2008 Turm Oil

21  permit that Epsilon acquired through its contractor, Turm Oil.

22  Right?

23  A.  My testimony was that the information provided to us about

24  the coordinates came from the SRBC, and yes, they showed those

25  to be the same coordinates.

CLANTON - CROSS

1  Q.  Do you recall, sir, being shown Plaintiff's Exhibit 23,

2  which is the SRBC docket number 20110607?

3  A.  Yes.

4  Q.  And this is the one when you were testifying, you directed

5  the Court's attention to the chart at that top of page three of

6  this that shows the constituent parts of the gallonage that is

7  permitted under this docket.  And you made the point that .216

8  million gallons a day was sourced to the Turm Oil docket and

9  .499 was sourced to Chesapeake's 2009 docket.  Correct?

10  A.  Correct.

11  Q.  And that creates a total authorization on page one of .715

12  million gallons a day.  Correct?

13  A.  That is correct.

14  Q.  Now, this document that you testified to about yesterday

15  aggregates those two volume totals into a new total itself has

16  withdrawal -- I'm sorry -- on page two has withdrawal location

17  coordinates, doesn't it?

18  A.  It does.

19  Q.  And if you would, compare the ones on that to the ones on

20  the screen that are at the drop-pin at the Wyalusing Creek.

21  A.  Okay.

22  Q.  They're different, aren't they?

23  A.  They are.

24  Q.  And you didn't put a drop-pin where these coordinate are on

25  your exhibit, did you?

CLANTON - CROSS

1    A.  We did not.

2    Q.  So if you would, take a look at Exhibit 24 with me.  And

3    you were asked about this yesterday.  This is the 20121209

4    docket.  Correct?

5    A.  Correct.

6            ATTORNEY BRIER:  And Mary, could you put the second

7    paragraph on the screen, please?  If you can enlarge that,

8    please.

9    BY ATTORNEY BRIER:

10   Q.  The record will reflect, sir, that when you were asked

11   about this yesterday, your Counsel directed your attention to

12   the language in the second paragraph that ends with a reference

13   to Commission docket 20081227.  Do you remember that?

14   A.  I do.

15   Q.  Are you weren't shown the next sentence, were you?

16   A.  I was not.

17   Q.  Why don't you read it for the Court?  Read it out loud.

18   A.  Yes.  "This renewal incorporates a combination -- the

19   quantity combined in Commission docket number 20110607 and

20   authorizes a project to operate at a location previously

21   reviewed and approved under Commission docket number 20090610."

22   Q.  Who obtained Commission docket 20090610?

23   A.  Chesapeake Appalachia.

24   Q.  So when you were testifying yesterday, you weren't shown

25   that sentence, were you?

1  A.  I was not.

2  Q.  And when it says this renewal, it's talking about the 2012

3  renewal, isn't it?

4  A.  Yes.

5  Q.  And doesn't that expressly state that it authorizes the

6  project to operate at the location previously reviewed and

7  approved under Commission docket 20090610?

8  A.  It authorizes that to be both permits.

9  Q.  The withdrawal point is at the site that Chesapeake's

10  original water surface withdrawal point was at.  Correct?

11  A.  Ask the question again.

12  Q.  The current withdrawal point in the Wyalusing Creek for the

13  .715 million gallons a day isn't at the Turm Oil original

14  surface water withdrawal point; it's at the Chesapeake surface

15  water withdrawal point that was approved in the 20090610

16  docket.  Correct?

17  A.  My understanding of the coordinates comes from the SRBC.

18  And the coordinates provided to us by the SRBC are consistent

19  with coordinates on docket number 20121209 and had been renewed

20  into docket 2017.

21  Q.  Right.  That's my point.  The 2012 docket was renewed into

22  2017, and that withdrawal point goes back to the Chesapeake

23  withdraw point.

24  A.  My understanding that the coordinate provided to us by the

25  SRBC in the e-mail exchange we had showing our docket number

CLANTON - CROSS

1  lists the same coordinates as the current docket.

2  Q.  I'm not going to belabor it, but I want to make sure the

3  record is clear for the Court.

4          This 2012 document states that it's a renewal that

5  incorporates the combined quantity contained in the Commission

6  docket number 20110607 and authorizes the project to operate at

7  the location previously reviewed and approved under Commission

8  docket number 20090610.

9          That 20090610 is the Chesapeake docket and surface

10 withdrawal point, isn't it?

11 A.  Yes.

12 Q.  I want to speak to you about irreparable harm, sir.  Your

13 Counsel, towards the end of your testimony yesterday, asked you

14 to explain to the Court Epsilon's position as to why it would

15 be irreparably harmed if the Court denies the request.

16          And you identified two justifications for irreparable

17 harm.  The first justification was that in the Auburn gas

18 gathering system, as volumes fall, the gas gathering rate

19 charged for the production of the gas increases.  Correct?

20 A.  The gathering and transportation fees increased, yes.

21 Q.  The cost of service model?

22 A.  It's described as a cost of service model, yes.  Correct.

23 Q.  And your point that you want the Court to appreciate is

24 that if you don't bring on new production, the existing wells,

25 the production eventually falls off, and the effect of that on

1  Epsilon and the other working interest parties is that the

2  gathering rate charged by Williams increases for the same

3  volume of gas?

4  A.  It's, in effect, how it works.

5  Q.  And you know that gathering rate.  If I asked you to look

6  up the gathering rate you paid Williams for the Auburn gas

7  gathering system in any month in the last 18 months, you could

8  look it up, can't you?

9  A.  We could.

10  Q.  So it's a known charge, the invoice you forwarded.  Right?

11  A.  Yes.

12  Q.  And therefore, if there was some finding that Chesapeake

13  had not complied with your view of the JOAs, and the gathering

14  rate number needed to be calculated as to how it increased,

15  it's a simple math calculation; volume times the gathering rate

16  will give you the basis for determining whether the charge is

17  increased.  Correct?

18  A.  That's not correct.  The determination of the gathering

19  rate which you are applying to that volume is tied to

20  throughput in Auburn which includes historical throughput and

21  forecasted projected throughput.

22  Q.  Right.  And then you do a look-back calculation.

23  A.  Right.  So you can take your produced volume and apply it

24  to the gathering and transportation fee you are describing to

25  calculate.  But we cannot estimate what the gathering and

1    transportation rate is going to be if we don't meet the

2    objectives of the development and continue to grow throughput

3    in Auburn.

4    Q.  Does Epsilon market its own gas?

5    A.  We do.

6    Q.  Can you agree that gathering and transportation are two

7    very different charges?  Correct?

8    A.  Yes.

9    Q.  Williams doesn't transport, Williams gathers.

10   A.  Right.

11   Q.  The gathering rate is knowable.  Correct?

12   A.  Yes, the current gathering rate is knowable.  The future

13   gathering rate is not.

14   Q.  Well, of course.  The current rate.  Right?

15   A.  The current rate is knowable, yes.

16   Q.  You know a lot about this, don't you?  Isn't Epsilon a

17   35-percent interest owner in the Williams/Auburn gas gathering

18   system?

19   A.  We do own an interest in the gathering system, yes.

20   Q.  So you are on both sides; you want to produce as part of a

21   joint operating agreement with Chesapeake, Equinor and others,

22   you want to be a producer to put gas into the gathering system.

23   Correct?

24   A.  Yes.

25   Q.  And then you want to be on the gathering side as a

CLANTON - CROSS

1  35-percent owner of the Williams gathering system, and you
2  benefit from that; you get revenue from that, don't you?
3  A.  We do.
4  Q.  In fact, in your 10(k), you get almost as much revenue from
5  the gathering system in Auburn as you do from your gas
6  production in Auburn, don't you?
7  A.  We do.
8  Q.  You did not tell the Court that yesterday, did you?
9  A.  I was not asked that question.
10 Q.  So that the Court understands; if wells are produced on the
11 Craige pad and that increases the volume put into the Williams
12 gathering system that you own a third of -- right?
13 A.  Yes.
14 Q.  -- and that has the effect of changing the gathering rate
15 charged by Williams, that benefits all of the joint
16 common-interest parties, including Chesapeake and Equinor,
17 doesn't it?
18 A.  Yes.
19 Q.  So your interests are aligned in that sense.  You are not
20 arguing that Chesapeake wants to see Equinor pay higher gas
21 gathering rates, are you?
22 A.  I have not made that argument, no.
23 Q.  Yeah.  I didn't think you would.  But to be clear, if
24 production is increased in the gas gathering system that you
25 own up there, you'll get more revenue from that, too.

CLANTON - CROSS

1  A.  We will.

2  Q.  And the gathering system does more than gather.  It

3  processes, doesn't it?

4  A.  It does.

5  Q.  It dehydrates.  Correct?

6  A.  Correct.

7  Q.  And Williams charges for that?

8  A.  There is a fee for that, yes.

9  Q.  So the higher the volume, the more revenue generated by

10  Epsilon as a one-third owner of --

11  A.  Yes.  There's costs and offset, as well.  But yes, revenue

12  increases.

13  Q.  Yeah, but you're not in business to incur costs; you are in

14  the business to make money.

15  A.  Agreed.

16  Q.  You only do it because as the volume increases, you make

17  more money.  Correct?

18  A.  Right.

19  Q.  We touched earlier on the argument that there's a concern

20  about not being able to quantify the drainage that might occur

21  if you're not able to develop the Craige South proposal that

22  that you are asking the Court to approve.

23  A.  Yes.

24  Q.  And we touched on that because you sold land to Cabot and

25  that land is right next to that proposed well.  Right?

1   A.   Yes.

2   Q.   Now, Chesapeake -- I'm sorry.  Epsilon has petroleum

3   consultants that are experts in valuing proved gas reserves,

4   don't they?

5   A.   We engage reservoir engineers, yes, to participate in our

6   reserve evaluation.

7   Q.   Do you know of a company by the name DeGolyer and

8   MacNaughton?

9   A.   DeGolyer and MacNaughton?

10  Q.   Thank you.

11  A.   Yes.

12  Q.   And they do work for Epsilon, don't they?

13  A.   They do.

14  Q.   And they study and evaluate your proved reserves, don't

15  they?

16  A.   They do.

17  Q.   And yesterday you said that it was possible that there

18  could be drainage from the offsetting wellbore on the Cabot

19  land if sold.  But as you sit here, you can't tell this Court

20  there is drainage, can you?

21  A.   I cannot.

22  Q.   And you haven't amended your publicly-filed reports that

23  value your proved reserves because of the drainage, have you?

24  A.   We have not.

25  Q.   And those go out to *Wall Street*; people rely on that.

1  A.  Agreed.

2  Q.  Just one final subject area.  Is it correct that what

3  you're asking this Court to do is to order that Epsilon be

4  permitted to develop the four proposed wells in a very short --

5  start that in a very short time period, and that if the Court

6  did that, it would be the first time in the history of Epsilon

7  that in the marcellus shale formation, it went onto a well pad

8  where another company has operating wells and performed very,

9  very dangerous drilling and completion operation?

10      Isn't that true?

11  A.  That is true.

12      ATTORNEY BRIER:  Nothing further.

13      THE COURT:  All right.  Redirect, Attorney Madriz?

14      ATTORNEY MADRIZ:  Yes, Your Honor.  Brief redirect.

15      THE COURT:  Yes.

16      REDIRECT EXAMINATION

17  BY ATTORNEY MADRIZ:

18  Q.  Good morning, Mr. Clanton.

19  A.  Good morning.

20  Q.  I would like to direct your attention to Plaintiff's

21  Exhibit 1, page 11, just because Counsel was talking to you a

22  little bit about the JOA and the deadlines and how it impacted

23  the commencement date.  Do you recall that?

24  A.  I do.

25  Q.  If Epsilon gets boots-on-the-ground by May 22nd, is it

CLANTON - REDIRECT

1   Epsilon's position that Epsilon has commenced operations under

2   its well proposal?

3   A.   It is.

4   Q.   If Epsilon has commenced operations by May 22nd, can

5   Epsilon engage with consultants, rig drillers, Rush Township to

6   get the wells drilled if Chesapeake cooperates with Epsilon?

7   A.   It can.

8   Q.   I want you to take a look at the first three lines of page

9   11 of Plaintiff's Exhibit Number 1.

10          Can you highlight and blow those up please, Mary?

11  Thank you.

12  A.   Okay.

13  Q.   I want to go through each piece to get Epsilon's position

14  to extend the proposals from April 22nd to May 22nd, if that's

15  okay with you.   Okay.

16          It reads, "If 100 percent subscription to the proposed

17  operation is obtained" -- are the four new proposed wells the

18  proposed operation?

19  A.   Yes.

20  Q.   And you testified that 100 percent subscription was

21  obtained by Epsilon.   Correct?

22  A.   That's correct.

23  Q.   So back to the sentence.  -- "the proposing party"--  Who

24  is the proposing party that is being referred to here?

25  A.   Epsilon.

1  Q.  -- "shall promptly notify the consenting parties of their

2  proportionate interest in the operation."  Was Chesapeake a

3  consenting party to the four proposed wells?

4  A.  They were not.

5  Q.  So does Epsilon have any obligation, in your mind, to

6  provide any further notice to Chesapeake?

7  A.  We don't believe they require notice.

8  Q.  -- "and the parties serving as operator" -- who is the

9  operator?  Who would be the parties serving as operator here?

10 A.  One of the consenting parties, which is us, Epsilon.

11 Q.  -- "shall commence such operation within the period

12 provided in Article VI.B.1, subject to the same extension

13 rights as provided therein."

14        Did I read that correctly?

15 A.  You did.

16 Q.  I am going to now direct your attention to page ten, lines

17 seven through ten.

18        Can you blow that up and highlight it, please, Mary?

19        Can you see those lines, sir?

20 A.  I can.

21 Q.  Are these the lines in the JOA that Epsilon relied on for

22 extending -- for the same extension rights as provided therein

23 as quoted in the previous language we just reviewed?

24 A.  It is.

25 Q.  Okay.  Thank you.  I want to turn your attention now to

1  Plaintiff's Exhibit Number 45.

2          Can you pull up the second e-mail, please?  Thank you,

3  Mary.

4          Do you recall Chesapeake's Counsel asking you

5  questions about your e-mail dated October 15th, 2020 at 2:50

6  p.m. to Ms. Woodard?

7  A.   I do.

8  Q.   In that e-mail one of the statements that you made was that

9  you do not make any reference to Article VI.2.

10 A.   I do.

11         ATTORNEY MADRIZ:  Can you highlight the portion of the

12 second sentence right after, from two all the way through to

13 parties?

14         THE WITNESS:  I'm sorry.  Repeat the question.

15         ATTORNEY MADRIZ:  I'm asking Mary to highlight certain

16 language for you.

17 BY ATTORNEY MADRIZ:

18 Q.   Do you see that?

19 A.   Yes.

20 Q.   And so again, Chesapeake's Counsel made a statement that

21 you made no mention to Article VI.2.  Do you recall that?

22 A.   I do.

23 Q.   I want you -- can you read that language right there?

24 A.   "Operations by less than all parties.  Two, operations by

25 less than all parties."

CLANTON - REDIRECT

1      ATTORNEY MADRIZ:  Mary, can we now go back to

2   Plaintiff's Exhibit 1 on page ten and focus on section two?

3   Can you highlight section two and the caption, as well?

4   BY ATTORNEY MADRIZ:

5   Q.  Is this caption the same exact caption that's included in

6   the e-mail that we just reviewed in Plaintiff's Exhibit 45?

7   A.  That was my intent, yes.

8   Q.  Did you reference this section in your e-mail?

9   A.  Technically I did.

10  Q.  And what section is this?

11  A.  This is operations by less than all parties.

12  Q.  And what actual section is this in the JOA?

13  A.  This is section two.

14  Q.  I also wanted to briefly talk about some of the statements

15  that were made while Chesapeake's Counsel was talking about

16  Epsilon's ability to re-propose and reset the clock.  Do you

17  remember that discussion?

18  A.  I do.

19  Q.  Essentially opposing Counsel was trying to make the point

20  that if for some reason this Court did not issue the temporary

21  injunction that Epsilon could simply just re-propose and reset

22  the clock.  Correct?  Do you remember that discussion?

23  A.  I do.

24      ATTORNEY BRIER:  Objection, Your Honor.  I know

25  there's no jury here and there's a lot of latitude, but I think

1  that is not an appropriate way of framing a question.  If he

2  has a question, he should ask the witness a question and not

3  lead him to it.  I think it's inappropriate.

4          THE COURT:  So in your question you characterized

5  Counsel's question on cross.  I'm going to overrule the

6  objection.  Be careful about your characterization.  It was a

7  little less than clear.  Why don't you rephrase?  Although I'm

8  overruling the objection, you can ask questions about questions

9  asked on cross.

10          ATTORNEY MADRIZ:  Sure.  Not a problem.

11  BY ATTORNEY MADRIZ:

12  Q.  So I want to talk about the discussion you had with

13  opposing Counsel about re-proposing and resetting the clock.  I

14  want to get a little bit more clarity about in the event this

15  Court does not issue a temporary injunction, if Epsilon can

16  simply just reset the clock and re-propose.

17  A.  Okay.

18  Q.  If Epsilon fails to meet the commencement date, and in the

19  interim before it re-proposes the same four wells, Chesapeake

20  or another JOA party proposes a well that conflicts with one of

21  Epsilon's proposed wells, how does that impact Epsilon's

22  ability to propose the well that is now in conflict with the

23  Chesapeake proposed well?

24  A.  It could prevent us from developing that well.

25  Q.  So going back to the question.  Can -- is there -- what is

1  your understanding as to whether Epsilon can have certainty

2  that if it fails to meet the commencement date that it can

3  simply re-propose the wells and start the clock for each of

4  those four proposed wells?

5  A.  There is not certainty that if we re-proposed the four

6  wells that they would be re-proposed under the same criteria,

7  and no other circumstances had arisen between then and

8  re-proposal.

9  Q.  Chesapeake's Counsel was also asking you a series of

10 questions about information that Epsilon had gathered, but I

11 think the discussion was that it was not shared.  Do you recall

12 that line of discussion?

13 A.  I do.

14 Q.  Why was that information not shared?

15 A.  They are a non-consenting party.

16 Q.  What has stopped Epsilon from moving forward and doing

17 everything that was included in that statute that was shown to

18 you during the discussion, your discussion with Chesapeake's

19 Counsel?

20 A.  A lack of cooperation by Chesapeake.

21 Q.  Go into that.  Explain what you mean by that.

22 A.  Because of this circumstance, because Epsilon -- Chesapeake

23 has elected not to serve as operator, and we are having to step

24 forward and serve as operator on a pad site where there are the

25 two existing wells and they are the operator of record, there

CLANTON - REDIRECT

1   is quite a bit of necessary exchange meant amongst the two
2   parties.
3          And we obviously are not getting any kind of support
4   from Chesapeake in these matters; whether they be regulatory,
5   whether they be technical, geoscience engineering, whether they
6   be concurrent operations on the site, whether they be safety
7   planning, regardless, they have not cooperated with us and
8   continue not to cooperate with us.
9   Q.  Is it possible for Epsilon to comply with the statute that
10  was statute that was shown to you without Chesapeake's
11  cooperation?
12  A.  It is not.
13  Q.  What can Epsilon do to circumvent Chesapeake's refusal to
14  cooperate with Epsilon to meet the requirements in that
15  statute?
16  A.  Repeat the question.
17  Q.  Can Epsilon do anything to meet -- satisfy the statute if
18  Chesapeake refuses to cooperate?
19  A.  Until we have boots-on-the-ground and access to the site
20  where we can define what our timing of operations are going to
21  be, it is not possible for us to comply with all the
22  obligations and regulations that we would be responsible to
23  comply with, including notices.
24  Q.  And can Epsilon have boots-on-the-ground if it does not
25  have access to the grounds and if Chesapeake refuses to

1  continue to cooperate with --

2  A.  If Chesapeake does not cooperate and prepare the existing

3  producing wells in a manner that would allow us access to the

4  site to conduct the drilling and completion operations that

5  they have elected not to operate on behalf of the consenting

6  parties, then we basically are stalled and are unable to make

7  progress toward advancing the proposal.

8  Q.  Thank you, sir.

9      I want to shift our attention really quickly about --

10  and talk about the volume throughput and the business portion

11  of Epsilon's -- of your discussion about Epsilon's business

12  with Chesapeake's Counsel.

13      You testified yesterday that projected volume

14  throughput played a key role in Epsilon's business.  Do you

15  recall that?

16  A.  I do.

17  Q.  How does Chesapeake's refusal to permit Epsilon to propose

18  wells impact Epsilon's ability to make those projections?

19  A.  Well, when -- as a part of this cost of this services

20  model, the forecasted amount of volume that is included with

21  the throughput gas that's already been processed through the

22  gathering system, to come up with the cost of service for that

23  particular year is hard to quantify.

24      If you can't put a forecast out there and know with

25  clarity what the development is going to -- how many wells are

CLANTON - REDIRECT

1   going to be drilled, how long the laterals are going to be,

2   what the productivity of those wells is going to be going into

3   the system and offering that up to Williams so that they can

4   use those projections to render back the gathering and -- the

5   cost of services for gathering that gas, it's difficult.

6          Without being able to propose wells, we can't know

7   with certainty what the projected volumes that are going to be

8   put into the system so that we can appropriately estimate what

9   that cost might be.

10  Q.  And what is that --

11  A.  Their refusal to share with us the forward development plan

12  of Auburn creates quite a bit of uncertainty on our behalf.

13  Q.  And what does that do to Epsilon's business operations and

14  business model?

15  A.  Well, as I testified yesterday, the single largest cost

16  component of producing these wells is the gathering, this fee

17  that we're talking about.  That fee is subject to all of our

18  production, not just new well production.

19         So if the operator does not continue to develop the

20  wells in accordance with the timing necessary to maintain or

21  lower that gathering fee, then we're subject to increases and

22  we lose profitability on an annual basis, on a quarterly basis,

23  on a monthly business.  It's ever-present and ongoing

24  presently.

25  Q.  And this is Epsilon's property right that Epsilon is trying

CLANTON - REDIRECT

1    to utilize.  This is not some -- and Chesapeake is refusing to

2    allow.  Is this the first time that this has happened?

3    A.  No.

4    Q.  How does Epsilon feel about Chesapeake's refusal to allow

5    Epsilon to do -- to try to capitalize on its property rights?

6    A.  Well, we, as a part of the settlement agreement, thought we

7    finally had recaptured our rights under the JOA to be able to,

8    if they were not going to, propose wells and continue the

9    development of Auburn.

10        And we're back here again being blocked and prevented

11   from exercising our rights under the joint operating agreement

12   to develop our minerals.

13   Q.  What comfort -- given what has transpired with Chesapeake

14   and their refusal to allow Epsilon to take full advantage of

15   its property rights, what level of comfort does Epsilon have

16   that this won't happen again in the future?

17        ATTORNEY BRIER:  Objection, Your Honor.  It's beyond

18   cross.  We did this dance yesterday.  I didn't cover Epsilon's

19   expectations about what's going to happen in the future.  He

20   had a lot of latitude, but now he's just doing something he

21   should have done on direct if he didn't.

22        THE COURT:  Mr. Madriz.

23        ATTORNEY MADRIZ:  Your Honor, this goes straight into

24   irreparable harm.  One of the arguments that was being advanced

25   was that the clock could just simply be reset and the whole

1  process could be started.  I'm trying to actually get to the

2  fact that this is a recurring issue and there is no level of

3  comfort that -- even assuming that there was not a conflict

4  well that was proposed by Chesapeake that there is no guarantee

5  that this won't happen again.

6          THE COURT:  Yes, Mr. Brier.

7          ATTORNEY BRIER:  Your Honor, he can argue that in

8  closing.  It's not redirect.

9          THE COURT:  I'm going to overrule the objection.  The

10  question has been posed.  I will allow the answer.  I don't

11  know if you need to have the question repeated for you,

12  Mr. Clanton.

13          THE WITNESS:  We are concerned that the behavior will

14  continue; if these permits and these well proposals expire, as

15  was done to us previously by the operator, that if we

16  re-propose them again, we have no confidence that they will be

17  honored then, as they are not being honored now.

18          ATTORNEY MADRIZ:  Thank you.  No further questions.

19          ATTORNEY BRIER:  May I briefly, Judge?

20          THE COURT:  You may.

21          ATTORNEY BRIER:  Could we put Exhibit 45 back on the

22  screen, please?

23                    RECROSS-EXAMINATION

24  BY ATTORNEY BRIER:

25  Q.  Mr. Clanton, you were just asked about Exhibit 45 and

1  specifically the language in your e-mail of October 15, 2020.

2  Correct?

3  A.  Yes.

4  Q.  And the line of questioning was that your e-mail actually

5  references Article VI.B.2.  Right?

6  A.  Yes.

7  Q.  It doesn't reference Article VI.2.  It references Article

8  VI.B.2.  Right?

9  A.  Yes, the B is a typo on my part.

10  Q.  I just wanted to make sure.  I wasn't tricking you when I

11  asked you the question the first time.  Right?

12  A.  Right.

13  Q.  So it references Article VI.B.2.  But more importantly, it

14  doesn't reference the first paragraph of Article VI.2, it

15  references the second paragraph.  Right?

16  A.  Yes, that was a typo on my part.

17  Q.  Oh, that's another typo.  Your reference to the second

18  paragraph is a typo?  You're telling this Court that's a typo?

19  A.  My intention was to reference Article VI.

20  Q.  But then you go on to talk about 100 percent subscription.

21  And that's in the second paragraph of VI.2, isn't it?

22  A.  It's in Article VI.

23  Q.  The second paragraph.

24  A.  Fine.  Yes.

25  Q.  What this e-mail doesn't say is we have the right under

1  Article VI.2(a).  It doesn't say that, does it?

2  A.  It doesn't say you have the right to do what under VI.2(a).

3  Q.  This e-mail doesn't say that Epsilon has the right to

4  develop the wells under Article VI.2(a) in the first paragraph,

5  does it?

6  A.  We don't say it specifically right there.

7  Q.  You don't say it generally either.

8  A.  Earlier in the e-mail train, I set out the three examples.

9  Q.  And then she asked you to identify the article, and the one

10  you identify is the second paragraph of Article VI.B.2.  Right?

11  A.  Yes.

12  Q.  Okay.  Thank you.

13        Now, you made a comment on redirect that if Chesapeake

14  doesn't go in and prepare the existing wells, you are not going

15  to be able to go in and drill and complete the new wells.

16  Right?

17  A.  Yes.

18  Q.  And that's a comment that I want to make sure the Court

19  understands.  When you say prepare the existing wells, there's

20  a great deal of work that would need to be done to make those

21  wells safe so that drilling operations could occur proximate to

22  them, isn't there?

23  A.  There is.

24  Q.  They would have to be plugged.  Correct?

25  A.  Not plugged.  They would have to be temporarily abandoned.

CLANTON - RECROSS

1    Q.   Abandoned.   And equipment would need to be removed so that

2    the big rigs could come in.   Right?

3    A.   Yes.   The wells would have to be prepared, is probably a

4    better way to put it, for temporary abandonment which does

5    include some downhole plugs.

6    Q.   Right.

7    A.   But it's not plugged in the sense that you plug the well

8    never to be produced again.

9    Q.   And I wasn't suggesting that.   I was suggesting that there

10   are safety steps that you need to take to plug the well so that

11   if there's a problem on the surface, you don't have a well

12   control event.

13   A.   Right.   I would choose not to use the word plug, because

14   that has a connotation that I don't want the Court to be

15   confused with.   The wells could be temporarily abandoned and

16   then be returned to their prior temporarily-abandonment

17   producing life.

18        So yes, they would have to be prepared for the safe

19   operations of the drilling and completion activities that we

20   would be conducting, but it would not damage the wells to

21   temporarily abandon them.

22   Q.   You're asking this Court, as part of the relief that you

23   need, to order Chesapeake to do all of that, aren't you, so

24   that you can go in and drill and complete the wells?

25   A.   We are asking this Court to require your client's

CLANTON - RECROSS

1    cooperation.

2             We're also knowledgeable and capable of what

3    temporarily-abandonment conditions need to be met.  And if

4    Chesapeake is unwilling to do that and would want to force that

5    obligation onto us, we can do it.

6    Q.   But Chesapeake is the operator of those wells, aren't they?

7    A.   Chesapeake is the operator of record, and we are not

8    disputing that nor are we trying to supplant them.

9    Q.   I don't want to belabor it.  My only point is the relief

10   you are seeking isn't simply to change the status quo that

11   would permit you to frack -- drill and complete the four new

12   wells.  It would also require Chesapeake to do things to the

13   existing wells it is producing?

14   A.   We are asking for relief that absolutely requires

15   Chesapeake to cooperate with us on many levels.

16   Q.   Now, you made a comment in response to your Counsel's

17   questions about this notion of lost profitability and why it's

18   in your business interest to increase the production in Auburn,

19   because it feeds into the gas gathering system that you own a

20   third of.  That lost profitability concept isn't something that

21   can't be calculated.  You calculate profitability all the time,

22   don't you?

23   A.   It's difficult to calculate.  And I may not have done a

24   good job explaining that.  But there's a forecasting volume.

25   That forecasted volume related to proposed development is a

1  component of the evaluation.  And we are unable to understand

2  from Chesapeake what the forward development plan is so that we

3  can properly estimate what that cost might be.

4  Q.  Whether it's difficult or not, it's calculable?

5  A.  We can't calculate it without Chesapeake's involvement and

6  their plans for development.

7  Q.  No.  It's calculated by Williams.  Williams calculates the

8  gathering rate, don't they?

9  A.  Williams is responsible for establishing the gathering fee,

10  yes.

11  Q.  Just one brief point on that.  You're one-third owner of

12  the Williams gathering system in Auburn.  Correct?

13  A.  I think we have 35 percent actually.

14  Q.  Thirty-five.  And you have a guaranteed rate of return of

15  18 percent on your invested capital on that gathering system,

16  don't you?

17  A.  That's correct.

18      ATTORNEY BRIER:  Okay.  Thank you, Judge.

19      THE COURT:  All right.  Mr. Clanton, I just have a few

20  questions.  Do you still have Plaintiff's 45?

21      THE WITNESS:  Yes.

22      THE COURT:  All right.  This exhibit, as you know, was

23  admitted into evidence yesterday.  And of course it's a 19-page

24  long e-mail thread, primarily between you and Ms. Woodard from

25  CHK.  And as I indicated on the record yesterday, I did review

1    the entire e-mail thread.  So I just want to ask you a question

2    about a few of the e-mails that were not asked about by

3    Counsel, because there was some terminology I didn't understand

4    in a few of the e-mails.

5         The first instance where I see this terminology, if

6    you could turn to page five, there is a September 30, 2020

7    e-mail from Ms. Woodard to you.  In the second paragraph of

8    this e-mail she refers to an offer on the Craige pad as a

9    cash/carry option.  I'll represent to you that similar

10   terminology is used in, I think, two other e-mails.

11        Can you just explain to me what is being discussed

12   between you and Ms. Woodard with respect to a cash/carry

13   option?

14        THE WITNESS:  Sure.  Because we were talking about

15   operatorship, and at that point it was believed by both us and

16   represented by Julie that probably this project wouldn't be

17   successful in capturing capital from Chesapeake because of the

18   financial constraints that they were under during that time,

19   and therefore, that's one of the reasons why they didn't want

20   to dedicate human resource to this project.  She -- and we

21   discussed the potential of them operating without bringing

22   capital to the table, participation; in other words, we would

23   carry their interests.  They could earn a reversionary interest

24   in the well if they were to come forward and serve as operator

25   and we take a portion of their interest.

1    And so we were discussing at that time the potential

2  of them serving as the project manager, continuing as operator,

3  drilling the wells and us finding some financial alternative to

4  their lack of capital availability for this -- or perceived

5  lack of capital availability for this project.

6    THE COURT:  Okay.  Understood.  Thank you.

7    My next question has to do -- again, I think my

8  question comes from a lack of understanding on my part about

9  some of the terminology involved.  Hopefully you'll find that

10  to be an understandable lack of understanding, given that I

11  don't have your depth of background in this particular field.

12    The term spud is the term that was utilized in your

13  company's proposal.  Right?

14    THE WITNESS:  Yes.

15    THE COURT:  And I thought you gave a very clear answer

16  in the first couple of questions to Mr. Brier's cross

17  examination about what that term means.  And I want to make

18  sure I understand, because I think there's a little confusion

19  on this issue.

20    So tell me again, what exactly does the word spud mean

21  in the context of a new well drill proposal?

22    THE WITNESS:  In general, the industry accepts the

23  word spud as the moment of which rotary drilling equipment is

24  initiated.

25    THE COURT:  Okay.  Well, what I wrote down in response

1   to Mr. Brier's question that it was the moment when a drill bit

2   hits the ground, and then you added meaning a drill rig is

3   on-site.

4           Is there a difference between those two things?

5           THE WITNESS:  No.  There can be two types of rigs.

6   But you know, one common understanding is when there is rotary

7   equipment that is tied to a rig, that spuds -- basically the

8   drill bit is at the surface and drills the first section of the

9   hole.

10          Now, often times operators will set conductor pipe, we

11  drill a certain amount of feet; 80, 90, 120 feet, and you don't

12  necessarily have to have rotary equipment to do that.  You can

13  have a different kind of rig that would do that.  Sometimes

14  it's not considered spudding.

15          Spudding is typically when you have a drilling rig

16  that is capable of drilling the surface hole.

17          THE COURT:  Okay.  So in order to be in the position

18  to have the kind of equipment on-site to do the type of

19  activity you just described, is your position then that you

20  don't need to have that road, the township approval in order to

21  bring that equipment in?

22          THE WITNESS:  That's right.

23          THE COURT:  So what type of equipment would you need

24  to bring in in order to be in that spud  --

25          THE WITNESS:  It's tractor-trailer based equipment.

CLANTON - COURT INQUIRY

1    But it's not repetitive, you know, constant use of the road.

2          THE COURT:  So --

3          THE WITNESS:  But those permits --

4          THE COURT:  Hold on, Mr. Clanton.  I don't think you

5    let me finish my question.

6          THE WITNESS:  Sorry.

7          THE COURT:  My question is what kind of equipment do

8    you need to bring in, the drilling equipment that you need to

9    have on-site in order to be quote/unquote spud ready?

10          THE WITNESS:  What kind of equipment do we need to

11    bring in?  We need to mobilize the drilling rig.

12          THE COURT:  Okay.  One tractor-trailer?

13          THE WITNESS:  No, ma'am.  That's the 30

14    tractor-trailer loads is a good estimate of that.

15          THE COURT:  Okay.  And your position then is that Rush

16    Township will not have any concern one way or another about

17    Epsilon, through a subcontractor, bringing 30 tractor-trailers

18    in?

19          THE WITNESS:  No, that's not what I'm saying.  I'm

20    saying the spudder rig is different than the drilling rig.  The

21    drilling rig is the one that would require about 30

22    tractor-trailer loads to mobilize the rig.  And there would

23    need to be coordination with the local authorities and the

24    townships for the condition of the road in the road agreement.

25          THE COURT:  Okay.  Now, your position is that, if I

1   understand your testimony, Epsilon -- if this Court grants

2   injunctive relief, Epsilon is in a position to have the

3   spudding rig on-site at the Craige well pad by May 22?

4           THE WITNESS:  Our position is that we can commence

5   operations commensurate with a joint operating agreement.

6   There is site prep that has to be done.  You have heard the

7   cross here.  There is preparatory work to be done on the

8   existing producing wells and the pad site, and then there is

9   additional pad site preparation work that would need to be done

10  prior to moving in some of these other services.

11          So all of those activities can be considered

12  commencement of operations that are not necessarily spud.

13          THE COURT:  What would constitute commencement of

14  operations for purposes of the language in the JOA?

15          THE WITNESS:  It's a gray area.  I think in this case

16  our interpretation would be boots-on-the-ground.  If we could

17  get boots-on-the-ground, that would be our commencement of

18  operations.  We would need access to the site.

19          THE COURT:  And you agree that that is a position or

20  an interpretation?

21          THE WITNESS:  Yes.

22          THE COURT:  Okay.  The document that you were shown by

23  Defendant's Counsel that is a Pennsylvania statutory provision,

24  and it's been marked as Defendant's 40 was --

25          It might be helpful if I could ask Defendant's Counsel

1    to pull up Defendant's Exhibit 40.  Thank you.  If you can

2    scroll down.  The Court is observing that the -- I'm sorry.  If

3    you can scroll back up to A.  There we go.

4          So the language seems to refer to the operator having

5    to do certain things pursuant to the statute.  Do you agree

6    with me?

7          THE WITNESS:  Yes.

8          THE COURT:  Is that your understanding, as well?

9          THE WITNESS:  Yes.

10          THE COURT:  You indicated to me basically -- actually

11    not basically.  I wrote it down.  You said it is impossible for

12    Epsilon to complete the steps delineated in this statute at

13    this point in time without the cooperation of Chesapeake.

14          Was that -- that was your answer to the question

15    earlier.  Do you recall testifying to that effect?

16          THE WITNESS:  Yes.  Um-hum.

17          THE COURT:  Now, why is it impossible for Epsilon to

18    take these steps, which basically amounts to reviewing public

19    information and submitting a questionnaire to landowners, but

20    it's not -- it wasn't impossible for Epsilon to submit well

21    proposals to DEP in December of 2020?  Explain that to me.

22          THE WITNESS:  Yes, Your Honor.  What I was tying to do

23    was item D in this, not item A but item D, which sets out that

24    the Department has at least 30 days prior to drilling.  We

25    can't commit to the 30 days prior to drilling because we can't

CLANTON - COURT INQUIRY

1    access the pad site.

2         THE COURT:  It says at least 30 days prior to

3    drilling.  Right?

4         THE WITNESS:  Right.  At this point it's still unclear

5    as to when we're going to be able to drill.

6         THE COURT:  Your testimony is that it's impossible,

7    and you used the word impossible, for Epsilon to submit this

8    report and to send out the questionnaires to landowners because

9    you don't know what date you could drill.

10        THE WITNESS:  And we don't know if we are going to

11   successfully prevail, to be honest with you.  We don't want to

12   send out questionnaires to people if we're not actually going

13   to be commencing operations.  It's unclear.

14        We would feel more comfortable with resolution to the

15   matter before we started making public notices.

16        THE COURT:  Understood.  Only one more question from

17   the Court.  It was the last point that you were examined on by

18   Mr. Brier.  And that has to do with the difficulty of

19   calculating essentially lost profitability.  All right.

20        And I understood your answer to be that it is a very

21   difficult figure to calculate, maybe under the best of

22   circumstances, but particularly under the circumstance where

23   there is information uniquely within the possession of

24   Chesapeake that would be needed for Williams to calculate a

25   future rate.  Did I understand you correctly?

1          THE WITNESS:  You got it.

2          THE COURT:  Okay.  And so I think you agreed with

3   Mr. Brier that the lost profitability figure is calculable if

4   you have the full universe of information.  Did I understand

5   that correctly?

6          THE WITNESS:  That is correct.

7          THE COURT:  All right.  And so for example, through

8   litigation and discovery, information could be requested from

9   Chesapeake through a formal mechanism, though it hasn't been

10  produced, obviously, informally.  Would you agree?

11         THE WITNESS:  I do.

12         THE COURT:  An expert would be required, whether it be

13  an economist, or maybe some other more specific field of

14  expertise, could calculate the lost profitability figure if the

15  full universe of information is obtained through litigation.

16         Would you agree?

17         THE WITNESS:  I agree.

18         THE COURT:  Okay.  The Court has no further questions.

19         I'll start with you, Mr. Madriz; do you wish to follow

20  up to any extent on the Court's questions?

21         ATTORNEY MADRIZ:  Could we have one minute?

22         THE COURT:  Certainly.

23                          (pause.)

24         ATTORNEY MADRIZ:  No questions, Your Honor.

25         THE COURT:  Okay.  Thank you.  Then Mr. Brier.

CLANTON - RE-RECROSS

1          ATTORNEY BRIER:  Just briefly, Judge.

2          THE COURT:  Okay.

3                    RE-RECROSS-EXAMINATION

4     BY ATTORNEY BRIER:

5     Q.  This hesitance to notify the landowners until you had

6     certainty; you had to notify the landowners when you submitted

7     the well proposals, didn't you?

8     A.  We submitted well proposals to the parties.

9     Q.  I'm sorry.  When you applied for the permits.  I misspoke.

10    Let me re-ask the question.

11    A.  Yes, we filed with the DEP, but we have not sent out to the

12    general public, per se.

13    Q.  I'm not talking about the general public.  I'm talking

14    about the people in the affected area in the units that you are

15    attempting to drill in.  You had to give notice to them when

16    you applied to DEP for the permits.  Correct?

17    A.  I'm not sure I understand your question.  Yes, we sent well

18    proposals to the partners.

19    Q.  Let's start over.  I'm not talking about well proposals.

20    A.  Okay.

21    Q.  DEP permits.

22    A.  Yes.

23    Q.  When you applied for those in 2020, you were required to

24    give notice to the affected landowners of your interest in

25    spudding and drilling those wells.  Correct?

A.  Yes.

ATTORNEY BRIER:  Thank you.

THE COURT:  All right.  Mr. Clanton, I think you thought I would never say this, but I believe we have concluded our questioning of you.  You are excused.

THE WITNESS:  Thank you.

THE COURT:  At least from the witness stand.  You are welcome to remain with us in the courtroom, if you wish.

Thank you, Mr. Clanton.

(Witness excused.)

All right.  Plaintiff's Counsel, are you prepared to proceed by way of stipulation to obviate the need to call the third witness, or have you had adequate time to resolve that issue?

ATTORNEY THOMAS:  I believe we still need some time to resolve the issue.  We just sent a draft to Defense Counsel.

ATTORNEY BLANK:  That's correct, Your Honor.  We are reviewing it now, if we could have a few minutes to try and through it.

THE COURT:  Wonderful.  I think this is a great time for us to take our morning recess.  Can you just give me a timeframe of how much time do you need?  I would normally take a 15-minute recess at this point.  Do you think that's adequate?

ATTORNEY BLANK:  Yes.

1      THE COURT:  All right.  The Court will be in recess

2  until 11:00.  You can notify Ms. Edleblute or Mr. Thomas if you

3  need additional time.  Court is in recess.

4      THE COURTROOM DEPUTY:  Please rise.

5      (A recess was taken from 10:50 to 11:15 a.m.)

6      THE COURT:  All right.  Plaintiff's Counsel and

7  Defense Counsel, I understand, have agreed to a stipulation in

8  writing and possibly an additional stipulation.  Who will be

9  presenting the stipulation on behalf of Plaintiff?

10      ATTORNEY THOMAS:  I will, Your Honor.  We have reached

11  a stipulation on what would have been Mr. Lane's testimony.  So

12  we have agreed to the stipulation of testimony that would have

13  been given by Mr. Lane Bond, and we have that stipulation

14  signed by both parties to proffer to the Court.  We also, based

15  on the stipulation, move for admission of Plaintiff's Exhibit

16  36 through 44.

17      THE COURT:  All right.  And do you have a copy -- a

18  signed copy of the stipulation that you would like to tender to

19  the Court?

20      ATTORNEY THOMAS:  Yes, Your Honor.  May I do so now?

21      THE COURT:  Thank you.  All right.  The parties'

22  stipulation with respect to the testimony of Mr. Bond is

23  admitted and will be made part of the record.

24      Does the stipulation also address the admission of

25  Exhibits 36 through 44, or would you like to, at this point,

1    move the admission of the exhibits?

2           ATTORNEY THOMAS:  Your Honor, at this point we would

3    like to move for the admission of those exhibits.

4           THE COURT:  Is there any objection to the admission of

5    Plaintiff's Exhibits 36 through, you said, 44?

6           ATTORNEY THOMAS:  Yes, Your Honor, that is correct.

7           ATTORNEY DEMPSEY:  No objection, Judge.

8           THE COURT:  All right.  Plaintiff's 36 through 44 are

9    admitted.  All right.  Ms. Thomas, is there any other

10   stipulations that the parties would like to present?

11          ATTORNEY THOMAS:  No, Your Honor.

12          THE COURT:  Okay.  Thank you.

13          And Plaintiff's Counsel, is there any other evidence

14   to present on behalf of Plaintiff?

15          ATTORNEY KROCK:  Yes, Your Honor.  We would like to

16   move for the admission of four documents, four additional

17   exhibits.  The first one, Your Honor, is the transcript of the

18   settlement proceedings from the prior lawsuit.  It was filed of

19   record in the case at, I guess, ECF docket number 37.

20          It was filed under seal.  We did not bring copies of

21   it today, Your Honor.  We thought there was a possibility that

22   if we put it in the record that it might not be sealed.

23          It wasn't clear to us whether Your Honor was going to

24   put any of these on the docket, which is why we don't have

25   them.  We could certainly obtain them.  Or since it's filed as

1   docket number 37, we think that everyone is apprised of what it

2   is and we may not even need to circulate copies.

3           THE COURT:  I'm certainly aware of the transcript,

4   having reviewed it in connection with one of the earlier-filed

5   motions.  It is part of the record.  It is filed under seal.  I

6   think maybe the cleanest thing would be if you simply want to

7   request that we incorporate that document as an exhibit for

8   purposes of this proceeding, and then I'll ask if there is any

9   objection to that incorporation.

10          ATTORNEY KROCK:  Certainly, Your Honor.  We ask that

11  the Court incorporate the transcript that's been marked as ECF

12  number 37 into the record as evidence, as if it were presented

13  here as an exhibit.

14          THE COURT:  All right.  Any objection to that?

15          ATTORNEY BRIER:  Respectfully, Your Honor, there is.

16  Exhibit 7 has an integration clause, paragraph 17, that says,

17  "This agreement is the complete agreement between the parties

18  regarding the lawsuit and may be modified or amended only by a

19  writing signed by all parties."

20          This is the settlement agreement.  I don't believe

21  it's -- I haven't looked -- I don't believe it's appropriate to

22  just offer a transcript of another proceeding to the Court when

23  there's a settlement agreement that sets forth within the four

24  corners of the instrument what the parties agreed to with very

25  competent counsel.

1    We have all had the experience many, many times

2  appearing before a court when parties reach an agreement in

3  principle and parties make representations to the court that

4  are then refined and further developed in a written settlement

5  agreement.  So I don't think it's appropriate.

6    THE COURT:  Let me turn back to Mr. Krock.  What is

7  the purpose for which you offer the settlement agreement

8  transcript?

9    ATTORNEY KROCK:  I guess it would be twofold, Your

10  Honor.  I mean, certainly what was represented to the Court,

11  which we believe to be consistent with the written settlement

12  agreement, so we're not trying to contradict or challenge

13  anything.  So that does, on one hand, reflect what the terms of

14  the settlement was.

15    But there's a second purpose.  And the purpose was

16  that we're establishing not just that this is what the parties

17  agreed to but that it was presented in open court and at that

18  time that there was a representation not just made to us but to

19  the Court, and if there was anything inaccurate -- and quite

20  frankly, the interpretation they are now trying to make.

21    They had the opportunity if there was clarification or

22  anything needed.  They will have the opportunity to address

23  that or clarify it if, in fact, there was something that needed

24  to be clarified.

25    So I think it was twofold, Your Honor.  It's not just

1  what the settlement agreement was; it's the overall

2  circumstances under which how it was negotiated and conveyed,

3  because we think that has separate, independent value.

4          THE COURT:  Mr. Brier, I don't think we need to

5  belabor the point.  I will accept what was previously submitted

6  to the Court and is currently filed under seal at doc 37 and

7  incorporate that into this case.  It is part of the record in

8  this case, and the weight and relevance of it can be argued by

9  Counsel at a later point today.

10         ATTORNEY BRIER:  I appreciate that.  I don't even have

11 it.  It wasn't provided to us.  I wasn't told this was going to

12 be asked for.

13         THE COURT:  Okay.  In as much as the Court is now in

14 the business of printing copies of everything for both parties,

15 I will ask Ms. Edleblute -- I assume Plaintiff's Counsel

16 doesn't need a copy of the transcript.

17         ATTORNEY KROCK:  That's correct, Your Honor.  We do

18 not.

19         THE COURT:  I will ask Ms. Edleblute to print one copy

20 for Defense Counsel.  If memory serves, the transcript, in its

21 entirety, is about eight pages.  The Court's recollection of

22 the transcript is that it reflects, in very typical fashion,

23 that all of the parties came in and represented to Judge

24 Mannion that, in fact, this was their agreement and they were

25 all voluntarily agreeing to the terms.  And that's it.  It's

1  very short.  We will print it and we will give you a copy, Mr.

2  Brier.

3      ATTORNEY KROCK:  The second document, Your Honor,

4  unfortunately, I hate to ask that another document be printed,

5  but it's another one that I don't have copies of right now.

6  And quite frankly, it is something that we didn't expect we

7  would need until today.  We were hopeful we could work a

8  stipulation out but we couldn't.

9      We believe it's appropriate to move into evidence a

10  copy of the form model JOA for this particular year that was

11  used as the model.  We didn't anticipate needing to use that.

12  It came to -- I guess we realized that even the Court had asked

13  questions about a particular section that is referenced in the

14  Craige JOA and pointed out that that number doesn't appear to

15  exist in our JOA.

16      I think it's a very easy explanation to make; that

17  when the parties modified the JOA, they cut out a subsection

18  (a) in Article VI and they actually cut out the header.  When

19  (a) got cut out, the header of (b) got eliminated.  So now

20  there is no (B) next to the heading title but afterwards

21  there's a (c).

22      So when you read the JOAs, it was just bad cutting and

23  pasting when it was put together.  So all we wanted to do was

24  just reach a stipulation with Counsel to just establish that is

25  section (b) right there that started with the form model (a),

1    but when the parties cut and paste, the (b) fell out and there
2    was no stipulation reached on that.
3         Seeing as the Court had inquired about it, we thought
4    it might be appropriate just for that limited purpose of
5    showing that that was the subsection (b).
6         THE COURT:  Mr. Brier.
7         ATTORNEY BRIER:  Your Honor, I hate to be difficult
8    but I do object.  Again, an 11th hour request that I don't
9    have.  The JOAs that are at issue are in evidence.  And the
10   JOAs that are at issue have, on the last page, page 30, the
11   last words above the signature lines are, "No changes,
12   alterations or modifications have been made other than those
13   made by strike-through and/or insertion that are clearly
14   recognizable as changes."
15        My distinguished colleague wasn't there in 2010 when
16   these were signed.  He doesn't know what was done and what was
17   cut and pasted and what judgment was made.  We weren't there.
18   There wasn't a witness in this courtroom that was there.  And
19   to now introduce some model instrument so that they can make
20   argument about what the intent was when revisions were made is
21   hugely prejudicial.  That's -- the Court has the evidence.
22        ATTORNEY KROCK:  Your Honor, we'll withdraw the
23   request.  The reality is is that every party, including the
24   correspondence of all of the parties that have referred to that
25   as section VI.B throughout at some point in time, so we just

1    thought with inquiries of the Court, we thought it might be

2    easier to stipulate and get something in that I don't think

3    anybody factually disputes.

4            THE COURT:  The request having been withdrawn, we will

5    move on to the next exhibit.  You said you had four.  We have

6    admitted one.  One is down and we have two.

7            ATTORNEY KROCK:  What I would consider to be the third

8    one is actually a series of exhibits.  These are the briefs

9    that I referenced in our opening statement, where we have got

10   four briefs in different courts, and we can either show them or

11   read, you know, the docket numbers.

12           These are four briefs that Chesapeake Appalachia, LLC

13   filed in federal court that are available on the electronic

14   docket, and there is no dispute about their authenticity.  In

15   all of these briefs, Chesapeake Appalachia, LLC sought

16   injunctive relief when their rights to property interest was

17   denied and they needed access.

18           We're admitting for the purpose of establishing that

19   when there are property interests, particularly in the gas and

20   oil industry, when access is denied that Chesapeake took the

21   same position we are taking in this case and argued that it was

22   indisputable that the denial of access causes irreparable harm

23   and cited to the very same authority we do.

24           THE COURT:  Mr. Brier.

25           ATTORNEY BRIER:  Your Honor, I don't know what he's

1   talking about.  I don't know what cases he's talking about.

2   He's asking to move into evidence things he hasn't given me.

3           This is not an efficient way of doing this.  If he

4   wants to argue that, he can argue it in a brief and give it to

5   the Court.  You don't just stipulate it into evidence and say

6   some party is here acting in a way inconsistent with its prior

7   conduct.

8           This Court has a record before it.  We were very, very

9   diligent in trying to make a record for it.  What was argued in

10  some other cases where we don't have the underlying pleadings

11  and we don't know what the testimony was, I don't get the point

12  of it.  He can make the argument that Chesapeake is acting

13  inconsistently.  You don't move those pleadings -- those briefs

14  that he hasn't given me into evidence.

15          ATTORNEY KROCK:  Your Honor, I'm offering them into

16  evidence.  This is a self-authenticating document that I'm

17  prepared to offer into evidence  We didn't conduct injunction

18  discovery in this case.  I didn't have all of the exhibits and

19  the evidence that they came with and are moving into evidence

20  during this hearing.

21          This is no different.  This is a document that we

22  obtained that is available.  It's self-authenticating.  And we

23  are offering it for the purpose, and it's just a limited

24  purpose, of what they asserted in here.  They can't -- it's the

25  other way around.  If they want to argue, once we have admitted

1  this into evidence, and make arguments about somehow why this

2  is different and it's distinguishable, they can make those

3  arguments.  But I don't need to establish any of those.  I just

4  need to establish that they made the arguments in these cases.

5           And I think it's admissible evidence, Your Honor.

6           ATTORNEY BRIER:  Your Honor, it's a case within a case

7  within a case within a case within a case.  It's like a

8  Russian, whatever they call it?

9           THE COURT:  The nesting doll.

10          ATTORNEY BRIER:  Nesting doll.  We're here on the

11  facts in this case.

12          THE COURT:  I understand, Mr. Brier.  I understand the

13  very limited purposes for which Mr. Krock moves to have these

14  briefs moved into evidence.  It's essentially to support his

15  argument already made in his opening statement that Chesapeake

16  has taken an inconsistent position in this case vis-a-vis other

17  cases previously litigated.

18          To the extent that those briefs are relevant, it would

19  seem to the Court to hinge on the similarity in the prior

20  cases, which the Court may or may not be able to ascertain from

21  the brief.

22          So I will admit them into evidence for the limited

23  purpose identified by Mr. Krock.  We will label them to be

24  clear about it, and then I need to receive those into evidence.

25  But again, we need to have copies provided for opposing --

1          ATTORNEY KROCK:  Those ones we do have copies of,
2     Your Honor.
3          THE COURT:  Wonderful.
4          ATTORNEY BRIER:  It would have been nice to have
5     gotten them earlier.
6          THE COURT:  Mr. Brier, I know that this has been an
7     extraordinary undertaking.  Let's remain --
8          ATTORNEY BRIER:  I apologize.
9          THE COURT:  -- civil with each other.  Actually, I
10    want to give a shout-out to my staff.  I think my staff has
11    been extraordinarily helpful, and we're happy to help, and I
12    understand everybody is working under extraordinary time
13    circumstances.
14         But do me a favor, while we're being helpful, let's
15    all be nice to each other.
16         ATTORNEY BRIER:  I understand your ruling and I
17    respect it.  Just for record, I should have added the argument
18    rule of completeness, that you pick one brief out of a file.  I
19    understand the Court's ruling.  I just wanted to see it.
20         THE COURT:  Very well.  Ms. Edleblute is going to
21    provide a copy of doc 37 to Defense Counsel.  For the record,
22    that document has been provided.
23         Mr. Krock, I think we are up to Plaintiff's 47, I
24    believe.
25         ATTORNEY KROCK:  So we would be starting at 47 or this

1    would be 48?

2          THE COURT:  Bear with me for one moment.  So your next

3    exhibit number that has not been utilized is Plaintiff's 47.

4    So I believe these four briefs would be -- would you be marking

5    them as Plaintiff's Exhibits 47, 48, 49 and 50?

6          ATTORNEY KROCK:  Yes.

7          THE COURT:  Okay.

8          ATTORNEY KROCK:  Would you like me to read the caption

9    for each one, or did you just want me to provide them?

10          THE COURT:  I have admitted them, and now you can just

11    tender them to the Court.  Actually, I'll tell you what, we

12    should identify for the record by some means what is P-47,

13    P-48, et cetera.  So if you could just give some identifying

14    information about what each document is.

15          ATTORNEY BRIER:  Can I have a copy?

16          ATTORNEY KROCK:  Yes.

17          Plaintiff's Exhibit 47 is a memorandum in support of

18    law of a motion for temporary restraining order and preliminary

19    and permanent injunction.  The caption is Chesapeake

20    Appalachia, LLC versus Robert C. and Mary S. McRoberts, et al.

21    This was filed in the United States District Court for the

22    Western District of Pennsylvania.

23          The next exhibit would be 48.  That caption of

24    Plaintiff's Exhibit 48 is Chesapeake Appalachia, LLC versus

25    Eugene Frye, F-R-Y-E.  Memorandum in support of Plaintiff's

motion for preliminary injunction.  That was filed in the
United States District Court for the Southern District of West
Virginia.

Plaintiff's Exhibit 49 is Chesapeake Appalachia, LLC
versus Chris Cole, C-O-L-E, and Jamie Cole.  The document is
entitled memorandum in support of motion for preliminary
injunction.  It was filed in the United States District Court
for the Middle District of Pennsylvania.

And the final exhibit, Exhibit 50, has a caption of
Chesapeake Appalachia, LLC versus Kevin Williams.  The document
is titled motion for preliminary injunction.  It was filed in
the United States District Court for The Eastern District of
Kentucky.

THE COURT:  All right.  Are there any other -- thank
you.  Please give those to Ms. Edleblute.  Thank you.

THE COURTROOM DEPUTY:  Sure.

ATTORNEY KROCK:  Your Honor, the last series of
exhibits that we move for admission into evidence are the two
expert reports that we had attached to our -- the previous
reply brief.  One was the expert report of Dorsey Roach.  The
second was the expert report of Bruce Kramer.

We do not, obviously, have copies of those.  I think
we understood that that was going to be addressed and the Court
was aware that was going to be addressed at the hearing.

THE COURT:  Mr. Brier.

1    ATTORNEY KRAVITZ:  Your Honor, I'm going to argue

2    this.  Your Honor, on May 6th when Epsilon filed its reply

3    brief to its preliminary injunction, it notified everybody for

4    the first time that they retained two experts.  We moved to

5    strike that on May 7th.

6         The Court quickly accommodated all the parties and

7    heard argument on that.  The Court provided Epsilon with a very

8    clear choice; either they could proceed yesterday and today

9    without experts or they could proceed the end of July with

10   experts.  Unhappy with that decision, they moved to reconsider,

11   and they improperly asserted before the Court the actual

12   pretrial expert reports of their two experts and told the Court

13   that their experts are not going to be available to come into

14   this hearing.

15        Your Honor did not fall for that trick.  Your Honor

16   confirmed for all the parties yesterday that the Court did not,

17   in fact, read those reports.  And they're here today and now

18   they want to put them into evidence.

19        The issue is they are hearsay and they are

20   inadmissible.  The experts are not available to be

21   cross-examined on their reliability or the authenticity of

22   their reports and the opinions contained therein.

23        In Epsilon's brief they make a statement.  And I am

24   quoting from page seven of ECF 65.  "Expert reports completely

25   inadmissible at trial may be allowed for a preliminary

1   injunction."

2          They provide the Court with two case citations,

3   neither of which stand for that proposition.

4          The first case, Engelund, admits an affidavit in a

5   preliminary injunction hearing.  We don't dispute that.

6   There's been affidavits admitted into evidence over the last

7   two days.

8          The last case is from the Fifth Circuit, and it

9   equally does not admit the pretrial expert report without an

10  expert being available to testify at a preliminary injunction

11  hearing.

12         The prejudice that was argued to this Court last week

13  is even more applicable today.  It's compounded.  Chesapeake

14  doesn't have an expert.  We just became aware there were

15  experts.  We have no ability to challenge these experts.  And I

16  would represent to the Court -- and I understand the Court did

17  not read the opinions contained in those pretrial reports.

18         But what they are attempting to do is usurp the sole

19  province of this Court to interpret a contract as a matter of

20  law.  And what they are trying to do is create an ambiguity

21  where they admit one does not exist, and we agree with that.

22         It's wholly improper.  And even though we're here on a

23  preliminary injunction and there's been argument that the Rules

24  of Evidence are relaxed, what really has occurred here, Your

25  Honor, is a hearing on the merits.  This is a trial on the

merits.

They have a self-imposed deadline of May 22, which is ten days from now, and they are going to try to argue to this Court in closing argument that they are likely to succeed on a declaratory judgment count. We will argue they are not. This is, in essence, under Rule 57 a speedy hearing under the merits of a declaratory judgment count. It is a trial.

And the pretrial report from an expert in the Middle District of Pennsylvania is inadmissible at trial where the expert witness is not available to be cross-examined. And that case is Transcontinental Gas Pipeline Company, LLC versus Permanent Easement for 2.59 Acres, and the cite is 2019 Westlaw 5622455. That's in the Middle District of Pennsylvania. There was a pretrial expert report offered into evidence. There was a motion in limine to preclude that report because the author of it was not available for cross-examination, Your Honor. It was ruled inadmissible.

And considering the extreme time pressures that we're under here and the hearing that we just had on the merits, we would ask for them to be not entered into evidence.

THE COURT: All right. Thank you.

Mr. Krock, your response.

ATTORNEY KROCK: Your Honor, I think there are three issues that I would like to address that pertain to the expert reports. The first issue is were we under a duty to disclose.

1   If we would have brought those experts in today without ever

2   telling anyone, did we do anything wrong?  Had we violated any

3   of the rules?

4          I know we talked about this earlier, and I hope the

5   Court indulges me, because you do remember that we filed our

6   reply brief, I guess, on a Friday afternoon at, I think, 2:30.

7   I'm sorry.  They filed their motion addressing the expert about

8   2:30 on a Friday and we had an oral argument with Your Honor,

9   and there was a ruling within about two hours.  So we had very

10  limited time to make an argument as to why our experts should

11  be able to walk in the door today.  And we didn't even have any

12  opportune -- or obligation to disclose them earlier.

13         In our motion for reconsideration that's what we

14  pointed out.  Your Honor asked a very important question that

15  said, was there any obligation for us to disclose the existence

16  of the experts for an injunction hearing or a pretrial hearing.

17  And Your Honor asked Counsel, do you have any authority that

18  suggests that we did anything wrong, we had an obligation to

19  disclose that?  And Counsel admitted no, they didn't have any

20  legal authority.

21         And my question now is but do they have this legal

22  authority that we found within 24 hours that said that there's

23  legal authority that actually affirmatively states we didn't

24  have an obligation to disclose that.

25         So the reality is, as far as surprise, I think that

1   the mere fact that we could have asked the experts to testify;

2   we could have marched them through the door, and their

3   testimony would be admissible.

4           I think it is now undisputed.  It's in one of their

5   briefs they said we're not arguing it's Rule 26, those cases

6   don't apply because Rule 26 didn't apply.  Well, if it's not

7   Rule 26, what rule was it that obligated us to disclose the

8   identity of these experts?  There is no rule.

9           At the end of the day we got punished.  We got

10  punished for failing to disclose something that we had no

11  obligation to disclose.  We are prejudiced because our experts

12  aren't here today.  We don't want to submit their reports.  We

13  wanted to have them here with their reports.  We wanted to

14  submit into evidence their testimony.  We can't, through no

15  fault of our own.

16          THE COURT:  Well, to be clear, Mr. Krock, I made a

17  ruling with respect to presenting any expert opinion testimony

18  at this hearing.  My ruling was not based on Rule 26.  I agree.

19  I found, in fact, that you did not have a duty to disclose.  My

20  ruling was based on fundamental fairness.  My ruling is what it

21  is.

22          I have denied your request to reconsider.  And I don't

23  take your argument in the spirit of an attempt to again

24  reconsider.  However, I think we need to move -- I agree with

25  you actually that the hearsay problem is a function of a motion

1    filed by Defense Counsel, which was granted by the Court.

2           You were precluded on Friday from having your experts

3    travel here, and then you indicated to the Court that it was

4    too late for them to change their travel plans even if the

5    Court had desired to reconsider.

6           ATTORNEY KROCK:  Right.

7           THE COURT:  Let's move forward to another issue now,

8    because there is also an objection to the substance of these

9    reports, which the Court has not reviewed.  And so for what

10   purpose are you offering each of these expert reports?  Let's

11   turn to that.

12          ATTORNEY KROCK:  Right.  And we'll take them one at a

13   time.  You know, Mr. Roach is a -- he is an expert land

14   professional.  His expertise is that he's intimately familiar

15   with the joint -- the model form JOAs, what they're intended to

16   do, what the purpose of the various provisions are.  He sat on

17   the committee that actually drafted the model form that is at

18   issue in this case, the 1989 model form.

19          So he's here to provide background information about

20   what the model form was intended to do.  It's very relevant to

21   this case, Your Honor.  He's not saying exactly what the

22   parties' agreement says.

23          But in a great example, Your Honor, there's a big

24   dispute about that first sentence in Article VI.2(b).  I'm

25   sorry.  It's (a).  It's the one about hey, what was the

1    original purpose of that sentence.  And our argument is that

2    the original purpose of that sentence was to put a time limit

3    on the activities.  That's our interpretation.  Not of what

4    these parties intended but what the model form was intended;

5    what the people in the industry understand and intend that

6    sentence to mean.

7          That's very relevant to our argument.  It's not him

8    telling what these parties intended.  He's saying what was that

9    sentence intended to mean in the abstract in the model form,

10   and it would help Your Honor to know that in deciding what was

11   the intent of these parties when they modified the model form.

12         THE COURT:  All right.  I think I can probably

13   shortcut this is a little bit.  Based on the Court's research,

14   the Sunbeam Corp. case from the Supreme Court of Pennsylvania

15   in a 2001 decision holds that the parol evidence rule, or the

16   bar on extrinsic evidence absent ambiguity in the contract,

17   does not apply in its ordinary strictness where the existence

18   of a custom or usage to explain the meaning of the words in a

19   writing is concerned.

20         I understand your argument to be, Mr. Krock, that at

21   least with respect to Mr. Roach's expert report, you are

22   tendering this report as some evidence of industry custom or

23   trade usage with respect to the language that appeared in the

24   model agreement and was carried forward into the parties' JOAs.

25         ATTORNEY KROCK:  Absolutely, Your Honor.

1    THE COURT:  The Third Circuit in <u>General Refractories</u>

2  <u>Company versus First State Insurance Company</u>, 855 F.3d, 152

3  quoted approvingly from the <u>Sunbeam</u> decision.

4    So, for the limited purpose of providing evidence on

5  industry custom or trade usage, I will admit Mr. Roach's report

6  over Defense Counsel's objection, taking note of Defense

7  Counsel's objection, and the Court will afford whatever weight

8  it believes Mr. Roach's opinion deserves.

9    Let's turn to the other report.

10    ATTORNEY KROCK:  Mr. Kramer is also being offered for

11  industry custom and practice.  Mr. Kramer is different in that

12  he is a licensed attorney.  He's a licensed attorney who is

13  very well known and respected in the oil and gas industry.  A

14  lot of people are saying if he's an attorney, isn't he telling

15  the Court how to decide.

16    The answer is no.  Mr. Kramer has testified countless

17  times, too many to count probably, in court about industry

18  custom and practice as far as the same concept of how terms are

19  utilized in a JOA.  But his are not from a land professional's

20  perspective of how the JOAs were formed and the like.  His is

21  more on an attorney perspective of that he's got experience in

22  how would you modify the form JOA; if you're being asked,

23  what's the industry custom of modifying the form JOA.

24    If one were asked to create veto power for an operator

25  or for any other party, what would the process be to implement

1   that into the agreement.  How do you change the model form and
2   how would you not to achieve the result that Chesapeake wants
3   this Court to conclude.

4          Mr. Kramer is not usurping your role, Your Honor.
5   Mr. Kramer is saying with knowledge of industry custom of the
6   terms and the practices and what is customarily understood by
7   people with knowledge of the industry and these JOAs, how would
8   they go about doing things from an industry custom standpoint
9   to achieve a particular desired result.

10         THE COURT:  Thank you for that proffer.  Let me give
11  an opportunity for Counsel to respond, because that is
12  materially different from the report of Mr. Roach.

13         ATTORNEY KRAVITZ:  Your Honor, the expert reports,
14  they can call them custom and usage reports, if they want to.

15         THE COURT:  Well, I have admitted Mr. Roach's report
16  so we are only talking about Professor Kramer's report.

17         ATTORNEY KRAVITZ:  And I respect that, Your Honor.  I
18  just want the record to just note my objection.

19         These are extrinsic opinions, trying to establish,
20  trying to put evidence before the Court that there is
21  ambiguities present.  They are calling it custom and usage.
22  But that's not what it is.  It's going to the ultimate issue of
23  interpreting the contract, which is the Court's function, as
24  the Court knows.

25         So we would not only object to the Dorsey Roach

1  opinion but also the Kramer opinion, as well.  In our opinion

2  they are not custom and usage expert opinions.  And for the

3  reasons that we said earlier, they're not here.

4         THE COURT:  Mr. Krock.

5         ATTORNEY KROCK:  I think we have already established

6  sufficient case law that you don't need ambiguity for evidence

7  of industry and custom.  With all due respect, in their opening

8  argument, Chesapeake's Counsel read an e-mail from our chief

9  financial officer and said look at what he said, this is what

10  he means.

11         Everybody has introduced evidence that's beyond the

12  four corners of the document to try to explain their

13  interpretations.  So the notion that we -- that there is some

14  ambiguity that needs to be established before we introduce

15  expert evidence would apply equally, I would think, to fact

16  evidence, and it's been introduced all throughout these two

17  days, to try to explain what the parties intended.  Yet, both

18  parties still argue that our positions are the only reasonable

19  ones.

20         The mere fact that we have both argued that our

21  position is the only reasonable one and there is ambiguity

22  doesn't mean that we didn't put in extrinsic evidence during

23  the hearing.

24         ATTORNEY BRIER:  Your Honor.

25         THE COURT:  Mr. Brier.

1    ATTORNEY BRIER:  It relates to what I argued in the
2    opening.  I certainly did that.  I did that knowing that the
3    author of the e-mail was here and would be cross-examined and
4    this Court would have the benefit to hear that.

5    The proffer that was made is that this law professor
6    has offered his judgment about how people in the industry would
7    have amended JOAs, had they intended the outcome that
8    Chesapeake argues.

9    That is not custom and usage.  That's a law professor
10   saying this is what I would expect people to do.  It is very,
11   very different from the first report that this Court let in.
12   And you noted that initially.  You said it's materially
13   different.  It is coming through the side window to say if I
14   had done this, this is what I would have done.

15   Well, that's irrelevant.  It offers nothing to the
16   Court.  And it's not custom and usage.  I would respectfully
17   ask you to preclude it.

18   THE COURT:  I agree with Mr. Brier.  I think the
19   proffer made by you, Mr. Krock, is describing Professor
20   Kramer's opinion is, importantly, materially different from
21   your description of Mr. Roach's report.  And the important
22   distinction is exactly what Mr. Brier just highlighted; namely,
23   I understand from your description that Professor Kramer is
24   offering an opinion about how folks in the industry would write
25   language in order to achieve a certain effect.

1    The Court's task in this case is to interpret the

2 agreement that has been written as between the parties to the

3 agreement.

4    So frankly, I fear that Professor Kramer is offering a

5 legal conclusion with respect to an issue that is not even

6 clear to me is before the Court.  So I'm going to preclude

7 Professor -- I'm not admitting Professor Kramer's report.

8    I have admitted Mr. Roach's report.  It is in

9 evidence.  And the Court will review it, subject to the

10 objection made by Defense Counsel, and the Court will give

11 whatever weight the Court deems appropriate to Mr. Roach's

12 report.

13    But the Court is not taking Mr. Kramer's report into

14 evidence.  And to the extent that it has been filed, just to be

15 very clear, the Court does not intend to review what was filed

16 as, I think, Exhibit B attached, which is document 65-2.

17    All right.  That's the Court's ruling.  Now let's move

18 on.

19    Are there any other exhibits or any other evidence

20 that Plaintiff's Counsel is intending to introduce?

21    ATTORNEY KROCK:  No, Your Honor.

22    THE COURT:  All right.  So Plaintiff rests its

23 case-in-chief?

24    ATTORNEY KROCK:  It does, Your Honor.

25    THE COURT:  All right.  Defendant.

1    ATTORNEY BRIER:  Your Honor, we have an affidavit

2 regarding if the Court were to grant preliminary injunctive

3 relief as to what the bond should be.

4    And as a housekeeping matter, I don't think I asked

5 the Court to accept Exhibit 40 into evidence, which is the area

6 of review document.  I apologize for that.  I would ask that

7 that be admitted.

8    Other than our exhibit on the -- on what we think the

9 bond would need to address, we have no further evidence.  Based

10 on the way the Plaintiff's case went in, we're not calling any

11 witnesses.

12    THE COURT:  All right.  First, let me take what may be

13 the simplist issue here.  Defendant's 40, is there any

14 objection to the admission of Defendant's Exhibit 40?  That is

15 the Pennsylvania statutory provision.

16    ATTORNEY BLANK:  No, Your Honor.

17    THE COURT:  All right.  Defendant's Exhibit 40 is

18 admitted.

19    Now, with respect to the affidavit, has a copy been

20 provided to Plaintiff's Counsel?

21    ATTORNEY BRIER:  No.  I will do that now.

22    THE COURT:  I will give you an opportunity to review

23 that obviously now, Attorney Blank.

24    ATTORNEY BLANK:  Thank you.

25                        (pause.)

1    Your Honor, I have not had a chance to digest it in

2    full.  I would like to be able to review it with my client

3    before I address the Court.

4    THE COURT:  Okay.  I'm going to give you that

5    opportunity.  Let me just clean up one thing.  I don't think --

6    when I indicated that I'm admitting Mr. Roach's report, I don't

7    think I put an exhibit number on that.  Just to clarify for the

8    record, why don't we label that Plaintiff's Exhibit 51.  So

9    Mr. Roach's report, which the Court already has a copy of and

10   has printed from a previous filing, is now Plaintiff's Exhibit

11   51 in this case, and it has been admitted.

12   Okay.  Now, with respect to the proffered declaration,

13   how much time would you like?  I can take a recess to give you

14   an opportunity to discuss that with your client.  Would ten

15   minutes be sufficient?

16   ATTORNEY BLANK:  Ten minutes will be sufficient.

17   THE COURT:  All right.  The Court stands in recess

18   until 12:10.

19   (A recess was taken from 11:56 a.m. to 12:10 p.m.)

20   THE COURT:  All right.  Attorney Blank, have you had

21   an opportunity to come to a position with respect to the

22   proposed affidavit?

23   ATTORNEY BLANK:  Yes, Your Honor.  A couple of things

24   or a few things.  One, we're not going to contest the admission

25   of the declaration.  What we would like to do is, if the Court

1 is -- if that's their last piece of evidence and they're

2 resting, we would like an opportunity, if the Court is going to

3 break for lunch, I would like to go back -- we may have a

4 counter-declaration limited to this declaration that we would

5 like to submit in response to it.

6    I would like to have the lunch break to explore that

7 and come back to the Court.  That would be the last piece of

8 evidence that we would submit.  Then I assume the Court would

9 go to oral argument, if that's the Court's desire.

10    So that's at least the position that we would like to

11 proceed.

12    THE COURT:  Okay.  That is, generally speaking,

13 acceptable.  Why don't we take care of admitting Defendant's

14 proposed -- or Defendant's affidavit.  Let's have that marked

15 and admitted.  I think if you would like to have it marked as

16 an exhibit, which would be what Plaintiff did with their

17 declaration, your next exhibit number, I believe, is

18 Defendant's 42.

19    ATTORNEY BRIER:  So 42?

20    THE COURT:  Yes.  All right.

21    Now, just as a formal matter, I understood you to say

22 earlier, Mr. Brier, that this would be the only evidence

23 affirmatively presented in your case-in-chief.  Do you now

24 rest?

25    ATTORNEY BRIER:  We do, Judge.

1          THE COURT:  Okay.  And then I will turn to Plaintiff's

2     Counsel and ask if you have any rebuttal evidence you would

3     like to present.  And I understand, Mr. Blank, that you would

4     like to take the lunch recess in order to consider whether you

5     would like to submit a declaration -- a counter-declaration

6     basically?

7          ATTORNEY BLANK:  Yes, Your Honor.

8          THE COURT:  The only problem from the Court's

9     perspective, is I was envisioning concluding the testimony

10     before the lunch break in order to allow Counsel to prepare for

11     closing arguments on the other side of the lunch break.  You do

12     throw a little bit of wrench in the works there.

13          But I'm certainly going to give you a little bit of

14     time to do that.  What I would ask is -- we're going to take a

15     lunch recess for an hour, so we'll come back at 1:15 -- if you

16     have a declaration that you wish to submit, then we'll address

17     that.  If Defense Counsel needs any additional time in order to

18     complete their preparations of their closing argument, we'll

19     take an additional recess at this point.

20          It may be that you elect not to submit a declaration,

21     and it may be that Defense Counsel feels that no additional

22     time is needed.  Is that sufficient time?  I'm saying 1:15.

23     Again, I just want to make sure that we conclude this today.

24     If there's a request for a longer lunch break, I'll entertain

25     it.

1          ATTORNEY BLANK:  Judge, if I may, if we could take the

2     hour and a half.  Part of it is getting in and out with

3     security, and getting back to and from was a little tight

4     yesterday.  It will help us get through.  If we get it through,

5     I will present it to them before we come back here so they have

6     an opportunity to look at it, as well.

7          THE COURT:  That's fine.  Any objection, Mr. Brier?

8          ATTORNEY BRIER:  No.  I was going to say the exact

9     same thing in terms of that might give them the extra time to

10    let us look at it so we're not sitting here seeing it for the

11    first time in front of the Court.

12         THE COURT:  All right.  The Court will stand in recess

13    until 1:45.  Let's go off the record for a minute.

14              (Off-the-record discussion.)

15         (Whereupon, a luncheon recess was taken from 12:15 to

16    1:50 p.m.)

17         THE COURT:  Good afternoon, everyone.  Before we

18    recessed for lunch, I had admitted the declaration of Scott

19    Glenn as Defendant's Exhibit 42.

20         I know that Plaintiff's team was planning to utilize

21    the lunch recess to determine -- among other things, to

22    determine whether an additional declaration would be admitted.

23         Have you come to a conclusion on that?

24         ATTORNEY MADRIZ:  Yes, Your Honor.  We would like to

25    admit the declaration of Paul Atwood.

1    THE COURT:  Is there any objection to that?

2    ATTORNEY BRIER:  There is not, Your Honor.

3    THE COURT:  Okay.  Let's mark that as Plaintiff's 52.

4 All right.  Plaintiff's 52 is admitted.  It is the declaration

5 of Paul Atwood.

6    Is there any other rebuttal evidence to be submitted

7 by Plaintiff?

8    ATTORNEY MADRIZ:  No, Your Honor.

9    THE COURT:  All right.  Thank you.

10    With the evidence in this case concluded, we will turn

11 to closing arguments.  Just thinking off the top of my head, we

12 proceed with Defendant -- no, Plaintiff first.

13    ATTORNEY BRIER:  I think Plaintiffs.

14    ATTORNEY KROCK:  We're happy to go first, Your Honor.

15    THE COURT:  All right.  Happy to hear from you.

16    ATTORNEY KROCK:  Your Honor, the primary issue

17 involved in this entire proceeding involves the right to serve

18 as an operator if Chesapeake declines to participate in the

19 well proposal and to serve as the operator.  The other issues

20 are certainly important to us.  They're important to us if

21 Epsilon is permitted to proceed and serve as the operator.

22    Epsilon is going to need access to the Craige well pad

23 so that it can commence operations by preparing the well site,

24 shutting in the existing Craige well, just temporarily and

25 abandoning them, and then actually spudding and drilling the

1  well.  Epsilon is going to need to use the Wyalusing Creek
2  water point to withdraw water.
3        It's going to need to store that water in the Marbaker
4  impoundment, in a facility that is large enough to store the
5  volumes of water that it's going to need on a short basis for
6  hydraulics to fracture those wells.  PROOF!!!
7        Epsilon is going to need Chesapeake to stop attacking
8  the validity of a duly-issued permit to drill with the
9  Pennsylvania DEP.  And Epsilon is going to need a variety of
10 cooperation on a day-to-day basis when it's out on that pad to
11 work through how to make sure these operations are done
12 efficiently and effectively.
13        But the urgency of obtaining all of those other forms
14 of relief all turn upon the issue of whether Epsilon can serve
15 as the operator for its wells.  Your Honor, the evidence is
16 overwhelming that Epsilon has the right to serve as the
17 operator under the JOAs.  The evidence is even more
18 overwhelming that Epsilon has the right to serve as the
19 operator in accordance with the terms of the settlement
20 agreement.
21        Epsilon was outraged when it found out after the
22 settlement agreement had been signed that Chesapeake was taking
23 the very same position involved in the prior litigation, that
24 they had veto power.  Now that we've sat in the courtroom and
25 heard Chesapeake's explanation as to why it thinks it still has

1    veto power after it signed that settlement agreement, we're

2    even more -- even more outraged.

3        So I want to address first, Your Honor, the likelihood

4    of success on the merits on the operatorship issue, since I

5    believe it's the most critical.  And I'll start with the

6    settlement agreement.  There is only one plausible reading of

7    the settlement agreement.  Only one reasonable one.  Chesapeake

8    agreed that if Epsilon proposed a new well that Epsilon could

9    serve as the designated operator if Chesapeake elected not to

10   do so.

11       Your Honor, the prior lawsuit involved the very same

12   issue, the right to drill a new well on a pad that was then

13   under the operation by Chesapeake.  There were wells existing

14   on the pad at the time.  The argument was the same at the time,

15   that Chesapeake had the right to unilaterally veto the drilling

16   of a new well.  Epsilon served a declaration that it had the

17   right to serve as the operator and the ability to move forward

18   and do that.

19       You heard, Your Honor, that the parties settled that

20   matter.  They settled with a framework that had two components,

21   short term and long term.  The short-term component was the

22   parties agreed how to address the wells that had then been

23   proposed; which of the two sides that proposed wells would be

24   drilled in the short term.  But equally important in that

25   settlement agreement was the long term.  And one component of

1   the long term was that drilling moratorium.  Epsilon agreed not

2   to propose any new wells until 2020.  PROOF!!!

3        But in exchange for that moratorium, Epsilon received

4   something back.  Epsilon received paragraph 8(d).  It received

5   the acknowledgment that if this issue arose on a going forward

6   basis that Epsilon would be able to proceed with the well in

7   the event that Chesapeake declined to participate and to

8   operate.  PROOF!!!

9        As we expected, Chesapeake pointed to the caveat in

10  paragraph 8(d), to the extent permitted under the JOAs.  The

11  current argument, as we understand it, is that the -- that

12  Chesapeake's position is the JOAs only allow Chesapeake to

13  serve as the operator for a new well, ever.  So that the non --

14  the provision about designating someone else to serve as the

15  operator can only apply to work on the existing wells.  That's

16  their position.

17       And because of that, they point to the paragraph in

18  the settlement agreement that said hey, all we ever agreed was

19  if you proposed something on the existing well, then you may be

20  able to serve as the operator and we'll cooperate.  But then

21  the entire provision has no application to new wells.

22       Your Honor, the argument is absurd for several

23  reasons.  First and foremost, if we could actually pull up

24  Plaintiff's Exhibit 7, which is a copy of the settlement

25  agreement.  If you look at the express terms of the settlement

1    agreement, the settlement agreement consistently talks about

2    well proposals.  So if we can actually start right there.  Keep

3    it right there and look at paragraph three and paragraph four.

4    Those paragraphs talk about Chesapeake drilling, completing and

5    putting into production new wells.  Okay.  References to new

6    wells by Chesapeake in paragraphs three and four.  Those are

7    new wells that are going to be drilled.  Okay.

8         Then if you look at paragraph five, what does

9    paragraph five say?  Epsilon will not withhold consent to

10   participate in Chesapeake's well proposals to effectuate

11   paragraphs three and four.

12        So what does the term well proposal refer to when

13   we're talking to Chesapeake's wells?  It's talking about new

14   wells that are being drilled.  It's not talking about working

15   on existing wells.  That's the way well proposal is referred

16   to.  So if we go to the next page and we go to paragraph eight,

17   paragraph eight is referring to now Epsilon making proposals

18   for wells under the JOA.  So when it's our proposals, that also

19   refers to proposals for new wells.  It's consistent with the

20   language in the agreement.

21        And if there's ever any doubt about that, Your Honor,

22   look what it says after, "Epsilon made well proposals under the

23   JOAs", and it continues, "But they have to be compliant with

24   conformity to spacing pattern requirements."  I believe it was

25   Mr. Raleigh who discussed spacing while he was on the stand,

1    and the need to drill wells that are far enough apart from one
2    another, they need to be adequately spaced.  So you can tell
3    from the very first paragraph (sic) of paragraph eight that we
4    are contemplating the dwelling of new wells.
5           Then you continue in the subparagraphs, and these
6    subparagraphs are all under paragraph eight to address the
7    drilling of new wells in accordance with paragraph eight.  In
8    paragraph 8(b), what do we see?  "Should Chesapeake consent and
9    confirm operatorship of a well proposed by Epsilon."  We're
10   talking about well proposals.  The same with paragraph 8(c) "To
11   the extent that a well proposal is made."  We're talking about
12   a new well.  Then look at the moratorium, which is paragraph
13   8(d), "Epsilon will not make a proposal for wells to be drilled
14   before 2020."
15          That moratorium had nothing to do with work to be done
16   on existing wells.  That was new wells.  So you can tell from
17   that the settlement agreement itself well proposal equals new
18   wells.  Paragraph eight, we're talking about new wells.
19   Chesapeake would have you believe that with the exception of
20   the entire rest of the settlement agreement that 8(d) is
21   different, that paragraph (d) does not talk about new wells,
22   that somehow that only refers to proposals for work on the
23   existing wells.  It's completely inconsistent with the rest of
24   the language in the four corners of the document.
25          Your Honor, secondly, that interpretation is

1    completely inconsistent with the purpose and the circumstances

2    surrounding the settlement agreement.  Epsilon's proposal for

3    that Baltzley pad were new wells.  They didn't propose any work

4    on the existing wells.  And the parties didn't dispute in that

5    lawsuit anything about the operatorship of wells, of work that

6    will be done on existing wells.

7           So we really believe it is somewhat absurd to suggest

8    that rather than resolving the settlement agreement, the

9    primary issue involved in that case, who could serve as an

10   operator for a new well, that for some reason the parties

11   wished to interject this paragraph that addressed an issue that

12   was never raised in the lawsuit and was never a dispute among

13   the parties.  It just doesn't make any sense.

14          Our interpretation makes sense.  We recognize that it

15   says to the extent permitted under the JOAs.  And Mr. Raleigh

16   explained exactly why that exists.  We are talking about new

17   wells, but we don't have the right to designate a

18   non-consenting party to serve as the operator.  But there's a

19   logical reason why you want the designated party to be a

20   consenting party.  Because if it's not the operator who already

21   has sufficient reason to understand that they had some skin in

22   the game, you needed to make sure that the consenting party

23   designated as the operator had some financial incentive, was

24   aligned with any of the other consenting parties to ensure that

25   it was acting on their behalf.

1          Epsilon's interpretation of this paragraph is

2     consistent with the other language in the document.  Epsilon's

3     interpretation of this paragraph is consistent with the purpose

4     and the circumstances surrounding the settlement agreement.

5     It's the only reasonable interpretation, Your Honor.

6          The same is true as far as the likelihood of success

7     on the merits with respect to the joint operating agreements.

8     If we want to look at, you know, it was Exhibit 1, which was

9     the Craige JOA, and we focused extensively on the very caveat

10    at the beginning of the JOA -- I think it was on page ten --

11    that had the language in Article VI.2(a), that first sentence

12    that we have looked at; the one that Chesapeake claims is the

13    entire basis for their argument that unanimous consent is

14    required to drill a new well.

15          If you look at it, one thought, Your Honor, is if

16    someone really wanted to create a requirement of unanimous

17    consent, it would have been a lot easier to do.  Right where it

18    says operations by less than all parties, it would have been

19    pretty easy to insert something to say no new well shall be

20    drilled without the unanimous consent of all parties.

21          Notwithstanding anything to the contrary here,

22    unanimous consent is required.  Something to that effect would

23    have been very, very easy and simple if that was the intent of

24    the parties.  But again, Your Honor, looking at this first

25    paragraph, as the witnesses have testified, the first sentence

1    of this article VI.2(a) involves a limitation.  The purpose of

2    it is to impose a time limitation.  If the consenting parties

3    don't commence the operations within 90 days, then they cannot

4    move forward.  Excluding drilling from that sentence ironically

5    is intended to make it easier to drill wells as opposed to the

6    non-drilling activities, not to make it harder or to prohibit

7    it.  And again, Mr. Raleigh explained to you what the logical

8    reason is of why that distinction exists.

9           These JOAs were signed in 2010 in a geographic region

10   where there hadn't been a significant buildup of

11   infrastructure.  And it's conceivable that depending on the

12   location of the wells that it might be a little more

13   challenging to commence them within 90 days.  And that's the

14   reason why there is a distinction.

15          But secondly, and we went through the paragraph in

16   detail, Your Honor, the notion that if unanimous consent to

17   drill a well is completely inconsistent with the rest of the

18   language in this article, we looked at subsection (b) on page

19   11 that is entitled relinquishment for interest of

20   non-participation.

21          And Mr. Raleigh explained the purpose of this

22   paragraph.  The purpose is to recognize that if parties don't

23   consent, they are not going to contribute capital, and then the

24   consenting parties are going to need to find a way to fund the

25   work to fill in that gap with those missing dollars.  And if

1    the consenting parties put more money in, then there's a

2    reasonable expectation that they should get paid back for that

3    and that they should not just get their capital back but some

4    multiple of that.  That's the purpose of this paragraph.

5         So if drilling would not be able to be an undertaking,

6    then there would never be a reason to invoke this paragraph

7    with respect to drilling.  Ever.  And you would not expect to

8    see drilling in this paragraph.  Ever.  We counted four

9    separate times where this provision of the agreement refers to

10   drilling.  The most glaring one, Your Honor, is right around in

11   the middle, I think, where it says -- it's the reference to if

12   any well drilled, reworked, sidetracked, deepened, re-completed

13   or plugged back, which is around line ten, it goes on to say --

14   oh, and that's including any well drilled.

15        If it ends up being a well that is capable of

16   producing in paying quantities, then the consenting parties are

17   to complete and equip the well, and then they are to turn it

18   over to the operator.  And there's a parenthetical if the

19   operator did not conduct the operation.

20        That sentence tells us two things, Your Honor.

21        Number one, we're talking about drilling a new well;

22   and number two, that new well can be drilled by someone other

23   than the operator.  One of those designated parties is going to

24   hand it back over to the operator so that once it's drilled, it

25   can be maintained, just like all the other wells under the

1    JOAs.

2         Third and finally on this point, Your Honor, is just

3    looking outside of the document; Chesapeake's own conduct is

4    completely inconsistent with its interpretation of this portion

5    of the JOAs.  Chesapeake has drilled multiple wells without the

6    unanimous consent of the parties.  The wells were drilled

7    recently, after the settlement agreement had been entered in

8    2018.  And Chesapeake relied on the very same article that we

9    have looked at, the very same article that Chesapeake says we

10   are not allowed to utilize to drill new wells because there

11   isn't unanimous consent, but Chesapeake used those, that same

12   provision.

13        We're not going to walk through it here, Your Honor.

14   But I think you may recall the testimony where we had the Maris

15   well was the letter that was sent from Chesapeake to Epsilon to

16   advise that other people had non-consented and offering Epsilon

17   options of hey, how are we going to pick up or carry those

18   non-consenting parties' loss.  And there's three options you

19   have, Epsilon; one, two and three, which one would you like to

20   select.  And when you look and you compare that letter with

21   one, two and three, that is exactly the language in Article II

22   of the JOAs, (i), (ii), (iii).  The language is lifted right

23   out of the provision of those JOAs and put right in the letter.

24        So the easiest way to characterize it, Your Honor, is

25   if, in fact, that Chesapeake's position was correct and there

1   was veto power, that veto power would apply to everyone, not

2   just Chesapeake.  They don't have veto power.  Wells can go

3   forward without unanimous consent.

4         I want to shift gears then, Your Honor, and move to --

5   because I think it is very clear that the operatorship itself,

6   we can serve as the operator.  We have established the

7   likelihood on success of the merits on the issue.

8         So the next issue is what assets can we utilize.  Are

9   we allowed to utilize the Wyalusing creek water point, are we

10   allowed to utilize water impoundment.  What about the Craige

11   well pad?  So those are the issues I think that I want to

12   address.

13         I want to start with the Wyalusing Creek water point.

14   I think it's the most complicated and has the most moving

15   parts.  But I want to start with a simple -- backing up and

16   starting with a simple is just look at the settlement

17   agreement.  The settlement agreement Article 8(d) specifically

18   says that Chesapeake will cooperate by making co-owned assets

19   available, including water withdrawal points.

20         If there were no co-owned water withdrawal points, why

21   would that be in the settlement agreement?  And that settlement

22   agreement didn't list all of the co-owned asset nor was it

23   intended to.  It only listed a couple of them.  But it listed

24   some of the most important ones.  You have heard that the water

25   and the availability and access to obtain and store water is

1    one of the more significant portions of drilling a new well.

2    that's why that reference is in there.

3          Mr. Raleigh had testified that do you know how many

4    Epsilon had any interest in, co-owned or solely owned at that

5    time.  One.  Wyalusing Creek.  That was it.

6          So that's the easy part, Your Honor.  The mere fact

7    that the settlement agreement references it suggests that there

8    was a co-owned Wyalusing Creek water source.  Then just to back

9    up and look at some of the elements that came into play, Your

10   Honor, the question becomes in the farmout agreement, that's

11   kind of where that issue starts.  Did Epsilon convey an

12   undivided 50 percent of that docket for Wyalusing Creek to

13   Chesapeake or not?

14         And again, I think we can look at two things.  One,

15   what does the agreement say; and two, what makes sense under

16   the circumstances.  And if you look at what the agreements say,

17   the farmout actually says that permits are included.

18         The farmout agreement has very general language that

19   says -- almost a catch-all language, if you will, Your Honor,

20   says, "Any other assets that we owned that is utilized to

21   develop the general area in Susquehanna County and the

22   northeast county."  Those are included.  As far as we can tell,

23   the only argument Chesapeake made in response that said yes,

24   but you had a list of exhibits, you know, of different assets

25   and you didn't specifically list Wyalusing Creek on those

1    attachments.   That's true.

2          But Your Honor, the paragraph said that that was

3    including, but not limited to, the assets that were identified

4    on those charts.  And I have worked with many a deal lawyer

5    with our different firms, and while they do their best to list

6    assets, particularly when you are so selling such a large group

7    of assets, that they always include including, but not limited

8    to.  And they describe the category of asset and they may try

9    to identify on lists or, you know, exhibits those assets.  But

10   that is never intended to be all encompassing so that if they

11   forget something, it wasn't conveyed.

12         But then there's the common sense, Your Honor.  Why in

13   the world would Epsilon convey an undivided 50 percent interest

14   under the farmout with the intention that if things worked out,

15   it wasn't going to be a very active operator.  Its intention

16   was that Chesapeake become the operator.  The hope was that we

17   weren't going to be doing a lot of operating.  And this was an

18   important asset that we used to drill our eight wells before

19   the farmout.  Why would that be something that wouldn't go

20   along with the farmout -- the other farmout assets?  Why would

21   we have retained it?

22         But Your Honor, the permit that -- the docket name,

23   like the name on the docket was, in fact, transferred from

24   Epsilon to Chesapeake.  It was done a month or two later, after

25   the farmout.  So the timing is consistent with the notion that

1    Epsilon is not likely to be utilizing that.  It's more likely

2    that Chesapeake was going to be the party that would be

3    utilizing the Wyalusing Creek water withdrawal.  They can't be

4    listed both on the docket.  Only one person can be listed on

5    the docket.  SRBC wasn't going to allow them both.

6          So there is common sense why the docket was

7    transferred a couple months later.  And we have proven in this

8    hearing, Your Honor, that the name on the docket is not the

9    same as ownership of the right to take the water.  Those are

10   separate.  And we prove it through two ways.  Number one, we

11   have established that through our relationship with our

12   contractor, Turm Oil, that there was a distinction between

13   legal ownership of the rights to take the water and whose name

14   the docket was in.

15         To the outside world, Turm Oil is listed on that

16   docket.  They were listed as the owner.  But we had a private

17   master services agreement with them, in which they acknowledged

18   that all of the actions they were taking were on our behalf.

19   We were paying them.  In return, any permit for similar assets

20   that they required in their own name were really ours.

21         But secondly, Your Honor, the SRBC approval documents

22   themselves have a condition in them.  We read it into the

23   record, and it states, "Commission approval confers no property

24   rights upon the property sponsor."  So that means that the

25   approval document itself, the fact that the approval is granted

1    and the docket is being entered into the quote/unquote owner's
2    name is not akin to a property right.  It's not evidence of a
3    property right.

4         So what is Chesapeake's position in this case?
5    Exactly what the SRBC says doesn't work.  It's not the way it
6    works.  Their argument is well, you transferred the docket to
7    our name.  That equals ownership.  That's exactly what the SRBC
8    doesn't work.

9         But also, one of the things that we have asked from
10   the outset of the case, and the evidence is closed now and we
11   never heard, was there any separate consideration paid?  No.
12   If this were a separate transaction, completely separate from
13   the farmout, we have established in this proceeding that the
14   SRBC docket has significant value.  The right to take water is
15   valuable.

16        If this wasn't part of the farmout, why would Epsilon
17   have just given Chesapeake this valuable right a couple months
18   later?  We didn't get paid for it.  There's been no evidence of
19   compensation paid because there wasn't any.

20        Now, there's also been some testimony and almost a
21   suggestion by Chesapeake that somehow the fact that the permit
22   in which the parties owned an undivided 50 percent interest was
23   combined and consolidated with a separate permit or docket that
24   was associated with Chesapeake, that in some way, shape or form
25   that extinguished our property rights.  And that is simply not

1    the case.  There is no question that the two separate dockets

2    were combined into one.  But why would there be a suggestion

3    that somebody's rights extinguished, and one of the two of them

4    actually owned the right to take the water?

5          And there was some evidence in questioning about the

6    fact that one of the approvals referred to a docket being

7    rescinded and superseded.  But in context, that's not -- I

8    mean, that would be expected.  You've got one docket that was

9    in Epsilon's name that referred to the withdrawal of 216,000

10   gallons of water per day.  You've got a second docket that was

11   in Chesapeake's name that had 499,000 gallons of water per day.

12   Once you combine them, and we have got a new third permit for

13   715,000 gallons of water per day that can be withdrawn, you

14   obviously have to get rid of the two prior permits.

15         Of course they have to be rescinded or superseded,

16   because otherwise, somebody might make the argument that

17   there's the right to withdraw over 1.4 million barrels --

18   gallons of water per day.  You can have the two stand alone

19   separately and still have them consolidated.

20         I laugh thinking about this, Your Honor, because every

21   time I drive through Latrobe, you know the home of Arnold

22   Palmer -- I'm not a golf person like Mr. Brier here.  But my

23   kids loved Arnold Palmers.  When they were kids, they always

24   wanted to have Arnold Palmers.  I learned that an Arnold Palmer

25   is half iced tea, half lemonade and you put them together.  So

1  if I've got a gallon of iced tea here in one glass, and I've

2  got a gallon of lemonade in the other and I and pour the two of

3  them together, I have combined them, I've consolidated them.  I

4  don't have iced tea anymore.  I don't have lemonade anymore.

5  I've got an Arnold Palmer.  Now, I have still got two gallons

6  of liquid.  They didn't get rescinded.  They still exist, but

7  they exist now as a separate entity.

8       You know what, there's been talk about which

9  coordinates existed for where was the water taken.  Bottom

10  line, it doesn't matter.  I mean, if I made my Arnold Palmer,

11  does it matter which glass I poured it into?  If I poured the

12  lemonade into the iced tea, does that mean the person who owned

13  the iced tea glass owns it?  If I pour it back into the other

14  glass, does that mean one owns it and the other doesn't and

15  they can exclude them?  Of course not.

16       That's what we're talking about here, a combined

17  docket.  The other two cease to exist.  What we have got here

18  is essentially something new, and it's a something new that

19  both parties contributed to and they have an undivided interest

20  in it.  And we're not suggesting that Epsilon has the right to

21  exclude Chesapeake from it.  But what we are suggesting is that

22  Chesapeake doesn't have the right to exclude Epsilon from it.

23       Now, I think, Your Honor, I said that was the trickier

24  issue.  As far as the Marbaker impoundment, the Craige well pad

25  and some of these other issues, I don't think it's really much

1    of a dispute any longer.  We have submitted a stipulation, Your

2    Honor, that replaced essentially the live testimony of

3    Mr. Bond.  I think the parties are in agreement now that there

4    is no dispute that Epsilon paid its pro rata share of the cost

5    of building the Craige well pad and that we own an ownership in

6    the Craige well pad.  And the same is true with the Marbaker

7    impoundment.

8            So having paid our pro rata share of those costs and

9    owning an interest in them, we're allowed to utilize them if we

10   are serving as the operator under the JOAs.

11           And the final point to note, Your Honor, is more just

12   an issue of fairness.  We heard testimony that the Craige oil

13   and gas lease that actually gave rights to minerals on the

14   Craige property was eventually obtained by Epsilon.  We had a

15   swap with Chief and we acquired that lease, and we have a

16   relationship with the Craige family.

17           There would not be a need to put a pad out there and

18   do all of that development but for the assets that Epsilon

19   contributed to the JOAs.  That's exactly what Mr. Raleigh

20   testified earlier, is you don't contribute assets to the JOAs,

21   have them developed and enhanced, contribute to the funding and

22   then not be able to use them.

23           So I do believe, Your Honor, we have also established

24   a likelihood of success on the merits; not just that Epsilon

25   can serve as the operator, but also standing in the shoes

1   temporarily for Chesapeake, we are entitled to use all of the

2   assets that Chesapeake could have used.  Those are assets that

3   we co-owned.

4           I want to shift gears, Your Honor, and talk about

5   irreparable harm.  It is undisputed we are talking about

6   property interest.  We are talking about oil and gas property

7   interests.  I think we have introduced evidence that oil and

8   gas wells, to develop those property interests, are unique.

9   Each one is different.  We're not talking about fungible goods

10  or even fungible construction.  They're all good.  Chesapeake's

11  actions are preventing Epsilon from moving forward to develop

12  its unique property.

13          Under Pennsylvania law, under Third Circuit law,

14  though, we believe that that interference in and of itself

15  constitutes irreparable harm.  Period.

16          And I know we have cited certain law in our briefs,

17  the Minard Run case was a similar case where the inability to

18  develop assets was deemed to be irreparable harm.  And Your

19  Honor, that's why we did want to introduce into evidence the

20  briefs that Chesapeake has filed in the other case; not so much

21  that it's super important as far as the unique circumstances of

22  every case but more for the general proposition that it's

23  pretty well known in the oil and gas industry that development

24  is important, being able to access your assets and harness them

25  is important.  And Chesapeake makes the same argument and

1    relies on the same case law that we rely on when we're denied

2    access to our property interests in the minerals.

3         Now, in conjunction with irreparable harm, Your Honor,

4    there's been some suggestion that we can simply just re-propose

5    these wells and there will never be any issue or problem with

6    doing so.  We can take our time period that exists now and just

7    pick it up and move it out six months and plop it down and it's

8    the same.  Maybe.  But there is a good likelihood that is not

9    the case.  Circumstances change between now and then.

10        As, you know, Mr. Clanton testified, what if anyone

11   makes a competing well proposal in the interim and our proposal

12   gets outvoted?  We are never going to be able to drill those

13   wells again, potentially.

14        But, what about -- you know, it's an assumption that

15   capital is available, that equipment will be available down the

16   road.  There is still a lot of assumptions that that well is

17   going to be able to get drilled.  And you know what?  What

18   about the costs?  Do we have to re-submit -- depending on how

19   far down the road we are, that proposal is six, seven, eight,

20   nine months old.  Do we have an obligation to go back and rebid

21   it, price it and figure out how it's going to work?  Maybe.  Is

22   that still a viable option at that point in time?  I don't

23   know.

24        But Your Honor, there is also case law in Pennsylvania

25   that says, The repeated -- having to bring repeated lawsuits

1    over and over to vindicate one's rights also can constitute
2    irreparable harm; that if you are repeatedly getting shot down
3    and frustrated as far as exercising your rights, it's not fair
4    to make you come back every time it happens, file a lawsuit,
5    seek damages and try to collect your damages.  And the next
6    time it happens, file a lawsuit and try to collect your
7    damages.
8             That's what we're looking at here.  This is already
9    the second time.  If we have to re-propose this well in three
10   weeks, do we have a reasonable expectation that we are going to
11   be able to proceed with it, that Chesapeake is going to say
12   okay, we decline to participate but you go ahead and serve as
13   the operator?  It's going to be continuing litigation, Your
14   Honor.
15            Then when there is irreparable harm, we did talk about
16   the Auburn gathering system and the costs associated with that
17   and how those could be calculated.  As, I believe, Your Honor
18   pointed out, part of the problem is we don't have perfect and
19   complete information from Chesapeake about future plans, future
20   development.  And if we had that, that we might be able to
21   calculate monetary damages, which is true.  But that doesn't
22   necessarily mean that there is no irreparable harm on that
23   particular issue, that that's not a second component of
24   irreparable harm.
25            The reason, Your Honor, is twofold.  Number one, while

1    that may happen in a particular lawsuit, we don't necessarily

2    have a right to force Chesapeake under the JOAs to give us all

3    of the information we want.  We think they should.  We would

4    like to sit and meet with them and work through them and think

5    that it's the right thing to do in order to have a true

6    commercial partnership in these issues; say here is what we

7    would like to do, what would you like to do.

8         We would like to think that they'll work with us.  But

9    if they decide not to, we're not suggesting we're going to file

10   an injunction action and march in and force them to give it to

11   us.  So what we are really talking about is more just a

12   repeated lawsuit.  In any single lawsuit maybe we might be able

13   to calculate damages.  But we're not going to be able to do

14   that on an ongoing basis in our business.  We are just going

15   to have to keep filing repeated lawsuits and then trying to

16   quantify the damages.  That's still irreparable harm, Your

17   Honor.

18        Finally, we did have testimony about drainage of

19   wells.  It might not apply to all of the wells that we have

20   proposed but certainly at least one of them.  You've got the

21   serious possibility that that well, the value of the well is

22   declining because we have a competing well out there that could

23   be draining the gas that would be available to that Craige

24   South well.

25        Now, some examination questions had suggested yeah,

well, didn't we formerly own that adjacent property and then
swap it to somebody else? Yeah. Did we get paid for that?
Yes. But does that mean that somehow we gave up our right to
rely on drainage or we expect drainage to occur? No. We
expected to be able to drill a well down in that area and drain
the gas. They are not mutually exclusive, I guess is the
point, Your Honor.

Now, that's also an example of a situation, Your
Honor.

What is the -- how would we calculate those damages?
Irreparable harm is for something that's hard to calculate.
There's been some comments from Chesapeake that said geeze, you
guys are just speculating. You can't even prove that this
drainage occurred. That's true. I don't know that we can
perfectly guarantee that it was happening.

Your Honor, under Pennsylvania case law with the Rule
of Capture, you can search oil and gas cases where one property
owner says you know what, you're draining the natural gas from
beneath my property, you're converting my property. And the
Courts come back and say no, under the Rule of Capture, that's
not the way it works. If someone is draining lands from
underneath your property, what you do is you drill your own
well. That's how you address that.

So the fact that drainage exists and occurs, it is so
common and so understood that there is an entire body of law

1   with the Rule of Capture that says the whole reason we tell you

2   to go drain your own well is because we understand that

3   drainage occurs and we understand it's very challenging to

4   actually prove in any specific instance whether it has occurred

5   and the extent that it's occurred.

6       Your Honor, I do believe that we have established a

7   number of different elements of irreparable harm.

8       But in that regard, I do want to address a couple of

9   issues that have come up.  These are issues about the timing of

10  the operations and the type of operations that have to occur.

11  And I think it's -- you know, it's obvious that it's important

12  to the case to say; number one, the proposal is expired

13  already; and number two, can the work get done, or is the

14  failure to get work done going to moot the necessity for an

15  injunction in this Case.

16      So I guess the questions becomes; number one, what has

17  to be done under the proposals; and number two, when does it

18  have to be done.

19      I think they are separate issues.  I would like to

20  address the first, the initially what has to be done.  The

21  answer -- and I think Mr. Clanton said it.  The answer is

22  Epsilon needs to commence operations on the wells.  That's what

23  has to be done in order to keep the proposals.  I should say

24  that.  If you actually read the summary that says, "Must

25  commence operations and then continue with reasonable diligence

1    to complete them."  So it's not like we can get

2    boots-on-the-ground on the well pad and do something and then

3    just stop and leave.  Once you have commenced a well operation,

4    you have to act with due diligence to carry out the remainder

5    of the operation.

6         So you know, where does the timeframe come from?

7    We're really looking at the 30-day extension.  That's what has

8    come into play is where does this -- I'm sorry.  I don't want

9    jump out, I want to keep it with the operations because the JOA

10   clearly refers to commencing operations.  But some of the

11   questions came up and said but what about the well proposals.

12   The well proposals themselves refer to a anticipated spud date

13   of April 22nd, not commencing operations.

14        And the question then becomes well, did Epsilon

15   actually amend the contract and say I'm not bound by commencing

16   operations, now I have to do more than commencing operations.

17   That's not good enough for my well paid.  I need to go beyond

18   that and I get all the way to spudding.  That's the way the JOA

19   works.  The answer is no.

20        No.  The only thing that we put in that is governing

21   in the well proposal is when we expect or when we have to

22   commence operations on the well.  Okay.  If we had to do more

23   than that and go down the line we anticipated spudding, we

24   didn't amend the contract to actually create a -- we'll say

25   more work that we had to do by the day we designated.

1    I think the example to illustrate this, Your Honor, is
2 what if the inverse had happened?  If we believed that
3 commencement of operations -- and it's a little bit difficult.
4 Some people disagree on it.  And we don't say okay, it's not
5 just back-end operation, just sitting down in an office in
6 Houston and mail things out, we're not trying to argue that
7 that would be commencing operations.

8    We think a more cautious approach and a more
9 reasonable approach is to say you have got to be on the pad.
10 I'm not saying you have to spud the well.  I'm just saying you
11 have got to be doing a lot of things on the well, the pad, to
12 start preparing it.  That's commencement of operations.

13    What if we had put in our well proposal you know what,
14 we only have nine employees.  Let's say we were going to hire a
15 couple of new employees and we put in our well proposal, that
16 by May 22nd of 2021, we will have interviewed and hired two new
17 people who were going to be involved in this project.  And we
18 satisfied it.  We meant what we said in our well proposal.

19    Have we satisfied the JOA?  No.  We haven't commenced
20 operations.  We have the right to pick a time period for
21 commencement of operation.  That's what the JOA says, and that
22 is what is governing in our proposal.

23    But we are not allowed to change what commencing
24 operations is in our well proposal, either for the good or the
25 bad?  We can't try to get us more latitude.  But if we did

1    something like what we did here, which is honestly hope and
2    expect that we would be able to spud by now, if we didn't meet
3    that, that doesn't mean our proposal expired because we didn't
4    spud.  We still just have to commence operations.
5            So I want shift gears now and focus not on what we
6    have to do but when we have to do it.  Again, there's been some
7    discussion back and forth about this 30-day extension and how
8    it applies.  I would like to pull up -- if we can focus here on
9    the language of Exhibit 1, which is the Craige JOA.  And we are
10   actually on Article VI.1.  It's on page ten.
11           We've looked at this provision that talks about the
12   30-day extension.  But we recognize that while this is relevant
13   and it's important, it's technically not the direct section
14   that applies, because this is talking about a well in which
15   there are nothing but consenting parties.  That's the section
16   of this agreement.  This portion is in the section that says
17   consent of all parties.
18           Okay.  And what it says is, "However, said
19   commencements may be extended upon written notice by operator
20   to the other parties."  Okay.  Stop right there.  In that
21   circumstance, the operator would be Chesapeake and the other
22   parties are the parties -- everyone who is getting notice is a
23   consenting party.  In this case it happened to be everyone.
24   But other parties is referring to consenting parties, because
25   this is a situation in which everybody has consented.

1          And then the provision goes on to address the

2    circumstances in which this 30-day extension could be taken.

3    And it includes things like the need to get permits and surface

4    right issues and appropriate drilling equipment.

5          So that is where the notion of this 30-day extension

6    applies.  It emanates in a section that involves consent of all

7    parties, and it describes how it works.  Well, then if we can

8    flip the page and we're going to say is this same concept

9    incorporated into the drilling of a well in which somebody does

10   withhold consent and that it is going forward without the

11   consent of all the parties, and the answer is yes.

12         At the top of the page it says, "If 100 percent

13   subscription to a proposed operation is obtained" -- and that

14   means that we have got enough to -- we have carried everybody's

15   interest and it's going to move forward.  Then it says, "The

16   proposing party" -- well, that's not Chesapeake necessarily

17   anymore, that's Epsilon -- "shall promptly notify consenting

18   parties."  Not the non-consenting parties, the consenting

19   parties -- "of their proportionate interests in the operation

20   and the party serving as operator" -- which is, again, in this

21   instance, Epsilon -- "shall commence such operations within the

22   period provided in Article VI.B.1, subject to the same

23   extension rights as provided therein."  So that is where they

24   are incorporating back.

25         Again, Your Honor, there is no Article VI.B.1

1  technically because the B was omitted in the provision we just

2  looked at.

3          But Your Honor, look at the subject matter.  It is

4  talking about the same circumstance.  They are talking about an

5  extension of how long you have to commence operations after you

6  are ready to go forward.  It's the exact same time period that

7  we just looked at, but it's in the context of when you have

8  non-consenting parties.

9          And because we are looking at it, it is in a sentence

10  that is talking about notice being provided, and it's from the

11  proposing parties to the consenting parties, that why we didn't

12  need to include non-consenting parties when we provided notice

13  of our right to invoke that provision.  That's where the

14  language comes from, Your Honor.  It is in the very same

15  sentence about providing notice to consenting parties.

16          So, in this instance Mr. Clanton testified that he did

17  invoke that provision.  We had permitting issues.  Permitting

18  issues brought us here today, Your Honor.  So I don't think

19  there is any dispute that we have got delay in obtaining a

20  permit and our water management plan being approved.  So in

21  this instance, all we had to do was invoke it and provide the

22  notice to the consenting parties.

23          And Your Honor, in three of the four wells, it's just

24  us.  We are the proposing party.  We don't have to provide

25  anyone else with written notice because we are the proposing

1     party.  While we disagree with a lot with Chesapeake, I doubt

2     that they are going to say that we should have provided written

3     notice to ourself.

4           So that really is only talking about one well.  The

5     Craige South well was the only well that we had to provide

6     notice.  And Mr. Clanton said he did.  The only evidence that

7     came into court on that issue, they said did you provide

8     written notice.  He said yes, to the consenting parties but not

9     to the non-consenting parties.  So there is nothing to refute

10    that.  It is undisputed that written notice was provided to the

11    consenting parties in the only situation where there were

12    consenting parties other than Epsilon.

13          That, Your Honor, is why we have established that it

14    is reasonably likely to succeed on the merits that what we have

15    to do is commence operations, which we can do by May 22nd if

16    Your Honor rules in our favor, and that the May 22nd is the

17    appropriate deadline because we satisfied the obligation, the

18    requirement of invoking that 30-day notice.

19          Finally, Your Honor, the issue I want to address is

20    kind of the harm to the public and the issues in that regard.

21    As we said at the outset, that we thought that the accusations

22    that Epsilon is not capable and qualified to perform this work

23    safely, we're not -- it's just that, accusations.  I think that

24    we have established that in this hearing.

25          Granting this -- granting us access to do the work is

1    not going to cause harm.  Harm will only occur if a mistake is

2    made or if something problematic occurs on the well pad.  And

3    there is simply no evidence and no basis to believe that any

4    problems will arise on the well pad.  The undisputed testimony

5    is that Epsilon utilized and will utilize the same

6    subcontractors that are experienced in the area that most other

7    operators use in this region, including Chesapeake.

8          But Your Honor, the evidence also came in that

9    Epsilon's management personnel are very, very experienced.

10   There might not be a lot of them, but they are very, very

11   experienced.  And they have had experience in these type of

12   operations, and they are certainly capable of managing the

13   subcontractors that they have.

14         But again, Your Honor, to establish that some of this,

15   I think, are just accusations or subterfuge, let's look back at

16   some of these agreements.  The settlement agreement said that--

17   well, let's say it contemplated that there would be a situation

18   where there will be multiple operators on a well pad.  If it

19   was so very dangerous to have Epsilon come out and have two

20   operators on the well pad, why we would they have ever signed

21   that settlement?  It was just a couple years ago.  We didn't

22   have any more experience then than we do now.  But Chesapeake's

23   response says whoa, whoa, whoa, we disagree with your

24   interpretation.  We only said that you can only serve as the

25   operator for the non-new well activities, not to drill a new

1    well.

2           Well, we disagree with them.  Think about it.  There's

3    five other activities that are listed.  What they're saying is

4    it's okay to have two operators on the well pad if you are

5    performing other activities, just not drilling.

6           Well, what are those other activities?  Deepening a

7    well.  You're going deeper.  You've still got to have a permit.

8    You've still got to bring the big drilling rig on.  That's

9    still going to happen, under their argument, if we would have

10   proposed some work on an new well -- or I'm sorry -- on an

11   existing well, and they said okay, come on, you guys can serve

12   as the operator, we would still be on the same well pad, we

13   would still have the drilling rig for some of those activities;

14   not all of them, Your Honor, but at least some of those

15   activities we would be doing the same or similar activity that

16   would create the alleged risk that they are relying on in this

17   case.  But they are saying in similar circumstance we can do

18   that; we can be on the well pad.

19          So Your Honor, that -- we have certainly established

20   that there is no significant risk of us being on the well pad

21   operating at the same time that the existing wells are there.

22          So you know, in conclusion, Your Honor, I think the

23   overarching thing that we have learned from these facts is that

24   Chesapeake is not going to honor those agreements.  They are

25   just not going to.  They'll find a different argument of some

kind, but it's going to be a new argument or a different
argument to say whatever it is, we can't operate it.

What it comes down to is it looks like Chesapeake
wants the benefit of JOAs and joint development without the
corresponding tradeoff.  That's what JOAs are.  Everybody
contributes their assets.  Chesapeake is the operator.  They
get to perform the day-to-day operations, but they don't have
any more control over which activities should be undertaken
than Epsilon or any other JOA party.  That's the way it works.

They don't like it now.  They took the assets.  They
had no problem taking the Craige oil unit and putting their pad
out there.  But now what they don't want to do is allow us to
participate in the decision making and move forward if they
don't want to participate.  They took the benefits of the
settlement agreement.  We drilled the -- most of the wells they
wanted to drill on the short term, and we had a moratorium
where we didn't propose any wells.  They want to deprive us the
benefit.

Your Honor, two lawsuits is enough.  If we don't get
injunctive relief, there's going to be a third and maybe more.
So we implore the Court to grant the injunctive relief, allow
Epsilon to get out and get on the well pad so that we can
commence operation and we can move forward and take advantage
of the benefit of our unique property interests.

Thank you, Your Honor.

1          THE COURT:  Thank you, Mr. Krock.

2          On behalf of the Defendant, who will present the

3    closing argument?

4          ATTORNEY BRIER:  I will, Your Honor.

5          THE COURT:  All right.  Please proceed.

6          ATTORNEY BRIER:  Your Honor, Epsilon's motion for

7    preliminary injunction should be denied.  The testimony and

8    evidence that this Court has received over the last two days

9    establishes beyond cavil that this Court is being asked to

10   enter a mandatory injunction; a mandatory injunction that,

11   quite candidly, evolves every time Epsilon presents an

12   argument.

13         Candidly, if you wanted to enter an order that would

14   address what they really want, I don't think the Court has the

15   ability to do so, given how mandatory this injunctive relief

16   is.

17         They want to displace Chesapeake as the operator

18   without the other JOA parties being present.  They want to

19   require, whether you call it the plugging or the temporary

20   stopping of the current operational wells on the Craige pad,

21   they want to allow Epsilon to go out and -- this is quite

22   startling -- find a contractor.  They haven't even found a

23   contractor yet who would go in and do the drilling and

24   completing operations ten days before their deadline lapses and

25   to have that contractor come on where there's two operating

1    wells and perform these very dangerous services.  And also, to

2    bar Chesapeake from completing or proceeding with the Koromlan

3    well.  It's mandatory in tremendous proportions.

4         We heard Mr. Clanton testify that Chesapeake would

5    have to do certain things in order to prepare the well pad for

6    Epsilon to come on.  How could this Court possibly draft that

7    order, directing that Chesapeake do everything that Chesapeake

8    would need to do in order to safely transition the well pad to

9    Epsilon.  Epsilon has failed to meet the heightened standard

10   required for the issuance of a mandatory injunction.

11        When I made my opening remarks yesterday, I directed

12   the Court to the Bennington Food case, which again states that

13   when a party is seeking a mandatory injunction, they, and I

14   quote, "Must meet a higher standard of showing irreparable harm

15   in the absence of an injunction."

16        Now, the irreparable harm argument is really an

17   evolving argument.  In the last 48 hours it has evolved as

18   follows; "We're going to be really irreparably harmed because

19   the volumes going into the Auburn gas gathering system are

20   going to decline, and as a result of that, we are going to pay

21   higher gas gathering rates."  The Court heard a lot of

22   testimony on that.  We understand their interest in developing

23   in the Auburn gas gathering system.  I understand it a lot

24   better today than I did before.

25        It explains why we're here.  They want this Court to

1   direct the development because they are on both sides of the

2   transaction.  They benefit from working production as a working

3   interest owner in these JOAs, and then they capture 35 percent

4   of the revenue in the gathering system.  The riddle has been

5   solved, Judge.  The riddle has been solved.  That's why we're

6   here.

7           So you want to talk about irreparable harm, the next

8   argument is they are going to be irreparably harmed because of

9   some threat of drainage of their minerals.  We hear all about

10  Chesapeake's other cases and other briefs.  But let's talk

11  about this case.

12          What have you heard in this case?  You heard it from

13  Mr. Clanton.  You heard it from him.  I asked him, point blank,

14  do you have any evidence that there is drainage occurring of

15  your mineral interests because of Cabot's offsetting well.  And

16  unlike some of his other answers where I found him quite

17  evasive, he looked me right in the face and he said no.

18          Now today, his lawyer stands before you and uses this

19  phrase; there's a serious possibility of drainage.  What?  Was

20  he here when his witness said they have no evidence it?  This

21  Court is going to embrace that and say oh, I see that it's

22  irreparable harm.  It's something that could happen, but there

23  is no evidence that it is happening.

24          I asked him, point blank, don't you have a petroleum

25  engineer that evaluates your proved reserves who is able to

1    determine what those proved reserves are, and why didn't you

2    bring that petroleum engineer to court to say there's drainage.

3    Because there is no drainage, Judge. That's why even his

4    Counsel can't get the words out. He says there's a serious

5    possibility. That is so speculative. The reason they want to

6    argue that it's irrepairable is because it's not quantifiable.

7    Well, it's not quantifiable because it's not real. If it were

8    real, you would have seen evidence that there is drainage.

9              So the evolving irreparable harm argument, first, gas

10   gathering rates are going to go up. Little footnote on that;

11   the other side of their operation benefits from that, because

12   they are in the gas gathering field. So that's number one.

13   But as this Court said, and you were very deliberate in your

14   decision of Mr. Clanton, isn't it true, sir, that with the

15   authority of process of the Court in this lawsuit, you could

16   get the type of information you would need to bring an expert

17   in to calculate the lost profits or the lost profitably. It

18   took a little while to get there. Mr. Clanton admitted that

19   that's true. That's true.

20             But today in closing, it's like his lawyer wasn't in

21   the room. His lawyer forgets that. And he says we're going to

22   have a hard time compelling that information from Chesapeake.

23   We would like to think they would give it to us, but I'm not

24   sure we're going to get it.

25             Well, Judge, you couldn't have made it more clearer.

1    If this lawsuit proceeds, they can use the process of the

2    courts to seek information from Chesapeake, put an expert on,

3    and if it's real they will prove damages.  And on the point of

4    damages, the reason we're here on May 11 and 12, and we were

5    not here last month, is because when they came to court the

6    first time in March, they pled a case for damages.  They pled a

7    breach of contract case.

8         And the Court will remember on one of our first calls,

9    I said Judge, we filed an emergency motion in the Southern

10   District of Texas to enforce the injunction order of that

11   bankruptcy court.  They drafted their complaint and they lost a

12   month because of that.  Then they come back, having pled

13   damages, and they say our damages are incalculable.  How could

14   we ever prove damages?  The first case pled them.  Then we hear

15   that the threat of serial litigation is itself a justification

16   for irreparable harm.

17        Now, my memory, Judge, is absolutely imperfect.  I

18   don't think they have briefed that threat of serial litigation.

19   Serial litigation?  There was a lawsuit in 2018 that was

20   settled.  And the testimony that came out about that lawsuit

21   that is abundantly clear is that both of the executives of

22   Epsilon sat in this court under oath and admitted that

23   settlement agreement didn't alter, amend or modify the JOAs.

24        As this Court knows, nor could it because the absent

25   JOA parties were not parties to the lawsuit.  So whatever

1    rights Epsilon had before that paragraph eight was agreed to

2    and whatever rights Chesapeake had as the operator under the

3    JOAs existed without alteration after the settlement agreement.

4    The lawsuit is not about re-litigating that case.  It's about

5    the JOAs.  It's about whether Epsilon can meet this

6    extraordinarily high standard of convincing this Court that it

7    should grant a preliminary injunction.

8         So not only is the -- they have to prove two things,

9    immediate and irreparable.  They fail on the irrepairable prong

10   for the reasons I just said; the damages can be calculated.

11   They don't have any evidence of drainage.  This serial lawsuit

12   issue is new.  It's the second lawsuit, and I guess we want to

13   intimidate the Court with the threat that if you don't grant

14   the injunction, Judge, we're going to be here for another

15   injunction.  I can't stop them from coming to court.  But you

16   don't get to claim victory because you have come to back to

17   court.  You have to prove a case.  You have to prove immediate

18   and irreparable harm.

19        And you can't claim that the harm that is immediate

20   and irreparable is drainage and then run away from it when

21   you're confronted.  And you can't claim the lost value in the

22   Auburn gas gathering system and then admit that it's

23   quantifiable.

24        But then there's another prong.  It has to also be

25   immediate.  Mr. Clanton, in his testimony today, sat before

1   this Court and said we've had a business interest in developing

2   the gas gathering system, a serious business interest in doing

3   it for well over a year, back to Q-1, '20.  No doubt about it.

4   They did, they have, and they still do have that business

5   interest because they want to make money.

6          But that doesn't satisfy -- they can't come to court

7   in March, plead a case for damages, withdraw it, come back in

8   April, a full year after they say they were aware of this issue

9   and say to the Court now it is immediate.  You can't create the

10  crisis.  The judicial system doesn't reward people who sit on

11  their hand and then come to court a year later and say we,

12  today, have an emergency.

13         On either prong, they must prove both and they fail on

14  both.

15         We heard a concession, I think, today.  Just back to

16  that drainage issue for a second.  Three of the four proposed

17  wells run up into the acreage that Chesapeake and Epsilon

18  control.  Now, Judge, sometimes you just have to take a step

19  back and ask yourself, why wasn't that shared yesterday?  Why

20  did I have to pull that out, if they are going to ask this

21  Court to use its extraordinary powers and grant immediate

22  injunctive relief.  We're talking about drainage, and today

23  it's like ho-hum, so it doesn't apply to three of the wells.

24         And it does matter that they sold the parcel to Cabot

25  and got $1.375 million.  It does matter, because they didn't

1    tell the Court that yesterday either.

2          So when they're worried about drainage, they are

3    creating this perception that there is these offsetting wells

4    over which they had no input or control.  What's the truth?

5    They sold them the acreage and now they want to come to court

6    and say that creates an emergency.

7          Mr. -- my colleague may not like the way the JOAs

8    work, and he may not like the fact that the JOA says that if

9    they don't meet their own deadlines in their proposal, they

10   could re-propose.  I didn't put that in the JOAs.  That's what

11   the JOA says.  It goes to the issue of immediate and

12   irreparable harm.  They could reset the clock.  And if they

13   think Chesapeake reaches its obligations under the JOAs, they

14   come to court.  And this time they can do it timely to assert

15   their rights.  Our position is we are not violating the JOAs.

16         The Third Circuit in the Hope versus Warden, York

17   County Prison case, referenced this yesterday, too, is that of

18   a party seeking a mandatory injunction that bears a

19   particularly heavy burden of showing likelihood of success on

20   the merits and must show that their right to relief is

21   indisputably clear.  That's at 972 F.3d, 310.  The cite is at

22   page 320.

23         The Court has heard a lot about a highly-technical

24   industry.  Looked closely at the JOAs.  I don't know how this

25   Court could come to a conclusion that any right that Epsilon

1   claims Chesapeake is interfering with is indisputably clear.

2   There is a vigorous debate.  But their rights, as they assert

3   them, are not indisputably clear.

4           But I said to you yesterday if you don't believe me,

5   believe them.  And I reference the October 20, 2020 e-mail of

6   Mr. Clanton to Ms. Woodard.  Remember, this is after the

7   settlement agreement in '18.  It's after the parties have

8   disagreed over how the JOAs function.  Ms. Woodard asked him

9   what section of the JOAs are you relying on for your position.

10          And in his e-mail, one of the most remarkable

11  typographical errors I have heard about in my 59 years, he says

12  following our internal review, the hundreds of years of

13  experience that he and his colleague, Mr. Raleigh, have of the

14  relevant JOAs, we believe Article VI B(2), operations by less

15  than all parties, second paragraph is the article in the JOA

16  that will govern the proposals.  The second paragraph.  Not the

17  first paragraph they come running to court on, VI 2(a) that has

18  the interlineated language.

19          Not even a reference to that.  And Judge, you'll have

20  to be the judge of credibility.  Does anyone in this courtroom

21  believe that was a typographical error?  And to eliminate any

22  doubt, the language tracks the language in the second

23  paragraph.  So after he accidentally typed the second

24  paragraph, he then tracks the language about 100 percent

25  subscription.  And their interpretation, after their studied

1   review is that the incumbent operator (CHK) would serve as the

2   operator on behalf of the consenting party.  That's October of

3   2020.  It's after the issue has been framed, there's a

4   disagreement between the parties, there is not a hint of the

5   theory that is anything being indisputably clear.  Indisputably

6   clear.  So indisputably clear it's not referenced when

7   Mrs. Woodard says what section of the JOAs are you relying on,

8   and he said that his colleague was involved in the internal

9   review and agreed to what was written.

10          So I guess he adopted the typo.  Thought the typo was

11  the right answer.  Well, so did Mr. Clanton.

12          But as we move forward, there's a revisionist's

13  argument, because they need to create an argument that they

14  have the right to be designated operator.  So they go through

15  the JOAs and they find there's one paragraph in the JOAs where

16  a party who is proposing to do work, our argument is work in an

17  existing well.  Because that's what the interlineated language

18  says.  Their argument is -- proposes any well, any work, has,

19  in the first paragraph, a contractual right to be designated

20  operator if it complies with everything else in the agreement

21  in this paragraph.

22          So now, all the sudden they say without the second

23  paragraph, pay no attention to what we said a couple months

24  ago, it's the first paragraph.  That's why the reading is so

25  strained.  They want to say that language, that interlineated

1    language to rework, sidetrack, deepen, re-complete or plug

2    back, that's added to alter the time period under which things

3    would need to be done if that's what you're doing.

4            It's surplusage, if that's what they intended.  It's

5    sole surplusage, because any -- if that language were not

6    there, that's the exact amount of time that would apply to

7    reworking, deepening, side tracking a well.  Because it would

8    be collided within the entire notion in any proposal --

9            So their argument -- he calls mine absurd.  Absurd?

10   That that interlineated language limits that paragraph to the

11   type of proposal that could shift an operator.  I submit to

12   you, Your Honor, that their reading of it -- their reading of

13   it creates an amendment that means nothing, because that's how

14   much time applies anyway.  Now he says, oh, but wait, Mr.

15   Brier, you are mischaracterizing me.  What we're saying is you

16   have to do that work within the existing wellbore within the

17   time framed.  But if you are doing a new well, that time

18   doesn't apply.  That's how he wants you to read it.

19           Well, they amended it for the existing wellbore and

20   and they don't provide anything about the time period that that

21   would control a proposal on a new well.  But all of that is

22   noise, Judge, because we know what they did.  On December 22,

23   they proposed four new wells.  They started the clock and they

24   set the deadline.  They start the clock on December 22, and

25   they set the deadline at April 22.  And they anticipate that

1    the spud activity will occur by April 22.

2            So I argued -- I'm sorry.  I examined Mr. Clanton on

3    whether this entire case is moot.  Did their proposals expire

4    on April 22.  Yesterday, he answered his own Counsel and said

5    yes, our proposal expired.  Today he said that was a mistake.

6    That's not what I meant under oath in this court.  What I meant

7    to say is the language in Article VI 1 that begins at line

8    three and ends at line ten, that it is expressly conditioned on

9    those situations where all parties to whom such notice is

10   delivered and elect to participate, that that governs, and

11   that's what gives them the unilateral right to extend it to 30

12   days.

13           Your Honor, a clean way of dealing with this case is

14   to find that their proposals expired on April 22.  And that's

15   not unfair to them.  They start the clock.  They set the

16   deadline.  They came to this court with the complaint they had

17   to withdrawal, and they came back to court weeks later to cry

18   about an emergency, the same thing that they've been claiming

19   was an emergency last year.

20           If it was an emergency in the second, third, fourth

21   quarter of '20, why didn't they come to court?  Or is there

22   other explanation?  It wasn't an emergency last year, which is

23   my submittal to you, Judge, and it's not an emergency today.

24   They are just calling it one.

25           By the way, this notion that they have the unilateral

1   right to extend for 30 days if they give notice -- written

2   notice to the other parties, Mr. Clanton said well, that should

3   just say to the other consenting parties.  He doesn't like the

4   way that reads, so they interpret it to be other consenting

5   parties because they admit they haven't given notice to us or

6   to the absent JOA parties.

7          Equinor, as you know, Your Honor, is -- has a

8   significant interest in these wells and in this acreage, and

9   they didn't even get noticed.  Epsilon now views themselves as

10  the party who can solely extend for another 30 days and not

11  even give written notice.  There no evidence of a title issue

12  that would warrant the extension of 30 days, even if that

13  provision applied.

14         Your Honor asked some questions about the area of

15  review survey.  And this, I think, all falls under the big

16  umbrella of are they ready, are they credible, can they do what

17  they would ask you to order.

18         And what's the public interest?  Well, we saw in the

19  area of review survey, the depth regulation speaks to

20  protecting the waters of the Commonwealth of Pennsylvania.

21  It's not about Chesapeake.  It's not about Epsilon.  It's about

22  the public.  And Your Honor said to Mr. Clanton, Mr. Clanton,

23  is it your position that Chesapeake's lack of cooperation has

24  prevented you from sending out the questionnaires.  Well, Your

25  Honor, we didn't want to do that because we didn't want to tell

1    people what we are thinking about doing until we knew if the

2    Court was going to let us do it.

3           Minutes later on redirect -- or recross, Mr. Clanton,

4    haven't you already told the landowners in the affected area

5    that you intend to do these wells.  It took a little while, but

6    again, yes, we have told the landowners.  That's not credible,

7    Judge, for him to say the reason we didn't send out the

8    questionnaire, as required by the statute, is because we didn't

9    want to tell people until we knew what we were doing.  They

10   didn't do it because they don't expect to operate and they are

11   not to operate.

12          Your Honor also asked can't you look at the public

13   record and learn this information?  I think the answer was yes.

14   Yeah, that would be available to us.  But he says essentially

15   because big, bad Chesapeake won't cooperate, we can't comply

16   with that Pennsylvania Department of Environmental Protection

17   regulation.

18          Those are real safety issues, Judge.  There is nothing

19   hypothetical about going onto a well pad where there is two

20   producing wells and starting drilling and completing operations

21   for more wells.  This is really, really dangerous work.

22          That's why Mr. Clanton admitted, and I think it was my

23   last question on cross, "Is it true, Mr. Clanton, that you have

24   never, in the marcellus formation, gone into an existing well

25   pad where there is producing wells and conduct a drilling and

completing operation in a situation where there's a tremendous danger to public safety. He said yeah, we've never done that. He wants this Court to order it, though.

Do you have a collision survey? Yes. Have you shared it with anybody? No. Have you done the risk assessment? Yes. Have you shared it with anybody? No. How do they expect anybody to cooperate with them if they're not sending around the material that they are obligated to create under the regulations?

Your Honor also asked about the road maintenance agreement. And this was in the context of Your Honor probing what does spud mean. Mr. Clanton said first well, it's when the rotary drill starts hitting the earth. Well, how do those big pieces of equipment get there. Well, they get there on trucks. Well, do you have a road maintenance agreement. No.

Rush Township requires a road maintenance agreement. Judge, I was at this site last week. It is very mountainous. The dirt roads are narrow. They are barely passable with two cars, and there are road maintenance agreements for a reason. These roads get destroyed by this heavy equipment. So the Township says to the operator, which is anybody who wants to conduct operation, you can't ruin our roads. You can't come in and develop this property before you first sign a road maintenance agreement.

Now, imagine it's May 12th. They want you to order

1    that they start this operation and they don't have a road

2    maintenance agreement.  I didn't hear them say we interfered

3    with that.  It's not a serious proposal, Judge.

4         I just want to talk briefly about boots-on-the-ground.

5    As Your Honor notes, in the four proposals they talk about an

6    anticipated spud date.  They know there is no chance they will

7    meet an anticipated spud date, on May 22, June 22nd, July 22nd.

8    They are nowhere near getting on and doing that work based on

9    what they have admitted.  They don't even have a contractor.

10   There's nine people.  Three of them are here.

11        And by May 22nd, they are going to spud?  And they say

12   no, we're just going to put boots-on-the-ground.  Well, that

13   euphemism is not really helpful when you are considering the

14   safety issue and the fact that there is two operating wells.

15   And there is all kinds of work that would need to be done, and

16   the Court would have to order Chesapeake to do it.

17        They don't have the people to do it.  Their nine

18   people aren't going to come in and shut in two operating wells

19   safely so that they can complete whatever operations they call

20   boots-on-the-ground.  It would take weeks just to prepare the

21   site, just to get the matting down and do the other preparatory

22   work before you could do any of the work, before you could even

23   bring a truck up there.

24        Your Honor, I want to talk briefly about the water

25   thing, again, against the backdrop of indisputably clear.  My

1    colleague introduced into evidence Plaintiff's Exhibit 16.  No.

2    I'm sorry.  Plaintiff's Exhibit 14.  I'm wrong.  Plaintiff's

3    Exhibit 16.

4            Let me start over so the record is clear.  My

5    colleague introduced into evidence Plaintiff's Exhibit 16.

6    It's the aerial view of the Wyalusing Creek water withdrawal

7    satellite photo with the red pin-drop at the SRBC coordinates.

8    You actually heard testimony yesterday about how they believed

9    those coordinates were the coordinates from their Turm Oil

10   permit.

11           Recognizing that that completely fell apart in

12   cross-examination today, my colleague stands before you and

13   says -- I hope I quote it correctly.  I think he said the

14   coordinates don't make any difference or it doesn't matter what

15   coordinates there are.  Really?  What did we spend time

16   yesterday for introducing an exhibit that purports to put the

17   coordinate on the map so that this Judge would believe that the

18   current water withdrawal facility is the one from their 2008

19   docket.

20           That's because they wanted you to believe that the

21   water is being taken out of the Wyalusing Creek at the exact

22   coordinate points of their 2008 docket.  And when that fell

23   apart today, hours later we hear the coordinates don't matter.

24           They do matter.  And I'll explain to the Court why

25   they matter.  There is no doubt that the total gallonage

1    permitted under the 2017 docket, the 2012 docket, is a

2    combination of the gallonage permitted under the Turm Oil water

3    docket and Chesapeake's 2009 docket.  The gallonage has been

4    aggregated.  But there's only one withdrawal site.  And it's

5    either theirs from 2008 or it's ours.

6         And the reason they say it doesn't matter is because

7    they now know the coordinates of the current water withdrawal

8    facility are the coordinates of our water withdrawal facility.

9    But hoping you overlook that, they are dismissive of whether or

10   not it's relevant after trying to prove the contrary.

11        The state of the record is clearest.  The permit was

12   transferred 100 percent to Chesapeake after the farmout

13   agreement was signed and then registered with the SRBC at

14   100 percent to Chesapeake at the coordinates of Chesapeake's

15   water withdrawal site.  And the 2008 permit was superseded and

16   rescinded.

17        Now, my colleague offers an explanation that those

18   words shouldn't -- the Court shouldn't read anything into those

19   words.  But it's the plain language of the docket.  Their's was

20   superseded and rescinded.  The two were aggregated into a new

21   docket and the water is withdrawn at the coordinates of the

22   Chesapeake docket.

23        Another interesting point, Judge, is that this Court

24   has gone to extraordinarily lengths to permit the parties to

25   present this case on an extremely aggressive schedule.  You

1   have conducted interim argument, including an argument on their

2   emergency request that you order us to sign the letter for the

3   SRBC.  And you'll recall, Judge that the predicate behind that

4   request was that they needed to get it to DEP at least 30 days

5   before May 22 in order to allow DEP to act.

6         You know what you didn't hear a hint about in this

7   trial?  On May 12th -- if all of that was true back then, on

8   May 12th, how is it possible, that even if this Court wanted to

9   grant relief that it could do so in such a fashion that the

10  DEP, now in a less than a two-week period, and it will be

11  whenever the Court rules, would somehow come to ground on the

12  conduct, the review that they need to do.  Not a hint.  Not an

13  explanation.

14        While I wasn't on the call that Mr. Dempsey conducted

15  with the Court on this issue, I'm familiar with the transcript

16  and I am familiar with the Court's inquiry whether if you deny

17  the request, would it moot the request for the injunction.  I

18  thought the answer was obtuse.  But at least there was an

19  answer.

20        Today, on May 12th, after being told they needed 30

21  days ahead, there is no explanation of why they still have a

22  viable plan.

23        Your Honor, in your opinion, looked at the draft

24  letter that would go to the SRBC, according to Epsilon's

25  request, and noted in the last sentence of, I think, the second

1  paragraph that says it will remain in force until it's

2  terminated by either party.  That was part of your logic as to

3  whether this was indisputably clear; an indisputably clear

4  right about who owns this.

5          If Epsilon today pulled up to the Wyalusing Creek

6  water withdrawal facility and tried to withdraw water from that

7  creek, they would be breaking the rules of the SRBC.  And

8  that's why Epsilon needs a commitment letter from Chesapeake.

9          You know what's interesting, Judge?  An affidavit or a

10 stipulation was presented that shows that Epsilon, as a working

11 interest owner, has contributed capital to the development of

12 the Marbaker impoundment and the Craige well pad.  We

13 stipulated to that because it's true.  All working interest

14 owners did.

15         What I think is most startling about the stipulation

16 is what's not in it.  Not a hint about contributing capital to

17 the Wyalusing Creek water withdrawal facility.  And you didn't

18 hear one word of testimony that they contributed capital to

19 build that facility.  And that's because they didn't.

20 Chesapeake designed it, constructed it, paid for it, and

21 operated it.  That's what ownership smells and looks like.

22         On the other assets, the Marbaker, no dispute.  They

23 contributed capital.  And the Craige pad, they contributed

24 capital.  We are not disputing that.  So did Equinor and so did

25 everybody else.  But don't come to court and say we own the

1   Wyalusing Creek water withdrawal facility and put up a document

2   that's not accurate about the coordinates and still make an

3   argument that they have some interest in it.  If they thought

4   they owned it, they would have put evidence in about

5   contributing to the development of it.

6          Epsilon hasn't drilled or developed a well in the

7   marcellus formation since, I think, 2009.  It's 2021.  They

8   have nine employees.  They don't have a contractor under

9   contract.  They haven't supplied what they need to supply to

10  the DEP.  And they admit that this is an extremely dangerous

11  operation to conduct.

12         There is no reasonable interpretation that Epsilon has

13  the ability to do what it's asking this Court to order.

14         There is not any evidence of a viable plan.  The only

15  evidence you heard is two executives have been in the industry

16  a long time, both of them with Schlumberger.  And from that,

17  you are supposed to conclude that they have an indisputable and

18  clear right to go ahead and do something like this.

19         They love to say well, the reason we don't have any of

20  that done is because Chesapeake hasn't cooperated with us.  You

21  would expect if they were going to make that argument, Judge,

22  that they would have put evidence before the Court of them

23  sending Chesapeake the kinds of information that they admitted

24  they haven't even developed.

25         These are good lawyers.  If they wanted to argue that

Chesapeake is the sole factor that they are not ready to

proceed, you would have seen the collision survey and all of

the other work. And they would come to you and say we've done

everything we're required to do, but Chesapeake is the problem.

They didn't do that.

They tell a story about how there was a lawsuit two

years ago. And then they introduce a chain e-mail. And from

that, the Court is supposed to conclude that Chesapeake is the

problem. The problem is they're not ready to go. They're not

serious about going. They don't have the capacity to go.

That's what came out.

And it would be frustrating enough if it was just

about us and them. But it's about the public, too. It's about

Rush Township. It's about the waters of the Commonwealth. And

it's about the public safety.

Your Honor, I don't want to dwell on the JOAs. I

think the Court has the full sense of them. I just want to

make the point that I've probably made already; that there is

only one operator-shifting provision in the JOA, and that's in

Article VI 2(a), which has the interlineated language over

which we disagree.

But there is another way for them to take over if they

are such skilled operators. They could send a ballot out to

all of the other joint interest owners and take a vote on

whether Chesapeake should be removed because we're not acting

1    like a reasonably prudent operator.  And they could do that

2    under Article V.  And if their colleagues in the industry

3    agreed with them and there was a majority vote, Chesapeake

4    would be removed.  But that's -- they haven't done that.

5    There's a concession that that's not what this case is about.

6          They want to come in under VI 2(a) without even notice

7    to the other JOA-interested parties to have this Court do what

8    they couldn't do if they went out to the other JOA parties, but

9    the other JOA parties won't vote to remove Chesapeake.  The

10   other JOA parties don't own 35 percent of the Auburn gas

11   gathering system like we can.  Equinor -- I'm sorry.

12   Chesapeake doesn't own any of the gas gathering system.

13         So what the Court is being asked to do is to shoehorn

14   into this tortured language of VI 2(a) some extraordinary

15   relief that they read into it by reading out the interlineated

16   language.

17         Judge, we submit if this were a standard injunction

18   where they were seeking to preserve the status quo, they would

19   fall far short of that standard.  But this is so different.

20   There is no likelihood of success on the merits.  There is no

21   likelihood they will ever be ready to start operations on

22   May 22.

23         They want to put boots-on-the-ground.  Whose boots?

24   Whose boots?  Where's the contractor who would come in and say

25   we're ready to go?  Not their boots.

1      So Your Honor, it's not immediate.  It's not

2  irrepairable.  They don't have an indisputable claim for

3  likelihood of success on the merits.

4      You've been extraordinarily patient.  I'm most

5  grateful to you and your staff for accommodating us on such

6  short notice.

7      There is an issue about the bond.  I just want to be

8  respectful of the Court's time.  If the Court wants to hear

9  argument on the bond, I'd be happy to make it.  If the Court

10  doesn't think it needs it, that is okay, too.  I would just add

11  this.  The counter-declaration that we got today from Mr. Paul

12  Atwood, I guess he's one of the other nine employees, is that

13  Epsilon has insurance.  Epsilon is fully insured and bonded.

14      That's all fine and good, Judge.  But Rule 65 of the

15  Federal Rules of Civil Procedure, and I'm referring to 65,

16  subpart (c) where it says, "The Court may issue a preliminary

17  injunction or temporary restraining order only if the movant

18  gives security in amounts that the Court considers proper to

19  pay the costs and damages sustained to any party found to have

20  been wrongfully enjoined or restrained."

21      That they are an insurable entity is utterly

22  irrelevant to Rule 65(c).  What, are they going to add all of

23  the JOA parties as additional insureds?  Who knows what's

24  insured.  That's not the purpose of the bonding requirement

25  under 65(c).  Mr. Atwood's declaration is of -- is not and

1   cannot be a substitute for a significant bond for this Court to

2   conclude that it was going to grant any type of relief.

3         So I thank you for your time.  I know it's been a long

4   day.  I think that's it.

5         THE COURT:  Well, Mr. Brier, I do have one point of

6   clarification.  With respect to the declaration that's been

7   admitted as Defendant's 42, you have addressed Mr. Atwood's

8   declaration that was admitted at P-52, but Mr. Glenn's

9   declaration includes a lot of different figures.

10         What is -- just in very brief terms, what is your

11   position with respect to the amount -- I think in your papers

12   prior to the hearing, you referred to it as there would need to

13   be a significant bond.  You have submitted a declaration that

14   has a lot of different figures in it.  What are you asking the

15   Court -- if the Court were to require a bond, what amount are

16   you asking for?

17         ATTORNEY BRIER:  So, Judge, I misplaced it.

18         THE COURT:  Are you looking for the declaration,

19   Mr. Brier?

20         ATTORNEY BRIER:  Yes.

21         ATTORNEY MADRIZ:  Here you are.

22         ATTORNEY BRIER:  Thank you.

23         So Your Honor, here is what the declaration

24   establishes.  It establishes that the Craige pad was developed

25   at the cost of $20.3 million.  That is money that the working

1    interest owners all paid collectively based on their

2    proportionate interests.

3            And it says in section seven that if the -- if the

4    producing wells are damaged and production is not recovered

5    because of the damage, the estimated foreseeable economic

6    damage is the present value of $1.618 million, which is the

7    value of the lost reserves in those two producing wells, and

8    approximately $576,000 to plug, abandon and reclaim the wells.

9    Once they are damaged, you can't just leave them.  You have to

10   go through a whole approved process to plug, abandon and

11   reclaim them.

12           So if the wells were damaged and production could not

13   be reestablished, the bond would need to be in the amount of

14   $2.1-odd million to protect Chesapeake from the damage.

15           If they damage the producing wells, but they're able

16   to be reworked and deepened and sidetracked, because they're an

17   existing wellbore, the estimated cost of that is $980,000.

18           Then the royalty -- the landowners, Judge, get paid

19   royalties on the gas produced from these wells.  They would be

20   harmed on a monthly basis to the tune of about $18,000 if the

21   wells were damaged.

22           Then the last point is, as the Court knows, Chesapeake

23   has proposed a different well, the Koromlan well, which, by the

24   way, they would share in the production of that.  It would all

25   go into the Auburn gas gathering system.

1          The estimated ---- the estimated present value of that

2     well is $12.9 million.

3          So if the Court were to enjoin us and say you can't

4     develop the Koromlan well, we would be damaged to the amount of

5     $12.9 million, which is the net present value of that proposed

6     well.  If they go on the pad and cause damage to the existing

7     producing wells, you know, the figures are there, depending on

8     the damage that they would produce.

9          I hope that answers the Court's question.

10         THE COURT:  It does.  Thank you.  All right.  That was

11    my only question.  Yes.

12         ATTORNEY MADRIZ:  Can I respond briefly on the bond

13    issue, Your Honor?

14         THE COURT:  Well, yes, although you presented no

15    argument on it in your initial closing argument.  Certainly.

16    For the sake of completeness, yes.

17         ATTORNEY MADRIZ:  Certainly, Your Honor.  I think it's

18    their position that they have to come up with the bond amount.

19    I need to respond to it.  I apologize we didn't do it in

20    advance.  I'll be very brief.

21         Judge, the fallacy in the argument of the 20.3 versus

22    the 1.6576 and the 948 is that Mr. Glenn has said that the

23    present value is 1.6 million.  You would never put 20 million

24    back in.  The highest value would be 1.6 million.  That's the

25    present value of that well, the highest amount.

1       Again, then take back of that, we own 30 percent of

2    that. Then there has to be some evaluation by this Court that

3    there is something that we would do that would injure to get to

4    that amount. Then back to again why we put Paul Atwood's

5    counter-designation in is, one, there is insurance to cover if

6    there is any issues that would result in it. Again, they would

7    be covered. There wouldn't be any damage. The Court would

8    then have to give an additional bond amount.

9       But if the Court -- again, I think 65 requires the

10    Court to put in some bond amount. So this idea that it's

11    millions of dollars, again, I would say is not correct on

12    Mr. Glenn. The Pa. DEP requires a bond. And for 150 wells

13    they require a bond of $430,000.

14       So that bond is in place. That's an amount.

15       And the suggestion, back on the Koromlan well, the

16    Koromlan well is not even in existence. It's a purely

17    speculative number.

18       In terms of back to Mr. Glenn, if you go back to the

19    evidence, and specifically the Chesapeake well proposal, it

20    doesn't even have a commencement date contained within the

21    Koromlan -- there is no Koromlan well out there right now. So

22    again, this $12 million is sort of a speculative issue that

23    shouldn't be considered.

24       Back to what we would propose, again, Judge, I -- in

25    this case, again, with the evidence before you, I think a

1   nominal amount is correct.  I can't see an amount more than

2   what the Pa. DEP put in.  Even if you were going to say I'm not

3   going to divide it by 150, that would be the upper limit in

4   terms of a bond, because the regulatory agency has actually put

5   the bonding amount out.

6          I think that's a better reflection versus some

7   speculative nature that something is going to happen that's not

8   insured that will result in some damage to Chesapeake.  I just

9   don't see that it's warranted to be in the millions of dollars.

10         ATTORNEY BRIER:  Judge, may I have 30 seconds?

11         THE COURT:  Yes.

12         ATTORNEY BRIER:  The Pa. DEP bond is to protect Pa.

13  DEP's interest.  This bond, under Rule 65(c), is to protect the

14  party found to have been wrongly enjoined or restrained.  It's

15  apples and oranges.

16         This Court has heard a lot of evidence, and we

17  respectfully trust the Court.  We don't think an injunction

18  should be issued at all, so I'm loathe to talk about a bond.

19  But if the Court found it needed to do something, the bond

20  needs to be adequate to protect the interests, and that's what

21  our declaration establishes.

22         THE COURT:  All right.  The evidence is submitted.  I

23  will issue an opinion as quickly as possible.  You certainly

24  understand the timing considerations.

25         Counsel, I have enjoyed spending two days with you.  I

think everyone has done a fantastic job of getting the evidence

before me.  It's now in my hands.  So have a wonderful

afternoon.  Court is adjourned.

ATTORNEY BRIER:  Thank you, Your Honor.

ATTORNEY MADRIZ:  Thank you, Judge.

(3:45  p.m., court adjourned.)

1                         REPORTER'S CERTIFICATE

2

3         I, Lori A. Fausnaught, RMR, CRR, Official Court

4 Reporter for the United States District Court for the Middle

5 District of Pennsylvania, appointed pursuant to the provisions

6 of Title 28, United States Code, Section 753, do hereby certify

7 that the foregoing is a true and correct transcript of the

8 within-mentioned proceedings had in the above-mentioned and

9 numbered cause on the date or dates hereinbefore set forth; and

10 I do further certify that the foregoing transcript has been

11 prepared by me or under my supervision.

12

13
                               s/Lori A. Fausnaught, RMR, CRR

14                                -----------------------------
                               Lori A. Fausnaught, RMR, CRR

15                                Official Court Reporter

16

17 REPORTED BY:

18      LORI A. FAUSNAUGHT, RMR, CRR
     Official Court Reporter

19      United States District Court
     Middle District of Pennsylvania

20      Lori_Fausnaught@pamd.uscourts.gov

21

22         (The foregoing certificate of this transcript does
not apply to any reproduction of the same by any means unless

23 under the direct control and/or supervision of the certifying
reporter.)

24

25

**ATTORNEY BLANK:**
**[8]** 81/17 81/25 107/16
107/24 108/16 108/23
110/7 111/1
**ATTORNEY BRIER:**
**[51]** 5/17 5/19 5/23 9/1
14/2 17/18 21/15 31/12
35/9 35/15 35/18 40/14
41/2 45/7 47/6 55/12
59/24 65/17 66/7 66/19
66/21 71/18 80/1 81/2
84/15 86/10 88/7 89/25
91/6 91/10 92/4 92/8
92/16 93/15 104/24
105/1 107/1 107/21
109/19 109/25 111/8
112/2 112/13 146/4
146/6 170/17 170/20
170/22 174/10 174/12
175/4
**ATTORNEY
DEMPSEY: [1]** 83/7
**ATTORNEY KRAVITZ:**
**[3]** 95/1 103/13 103/17
**ATTORNEY KROCK:**
**[25]** 14/1 83/15 84/10
85/9 86/17 87/3 88/22
89/7 90/15 92/1 92/25
93/6 93/8 93/16 94/17
97/23 100/6 100/12
101/25 102/10 104/5
106/21 106/24 112/14
112/16
**ATTORNEY MADRIZ:**
**[21]** 17/14 17/24 18/2
18/19 30/24 40/11
55/14 58/11 58/15 59/1
60/10 65/23 66/18
79/21 79/24 111/24
112/8 170/21 172/12
172/17 175/5
**ATTORNEY THOMAS:**
**[6]** 81/15 82/10 82/20
83/2 83/6 83/11
**THE COURT: [123]**
5/2 5/13 5/21 18/1 18/7
19/6 21/14 21/16 31/1
31/6 31/8 31/11 35/11
35/17 35/20 40/16
40/25 41/3 41/23 42/21
55/13 55/15 60/4 65/22
66/6 66/9 66/20 71/19
71/22 73/6 73/15 73/25
74/17 74/23 75/2 75/4
75/7 75/12 75/15 75/25
76/13 76/16 76/22 77/8
77/10 77/17 78/2 78/6
78/16 79/2 79/7 79/12
79/18 79/22 79/25 80/2
81/3 81/7 81/20 82/1
82/6 82/17 82/21 83/4
83/8 83/12 84/3 84/14
85/6 86/4 86/13 86/19

88/6 89/4 89/24 91/9
91/12 92/3 92/6 92/9
92/20 93/2 93/7 93/10
94/14 94/25 97/21
99/16 100/7 101/12
102/1 103/10 103/15
104/4 104/25 105/18
106/22 106/25 107/12
107/17 107/22 108/4
108/17 108/20 109/12
109/20 110/1 110/8
111/7 111/12 111/17
112/1 112/3 112/9
112/15 146/1 146/5
170/5 170/18 172/10
172/14 174/11 174/22
**THE COURTROOM
DEPUTY: [2]** 82/4
94/16
**THE LAW CLERK: [2]**
31/5 31/7
**THE WITNESS: [38]**
5/6 5/16 5/18 5/22
30/25 31/3 31/10 31/13
41/25 42/22 58/14
66/13 71/21 72/14
73/14 73/22 74/5 74/22
74/25 75/3 75/6 75/10
75/13 75/19 76/4 76/15
76/21 77/7 77/9 77/16
77/22 78/4 78/10 79/1
79/6 79/11 79/17 81/6

**$**
**$1.375 [2]** 28/20 152/25
**$1.375 million [1]**
28/20
**$1.618 [1]** 171/6
**$1.618 million [1]**
171/6
**$12 [1]** 173/22
**$12 million [1]** 173/22
**$12.9 [2]** 172/2 172/5
**$12.9 million [2]** 172/2
172/5
**$18,000 [1]** 171/20
**$2.1 [1]** 171/14
**$2.1-odd [1]** 171/14
**$20.3 [1]** 170/25
**$20.3 million [1]**
170/25
**$430,000 [1]** 173/13
**$576,000 [1]** 171/8
**$980,000 [1]** 171/17

**'**
**'18 [1]** 154/7
**'20 [5]** 22/10 25/23
25/25 152/3 157/21
**'21 [1]** 22/10

**.**
**.216 [1]** 46/7
**.499 [1]** 46/9

**.715 [2]** 46/11 48/13
**.715 million gallons [1]**
48/13

**1**
**1,000 [3]** 36/17 36/18
36/24
**1.4 [1]** 128/17
**1.6 million [2]** 172/23
172/24
**1.6576 [1]** 172/22
**10 [2]** 40/20 52/4
**100 [1]** 4/14
**100 percent [14]** 14/15
19/3 30/20 31/18 32/6
32/7 33/23 56/16 56/20
67/20 140/12 154/24
163/12 163/14
**102 [1]** 4/14
**107 [1]** 4/18
**109 [2]** 4/19 4/19
**10:50 [1]** 82/5
**11 [8]** 3/6 14/12 32/6
32/14 55/21 56/9
120/19 150/4
**112 [2]** 4/15 4/15
**11:00 [1]** 82/2
**11:15 [1]** 82/5
**11:56 [1]** 108/19
**11th hour [1]** 88/8
**12 [3]** 1/13 44/11 150/4
**120 [2]** 6/12 20/1
**120 feet [1]** 74/11
**12:10 [2]** 108/18
108/19
**12:15 [1]** 111/15
**12th [5]** 37/9 160/25
164/7 164/8 164/20
**14 [1]** 162/2
**15 [10]** 21/21 29/15
29/25 30/12 30/19
31/15 31/24 32/25
33/14 67/1
**15-minute [1]** 81/23
**150 [2]** 173/12 174/3
**152 [1]** 102/2
**15222-3142 [1]** 1/20
**15th [1]** 58/5
**16 [4]** 45/9 162/1 162/3
162/5
**17 [1]** 84/16
**18 [1]** 50/7
**18 percent [1]** 71/15
**1800 [1]** 1/19
**18503 [1]** 2/5
**19-page [1]** 71/23
**1989 [1]** 100/18
**1:15 [2]** 110/15 110/22
**1:21-CV-00658-JPW [1]**
1/4
**1:45 [1]** 111/13
**1:50 [1]** 111/16
**1HL [1]** 5/11

**2**
**2.59 Acres [1]** 97/12
**20 [1]** 154/5
**20 million [1]** 172/23
**20.3 [1]** 172/21
**200 [1]** 2/5
**2001 [1]** 101/15
**2008 [5]** 45/20 162/18
162/22 163/5 163/15
**20081227 [1]** 47/13
**2009 [3]** 46/9 163/3
166/7
**20090610 [6]** 47/21
47/22 48/7 48/15 49/8
49/9
**2010 [2]** 88/15 120/9
**20110607 [3]** 46/2
47/19 49/6
**2012 [4]** 48/2 48/21
49/4 163/1
**20121209 [2]** 47/3
48/19
**2017 [3]** 48/20 48/22
163/1
**2018 [2]** 122/8 150/19
**2019 [3]** 28/17 28/24
97/12
**2020 [31]** 6/5 21/21
21/23 22/7 22/25 23/12
23/16 23/18 23/20 24/2
24/4 24/5 24/6 24/19
24/25 25/19 27/8 27/11
28/3 30/10 32/25 40/23
58/5 67/1 72/6 77/21
80/23 115/2 117/14
154/5 155/3
**2021 [9]** 1/13 3/6 7/21
7/24 8/6 8/17 23/22
138/16 166/7
**216,000 [1]** 128/9
**22 [30]** 5/11 6/5 6/17
6/18 6/22 7/20 7/20
7/24 8/2 8/6 8/24 11/13
11/17 13/8 13/21 37/11
43/20 43/21 44/11 76/3
97/2 156/22 156/24
156/25 157/1 157/4
157/14 161/7 164/5
168/22
**22902 [1]** 1/22
**22nd [12]** 8/16 16/1
16/4 55/25 56/4 56/14
56/14 137/13 142/15
161/7 161/7 161/11
**22nd is [1]** 142/16
**22nd of [1]** 138/16
**23 [1]** 46/1
**24 [2]** 47/2 98/22
**25 [1]** 38/20
**26 [4]** 99/5 99/6 99/7
99/18
**260 [1]** 1/19
**27 [2]** 15/17 15/19
**28 [3]** 30/4 34/17 176/6

**28th [1]** 33/25
**29 [1]** 29/19
**2906 [1]** 1/25
**29th [2]** 29/14 29/16
**2:30 [2]** 98/6 98/8
**2:50 [1]** 58/5

**3**
**30 [38]** 5/10 5/11 5/16
5/18 6/2 6/16 6/21 8/11
8/23 9/8 9/16 10/11
10/16 10/17 11/13
11/15 12/11 12/17 13/9
13/17 13/20 18/16
39/13 72/6 75/13 75/17
75/21 77/24 77/25 78/2
88/10 157/11 158/1
158/10 158/12 164/4
164/20 174/10
**30 percent [1]** 173/1
**30-day [6]** 137/7 139/7
139/12 140/2 140/5
142/18
**30-load [1]** 44/21
**30-truckload [1]** 44/21
**300 [1]** 1/22
**31 [3]** 5/20 6/15 6/16
**310 [2]** 1/22 153/21
**3142 [1]** 1/20
**32 [1]** 6/16
**320 [1]** 153/22
**33 [2]** 6/16 13/9
**35 [2]** 4/18 148/3
**35 percent [2]** 71/13
168/10
**35-percent [2]** 51/17
52/1
**36 [5]** 4/3 82/16 82/25
83/5 83/8
**37 [6]** 4/4 83/19 84/1
84/12 86/6 92/21
**38 [1]** 4/5
**39 [1]** 4/6
**3:45 [1]** 175/6

**4**
**40 [11]** 4/7 4/18 35/8
35/10 39/6 76/24 77/1
107/5 107/13 107/14
107/17
**41 [1]** 4/8
**42 [6]** 4/9 4/19 109/18
109/19 111/19 170/7
**425 [1]** 2/5
**44 [4]** 82/16 82/25 83/5
83/8
**45 [9]** 21/11 29/10
29/19 29/25 58/1 59/6
66/21 66/25 71/20
**47 [7]** 4/10 92/23 92/25
93/3 93/5 93/12 93/17
**48 [7]** 4/11 93/1 93/5
93/13 93/23 93/24
147/17

**4**

166/13

**49 [3]** 4/12 93/5 94/4
**499,000 [1]** 128/11

**5**

**50 [3]** 4/13 93/5 94/9
**50 percent [3]** 124/12
125/13 127/22
**51 [3]** 4/14 108/8
108/11
**52 [4]** 4/15 112/3 112/4
170/8
**55 [1]** 3/8
**5622455 [1]** 97/13
**57 [1]** 97/6
**59 [1]** 154/11

**6**

**600 [1]** 1/24
**65 [7]** 95/24 169/14
169/15 169/22 169/25
173/9 174/13
**65-2 [1]** 106/16
**67 [1]** 3/9

**7**

**71 [1]** 3/10
**715,000 [1]** 128/13
**7500 [1]** 1/24
**753 [1]** 176/6
**77002-2906 [1]** 1/25
**78a.52a [1]** 38/21
**7th [1]** 95/5

**8**

**80 [2]** 3/11 74/11
**82 [7]** 4/3 4/4 4/5 4/6
4/7 4/8 4/9
**83 [7]** 4/3 4/4 4/5 4/6
4/7 4/8 4/9
**855 [1]** 102/2
**8:41 [1]** 5/1

**9**

**90 [4]** 6/22 74/11 120/3
120/13
**93 [8]** 4/10 4/10 4/11
4/11 4/12 4/12 4/13
4/13
**948 [1]** 172/22
**972 [1]** 153/21

**A**

**a.m [3]** 5/1 82/5 108/19
**abandon [3]** 69/21
171/8 171/10
**abandoned [5]** 36/21
36/22 68/25 69/1 69/15
**abandoning [1]** 112/25
**abandonment [3]** 69/4
69/16 70/3
**ability [10]** 19/4 38/7
40/6 59/16 60/22 63/18
96/15 114/17 146/15

**able [26]** 37/21 38/15
53/20 53/21 64/6 65/7
68/15 78/5 91/20 98/11
108/2 115/6 115/20
121/5 130/22 131/24
132/12 132/17 133/11
133/20 134/12 134/13
135/5 139/2 148/25
171/15
**about [170]** 5/20 10/22
11/16 13/8 13/24 14/6
14/12 14/14 15/8 15/9
15/25 18/2 18/10 21/23
22/10 23/4 23/6 23/10
24/20 24/21 24/22
25/17 29/8 30/5 31/20
32/1 34/6 37/14 40/19
45/1 45/23 46/14 47/3
47/11 48/2 49/12 51/16
53/20 55/22 58/5 59/14
59/15 60/6 60/8 60/12
60/13 60/14 61/10 63/9
63/10 63/11 64/17 65/4
65/19 66/25 67/20
70/17 72/2 72/2 72/14
73/8 73/17 75/16 75/21
80/13 80/14 80/19
86/21 87/13 88/3 88/20
89/14 90/1 90/1 91/1
91/24 93/14 98/4 98/7
98/9 100/19 100/24
100/25 102/17 103/8
103/16 105/6 105/24
115/14 116/1 116/4
116/13 116/14 116/21
117/10 117/11 117/18
117/21 118/5 118/16
121/21 123/10 128/5
128/20 129/8 129/16
131/4 131/5 131/6
131/9 132/14 132/18
133/15 133/19 134/11
134/18 136/9 137/11
139/7 139/11 139/14
141/4 141/4 141/10
141/15 142/4 144/2
148/7 148/9 148/11
150/20 151/4 151/4
151/5 152/3 152/22
153/2 153/23 154/11
154/24 156/20 157/18
158/14 158/21 158/21
158/21 159/1 159/19
160/10 161/4 161/5
161/24 162/8 164/6
165/4 165/15 165/16
166/2 166/4 167/6
167/10 167/13 167/13
167/13 167/14 167/15
168/5 169/7 171/20
174/18
**above [3]** 36/18 88/11
176/8

**above-mentioned [1]**
176/8
**absence [1]** 147/15
**absent [4]** 21/6 101/16
150/24 158/6
**absolutely [3]** 70/14
101/25 150/17
**abstract [1]** 101/9
**absurd [4]** 115/22
118/7 156/9 156/9
**abundantly [1]** 150/21
**accept [2]** 86/5 107/5
**acceptable [1]** 109/13
**accepted [1]** 7/10
**accepts [1]** 73/22
**access [19]** 8/1 8/4
38/1 38/2 38/3 38/6
62/19 62/25 63/3 76/18
78/1 89/17 89/20 89/22
112/22 123/25 131/24
132/2 142/25
**accessing [1]** 44/16
**accidentally [1]** 154/23
**accommodated [1]**
95/6
**accommodating [1]**
169/5
**accordance [1]** 16/14
64/20 113/19 117/7
**according [2]** 8/6
164/24
**accurate [1]** 166/2
**accusations [3]** 142/21
142/23 143/15
**achieve [3]** 103/2
103/9 105/25
**acknowledged [1]**
126/17
**acknowledgment [1]**
115/5
**acquired [2]** 45/21
130/15
**acreage [3]** 152/17
153/5 158/8
**Acres [1]** 97/12
**across [1]** 38/24
**act [2]** 137/4 164/5
**acting [4]** 90/6 90/12
118/25 167/25
**action [1]** 134/10
**actions [3]** 24/13
126/18 131/11
**active [4]** 10/14 16/23
36/21 125/15
**activities [11]** 69/19
76/11 101/3 120/6
143/25 144/3 144/5
144/6 144/13 144/15
145/8
**activity [3]** 74/19
144/15 157/1
**actual [5]** 8/8 16/9 17/4
59/12 95/11
**actually [34]** 14/13

18/5 18/6 18/20 19/5
22/6 27/16 27/19 32/18
66/1 67/4 71/13 77/10
78/12 87/18 89/8 92/9
93/11 98/23 99/25
100/17 112/25 115/23
116/2 124/17 128/4
130/13 136/4 136/24
137/15 137/24 139/10
162/8 174/4
**add [6]** 6/22 8/23 13/17
13/20 169/10 169/22
**added [3]** 74/2 92/17
156/2
**additional [13]** 8/11
9/16 39/21 76/9 82/3
82/8 83/16 110/17
110/19 110/21 111/22
169/23 173/8
**address [16]** 82/24
85/22 97/24 107/9
108/3 110/16 114/3
114/22 117/6 123/12
135/23 136/8 136/20
140/1 142/19 146/14
**addressed [4]** 94/23
94/24 118/11 170/7
**addressing [1]** 98/7
**adequate [3]** 81/13
81/24 174/20
**adequately [1]** 117/2
**adjacent [1]** 135/1
**adjourned [2]** 175/3
175/6
**admissible [2]** 91/5
99/3
**admission [10]** 33/21
82/15 82/24 83/1 83/3
83/4 83/16 94/18
107/14 108/24
**admit [8]** 91/22 96/9
96/21 102/5 111/25
151/22 158/5 166/10
**admits [1]** 96/4
**admitted [27]** 4/2 4/17
20/10 71/23 82/23 83/9
89/6 90/25 93/10 96/6
98/19 103/15 106/8
107/7 107/18 108/11
109/15 111/18 111/22
112/4 149/18 150/22
159/22 161/9 166/23
170/7 170/8
**admitting [4]** 89/18
106/7 108/6 109/13
**adopted [1]** 155/10
**advance [1]** 172/20
**advanced [1]** 65/24
**advancing [1]** 63/7
**advantage [2]** 65/14
145/23
**advise [1]** 122/16
**aerial [1]** 162/6
**affected [3]** 80/14

80/24 159/4
**affidavit [6]** 96/4 107/1
107/19 108/22 109/14
165/9
**affidavits [1]** 96/6
**affirmative [5]** 21/3
37/3 37/13 37/16 43/22
**affirmatively [2]** 98/23
109/23
**afford [1]** 102/7
**afraid [1]** 24/17
**after [21]** 20/22 21/1
21/22 32/22 58/12
113/21 114/1 116/22
122/7 125/24 141/5
151/3 152/8 154/6
154/7 154/23 154/25
155/3 163/10 163/12
164/20
**afternoon [3]** 98/6
111/17 175/3
**afterwards [1]** 87/20
**again [35]** 15/9 17/25
40/14 48/11 58/20
65/10 65/16 66/5 66/16
69/8 73/7 73/20 88/8
91/25 99/23 110/23
119/24 120/7 124/14
132/13 139/6 140/20
140/25 143/14 147/12
159/6 161/25 173/1
173/4 173/6 173/9
173/11 173/22 173/24
173/25
**against [1]** 161/25
**agency [1]** 174/4
**aggregated [2]** 163/4
163/20
**aggregates [1]** 46/15
**aggressive [1]** 163/25
**ago [3]** 143/21 155/24
167/7
**agree [22]** 7/20 7/23
10/23 15/1 19/11 19/18
20/19 22/19 26/7 28/11
33/14 36/9 51/6 76/19
77/5 79/10 79/16 79/17
96/21 99/18 99/24
105/18
**agreed [14]** 53/15 55/1
79/2 82/7 82/12 84/24
85/17 114/8 114/22
115/1 115/18 151/1
155/9 168/3
**agreeing [1]** 86/25
**agreement [72]** 20/10
20/16 20/22 20/23 21/2
21/7 32/22 43/23 43/25
44/5 44/13 51/21 65/6
65/11 75/24 76/5 84/17
84/17 84/20 84/23 85/2
85/5 85/7 85/12 86/1
86/24 100/22 101/24
103/1 106/2 106/3

# A

**agreement... [41]**
113/20 113/22 114/1
114/6 114/7 114/25
115/18 115/25 116/1
116/1 116/20 117/17
117/20 118/2 118/8
119/4 121/9 122/7
123/17 123/17 123/21
123/22 124/7 124/10
124/15 124/18 126/17
130/3 139/16 143/16
145/15 150/23 151/3
154/7 155/20 160/11
160/15 160/16 160/24
161/2 163/13
**agreements [5]** 119/7
124/16 143/16 144/24
160/19
**ahead [5]** 23/25 33/16
133/12 164/21 166/18
**akin [1]** 93/20
**al [1]** 93/20
**aligned [2]** 52/19
118/24
**all [115]** 5/23 6/16 6/17
7/15 11/4 11/8 11/17
12/8 12/21 13/1 13/6
13/14 19/24 21/5 23/23
24/12 24/25 26/1 26/8
32/18 36/23 38/13
52/15 55/13 58/12
58/24 58/25 59/11
62/21 64/17 69/23
70/21 71/19 71/22
76/11 78/19 79/7 81/3
81/11 82/1 82/6 82/17
82/21 83/8 83/9 84/14
84/19 85/1 86/23 86/25
87/23 88/24 89/15
90/18 92/15 94/14 95/6
95/16 97/21 101/12
104/7 104/16 106/17
106/22 106/25 107/12
107/17 108/17 108/20
109/20 111/12 112/4
112/9 112/15 113/13
113/14 115/18 117/6
119/18 119/20 121/25
123/22 124/19 125/10
126/18 130/18 131/1
131/10 134/2 134/19
137/18 139/17 140/6
140/11 141/21 144/14
146/5 148/9 154/15
155/22 156/21 157/9
158/15 161/15 164/7
165/13 167/2 167/24
169/14 169/22 171/1
171/24 172/10 174/18
174/22
**alleged [1]** 144/16
**allow [12]** 63/3 65/2
65/4 65/14 66/10

110/10 115/12 126/5
145/12 145/21 146/21
164/5
**allowed [7]** 8/1 95/25
122/10 123/9 123/10
130/9 138/23
**allows [1]** 33/16
**almost [3]** 52/4 124/19
127/20
**alone [1]** 128/18
**along [5]** 11/4 15/18
16/8 31/4 125/20
**already [11]** 19/24 31/1
63/21 91/15 104/5
108/9 118/20 133/8
136/13 159/4 167/18
**also [25]** 15/11 22/19
34/10 59/14 61/9 70/2
70/12 82/14 82/24
100/8 102/10 104/1
116/18 127/9 127/20
130/23 130/25 132/24
133/1 135/8 143/8
147/1 151/24 159/12
160/10
**alter [2]** 150/23 156/2
**alteration [1]** 151/3
**alterations [1]** 88/12
**alternative [1]** 73/3
**alternatives [3]** 31/25
32/1 33/24
**although [2]** 60/7
172/14
**always [3]** 22/22 125/7
128/23
**am [5]** 9/24 24/17
57/16 95/23 164/16
**ambiguities [1]** 103/21
**ambiguity [5]** 96/20
101/16 104/6 104/14
104/21
**amend [4]** 20/17
137/15 137/24 150/23
**amended [6]** 20/24
20/25 54/22 84/18
105/7 156/19
**amendment [1]** 156/13
**among [2]** 111/21
118/12
**amongst [1]** 62/1
**amount [17]** 28/22
63/20 74/11 156/6
170/11 170/15 171/13
172/4 172/18 172/25
173/4 173/8 173/10
173/14 174/1 174/1
174/5
**amounts [2]** 77/18
169/18
**analysis [1]** 18/13
**annual [1]** 64/22
**another [5]** 5/19 55/8
60/20 67/17 75/16
84/22 87/4 87/5 100/7

117/2 151/14 151/24
158/10 163/23 167/22
**answer [20]** 13/6 17/17
19/12 22/23 25/14
30/12 32/2 66/10 73/15
77/14 78/20 102/16
136/21 136/21 137/19
140/11 155/11 159/13
164/18 164/19
**answered [4]** 10/24
11/1 40/12 157/4
**answering [2]** 17/9
34/7
**answers [3]** 24/16
148/16 172/9
**anticipate [2]** 87/11
156/25
**anticipated [8]** 6/13
6/17 7/1 43/21 137/12
137/23 161/6 161/7
**any [85]** 7/21 9/22
16/10 16/12 21/8 28/8
36/16 38/8 38/19 41/21
42/5 43/5 44/15 50/7
57/5 57/6 58/9 62/3
75/16 79/20 83/4 83/9
83/13 83/24 84/8 84/14
91/3 94/14 98/2 98/11
98/15 98/17 98/19
99/17 102/25 106/19
106/19 107/10 107/13
110/2 110/17 111/7
112/1 112/6 115/2
116/21 118/3 118/13
118/24 121/12 121/14
124/4 124/20 126/19
127/11 127/19 130/1
132/5 134/12 136/4
141/19 143/3 143/22
145/8 145/9 145/17
148/14 151/11 153/25
154/21 155/18 155/18
156/5 156/8 161/22
162/14 166/14 166/19
168/12 169/19 170/2
173/6 173/7 176/22
176/22
**anybody [8]** 26/21
41/19 42/10 89/3 160/5
160/6 160/7 160/21
**anymore [3]** 129/4
129/4 140/17
**anyone [5]** 38/19 98/2
132/10 141/25 154/20
**anything [17]** 7/1 8/2
10/22 13/3 28/7 32/1
62/17 85/13 85/19
85/22 98/2 98/18 118/5
119/21 155/5 156/20
163/18
**anyway [3]** 156/14
**apart [3]** 117/1 162/11
162/23
**apologies [1]** 18/19

**apologize [4]** 30/23
92/8 107/6 172/19
**Appalachia [9]** 1/6
15/5 47/23 89/12 89/15
93/20 93/24 94/4 94/10
**appear [1]** 87/14
**APPEARANCES [2]**
1/17 2/1
**appeared [1]** 101/23
**appearing [1]** 85/2
**apples [1]** 174/15
**applicable [2]** 12/22
96/13
**application [1]** 115/21
**applied [5]** 20/3 80/9
80/16 80/23 158/13
**applies [6]** 10/8 14/6
139/8 139/14 140/6
156/14
**apply [12]** 50/23 99/6
99/6 101/17 104/15
115/15 123/1 134/19
152/23 156/6 156/18
176/22
**applying [1]** 50/19
**appointed [1]** 176/5
**appreciate [3]** 28/6
49/23 86/10
**apprised [1]** 84/1
**approach [2]** 138/8
138/9
**appropriate [8]** 60/1
84/21 85/5 87/9 88/4
106/11 140/4 142/17
**appropriately [1]** 64/8
**approval [5]** 74/20
126/21 126/23 126/25
126/25
**approvals [1]** 128/6
**approve [1]** 53/22
**approved [6]** 47/21
48/7 48/15 49/7 141/20
171/10
**approvingly [1]** 102/3
**approximately [1]**
171/8
**April [22]** 6/18 7/20
7/20 7/24 8/2 8/6 8/9
8/16 8/24 11/13 13/21
16/1 16/3 16/4 43/21
56/14 137/13 152/8
156/25 157/1 157/4
157/14
**April 22 [14]** 6/18 7/20
7/20 7/24 8/2 8/6 8/24
11/13 13/21 43/21
156/25 157/1 157/4
157/14
**April 22nd [3]** 8/16
16/1 16/4
**April 22nd or [1]** 16/3
**April 22nd timing [1]**
8/9
**are [247]**

**area [12]** 36/12 37/7
55/2 76/15 80/14 107/5
124/21 135/5 143/6
158/14 158/19 159/4
**aren't [6]** 43/17 46/22
69/23 70/6 99/12
161/18
**argue [11]** 66/7 90/4
90/4 90/25 95/1 97/3
97/5 104/18 138/6
149/6 166/25
**argued [7]** 86/8 89/21
90/9 96/12 104/20
105/1 157/2
**argues [1]** 105/8
**arguing [2]** 52/20 99/5
**argument [50]** 18/18
52/22 53/19 88/20
90/12 91/15 92/17 95/7
96/23 97/4 98/8 98/10
99/23 101/1 101/7
101/20 104/8 109/9
110/18 114/14 115/11
115/22 119/13 124/23
127/6 128/16 131/25
144/9 144/25 145/1
145/2 146/3 146/12
147/16 147/17 148/8
149/9 155/13 155/13
155/16 155/18 156/9
164/1 164/1 166/3
166/21 169/9 172/15
172/15 172/21
**arguments [6]** 65/24
91/1 91/3 91/4 110/11
112/11
**arise [1]** 143/4
**arisen [1]** 61/7
**Armezzani [1]** 2/4
**Arnold [6]** 128/21
128/23 128/24 128/24
129/5 129/10
**arose [1]** 115/5
**around [4]** 90/25
121/10 121/13 160/7
**article [52]** 9/10 14/22
15/1 15/11 15/15 15/19
16/3 16/12 17/8 29/23
30/3 30/11 31/19 31/19
31/22 32/2 33/15 33/19
33/22 35/2 35/3 57/12
58/9 58/21 67/5 67/7
67/7 67/13 67/14 67/19
67/22 68/1 68/4 68/9
68/10 87/18 100/24
119/11 120/1 120/18
122/8 122/9 122/21
123/17 139/10 140/22
140/25 154/14 154/15
157/7 167/20 168/2
**Article VI.2 [1]** 67/14
**Article VI.B.1 [1]**
140/22
**Article XI [1]** 16/12

# A

**as [178]**
**ascertain [1]** 91/20
**ask [23]** 23/13 35/7
40/14 40/15 48/11 60/2
60/8 72/1 76/25 80/10
84/8 84/10 86/15 86/19
87/4 97/20 105/17
107/6 110/2 110/14
152/19 152/20 158/17
**asked [37]** 8/15 14/12
14/25 14/25 17/4 22/12
29/9 29/16 40/12 42/19
47/3 47/10 49/13 50/5
52/9 60/9 66/25 67/11
68/9 72/2 86/12 87/12
98/14 98/17 99/1
102/22 102/24 107/4
127/9 146/9 148/13
148/24 154/8 158/14
159/12 160/10 168/13
**asking [20]** 11/11 18/6
18/22 19/2 19/10 30/2
33/16 39/2 53/22 55/3
58/4 58/15 61/9 69/22
69/25 70/14 90/2
166/13 170/14 170/16
**asks [1]** 30/11
**assert [3]** 30/10 153/14
154/2
**asserted [2]** 90/24
95/11
**assessment [2]** 42/2
160/5
**asset [3]** 123/22 125/8
125/18
**assets [19]** 123/8
123/18 124/20 124/24
125/3 125/6 125/7
125/9 125/20 126/19
130/18 130/20 131/2
131/2 131/18 131/24
145/6 145/10 165/22
**assignment [1]** 28/23
**associated [2]** 127/24
133/16
**assume [2]** 86/15
109/8
**assuming [1]** 66/3
**assumption [1]** 132/14
**assumptions [1]**
132/16
**attached [2]** 94/19
106/16
**attachments [1]** 125/1
**attacking [1]** 113/7
**attempt [1]** 99/23
**attempting [2]** 80/15
96/18
**attention [7]** 46/5
47/11 55/20 57/16
57/25 63/9 155/23
**attentiveness [1]** 22/14
**attorney [11]** 3/6 3/7

3/8 42/21 55/13 102/12
102/12 102/14 102/21
107/23 108/20
**Atwood [3]** 111/25
112/5 169/12
**Atwood's [3]** 169/25
170/7 173/4
**Auburn [28]** 21/24
21/25 22/16 23/7 24/3
24/5 24/6 24/9 24/14
24/15 24/19 49/17 50/6
50/20 51/3 51/17 52/5
52/6 64/12 65/9 70/18
71/12 133/16 147/19
147/23 151/22 168/10
171/25
**authenticating [2]**
90/16 90/22
**authenticity [2]** 89/14
95/21
**author [2]** 97/15 105/3
**authorities [1]** 75/23
**authority [8]** 15/12
35/16 89/23 98/17
98/20 98/22 98/23
149/15
**authorization [1]** 46/11
**authorizes [4]** 47/20
48/5 48/8 49/6
**availability [1]** 73/4
73/5 123/25
**available [13]** 24/12
89/13 90/22 95/13
95/20 96/10 97/10
97/16 123/19 132/15
132/15 134/23 159/14
**Avenue [1]** 1/19
**aware [6]** 25/20 28/22
84/3 94/24 96/14 152/8
**away [2]** 20/8 151/20

# B

**back [51]** 5/2 15/8 16/6
22/3 32/12 45/7 48/22
50/22 56/23 59/1 60/25
64/4 65/10 66/21 77/3
85/6 109/3 109/7
110/15 111/3 111/5
115/4 121/2 121/3
121/13 121/24 124/8
129/13 132/20 133/4
135/20 138/5 139/7
140/24 143/15 150/12
151/16 152/3 152/7
152/15 152/19 156/2
157/17 164/7 172/24
173/1 173/4 173/15
173/18 173/18 173/24
**back-end [1]** 138/5
**backdrop [1]** 161/25
**background [2]** 73/11
100/19
**backing [1]** 123/15
**bad [3]** 87/22 138/25

159/15
**ballot [1]** 167/23
**Baltzley [1]** 118/3
**bankruptcy [1]** 150/11
**bar [2]** 101/16 147/2
**barely [1]** 160/18
**barrels [1]** 128/17
**based [11]** 5/13 18/25
19/24 74/25 82/14
99/18 99/20 101/13
107/9 161/8 171/1
**basically [6]** 63/6 74/7
77/10 77/11 77/18
110/6
**basis [13]** 34/7 39/21
44/17 50/16 64/22
64/22 113/5 113/10
115/6 119/13 134/14
143/3 171/20
**be [259]**
**Bear [1]** 93/2
**bears [1]** 153/18
**became [2]** 22/4 96/14
**because [88]** 6/20 8/4
8/22 10/18 19/4 20/23
23/13 25/6 25/9 26/4
26/11 26/19 27/10 30/3
37/14 40/8 53/16 53/24
54/23 55/21 61/22
61/22 69/13 70/19 72/3
72/14 72/17 73/18
77/25 78/8 86/3 97/15
98/5 99/6 99/11 100/8
103/11 115/17 118/20
122/10 123/5 127/19
128/16 128/20 134/22
136/2 137/9 139/3
139/14 139/24 141/1
141/9 141/25 142/17
147/18 148/1 148/8
148/15 149/3 149/6
149/7 149/11 150/5
150/12 150/24 151/16
152/5 152/25 155/13
155/17 156/5 156/7
156/13 156/22 158/5
158/25 159/8 159/10
159/15 162/20 163/6
165/13 165/19 166/20
167/25 171/5 171/16
174/4
**become [1]** 125/16
**becomes [3]** 124/10
136/16 137/14
**been [70]** 7/13 8/1 9/23
16/9 16/15 17/3 17/5
19/5 19/21 20/10 22/4
26/19 27/11 33/18
35/11 38/2 38/17 41/11
41/19 41/21 41/24 42/5
42/10 48/19 63/21
66/10 76/24 79/9 82/11
82/13 84/11 88/12 89/4
92/4 92/6 92/11 92/22

93/3 96/6 96/23 104/16
106/2 106/14 107/19
108/11 113/22 114/22
119/17 119/18 119/23
120/10 122/7 127/18
127/20 129/8 132/4
135/12 139/6 148/4
148/5 155/3 157/18
163/3 166/15 169/4
169/20 170/3 170/6
174/14 176/10
**before [37]** 1/10 5/9
17/22 20/5 20/21 21/1
22/6 28/7 35/23 44/7
60/19 78/15 85/2 90/8
95/11 103/20 104/14
106/6 108/13 110/10
111/5 111/17 117/14
125/18 146/24 147/24
148/18 151/1 151/25
160/23 161/22 161/22
162/12 164/5 166/22
173/25 175/2
**begin [1]** 10/12
**beginning [2]** 12/20
119/10
**begins [2]** 9/10 157/7
**behalf [11]** 5/4 19/11
31/23 63/5 64/12 82/9
83/14 118/25 126/18
146/2 155/2
**behavior [1]** 66/13
**behind [1]** 164/3
**being [32]** 26/21 26/21
27/7 29/9 30/6 37/20
46/1 53/20 56/24 64/6
65/10 65/24 66/17
72/11 92/4 96/10
102/10 102/22 116/14
121/15 127/1 128/6
131/24 141/10 141/20
144/20 146/9 146/18
155/5 162/21 164/20
168/13
**belabor [4]** 13/23 49/2
70/9 86/5
**believe [28]** 5/14 21/9
27/10 57/7 81/4 81/15
84/20 84/21 85/11 87/9
92/24 93/4 109/17
114/5 116/24 117/19
118/7 130/23 131/14
133/17 136/6 143/3
154/4 154/5 154/14
154/21 162/17 162/20
**believed [3]** 72/15
138/2 162/8
**believes [1]** 102/8
**below [1]** 30/4
**beneath [1]** 135/19
**benefit [7]** 19/7 52/2
105/4 145/4 145/18
145/24 148/2
**benefits [3]** 52/15

145/14 149/11
**Bennington [1]** 147/12
**best [2]** 78/21 125/5
**better [3]** 69/4 147/24
174/6
**between [12]** 20/17
22/4 34/15 61/7 71/24
72/12 74/4 84/17 106/2
126/12 132/9 155/4
**beyond [4]** 65/17
104/11 137/17 146/9
**big [6]** 69/2 100/23
144/8 158/15 159/15
160/14
**binder [8]** 5/10 5/14
5/15 5/15 21/12 35/7
35/9 45/8
**binders [1]** 35/11 35/13
35/19
**bit [12]** 7/9 29/11 55/22
60/14 62/1 64/12 74/1
74/8 101/13 110/12
110/13 138/3
**blank [6]** 1/21 107/23
108/20 110/3 148/13
148/24
**blocked [1]** 65/10
**blow [2]** 56/10 57/18
**body [1]** 135/25
**bond [23]** 82/13 82/22
107/3 107/9 130/3
169/7 169/9 170/1
170/13 170/15 171/13
172/12 172/18 173/8
173/10 173/12 173/13
173/14 174/4 174/12
174/13 174/18 174/14
**bonded [1]** 169/13
**bonding [2]** 169/24
174/5
**boots [15]** 7/4 7/24
55/25 62/19 62/24
76/16 76/17 137/2
161/4 161/12 161/20
168/23 168/23 168/24
168/25
**bores [1]** 36/25
**both [15]** 48/8 51/20
72/15 82/14 86/14
104/17 104/20 126/4
126/5 129/19 148/1
150/21 152/13 152/14
166/16
**bottom [3]** 15/20 29/19
129/9
**bottomhole [1]** 36/15
**bound [1]** 137/15
**breach [1]** 150/7
**break [5]** 109/3 109/6
110/10 110/11 110/24
**breaking [1]** 165/7
**brief [11]** 55/14 71/11
90/4 91/21 92/18 94/20
95/3 95/23 98/6 170/10

# B

**brief... [1]** 172/20
**briefed [1]** 150/18
**briefly [6]** 59/14 66/19
80/1 161/4 161/24
172/12
**briefs [12]** 89/8 89/10
89/12 89/15 90/13
91/14 91/18 93/4 99/5
131/16 131/20 148/10
**Brier [27]** 2/2 2/4 3/7
3/9 3/11 19/10 40/25
66/6 78/18 79/3 79/25
86/4 87/2 88/6 89/24
91/12 92/6 94/25
104/25 105/18 105/22
109/22 111/7 128/22
156/15 170/5 170/19
**Brier's [2]** 73/16 74/1
**bring [12]** 44/7 49/24
74/21 74/24 75/8 75/11
83/20 132/25 144/8
149/2 149/16 161/23
**bringing [2]** 72/21
75/17
**brought [2]** 98/1
141/18
**Bruce [1]** 94/21
**build [1]** 165/19
**building [1]** 130/5
**buildup [1]** 120/10
**burden [1]** 153/19
**business [14]** 53/13
53/14 63/10 63/11
63/14 64/13 64/14
64/23 70/18 86/14
134/14 152/1 152/2
152/4
**buy [1]** 35/19

# C

**C-O-L-E [1]** 94/5
**Cabot [9]** 28/13 28/14
28/17 28/18 28/24 29/1
53/24 54/18 152/24
**Cabot's [1]** 148/15
**calculable [2]** 71/4
79/3
**calculate [12]** 50/25
70/21 70/23 71/5 78/21
78/24 79/14 133/21
134/13 135/10 135/11
149/17
**calculated [5]** 50/14
70/21 71/7 133/17
151/10
**calculates [1]** 71/7
**calculating [2]** 6/12
78/19
**calculation [3]** 16/3
50/15 50/22
**call [6]** 81/12 91/8
103/14 146/19 161/19
164/14

**called [1]** 11/14
**calling [3]** 103/21
107/10 157/24
**calls [2]** 150/8 156/9
**came [14]** 25/1 45/24
86/23 87/12 90/19
124/9 137/11 142/7
143/8 150/5 150/20
157/16 157/17 167/11
**can [124]** 5/19 5/22
7/20 7/23 9/14 10/23
12/11 16/23 19/25
21/19 23/24 26/7 27/2
28/7 28/11 29/22 30/21
31/3 33/14 38/1 40/7
42/18 42/19 44/7 45/10
45/11 47/7 50/23 51/6
54/20 56/4 56/7 56/10
57/18 57/19 57/20 58/2
58/11 58/23 59/1 59/3
60/8 60/15 60/25 61/1
61/2 62/13 62/17 62/20
62/24 63/24 64/3 64/8
66/7 69/24 70/5 70/21
71/3 72/11 74/5 74/12
76/4 76/11 77/1 77/3
81/21 82/2 86/8 88/19
89/10 90/4 90/12 90/24
91/2 93/10 93/15
101/12 103/14 108/13
112/23 113/14 115/15
116/2 117/2 117/16
121/22 121/25 123/2
123/6 123/8 124/14
124/22 126/3 126/4
128/13 128/18 129/15
130/25 132/4 132/6
133/1 135/14 135/17
136/13 137/1 139/8
140/7 142/15 143/24
144/11 144/17 144/18
145/22 145/23 150/1
151/5 151/10 152/6
153/14 158/10 158/16
161/19 168/11 172/12
**can't [27]** 17/17 18/18
26/5 37/23 38/13 50/8
54/19 64/6 71/5 77/25
77/25 99/14 135/13
138/25 145/2 149/4
151/15 151/19 151/21
152/9 159/12 159/15
160/22 160/22 171/9
172/3 174/1
**candidly [2]** 146/11
146/13
**cannot [6]** 27/20 35/19
50/25 54/21 120/3
170/1
**capable [5]** 70/2 74/16
121/15 142/22 143/12
**capacity [4]** 17/15
18/15 18/21 167/10
**capital [14]** 27/15

71/15 72/17 72/22 73/4
73/5 120/23 121/3
132/15 165/11 165/16
165/18 165/23 165/24
**capitalize [1]** 65/5
**caption [7]** 59/3 59/5
59/5 93/8 93/19 93/23
94/9
**capture [5]** 26/25
135/17 135/20 136/1
148/3
**captured [2]** 26/21
26/21
**capturing [2]** 26/12
72/17
**care [1]** 109/13
**careful [2]** 33/2 60/6
**carried [2]** 101/24
140/14
**carry [5]** 72/9 72/12
72/23 122/17 137/4
**cars [1]** 160/19
**case [69]** 16/25 17/20
24/20 24/21 25/3 25/10
26/16 34/6 38/18 39/21
39/21 76/15 83/19 86/7
86/8 89/21 90/18 91/6
91/6 91/7 91/7 91/7
91/11 91/16 96/2 96/4
96/8 97/11 100/18
100/21 101/14 104/6
106/1 106/23 107/10
108/11 109/23 112/10
118/9 127/4 127/10
128/1 131/17 131/17
131/20 131/22 132/1
132/9 132/24 135/16
136/12 136/15 139/23
144/17 147/12 148/11
148/12 150/6 150/7
150/14 151/4 151/17
152/7 153/17 157/3
157/13 163/25 168/5
173/25
**cases [8]** 90/1 90/10
91/4 91/17 91/20 99/5
135/17 148/10
**cash [2]** 72/9 72/12
**cash/carry [2]** 72/9
72/12
**catch [1]** 124/19
**catch-all [1]** 124/19
**category [1]** 125/8
**cause [3]** 143/1 172/6
176/9
**causes [1]** 89/22
**causing [1]** 27/3
**cautious [1]** 138/8
**caveat [2]** 115/9 119/9
**cavil [1]** 146/9
**cease [1]** 129/17
**certain [6]** 58/15 74/11
77/5 105/25 131/16
147/5

**certainly [16]** 29/21
43/17 79/22 83/25 84/3
84/10 85/10 105/2
110/13 112/20 134/20
143/12 144/19 172/15
172/17 174/23
**certainty [4]** 61/1 61/5
64/7 80/6
**certificate [2]** 176/1
176/22
**certified [1]** 37/5
**certify [2]** 176/6 176/10
**certifying [1]** 176/23
**cetera [1]** 93/13
**chain [1]** 167/7
**challenge [2]** 85/12
96/15
**challenging [2]** 120/13
136/3
**chance [2]** 108/1 161/6
**change [5]** 70/10 100/4
103/1 132/9 138/23
**changed [1]** 29/22
**changes [2]** 88/11
88/14
**changing [1]** 52/14
**characterization [1]**
60/6
**characterize [1]** 122/24
**characterized [1]** 60/4
**charge [2]** 50/10 50/16
**charged [3]** 49/19 50/2
52/15
**charges [2]** 51/7 53/7
**Charlottesville [1]** 1/22
**chart [1]** 46/5
**charts [1]** 125/4
**Chesapeake [162]** 1/6
9/18 10/14 10/15 10/18
15/5 20/21 22/5 22/20
23/1 23/4 24/14 24/14
25/8 25/20 26/9 26/22
30/6 30/17 30/19 31/17
31/23 32/19 34/1 34/9
34/10 34/13 34/18
34/23 37/22 38/2 38/8
38/19 38/23 39/1 42/12
47/23 48/14 48/22 49/9
50/12 51/21 52/16
52/20 54/2 56/6 57/2
57/6 60/19 60/23 61/20
61/22 62/4 62/18 62/25
63/2 65/1 65/13 66/4
68/13 69/23 70/4 70/6
70/7 70/12 70/15 71/2
72/17 77/13 78/24 79/9
89/12 89/15 89/20
90/12 91/15 93/19
93/24 94/4 94/10 96/13
103/2 105/8 112/18
113/7 113/22 114/7
114/9 114/13 114/15
115/7 115/9 115/12
116/4 116/6 117/8

117/19 119/12 122/5
122/8 122/9 122/11
122/15 123/2 123/18
124/13 124/23 125/16
125/24 126/2 127/17
127/21 127/24 129/21
129/22 131/1 131/2
131/20 131/25 133/11
133/19 134/2 135/12
139/21 140/16 142/1
143/7 144/24 145/3
145/6 146/17 147/2
147/4 147/7 147/7
149/22 150/2 151/2
152/17 153/13 154/1
158/21 159/15 161/16
163/12 163/14 163/22
165/8 165/20 166/20
166/23 167/1 167/4
167/8 167/25 168/3
168/9 168/12 171/14
171/22 173/19 174/8
**Chesapeake's [29]**
23/3 46/9 48/9 58/4
58/20 59/15 61/9 61/18
62/10 62/13 63/12
63/17 65/4 71/5 104/8
113/25 115/12 116/10
116/13 122/3 122/25
127/4 128/11 131/10
143/22 148/10 158/23
163/3 163/14
**chief [8]** 17/19 18/16
20/13 38/15 104/8
106/23 109/23 130/15
**CHK [2]** 71/25 155/1
**choice [1]** 95/8
**choose [1]** 69/13
**chose [1]** 16/1
**Chris [1]** 94/1
**Circuit [4]** 96/8 102/1
131/13 153/16
**circulate [1]** 84/2
**circumstance [5]**
61/22 78/22 139/21
141/4 144/17
**circumstances [10]**
61/7 78/22 86/2 92/13
118/1 119/4 124/16
131/21 132/9 140/2
**circumvent [1]** 62/13
**citations [1]** 96/2
**cite [3]** 35/3 97/12
153/21
**cited [2]** 89/23 131/16
**civil [2]** 92/9 169/15
**claim [2]** 151/16
151/19 151/21 169/2
**claiming [2]** 22/11
157/18
**claims [2]** 119/12
154/1
**CLANTON [40]** 3/5 5/2
5/5 5/9 5/13 17/15 18/3

# C

**CLANTON... [33]** 18/10
18/14 18/24 19/3 19/9
21/18 21/21 55/18
66/12 66/25 71/19 75/4
81/3 81/9 132/10
136/21 141/16 142/6
147/4 148/13 149/14
149/18 151/25 154/6
155/11 157/2 158/2
158/22 158/22 159/3
159/22 159/23 160/12
**Clanton's [2]** 19/12
21/13
**clarification [2]** 85/21
170/6
**clarified [1]** 85/24
**clarify [3]** 15/16 85/23
108/7
**clarity [2]** 60/14 63/25
**clause [2]** 13/11 84/16
**clean [2]** 108/5 157/13
**cleanest [1]** 84/6
**clear [30]** 6/8 13/7
19/18 22/4 38/1 38/3
38/5 49/3 52/23 60/7
73/15 83/23 91/24 95/8
99/16 106/6 106/15
123/5 150/21 153/21
154/1 154/3 155/5
155/6 155/6 161/25
162/4 165/3 165/3
166/18
**clearer [1]** 149/25
**clearest [1]** 163/11
**clearly [2]** 88/13
137/10
**clerk [1]** 31/8
**client [2]** 108/2 108/14
**client's [1]** 69/25
**clock [12]** 16/20 19/25
59/16 59/22 60/13
60/16 61/3 65/25
153/12 156/23 156/24
157/15
**closed [1]** 127/10
**closely [1]** 153/24
**closing [8]** 66/8 97/4
110/11 110/18 112/11
146/3 149/20 172/15
**co [6]** 123/18 123/20
123/22 124/4 124/8
131/3
**co-owned [6]** 123/18
123/20 123/22 124/4
124/8 131/3
**Code [4]** 35/24 36/3
38/21 176/6
**Cole [2]** 94/5 94/5
**colleague [8]** 88/15
153/7 154/13 155/8
162/1 162/5 162/12
163/17
**colleagues [1]** 168/2

**collect [2]** 133/5 133/6
**collectively [1]** 171/1
**collided [1]** 156/8
**collision [3]** 41/13
160/4 167/2
**combination [2]** 47/18
163/2
**combine [1]** 128/12
**combined [6]** 47/19
49/5 127/23 128/2
129/3 129/16
**come [37]** 29/7 63/22
69/2 72/24 95/13
108/21 109/7 110/15
111/5 111/23 133/4
135/20 136/9 137/6
137/8 143/19 144/11
146/25 147/6 150/12
151/16 152/6 152/7
152/11 153/5 153/14
153/25 154/17 157/21
160/22 161/18 164/11
165/25 167/3 168/6
168/24 172/18
**comes [4]** 48/17 73/8
141/14 145/3
**comfort [1]** 65/13
65/15 66/3
**comfortable [1]** 78/14
**coming [2]** 105/13
151/15
**commence [15]** 14/21
32/11 57/11 76/4
112/23 120/3 120/13
136/22 136/25 137/22
139/4 140/21 141/5
142/15 145/23
**commenced [6]** 16/10
17/5 56/1 56/4 137/3
138/19
**commencement [15]**
8/8 8/18 15/21 15/24
16/1 55/23 60/18 61/2
76/12 76/13 76/17
138/3 138/12 138/21
173/20
**commencements [1]**
139/19
**commencing [8]** 7/6
78/13 137/10 137/13
137/15 137/16 138/7
138/23
**commensurate [1]**
76/5
**comment [3]** 68/13
68/18 70/16
**comments [1]** 135/12
**commercial [1]** 134/6
**Commission [8]** 47/13
47/19 47/21 47/22 48/7
49/5 49/7 126/23
**commit [1]** 77/25
**commitment [1]** 165/8
**committed [1]** 11/7

**committee [1]** 100/17
**commodity [2]** 27/5
27/20
**common [5]** 52/16 74/6
125/12 126/6 135/25
**common-interest [1]**
52/16
**Commonwealth [4]**
39/22 40/1 158/20
167/14
**company [13]** 17/10
17/21 18/4 33/5 33/9
33/12 41/11 42/17 54/7
55/8 97/11 102/2 102/2
**company's [3]** 18/18
21/23 73/13
**compare [2]** 46/19
122/20
**compelling [1]** 149/22
**compensation [1]**
127/19
**competent [1]** 84/25
**competing [2]** 132/11
134/22
**competitor [1]** 25/18
**complaint [2]** 150/11
157/16
**complete [17]** 38/20
39/2 43/1 43/9 43/13
44/16 68/15 69/24
70/11 77/12 84/17
110/18 121/17 133/19
137/1 156/1 161/19
**completed [1]** 121/12
**completely [7]** 95/24
117/23 118/1 120/17
122/4 127/12 162/11
**completeness [2]**
92/18 172/16
**completing [6]** 43/10
116/4 146/24 147/2
159/20 160/1
**completion [5]** 15/13
45/2 55/9 63/4 69/19
**compliant [1]** 116/23
**complicate [1]** 29/12
**complicated [1]** 123/14
**complied [3]** 37/4
37/15 50/13
**complies [1]** 155/20
**comply [5]** 39/25 62/9
62/21 62/23 159/15
**component [5]** 64/16
71/1 114/21 114/25
133/23
**components [1]**
114/20
**compounded [1]** 96/13
**conceivable [1]** 120/11
**concentration [1]**
29/11
**concept [3]** 70/20
102/18 140/8
**concern [6]** 26/2 26/4

26/11 26/17 53/19
75/16
**concerned [3]** 22/25
66/13 101/19
**concerns [2]** 25/17
25/21
**concession [2]** 152/15
168/5
**conclude [5]** 103/3
110/23 166/17 167/8
170/2
**concluded [2]** 81/4
112/10
**concluding [1]** 110/9
**conclusion [6]** 105/5
111/23 144/22 153/25
**concurrent [1]** 62/6
**condition [3]** 12/8
75/24 126/22
**conditioned [1]** 157/8
**conditions [10]** 70/3
**conduct [10]** 16/13
63/4 90/7 90/17 121/19
122/3 159/25 160/22
164/12 166/11
**conducted [3]** 3/6
164/1 164/14
**conducting [1]** 69/20
**conductor [1]** 74/10
**confers [1]** 126/23
**confidence [1]** 66/16
**confirm [1]** 117/9
**confirmed [1]** 95/16
**conflict [2]** 60/22 66/3
**conflicts [1]** 60/20
**conformity [1]** 116/24
**confronted [1]** 151/21
**confused [1]** 69/15
**confusion [1]** 73/18
**conjunction [1]** 132/3
**connection [1]** 84/4
**connotation [1]** 69/14
**consent [16]** 34/3
116/9 117/8 119/13
119/17 119/20 119/22
120/16 120/23 122/6
122/11 123/3 139/17
140/6 140/10 140/11
**consented [2]** 122/16
139/25
**consenting [54]** 9/23
10/1 10/4 10/4 10/8
10/8 10/21 10/22 10/23
11/19 12/15 12/25 13/4
13/16 14/6 14/7 14/10
14/19 30/7 31/23 32/9
34/19 57/1 57/3 57/10
61/15 63/5 118/18
118/20 118/22 118/24
120/2 120/24 121/1
121/16 122/18 139/15
139/23 139/24 140/17
140/18 140/18 141/8
141/11 141/12 141/15

141/22 142/8 142/9
142/11 142/12 155/2
158/3 158/4
**consider [2]** 89/7 110/4
**consideration [3]**
26/23 34/15 127/11
**considerations [3]**
27/6 27/14 174/24
**considered [3]** 74/14
76/11 173/23
**considering [2]** 97/18
161/13
**considers [1]** 169/18
**consistent [6]** 48/18
85/11 116/19 119/2
119/3 125/25
**consistently [1]** 116/1
**consolidated [3]**
127/23 128/19 129/3
**constant [2]** 22/15 75/1
**constituent [1]** 46/6
**constitute [2]** 76/13
133/1
**constitutes [1]** 131/15
**constraints [1]** 72/18
**constructed [1]** 165/20
**construction [2]** 44/6
131/10
**consultants [3]** 43/8
54/3 56/5
**contained [4]** 49/5
95/22 96/17 173/20
**contemplated [1]**
143/17
**contemplating [1]**
117/4
**contest [1]** 108/24
**context [6]** 17/4 17/9
73/21 128/7 141/7
160/11
**continual [1]** 22/15
**continue [8]** 51/2 62/8
63/1 64/19 65/8 66/14
117/5 136/25
**Continued [1]** 2/1
**continues [1]** 116/23
**continuing [2]** 73/2
133/13
**contract [8]** 44/7 96/19
101/16 103/23 137/15
137/24 150/7 166/9
**contractor [10]** 43/12
44/8 45/21 126/12
146/22 146/23 146/25
161/9 166/8 168/24
**contractors [1]** 43/2
**contractual [1]** 155/19
**contractually [1]** 11/6
**contradict [1]** 85/12
**contrary [2]** 119/21
163/10
**contribute [3]** 120/23
130/20 130/21
**contributed [6]** 129/19

# C

**contributed... [5]**
130/19 165/11 165/18
165/23 165/23
**contributes [1]** 145/6
**contributing [2]** 165/16
166/5
**control [9]** 6/8 6/11
15/12 69/12 145/8
152/18 153/4 156/21
176/23
**convene [1]** 5/1
**converting [1]** 135/19
**convey [2]** 124/11
125/13
**conveyed [2]** 86/2
125/11
**convincing [1]** 151/6
**cooperate [11]** 37/21
62/8 62/14 62/18 63/1
63/2 70/15 115/20
123/18 159/15 160/7
**cooperated [2]** 62/7
166/20
**cooperates [1]** 56/6
**cooperation [10]** 10/18
37/19 37/22 38/20
61/20 62/11 70/1 77/13
113/10 158/23
**coordinate [4]** 46/24
48/24 162/17 162/22
**coordinates [22]** 45/11
45/20 45/20 45/24
45/25 46/17 48/17
48/18 48/19 49/1 129/9
162/7 162/9 162/9
163/7 163/8 163/14
163/21 166/2
**coordination [1]** 75/23
**copies [7]** 83/20 84/2
86/14 87/5 91/25 92/1
94/22
**copy [15]** 30/21 31/3
31/5 31/8 82/17 82/18
86/16 86/19 87/1 87/10
92/21 93/15 107/19
108/9 115/24
**corners [3]** 84/24
104/12 117/24
**Corp [1]** 101/14
**corporate [3]** 17/16
41/8 42/24
**correct [112]** 5/12 6/3
6/4 6/9 6/13 6/14 6/18
6/19 6/23 7/2 7/4 7/5
7/6 7/7 7/9 7/13 7/18
7/19 7/21 7/25 8/3 8/24
8/25 9/11 9/17 10/12
10/13 10/16 11/9 11/10
11/13 12/2 12/12 13/9
13/10 13/12 13/13 15/7
15/13 16/5 16/16 19/22
20/3 20/7 21/4 21/24

22/5 25/3 25/4 25/19
26/14 26/15 26/22
28/15 28/16 29/3 29/4
30/1 30/8 30/14 30/15
35/5 36/4 36/12 37/15
39/16 40/9 40/10 41/10
42/14 42/18 43/4 44/9
44/10 44/13 44/14 46/9
46/10 46/12 46/13 47/4
47/5 48/10 48/16 49/19
49/22 50/17 50/18 51/7
51/11 51/23 53/5 53/6
53/17 55/2 56/21 56/22
59/22 67/2 68/24 71/12
71/17 79/6 80/16 80/25
81/17 83/6 86/17
122/25 173/11 174/1
176/7
**correctly [7]** 9/24
39/18 40/20 57/14
78/25 79/5 162/13
**correspondence [1]**
88/24
**corresponding [1]**
145/5
**cost [12]** 27/19 49/21
49/22 63/19 63/22 64/5
64/9 64/15 71/3 130/4
170/25 171/17
**costs [8]** 27/14 28/1
53/11 53/13 130/8
132/18 133/16 169/19
**could [61]** 5/10 16/7
20/8 20/11 21/11 21/20
29/18 44/18 45/6 45/10
47/6 50/7 50/9 54/18
59/21 60/24 65/25 66/1
66/21 68/21 69/2 69/15
72/6 72/23 76/16 76/25
78/9 79/8 79/14 79/21
81/18 83/25 87/7 93/13
95/8 95/9 99/1 99/2
111/1 114/8 115/23
118/9 131/2 133/17
134/22 140/2 147/6
148/22 149/15 150/13
150/24 153/10 153/12
153/25 156/11 161/22
161/22 164/9 167/23
168/1 171/12
**couldn't [4]** 8/4 87/8
149/25 168/8
**counsel [43]** 8/15
14/25 18/6 47/11 49/13
55/21 58/4 58/20 59/15
59/19 60/13 61/9 61/19
63/12 72/3 76/23 76/25
81/11 81/16 82/6 82/7
83/13 84/25 86/9 86/15
86/20 87/24 92/21
98/17 98/19 100/1
103/11 104/8 106/10
106/20 107/20 110/2
110/10 110/17 110/21

149/4 157/4 174/25
**Counsel's [4]** 60/5
70/16 102/6 102/7
**count [3]** 97/5 97/7
102/17
**counted [1]** 121/8
**counter [4]** 109/4
110/5 169/11 173/5
**counter-declaration [3]**
109/4 110/5 169/11
**counter-designation**
**[1]** 173/5
**countless [1]** 102/16
**county [3]** 124/21
124/22 153/17
**couple [9]** 73/16
108/23 123/23 126/7
127/17 136/8 138/15
143/21 155/23
**course [4]** 51/14 71/23
128/15 129/15
**court [201]**
**Court's [14]** 18/13 46/5
79/20 86/21 92/19
101/13 103/23 106/1
106/17 109/9 110/8
164/16 169/8 172/9
**courtroom [6]** 10/9
41/11 81/8 88/18
113/24 154/20
**courts [3]** 89/10 135/20
150/2
**cover [2]** 65/18 173/5
**covered [1]** 173/7
**Craige [37]** 5/1 6/3
7/21 7/24 8/2 9/2 11/23
15/4 26/8 26/19 28/13
28/15 28/25 29/2 52/11
53/21 72/8 76/3 87/14
112/22 112/24 119/9
123/10 129/24 130/5
130/6 130/12 130/14
130/16 134/23 139/9
142/5 145/11 146/20
165/12 165/23 170/24
**create [8]** 96/20 102/24
119/16 137/24 144/16
152/9 155/13 160/8
**creates [4]** 46/11 64/12
153/6 156/13
**creating [1]** 153/3
**credibility [1]** 154/20
**credible [2]** 158/16
159/6
**creek [18]** 45/15 45/16
46/20 48/12 113/1
123/9 123/13 124/5
124/8 124/12 124/25
126/3 162/6 162/21
165/5 165/7 165/17
166/1
**crisis [1]** 152/10
**criteria [1]** 61/6
**critical [2]** 26/4 114/5

**cross [15]** 3/7 5/4 5/7
18/12 60/5 60/9 65/18
73/16 76/7 95/21 97/10
97/16 105/3 159/23
162/12
**cross-examination [3]**
18/12 97/16 162/12
**cross-examined [3]**
95/21 97/10 105/3
**CRR [5]** 1/14 176/3
176/13 176/14 176/18
**cry [1]** 157/17
**curing [1]** 8/12
**current [9]** 48/12 49/1
51/12 51/14 51/15
115/11 146/20 162/18
163/7
**currently [3]** 28/14
42/12 86/6
**custom [14]** 101/18
101/22 102/5 102/11
102/18 102/23 103/5
103/8 103/14 103/21
104/2 104/7 105/9
105/16
**customarily [1]** 103/6
**cut [5]** 87/17 87/18
87/19 88/1 88/17
**cutting [1]** 87/22
**CV [1]** 1/4

# D

**D-rings [1]** 35/12
**daily [1]** 44/17
**damage [11]** 22/18
26/18 69/20 171/5
171/6 171/14 171/15
172/6 172/8 173/7
174/8
**damaged [5]** 171/4
171/9 171/12 171/21
172/4
**damages [17]** 26/5
133/5 133/5 133/7
133/21 134/13 134/16
135/10 150/3 150/4
150/6 150/13 150/13
150/14 151/10 152/7
169/19
**dance [1]** 65/18
**danger [1]** 160/2
**dangerous [5]** 55/9
143/19 147/1 159/21
166/10
**Daniel [1]** 2/2
**date [20]** 1/13 6/13
6/17 7/1 7/8 7/8 15/21
15/24 16/1 19/25 43/21
55/23 60/18 61/2 78/9
137/12 161/6 161/7
173/20 176/9
**dated [1]** 58/5
**dates [1]** 176/9
**day [21]** 19/24 46/8

46/12 48/13 99/9
113/10 113/10 128/10
128/11 128/13 128/18
137/7 137/25 139/7
139/12 140/2 140/5
142/18 145/7 145/7
170/4
**days [36]** 6/12 6/21
6/22 8/11 8/24 9/8 9/16
10/11 10/16 10/18
11/13 11/15 12/11
12/17 13/17 13/20 20/1
39/13 43/1 77/24 77/25
78/2 96/7 97/3 104/17
120/3 120/13 146/8
146/24 157/12 158/1
158/10 158/12 164/4
164/21 174/25
**deadline [10]** 9/14
11/13 12/17 17/12 97/2
142/17 146/24 156/24
156/25 157/16
**deadlines [2]** 55/22
153/9
**deal [3]** 18/9 68/20
125/4
**dealing [1]** 157/13
**debate [1]** 154/2
**December [10]** 5/11
6/5 6/17 11/17 13/8
40/23 43/20 77/21
156/22 156/24
**December 22 [8]** 5/11
6/5 6/17 11/17 13/8
43/20 156/22 156/24
**decide [2]** 6/21 28/6
40/7 102/15 134/9
**decided [2]** 6/9 34/10
**deciding [2]** 6/12
101/10
**decision [7]** 17/3 28/8
95/10 101/15 102/3
145/13 149/14
**declaration [23]**
108/12 108/25 109/4
109/4 109/17 110/5
110/5 110/16 110/20
111/18 111/22 111/25
112/4 114/16 169/11
169/25 170/6 170/8
170/9 170/13 170/18
170/23 174/21
**declaratory [2]** 97/5
97/7
**decline [3]** 34/24
133/12 147/20
**declined [1]** 115/7
**declines [4]** 30/7 30/18
34/19 112/18
**declining [1]** 134/22
**dedicate [1]** 72/20
**deemed [1]** 131/18
**deems [1]** 106/11
**deepen [1]** 156/1

# D

**deepened [2]** 121/12 171/16
**deepening [2]** 144/6 156/7
**deeper [1]** 144/7
**Defendant [6]** 2/2 4/17 5/4 106/25 112/12 146/2
**Defendant's [13]** 5/14 76/23 76/24 76/25 77/1 107/13 107/14 107/17 109/13 109/14 109/18 111/19 170/7
**Defense [12]** 35/9 39/6 81/16 82/7 86/20 92/21 100/1 102/6 102/6 106/10 110/17 110/21
**define [1]** 62/20
**defined [1]** 37/24
**definitely [1]** 22/2
**DeGolyer [2]** 54/7 54/9
**dehydrates [1]** 53/5
**delay [5]** 26/18 26/20 28/9 29/13 141/19
**deliberate [1]** 149/13
**delineated [1]** 77/12
**delivered [6]** 11/5 12/9 12/22 13/2 13/7 157/10
**delving [1]** 18/4
**Dempsey [2]** 2/3 164/14
**denial [1]** 89/22
**denied [5]** 89/17 89/20 99/22 132/1 146/7
**denies [7]** 16/18 18/23 19/10 19/19 19/23 24/23 49/15
**deny [1]** 164/16
**denying [1]** 18/8
**DEP [13]** 36/2 77/21 80/11 80/16 80/21 113/9 164/4 164/5 164/10 166/10 173/12 174/2 174/12
**DEP's [1]** 174/13
**Department [7]** 20/4 37/6 39/18 39/20 40/6 77/24 159/16
**depend [1]** 27/4
**depending [3]** 120/11 132/18 172/7
**deposition [1]** 18/16
**deprive [1]** 145/17
**depth [2]** 73/11 158/19
**describe [1]** 125/8
**described [2]** 49/22 74/19
**describes [1]** 140/7
**describing [2]** 50/24 105/19
**description [2]** 105/21 105/23
**deserves [1]** 102/8

**designate [1]** 118/17
**designated [7]** 114/9 118/19 118/23 121/23 137/25 155/14 155/19
**designating [1]** 115/14
**designation [1]** 173/5
**designed [1]** 165/20
**desire [1]** 109/9
**desired [2]** 100/5 103/9
**desires [1]** 16/13
**despite [1]** 12/7
**destroyed [1]** 160/20
**detail [1]** 120/16
**determination [3]** 23/9 39/20 50/18
**determine [6]** 18/7 33/16 40/6 111/21 111/22 149/1
**determining [1]** 50/16
**develop [13]** 24/14 27/19 53/21 55/4 64/19 65/12 68/4 124/21 131/8 131/11 131/18 160/23 172/4
**developed [7]** 27/11 28/3 85/4 130/21 166/6 166/24 170/24
**developing [6]** 21/24 21/25 24/19 60/24 147/22 152/1
**development [29]** 22/14 22/16 23/6 24/1 24/3 24/4 24/6 24/9 24/9 24/10 24/15 25/12 27/2 27/3 28/9 51/2 63/25 64/11 65/9 70/25 71/2 71/6 130/18 131/23 133/20 145/4 148/1 165/11 166/5
**dialogue [2]** 22/15 22/15
**did [73]** 6/10 15/24 20/16 20/16 20/18 21/8 21/9 23/14 23/15 23/16 23/16 23/17 23/18 23/19 23/20 23/21 25/6 25/11 25/15 25/16 29/7 33/19 39/1 39/3 39/23 40/20 46/25 47/1 52/8 52/8 55/6 57/14 57/15 59/8 59/9 59/20 65/18 71/25 78/25 79/4 83/20 93/9 95/15 95/16 96/16 98/2 98/18 99/19 105/2 105/2 109/16 121/19 124/11 131/19 133/15 134/18 135/2 137/14 138/25 139/1 141/16 142/6 142/7 147/24 152/4 152/20 155/11 156/22 157/3 162/15 165/14 165/24 165/24
**didn't [72]** 7/21 7/23 8/2 8/7 8/22 10/10

10/15 10/20 12/24 13/16 13/19 13/21 17/20 23/12 23/18 23/20 24/17 24/24 25/11 25/14 25/14 28/17 28/18 29/7 34/12 34/23 46/24 52/23 65/18 65/21 72/3 72/19 80/7 87/6 87/11 90/17 90/18 98/11 98/19 98/23 99/6 104/22 118/3 118/4 123/22 124/25 127/18 129/6 135/1 137/24 139/2 139/3 141/11 143/21 145/17 149/1 150/23 152/25 153/10 157/21 158/9 158/25 158/25 159/7 159/8 159/10 161/2 164/6 165/17 165/19 167/5 172/19
**difference [2]** 74/4 162/14
**different [23]** 46/22 51/7 74/13 75/20 89/10 90/21 91/2 102/11 103/12 105/11 105/13 105/20 117/21 124/24 125/5 131/9 136/7 144/25 145/1 168/19 170/9 170/14 171/23
**difficult [7]** 28/10 64/5 70/23 71/4 78/21 88/7 138/3
**difficulty [1]** 78/18
**digest [1]** 108/1
**diligence [2]** 136/25 137/4
**diligent [1]** 90/9
**direct [9]** 3/6 21/13 22/15 55/20 57/16 65/21 139/13 148/1 176/23
**directed [3]** 46/4 47/11 147/11
**directing [1]** 147/7
**dirt [1]** 160/18
**disagree [10]** 13/24 24/2 24/4 24/5 24/7 138/4 142/1 143/23 144/2 167/21
**disagreed [6]** 14/6 23/1 23/3 23/4 23/6 154/8
**disagreement [2]** 22/4 155/4
**disclose [9]** 97/25 98/12 98/15 98/19 98/24 99/7 99/10 99/11 99/19
**discovery [3]** 24/11 79/8 90/18
**discuss [1]** 108/14
**discussed [3]** 72/11 72/21 116/25

**discussing [1]** 73/1
**discussion [10]** 59/17 59/22 60/12 61/11 61/12 61/18 61/18 63/11 111/14 139/7
**discussions [1]** 22/21
**dismissive [1]** 163/9
**displace [1]** 146/17
**dispute [10]** 24/18 89/14 96/5 100/24 118/4 118/12 130/1 130/4 141/19 165/22
**disputes [1]** 89/3
**disputing [2]** 70/8 165/24
**distinction [4]** 105/22 120/8 120/14 126/12
**distinguishable [1]** 91/2
**distinguished [1]** 88/15
**DISTRICT [17]** 1/1 1/2 93/21 93/22 94/2 94/2 94/7 94/8 94/12 94/12 97/9 97/13 150/10 176/4 176/5 176/19 176/19
**divide [1]** 174/3
**do [185]**
**doc [2]** 86/6 92/21
**docket [50]** 46/2 46/7 46/8 46/9 47/4 47/13 47/19 47/21 47/22 48/7 48/16 48/19 48/20 48/21 48/25 49/1 49/6 49/8 49/9 83/19 83/24 84/1 89/11 89/14 124/12 125/22 125/23 126/4 126/5 126/6 126/8 126/14 126/16 127/1 127/6 127/14 127/23 128/6 128/8 128/10 129/17 162/19 162/22 163/1 163/1 163/3 163/3 163/19 163/21 163/22
**dockets [1]** 128/1
**document [21]** 30/22 46/14 49/4 76/22 84/7 87/3 87/4 90/16 90/21 92/22 93/14 94/5 94/10 104/12 106/16 107/6 117/24 119/2 122/3 126/25 166/1
**documents [2]** 83/16 126/21
**does [48]** 8/16 13/3 25/8 41/20 41/22 46/18 51/4 53/2 53/4 57/5 60/15 60/21 62/24 63/2 63/17 64/13 64/19 65/4 65/15 68/1 68/5 69/4 73/20 82/24 85/13 96/9 96/21 101/17 106/15

106/24 116/8 116/12 117/21 124/15 129/11 129/12 129/14 135/3 136/17 137/6 137/8 140/9 152/24 152/25 154/20 160/12 172/10 176/22
**doesn't [47]** 10/1 10/2 10/6 10/22 11/7 14/7 17/11 18/21 25/10 26/17 27/4 32/1 46/17 48/5 51/9 52/17 53/3 67/7 67/14 67/25 68/1 68/2 68/3 68/14 86/16 87/14 88/16 96/14 104/22 118/13 127/5 127/8 129/10 129/14 129/21 133/21 139/3 152/6 152/10 152/23 156/18 158/3 162/14 163/6 168/12 169/10 173/20
**doing [14]** 61/16 65/20 90/3 103/8 125/17 132/6 138/11 144/15 152/2 156/3 156/17 159/1 159/9 161/8
**doll [2]** 91/9 91/10
**dollar [1]** 28/22
**dollars [3]** 120/25 173/11 174/9
**don't [116]** 12/19 13/23 19/7 19/13 21/9 21/18 29/9 29/12 32/2 32/12 34/5 35/3 35/3 38/8 43/9 44/1 47/17 49/24 51/1 51/16 52/2 52/6 54/4 54/12 54/14 57/7 60/7 66/10 68/6 68/7 69/11 69/14 70/9 70/22 71/8 71/16 73/11 74/11 74/20 75/4 78/9 78/10 78/11 83/24 84/20 84/21 85/5 86/4 86/10 87/5 88/8 89/2 89/25 90/1 90/5 90/10 90/11 90/11 90/13 91/3 96/5 99/6 99/12 99/22 104/6 107/4 108/5 108/6 108/8 109/13 118/17 120/3 120/22 123/2 129/4 129/4 129/25 130/20 132/22 133/18 134/1 135/14 137/8 138/4 141/18 141/24 145/7 145/10 145/12 145/14 145/19 146/14 148/24 150/18 151/11 151/13 151/16 153/9 153/24 154/4 156/20 159/10 161/1 161/9 161/17 162/14 162/23 165/25 166/8 166/19 167/10 167/16 168/10

# D

**don't... [3]** 169/2 174/9 174/17
**done [36]** 7/15 7/16 7/18 19/24 38/11 39/11 39/15 42/15 65/21 66/15 68/20 70/23 76/6 76/7 76/9 88/16 105/14 105/14 113/11 117/15 118/6 125/24 136/13 136/14 136/17 136/18 136/20 136/23 156/3 160/2 160/5 161/15 166/20 167/3 168/4 175/1
**door [2]** 98/11 99/2
**Dorsey [2]** 94/20 103/25
**doubt [6]** 32/18 116/21 142/1 152/3 154/22 162/25
**down [15]** 11/8 27/15 73/25 77/2 77/11 89/6 132/7 132/15 132/19 133/2 135/5 137/23 138/5 145/3 161/21
**downhole [1]** 69/5
**draft [3]** 81/16 147/6 164/23
**drafted [2]** 100/17 150/11
**drain [2]** 135/5 136/2
**drainage [27]** 25/17 25/21 26/2 26/4 26/11 29/8 53/20 54/18 54/20 54/23 134/18 135/4 135/4 135/14 135/24 136/3 148/9 148/14 148/19 149/2 149/3 149/8 151/11 151/20 152/16 152/22 153/2
**draining [3]** 134/23 135/18 135/21
**drill [35]** 7/9 7/14 20/4 36/11 42/25 43/1 43/9 43/10 43/12 44/16 68/15 69/24 70/11 73/21 74/1 74/2 74/8 74/11 78/5 78/9 80/15 113/8 114/12 117/1 119/14 120/5 120/17 122/10 125/18 132/12 135/5 135/22 143/25 145/16 160/13
**drilled [16]** 56/6 64/1 114/24 116/7 116/14 117/13 119/20 121/12 121/14 121/22 121/24 122/5 122/6 132/17 145/15 166/6
**drillers [1]** 56/5
**drilling [39]** 15/13 39/14 55/9 63/4 68/21 69/19 73/3 73/23 74/15 74/16 75/8 75/11 75/20 75/21 77/24 77/25 78/3 80/25 112/25 114/15 115/1 116/4 117/7 120/4 120/6 121/5 121/7 121/8 121/10 121/21 124/1 140/4 140/9 144/5 144/8 144/13 146/23 159/20 159/25
**drills [1]** 74/8
**drive [1]** 128/21
**drop [5]** 26/3 45/17 46/20 46/24 162/7
**drop-pin [1]** 45/17 46/20 46/24
**due [3]** 16/25 104/7 137/4
**duly [1]** 113/8
**duly-issued [1]** 113/8
**during [7]** 23/23 24/25 27/15 61/18 72/18 90/20 104/22
**duties [1]** 43/10
**duty [2]** 97/25 99/19
**dwell [1]** 167/16
**dwelling [1]** 117/4

# E

**e-mail [35]** 21/15 21/21 22/12 24/8 24/25 25/8 29/10 29/12 29/15 29/19 30/4 30/4 33/14 33/20 34/17 48/25 58/2 58/5 58/8 59/6 59/8 67/1 67/4 67/25 68/3 68/8 71/24 72/1 72/7 72/8 104/8 105/3 154/5 154/10 167/7
**e-mails [2]** 72/2 72/4 72/10
**each [11]** 6/15 12/23 37/21 56/13 61/3 92/9 92/15 93/9 93/14 100/10 131/9
**earlier [10]** 53/19 68/8 77/15 84/4 92/5 98/4 98/12 104/3 109/22 130/20
**earlier-filed [1]** 84/4
**early [2]** 21/23 22/25
**earn [1]** 72/23
**earth [1]** 160/13
**Easement [1]** 97/12
**easements [1]** 8/12
**easier [5]** 35/12 35/13 89/2 119/17 120/5
**easiest [1]** 122/24
**Eastern [1]** 94/12
**easy [4]** 87/16 119/19 119/23 124/6
**ECF [3]** 83/19 84/11 95/24
**economic [2]** 28/8

171/5
**economist [1]** 79/13
**Edleblute [5]** 82/2 86/15 86/19 92/20 94/15
**effect [7]** 19/23 49/25 50/4 52/14 77/15 105/25 119/22
**effectively [1]** 113/12
**effectuate [1]** 116/10
**efficient [1]** 90/3
**efficiently [1]** 113/12
**eight [11]** 20/11 86/21 116/16 116/17 117/3 117/6 117/7 117/18 125/18 132/19 151/1
**either [9]** 39/15 68/7 89/10 95/8 138/24 152/13 153/1 163/5 165/2
**elect [10]** 11/5 12/9 12/22 12/24 13/2 13/11 13/14 13/16 110/20 157/10
**elected [10]** 11/18 12/1 12/3 12/5 13/5 34/10 34/14 61/23 63/5 114/9
**electronic [1]** 89/13
**elects [5]** 30/6 30/17 30/19 31/17 34/18
**elements [1]** 124/9 136/7
**eliminate [2]** 32/18 154/21
**eliminated [1]** 87/19
**Elizabeth [1]** 1/18
**else [5]** 115/14 135/2 141/25 155/20 165/25
**emanates [1]** 140/6
**embrace [1]** 148/21
**emergency [11]** 22/10 23/8 150/9 152/12 153/6 157/18 157/19 157/20 157/22 157/23 164/2
**employ [1]** 39/10
**employees [9]** 40/21 40/24 41/9 42/25 43/17 138/14 138/15 166/8 169/12
**encompassing [1]** 125/10
**end [8]** 11/8 14/4 21/13 40/23 49/13 95/9 99/9 138/5
**ends [3]** 47/12 121/15 157/8
**Energy [2]** 1/3 41/7
**enforce [1]** 150/10
**engage [3]** 43/2 54/5 56/5
**engaged [5]** 43/5 43/7 43/8 43/12 43/24
**Engelund [1]** 96/4

**engineer [2]** 148/25 149/2
**engineering [1]** 62/5
**engineers [1]** 54/5
**enhanced [1]** 130/21
**enjoin [1]** 172/3
**enjoined [2]** 169/20 174/14
**enjoyed [1]** 174/25
**enlarge [2]** 45/11 47/7
**enough [6]** 113/4 117/1 137/17 140/14 145/19 167/12
**ensure [2]** 39/22 118/24
**enter [2]** 146/10 146/13
**entered [5]** 20/22 20/23 97/20 122/7 127/1
**entertain [1]** 110/24
**entire [11]** 30/22 36/18 41/5 72/1 112/17 115/21 117/20 119/13 135/25 156/8 157/3
**entirety [1]** 86/21
**entities [1]** 41/5 41/9 42/24
**entitled [3]** 94/6 120/19 131/1
**entitles [1]** 10/11
**entity [2]** 129/7 169/21
**environmental [4]** 20/5 36/3 36/6 159/16
**environments [1]** 27/16
**envisioning [1]** 110/9
**Epsilon [153]** 1/3 6/5 6/8 6/11 7/21 7/23 8/16 12/3 14/17 15/12 15/24 16/19 17/16 18/23 19/11 19/11 20/3 22/5 22/25 23/4 23/11 24/7 24/18 24/22 26/9 26/22 28/18 36/9 36/23 38/7 38/19 40/21 40/23 40/25 41/5 41/7 41/8 41/8 42/24 43/17 45/21 50/1 51/4 51/16 53/10 54/2 54/12 55/3 55/6 55/25 56/1 56/4 56/5 56/6 56/21 56/25 57/5 57/10 57/21 59/21 60/15 60/18 61/1 61/10 61/16 61/22 62/9 62/13 62/14 62/17 62/24 63/17 64/25 65/4 65/5 65/14 65/15 68/3 75/17 76/1 76/2 77/12 77/17 77/20 78/7 95/2 95/7 112/21 112/22 113/1 113/7 113/9 113/14 113/16 113/18 113/21 114/8 114/8 114/16 115/1 115/3 115/4 115/6 116/9 116/17

116/22 117/9 117/13 122/15 122/16 122/19 124/4 124/11 125/13 125/24 126/1 127/16 129/20 129/22 130/4 130/14 130/18 130/24 131/11 136/22 137/14 140/17 140/21 142/12 142/22 143/5 143/19 145/9 145/22 146/11 146/21 147/6 147/9 147/9 150/22 151/1 151/5 152/17 153/25 158/9 158/21 165/5 165/8 165/10 166/6 166/12 169/13 169/13
**Epsilon's [24]** 16/19 23/1 40/20 49/14 56/1 56/13 59/16 60/21 60/21 63/11 63/11 63/14 63/18 64/13 64/25 65/18 95/23 118/2 119/1 119/2 128/9 143/9 146/6 164/24
**equally [3]** 96/9 104/15 114/24
**equals [2]** 117/17 127/7
**Equinor [10]** 9/20 10/9 10/20 21/1 51/21 52/16 52/20 158/7 165/24 168/11
**equip [1]** 121/17
**equipment [16]** 44/7 69/1 73/23 74/7 74/12 74/18 74/21 74/23 74/25 75/7 75/8 75/10 132/15 140/4 160/14 160/20
**error [1]** 154/21
**errors [1]** 154/11
**Esquire [8]** 1/18 1/18 1/21 1/23 2/2 2/3 2/3 2/4
**essence [1]** 97/6
**essentially [6]** 59/19 78/19 91/14 129/18 130/2 159/14
**establish [5]** 87/24 91/3 91/4 103/19 143/14
**established [10]** 104/5 104/14 123/6 126/11 127/13 130/23 136/6 142/13 142/24 144/19
**establishes [4]** 146/9 170/24 170/24 174/21
**establishing [3]** 71/9 85/16 89/18
**estimate [6]** 44/18 44/19 50/25 64/8 71/3 75/14
**estimated [6]** 15/21

# E

estimated... **[5]** 15/24
171/5 171/17 172/1
172/1
et **[2]** 93/13 93/20
Eugene **[1]** 93/25
euphemism **[1]** 161/13
evaluate **[1]** 54/14
evaluates **[1]** 148/25
evaluation **[3]** 54/6
71/1 173/2
evasive **[1]** 148/17
even **[35]** 12/22 13/15
20/5 21/6 27/12 35/3
40/8 66/3 84/2 86/10
87/12 96/13 96/22
98/11 100/4 106/5
113/17 114/2 114/2
131/10 135/13 146/22
149/3 154/19 158/9
158/11 158/12 161/9
161/22 164/8 166/24
168/6 173/16 173/20
174/2
event **[4]** 19/9 60/14
69/12 115/7
events **[1]** 18/5
eventually **[2]** 49/25
130/14
ever **[10]** 64/23 98/1
115/13 115/18 116/21
121/7 121/8 143/20
150/14 168/21
ever-present **[1]** 64/23
every **[6]** 24/18 88/23
128/20 131/22 133/4
146/11
everybody **[8]** 35/14
35/23 92/12 95/3
104/11 139/25 145/5
165/25
everybody's **[1]** 140/14
everyone **[7]** 5/2 84/1
111/17 123/1 139/22
139/23 175/1
everything **[7]** 12/8
26/3 61/17 86/14 147/7
155/20 167/4
evidence **[76]** 20/10
71/23 83/13 84/12 87/9
88/9 88/21 90/2 90/5
90/14 90/16 90/17
90/19 90/19 91/1 91/5
91/14 91/22 91/24
94/18 95/18 96/6 96/24
97/14 97/20 99/14
101/15 101/16 101/22
102/4 103/20 104/6
104/11 104/15 104/16
104/22 106/9 106/14
106/19 107/5 107/9
109/1 109/8 109/22
110/2 112/6 112/10
113/15 113/17 127/2
127/10 127/18 128/5
131/7 131/19 142/6
143/3 143/8 146/8
148/14 148/20 148/23
149/8 151/11 158/11
162/1 162/5 166/4
166/14 166/15 166/22
173/19 173/25 174/16
174/22 175/1
evidenced **[1]** 22/14
evolved **[1]** 147/17
evolves **[1]** 146/11
evolving **[2]** 147/17
149/9
exact **[5]** 59/5 111/8
141/6 156/6 162/21
exactly **[8]** 73/20
100/21 105/22 118/16
122/21 127/5 127/7
130/19
examination **[9]** 5/7
18/12 55/16 66/23
73/17 80/3 97/16
134/25 162/12
examined **[5]** 78/17
95/21 97/10 105/3
157/2
example **[4]** 79/7
100/23 135/8 138/1
examples **[1]** 68/8
exception **[2]** 18/25
117/19
exchange **[5]** 21/22
25/1 48/25 62/1 115/3
exchanged **[1]** 28/19
exchanges **[1]** 24/8
exclude **[3]** 129/15
129/21 129/22
Excluding **[1]** 120/4
exclusive **[2]** 27/21
135/6
Excuse **[1]** 30/21
excused **[2]** 81/5 81/10
executive **[1]** 20/13
executives **[2]** 150/21
166/15
exercise **[1]** 11/15
exercised **[2]** 8/10
11/14
exercising **[2]** 65/11
133/3
exhibit **[82]** 4/3 4/4 4/5
4/6 4/7 4/8 4/9 4/10
4/11 4/12 4/13 4/14
4/15 4/18 4/19 5/9 5/10
5/16 5/18 5/20 6/2 6/15
9/2 9/4 9/10 15/19 20/9
20/9 21/11 29/10 29/18
30/24 35/8 39/5 39/6
45/8 45/9 45/13 45/15
46/1 46/25 47/2 55/21
56/9 58/1 59/2 59/6
66/21 66/25 71/22 77/1
82/15 84/7 84/13 84/16
89/5 93/3 93/17 93/23
93/24 94/4 94/9 94/9
106/16 107/5 107/8
107/14 107/17 108/7
108/8 108/10 109/16
109/17 111/19 115/24
119/8 139/9 162/1
162/2 162/3 162/5
162/16
Exhibit 1 **[4]** 9/10 15/19
119/8 139/9
Exhibit 24 **[1]** 47/2
Exhibit 30 **[4]** 5/10 5/16
5/18 6/2
Exhibit 40 **[2]** 35/8 39/6
Exhibit 45 **[3]** 29/10
29/18 66/25
Exhibit 50 **[1]** 94/9
Exhibit 7 **[2]** 20/9 84/16
exhibits **[15]** 4/1 13/9
45/8 82/25 83/1 83/3
83/5 83/17 89/8 90/18
93/5 94/18 106/19
124/24 125/9
exist **[5]** 87/15 96/21
129/6 129/7 129/17
existed **[4]** 25/18 25/23
129/9 151/3
existence **[3]** 98/15
101/17 173/16
existing **[24]** 49/24
61/25 63/2 68/14 68/19
70/13 76/8 112/24
114/13 115/15 115/19
116/15 117/16 117/23
118/4 118/6 144/11
144/21 155/17 156/16
156/19 159/24 171/17
172/6
exists **[4]** 118/16 120/8
132/6 135/24
expect **[9]** 87/6 105/10
121/7 135/4 137/21
139/2 159/10 160/6
166/21
expectation **[2]** 121/2
133/10
expectations **[1]** 65/19
expected **[3]** 115/9
128/8 135/5
experience **[5]** 85/1
102/21 143/11 143/22
154/13
experienced **[3]** 143/6
143/9 143/11
expert **[23]** 79/12 94/19
94/20 94/21 95/12
95/24 96/9 96/10 96/14
97/8 97/10 97/14 97/24
98/7 99/17 100/10
100/13 101/21 103/13
104/2 104/15 149/16
150/2
expertise **[2]** 79/14
100/14
experts **[16]** 54/3 95/4
95/9 95/10 95/12 95/13
95/20 96/15 96/15 98/1
98/10 98/16 99/1 99/8
99/11 100/2
expire **[4]** 8/19 8/22
66/14 157/3
expired **[6]** 8/7 13/20
136/12 139/3 157/5
157/14
expires **[1]** 18/11
explain **[9]** 22/22 49/14
61/21 72/11 77/21
101/18 104/12 104/17
162/24
explained **[2]** 118/16
120/7 120/21
explaining **[1]** 70/24
explains **[1]** 147/25
explanation **[6]** 87/16
113/25 157/22 163/17
164/13 164/21
explore **[1]** 109/6
express **[1]** 115/25
expressly **[2]** 48/5
157/8
extend **[11]** 8/9 10/17
11/13 12/11 12/17
16/25 18/25 56/14
157/11 158/1 158/10
extended **[4]** 8/10 9/15
17/12 139/19
extending **[2]** 10/16
57/22
extension **[13]** 14/23
16/10 17/6 57/12 57/22
137/7 139/7 139/12
140/2 140/5 140/23
141/5 158/12
extensively **[1]** 119/9
extent **[12]** 26/12 26/19
26/20 27/2 28/1 79/20
91/18 106/14 115/10
117/11 118/15 136/5
extinguished **[2]**
127/25 128/3
extra **[1]** 111/9
extraordinarily **[4]**
92/11 151/6 163/24
169/4
extraordinary **[4]** 92/7
92/12 152/21 168/14
extreme **[1]** 97/18
extremely **[2]** 163/25
166/10
extrinsic **[3]** 101/16
103/19 104/22

# F

F-R-Y-E **[1]** 93/25
F.3d **[2]** 102/2 153/21
face **[1]** 148/17
facility **[8]** 113/4
162/18 163/8 163/8
165/6 165/17 165/19
166/1
fact **[24]** 8/8 9/8 9/14
11/23 18/22 24/13 52/4
66/2 85/23 86/24 95/17
99/1 99/19 104/15
104/20 122/25 124/6
125/23 126/25 127/21
128/6 135/24 153/8
161/14
factor **[2]** 27/7 167/1
facts **[2]** 91/11 144/23
factually **[1]** 89/3
fail **[2]** 151/9 152/13
failed **[1]** 147/9
failing **[1]** 99/10
fails **[2]** 60/18 61/2
failure **[1]** 136/14
fair **[4]** 6/25 17/23
18/12 133/3
fairness **[2]** 99/20
130/12
fall **[3]** 49/18 95/15
168/19
fallacy **[1]** 172/21
falls **[2]** 49/25 158/15
familiar **[3]** 100/14
164/15 164/16
family **[2]** 41/5 130/16
fantastic **[1]** 175/1
far **[12]** 19/13 19/15
98/25 102/18 117/1
119/6 124/22 129/24
131/21 132/19 133/3
168/19
farmout **[11]** 124/10
124/17 124/18 125/14
125/19 125/20 125/20
125/25 127/13 127/16
163/12
fashion **[2]** 86/22 164/9
fault **[1]** 99/15
Fausnaught **[7]** 1/14
1/14 176/3 176/13
176/14 176/18 176/20
favor **[2]** 92/14 142/16
fear **[1]** 106/4
federal **[3]** 32/22 89/13
169/15
fee **[6]** 50/24 53/8
64/16 64/17 64/21 71/9
feeds **[1]** 70/19
feel **[2]** 65/4 78/14
feels **[2]** 17/21 110/21
fees **[1]** 49/20
feet **[5]** 36/17 36/18
36/24 74/11 74/11
fell **[3]** 88/1 162/11
162/22
few **[5]** 71/19 72/2 72/4
81/18 108/24
field **[3]** 73/11 79/13
149/12

# F

**Fifth [1]** 96/8
**figure [4]** 78/21 79/3 79/14 132/21
**figures [3]** 170/9 170/14 172/7
**file [5]** 16/22 92/18 133/4 133/6 134/9
**filed [22]** 34/13 54/22 80/11 83/18 83/20 83/25 84/4 84/5 86/6 89/13 93/21 94/1 94/7 94/11 95/2 98/5 98/7 100/1 106/14 106/15 131/20 150/9
**filing [2]** 108/10 134/15
**fill [1]** 120/25
**final [3]** 55/2 94/9 130/11
**finally [4]** 65/7 122/2 134/18 142/19
**financial [4]** 72/18 73/3 104/9 118/23
**find [6]** 73/9 120/24 144/25 146/22 155/15 157/14
**finding [2]** 50/12 73/3
**fine [3]** 67/24 111/7 169/14
**finish [1]** 75/5
**firm [1]** 35/16
**firms [1]** 125/5
**first [42]** 18/14 22/23 25/1 25/2 35/4 49/17 55/6 56/8 65/2 67/11 67/14 68/4 72/5 73/16 74/8 83/17 95/4 96/4 97/25 100/24 102/2 105/11 107/12 111/11 112/12 112/14 114/3 115/23 117/3 119/11 119/24 119/25 136/20 149/9 150/6 150/8 150/14 154/17 155/19 155/24 160/12 160/23
**five [6]** 36/20 71/14 72/6 116/8 116/9 144/3
**flip [1]** 140/8
**focus [5]** 24/17 24/18 59/2 139/5 139/8
**focused [1]** 119/9
**folks [1]** 105/24
**follow [3]** 15/18 31/4 79/19
**following [6]** 11/3 15/21 33/2 36/16 39/17 154/12
**follows [2]** 12/8 147/18
**Food [1]** 147/12
**footnote [1]** 149/10
**Forbes [1]** 1/19
**force [11]** 16/11 16/22 17/2 17/7 17/13 19/1 19/14 70/4 134/2

134/10 165/1
**forecast [1]** 63/24
**forecasted [3]** 50/21 63/20 70/25
**forecasting [1]** 70/24
**foregoing [3]** 176/7 176/10 176/22
**foremost [1]** 115/23
**forget [1]** 125/11
**forgets [1]** 149/21
**form [14]** 39/3 87/10 87/25 100/15 100/17 100/18 100/20 101/4 101/9 101/11 102/22 102/23 103/1 127/24
**formal [2]** 79/9 109/21
**formation [3]** 55/7 159/24 166/7
**formed [1]** 102/20
**formerly [1]** 135/1
**forms [2]** 37/5 113/13
**forth [4]** 22/3 84/21 139/7 176/9
**forward [19]** 40/8 61/16 61/24 64/11 71/2 72/24 100/7 101/24 114/17 115/5 120/4 123/3 131/11 140/10 140/15 141/6 145/13 145/23 155/12
**forwarded [1]** 50/10
**found [8]** 98/2 99/19 113/21 146/22 148/16 169/19 174/14 174/19
**four [37]** 6/25 11/16 15/25 20/4 23/23 26/7 28/11 36/25 41/8 42/2 42/24 43/1 43/13 55/4 56/17 57/3 60/19 61/4 61/5 70/11 83/16 83/16 84/23 89/5 89/10 89/12 93/4 104/12 116/3 116/6 116/11 117/24 121/8 141/23 152/16 156/23 161/5
**fourth [5]** 1/22 25/19 25/24 28/12 157/20
**frack [2]** 43/1 70/11
**fracture [1]** 113/6
**framed [2]** 155/3 156/17
**framework [1]** 114/20
**framing [1]** 60/1
**frankly [3]** 85/20 87/6 106/4
**Friday [3]** 98/6 98/8 100/2
**front [3]** 5/15 35/24 111/11
**frustrated [1]** 133/3
**frustrating [1]** 167/12
**Frye [1]** 93/25
**full [8]** 22/9 40/24

65/14 79/4 79/15 108/2 152/8 167/17
**full-time [1]** 40/24
**fully [1]** 169/13
**function [3]** 99/25 103/23 154/8
**functional [1]** 38/24
**fund [1]** 120/24
**fundamental [1]** 99/20
**funding [1]** 130/21
**fungible [2]** 131/9 131/10
**further [7]** 55/12 57/6 66/18 79/18 85/4 107/9 176/10
**future [7]** 35/11 51/12 65/16 65/19 78/25 133/19 133/19

# G

**gain [1]** 24/11
**gallon [2]** 129/1 129/2
**gallonage [4]** 46/6 162/25 163/2 163/3
**gallons [8]** 46/8 46/12 48/13 128/10 128/11 128/13 128/18 129/5
**game [1]** 118/22
**gap [1]** 120/25
**gas [41]** 21/24 21/25 27/5 27/18 49/17 49/18 49/19 50/3 50/6 51/4 51/17 51/22 52/5 52/20 52/24 54/3 63/21 64/5 70/19 89/19 97/11 102/13 130/13 131/6 131/8 131/23 134/23 135/6 135/17 135/18 147/19 147/21 147/23 149/9 149/12 151/22 152/2 168/10 168/12 171/19 171/25
**gather [1]** 53/2
**gathered [1]** 61/10
**gathering [52]** 21/24 21/25 41/8 49/18 49/18 49/20 50/2 50/5 50/6 50/7 50/13 50/15 50/18 50/24 50/25 51/6 51/11 51/12 51/13 51/17 51/19 51/22 51/25 52/1 52/5 52/12 52/14 52/21 52/24 53/2 63/22 64/4 64/5 64/16 64/21 70/19 71/8 71/9 71/12 71/15 133/16 147/19 147/21 147/23 148/4 149/10 149/12 151/22 152/2 168/11 168/12 171/25
**gathers [1]** 51/9
**gave [3]** 73/15 130/13 135/3
**gears [3]** 123/4 131/4 139/5

**geeze [1]** 135/12
**general [7]** 73/22 80/12 80/13 102/1 124/18 124/21 131/22
**generally [3]** 7/10 68/7 109/12
**generated [1]** 53/9
**gentleman [1]** 17/18
**geographic [1]** 120/9
**geoscience [1]** 62/5
**get [47]** 24/15 27/18 35/19 44/12 44/24 52/2 52/4 52/25 56/6 56/13 60/14 66/1 76/17 89/2 90/11 111/4 111/4 121/2 121/3 127/18 128/14 129/6 132/17 135/2 136/13 136/14 137/1 137/18 138/25 140/3 145/7 145/19 145/22 145/22 149/4 149/16 149/18 149/24 151/16 158/9 160/14 160/14 160/20 161/21 164/4 171/18 173/3
**gets [1]** 55/25 132/12
**getting [8]** 37/21 62/3 111/2 111/3 133/2 139/22 161/8 175/1
**give [26]** 6/21 22/22 30/12 44/18 50/16 80/15 80/24 81/21 87/1 90/4 92/10 93/13 94/15 103/10 106/10 107/22 108/4 108/13 110/13 111/9 134/2 134/10 149/23 158/1 158/11 173/8
**given [8]** 65/13 73/10 82/13 90/2 90/14 127/17 146/15 158/5
**gives [6]** 11/12 13/17 13/19 15/12 157/11 169/18
**giving [2]** 12/12 35/12
**glaring [1]** 121/10
**glass [4]** 129/1 129/11 129/13 129/14
**Glenn [4]** 111/19 172/22 173/12 173/18
**Glenn's [1]** 170/8
**go [59]** 17/22 23/12 23/16 23/18 23/20 23/25 25/11 25/14 25/15 25/16 26/8 27/15 28/12 28/15 29/18 33/16 36/10 40/7 42/25 43/2 43/12 45/7 54/25 56/13 59/1 61/21 67/20 68/14 68/15 69/24 77/3 103/8 109/3 109/9 111/13 112/14 116/16 116/16 123/2 125/19 132/20 133/12 136/2

137/17 137/23 141/6 146/21 146/23 149/10 155/14 164/24 166/18 167/9 167/10 168/25 171/10 171/25 172/6 173/18
**goals [1]** 29/21
**goes [7]** 12/10 18/22 48/22 65/23 121/13 140/1 153/11
**going [116]** 17/1 17/12 17/14 17/21 20/8 22/11 23/14 24/14 24/15 26/11 29/11 34/23 35/7 40/11 40/14 43/17 44/5 45/7 49/2 51/1 57/16 60/5 60/25 62/20 63/25 64/1 64/1 64/2 64/7 65/8 65/19 66/9 68/14 78/5 78/10 78/12 83/23 86/11 92/20 94/23 94/24 95/1 95/13 97/3 103/22 106/6 108/4 108/24 109/2 110/13 110/14 111/8 112/22 113/1 113/3 113/5 113/7 113/9 115/5 116/7 120/23 120/24 121/21 122/13 122/17 125/15 125/17 126/2 126/5 132/12 132/17 132/21 133/10 133/13 133/13 134/9 134/13 134/14 136/14 138/14 138/17 140/8 140/10 140/15 142/2 143/1 144/7 144/9 144/24 144/25 145/1 145/20 147/18 147/19 147/20 147/20 148/8 148/21 149/10 149/21 149/24 151/14 152/20 159/2 159/19 161/1 161/12 161/18 166/21 167/10 169/22 170/2 174/2 174/3 174/7
**golf [1]** 128/22
**gone [4]** 27/24 44/12 159/24 163/24
**good [14]** 5/5 5/6 29/5 55/18 55/19 70/24 75/14 111/17 131/10 132/8 137/17 138/24 166/25 169/14
**goods [1]** 131/9
**got [25]** 38/12 79/1 87/19 87/19 89/9 99/9 99/9 102/21 128/8 128/10 128/12 129/1 129/2 129/5 129/5 129/17 134/20 138/9 138/11 140/14 141/19 144/7 144/8 152/25 169/11

# G

**gotten [1]** 92/5
**govern [1]** 154/16
**governing [2]** 137/20
138/22
**governs [1]** 157/10
**grand [1]** 41/9
**grant [10]** 17/11 26/3
37/11 107/2 145/21
151/7 151/13 152/21
164/9 170/2
**granted [3]** 38/1 100/1
126/25
**granting [3]** 38/2
142/25 142/25
**grants [1]** 76/1
**grateful [1]** 169/5
**gray [1]** 76/15
**great [4]** 18/9 68/20
81/20 100/23
**Gregory [1]** 1/18
**ground [15]** 7/4 7/9
7/24 55/25 62/19 62/24
74/2 76/16 76/17 137/2
161/4 161/12 161/20
164/11 168/23
**grounds [1]** 62/25
**group [1]** 125/6
**groups [1]** 38/24
**grow [1]** 51/2
**guarantee [2]** 66/4
135/15
**guaranteed [1]** 71/14
**guess [11]** 13/22 18/21
83/19 85/9 87/12 98/6
135/6 136/16 151/12
155/10 169/12
**guys [5]** 16/4 17/1
33/12 135/13 144/11

# H

**had [92]** 6/8 6/11 8/1
10/17 10/18 13/4 14/13
16/15 17/4 19/21 20/21
20/22 21/1 21/1 21/5
21/7 22/4 24/19 28/4
33/24 34/2 34/3 34/3
40/23 43/20 48/19
48/25 50/13 60/12 61/7
61/10 65/7 65/20 80/5
80/6 80/15 81/13 85/1
85/21 87/12 88/3 89/5
94/19 97/19 98/2 98/8
98/9 98/18 99/10 100/5
105/7 105/14 108/1
108/20 111/18 113/22
113/24 114/15 114/16
114/20 114/22 117/15
118/21 118/23 119/11
122/7 122/14 122/16
124/3 124/4 124/24
126/16 128/11 130/14
133/20 134/25 137/22
137/25 138/2 138/13

141/17 141/21 142/5
143/11 145/11 145/16
151/1 151/2 152/1
153/4 157/16 176/8
**hadn't [1]** 120/10
**half [3]** 111/2 128/25
128/25
**hand [1]** 85/13 121/24
152/11
**handed [1]** 21/12
**handle [1]** 8/11
**hands [1]** 175/2
**happen [8]** 23/14 65/16
65/19 66/5 134/1 144/9
148/22 174/7
**happened [3]** 65/2
138/2 139/23
**happening [2]** 135/15
148/23
**happens [4]** 8/17 18/11
133/4 133/6
**happy [4]** 92/11 112/14
112/15 169/9
**hard [4]** 31/3 63/23
135/11 149/22
**harder [1]** 120/6
**harm [35]** 18/8 22/11
23/10 23/13 24/22 25/2
25/9 28/8 49/12 49/17
65/24 89/22 131/5
131/15 131/18 132/3
133/2 133/15 133/22
133/24 134/16 135/11
136/7 142/20 143/1
143/1 147/14 147/16
148/7 148/22 149/9
150/16 151/18 151/19
153/12
**harmed [4]** 49/15
147/18 148/8 171/20
**harness [1]** 131/24
**Harrisburg [1]** 1/11
**has [118]** 7/13 7/20 8/6
9/23 10/10 12/1 12/3
12/5 16/9 19/3 23/9
27/11 27/24 27/25
28/13 28/14 31/1 34/10
35/23 36/23 38/2 38/7
40/6 40/21 41/11 41/19
41/21 41/22 41/24 42/5
42/10 42/15 46/15
46/16 52/14 54/2 55/8
56/1 56/4 60/2 61/16
61/23 65/2 65/16 66/10
68/3 69/14 73/7 76/6
77/24 78/18 79/18
84/16 86/3 88/21 90/8
91/16 92/6 92/10 92/22
93/3 94/9 96/24 100/9
102/16 104/11 105/6
106/2 106/14 107/19
108/9 108/10 108/11
113/16 113/18 113/25
115/21 118/21 122/5

123/14 124/18 127/14
129/20 131/20 136/4
136/16 136/20 136/23
137/7 139/25 146/8
146/14 147/9 147/17
148/4 148/5 151/24
153/23 154/17 155/3
155/18 158/7 158/23
163/3 163/24 165/11
166/12 167/17 167/20
169/13 170/14 171/23
172/22 173/2 174/4
174/16 175/1 176/10
**hasn't [5]** 79/9 90/2
90/14 166/6 166/20
**hate [2]** 87/4 88/7
**have [347]**
**haven [5]** 146/22 158/5
166/9 166/24 168/4
**haven't [19]** 14/4 28/8
29/21 37/17 38/11
38/18 39/11 39/15 40/8
44/12 54/22 84/21
138/19 159/4
**having [10]** 22/20
36/16 61/23 77/4 84/4
89/4 100/2 130/8
132/25 150/12
**he [49]** 17/16 17/19
18/18 31/1 33/8 60/1
60/2 65/19 65/20 65/21
66/7 88/16 90/2 90/3
90/4 90/12 90/14
100/13 100/16 102/12
102/14 104/9 104/10
116/25 141/16 142/6
142/8 148/17 148/17
148/20 149/4 149/21
153/8 154/11 154/13
154/23 154/24 155/8
155/10 156/9 156/14
156/18 157/4 157/5
158/3 159/14 160/2
160/3 162/13
**he's [15]** 17/16 17/20
18/5 65/20 89/25 90/1
90/2 100/14 100/19
100/21 101/8 102/12
102/14 102/21 169/12
**head [1]** 112/11
**header [2]** 87/18 87/19
**heading [1]** 87/20
**hear [10]** 20/16 105/4
112/15 148/9 150/14
161/2 162/23 164/6
165/18 169/8
**heard [19]** 18/14 76/6
95/7 113/25 114/19
123/24 127/11 130/12
147/4 147/21 148/12
148/12 148/13 152/15
153/23 154/11 162/8
166/15 174/16
**hearing [15]** 90/20

94/24 95/14 96/5 96/11
96/25 97/6 97/19 98/16
98/16 99/18 104/23
126/8 142/24 170/12
**hearsay [2]** 95/19
99/25
**heart [2]** 17/22 18/21
**heavy [4]** 44/5 44/7
153/19 160/20
**heightened [1]** 147/9
**help [7]** 38/8 39/2 39/3
43/10 92/11 101/10
111/4
**helpful [4]** 76/25 92/11
92/14 161/13
**helping [1]** 15/18
**HENRY [2]** 3/5 29/20
**her [5]** 30/10 30/12
30/16 32/2 32/12
**here [61]** 5/18 5/22
10/10 12/22 15/18
15/25 17/15 17/16
18/14 21/19 22/9 22/19
28/2 33/2 34/5 34/9
36/23 43/5 54/19 56/24
57/9 59/25 65/10 76/7
84/13 90/6 90/24 91/10
95/17 96/22 96/24
97/19 99/12 99/13
100/3 100/19 104/3
105/3 107/13 111/5
111/10 119/21 122/13
128/22 129/1 129/16
129/17 133/8 134/6
139/1 139/8 141/18
147/25 148/6 148/20
150/4 150/5 151/14
161/10 170/21 170/23
**hereby [1]** 176/6
**herein [2]** 14/23 16/11
**hereinbefore [1]** 176/9
**hereto [1]** 176/12
**hereunder [1]** 17/7
**herewith [1]** 16/15
**hesitance [1]** 80/5
**hey [3]** 100/25 115/18
122/17
**high [1]** 151/6
**higher [6]** 27/8 27/12
52/20 53/9 147/14
147/21
**highest [2]** 172/24
172/25
**highlight [5]** 56/10
57/18 58/11 58/15 59/3
**highlighted [1]** 105/22
**highly [1]** 153/23
**highly-technical [1]**
153/23
**him [11]** 18/16 18/20
20/16 60/3 101/7
148/13 148/13 148/16
148/24 154/8 159/7
**hinge [1]** 91/19

**hint [4]** 155/4 164/6
164/12 165/16
**hire [1]** 138/14
**hired [1]** 138/16
**his [21]** 17/15 18/2
18/15 18/20 91/14
91/15 100/14 102/19
102/20 105/6 148/16
148/18 148/20 149/3
149/20 149/21 151/25
154/10 154/13 155/8
157/4
**historical [1]** 50/20
**history [1]** 55/6
**hits [2]** 7/9 74/2
**hitting [1]** 160/13
**hmm [2]** 44/23 44/25
**ho [1]** 152/23
**ho-hum [1]** 152/23
**hold [3]** 27/20 28/7
75/4
**holds [1]** 101/15
**hole [2]** 74/9 74/16
**home [1]** 128/21
**honest [1]** 78/11
**honestly [1]** 139/1
**honor [146]** 9/4 17/14
17/18 17/24 18/19
40/11 55/14 59/24
65/17 65/23 66/7 77/22
79/24 81/17 82/10
82/20 83/2 83/6 83/11
83/15 83/17 83/21
83/23 84/10 84/15
85/10 85/25 86/17 87/3
88/7 88/22 89/25 90/15
91/5 91/6 92/2 94/17
95/1 95/2 95/15 95/15
96/25 97/16 97/23 98/8
98/14 98/17 100/21
100/23 101/10 101/25
103/4 103/13 103/17
104/24 106/21 106/24
107/1 107/16 108/1
108/23 110/7 111/24
112/2 112/8 112/14
114/11 114/19 115/22
116/21 117/25 119/5
119/15 119/24 120/16
121/10 121/20 122/2
122/13 122/24 123/4
124/6 124/10 124/19
125/2 125/12 125/22
126/8 126/21 128/20
129/23 130/2 130/11
130/23 131/4 131/19
132/3 132/24 133/14
133/17 133/25 134/17
135/7 135/9 135/16
136/6 138/1 140/25
141/3 141/14 141/18
141/23 142/13 142/16
142/19 143/8 143/14

# H

honor... **[26]** 144/14 144/19 144/22 144/24 145/19 145/25 146/4 146/6 156/12 157/13 158/7 158/14 158/22 158/25 159/12 160/10 160/11 161/5 161/24 164/23 167/16 169/1 170/23 172/13 172/17 175/4

HONORABLE **[1]** 1/10
honored **[2]** 66/17 66/17
hope **[9]** 24/16 29/12 35/23 98/4 125/16 139/1 153/16 162/13 172/9
hopeful **[1]** 87/7
Hopefully **[1]** 73/9
hoping **[1]** 163/9
horizontal **[3]** 15/20 36/19 36/24
horizontally **[1]** 36/17
hour **[3]** 88/8 110/15 111/2
hours **[4]** 98/9 98/22 147/17 162/23
housed **[1]** 36/1
housekeeping **[1]** 107/4
Houston **[2]** 1/25 138/6
how **[48]** 5/20 18/25 44/15 45/1 50/4 50/14 55/22 60/21 63/17 63/25 64/1 65/4 81/22 86/2 102/15 102/18 102/20 102/22 103/1 103/2 103/7 105/6 105/24 108/13 113/11 114/22 122/17 124/3 132/18 132/21 133/17 135/10 135/23 139/7 140/7 141/5 146/15 147/6 150/13 153/24 154/8 156/13 156/18 160/6 160/13 162/8 164/8 167/6
However **[2]** 99/24 139/18
hugely **[1]** 88/21
hum **[6]** 13/10 30/13 33/1 40/3 77/16 152/23
human **[1]** 72/20
hundreds **[2]** 45/5 154/12
hurting **[1]** 26/12
hydraulics **[1]** 113/6
hypothetical **[3]** 28/4 28/5 159/19

# I

I'd **[1]** 169/9
I'll **[11]** 15/10 19/6

21/10 72/9 79/19 84/8 93/11 110/24 114/5 162/24 172/20
I'm **[66]** 6/15 9/4 13/8 13/25 16/6 16/6 16/8 17/14 18/17 19/3 20/8 28/22 30/2 30/16 35/7 38/12 39/17 40/11 40/14 40/25 45/7 46/16 49/2 54/2 58/14 58/15 60/5 60/7 66/1 66/9 75/19 75/19 77/2 80/9 80/13 80/13 80/17 80/19 84/3 90/15 90/16 95/1 98/7 100/24 106/6 106/7 108/4 108/6 110/13 110/22 128/22 137/8 137/15 138/10 138/10 144/10 149/23 157/2 162/2 162/2 164/15 168/11 169/4 169/15 174/2 174/18
I've **[6]** 18/14 129/1 129/1 129/3 129/5 167/18
iced **[5]** 128/25 129/1 129/4 129/12 129/13
idea **[3]** 10/10 44/15 173/10
identified **[9]** 4/2 4/17 32/18 36/23 37/7 38/12 49/16 91/23 125/3
identify **[6]** 36/15 38/8 68/9 68/10 93/12 125/9
identifying **[1]** 93/13
identity **[1]** 99/8
ii **[3]** 1/13 122/21 122/22
iii **[1]** 122/22
illustrate **[1]** 138/1
imagine **[1]** 160/25
immeasurable **[1]** 26/18
immediate **[14]** 22/13 23/10 23/13 24/21 24/24 25/2 151/9 151/17 151/19 151/25 152/9 152/21 153/11 169/1
immediately **[2]** 28/24 29/2
impact **[2]** 60/21 63/18
impacted **[1]** 55/22
imperfect **[1]** 150/17
implement **[1]** 102/25
implore **[1]** 145/21
important **[16]** 24/2 24/3 24/5 24/7 98/14 105/21 112/20 112/20 114/24 123/24 125/18 131/21 131/24 131/25 136/11 139/13
importantly **[3]** 11/2 67/13 105/20

impose **[1]** 120/2
imposed **[1]** 97/2
impossible **[5]** 77/11 77/17 77/20 78/6 78/7
impoundment **[5]** 113/4 123/10 129/24 130/7 165/12
improper **[1]** 96/22
improperly **[1]** 95/11
improve **[1]** 27/16
improved **[1]** 27/20
inability **[1]** 131/17
inaccurate **[1]** 85/19
inactive **[1]** 36/21
inadmissible **[4]** 95/20 95/25 97/9 97/17
inappropriate **[1]** 60/3
inasmuch **[2]** 18/7 18/9
Inc **[1]** 1/3
incalculable **[1]** 150/13
incentive **[1]** 118/23
include **[5]** 15/21 27/6 69/5 125/7 141/12
included **[5]** 59/5 61/17 63/20 124/17 124/22
includes **[3]** 50/20 140/3 170/9
including **[17]** 7/16 16/10 17/6 24/13 38/24 39/8 39/10 42/12 52/16 62/23 88/23 121/14 123/19 125/3 125/7 143/7 164/1
inconsistent **[6]** 90/6 91/16 117/23 118/1 120/17 122/4
inconsistently **[1]** 90/13
incorporate **[3]** 84/7 84/11 86/7
incorporated **[1]** 140/9
incorporates **[2]** 47/18 49/5
incorporating **[1]** 140/24
incorporation **[1]** 84/9
increase **[1]** 70/18
increased **[4]** 49/20 50/14 50/17 52/24
increases **[6]** 49/19 50/2 52/11 53/12 53/16 64/21
incumbent **[4]** 31/22 32/19 34/2 155/1
incur **[1]** 53/13
independent **[1]** 86/3
INDEX **[2]** 3/2 3/18
indicate **[1]** 25/9
indicated **[6]** 28/4 31/1 71/25 77/10 100/3 108/6
indisputable **[3]** 89/22 166/17 169/2
indisputably **[9]**

153/21 154/1 154/3 155/5 155/5 155/6 161/25 165/3 165/3
individual **[2]** 18/15 18/20
indulges **[1]** 98/5
industry **[20]** 7/8 73/22 89/20 101/5 101/22 102/5 102/11 102/13 102/17 102/23 103/5 103/7 103/8 104/7 105/6 105/24 131/23 153/24 166/15 168/2
informally **[1]** 79/10
information **[19]** 39/19 40/7 45/23 61/10 61/14 77/19 78/23 79/4 79/8 79/15 93/14 100/19 133/19 134/3 149/16 149/22 150/2 159/13 166/23
infrastructure **[1]** 120/11
initial **[1]** 172/15
initially **[2]** 105/12 136/20
initiated **[1]** 73/24
inject **[1]** 17/20
injected **[1]** 17/19
injunction **[32]** 1/12 18/24 59/21 60/15 90/17 93/19 94/1 94/7 94/11 95/3 96/1 96/5 96/10 96/23 98/16 134/10 136/15 146/7 146/10 146/10 147/10 147/13 147/15 150/10 151/7 151/14 151/15 153/18 164/17 168/17 169/17 174/17
injunctive **[10]** 18/9 19/10 19/19 76/2 89/16 107/2 145/20 145/21 146/15 152/22
injure **[1]** 173/3
input **[2]** 21/8 153/4
inquired **[1]** 88/3
inquiries **[1]** 89/1
inquiry **[2]** 3/10 164/16
insert **[1]** 119/19
insertion **[1]** 88/13
instance **[7]** 27/14 44/20 72/5 136/4 140/21 141/16 141/21
instrument **[2]** 84/24 88/19
insurable **[1]** 169/21
insurance **[3]** 102/2 169/13 173/5
insured **[3]** 169/13 169/24 174/8
insureds **[1]** 169/23
integration **[1]** 84/16
intend **[3]** 101/5 106/15

159/5
intended **[12]** 100/15 100/20 101/4 101/4 101/8 101/9 104/17 105/7 120/5 123/23 125/10 156/4
intending **[1]** 106/20
intent **[4]** 59/7 88/20 101/11 119/23
intention **[3]** 67/19 125/14 125/15
interest **[37]** 14/20 21/23 24/19 28/14 28/23 32/10 50/1 51/17 51/19 52/16 57/2 70/18 72/23 72/25 80/24 89/16 120/19 124/4 125/13 127/22 129/19 130/9 131/6 140/15 147/22 148/3 152/1 152/2 152/5 158/8 158/18 165/11 165/13 166/3 167/24 171/1 174/13
interested **[1]** 168/7
interesting **[2]** 163/23 165/9
interests **[11]** 52/19 72/23 89/19 131/7 131/8 132/2 140/19 145/24 148/15 171/2 174/20
interfered **[1]** 161/2
interference **[1]** 131/14
interfering **[1]** 154/1
interim **[3]** 60/19 132/11 164/1
interject **[1]** 118/11
interlineated **[6]** 154/18 155/17 155/25 156/10 167/20 168/15
internal **[3]** 33/2 154/12 155/8
interpret **[4]** 11/11 96/19 106/1 158/4
interpretation **[23]** 10/3 10/17 10/11 12/19 12/20 14/9 17/21 19/2 31/19 36/10 76/16 76/20 85/20 101/3 117/25 118/14 119/1 119/3 119/5 122/4 143/24 154/25 166/12
interpretations **[1]** 104/13
interpreting **[1]** 103/23
interrupt **[1]** 34/5
interviewed **[1]** 138/16
intimately **[1]** 100/14
intimidate **[1]** 151/13
introduce **[5]** 88/19 104/14 106/20 131/19 167/7
introduced **[6]** 18/16

# I

**introduced... [5]**
104/11 104/16 131/7
162/1 162/5
**introducing [1]** 162/16
**inverse [1]** 138/2
**invested [1]** 71/15
**invoice [1]** 50/10
**invoke [6]** 17/21 19/14
121/6 141/13 141/17
141/21
**invoking [1]** 142/18
**involved [12]** 19/5 21/7
33/3 33/7 33/10 73/9
112/17 113/23 114/11
118/9 138/17 155/8
**involvement [1]** 71/5
**involves [3]** 112/17
120/1 140/6
**ironically [1]** 120/4
**irrelevant [2]** 105/15
169/22
**irrepairable [4]** 149/6
151/9 151/20 169/2
**irreparable [32]** 18/8
22/11 23/10 23/13
24/22 24/25 25/2 25/9
49/12 49/16 65/24
89/22 131/5 131/15
131/18 132/3 133/2
133/15 133/22 133/24
134/16 135/11 136/7
147/14 147/16 148/7
148/22 149/9 150/16
151/9 151/18 153/12
**irreparably [3]** 49/15
147/18 148/8
**irrespective [1]** 16/2
**is [671]**
**isn't [19]** 11/16 12/17
27/8 28/25 29/25 40/2
41/5 48/3 48/13 49/10
51/16 55/10 67/21
68/22 70/10 70/20
102/14 122/11 149/14
**issuance [1]** 147/10
**issue [49]** 11/16 17/19
17/22 18/10 19/4 59/20
60/15 66/2 73/19 81/14
81/16 88/9 88/10 95/19
97/25 100/7 100/18
103/22 106/5 107/13
112/16 113/14 114/4
114/12 115/5 118/9
118/11 123/7 123/8
124/11 129/24 130/12
132/5 133/23 142/7
142/19 151/12 152/8
152/16 153/11 155/3
158/11 161/14 164/15
169/7 169/16 172/13
173/22 174/23
**issued [2]** 113/8
174/18

# J

**issues [15]** 18/24
97/24 112/19 123/11
129/25 134/6 136/9
136/9 136/19 140/4
141/17 141/18 142/20
159/18 173/6
**it [459]**
**it's [179]**
**item [3]** 77/23 77/23
77/23
**its [21]** 12/17 15/13
26/3 45/21 51/4 56/2
65/5 65/15 86/20 90/6
95/2 95/3 101/17
106/22 113/15 122/4
125/15 130/4 131/12
152/21 153/13
**itself [7]** 26/17 46/15
117/17 123/5 126/25
131/14 150/15

---

**Jamie [1]** 94/5
**January [1]** 6/22
**January 22 [1]** 6/22
**JENNIFER [1]** 1/10
**JOA [68]** 6/21 8/9 8/10
9/2 9/22 9/23 10/11
11/11 12/5 12/14 14/7
14/12 15/2 15/9 15/11
16/4 19/15 19/20 20/6
20/23 20/25 21/5 21/6
23/1 23/3 23/5 29/23
30/3 30/11 32/3 32/6
32/14 34/1 35/2 55/22
57/21 59/12 60/20 65/7
76/14 87/10 87/14
87/15 87/17 102/19
102/22 102/23 116/18
119/9 119/10 137/9
137/18 138/19 138/21
139/9 145/9 146/18
150/25 153/8 153/11
154/15 158/6 167/19
168/7 168/8 168/9
168/10 169/23
**JOA-interested [1]**
168/7
**JOAs [18]** 8/23 14/9
20/8 20/17 22/5 33/3
33/15 36/10 50/13
87/22 88/9 88/10
100/15 101/24 102/20
103/7 105/7 113/17
115/10 115/12 116/23
118/15 120/9 122/1
122/5 122/22 122/23
130/10 130/19 130/20
134/2 145/4 145/5
148/3 150/23 151/3
151/5 153/7 153/10
153/13 153/15 153/24
154/8 154/9 154/14
155/7 155/15 155/15

---

167/16
**job [2]** 70/24 175/1
**John [1]** 2/3
**joint [10]** 41/21 42/5
51/21 52/15 65/11 76/5
100/15 119/7 145/4
167/24
**Jonathan [1]** 1/21
**JPW [1]** 1/4
**judge [42]** 14/13 14/25
21/12 35/9 35/15 40/14
45/8 66/19 71/18 80/1
83/7 86/23 109/25
111/1 148/5 149/3
149/25 150/9 150/17
151/14 152/18 154/19
154/20 156/22 157/23
159/7 159/18 160/17
161/3 162/17 163/23
164/3 165/9 166/21
168/17 169/14 170/17
171/18 172/21 173/24
174/10 175/5
**judgment [4]** 88/17
97/5 97/7 105/6
**judicial [1]** 152/10
**Julie [14]** 21/22 29/10
29/13 29/16 29/19 30/2
31/15 32/19 33/14
33/25 34/8 34/12 34/16
72/16
**July [2]** 95/9 161/7
**July 22nd [1]** 161/7
**jump [1]** 137/9
**jumping [1]** 16/6
**June [2]** 13/8 161/7
**June 22nd [1]** 161/7
**jury [1]** 59/25
**just [103]** 5/13 6/11
17/19 25/6 33/21 35/12
36/1 36/14 37/14 40/15
44/24 55/2 55/21 57/23
59/6 59/21 60/16 64/18
65/20 65/25 66/25
67/10 71/11 71/19 72/1
72/11 74/19 80/1 81/16
81/21 84/22 85/16
85/18 85/25 87/22
87/24 87/24 88/4 88/25
90/5 90/23 91/3 92/17
92/19 93/9 93/10 93/13
96/14 97/19 103/18
103/18 105/22 106/14
108/5 108/7 109/21
110/23 112/11 112/24
118/13 121/3 121/25
122/2 123/2 123/16
124/8 127/17 130/11
130/24 132/4 132/6
134/11 134/14 135/13
137/3 138/5 138/5
138/10 139/4 141/1
141/7 141/23 142/23
143/15 143/21 144/5

---

144/25 151/10 152/15
152/18 157/24 158/3
161/4 161/12 161/20
161/21 167/12 167/17
169/7 169/10 170/10
171/9 174/8
**justification [2]** 49/17
150/15
**justifications [1]** 49/16

# K

**keep [5]** 24/12 116/2
134/15 136/23 137/9
**KELLY [1]** 2/4
**Kentucky [1]** 94/13
**Kevin [1]** 94/10
**key [1]** 63/14
**kids [2]** 128/23 128/23
**kind [8]** 62/3 74/13
74/18 75/7 75/10
124/11 142/20 145/1
**kinds [2]** 161/15
166/23
**knew [2]** 159/1 159/9
**know [56]** 12/19 21/18
29/21 31/12 34/12
34/23 41/13 44/1 50/5
51/16 54/7 59/24 63/24
64/6 66/11 71/22 74/6
75/1 78/9 78/10 88/16
89/11 89/25 90/1 90/11
92/6 98/4 100/13
101/10 111/20 119/8
124/3 124/24 125/9
128/21 129/8 131/16
132/10 132/14 132/17
132/23 135/14 135/18
136/11 137/6 138/13
144/22 153/24 156/22
158/7 161/6 163/7
164/6 165/9 170/3
172/7
**knowable [3]** 51/11
51/12 51/15
**knowing [1]** 105/2
**knowledge [2]** 103/5
103/7
**knowledgeable [1]**
70/2
**known [5]** 37/14 43/20
50/10 102/13 131/23
**knows [4]** 103/24
150/24 169/23 171/22
**Koromlan [7]** 147/2
171/23 172/4 173/15
173/16 173/21 173/21
**Kramer [9]** 94/21
102/10 102/11 102/16
103/4 103/5 104/1
105/23 106/4
**Kramer's [4]** 103/16
105/20 106/7 106/13
**Kravitz [1]** 2/3
**Krock [11]** 1/18 85/6

---

91/13 91/23 92/23
97/22 99/16 101/20
104/4 105/19 146/1

# L

**label [2]** 91/23 108/8
**lack [8]** 25/12 27/3
61/20 73/4 73/5 73/8
73/10 158/23
**land [5]** 53/24 53/25
54/19 100/13 102/19
**landowner [1]** 38/13
**landowners [12]** 37/6
37/17 37/23 38/8 77/19
78/8 80/5 80/6 80/24
159/4 159/6 171/18
**lands [1]** 135/21
**Lane [1]** 82/13
**Lane's [1]** 82/11
**language [45]** 9/9 9/24
11/2 12/20 13/1 14/5
30/16 30/17 32/5 33/22
35/4 47/12 57/23 58/16
58/23 67/1 76/14 77/4
101/23 105/25 116/20
117/24 119/2 119/11
120/18 122/21 122/22
124/18 124/19 139/9
141/14 154/18 154/22
154/22 154/24 155/17
155/25 156/1 156/5
156/10 157/7 163/19
167/20 168/14 168/16
**lapses [1]** 146/24
**large [2]** 113/4 125/6
**largest [1]** 64/15
**last [20]** 16/6 50/7
78/17 88/10 88/11
94/17 96/6 96/8 96/12
109/1 109/7 146/8
147/17 150/5 157/19
157/22 159/23 160/17
164/25 171/22
**late [1]** 100/4
**later [10]** 12/10 22/9
86/9 125/24 126/7
127/18 152/11 157/17
159/3 162/23
**laterals [1]** 64/1
**latitude [2]** 59/25 65/20
138/25
**Latrobe [1]** 128/21
**laugh [1]** 128/20
**law [24]** 31/8 35/16
93/18 96/20 104/6
105/5 105/9 131/13
131/13 131/16 132/1
132/24 135/16 135/25
**lawsuit [19]** 83/18
84/18 114/11 118/5
118/12 133/4 133/6
134/1 134/12 134/12
149/15 150/1 150/19
150/20 150/25 151/4

---

# L

**lawsuit... [3]** 151/11 151/12 167/6
**lawsuits [4]** 24/13 132/25 134/15 145/19
**lawyer [4]** 125/4 148/18 149/20 149/21
**lawyers [2]** 19/5 166/25
**layout [3]** 30/5 42/8 42/15
**lead [1]** 60/3
**learn [1]** 159/13
**learned [2]** 128/24 144/23
**lease [4]** 28/14 28/23 130/13 130/15
**leased [4]** 26/9 26/9 26/22 28/12
**least [11]** 26/13 39/13 77/24 78/2 81/7 101/21 109/10 134/20 144/14 164/4 164/18
**leave [2]** 137/3 171/9
**legal [6]** 19/2 98/20 98/21 98/23 106/5 126/13
**lemonade [4]** 128/25 129/2 129/4 129/12
**length [1]** 36/18
**lengths [1]** 163/24
**less [7]** 58/24 58/25 59/11 60/7 119/18 154/14 164/10
**let [14]** 19/18 24/17 31/12 32/7 75/5 80/10 85/6 103/10 105/11 107/12 108/5 111/10 159/2 162/4
**let's [18]** 5/19 11/16 15/15 36/1 80/19 92/7 92/14 100/7 100/10 102/9 106/17 109/14 111/13 112/3 138/14 143/15 143/17 148/10
**letter [8]** 38/21 39/1 122/15 122/20 122/23 164/2 164/24 165/8
**level [2]** 65/15 66/2
**levels [1]** 70/15
**LH [1]** 6/3
**licensed [2]** 102/12 102/12
**life [1]** 69/17
**lifted [1]** 122/22
**like [50]** 17/22 38/21 55/20 82/18 82/25 83/3 83/10 83/15 91/7 93/8 97/24 102/20 108/2 108/13 108/25 109/2 109/3 109/5 109/6 109/10 109/15 110/3 110/4 110/5 111/24 121/25 122/19 125/23

128/22 134/4 134/7 134/7 134/8 136/19 137/1 139/1 139/8 140/3 145/3 145/10 149/20 149/23 152/23 153/7 153/8 158/3 165/21 166/18 168/1 168/11
**likelihood [9]** 114/3 119/6 123/7 130/24 132/8 153/19 168/20 168/21 169/3
**likely [4]** 97/4 126/1 126/1 142/14
**limine [1]** 97/15
**limit [2]** 101/2 174/3
**limitation [2]** 120/1 120/2
**limited [9]** 88/4 90/23 91/13 91/22 98/10 102/4 109/4 125/3 125/7
**limits [1]** 156/10
**line [16]** 11/3 11/8 11/8 11/9 14/4 16/8 30/22 38/3 40/12 61/12 67/4 121/13 129/10 137/23 157/7 157/8
**lines [9]** 13/25 14/13 15/9 32/16 56/8 57/16 57/19 57/21 88/11
**liquid [1]** 129/6
**list [5]** 38/13 123/22 124/24 124/25 125/5
**listed [7]** 123/23 123/23 126/4 126/4 126/15 126/16 144/3
**lists [2]** 49/1 125/9
**litigated [1]** 91/17
**litigating [1]** 151/4
**litigation [8]** 10/14 79/8 79/15 113/23 133/13 150/15 150/18 150/19
**little [14]** 29/11 55/22 60/7 60/14 73/18 101/13 110/12 110/13 111/3 120/12 138/3 149/10 149/18 159/5
**live [1]** 130/2
**LLC [8]** 1/6 89/12 89/15 93/20 93/24 94/4 94/10 97/11
**LLP [4]** 1/19 1/21 1/24 2/4
**load [1]** 44/21
**loads [2]** 75/14 75/22
**loathe [1]** 174/18
**local [1]** 75/23
**location [7]** 33/18 33/21 46/16 47/20 48/6 49/7 120/12
**locations [1]** 36/16
**logic [2]** 165/2
**logical [2]** 118/19

120/7
**long [9]** 35/18 64/1 71/24 114/21 114/25 115/1 141/5 166/16 170/3
**longer [2]** 110/24 130/1
**look [32]** 14/11 15/8 15/15 15/16 20/9 21/11 35/8 36/1 36/20 47/2 50/5 50/8 50/22 56/8 104/9 111/6 111/10 115/25 116/3 116/8 116/22 117/12 119/8 119/15 122/20 123/16 124/9 124/14 124/16 141/3 143/15 159/12
**look-back [1]** 50/22
**looked [10]** 84/21 119/12 120/18 122/9 139/11 141/2 141/7 148/17 153/24 164/23
**looking [9]** 6/2 16/8 29/10 119/24 122/3 133/8 137/7 141/9 170/18
**looks [2]** 145/3 165/21
**Lori [7]** 1/14 1/14 176/3 176/13 176/14 176/16 176/20
**lose [1]** 64/22
**loss [5]** 26/15 26/23 27/3 27/12 122/18
**lost [11]** 13/25 70/17 70/20 78/19 79/3 79/14 149/17 149/17 150/11 151/21 171/7
**lot [18]** 22/3 38/18 51/16 59/25 65/20 102/14 119/17 125/17 132/16 138/11 142/1 143/10 147/21 147/23 153/23 170/9 170/14 174/16
**loud [1]** 47/17
**love [1]** 166/19
**loved [1]** 128/23
**lower [4]** 27/16 27/18 27/19 64/21
**LTD [1]** 41/7
**lunch [9]** 109/3 109/6 110/4 110/10 110/11 110/15 110/24 111/18 111/21
**luncheon [1]** 111/15

# M

**ma'am [1]** 75/13
**MacNaughton [2]** 54/8 54/9
**made [36]** 12/15 15/11 16/15 17/3 19/21 24/4 24/5 25/20 46/7 52/22 58/8 58/20 58/21 59/15 68/13 70/16 82/23

85/18 88/12 88/13 88/17 88/20 91/4 91/15 99/16 105/5 105/19 106/10 116/22 117/11 124/23 129/10 143/2 147/11 149/25 167/18
**Madriz [6]** 1/23 3/6 3/8 55/13 65/22 79/19
**mail [37]** 21/15 21/21 22/12 24/8 24/25 25/8 29/10 29/12 29/15 29/19 30/4 30/4 33/14 33/20 34/17 37/5 48/25 58/2 58/5 58/8 59/6 59/8 67/1 67/4 67/25 68/3 68/8 71/24 72/1 72/7 72/8 104/8 105/3 138/6 154/5 154/10 167/7
**mails [3]** 72/2 72/4 72/10
**maintain [1]** 64/20
**maintained [1]** 121/25
**maintaining [1]** 44/8
**maintenance [10]** 43/23 43/25 44/5 44/12 160/10 160/15 160/16 160/19 160/24 161/2
**majeure [7]** 16/12 16/22 17/2 17/7 17/13 19/1 19/14
**majority [1]** 168/3
**make [43]** 6/9 6/25 23/9 28/7 31/3 35/3 39/20 49/2 53/4 53/16 58/9 59/19 63/6 63/18 67/10 68/18 68/20 73/17 85/3 85/20 87/16 88/19 90/9 90/12 91/1 91/2 95/23 98/10 110/23 113/11 117/13 118/13 118/22 120/5 120/6 128/16 133/4 152/5 162/14 166/2 166/21 167/18 169/9
**makes [7]** 9/14 12/16 33/14 118/14 124/15 131/25 132/11
**making [6]** 24/1 24/2 78/15 116/17 123/18 145/13
**management [2]** 141/20 143/9
**manager [1]** 73/2
**managing [1]** 143/12
**mandatory [7]** 146/10 146/10 146/15 147/3 147/10 147/13 153/18
**manner [1]** 63/3
**Mannion [1]** 86/24
**many [9]** 37/19 44/15 63/25 70/15 85/1 85/1 102/17 124/3 125/4
**map [1]** 162/17

**Marbaker [5]** 113/3 129/24 130/6 165/12 165/22
**marcellus [3]** 55/7 159/24 166/7
**march [1]** 134/10 150/6 152/7
**marched [1]** 99/2
**Maris [1]** 122/14
**mark [1]** 112/3
**marked [4]** 76/24 84/11 109/14 109/15
**market [1]** 51/4
**marking [1]** 93/4
**Mary [1]** 5/23 9/1 15/18 16/7 47/6 56/10 57/18 58/3 58/15 59/1 93/20
**master [1]** 126/17
**material [1]** 160/8
**materially [1]** 103/12 105/12 105/20
**math [1]** 50/15
**matter [15]** 78/15 96/19 107/4 109/21 114/20 129/10 129/11 141/3 152/24 152/25 162/14 162/23 162/24 162/25 163/6
**matters [4]** 37/20 38/24 39/4 62/4
**matting [1]** 161/21
**may [62]** 1/13 3/6 21/23 22/3 22/6 22/9 22/10 27/15 27/16 27/18 27/18 30/24 33/18 37/9 37/11 39/18 39/20 40/17 44/11 44/11 55/25 56/4 56/14 66/19 66/20 70/23 76/3 82/20 84/2 84/18 91/20 91/20 95/2 95/5 95/25 97/2 107/12 109/3 110/20 110/21 111/1 115/19 122/14 125/8 134/1 138/16 139/19 142/15 142/16 150/4 153/7 153/8 160/25 161/7 161/11 161/14 164/7 164/8 164/20 168/22 169/16 174/10
**May 11 [1]** 150/4
**May 12th [1]** 164/8
**May 22 [4]** 44/11 97/2 161/7 168/22
**May 6th when [1]** 95/2
**May 7th [1]** 95/5
**maybe [7]** 78/21 79/13 84/6 132/8 132/21 134/12 145/20
**McGUIRE [3]** 1/19 1/21 1/24
**McRoberts [1]** 93/20
**me [39]** 11/4 16/9 17/4

# M

me... **[36]** 19/18 19/19 24/17 29/9 30/21 31/12 32/7 35/12 39/17 47/2 72/11 73/20 75/5 77/6 77/10 77/21 80/10 81/21 85/6 90/2 90/14 92/14 93/2 93/8 93/9 98/5 103/10 106/6 107/12 108/5 148/17 154/4 156/15 162/4 175/2 176/11

mean **[17]** 13/3 15/14 25/10 61/21 73/20 85/10 101/6 101/9 104/22 128/8 129/10 129/12 129/14 133/22 135/3 139/3 160/12

meaning **[2]** 74/2 101/18

means **[9]** 13/1 13/3 73/17 93/12 104/10 126/24 140/14 156/13 176/22

meant **[4]** 62/1 138/18 157/6 157/6

measure **[1]** 27/21

measured **[1]** 36/17

measures **[1]** 39/21

mechanism **[1]** 79/9

meet **[12]** 51/1 60/18 61/2 62/14 62/17 134/4 139/2 147/9 147/14 151/5 153/9 161/7

memorandum **[3]** 93/17 93/25 94/6

memory **[2]** 86/20 150/17

mention **[2]** 33/19 58/21

mentioned **[2]** 176/8 176/8

mere **[3]** 99/1 104/20 124/6

merits **[12]** 96/25 97/1 97/6 97/19 114/4 119/7 123/7 130/24 142/14 153/20 168/20 169/3

met **[1]** 70/3

methods **[1]** 39/10

middle **[7]** 1/2 94/8 97/8 97/13 121/11 176/4 176/19

might **[17]** 24/12 35/11 35/13 53/20 64/9 71/3 76/25 83/22 88/4 89/1 111/9 120/12 128/16 133/20 134/12 134/19 143/10

million **[15]** 28/20 46/8 46/12 48/13 128/17 152/25 170/25 171/6 171/14 172/2 172/5 172/23 172/23 172/24

173/22

millions **[2]** 173/11 174/9

Minard **[1]** 131/17

mind **[2]** 15/10 57/5

mine **[1]** 156/9

mineral **[1]** 148/15

minerals **[8]** 26/12 26/13 26/20 28/9 65/12 130/13 132/2 148/9

minute **[4]** 36/14 79/21 81/23 111/13

minutes **[4]** 81/18 108/15 108/16 159/3

mischaracterizing **[1]** 156/15

misplaced **[1]** 170/17

missing **[1]** 120/25

misspoke **[1]** 80/9

misstatement **[1]** 8/21

mistake **[2]** 143/1 157/5

mobilization **[1]** 44/20

mobilize **[2]** 75/11 75/22

model **[17]** 49/21 49/22 63/20 64/14 87/10 87/11 87/25 88/19 100/15 100/17 100/18 100/20 101/4 101/9 101/11 101/24 103/1

modifications **[1]** 88/12

modified **[3]** 84/18 87/17 101/11

modify **[3]** 20/17 102/22 150/23

modifying **[1]** 102/23

moment **[4]** 19/7 73/23 74/1 93/2

monetary **[1]** 133/21

money **[8]** 26/5 27/6 28/3 53/14 53/17 121/1 152/5 170/25

monitor **[1]** 39/11

monitored **[1]** 39/10

monitoring **[1]** 39/9

month **[4]** 50/7 125/24 150/5 150/12

monthly **[2]** 64/23 171/20

months **[6]** 50/7 126/7 127/17 132/7 132/20 155/23

moot **[4]** 40/17 136/14 157/3 164/17

moratorium **[5]** 115/1 115/3 117/12 117/15 145/16

more **[41]** 8/24 9/8 10/11 11/2 11/13 22/2 40/7 45/4 52/25 53/2 53/9 53/17 60/14 67/13 78/14 78/16 79/13

96/13 102/21 113/17 114/2 114/2 120/12 121/1 124/1 126/1 130/11 131/22 134/11 137/16 137/22 137/25 138/8 138/8 138/25 143/22 145/8 145/20 149/25 159/21 174/1

morning **[6]** 5/4 5/5 5/6 55/18 55/19 81/21

most **[11]** 33/12 114/5 121/10 123/14 123/14 123/24 143/6 145/15 154/10 165/15 169/4

motion **[10]** 93/18 94/1 94/6 94/11 97/15 98/7 98/13 99/25 146/6 150/9

motions **[1]** 84/5

mountainous **[1]** 160/17

movant **[1]** 169/17

move **[22]** 19/25 20/8 82/15 83/1 83/3 83/16 87/9 89/5 90/2 90/13 94/18 99/24 100/7 106/17 114/17 120/4 123/4 132/7 140/15 145/13 145/23 155/12

moved **[3]** 91/14 95/4 95/10

moves **[1]** 91/13

moving **[5]** 61/16 76/10 90/19 123/14 131/11

Mr **[18]** 3/9 3/11 17/15 79/25 82/2 86/4 87/1 88/6 89/24 91/12 91/23 92/6 94/25 104/25 128/22 153/7 156/14 172/22

Mr. **[103]** 5/2 5/5 5/9 5/13 18/3 18/10 18/14 18/24 19/3 19/9 19/10 19/12 21/13 21/18 21/21 31/11 33/6 33/7 40/25 55/18 65/22 66/6 66/12 66/25 71/19 73/16 74/1 75/4 78/18 79/3 79/19 81/3 81/9 82/11 82/13 82/22 85/6 91/13 92/23 97/22 99/16 100/13 101/20 101/1 102/5 102/8 102/10 102/11 102/16 103/4 103/15 104/5 105/18 105/19 105/21 105/22 106/8 106/11 106/11 106/13 108/6 108/9 109/22 110/3 111/7 116/25 118/15 120/7 120/21 124/3 130/3 130/19 132/10 136/21 141/16 142/6 146/1 147/4

148/13 149/14 149/18 151/25 154/6 154/13 155/11 157/2 158/2 158/22 158/22 159/3 159/22 159/23 160/12 164/14 169/11 169/25 170/5 170/7 170/8 170/19 173/12 173/18

Mr. Atwood's **[2]** 169/25 170/7

Mr. Blank **[1]** 110/3

Mr. Bond **[2]** 82/22 130/3

Mr. Brier **[11]** 19/10 40/25 66/6 78/18 79/3 105/18 105/22 109/22 111/7 170/5 170/19

Mr. Brier's **[2]** 73/16 74/1

Mr. Clanton **[38]** 5/2 5/5 5/9 5/13 18/3 18/10 18/14 18/24 19/3 19/9 21/18 21/21 55/18 66/12 66/25 71/19 75/4 81/3 81/9 132/10 136/21 141/16 142/6 147/4 148/13 149/14 149/18 151/25 154/6 155/11 157/2 158/2 158/22 159/22 159/23 160/12

Mr. Clanton's **[2]** 19/12 21/13

Mr. Dempsey **[1]** 164/14

Mr. Glenn **[2]** 173/12 173/18

Mr. Glenn's **[1]** 170/8

Mr. Kramer **[5]** 102/10 102/11 102/16 103/4 103/5

Mr. Kramer's **[1]** 106/13

Mr. Krock **[9]** 85/6 91/13 92/23 97/22 99/16 101/20 104/4 105/19 146/1

Mr. Lane **[1]** 82/13

Mr. Lane's **[1]** 82/11

Mr. Madriz **[2]** 65/22 79/19

Mr. Paul **[1]** 169/11

Mr. Raleigh **[9]** 33/6 33/7 116/25 118/15 120/7 120/21 124/3 130/19 154/13

Mr. Roach **[2]** 100/13 103/12

Mr. Roach's **[9]** 101/21 102/5 102/8 103/15 105/21 106/8 106/11 108/6 108/9

Mr. Thomas **[1]** 31/11

Mrs. **[1]** 155/7

Mrs. Woodard **[1]** 155/7

Ms **[5]** 82/2 86/15 86/19 92/20 94/15

Ms. **[7]** 58/6 71/24 72/7 72/12 83/9 154/6 154/8

Ms. Thomas **[1]** 83/9

Ms. Woodard **[6]** 58/6 71/24 72/7 72/12 154/6 154/8

much **[8]** 44/5 52/4 81/22 86/13 108/13 129/25 131/20 156/14

multiple **[3]** 121/4 122/5 143/18

multitude **[1]** 38/24

must **[6]** 16/14 37/5 136/24 147/14 152/13 153/20

mutually **[1]** 135/6

my **[64]** 13/6 13/25 14/9 15/15 17/10 18/19 18/21 18/21 19/7 22/23 22/25 23/8 23/12 24/24 25/11 31/8 31/15 33/18 35/20 38/4 38/7 41/2 45/23 48/17 48/23 48/24 59/7 67/9 67/16 67/19 70/9 73/7 73/7 73/8 75/5 75/7 88/15 92/10 92/10 98/21 99/18 99/19 99/20 103/18 108/2 112/11 128/22 129/10 135/19 133/17 137/17 147/11 150/17 153/7 154/11 157/23 159/22 161/25 162/4 162/12 163/17 172/11 175/2 176/11

MYERS **[1]** 2/4

# N

N.E **[1]** 1/22

name **[10]** 54/7 125/22 125/23 126/8 126/13 126/20 127/2 127/7 128/9 128/11

namely **[2]** 18/11 105/22

narrow **[1]** 160/18

natural **[2]** 36/4 135/18

nature **[1]** 174/7

near **[1]** 161/8

necessarily **[6]** 34/15 74/12 76/12 133/22 134/1 140/16

necessary **[7]** 7/15 18/12 24/13 38/5 39/19 62/1 64/20

necessity **[1]** 136/14

need **[61]** 7/15 7/17 24/8 24/9 26/17 37/20 38/20 41/20 66/11 68/20 69/1 69/10 69/23

# N

**need... [48]** 70/3 74/20 74/23 75/8 75/8 75/10 75/11 75/23 76/9 76/18 81/12 81/15 81/22 82/3 84/2 86/4 86/16 87/7 91/3 91/4 91/24 91/25 99/24 104/6 107/9 112/22 113/1 113/3 113/5 113/7 113/9 117/1 117/2 120/24 130/17 137/17 140/3 141/12 147/8 149/16 155/13 156/3 161/15 164/12 166/9 170/12 171/13 172/19
**needed [11]** 39/21 50/14 78/24 85/22 85/23 89/17 110/22 118/22 164/4 164/20 174/19
**needing [1]** 87/11
**needs [9]** 7/16 28/6 40/7 104/14 110/17 136/22 165/8 169/10 174/20
**negotiated [1]** 86/2
**neither [1]** 96/3
**nesting [2]** 91/9 91/10
**net [1]** 172/5
**never [13]** 15/10 69/8 81/4 118/12 118/12 121/6 125/10 127/11 132/5 132/12 159/24 160/2 172/23
**new [48]** 46/15 49/24 56/17 64/18 68/15 70/11 73/21 114/8 114/12 114/16 115/2 115/13 115/21 116/5 116/5 116/7 116/13 116/19 117/4 117/7 117/12 117/16 117/17 117/18 117/21 118/3 118/10 118/16 119/14 119/19 121/21 121/22 129/18 129/18 138/15 138/16 143/25 143/25 144/10 145/1 151/12 156/17 156/21 156/23 163/20
**next [18]** 13/11 19/24 28/14 28/24 29/2 41/2 47/15 53/25 73/7 87/20 89/5 93/2 93/23 109/17 116/16 123/8 133/5 148/7
**nice [2]** 92/4 92/15
**Nicholas [1]** 2/3
**nine [12]** 9/10 40/21 40/23 41/9 42/25 43/17 132/20 138/14 161/10 161/17 166/8 169/12

**no [128]** 4/3 4/4 4/5 4/6 4/7 4/8 4/9 4/10 4/11 4/12 4/13 4/14 4/15 4/18 4/19 7/4 7/6 8/8 10/10 12/5 12/14 12/19 15/1 16/15 19/13 19/20 21/7 21/19 24/18 25/4 25/5 26/11 26/15 26/23 28/4 29/9 33/15 35/16 37/19 38/21 40/6 41/23 41/24 41/25 42/7 42/11 42/19 43/14 43/15 43/16 43/19 52/22 58/21 59/25 61/7 65/3 66/2 66/4 66/16 66/18 71/7 74/5 75/13 75/19 79/18 79/24 83/7 83/11 87/20 88/2 88/11 89/14 90/21 96/15 98/19 99/8 99/10 99/14 102/16 106/21 107/9 107/16 107/21 110/21 111/8 112/8 112/12 115/21 119/19 123/20 126/23 127/11 127/18 128/1 130/4 133/22 135/4 135/20 137/19 137/20 138/19 140/25 143/3 143/3 144/20 145/11 148/17 148/20 148/23 149/3 152/3 153/4 155/23 158/11 160/5 160/6 160/15 161/6 161/12 162/1 162/25 164/21 165/22 166/12 168/20 168/20 172/14 173/21
**nobody [2]** 12/1 41/22
**nodded [5]** 21/3 37/3 37/13 37/16 43/22
**noise [1]** 156/22
**nominal [1]** 174/1
**non [22]** 10/4 10/8 10/21 10/23 11/19 12/15 12/25 13/16 31/16 34/3 61/15 115/13 118/18 120/6 120/20 122/16 122/18 140/18 141/8 141/12 142/9 143/25
**non-consented [1]** 122/16
**non-consenting [15]** 10/4 10/8 10/21 10/23 11/19 12/15 12/25 13/16 61/15 118/18 122/18 140/18 141/8 141/12 142/9
**non-drilling [1]** 120/6
**non-new [1]** 143/25
**non-operator [1]** 31/16
**non-operators [1]** 34/3
**non-participation [1]** 120/20

**none [1]** 6/25
**normally [1]** 81/22
**north [8]** 6/3 11/24 11/24 12/1 26/8 26/8 26/11 26/19
**northeast [1]** 124/22
**not [306]**
**note [3]** 102/6 103/18 130/11
**noted [2]** 105/12 164/25
**notes [1]** 161/5
**nothing [9]** 5/18 16/19 55/12 105/15 117/15 139/15 142/9 156/13 159/18
**notice [42]** 9/15 9/18 9/25 10/3 11/5 11/5 12/9 12/12 12/21 13/2 13/4 13/7 13/11 13/14 13/25 14/4 14/10 16/13 37/25 57/6 57/7 80/15 80/24 139/19 139/22 141/10 141/12 141/15 141/22 141/25 142/3 142/6 142/8 142/10 142/18 157/9 158/1 158/2 158/5 158/11 168/6 169/6
**noticed [1]** 158/9
**notices [4]** 11/17 38/5 62/23 78/15
**notified [1]** 95/3
**notify [7]** 14/19 32/9 57/1 80/5 80/6 82/2 140/17
**notion [7]** 70/17 104/13 120/16 125/25 140/5 156/8 157/25
**Notwithstanding [1]** 119/21
**now [88]** 5/3 6/25 7/20 8/22 9/18 13/7 14/11 18/4 22/9 24/10 26/4 26/7 33/14 36/14 36/23 38/18 39/5 39/17 41/13 42/18 46/14 54/2 57/16 57/25 59/1 60/22 65/20 66/17 68/13 70/16 74/10 75/25 77/17 81/18 82/20 85/20 86/13 87/5 87/19 88/19 93/10 95/17 97/3 98/21 99/4 100/7 106/17 107/19 107/21 107/23 108/10 108/12 109/21 109/23 113/24 116/17 127/10 127/20 129/5 129/7 129/23 130/3 132/3 132/6 132/9 134/25 135/8 137/16 139/2 139/5 143/22 145/10 145/12 147/16 148/18 150/17 152/9

152/18 153/5 155/22 156/14 158/9 160/25 163/7 163/17 164/10 173/21 175/2
**nowhere [1]** 161/8
**number [28]** 46/2 47/19 47/21 48/19 48/25 49/6 49/8 50/14 56/9 58/1 83/19 84/1 84/12 87/14 93/3 108/7 109/17 121/21 121/22 126/10 133/25 136/7 136/12 136/13 136/16 136/17 149/12 173/17
**numbered [1]** 176/9
**numbers [1]** 89/11
**numeral [1]** 14/22

# O

**oath [6]** 5/3 8/13 39/1 45/19 150/22 157/6
**object [42]** 17/14 40/11 88/8 103/25
**objection [23]** 18/15 18/21 18/22 19/6 19/16 40/16 59/24 60/6 60/8 65/17 66/9 83/4 83/7 84/9 84/14 100/8 102/6 102/7 103/18 106/10 107/14 111/7 112/1
**objectives [1]** 51/2
**obligated [2]** 99/7 160/8
**obligation [10]** 14/9 57/5 70/5 98/12 98/15 98/18 98/24 99/11 132/20 142/17
**obligations [2]** 62/22 153/13
**observing [1]** 77/2
**obstruct [1]** 24/15
**obtain [2]** 83/25 123/25
**obtained [8]** 14/16 47/22 56/17 56/21 79/15 90/22 130/14 140/13
**obtaining [2]** 113/13 141/19
**obtuse [1]** 164/18
**obviate [1]** 81/12
**obvious [2]** 22/18 136/11
**obviously [7]** 12/3 45/4 62/3 79/10 94/22 107/23 128/14
**occur [7]** 27/2 53/20 68/21 135/4 136/10 143/1 157/1
**occurred [4]** 96/24 135/14 136/4 136/5
**occurring [4]** 22/19 25/10 30/22 148/14
**occurs [4]** 18/5 135/24 136/3 143/2

**October [13]** 21/21 29/15 29/25 30/12 30/19 31/15 31/24 32/25 33/14 58/5 67/1 154/5 155/2
**October 15 [9]** 21/21 29/15 29/25 30/12 30/19 31/24 32/25 33/14 67/1
**October 15th [1]** 58/5
**odd [1]** 171/14
**off [5]** 26/8 49/25 111/13 111/14 112/11
**offer [4]** 72/8 84/22 85/7 90/17
**offered [3]** 97/14 102/10 105/6
**offering [7]** 64/3 90/15 90/23 100/10 105/24 106/4 122/16
**offers [2]** 105/15 163/17
**office [1]** 138/5
**officer [5]** 17/19 18/17 20/13 38/15 104/9
**Official [1]** 176/3
**offset [3]** 26/15 26/24 53/11
**offsetting [4]** 25/18 54/18 148/15 153/3
**often [1]** 74/10
**oh [5]** 5/16 67/17 121/14 148/21 156/14
**oil [16]** 45/20 45/21 46/8 48/13 89/20 102/13 126/12 126/15 130/12 131/6 131/7 131/23 135/17 145/11 162/9 163/2
**okay [45]** 9/13 14/11 16/2 19/6 22/24 23/8 41/3 46/21 56/12 56/15 56/15 57/25 60/17 68/12 71/18 73/6 73/25 74/17 75/12 75/15 79/22 76/22 79/2 79/18 79/25 80/2 80/20 83/12 86/13 93/7 108/4 108/12 109/12 110/1 112/3 116/5 116/7 133/12 137/22 138/4 139/18 139/20 144/4 144/11 169/10
**old [1]** 132/20
**omission [1]** 33/18
**omitted [1]** 141/1
**once [5]** 90/25 121/24 128/12 137/3 171/9
**one [102]** 11/8 11/24 12/23 14/13 16/6 18/24 21/12 21/18 22/19 24/18 27/21 27/22 29/25 30/6 31/25 32/16

# O

**one... [86]** 33/24 37/20 41/15 44/1 46/4 46/11 53/10 55/2 57/10 58/8 60/20 65/24 68/9 71/11 71/17 72/19 74/6 75/12 75/16 75/21 78/16 79/21 83/17 84/4 85/13 86/19 87/5 89/6 89/6 89/8 92/18 93/2 93/9 94/20 96/21 99/4 100/12 100/25 102/24 104/21 108/5 108/24 114/6 114/7 114/7 114/25 117/1 119/12 119/15 121/10 121/21 121/23 122/19 122/19 122/21 124/1 124/5 124/14 126/4 126/10 127/9 128/2 128/3 128/6 128/8 129/1 129/14 131/9 133/25 134/20 135/17 136/12 136/16 142/4 149/12 150/8 154/10 155/15 157/24 162/18 163/4 165/18 167/19 169/12 170/5 173/5
**one's [1]** 133/1
**one-third [2]** 53/10 71/11
**ones [6]** 35/17 46/19 46/19 92/1 104/19 123/24
**ongoing [3]** 22/15 64/23 134/14
**only [36]** 14/6 27/21 53/16 70/9 78/16 84/18 103/16 103/25 104/18 104/21 109/22 110/8 114/6 114/7 115/12 115/15 117/22 119/5 123/23 124/23 126/4 137/20 138/14 142/4 142/5 142/6 142/11 143/1 143/24 143/24 151/8 163/4 166/14 167/19 169/17 172/11
**open [2]** 24/12 85/17
**opening [5]** 89/9 91/15 104/7 105/2 147/11
**operate [18]** 30/7 30/8 30/18 34/3 34/11 34/14 34/19 34/20 34/24 36/11 47/20 48/6 49/6 63/5 115/8 145/2 159/10 159/11
**operated [1]** 165/21
**operates [1]** 42/12
**operating [19]** 7/17 17/19 18/17 38/15 41/8 41/21 42/5 42/17 51/21 55/8 65/11 72/21 76/5 119/7 125/17 144/21

**operation [31]** 11/6 12/10 14/16 14/20 14/21 15/20 16/9 16/13 17/4 32/8 32/10 32/11 55/9 56/17 56/18 57/2 57/11 114/13 121/19 137/3 137/5 138/5 138/21 140/13 140/19 145/23 149/11 160/1 160/22 161/1 166/11
**operational [1]** 146/20
**operations [52]** 7/6 8/8 8/18 15/13 44/1 44/11 56/1 56/4 58/24 58/24 59/11 62/6 62/20 63/4 64/13 68/21 69/19 76/5 76/12 76/14 76/18 78/13 112/23 113/11 119/18 120/3 136/10 136/10 136/22 136/25 137/9 137/10 137/13 137/16 137/16 137/22 138/3 138/7 138/12 138/20 138/24 139/4 140/21 141/5 142/15 143/12 145/7 146/24 154/14 159/20 161/19 168/21
**operator [76]** 9/15 9/25 12/11 14/5 14/21 15/4 15/6 20/21 22/17 31/16 31/22 31/23 32/11 32/19 33/17 34/2 36/15 37/19 39/7 39/10 44/6 57/8 57/9 57/9 61/23 61/24 61/25 64/19 66/15 70/6 70/7 72/24 73/2 77/4 102/24 112/18 112/19 112/21 113/15 113/17 113/19 114/9 114/17 115/13 115/15 115/20 118/10 118/18 118/20 118/23 121/18 121/19 121/23 121/24 123/6 125/15 125/16 130/10 130/25 133/13 139/19 139/21 140/20 143/25 144/12 145/6 146/17 151/22 155/1 155/2 155/14 155/20 156/11 160/21 167/19 168/1
**operator-shifting [1]** 167/19
**operators [10]** 26/16 26/24 34/3 39/25 74/10 143/7 143/18 143/20 144/4 167/23
**operatorship [5]** 72/15 114/4 117/9 118/5 123/5
**opinion [10]** 31/24 99/17 102/8 104/1

104/1 104/1 105/20 105/24 164/23 174/23
**opinions [4]** 95/22 96/17 103/19 104/2
**opportune [1]** 98/12
**opportunity [16]** 8/23 9/8 16/22 16/24 21/7 22/22 42/21 85/21 85/22 103/11 107/22 108/5 108/14 108/21 109/2 111/6
**opposed [1]** 120/5
**opposing [4]** 18/6 59/19 60/13 91/25
**option [4]** 34/14 72/9 72/13 132/22
**options [4]** 30/5 33/25 122/17 122/18
**oral [2]** 98/8 109/9
**oranges [1]** 174/15
**order [26]** 55/3 69/23 74/17 74/20 74/24 75/9 93/18 105/25 110/4 110/10 110/17 134/5 136/23 146/13 147/5 147/7 147/8 150/10 158/17 160/3 160/25 161/16 164/2 164/5 166/13 169/17
**ordinary [1]** 101/17
**original [4]** 48/10 48/13 101/1 101/2
**orphan [1]** 36/21
**other [84]** 7/1 9/15 9/25 10/1 10/5 11/19 12/4 12/5 13/23 14/5 14/8 16/3 16/14 21/6 27/14 28/1 35/7 37/21 39/18 50/1 61/7 72/10 72/22 76/10 79/13 83/9 83/13 88/12 90/10 90/25 91/16 92/9 92/15 94/14 102/9 102/25 106/19 106/19 107/8 110/11 111/21 112/6 112/19 113/13 118/24 119/2 121/22 121/25 122/16 124/20 125/20 129/2 129/13 129/14 129/17 129/25 131/20 139/20 139/21 139/24 142/12 143/6 144/3 144/5 144/6 145/9 146/18 148/10 148/10 148/16 149/11 157/22 158/2 158/3 158/4 161/21 165/22 167/3 167/24 168/7 168/8 168/9 168/10 169/12

33/5 34/1 35/16 48/25 54/5 62/20 63/9 64/12 64/17 65/7 65/11 65/12 76/4 76/16 76/17 81/5 81/21 87/15 89/9 94/19 98/5 98/10 98/13 99/11 99/15 101/1 101/3 101/7 104/1 104/8 104/18 104/20 107/8 116/18 118/14 125/5 125/18 126/11 126/11 126/18 127/7 127/25 130/8 131/16 132/2 132/6 132/11 134/14 135/3 138/13 138/15 138/18 138/22 138/24 139/3 141/13 141/20 142/16 145/24 150/8 150/13 153/15 154/12 155/16 157/5 160/22 163/8 174/21
**ours [2]** 126/20 163/5
**ourself [1]** 142/3
**out [57]** 6/12 14/9 17/5 19/25 24/8 27/20 29/7 33/25 34/1 37/25 43/2 47/17 54/25 63/24 68/8 77/23 78/8 78/12 80/11 87/8 87/14 87/17 87/18 87/19 88/1 92/10 92/18 98/14 111/2 113/10 113/21 122/23 125/14 130/17 132/7 132/21 133/18 134/22 137/4 137/9 138/6 143/19 145/12 145/22 146/21 149/4 150/20 152/20 158/24 159/7 162/21 167/11 167/23 168/8 168/15 173/21 174/15
**outcome [2]** 16/25 105/7
**outraged [2]** 113/21 114/2
**outset [2]** 127/10 142/21
**outside [2]** 122/3 126/15
**outvoted [1]** 132/12
**over [19]** 6/8 16/20 29/22 80/19 96/6 102/6 121/18 121/24 128/17 133/1 133/1 145/8 146/8 152/3 153/4 154/8 162/4 167/20 167/22
**overall [1]** 86/1
**overarching [1]** 144/23
**overlook [1]** 163/9
**overly [1]** 29/12
**overrule [2]** 19/6 60/5 66/9
**overruled [1]** 19/16
**overruling [1]** 60/8

**overwhelming [2]** 113/16 113/18
**own [21]** 8/15 12/17 28/12 52/14 51/19 52/12 52/25 70/19 99/15 122/3 126/20 130/5 135/1 135/22 136/2 153/9 157/4 165/25 168/10 168/12 173/1
**owned [12]** 123/18 123/20 123/22 124/4 124/4 124/8 124/20 127/22 128/4 129/12 131/3 166/4
**owner [8]** 51/17 52/1 53/10 71/11 126/16 135/18 148/3 165/11
**owner's [1]** 127/1
**owners [3]** 165/14 167/24 171/1
**ownership [5]** 126/9 126/13 127/7 130/5 165/21
**owning [1]** 130/9
**owns [3]** 129/13 129/14 165/4

# P

**P-45 [1]** 29/25
**P-47 [1]** 93/12
**P-48 [1]** 93/13
**P-52 [1]** 170/8
**p.m [4]** 58/6 108/19 111/16 175/6
**PA [6]** 1/20 2/5 173/12 174/2 174/12 174/12
**pace [1]** 23/6
**pacing [2]** 15/13 15/14 15/15
**pad [48]** 7/21 7/24 8/2 15/4 26/8 42/12 42/15 43/12 52/11 55/7 61/24 72/8 76/3 76/8 76/9 78/1 112/22 113/10 114/12 114/14 118/3 123/11 129/24 130/5 130/6 130/17 137/2 138/9 138/11 143/2 143/4 143/18 143/20 144/4 144/12 144/18 144/20 145/11 145/22 146/20 147/5 147/8 159/19 159/25 165/12 165/23 170/24 172/4
**page [36]** 3/3 9/3 9/5 9/9 9/10 14/12 15/8 15/16 15/19 16/6 16/7 20/12 21/20 29/25 32/6 32/14 39/5 46/5 46/11 46/16 55/21 56/8 57/16 59/2 71/23 72/6 88/10 88/10 95/24 116/16 119/10 120/18 139/10 140/8 140/12 153/22

# P

**pages [2]** 29/18 86/21
**paid [14]** 28/20 29/5
50/6 121/2 127/11
127/18 127/19 130/4
130/8 135/2 137/17
165/20 171/1 171/18
**painted [1]** 26/24
**Palmer [4]** 128/22
128/24 129/5 129/10
**Palmers [2]** 128/23
128/24
**pamd.uscourts.gov [2]**
1/14 176/20
**paper [4]** 30/21 36/2
38/18 38/19
**papers [1]** 170/11
**paragraph [54]** 20/11
35/4 47/7 47/12 67/14
67/15 67/18 67/21
67/23 68/4 68/10 72/7
84/16 115/4 115/10
115/17 116/3 116/3
116/8 116/9 116/16
116/17 117/3 117/3
117/6 117/7 117/8
117/10 117/12 117/18
117/21 118/11 119/1
119/3 119/25 120/15
120/22 121/4 121/6
121/8 125/2 151/1
154/15 154/16 154/17
154/23 154/24 155/15
155/19 155/21 155/23
155/24 156/10 165/1
**paragraphs [3]** 116/4
116/6 116/11
**parcel [1]** 152/24
**parent [1]** 41/7
**parenthetical [1]**
121/18
**parol [1]** 101/15
**part [21]** 10/17 11/3
13/23 13/24 33/22 36/2
51/20 63/19 65/6 67/9
67/16 69/22 73/8 82/23
84/5 86/7 111/2 124/6
127/16 133/18 165/2
**participate [29]** 6/21
11/5 11/7 11/18 12/2
12/3 12/5 12/9 12/22
12/24 13/2 13/5 13/12
13/14 13/16 30/6 30/18
30/19 31/17 34/10
34/18 54/5 112/18
115/7 116/10 133/12
145/13 145/14 157/10
**participation [2]** 72/22
120/20
**particular [7]** 63/23
73/11 87/10 87/13
103/9 133/23 134/1
**particularly [4]** 78/22
89/19 125/6 153/19

**parties [136]** 6/21 9/16
9/22 9/23 9/25 10/1
10/2 10/4 10/4 10/5
10/8 10/8 11/4 11/6
11/17 11/19 12/4 12/9
12/16 12/21 12/23
12/25 13/1 13/4 13/6
13/14 13/16 14/5 14/7
14/7 14/8 14/10 14/19
16/14 20/17 21/5 21/6
21/6 30/7 31/24 32/9
34/19 41/21 42/6 50/1
52/16 57/1 57/8 57/9
57/10 58/13 58/24
58/25 59/11 62/2 63/6
80/8 82/14 83/10 84/17
84/19 84/24 85/2 85/3
85/16 86/14 86/23
87/17 88/1 88/24 95/6
95/16 101/4 101/8
101/11 104/17 104/18
106/2 114/19 114/22
118/4 118/10 118/13
118/24 119/18 119/20
119/24 120/2 120/22
120/24 121/1 121/16
121/23 122/6 127/22
129/19 130/3 139/15
139/17 139/20 139/22
139/22 139/24 139/24
140/7 140/11 140/18
140/18 140/19 141/8
141/11 141/11 141/12
141/15 141/22 142/8
142/9 142/11 142/12
146/18 150/25 150/25
154/7 154/15 155/4
157/9 158/2 158/3
158/5 158/6 163/24
168/7 168/8 168/9
168/10 169/23
**parties' [4]** 82/21
100/22 101/24 122/18
**partners [1]** 80/18
**partnership [1]** 134/6
**parts [2]** 46/6 123/15
**party [37]** 10/21 12/5
14/16 14/20 16/12 20/6
30/7 32/8 32/10 34/19
56/23 56/24 57/3 60/20
61/15 88/23 90/6
102/25 118/18 118/19
118/20 118/22 126/2
139/23 140/16 140/20
141/24 142/1 145/9
147/13 153/18 155/2
155/16 158/10 165/2
169/19 174/14
**passable [1]** 160/18
**passed [1]** 7/20
**paste [1]** 88/1
**pasted [1]** 88/17
**pasting [1]** 87/23
**paths [1]** 36/16

**patient [1]** 169/4
**pattern [1]** 116/24
**Paul [4]** 111/25 112/5
169/11 173/4
**pause [2]** 79/23 107/25
**pay [4]** 52/20 147/20
155/23 169/19
**paying [2]** 121/16
126/19
**PENNSYLVANIA [20]**
1/2 1/11 20/4 35/24
38/21 76/23 93/22 94/8
97/9 97/13 101/14
107/15 113/9 131/13
132/24 135/16 158/20
159/16 176/5 176/19
**people [19]** 33/12
35/19 54/25 78/12
80/14 101/5 102/14
103/7 105/6 105/10
122/16 138/4 138/17
152/10 159/1 159/9
161/10 161/17 161/18
**per [5]** 80/12 128/10
128/11 128/13 128/18
**perceived [1]** 73/4
**percent [24]** 14/15 19/9
30/20 31/18 32/6 32/7
33/23 51/17 52/1 56/16
56/20 67/20 71/13
71/15 124/12 125/13
127/22 140/12 148/3
154/24 163/12 163/14
168/10 173/1
**perception [1]** 153/3
**perfect [1]** 133/18
**perfectly [1]** 135/15
**perform [5]** 43/10 44/1
142/22 145/7 147/1
**performance [1]** 36/7
**performed [2]** 42/2
55/8
**performing [1]** 144/5
**Perhaps [1]** 35/20
**period [12]** 9/16 14/21
55/5 57/11 131/15
132/6 138/20 140/22
141/6 156/2 156/20
164/10
**permanent [2]** 93/19
97/12
**permission [1]** 17/24
**permit [15]** 45/21 63/17
70/11 113/8 125/22
126/19 127/21 127/23
128/12 141/20 144/7
162/10 163/11 163/15
163/24
**permits [11]** 10/19 20/9
48/8 66/14 75/3 80/9
80/16 80/21 124/17
128/14 140/3
**permitted [11]** 16/11
17/7 36/9 44/16 46/7

55/4 112/21 115/10
118/15 163/1 163/2
**permitting [3]** 8/11
141/17 141/17
**person [4]** 12/16 126/4
128/22 129/12
**personal [1]** 17/15
**personnel [3]** 22/20
43/8 143/9
**perspective [3]** 102/20
102/21 110/9
**pertain [1]** 97/24
**petroleum [3]** 54/2
148/24 149/2
**photo [1]** 162/7
**phrase [2]** 29/13
148/19
**pick [6]** 5/4 15/24
92/18 122/17 132/7
138/20
**picked [2]** 16/2 16/4
**piece [3]** 56/13 109/1
109/7
**pieces [1]** 160/14
**pin [4]** 45/17 46/20
46/24 162/7
**pin-drop [1]** 162/7
**pipe [1]** 74/10
**Pipeline [1]** 97/11
**Pittsburgh [1]** 1/20
**place [3]** 1/11 13/25
173/14
**plain [1]** 163/19
**Plaintiff [10]** 1/18 3/3
4/2 18/17 82/9 83/14
106/22 109/16 112/7
112/12
**Plaintiff's [47]** 5/9 5/10
5/11 5/15 6/15 9/2 9/4
20/9 21/11 45/7 45/8
45/9 46/1 55/20 56/9
58/1 59/2 59/6 71/20
81/11 82/6 82/15 83/5
83/8 83/13 86/15 92/23
93/3 93/5 93/17 93/24
93/25 94/4 106/20
107/10 107/20 108/8
108/10 110/1 111/20
112/3 112/4 115/24
162/1 162/2 162/2
162/5
**Plaintiffs [1]** 112/13
**plan [6]** 39/9 64/11
71/2 141/20 164/22
166/14
**planning [1]** 62/7
111/20
**plans [5]** 24/11 25/12
71/6 100/4 133/19
**plausible [1]** 114/6
**play [2]** 124/9 137/8
**played [1]** 63/14
**plead [1]** 152/7
**pleadings [2]** 90/10

90/13
**please [23]** 5/10 9/1
11/4 13/6 15/17 16/7
16/8 18/1 20/12 21/11
21/20 31/13 32/15
45/10 47/7 47/8 56/10
57/18 58/2 66/22 82/4
94/15 146/5
**pled [4]** 150/6 150/6
150/12 150/14
**plenary [2]** 6/8 6/11
**plop [1]** 132/7
**plug [6]** 69/7 69/10
69/13 156/1 171/8
171/10
**plugged [5]** 36/22
68/24 68/25 69/7
121/13
**plugging [1]** 146/19
**plugs [1]** 69/5
**Plus [1]** 8/9
**point [52]** 15/8 24/1
23/24 24/4 24/6 24/8
24/24 31/15 34/23
40/17 45/16 46/7 48/9
48/10 48/12 48/14
48/15 48/21 48/22
48/23 49/10 49/23
59/19 70/9 71/11 72/15
77/13 78/4 78/17 81/23
82/25 83/2 86/5 86/9
88/25 90/11 110/19
113/2 115/17 122/2
123/9 123/13 130/11
132/22 135/7 148/13
148/24 150/3 163/23
167/18 170/5 171/22
**pointed [4]** 87/14 98/14
115/9 133/18
**points [3]** 123/19
123/20 162/22
**portion [5]** 58/11 63/10
72/25 122/4 139/16
**portions [1]** 124/1
**posed [2]** 19/8 66/10
**position [32]** 13/15
17/10 17/12 18/18
21/10 30/10 37/12
49/14 56/1 56/13 74/17
74/19 75/15 75/25 76/2
76/4 76/19 89/21 91/16
104/21 108/21 109/10
113/23 115/12 115/16
122/25 127/4 153/15
154/9 158/23 170/11
172/18
**positions [1]** 104/18
**positive [1]** 35/15
**possession [1]** 78/23
**possibility [4]** 83/21
134/21 148/19 149/5
**possible [5]** 54/17 62/9
62/21 164/8 174/23
**possibly [2]** 82/8 147/6

# P

**potential [3]** 24/10 72/21 73/1
**potentially [3]** 22/18 25/10 132/13
**pour [2]** 129/2 129/13
**poured [2]** 129/11 129/11
**power [6]** 102/24 113/24 114/1 123/1 123/1 123/2
**powers [1]** 152/21
**practical [1]** 19/23
**practice [2]** 102/11 102/18
**practices [1]** 103/6
**precise [3]** 18/10 22/2 32/7
**preclude [3]** 97/15 105/17 106/6
**precluded [1]** 100/2
**predicate [1]** 164/3
**predominant [1]** 27/7
**prefer [1]** 35/17
**preferences [1]** 35/21
**prejudice [1]** 96/12
**prejudiced [1]** 99/11
**prejudicial [1]** 88/21
**preliminary [15]** 1/12 18/8 93/18 94/1 94/6 94/11 95/3 95/25 96/5 96/10 96/23 107/2 146/7 151/7 169/16
**prep [1]** 76/6
**preparation [1]** 76/9
**preparations [1]** 110/18
**preparatory [2]** 76/7 161/21
**prepare [6]** 63/2 68/14 68/19 110/10 147/5 161/20
**prepared [9]** 6/23 7/13 7/14 41/15 69/3 69/18 81/11 90/17 176/11
**preparing [2]** 112/23 138/12
**present [15]** 20/13 64/23 83/10 83/14 103/21 110/3 111/5 146/2 146/18 163/25 171/6 172/1 172/5 172/23 172/25
**presented [5]** 84/12 85/17 109/23 165/10 172/14
**presenting [3]** 18/20 82/9 99/17
**presently [1]** 64/24
**presents [1]** 146/11
**preserve [1]** 168/18
**pressures [1]** 97/18
**pretrial [6]** 95/12 96/9 96/17 97/8 97/14 98/16

**pretty [2]** 119/19 131/23
**prevail [1]** 78/11
**prevent [2]** 16/19 60/24
**prevented [2]** 65/10 158/24
**preventing [1]** 131/11
**previous [3]** 57/23 94/19 108/10
**previously [6]** 47/20 48/6 49/7 66/15 86/5 91/17
**price [7]** 27/4 27/5 27/8 27/12 27/16 27/18 132/21
**prices [1]** 27/21
**primarily [1]** 71/24
**primary [2]** 112/16 118/9
**principle [1]** 85/3
**print [2]** 86/19 87/1
**printed [2]** 87/4 108/10
**printing [1]** 86/14
**prior [15]** 16/15 19/21 39/14 69/16 76/10 77/24 77/25 78/2 83/18 90/6 91/19 113/23 114/11 128/14 170/12
**priority [2]** 22/16 22/17
**Prison [1]** 153/17
**private [1]** 126/16
**pro [2]** 130/4 130/8
**probably [1]** 44/21 45/4 69/3 72/16 101/12 102/17 167/18
**probing [1]** 160/11
**problem [10]** 60/10 69/11 99/25 110/8 132/5 133/18 145/11 167/4 167/9 167/9
**problematic [1]** 143/2
**problems [1]** 143/4
**Procedure [1]** 169/15
**proceed [12]** 5/3 31/13 81/12 95/8 95/9 109/11 112/12 112/21 115/6 133/11 146/5 167/2
**proceeding [5]** 84/8 84/22 112/17 127/13 147/2
**proceedings [3]** 1/12 83/18 176/8
**proceeds [1]** 150/1
**process [7]** 19/5 22/3 66/1 102/25 149/15 150/1 171/10
**processed [1]** 63/21
**processes [1]** 53/3
**produce [2]** 51/20 172/8
**produced [6]** 42/8 50/23 52/10 69/8 79/10 171/19
**producer [1]** 51/22

**producing [13]** 42/16 63/3 64/16 69/17 70/13 76/8 121/16 159/20 159/25 171/4 171/7 171/15 172/7
**production [14]** 26/25 49/19 49/24 49/25 52/6 52/24 64/18 64/18 70/18 116/5 148/2 171/4 171/12 171/24
**productivity [1]** 64/2
**professional [1]** 100/14
**professional's [1]** 102/19
**professor [8]** 103/16 105/5 105/9 105/19 105/23 106/4 106/7 106/7
**proffer [4]** 82/14 103/10 105/5 105/19
**proffered [1]** 108/12
**profitability [10]** 27/17 27/20 27/21 64/22 70/17 70/20 70/21 78/19 79/3 79/14
**profitably [1]** 149/17
**profits [1]** 149/17
**progress [1]** 63/7
**prohibit [1]** 120/6
**project [8]** 47/20 48/6 49/6 72/16 72/20 73/2 73/5 138/17
**projected [3]** 50/21 63/13 64/7
**projections [2]** 63/18 64/4
**promptly [4]** 14/19 32/9 57/1 140/17
**prong [3]** 151/9 151/24 152/13
**proof [4]** 35/15 113/6 115/2 115/8
**proper [1]** 169/18
**properly [1]** 71/3
**properties [3]** 26/22 28/19 29/1
**property [31]** 28/13 28/13 28/17 28/18 28/20 28/24 37/6 37/24 64/25 65/6 65/15 89/16 89/19 126/23 126/24 127/2 127/3 127/25 130/14 131/6 131/6 131/8 131/12 132/2 135/1 135/17 135/19 135/19 135/22 145/24 160/23
**proportionate [5]** 14/20 32/10 57/2 140/19 171/2
**proportions [1]** 147/3
**proposal [42]** 5/11 6/9 11/20 12/15 12/16

15/20 16/15 16/21 18/11 19/12 19/21 53/21 56/2 61/8 63/7 73/13 73/21 112/19 116/12 116/15 117/11 117/13 117/17 118/2 132/11 132/11 132/19 136/12 137/21 138/13 138/15 138/18 138/22 138/24 139/3 153/9 156/8 156/11 156/21 157/5 161/3 173/19
**proposals [37]** 6/15 6/25 8/6 8/19 11/23 11/24 12/25 13/9 13/20 16/23 16/25 30/20 34/2 34/13 56/14 66/14 77/21 80/7 80/8 80/18 80/19 116/2 116/10 116/17 116/18 116/19 116/22 117/10 117/22 136/17 136/23 137/11 137/12 154/16 157/3 157/14 161/5
**propose [19]** 6/12 19/20 19/25 59/16 59/21 60/16 60/22 61/3 63/17 64/6 65/8 66/16 115/2 118/3 132/4 133/9 145/17 153/10 173/24
**proposed [47]** 6/5 6/16 11/6 12/3 12/10 12/23 14/16 15/25 20/4 20/5 26/7 26/13 28/25 29/3 32/8 34/9 36/25 41/15 42/2 43/13 53/25 55/4 56/16 56/17 56/18 57/3 60/21 60/23 61/4 61/5 61/6 66/4 70/25 108/22 109/14 114/8 114/23 114/23 115/19 117/9 134/20 140/13 144/10 152/16 156/23 171/23 172/5
**proposes [4]** 31/16 60/19 60/20 155/18
**proposing [12]** 14/16 16/13 16/20 32/8 56/23 56/24 60/13 140/16 141/11 141/24 141/25 155/16
**proposition [2]** 96/3 131/22
**protect [6]** 7/16 40/1 171/14 174/12 174/13 174/20
**protecting [1]** 158/20
**protection [6]** 20/5 36/3 36/3 36/6 39/22 159/16
**prove [10]** 126/10 135/13 136/4 150/3 150/14 151/8 151/17

151/17 152/13 163/10
**proved [5]** 54/3 54/14 54/23 148/25 149/1
**proven [1]** 126/7
**provide [11]** 31/8 57/6 92/21 93/9 96/2 100/19 141/21 141/24 142/5 142/7 156/20
**provided [24]** 13/4 14/22 14/23 16/10 17/5 17/6 37/5 45/23 48/18 48/24 57/12 57/13 57/22 86/11 91/25 92/22 95/7 107/20 140/22 140/23 141/10 141/12 142/2 142/10
**providing [2]** 102/4 141/15
**province [1]** 96/19
**provision [21]** 11/14 12/7 12/14 13/19 18/3 19/3 19/15 76/23 107/15 115/14 115/21 121/9 122/12 122/23 139/11 140/1 141/1 141/13 141/1 158/13 167/19
**provisions [4]** 16/12 17/8 100/16 176/5
**proximate [1]** 68/21
**prudent [1]** 168/1
**public [14]** 37/23 40/1 44/9 77/18 78/15 80/12 80/13 142/20 158/18 158/22 159/12 160/2 167/13 167/15
**publicly [1]** 54/22
**publicly-filed [1]** 54/22
**pull [5]** 58/2 77/1 115/23 139/8 152/20
**pulled [1]** 165/5
**punished [2]** 99/9 99/10
**purely [1]** 173/16
**purports [2]** 45/15 162/16
**purpose [20]** 85/7 85/15 85/15 88/4 89/18 90/23 90/24 91/23 100/10 100/16 101/1 101/2 102/4 118/1 119/3 120/1 120/21 120/22 121/4 169/24
**purposes [3]** 76/14 84/8 91/13
**pursuant [2]** 77/5 176/5
**put [43]** 9/1 16/7 20/11 21/19 22/12 32/15 45/10 46/24 47/6 51/22 52/11 63/24 64/8 66/21 69/4 83/22 83/24 87/23 95/18 101/2 103/20 104/22 108/7 121/1

**P**

put... **[19]** 122/23
128/25 130/17 137/20
138/13 138/15 150/2
153/10 161/12 162/16
166/1 166/4 166/22
168/23 172/23 173/4
173/10 174/2 174/4
putting **[3]** 5/24 116/5
145/11

**Q**

Q-1 **[7]** 22/6 22/7 22/25
23/12 23/22 24/2 152/3
Q-2 **[2]** 23/16 24/4
Q-3 **[3]** 23/18 24/5
30/10
Q-4 **[2]** 23/20 24/6
qualified **[1]** 142/22
quantifiable **[3]** 149/6
149/7 151/23
quantified **[3]** 26/5
28/2 28/8
quantify **[4]** 28/10
53/20 63/23 134/16
quantities **[1]** 121/16
quantity **[2]** 47/19 49/5
quarter **[6]** 25/3 25/19
25/23 25/24 25/25
157/21
quarterly **[1]** 64/22
quarters **[2]** 24/19 26/1
question **[61]** 8/15 8/17
13/6 17/9 17/10 17/15
17/17 17/23 18/2 18/12
18/22 19/8 19/8 22/23
22/25 23/8 23/12 24/16
25/11 25/14 29/14
29/15 29/24 30/2 32/2
38/4 38/7 41/2 41/23
42/19 48/11 52/9 58/14
60/1 60/2 60/2 60/4
60/5 60/25 62/16 66/10
66/11 67/11 72/1 73/7
73/8 74/1 75/5 75/7
77/14 78/16 80/10
80/17 98/14 98/21
124/10 128/1 137/14
159/23 172/9 172/11
questioning **[6]** 18/10
30/22 40/12 67/4 81/5
128/5
questionnaire **[4]** 37/5
38/16 77/19 159/8
questionnaires **[5]**
37/17 38/17 78/8 78/12
158/24
questions **[18]** 14/14
34/7 58/5 60/8 60/8
61/10 66/18 70/17
71/20 73/16 79/18
79/20 79/24 87/13
134/25 136/16 137/11
158/14

**quick** **[1]** 29/20
**quickly** **[3]** 63/9 95/6
174/23
**quite** **[7]** 62/1 64/12
85/19 87/6 146/11
146/21 148/16
**quo** **[2]** 70/10 168/18
**quote** **[7]** 8/16 32/12
33/22 75/9 127/1
147/14 162/13
**quote/unquote** **[1]** 75/9
127/1
**quoted** **[2]** 57/23 102/3
**quoting** **[2]** 32/13
95/24

**R**

**raised** **[2]** 18/25 118/12
**Raleigh** **[9]** 33/6 33/7
116/25 118/15 120/7
120/21 124/3 130/19
154/13
**rata** **[2]** 130/4 130/8
**rate** **[17]** 49/18 50/2
50/5 50/6 50/14 50/15
50/19 51/1 51/11 51/12
51/13 51/14 51/15
52/14 71/8 71/14 78/25
**rates** **[3]** 52/21 147/21
149/10
**rather** **[2]** 5/15 118/8
**re** **[23]** 16/20 19/20
19/25 26/3 59/16 59/21
60/13 60/16 60/19 61/3
61/5 61/6 61/8 66/16
80/3 80/10 121/12
132/4 132/18 133/9
151/4 153/10 156/1
**re-ask** **[1]** 80/10
**re-complete** **[1]** 156/1
**re-completed** **[1]**
121/12
**re-do** **[1]** 26/3
**re-litigating** **[1]** 151/4
**re-proposal** **[1]** 61/8
**re-propose** **[10]** 19/20
19/25 59/16 59/21
60/16 61/3 66/16 132/4
133/9 153/10
**re-proposed** **[2]** 61/5
61/6
**re-proposes** **[1]** 60/19
**re-proposing** **[2]** 16/20
60/13
**RE-RECROSS-EXAMIN
ATION** **[1]** 80/3
**re-submit** **[1]** 132/18
**reach** **[2]** 85/2 87/24
**reached** **[2]** 82/10 88/2
**reaches** **[1]** 153/13
**read** **[21]** 5/22 11/4
16/8 39/23 40/20 45/11
47/17 47/17 57/14
58/23 87/22 89/11 93/8

95/17 96/17 104/8
126/22 136/24 156/18
163/18 168/15
**reading** **[9]** 9/24 39/18
114/6 155/24 156/12
156/12 168/15
**reads** **[2]** 56/16 158/4
**ready** **[9]** 31/12 37/25
75/9 141/6 158/16
167/1 167/9 168/21
168/25
**real** **[5]** 19/7 149/7
149/8 150/3 159/18
**real-time** **[1]** 19/7
**reality** **[2]** 88/23 98/25
**realized** **[1]** 87/12
**really** **[16]** 63/9 96/24
118/7 119/16 126/20
129/25 134/11 137/7
142/4 146/14 147/16
147/18 159/21 159/21
161/13 162/15
**reason** **[16]** 10/17
59/20 118/10 118/19
118/21 120/8 120/14
121/6 133/25 136/1
149/5 150/4 159/7
160/19 163/6 166/19
**reasonable** **[9]** 104/18
104/21 114/7 119/5
121/2 133/10 136/25
138/9 166/12
**reasonably** **[2]** 142/14
168/1
**reasons** **[4]** 72/19
104/3 115/23 151/10
**rebid** **[1]** 132/20
**rebuttal** **[2]** 110/2
112/6
**recall** **[12]** 8/13 8/15
8/19 46/1 55/23 58/4
58/21 61/11 63/15
77/15 122/14 164/3
**recaptured** **[1]** 65/7
**receive** **[2]** 13/14 91/24
**received** **[5]** 11/17
115/3 115/4 115/4
146/8
**receiving** **[1]** 22/17
**recently** **[1]** 122/7
**recess** **[14]** 81/21
81/23 82/1 82/3 82/5
108/13 108/17 108/19
110/4 110/15 110/19
111/12 111/15 111/21
**recessed** **[1]** 111/18
**reclaim** **[1]** 171/8
171/11
**recognizable** **[1]** 88/14
**recognize** **[3]** 118/14
120/22 139/12
**Recognizing** **[1]**
162/11
**recollection** **[1]** 86/21

**reconsider** **[5]** 35/20
95/10 99/22 99/24
100/5
**reconsideration** **[1]**
98/13
**record** **[24]** 47/10 49/3
61/25 70/7 71/25 82/23
83/19 83/22 84/5 84/12
86/7 90/8 90/9 92/7
92/21 93/12 103/18
108/8 111/13 111/14
126/23 159/13 162/4
163/11
**records** **[1]** 37/23
**recovered** **[1]** 171/4
**recross** **[5]** 3/9 3/11
66/23 80/3 159/3
**RECROSS-EXAMINATI
ON** **[1]** 66/23
**recurring** **[1]** 66/2
**red** **[2]** 45/16 162/7
**redirect** **[8]** 3/8 42/19
55/13 55/14 55/16 66/8
68/13 159/3
**reduction** **[1]** 26/25
**reestablished** **[1]**
171/13
**refer** **[4]** 30/21 77/4
116/12 137/12
**reference** **[19]** 7/1 7/4
7/6 9/14 15/11 32/5
33/15 35/4 47/12 58/9
59/8 67/7 67/14 67/17
67/19 121/11 124/2
154/5 154/19
**referenced** **[5]** 9/7
87/13 89/9 153/17
155/6
**references** **[6]** 67/5
67/7 67/13 67/15 116/5
124/7
**referred** **[6]** 56/24
88/24 116/15 128/6
128/9 170/12
**referring** **[6]** 9/9 9/13
41/1 116/17 139/24
169/15
**refers** **[5]** 72/8 116/19
117/22 121/9 137/10
**refined** **[1]** 85/4
**reflect** **[2]** 47/10 85/13
**reflection** **[1]** 174/6
**reflects** **[1]** 86/22
**Refractories** **[1]** 102/1
**reframe** **[1]** 19/18
**refusal** **[5]** 62/13 63/17
64/11 65/4 65/14
**refuses** **[2]** 62/18 62/25
**refusing** **[1]** 65/1
**refute** **[1]** 142/9
**regard** **[2]** 136/8
142/20
**regarding** **[3]** 22/5
84/18 107/2

**regardless** **[1]** 62/7
**region** **[2]** 120/9 143/7
**registered** **[1]** 163/13
**regulation** **[6]** 36/12
37/14 37/18 39/25
158/19 159/17
**regulations** **[2]** 62/22
160/9
**regulatory** **[4]** 38/25
39/4 62/4 174/4
**related** **[2]** 8/9 70/25
**relates** **[1]** 105/1
**relationship** **[2]** 126/11
130/16
**relaxed** **[1]** 96/24
**relevance** **[2]** 44/4 86/8
**relevant** **[7]** 33/3 91/18
100/20 101/7 139/12
154/14 163/10
**reliability** **[1]** 95/21
**relied** **[2]** 57/21 122/8
**relief** **[22]** 17/11 18/9
19/10 22/13 23/13 26/3
37/11 69/22 70/9 70/14
76/2 89/16 107/3
113/14 145/20 145/21
146/15 152/22 153/20
164/9 168/15 170/2
**relies** **[1]** 132/1
**relinquishment** **[1]**
120/19
**rely** **[3]** 54/25 132/1
135/4
**relying** **[9]** 11/2 29/23
30/3 30/11 32/3 35/2
144/16 154/9 155/7
**remain** **[5]** 5/3 16/23
81/8 92/7 165/1
**remainder** **[1]** 137/4
**remarkable** **[1]** 154/10
**remarks** **[1]** 147/11
**remember** **[9]** 8/17
29/9 45/13 47/13 59/17
59/22 98/5 150/8 154/6
**remind** **[1]** 5/3
**remove** **[1]** 168/9
**removed** **[3]** 69/1
167/25 168/4
**render** **[1]** 64/4
**renewal** **[4]** 47/18 48/2
48/3 49/4
**renewed** **[4]** 48/19
48/21
**Repeat** **[2]** 58/14 62/16
**repeated** **[5]** 66/11
132/25 132/25 134/12
134/15
**repeatedly** **[2]** 40/13
133/2
**repetitive** **[1]** 75/1
**rephrase** **[1]** 60/7
**replaced** **[1]** 130/2
**reply** **[3]** 94/20 95/2
98/6

# R

**report [26]** 39/8 39/14 39/19 40/8 78/8 94/20 94/21 96/9 97/8 97/14 97/15 101/21 101/22 102/5 102/9 103/12 103/15 103/16 105/11 105/21 106/7 106/8 106/12 106/13 108/6 108/9
**REPORTED [2]** 1/14 176/17
**reporter [4]** 176/4 176/15 176/18 176/23
**REPORTER'S [1]** 175/7
**reports [14]** 54/22 94/19 95/12 95/17 95/22 95/24 96/17 97/25 99/12 99/13 100/9 100/10 103/13 103/14
**represent [2]** 72/9 96/16
**representation [1]** 85/18
**representations [1]** 85/3
**representative [1]** 17/16
**represented [3]** 72/16 85/10 86/23
**reproduction [1]** 176/22
**request [17]** 16/19 18/24 19/19 24/23 39/3 49/15 84/7 88/8 88/23 89/4 99/22 110/24 164/2 164/4 164/17 164/17 164/25
**requested [2]** 41/22 79/8
**require [8]** 39/18 57/7 69/25 70/12 75/21 146/19 170/15 173/13
**required [15]** 14/10 19/14 37/18 39/9 39/14 40/8 44/1 79/12 80/23 119/14 119/22 126/20 147/10 159/8 167/4
**requirement [4]** 10/3 119/16 142/18 169/24
**requirements [2]** 62/14 116/24
**requires [5]** 44/6 70/14 160/16 173/9 173/12
**rescinded [5]** 128/7 128/15 129/6 163/16 163/20
**research [1]** 101/13
**reserve [2]** 26/24 54/6
**reserves [9]** 26/15 27/1 27/19 54/3 54/14 54/23 148/25 149/1 171/7

**reservoir [1]** 54/5
**reset [6]** 19/25 59/16 59/21 60/16 65/25 153/12
**resetting [1]** 60/13
**resolution [1]** 78/14
**resolve [2]** 81/13 81/16
**resolving [1]** 118/8
**resource [1]** 72/20
**resources [1]** 36/4
**respect [16]** 72/12 82/22 92/17 99/17 101/21 101/23 103/17 104/7 106/5 107/19 108/12 108/21 119/7 121/7 170/6 170/11
**respected [1]** 102/13
**respectful [1]** 169/8
**respectfully [3]** 84/15 105/16 174/17
**respond [6]** 17/24 23/24 38/13 103/11 172/12 172/19
**responded [2]** 18/3 34/12
**responding [4]** 28/4 29/14 29/24 30/4
**response [11]** 29/15 29/20 30/18 31/15 32/19 70/16 73/25 97/22 109/5 124/23 143/23
**responsibility [1]** 44/8
**responsible [2]** 62/22 71/9
**rest [4]** 109/24 117/20 117/23 120/17
**resting [1]** 109/2
**restrained [2]** 169/20 174/14
**restraining [2]** 93/18 169/17
**rests [1]** 106/22
**resubmit [1]** 19/12
**resubmitted [1]** 16/14
**result [5]** 103/2 103/9 147/20 173/6 174/8
**resulted [2]** 28/8
**retained [2]** 95/4 125/21
**return [3]** 27/15 71/14 126/19
**returned [1]** 69/16
**revenue [6]** 52/2 52/4 52/25 53/9 53/11 148/4
**reversionary [1]** 72/23
**review [17]** 33/3 36/12 39/8 39/19 40/9 71/25 106/9 106/15 107/6 107/22 108/2 154/12 155/1 155/9 158/15 158/19 164/12
**reviewed [7]** 47/21 48/6 49/7 57/23 59/6

84/4 100/9
**reviewing [2]** 77/18 81/18
**revise [1]** 20/17
**revision [1]** 35/20
**revisionist's [1]** 155/12
**revisions [1]** 88/20
**reward [1]** 152/10
**rework [1]** 156/1
**reworked [2]** 121/12 171/16
**reworking [1]** 156/7
**Richard [1]** 2/4
**rid [1]** 128/14
**riddle [2]** 148/4 148/5
**rig [20]** 7/12 42/8 42/15 44/20 44/21 44/21 44/24 56/5 74/2 74/7 74/13 74/15 75/11 75/20 75/20 75/21 75/22 76/3 144/8 144/13
**right [168]** 5/23 6/6 8/11 8/10 8/11 9/16 10/17 11/12 11/21 11/24 12/6 12/13 12/24 13/17 13/17 13/19 14/17 14/23 15/3 15/6 15/22 16/17 18/4 19/7 19/20 20/1 20/2 20/24 21/20 22/9 23/2 23/3 25/21 26/5 29/16 30/8 32/20 33/22 34/3 34/4 34/6 34/20 34/20 34/21 35/6 36/5 36/10 37/9 37/10 37/12 37/25 39/23 41/11 42/13 43/18 43/21 44/22 45/3 45/5 45/17 45/22 48/21 50/10 50/22 50/23 51/10 51/14 52/12 53/18 53/25 53/25 55/13 58/12 58/23 64/25 67/5 67/8 67/11 67/12 67/15 67/25 68/2 68/3 68/6 68/10 68/16 69/2 69/6 69/13 71/19 71/22 73/13 74/22 78/3 78/4 78/19 79/7 81/3 81/11 82/1 82/6 82/17 82/21 83/8 83/9 84/14 87/5 87/25 94/14 97/21 100/6 100/12 101/12 106/17 106/22 106/25 107/12 107/17 108/17 108/20 109/20 111/12 112/4 112/9 112/15 112/17 113/16 113/18 114/12 114/15 114/17 116/2 116/3 118/17 119/17 121/10 122/22 122/23 126/9 127/2 127/3 127/14 127/17 128/4 128/17 129/20

129/22 134/2 134/5 135/3 138/20 139/20 140/4 141/13 146/5 148/17 153/20 153/25 155/11 155/14 155/19 157/11 158/1 165/4 166/18 172/10 173/21 174/22
**rights [24]** 20/21 21/1 21/5 23/13 23/4 57/13 57/22 65/5 65/7 65/11 65/15 89/16 126/13 126/24 127/25 128/3 130/13 133/1 133/3 140/23 151/1 151/2 153/15 154/2
**rigs [3]** 7/11 69/2 74/5
**ring [1]** 5/14
**rings [1]** 35/12
**rise [1]** 82/4
**risk [2]** 26/15 42/2 144/16 144/20 160/5
**RMR [5]** 1/14 176/3 176/13 176/14 176/18
**RMR/CRR [1]** 1/14
**Roach [4]** 94/20 100/13 103/12 103/25
**Roach's [9]** 101/21 102/5 102/8 103/15 105/21 106/8 106/11 108/6 108/9
**road [16]** 43/23 43/24 44/4 44/12 74/20 75/1 75/24 75/24 132/16 132/19 160/10 160/15 160/16 160/19 160/23 161/1
**roads [4]** 44/9 160/18 160/20 160/22
**Robert [1]** 93/20
**role [3]** 43/19 63/14 103/4
**Roman [1]** 14/22
**room [1]** 149/21
**rotary [4]** 73/23 74/6 74/12 160/13
**royalties [1]** 171/19
**royalty [1]** 171/18
**ruin [1]** 160/22
**rule [15]** 92/18 97/6 99/5 99/6 99/7 99/7 99/8 99/18 101/15 135/16 135/20 136/1 169/14 169/22 174/13
**ruled [1]** 97/17
**rules [6]** 96/23 98/3 142/16 164/11 165/7 169/15
**ruling [9]** 17/2 92/16 92/19 98/9 99/17 99/18 99/20 99/20 106/17
**run [6]** 11/24 12/1 26/8 131/17 151/20 152/17
**running [1]** 154/17

**runs [1]** 11/24
**Rush [7]** 43/23 43/24 44/12 56/5 75/15 160/16 167/14
**Russian [1]** 91/8

# S

**s/Lori [1]** 176/13
**safe [2]** 68/21 69/18
**safely [3]** 142/23 147/8 161/19
**safety [7]** 40/1 62/6 69/10 159/18 160/2 161/14 167/15
**said [52]** 8/18 8/19 14/6 15/12 16/13 25/1 37/15 38/20 54/17 77/11 83/5 89/5 98/15 98/22 99/5 104/3 104/9 104/9 105/12 115/18 124/23 125/2 129/23 135/12 136/21 137/11 138/18 139/18 142/6 142/7 142/8 142/21 143/16 143/24 144/11 148/17 148/20 149/13 150/9 151/10 152/1 154/4 155/8 155/23 157/4 157/5 158/2 158/22 160/2 160/12 162/13 172/22
**sake [1]** 172/16
**same [45]** 9/15 9/25 14/4 14/12 14/22 16/14 25/17 25/21 45/20 45/25 49/1 50/2 57/12 57/22 59/5 60/19 61/6 89/21 89/23 102/18 111/9 113/23 114/11 114/14 117/10 119/6 122/8 122/9 122/11 126/9 130/6 131/25 132/1 132/18 140/8 140/22 141/4 141/6 141/14 143/5 144/12 144/15 144/21 157/18 176/22
**sand [1]** 45/1
**sat [4]** 100/16 113/24 150/22 151/25
**satellite [1]** 162/7
**satisfied [3]** 138/18 138/19 142/17
**satisfy [2]** 62/17 152/6
**saved [1]** 28/3
**saw [1]** 158/18
**say [63]** 10/1 10/22 11/11 14/7 26/2 31/18 32/1 33/2 35/12 42/18 67/25 68/1 68/2 68/3 68/6 68/7 68/19 81/4 90/5 105/13 109/21 111/8 116/9 119/19 121/13 124/15 124/16

# S

**say... [36]** 133/11 134/6 135/20 136/12 136/23 137/15 137/24 138/4 142/2 143/17 145/2 148/21 149/2 150/13 152/8 152/9 152/11 153/6 155/22 155/25 157/7 158/3 159/7 161/2 161/11 163/6 165/25 166/19 167/3 168/24 172/3 173/11 174/2

**saying [14]** 8/20 75/19 75/20 100/21 101/8 102/14 103/5 105/10 110/22 138/10 138/10 144/3 144/17 156/15

**says [62]** 9/24 10/1 10/5 10/5 10/7 12/7 12/11 13/6 13/24 14/4 14/7 14/15 15/20 16/9 29/20 30/17 34/17 34/17 35/2 36/15 37/4 39/7 39/13 39/17 48/2 78/2 84/16 100/22 116/22 118/15 119/18 121/11 122/9 123/18 124/17 124/19 124/20 127/5 132/25 135/18 136/1 136/24 138/21 139/16 139/18 140/12 140/15 143/23 149/4 149/21 153/8 153/11 154/11 155/7 155/18 156/14 159/14 160/21 162/13 165/1 169/16 171/3

**scenario [7]** 26/24 31/16 34/9 34/15 34/18 34/25 35/1

**schedule [2]** 26/3 163/25

**Schlumberger [1]** 166/16

**Scott [1]** 111/18

**Scranton [1]** 2/5

**screen [15]** 5/21 5/22 5/24 6/2 16/7 20/11 21/19 31/4 32/15 32/16 36/2 45/10 46/20 47/7 66/22

**scroll [2]** 77/2 77/3

**se [1]** 80/12

**seal [3]** 83/20 84/5 86/6

**sealed [1]** 83/22

**search [1]** 135/17

**second [27]** 25/25 39/5 47/6 47/12 58/2 58/12 67/15 67/17 67/21 67/23 68/10 72/7 85/15 87/3 94/21 128/10 133/9 133/23 151/12

152/16 154/15 154/16 154/22 154/23 155/22 157/20 164/25

**secondly [3]** 117/25 120/15 126/21

**seconds [1]** 174/10

**section [22]** 35/23 37/4 37/15 38/21 59/2 59/3 59/8 59/10 59/12 59/13 74/8 87/13 87/25 88/25 139/13 139/15 139/16 140/6 154/9 155/7 171/3 176/6

**secure [1]** 10/19

**security [2]** 111/3 169/18

**see [12]** 5/19 36/7 52/20 57/19 58/18 72/5 92/19 117/8 121/8 148/21 174/1 174/9

**seeing [3]** 45/13 88/3 111/10

**seek [2]** 133/5 150/2

**seeking [5]** 38/23 70/10 147/13 153/18 168/18

**seem [1]** 91/19

**seems [1]** 77/4

**seen [3]** 38/18 149/8 167/2

**select [1]** 122/20

**self [3]** 90/16 90/22 97/2

**self-authenticating [2]** 90/16 90/22

**self-imposed [1]** 97/2

**sell [1]** 28/18

**selling [1]** 125/6

**send [8]** 10/15 10/20 37/25 39/1 78/8 78/12 159/7 167/23

**sending [3]** 158/24 160/7 166/23

**senior [1]** 33/12

**sense [8]** 52/19 69/7 118/13 118/14 124/15 125/12 126/6 167/17

**sent [15]** 9/18 9/20 9/22 9/23 21/21 37/17 38/16 38/17 41/19 41/20 41/24 80/11 80/17 81/16 122/15

**sentence [27]** 9/13 9/13 11/3 11/7 11/8 11/12 12/8 12/11 12/21 13/17 13/24 47/15 47/25 56/23 58/12 100/24 101/1 101/2 101/6 101/9 119/11 119/25 120/4 121/20 141/9 141/15 164/25

**separate [11]** 33/22 86/3 121/9 126/10 127/11 127/12 127/12

127/23 128/1 129/7 136/19

**separately [1]** 128/19

**September [7]** 29/14 29/16 29/19 30/4 33/25 34/17 72/6

**September 28 [2]** 30/4 34/17

**September 28th [1]** 33/25

**September 29 [1]** 29/19

**September 29th [2]** 29/14 29/16

**September 30 [1]** 72/6

**serial [4]** 150/15 150/18 150/19 151/11

**series [3]** 61/9 89/8 94/17

**serious [6]** 134/21 148/19 149/4 152/2 161/3 167/10

**serve [23]** 31/23 61/23 61/24 72/24 112/17 112/19 112/21 113/14 113/16 113/18 114/9 114/17 115/13 115/14 115/20 118/9 118/18 123/6 130/25 133/12 143/24 144/11 155/1

**served [1]** 114/16

**serves [1]** 86/20

**service [3]** 49/21 49/22 63/22

**services [6]** 27/15 63/19 64/5 76/10 126/17 147/1

**serving [8]** 14/20 15/6 32/10 57/8 57/9 73/2 130/10 140/20

**set [10]** 14/9 18/5 33/25 34/1 68/8 74/10 156/24 156/25 157/15 176/9

**sets [3]** 17/5 77/23 84/23

**settled [3]** 114/19 114/20 150/20

**settlement [43]** 20/10 20/16 20/22 20/23 21/2 21/7 32/22 65/6 83/18 84/20 84/23 85/4 85/7 85/11 85/14 86/1 113/19 113/22 114/1 114/6 114/7 114/25 115/18 115/24 115/25 116/1 117/17 117/20 118/2 118/8 119/4 122/7 123/16 123/17 123/21 123/21 124/7 143/16 143/21 145/15 150/23 151/3 154/7

**seven [8]** 14/1 14/4 29/18 29/22 57/17

95/24 132/19 171/3

**several [2]** 31/2 115/22

**shale [1]** 55/7

**shall [14]** 11/6 14/19 14/21 15/21 32/9 32/11 36/15 39/8 39/13 57/1 57/11 119/19 140/17 140/21

**shape [1]** 127/24

**share [5]** 12/19 64/11 130/4 130/8 171/24

**shared [11]** 33/8 35/18 41/21 42/5 42/10 42/16 61/11 61/14 152/19 160/4 160/6

**shares [1]** 44/8

**she [7]** 29/20 30/10 34/22 35/2 68/9 72/8 72/20

**she's [1]** 30/3

**shift [5]** 63/9 123/4 131/4 139/5 156/11

**shifting [1]** 167/19

**shoehorn [1]** 168/13

**shoes [1]** 130/25

**short [10]** 55/4 55/5 87/1 113/5 114/21 114/21 114/24 145/16 168/19 169/6

**short-term [1]** 114/21

**shortcut [1]** 101/13

**shot [1]** 133/2

**should [20]** 8/18 26/3 60/2 65/21 92/17 93/12 98/10 107/3 117/8 121/2 121/3 134/3 136/23 142/2 145/8 146/7 151/7 158/2 167/25 174/18

**shouldn't [3]** 163/18 163/18 173/23

**shout [1]** 92/10

**shout-out [1]** 92/10

**show [3]** 45/15 89/10 153/20

**showed [1]** 45/24

**showing [5]** 33/24 48/25 88/5 147/14 153/19

**shown [6]** 46/1 47/15 47/24 61/17 62/10 76/22

**shows [2]** 46/6 165/10

**shut [2]** 7/17 161/18

**shutting [1]** 112/24

**sic [1]** 117/3

**side [5]** 51/25 105/13 110/11 149/11 156/7

**sides [3]** 51/20 114/23 148/1

**sidetrack [1]** 156/1

**sidetracked [2]** 121/12 171/16

**sight [1]** 38/3

**sign [3]** 44/7 160/23 164/2

**signature [1]** 88/11

**signed [10]** 28/23 82/14 82/18 84/19 88/16 113/22 114/1 120/9 143/20 163/13

**significant [8]** 27/22 120/10 124/1 127/14 144/20 158/8 170/1 170/13

**similar [5]** 72/9 126/19 131/17 144/15 144/17

**similarity [1]** 91/19

**simple [5]** 38/7 50/15 119/23 123/15 123/16

**simplist [1]** 107/13

**simply [9]** 59/21 60/16 61/3 65/25 70/10 84/6 127/25 132/4 143/3

**since [5]** 16/21 43/20 83/25 114/4 166/7

**single [2]** 64/15 134/12

**sir [25]** 5/17 9/7 14/11 15/17 16/9 20/3 20/8 20/14 21/19 25/7 29/10 31/12 32/16 35/7 35/24 35/25 40/19 41/23 43/19 46/1 47/10 49/12 53/9 83/8 149/14

**sit [6]** 10/9 36/23 43/5 54/19 134/4 152/10

**site [34]** 7/11 7/12 7/13 7/14 7/17 8/1 8/4 38/2 38/3 38/6 42/25 44/6 44/16 44/24 45/2 48/9 61/24 62/6 62/19 63/4 74/3 74/18 75/9 76/3 76/6 76/8 76/9 76/18 78/1 112/23 160/17 161/21 163/4 163/15

**sitting [2]** 111/10 138/5

**situation [6]** 12/15 135/8 139/25 142/11 143/17 160/1

**situations [1]** 157/9

**six [4]** 29/18 29/19 132/7 132/19

**size [1]** 5/14

**skilled [1]** 167/23

**skin [1]** 118/21

**skip [1]** 15/10

**smaller [3]** 35/13 35/17 35/19

**smells [1]** 165/21

**so [196]**

**sold [6]** 28/17 29/1 53/24 54/19 152/24 153/5

**sole [3]** 96/18 156/5 167/1

**solely [2]** 124/4 158/10

**solved [2]** 148/5 148/5

**some [57]** 14/14 15/12

## S

**some... [55]** 16/3 23/13 26/18 36/9 40/19 50/12 59/14 59/20 65/1 69/5 72/3 73/3 73/9 76/10 79/13 81/15 88/19 88/25 90/6 90/10 93/12 93/13 101/22 104/13 118/10 118/21 118/23 121/3 123/24 124/9 127/20 127/24 128/5 129/25 132/4 134/25 135/12 137/10 138/4 139/6 143/14 143/16 144/10 144/13 144/14 144/25 148/9 148/16 158/14 166/3 168/14 173/2 173/10 174/6 174/8
**somebody [3]** 128/16 135/2 140/9
**somebody's [1]** 128/3
**somehow [5]** 91/1 117/22 127/21 135/3 164/11
**someone [4]** 115/14 119/16 121/22 135/21
**something [23]** 65/20 70/20 85/23 87/6 89/2 99/10 115/4 115/19 119/19 119/22 125/11 125/19 129/18 129/18 135/11 137/2 139/1 143/2 148/22 166/18 173/3 174/7 174/19
**sometimes [2]** 74/13 152/18
**somewhat [1]** 118/7
**sorry [21]** 6/16 13/8 13/25 16/6 29/13 30/2 30/16 40/25 46/16 54/2 58/14 75/6 77/2 80/9 98/7 100/25 137/8 144/10 157/2 162/2 168/11
**sort [1]** 173/22
**sought [1]** 89/15
**source [2]** 36/15 124/8
**sourced [2]** 46/8 46/9
**south [8]** 11/24 28/13 28/15 28/25 29/2 53/21 134/24 142/5
**Southern [2]** 94/2 150/9
**spaced [1]** 117/2
**spacing [2]** 116/24 116/25
**speak [1]** 49/12
**speaking [2]** 34/25 109/12
**speaks [2]** 12/14 158/19
**specific [3]** 39/3 79/13 136/4

**specifically [9]** 9/2 9/3 16/11 17/7 67/1 68/6 123/17 124/25 173/19
**speculate [1]** 18/6
**speculating [1]** 135/13
**speculative [4]** 149/5 173/17 173/22 174/7
**speedy [1]** 97/6
**spend [2]** 36/14 162/15
**spending [1]** 174/25
**spent [1]** 18/9
**spirit [1]** 99/23
**sponsor [1]** 126/24
**Spruce [1]** 2/5
**spud [28]** 6/13 6/17 6/23 7/1 7/8 7/8 7/16 7/18 7/21 8/16 10/12 19/25 43/21 73/12 73/20 73/23 74/24 75/9 76/12 137/12 138/10 139/2 139/4 157/1 160/12 161/6 161/7 161/11
**spudder [1]** 75/20
**spudding [7]** 74/14 74/15 76/3 80/25 112/25 137/18 137/23
**spuds [1]** 74/7
**SRBC [15]** 45/24 46/2 48/17 48/18 48/25 126/5 126/21 127/5 127/7 127/14 162/7 163/13 164/3 164/24 165/7
**staff [3]** 92/10 92/10 169/5
**stalled [1]** 63/6
**stand [5]** 81/7 96/3 111/12 116/25 128/18
**standard [5]** 147/9 147/14 151/6 168/17 168/19
**standards [1]** 36/7
**standing [1]** 130/25
**standpoint [1]** 103/8
**stands [3]** 108/17 148/18 162/12
**start [17]** 39/14 44/11 45/9 55/5 61/3 79/19 80/19 114/5 116/2 123/13 123/15 138/12 156/24 157/15 161/1 162/4 168/21
**started [7]** 21/22 22/3 22/6 66/1 78/15 87/25 156/23
**starting [4]** 16/19 92/25 123/16 159/20
**startling [2]** 146/22 165/15
**starts [4]** 11/3 29/13 124/11 160/13
**state [4]** 25/8 48/5 102/2 163/11

**stated [1]** 22/19
**statement [4]** 58/20 89/9 91/15 95/23
**statements [2]** 58/8 59/14
**states [12]** 1/1 49/4 93/21 94/2 94/7 94/12 98/23 126/23 147/12 176/4 176/6 176/19
**status [3]** 22/17 70/10 168/18
**statute [8]** 61/17 62/9 62/10 62/15 62/17 77/5 77/12 159/8
**statutory [2]** 76/23 107/15
**Ste [3]** 1/22 1/24 2/5
**step [2]** 61/23 152/18
**steps [3]** 69/10 77/12 77/18
**still [28]** 15/6 16/12 16/21 16/22 21/5 23/23 26/20 27/11 71/20 78/4 81/15 104/18 113/25 128/19 129/5 129/6 132/16 132/22 134/16 139/4 144/7 144/8 144/9 144/12 144/13 152/4 164/21 166/2
**stipulate [2]** 89/2 90/5
**stipulated [1]** 165/13
**stipulation [18]** 17/6 81/12 82/7 82/8 82/9 82/11 82/12 82/13 82/22 82/24 87/8 87/24 88/2 130/1 165/10 165/15
**stipulations [1]** 83/10
**stop [4]** 113/7 137/3 139/20 151/15
**stopped [1]** 61/16
**stopping [1]** 146/20
**store [3]** 113/3 113/4 123/25
**story [1]** 167/6
**straight [1]** 65/23
**strained [1]** 155/25
**Street [4]** 1/22 1/24 2/5 54/25
**strictness [1]** 101/17
**strike [3]** 21/10 88/13 95/5
**strike-through [1]** 88/13
**string [2]** 21/15 25/8
**strip [3]** 27/4 27/8 27/12
**studied [1]** 154/25
**study [1]** 54/14
**subchapter [1]** 36/6
**subcontractor [1]** 75/17
**subcontractors [2]** 143/6 143/13

**subject [9]** 14/22 36/11 55/2 57/12 64/17 64/21 106/9 140/22 141/3
**submit [15]** 37/5 39/8 39/14 77/20 78/7 99/12 99/14 109/5 109/8 110/5 110/16 110/20 132/18 156/11 168/17
**submittal [1]** 157/23
**submitted [10]** 34/2 39/19 40/8 80/6 80/8 86/5 112/6 130/1 170/13 174/22
**submitting [1]** 77/19
**Subparagraph [1]** 36/14
**subparagraphs [2]** 117/5 117/6
**subpart [6]** 36/3 37/15 39/7 39/13 39/17 169/16
**subparts [1]** 36/20
**subscription [11]** 14/15 30/20 31/18 32/7 32/8 33/23 56/16 56/20 67/20 140/13 154/25
**subsection [5]** 39/15 39/20 87/17 88/5 120/18
**substance [1]** 100/8
**substantially [1]** 45/4
**substitute [1]** 170/1
**subterfuge [1]** 143/15
**succeed [2]** 97/4 142/14
**success [7]** 114/4 119/6 123/7 130/24 153/19 168/20 169/3
**successful [1]** 72/17
**successfully [1]** 78/11
**such [16]** 11/5 11/5 12/9 12/10 12/21 13/2 13/7 14/21 22/10 57/11 125/6 140/21 157/9 169/4 167/23 169/5
**sudden [1]** 155/22
**sue [1]** 10/10
**suffer [1]** 22/11
**suffered [1]** 26/18
**sufficient [5]** 104/6 108/15 108/16 110/22 118/21
**suggest [1]** 118/7
**suggested [1]** 134/25
**suggesting [6]** 17/20 69/9 69/9 129/20 129/21 134/9
**suggestion [4]** 127/21 128/2 132/4 173/15
**suggests [2]** 98/18 124/7
**Suite [1]** 1/19
**summarizing [1]** 39/8
**summary [1]** 136/24

**Sunbeam [2]** 101/14 102/3
**super [1]** 131/21
**superseded [4]** 128/7 128/15 163/15 163/20
**supervision [2]** 176/11 176/23
**supplant [1]** 70/8
**supplied [1]** 166/9
**supply [1]** 166/9
**support [6]** 38/23 62/3 91/14 93/17 93/25 94/6
**supposed [2]** 166/17 167/8
**Supreme [1]** 101/14
**sure [14]** 19/3 38/12 49/2 60/10 67/10 68/18 72/14 73/18 80/17 94/16 110/23 113/11 118/22 149/24
**surface [10]** 8/12 36/18 48/10 48/14 48/14 49/9 69/11 74/8 74/16 140/3
**surplusage [2]** 156/4 156/5
**surprise [1]** 98/25
**surrounding [2]** 118/2 119/4
**survey [5]** 41/13 158/15 158/19 160/4 167/2
**Susquehanna [1]** 124/21
**sustained [2]** 40/16 169/19
**swap [2]** 130/15 135/2
**system [28]** 21/24 21/25 49/18 50/7 51/18 51/19 51/22 52/1 52/5 52/12 52/24 53/2 63/22 64/3 64/8 70/19 71/12 71/15 133/16 147/19 147/23 148/4 151/22 152/2 152/10 168/11 162/12 171/25

## T

**table [1]** 72/22
**take [32]** 11/12 29/11 36/1 47/2 50/23 56/8 65/14 69/10 72/25 77/18 81/21 81/22 99/23 100/12 107/12 108/13 109/13 110/4 110/14 110/19 111/1 126/9 126/13 127/14 128/12 145/23 152/18 161/20 167/22 167/24 173/1
**taken [8]** 10/10 82/5 91/16 108/19 111/15 129/10 140/2 162/21
**takes [1]** 6/22
**taking [6]** 89/21 102/6

# T

**taking... [4]** 106/13
113/22 126/18 145/11
**talk [17]** 11/16 40/19
59/14 60/12 63/10
67/20 116/4 117/21
129/8 131/4 133/15
148/7 148/10 161/4
161/5 161/24 174/18
**talked [3]** 25/17 30/5
98/4
**talking [33]** 13/8 29/8
31/20 48/2 55/21 59/15
64/17 72/14 80/13
80/13 80/19 90/1 90/1
103/16 116/13 116/13
116/14 117/10 117/11
117/18 118/16 121/21
129/16 131/5 131/6
131/9 134/11 139/14
141/4 141/4 141/10
142/4 152/22
**talks [3]** 15/9 116/1
139/11
**task [1]** 106/1
**tea [5]** 128/25 129/1
129/4 129/12 129/13
**team [1]** 111/20
**technical [2]** 62/5
153/23
**technically [3]** 59/9
139/13 141/1
**tell [15]** 37/23 38/15
39/17 52/8 54/19 73/20
93/11 117/2 117/16
124/22 136/1 153/1
158/25 159/9 167/6
**telling [7]** 10/15 17/1
28/2 67/18 98/2 101/8
102/14
**tells [1]** 121/20
**temporarily [7]** 68/25
69/16 69/16 69/21 70/3
112/24 131/1
**temporarily-abandonm
ent [2]** 69/16 70/3
**temporary [7]** 18/23
59/20 60/15 69/4 93/18
146/19 169/17
**ten [21]** 9/3 9/5 9/9
11/8 11/9 15/8 16/6
16/7 16/8 43/1 57/16
57/17 59/2 97/3 108/14
108/16 119/10 121/13
139/10 146/24 157/8
**tender [2]** 82/18 93/11
**tendering [1]** 101/22
**term [11]** 73/12 73/12
73/17 114/21 114/21
114/21 114/24 114/25
115/1 116/12 145/16
**terminated [1]** 165/2
**terminology [4]** 72/3
72/5 72/10 73/9

**terms [12]** 6/11 19/20
85/13 86/25 102/18
103/6 111/9 113/19
115/25 170/10 173/18
174/4
**territory [2]** 26/9 28/12
**testified [12]** 6/20
20/14 46/14 56/20
63/13 64/15 102/16
119/25 124/3 130/20
132/10 141/16
**testify [6]** 18/18 19/4
20/16 96/10 99/1 147/4
**testifying [4]** 8/13 46/4
47/24 77/15
**testimony [31]** 8/7 8/22
9/7 19/15 29/7 40/19
45/19 45/23 49/13 76/1
78/6 82/11 82/12 82/22
90/11 99/3 99/14 99/17
110/9 122/14 127/20
130/2 130/12 134/18
143/4 146/7 147/22
150/20 151/25 162/8
165/18
**Texas [1]** 150/10
**than [24]** 5/15 7/1 27/8
27/12 53/2 58/24 58/25
59/11 60/7 75/20 88/12
107/8 118/8 119/18
121/23 137/16 137/23
142/12 143/22 145/9
147/24 154/15 164/10
174/1
**thank [39]** 5/23 9/3
14/2 15/18 22/2 31/10
31/11 41/25 42/22
45/11 54/10 56/11
57/25 58/2 63/8 66/18
68/12 71/18 73/6 77/1
79/25 81/2 81/6 81/9
82/21 83/12 94/14
94/15 97/21 103/10
107/24 112/9 145/25
146/1 170/3 170/22
172/10 175/4 175/5
**Thanks [1]** 29/20
**that [1144]**
**that's [156]** 6/19 6/20
6/20 7/5 8/25 9/9 10/5
10/7 10/13 11/8 11/12
12/6 13/11 14/5 14/16
15/3 16/5 17/3 18/5
19/15 20/7 20/10 22/2
24/20 25/3 25/4 26/2
27/4 28/13 29/24 30/1
32/5 32/12 34/6 34/7
34/13 34/25 40/5 40/10
41/2 41/5 41/7 42/17
43/4 43/19 44/10 44/14
45/16 48/21 50/18
56/14 56/22 59/5 63/21
67/17 67/18 67/21
68/18 71/17 72/19

74/22 75/13 75/19
81/17 81/23 84/11
86/17 86/25 88/21
97/13 98/13 101/3
101/7 103/22 104/11
105/9 105/15 106/17
109/1 109/9 109/10
111/7 115/15 116/15
120/13 121/4 121/14
124/2 124/6 124/10
125/1 127/7 128/7
129/16 130/19 131/19
133/8 133/23 134/16
135/8 135/11 135/14
135/20 135/23 136/22
137/7 137/17 137/18
138/12 138/21 139/15
140/16 140/17 141/13
144/8 145/5 145/9
148/5 149/3 149/12
149/19 149/19 153/10
153/21 155/2 155/17
155/24 156/2 156/3
156/4 156/6 156/13
156/18 157/6 157/11
157/14 159/6 159/22
162/20 165/8 165/19
165/21 166/2 167/11
167/19 168/4 168/5
169/14 169/24 170/4
170/6 172/24 173/14
174/6 174/7 174/20
**their [75]** 14/19 19/4
21/5 23/4 32/9 34/14
40/9 43/19 57/1 64/11
65/14 69/16 71/6 72/23
72/25 73/4 86/24 89/14
89/16 95/12 95/13
95/21 95/22 98/7 99/2
99/4 99/12 99/13 99/14
100/4 104/7 104/12
109/1 109/16 110/18
110/18 115/16 118/25
119/13 121/3 125/5
126/20 127/6 140/19
144/9 145/6 145/11
146/24 147/22 148/9
149/11 150/11 152/11
153/9 153/9 153/15
153/20 154/2 154/25
154/25 155/18 156/9
156/12 156/12 157/3
157/14 161/17 162/9
162/18 162/22 164/1
168/2 168/25 171/1
172/18
**Their's [1]** 163/19
**theirs [1]** 163/5
**them [81]** 6/25 10/15
28/2 30/6 35/23 37/20
39/2 66/16 68/22 69/21
70/8 72/21 73/2 80/15
83/25 83/25 89/10
90/15 91/22 91/23 92/5

93/5 93/9 93/10 93/11
95/18 97/20 98/12 99/2
99/13 100/4 100/12
103/14 111/5 111/9
112/25 120/13 123/23
126/5 126/17 126/19
126/22 128/3 128/12
128/19 128/25 129/3
129/3 129/3 129/15
130/9 130/9 130/21
130/22 131/24 134/4
134/4 134/10 134/20
137/1 143/10 144/2
144/14 150/14 151/15
153/5 154/3 154/5
157/11 157/15 160/7
161/2 161/10 166/16
166/22 167/13 167/17
167/22 168/3 171/9
171/11
**themselves [3]** 126/22
137/12 158/9
**then [77]** 6/22 12/10
29/22 31/18 32/5 34/13
36/6 36/20 39/9 41/7
50/22 51/25 61/7 63/6
64/21 66/17 67/20 68/9
69/16 74/2 74/19 75/15
76/8 79/25 84/8 85/4
91/24 100/3 109/8
110/1 110/16 112/25
114/12 114/22 115/19
115/20 116/8 117/5
117/12 120/3 120/23
121/1 121/6 121/16
121/17 123/4 124/8
125/12 130/22 132/9
133/15 134/15 135/1
136/25 137/2 137/14
140/1 140/7 140/15
143/22 148/3 150/12
150/14 151/20 151/22
151/24 152/11 154/24
163/13 164/7 167/7
171/18 171/22 173/1
173/2 173/4 173/8
**theory [1]** 155/5
**there [194]**
**there's [51]** 5/18 7/4
17/20 23/9 26/19 29/19
32/6 38/18 53/11 53/19
59/25 59/25 68/19
69/11 70/24 73/18
84/23 85/15 87/21 96/6
96/23 98/22 100/23
110/24 116/21 118/18
121/1 121/18 122/18
125/12 127/18 127/20
128/17 129/8 132/4
135/12 139/6 144/2
145/20 146/25 148/19
149/2 149/4 151/24
155/3 155/12 155/15
160/1 161/10 163/4

168/5
**therefore [2]** 50/12
72/19
**therein [5]** 11/7 57/13
57/22 95/22 140/23
**thereof [3]** 16/11 17/6
25/13
**these [62]** 10/12 12/23
13/20 16/20 16/22
16/25 22/20 24/8 28/3
33/17 34/7 36/11 37/20
38/5 39/11 43/1 44/1
44/17 46/24 57/21 62/4
64/16 66/14 66/14
76/10 77/18 83/24
88/16 89/8 89/12 89/15
91/4 91/13 93/4 96/15
99/8 100/8 100/10
101/4 101/8 101/11
103/7 103/19 104/16
113/11 117/5 120/9
129/25 132/5 134/6
136/9 143/11 143/16
144/23 147/1 148/3
153/3 158/8 159/5
160/20 166/25 171/19
**they [323]**
**they'll [2]** 134/8 144/25
**they're [17]** 15/6 19/2
27/11 46/22 95/17
100/15 104/3 109/1
112/20 131/10 144/3
153/2 160/7 167/9
167/9 171/15 171/16
**they've [1]** 157/18
**thing [8]** 84/6 108/5
111/9 134/5 137/20
144/23 157/18 161/25
**things [18]** 70/12 74/4
77/5 90/2 103/8 108/23
108/24 111/21 121/20
124/14 125/14 127/9
138/6 138/11 140/3
147/5 151/8 156/2
**think [103]** 5/13 10/24
11/1 13/1 13/3 14/25
17/23 18/11 19/10
19/13 21/19 22/14
22/19 23/6 24/8 52/23
59/25 60/3 61/11 71/13
72/10 73/7 73/18 75/4
76/15 79/2 81/3 81/20
81/23 84/1 84/6 85/5
85/25 86/3 86/4 87/16
89/2 91/5 92/10 92/23
94/22 97/23 98/6 98/25
99/4 99/24 101/12
104/5 104/15 105/18
106/16 107/4 107/8
108/5 108/7 109/15
112/13 119/10 121/11
122/14 123/5 123/11
123/14 124/14 129/23
129/25 130/3 131/7

**T**

**think... [35]** 134/3
134/4 134/8 136/11
136/19 136/21 138/1
138/8 141/18 142/23
143/15 144/2 144/22
146/14 149/23 150/18
152/15 153/13 158/15
159/13 159/22 162/13
164/25 165/15 166/7
167/17 169/10 170/4
170/11 172/17 173/9
173/25 174/6 174/17
175/1
**thinking [3]** 112/11
128/20 159/1
**thinks [1]** 113/25
**third [15]** 25/23 41/11
52/12 53/10 70/20
71/11 81/13 89/7 102/1
122/2 128/12 131/13
145/20 153/16 157/20
**Thirty [2]** 44/22 71/14
**Thirty-five [1]** 71/14
**this [301]**
**Thomas [4]** 1/18 31/11
82/2 83/9
**those [75]** 23/23 24/12
25/20 26/20 27/1 27/15
27/19 29/21 36/24 41/8
45/19 45/24 46/15
54/25 56/10 57/19 61/4
63/18 64/2 64/4 68/20
70/6 74/4 75/3 76/11
80/23 80/25 83/3 88/12
90/13 90/13 91/2 91/3
91/18 91/24 92/1 94/15
94/22 95/17 96/17 98/1
99/5 113/6 113/13
116/4 116/6 120/25
121/23 122/11 122/17
122/23 123/11 124/22
124/25 125/4 125/9
126/9 130/8 131/2
131/8 132/12 133/17
135/10 144/6 144/13
144/14 144/24 149/1
157/9 159/18 160/13
162/9 163/17 163/18
171/7
**though [8]** 12/22 13/15
27/12 28/11 79/9 96/22
131/14 160/3
**thought [13]** 18/20
65/6 73/15 81/4 83/21
88/3 89/1 89/1 119/15
142/21 155/10 164/18
166/3
**thread [2]** 71/24 72/1
**threat [4]** 148/9 150/15
150/18 151/13
**three [33]** 11/4 11/9
11/23 11/24 12/1 14/13
20/12 26/8 26/19 28/11

30/5 31/25 32/1 32/16
33/24 33/25 37/4 46/5
56/8 68/8 97/23 116/3
116/6 116/11 122/18
122/19 122/21 133/9
141/23 152/16 152/23
157/8 161/10
**through [31]** 14/13
24/25 45/21 56/13
57/17 58/12 63/21
75/17 79/7 79/9 79/15
81/19 82/16 82/25 83/5
83/8 88/13 99/2 99/14
105/13 111/4 111/4
113/11 120/15 122/13
126/10 126/11 128/21
134/4 155/14 171/10
**throughout [2]** 88/25
104/16
**throughput [7]** 50/20
50/20 50/21 51/2 63/10
63/14 63/21
**throw [1]** 110/12
**thus [1]** 19/15
**tied [2]** 50/19 74/7
**tight [1]** 111/3
**time [68]** 7/18 16/6
16/10 17/5 18/10 18/14
19/7 25/1 27/6 34/12
34/16 35/19 40/24 55/5
55/6 65/2 67/11 70/21
72/18 73/1 77/13 81/13
81/15 81/20 81/22 82/3
85/18 88/25 92/12 95/4
97/18 98/10 100/13
101/2 108/13 110/14
110/17 110/22 110/22
111/9 111/11 114/14
114/14 120/2 124/5
128/21 132/6 132/22
133/4 133/6 133/9
138/20 141/6 144/21
146/11 149/22 150/6
153/14 156/2 156/6
156/14 156/17 156/17
156/20 162/15 166/16
169/8 170/3
**timeframe [3]** 16/21
81/22 137/6
**timeframes [1]** 23/23
**timely [2]** 27/2 153/14
**times [5]** 50/15 74/10
85/1 102/17 121/9
**timing [6]** 8/9 62/20
64/20 125/25 136/9
174/24
**title [5]** 8/12 38/20
87/20 158/11 176/6
**titled [1]** 94/11
**today [34]** 8/22 10/9
15/4 15/6 17/11 23/8
27/12 36/23 37/9 83/21
86/9 87/7 95/8 95/17
96/13 98/1 98/11 99/12

110/23 141/18 147/24
148/18 149/20 151/25
152/12 152/15 152/22
157/5 157/23 162/12
162/23 164/20 165/5
169/11
**together [3]** 87/23
128/25 129/3
**told [5]** 86/11 95/12
159/4 159/6 164/20
**too [7]** 35/17 52/25
100/4 102/17 153/17
167/13 169/10
**took [5]** 89/20 145/10
145/14 149/18 159/5
**top [10]** 9/5 9/9 14/11
29/22 32/5 36/1 39/7
46/5 112/11 140/12
**tortured [1]** 168/14
**total [5]** 41/9 42/24
46/11 46/15 162/25
**totally [1]** 17/23
**totals [1]** 46/15
**touched [2]** 53/19
53/24
**toward [1]** 63/7
**towards [2]** 21/13
49/13
**township [10]** 43/23
43/24 44/6 44/12 56/5
74/20 75/16 160/16
160/21 167/14
**townships [1]** 75/24
**track [1]** 30/16
**tracked [1]** 30/16
**tracking [2]** 31/16
156/7
**tracks [2]** 154/22
154/24
**tractor [8]** 44/15 44/22
45/5 74/25 75/12 75/14
75/17 75/22
**tractor-trailer [4]** 74/25
75/12 75/14 75/22
**tractor-trailers [4]**
44/15 44/22 45/5 75/17
**trade [2]** 101/23 102/5
**tradeoff [1]** 145/5
**traffic [1]** 44/5
**trailer [4]** 74/25 75/12
75/14 75/22
**trailers [4]** 44/15 44/22
45/5 75/17
**train [1]** 68/8
**transaction [3]** 28/22
127/12 148/2
**Transcontinental [1]**
97/11
**transcript [12]** 83/17
84/3 84/11 84/22 85/8
86/16 86/20 86/22
164/15 176/7 176/10
176/22
**transferred [4]** 125/23

126/7 127/6 163/12
**transition [1]** 147/8
**transpired [1]** 65/13
**transport [1]** 51/9
**transportation [4]**
49/20 50/24 51/1 51/6
**travel [2]** 100/3 100/4
**Travis [1]** 1/24
**tremendous [2]** 147/3
160/1
**trial [5]** 95/25 96/25
97/7 97/9 164/7
**trick [1]** 95/15
**trickier [1]** 129/23
**tricking [1]** 67/10
**tried [1]** 165/6
**trouble [1]** 35/12
**truck [1]** 161/23
**truckload [1]** 44/21
**trucks [1]** 160/15
**true [18]** 11/16 12/18
40/2 55/10 55/11 119/6
125/1 130/6 133/21
134/5 135/14 149/14
149/19 149/19 159/23
164/7 165/13 176/7
**trust [1]** 174/17
**truth [1]** 153/4
**try [11]** 5/19 13/6 65/5
81/18 97/3 104/12
104/17 125/8 133/5
133/6 138/25
**trying [15]** 24/11 24/15
59/19 64/25 66/1 70/8
85/12 85/20 90/9 96/20
103/19 103/20 134/15
138/6 163/10
**Tuesday [1]** 1/13
**tune [1]** 171/20
**Turm [8]** 45/20 45/21
46/8 48/13 126/12
126/15 162/9 163/2
**turn [11]** 5/10 39/5
57/25 72/6 85/6 100/11
102/9 110/1 112/10
113/14 121/17
**two [63]** 7/17 33/12
35/11 35/13 42/15
46/15 46/16 49/16 51/6
58/12 58/24 59/2 59/3
59/13 61/25 62/1 72/10
74/4 74/5 89/6 94/18
95/4 95/12 96/2 96/7
98/9 104/16 114/20
114/23 121/20 121/22
122/19 122/21 124/14
124/15 125/24 126/10
128/1 128/3 128/14
128/18 129/2 129/5
129/17 136/13 136/17
138/16 143/19 144/4
145/19 146/8 146/25
151/8 159/19 160/18
161/14 161/18 163/20

164/10 166/15 167/6
171/7 174/25
**two-week [1]** 164/10
**twofold [1]** 85/9 85/25
133/25
**TX [1]** 1/25
**tying [1]** 77/22
**type [7]** 74/18 74/23
136/10 143/11 149/16
156/11 170/2
**typed [1]** 154/23
**types [2]** 24/13 74/5
**typical [1]** 86/22
**typically [1]** 74/15
**typo [7]** 67/9 67/16
67/17 67/18 67/18
155/10 155/10
**typographical [2]**
154/11 154/21

**U**

**U.S.A [2]** 1/3 41/7
**ultimate [1]** 103/22
**Um [7]** 13/10 30/13
33/1 40/3 44/23 44/25
77/16
**Um-hmm [1]** 44/25
**Um-hum [5]** 13/10
30/13 33/1 40/3 77/16
**umbrella [1]** 158/16
**unable [4]** 8/4 10/19
63/6 71/1
**unanimous [8]** 119/13
119/16 119/20 119/22
120/16 122/6 122/11
123/3
**unaware [2]** 23/24
24/10
**uncertainty [1]** 64/12
**unclear [2]** 78/4 78/13
**under [77]** 5/3 8/10
8/13 8/23 9/10 16/2
16/3 16/21 17/12 19/19
21/5 23/1 23/3 23/4
34/15 36/9 39/1 39/15
39/19 45/19 46/7 47/21
48/7 49/7 56/1 61/6
65/7 65/11 67/25 68/2
68/4 72/18 78/21 78/22
92/12 97/6 97/6 97/19
97/25 113/17 114/13
115/10 116/18 116/22
117/6 118/15 121/25
124/15 125/14 130/10
131/13 131/13 134/2
135/16 135/20 136/17
144/9 150/22 151/2
153/13 156/2 157/6
158/15 160/8 163/1
163/2 166/8 168/2
168/6 169/25 174/13
176/11 176/23

# U

underlying [1] 90/10
underneath [1] 135/22
understand [28] 15/16
29/21 37/12 71/1 72/3
73/18 76/1 78/25 79/4
80/17 82/7 91/12 91/12
92/12 92/16 92/19
96/16 101/5 101/20
105/23 110/3 115/11
118/21 136/2 136/3
147/22 147/23 174/24
understandable [1]
73/10
understanding [14]
16/18 18/3 18/17 19/8
24/11 25/12 34/1 48/17
48/24 61/1 73/8 73/10
74/6 77/8
understands [3] 44/4
52/10 68/19
understood [8] 19/13
73/6 78/16 78/20 94/23
103/6 109/21 135/25
undertaken [1] 145/8
undertaking [2] 92/7
121/5
undisputed [4] 99/4
131/5 142/10 143/4
undivided [4] 124/12
125/13 127/22 129/19
unfair [1] 157/15
unfortunately [1] 87/4
Unhappy [1] 95/10
unilateral [2] 157/11
157/25
unilaterally [3] 11/12
12/17 114/15
unique [4] 131/8
131/12 131/21 145/24
uniquely [1] 78/23
unit [2] 9/2 145/11
UNITED [8] 1/1 93/21
94/2 94/7 94/12 176/4
176/6 176/19
units [1] 80/14
universe [2] 79/4 79/15
unless [1] 176/22
unlike [1] 148/16
unmarked [1] 31/6
unquote [2] 75/9 127/1
unspecified [1] 18/5
until [13] 11/8 37/25
38/5 62/19 80/5 82/2
87/7 108/18 111/13
115/2 159/1 159/9
165/1
unwilling [1] 70/4
up [33] 5/4 9/16 21/13
27/24 50/6 50/8 52/25
56/10 57/18 58/2 63/22
64/3 77/1 77/3 79/20
92/23 108/5 115/23
121/15 122/17 123/15
124/9 132/7 135/3
136/9 137/11 139/8
149/10 152/17 161/23
165/5 166/1 172/18
upon [8] 9/15 9/24
11/15 23/10 24/22
113/14 126/24 139/19
upper [1] 174/3
urgency [1] 113/13
us [53] 24/2 24/3 24/12
24/15 27/3 34/15 38/2
45/23 48/18 48/24
57/10 60/24 62/7 62/8
62/21 63/3 64/11 66/15
70/5 70/15 72/15 73/3
81/8 81/21 83/23 85/18
86/11 98/15 99/7 111/4
111/10 112/20 112/20
121/20 134/2 134/8
134/11 138/25 141/18
141/24 142/25 144/20
145/12 145/17 149/23
158/5 159/2 159/14
164/2 166/20 167/13
169/5 172/3
usage [8] 101/18
101/23 102/5 103/14
103/21 104/2 105/9
105/16
use [11] 8/11 64/4
69/13 75/1 87/11 113/1
130/22 131/1 143/7
150/1 152/21
used [6] 72/10 78/7
87/11 122/11 125/18
131/2
uses [1] 148/18
usurp [1] 96/18
usurping [1] 103/4
utilize [8] 65/1 111/20
122/10 123/8 123/9
123/10 130/9 143/5
utilized [5] 73/12 93/3
102/19 124/20 143/5
utilizing [2] 126/1
126/3
utterly [1] 169/21

# V

VA [1] 1/22
valid [1] 16/21
validity [1] 113/8
valuable [2] 127/15
127/17
value [16] 26/25 27/3
27/6 27/12 54/23 86/3
127/14 134/21 151/21
171/6 171/7 172/1
172/5 172/23 172/24
172/25
valuing [1] 54/3
variety [1] 113/9
various [1] 100/16
verbally [1] 22/20
verify [1] 29/22
versus [9] 93/20 93/24
94/5 94/10 97/11 102/2
153/16 172/21 174/6
vertical [2] 36/17 36/24
very [50] 27/22 38/7
51/7 55/4 55/5 55/8
55/9 73/15 78/20 84/24
86/22 87/1 87/16 89/23
90/8 90/8 91/13 92/20
95/7 98/9 98/14 100/20
101/7 102/13 105/10
105/11 106/15 113/23
114/11 117/3 119/9
119/23 119/23 122/8
122/9 123/5 124/18
125/15 136/3 141/14
143/9 143/9 143/10
143/10 143/19 147/1
149/13 160/17 170/10
172/20
veto [7] 102/24 113/24
114/1 114/15 123/1
123/1 123/2
VI [13] 9/10 31/20
31/21 32/4 67/19 67/22
87/18 154/14 154/17
157/7 167/20 168/6
168/14
VI.1 [1] 139/10
VI.2 [14] 33/15 35/3
35/4 58/9 58/21 67/7
67/14 67/21 68/1 68/2
68/4 100/24 119/11
VI.B [1] 88/25
VI.B.1 [5] 14/22 15/1
57/12 140/22 140/25
VI.B.2 [4] 67/5 67/8
67/13 68/10
viable [3] 132/22
164/22 166/14
victory [1] 151/16
view [8] 8/23 13/20
17/2 24/24 33/8 33/9
35/18 50/13 162/6
views [1] 158/9
vigorous [1] 154/2
vindicate [1] 133/1
violated [1] 98/2
violating [1] 153/15
Virginia [1] 94/3
vis [2] 91/16 91/16
visited [2] 13/10 13/11
volume [14] 1/13 46/15
50/3 50/15 50/19 50/23
52/11 53/9 53/16 63/10
63/13 63/20 70/24
70/25
volumes [4] 49/18 64/7
113/5 147/19
voluntarily [1] 86/25
vote [3] 167/24 168/3
168/9
vs [1] 1/4

# W

wait [1] 156/14
walk [2] 98/11 122/13
Wall [1] 54/25
want [83] 13/23 15/16
22/23 27/10 34/5 36/14
37/11 40/15 40/19
42/20 42/25 44/11 45/9
49/2 49/12 49/23 51/20
51/22 51/25 56/8 56/13
57/25 58/23 60/12
60/14 63/9 68/18 69/14
70/4 70/9 72/1 72/19
73/17 78/11 84/6 90/25
92/10 93/9 95/18 99/12
103/14 103/18 110/23
114/3 118/19 119/8
123/4 123/11 123/13
123/15 131/4 131/19
134/3 136/8 137/8
137/9 139/5 142/19
145/12 145/14 145/17
146/14 146/17 146/18
146/21 147/25 148/7
149/5 151/12 152/5
153/5 155/25 158/25
158/25 159/9 160/25
161/4 161/24 167/16
167/17 168/6 168/23
169/7
wanted [14] 24/17
59/14 67/10 87/23
92/19 99/13 99/13
119/16 128/24 145/16
146/13 162/20 164/8
166/25
wants [9] 12/16 52/20
90/4 103/2 145/4
156/18 160/3 160/21
169/8
Warden [1] 153/16
warrant [1] 158/12
warranted [1] 174/9
was [261]
wasn't [21] 9/18 9/20
9/22 32/23 67/10 69/9
77/20 83/23 86/11
86/11 88/15 88/18
125/11 125/15 126/5
127/16 127/19 146/20
152/19 157/22 164/14
water [40] 45/15 48/10
48/14 48/15 113/2
113/2 113/3 113/5
123/9 123/10 123/13
123/19 123/20 123/24
123/25 124/8 126/3
126/9 126/13 127/14
128/4 128/10 128/11
128/13 128/18 129/9
141/20 161/24 162/6
162/18 162/21 163/2
163/7 163/8 163/15
163/21 165/6 165/6
165/17 166/1
waters [4] 39/22 40/1
158/20 167/14
way [27] 24/25 38/13
40/20 58/12 60/1 69/4
75/16 81/12 90/3 90/6
90/25 107/10 116/15
120/24 122/24 127/5
127/24 135/21 137/18
137/18 145/9 153/7
157/13 157/25 158/4
167/22 171/24
ways [1] 126/10
we [508]
we'll [8] 5/3 88/22
100/12 110/15 110/16
110/18 115/20 137/24
we're [64] 6/2 13/7
15/25 16/21 18/4 19/18
21/20 22/9 34/5 34/9
37/21 64/17 64/21
65/10 70/2 78/5 78/12
85/12 85/16 89/18
91/10 92/11 92/14
96/22 97/18 99/5
107/10 108/24 110/14
111/10 112/14 114/1
116/13 117/9 117/11
117/18 121/21 122/13
126/19 129/20 130/9
131/9 132/1 133/8
134/9 134/9 134/13
137/7 138/6 140/8
142/23 147/18 147/25
148/5 149/21 149/24
150/4 151/14 152/22
156/15 161/12 167/4
167/25 168/25
we've [5] 113/24
139/11 152/1 160/2
167/3
website [1] 35/21
week [3] 96/12 160/17
164/10
weeks [3] 133/10
157/17 161/20
weight [3] 86/8 102/7
106/11
welcome [2] 5/2 81/8
well [186]
wellbore [9] 28/15 29/2
36/16 36/17 36/19
54/18 156/16 156/19
171/17
wellbores [1] 26/13
wells [144] 7/17 7/21
10/12 11/16 12/23
15/25 16/20 20/4 20/5
21/25 25/18 26/7 26/8
26/19 28/3 28/12 31/19
33/17 36/11 36/21
36/21 36/21 36/22

# W

wells... **[121]** 36/22 36/24 36/25 38/12 39/9 39/11 41/15 42/3 42/16 44/17 49/24 52/10 55/4 55/8 56/6 56/17 57/3 60/19 60/21 61/3 61/4 61/6 61/25 63/3 63/18 63/25 64/2 64/6 64/16 64/20 65/8 68/4 68/14 68/15 68/19 68/21 69/3 69/15 69/20 69/24 70/6 70/12 70/13 73/3 76/8 80/25 113/6 113/15 114/13 114/22 114/23 115/2 115/15 115/21 116/5 116/6 116/7 116/13 116/14 116/15 116/18 116/19 117/1 117/4 117/7 117/13 117/16 117/16 117/18 117/18 117/21 117/23 118/3 118/4 118/5 118/6 118/17 120/5 120/12 121/25 122/5 122/6 122/10 123/2 125/18 131/8 132/5 132/13 134/19 134/19 136/22 141/23 144/21 145/15 145/17 146/20 147/1 152/17 152/23 153/3 156/23 158/8 159/5 159/20 159/21 159/25 161/14 161/18 171/4 171/7 171/8 171/12 171/15 171/19 171/21 172/7 173/12

**went [6]** 22/12 23/22 55/7 107/10 120/15 168/8

**were [87]** 8/4 9/9 10/15 10/19 14/12 20/13 22/20 23/23 24/2 24/10 24/11 25/12 28/20 29/5 29/8 32/13 33/10 33/24 34/1 34/25 36/9 38/23 44/16 46/4 47/3 47/10 47/15 47/24 47/25 57/4 59/15 65/8 66/25 72/2 72/14 72/18 72/24 73/1 76/22 78/17 80/23 84/12 86/24 87/7 88/16 88/20 90/8 96/14 97/25 100/2 102/20 102/24 107/2 114/13 118/3 120/9 122/6 123/20 125/3 126/16 126/18 126/18 126/19 126/20 127/12 128/2 128/23 138/14 138/17 142/11 149/7 149/13 150/4 150/25 152/8 156/5 159/9 162/9 163/20

166/21 168/17 168/18 170/15 171/12 171/21 172/3 174/2

**weren't [9]** 20/14 21/6 27/10 28/20 29/5 47/15 47/24 88/17 125/17

**West [1]** 94/2

**Western [1]** 93/22

**Westlaw [1]** 97/12

**what [215]**

**what's [8]** 44/19 65/19 102/23 153/4 158/18 165/9 165/16 169/23

**whatever [10]** 7/16 20/21 21/1 91/8 102/7 106/11 145/2 150/25 151/2 161/19

**whatsoever [1]** 33/15

**when [67]** 6/8 6/12 6/13 7/8 9/7 20/13 29/8 31/12 32/6 34/13 38/1 38/3 46/4 47/10 47/24 48/2 63/19 67/10 68/19 74/1 74/6 74/15 78/5 80/6 80/9 80/15 80/23 84/22 85/2 87/17 87/18 87/22 87/23 88/1 88/15 88/20 89/16 89/19 89/20 95/2 101/11 108/6 113/10 113/21 116/12 116/18 122/20 125/6 128/23 132/1 133/15 136/17 137/21 137/21 139/6 141/7 141/12 147/11 147/13 148/20 150/5 151/20 153/2 155/6 160/12 161/13 162/22

**whenever [1]** 164/11

**where [51]** 12/15 28/14 28/25 29/2 29/20 30/4 30/17 31/16 32/13 34/18 36/1 38/19 41/17 45/16 46/24 55/8 61/24 62/20 72/5 78/22 89/9 90/10 96/21 97/9 101/17 119/17 120/10 121/9 121/11 122/14 124/11 129/9 131/17 135/17 137/6 137/8 140/5 140/23 141/13 142/11 143/18 145/17 146/25 148/16 155/15 157/9 159/19 159/25 160/1 168/18 169/16

**Where's [1]** 168/24

**Whereupon [1]** 111/15

**whether [29]** 6/21 16/2 23/9 24/21 26/17 28/6 38/16 40/6 40/7 50/16 61/1 62/4 62/5 62/5 62/6 71/4 79/12 83/23 110/4 111/22 113/14 134/6 146/19 151/5

157/3 163/9 164/16 165/3 167/25

**which [65]** 6/2 6/22 9/10 29/22 30/3 30/11 32/2 32/2 32/6 34/7 37/4 40/25 46/2 50/19 50/20 57/10 69/4 73/23 77/18 77/23 83/24 85/7 85/11 86/2 91/13 91/20 96/3 97/2 100/1 100/9 103/23 106/16 107/5 108/9 109/16 114/23 115/24 117/12 119/8 121/13 122/19 126/17 127/22 129/8 129/11 133/21 139/1 139/9 139/14 139/25 140/2 140/9 140/20 142/15 145/8 147/12 153/4 156/2 157/22 160/21 167/20 167/21 171/6 171/23 172/5

**while [12]** 27/18 30/22 59/15 92/14 116/25 125/5 133/25 139/12 142/1 149/18 159/5 164/14

**who [34]** 10/9 10/10 12/23 13/4 13/16 33/3 33/3 37/23 41/20 41/22 42/12 43/7 47/22 56/23 57/8 57/9 82/8 102/12 116/25 118/9 118/20 129/12 138/17 139/22 146/2 146/23 148/25 152/10 155/16 158/10 160/21 165/4 168/24 169/23

**who's [1]** 15/4

**whoa [3]** 143/23 143/23 143/23

**whole [3]** 65/25 136/1 171/10

**wholly [1]** 96/22

**whom [6]** 11/4 12/9 12/21 13/2 13/7 157/9

**whose [4]** 37/6 126/13 168/23 168/24

**why [46]** 10/17 10/20 15/16 25/14 47/17 49/14 60/7 61/14 70/17 72/19 77/17 83/24 91/1 98/10 108/8 109/13 113/25 118/16 118/19 120/8 120/14 123/20 124/2 125/12 125/19 125/20 126/6 127/16 128/2 131/19 141/11 142/13 143/20 147/25 148/5 149/1 149/3 152/19 152/19 155/24 157/21 159/22 162/24 164/21 165/8 173/4

**will [66]** 18/4 18/23

19/9 22/22 31/8 35/20 39/10 42/21 47/10 50/16 53/1 66/10 66/13 66/16 74/10 75/16 82/1 82/8 82/10 82/23 85/22 86/5 86/15 86/19 87/1 87/1 89/4 91/22 91/23 97/5 102/5 102/7 106/9 106/10 107/21 107/22 108/16 110/1 111/4 111/5 111/12 112/10 116/9 117/13 118/6 123/18 124/19 132/5 132/15 138/16 143/1 143/4 143/5 143/18 146/2 146/4 150/3 150/8 154/16 157/1 161/6 164/10 165/1 168/21 174/8 174/23

**Williams [16]** 50/2 50/6 51/9 51/9 51/17 52/1 52/11 52/15 53/7 64/3 71/7 71/7 71/9 71/12 78/24 94/10

**Williams/Auburn [1]** 51/17

**WILSON [1]** 1/10

**window [1]** 105/13

**wise [1]** 35/13

**wish [3]** 79/19 81/8 110/16

**wished [1]** 118/11

**withdraw [6]** 48/23 88/22 113/2 128/17 152/7 165/6

**withdrawal [24]** 45/16 46/16 46/16 48/9 48/10 48/12 48/14 48/15 48/22 49/10 123/19 123/20 126/3 128/9 157/17 162/6 162/18 163/4 163/7 163/8 163/15 165/6 165/17 166/1

**withdrawn [3]** 89/4 128/13 163/21

**withhold [2]** 116/9 140/10

**within [27]** 14/21 16/10 17/5 21/25 22/20 36/16 36/24 37/6 37/24 39/13 57/11 78/23 84/23 91/6 91/7 91/7 91/7 98/9 98/22 120/3 120/13 140/21 156/8 156/16 156/16 173/20 176/8

**within-mentioned [1]** 176/8

**without [48]** 38/8 62/10 64/6 71/5 72/21 77/13 95/9 96/9 98/1 119/20 122/5 123/3 140/10 145/4 146/18 151/3 155/22 168/6

**witness [15]** 18/6 21/3 31/9 37/3 37/13 37/16 40/12 43/22 60/2 81/7 81/10 81/13 88/18 97/10 148/20

**witnesses [3]** 3/2 107/11 119/25

**won't [4]** 65/16 66/5 159/15 168/9

**wonderful [2]** 81/20 92/3 175/2

**Woodard [9]** 21/22 29/11 58/6 71/24 72/7 72/12 154/6 154/8 155/7

**WOODS [3]** 1/19 1/21 1/24

**word [7]** 15/15 35/13 69/13 73/20 73/23 78/7 165/18

**words [7]** 11/19 72/22 88/11 101/18 149/4 163/18 163/19

**work [37]** 7/15 7/16 19/24 54/12 68/20 76/7 76/9 87/7 113/11 115/15 117/15 117/22 118/3 118/5 120/25 127/5 127/8 132/21 134/4 134/8 136/13 136/14 137/25 142/22 142/25 144/10 153/8 155/16 155/16 155/18 156/16 159/21 161/8 161/15 161/22 161/22 167/3

**worked [2]** 125/4 125/14

**working [8]** 50/1 92/12 116/14 148/2 148/2 165/10 165/13 170/25

**works [7]** 50/4 110/12 127/6 135/21 137/19 140/7 145/9

**world [3]** 13/20 125/13 126/15

**worried [1]** 153/2

**worth [1]** 40/17

**would [219]**

**wouldn't [4]** 43/3 72/16 125/19 173/7

**wrench [1]** 110/12

**write [1]** 105/24

**writing [3]** 82/8 84/19 101/19

**written [18]** 9/15 9/18 92/25 12/12 13/24 14/4 16/13 85/4 85/11 106/2 139/19 141/25 142/2 142/8 142/10 155/9 158/1 158/11

**wrong [3]** 98/2 98/18 162/2

**wrongfully [1]** 169/20

**W**

**wrongly [1]** 174/14
**wrote [3]** 38/19 73/25
77/11
**Wyalusing [17]** 45/15
45/16 46/20 48/12
113/1 123/9 123/13
124/5 124/8 124/12
124/25 126/3 162/6
162/21 165/5 165/17
166/1

**X**

**XI [2]** 16/12 17/8
**XVI [4]** 15/11 15/15
15/19 16/3

**Y**

**Yasser [1]** 1/23
**yeah [9]** 21/20 23/25
33/18 52/23 53/13
134/25 135/2 159/14
160/2
**year [8]** 22/9 63/23
87/10 152/3 152/8
152/11 157/19 157/22
**years [4]** 143/21
154/11 154/12 167/7
**yes [137]** 5/17 6/7 6/24
7/3 7/10 7/12 7/14 7/22
8/1 8/5 9/12 10/7 11/22
11/25 12/25 13/18
14/18 14/24 15/23 21/5
21/14 21/16 22/1 22/8
22/18 25/3 25/22 26/6
26/10 26/23 27/9 29/1
29/6 29/17 30/9 31/7
31/13 31/21 31/25
32/17 32/21 32/24
33/19 36/8 36/13 37/1
37/16 38/23 39/24 40/4
40/5 40/5 40/22 41/6
41/12 41/14 41/16
41/23 42/4 42/9 43/6
44/3 44/23 45/18 45/24
46/3 47/18 48/4 49/11
49/20 49/22 50/11 51/8
51/12 51/15 51/19
51/24 52/13 52/18 53/8
53/11 53/11 53/23 54/1
54/5 54/11 55/14 55/15
56/19 58/19 59/7 66/6
67/3 67/6 67/9 67/16
67/24 68/11 68/17 69/3
69/18 71/10 71/21
73/14 76/21 77/7 77/9
77/16 77/22 80/11
80/17 80/22 81/1 81/25
82/20 83/6 83/15 93/6
93/16 108/23 109/20
110/7 111/24 124/23
135/3 140/11 142/8
157/5 159/6 159/13
160/4 160/5 170/20

172/11 172/14 172/16
174/11
**yesterday [34]** 6/20 8/7
8/13 9/7 14/13 20/14
25/18 29/7 30/5 40/20
45/13 46/14 47/3 47/11
47/24 49/13 52/8 54/17
63/13 64/15 65/18
71/23 71/25 95/8 95/16
111/4 147/11 152/19
153/1 153/17 154/4
157/4 162/8 162/16
**yet [3]** 43/24 104/17
146/23
**York [1]** 153/16
**you [676]**
**you'll [4]** 52/25 73/9
154/19 164/3
**you're [18]** 9/13 11/11
22/11 24/1 26/12 33/2
53/13 53/21 55/3 67/18
69/22 71/11 102/22
135/18 135/19 144/7
151/21 156/3
**you've [9]** 19/24 37/14
43/20 128/8 128/10
134/20 144/7 144/8
169/4
**your [261]**
**yourself [2]** 26/12
152/19