## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

EPSILON ENERGY USA, INC.,

        Plaintiff,

    v.

CHESAPEAKE APPALACHIA, LLC,

        Defendant.

Civil Action No. 1:21-dv-00658

Judge Jennifer P. Wilson

## AMENDED COMPLAINT

Plaintiff Epsilon Energy USA, Inc. ("Epsilon"), by and through its attorneys, files this Amended Complaint against Defendant Chesapeake Appalachia, LLC ("CHK") and alleges as follows:

### PARTIES

1.    Epsilon is an Ohio corporation with its principal place of business in Houston, Texas.

2.    The citizenship of a corporation is determined by its state of incorporation and the location of its principal place of business. *See* 28 U.S.C. § 1332(c)(1).

3.    Thus, Epsilon is a citizen of Texas and Ohio.

4.    CHK is an Oklahoma limited liability company with its principal place of business in Oklahoma City, Oklahoma.

5.      CHK's sole member is Chesapeake Energy Corporation, an Oklahoma corporation with a principal place of business in Oklahoma City, Oklahoma.

6.      Chesapeake Energy Corporation is an Oklahoma citizen.

7.      The citizenship of a limited liability company is determined by the citizenship of its members.  *See Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015) (citing *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412 (3d Cir. 2010); *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337 (3d Cir. 2013)).

8.      CHK is therefore a citizen of Oklahoma.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between Epsilon and CHK and the amount in controversy exceeds $75,000, excluding interest and costs.  28 U.S.C. § 1332(a).

10.     Venue for this matter lies in this District pursuant to 28 U.S.C. § 1391 because (1) a substantial part of the events or omissions giving rise to Epsilon's claims took place in this District and (2) the property that is the subject of this action is located within this District in Susquehanna County, Pennsylvania.  28 U.S.C. § 1391(b)(2).

11.     An actual controversy exists between the parties within the meaning of 28 U.S.C. §§ 2201, *et seq.*, with respect to CHK's duties to Epsilon under the Settlement Agreement and certain Operating Agreements ("JOAs").

## FACTUAL BACKGROUND

**A.    The Operating Agreements**

12.    Beginning in 2009, Epsilon, CHK, and other oil and gas companies (each a "JOA Party" and collectively the "JOA Parties") began entering into JOAs for drilling units covering acreage subject to oil and natural gas leases which had been (or would be) combined for the purposes of natural gas development.

13.    Epsilon and CHK are parties to an Operating Agreement dated October 18, 2010 for the Baltzley North Unit ("Baltzley North JOA"). A true and correct copy is attached hereto as Exhibit 1.

14.    Epsilon and CHK are parties to an Operating Agreement dated October 18, 2010 for the Baltzley South Unit ("Baltzley South JOA"). A true and correct copy is attached hereto as Exhibit 2.

15.    Epsilon and CHK are parties to an Operating Agreement dated December 16, 2010 for the Craige Unit ("Craige JOA"). A true and correct copy is attached hereto as Exhibit 3.

16.    Epsilon and CHK are parties to a Farmout Agreement dated February 1, 2010, which covers the Blanche Poulsen North and Blanche Poulsen South Units ("Poulsen Units") and incorporates a draft model JOA that applies to those units ("Poulsen JOA"). A true and correct copy of the Farmout Agreement is attached hereto as Exhibit 4 (the Poulsen JOA appears in Schedule 7.1.2, at 61).

3

17.     In the JOAs, Epsilon and CHK agreed to contribute their interests in oil and gas leases and to jointly develop those leases as drilling units within the geographical areas set forth in the JOAs.

18.     Each JOA identifies each JOA Party's specific working interest in the drilling unit governed by the JOA.

19.     Each of the JOAs at issue covers a different pooled unit, which is identified as the "Contract Area." Exhibit 1, Baltzley North JOA, Article I.C.; Exhibit 2, Baltzley South JOA, Article I.C; Exhibit 3, Craige JOA, Article I.C; Exhibit 4, Poulsen JOA, Article I.C.

20.     Each JOA is a stand-alone agreement that governs a different geographical Contract Area.

21.     Any JOA Party is entitled to propose the drilling and completion of a new well (a "Well Proposal").  Exhibit 1, Baltzley North JOA, Articles VI.1 and XVI; Exhibit 2, Baltzley South JOA, Articles VI.1 and XVI; Exhibit 3, Craige JOA, Articles VI.1 and XVI; Exhibit 4, Poulsen JOA, Articles VI.1 and XVI.

22.     Upon receipt of the Well Proposal, the other JOA Parties are required to elect whether they will consent to participate with their working interests (and thereby pay a pro rata share of the costs of developing the well).  Exhibit 1, Baltzley North JOA, Article VI.1; Exhibit 2, Baltzley South JOA, Article VI.1; Exhibit 3, Craige JOA, Article VI.1; Exhibit 4, Poulsen JOA, Article VI.1.

4

23.    If any JOA Party wishes to propose operations that conflict with the Well Proposal, it has 30 days to propose those conflicting operations.  Exhibit 1, Baltzley North JOA, Article VI.6; Exhibit 2, Baltzley South JOA, Article VI.6; Exhibit 3, Craige JOA, Article VI.6; Exhibit 4, Poulsen JOA, Article VI.6.

24.    If a conflicting proposal is received, the JOA Parties promptly vote to determine which of the two proposals will proceed.  Exhibit 1, Baltzley North JOA, Article VI.6; Exhibit 2, Baltzley South JOA, Article VI.6; Exhibit 3, Craige JOA, Article VI.6; Exhibit 4, Poulsen JOA, Article VI.6.

25.    Under each JOA, CHK was designated to serve as the default operator for wells drilled thereunder.  Exhibit 1, Baltzley North JOA, Article V.A.; Exhibit 2, Baltzley South JOA, Article V.A; Exhibit 3, Craige JOA, Article V.A; Exhibit 4, Poulsen JOA, Article V.A.

26.    If CHK elects not to participate in a Well Proposal and declines to serve as the operator, however, one of the consenting JOA Parties may serve as the operator in conjunction with that Well Proposal.  Exhibit 1, Baltzley North JOA, Article VI.2; Exhibit 2, Baltzley South JOA, Article VI.2; Exhibit 3, Craige JOA, Article VI.2; Exhibit 4, Poulsen JOA, Article VI.2.

27.    If less than all JOA Parties elect to participate, the proposing party is required to notify the other consenting JOA Parties of the working interests consenting and whether the proposing party recommends proceeding with the Well

Proposal. Exhibit 1, Baltzley North JOA, Article VI.2(a); Exhibit 2, Baltzley South JOA, Article VI.2(a); Exhibit 3, Craige JOA, Article VI.2(a); Exhibit 4, Poulsen JOA, Article VI.2(a).

28.    The consenting JOA Parties may participate with their proportionate share of working interest of those parties that are not participating.  Exhibit 1, Baltzley North JOA, Article VI.2(a); Exhibit 2, Baltzley South JOA, Article VI.2(a); Exhibit 3, Craige JOA, Article VI.2(a); Exhibit 4, Poulsen JOA, Article VI.2(a).

29.    If the proposing party does not withdraw the Well Proposal, the proposing party is deemed to be participating with any outstanding interests needed to equal 100 percent subscription. Exhibit 1, Baltzley North JOA, Article VI.2(a); Exhibit 2, Baltzley South JOA, Article VI.2(a); Exhibit 3, Craige JOA, Article VI.2(a); Exhibit 4, Poulsen JOA, Article VI.2(a).

30.    Once 100 percent subscription is reached, the JOA Party serving as the operator must commence operations in accordance with the Well Proposal. Exhibit 1, Baltzley North JOA, Articles VI.2 and XVI; Exhibit 2, Baltzley South JOA, Articles VI.2 and XVI; Exhibit 3, Craige JOA, Articles VI.2 and XVI; Exhibit 4, Poulsen JOA, Articles VI.2 and XVI.

31.    Article XVI of the JOAs sets forth the requirements for a proposal to drill a new well.

6

32.    In order to fulfill the requirements, a party proposing a horizontal well must include: "(1) the estimated commencement date; (2) the proposed depth; (3) the objective formation or formations to be penetrated or tested; (4) the Authorized Objective, the surface and bottomhole locations, proposed directional operations; and (5) the estimated costs of the operation, including, but not limited to, the estimated costs of drilling, testing, and Completing or abandoning the well. Operator's estimate of Completion costs should be included as an informational item." Exhibit 1, Baltzley North JOA, Article XVI.A.2(a); Exhibit 2, Baltzley South JOA, Article XVI.A.2(a); Exhibit 3, Craige JOA, Article XVI.A.2(a); Exhibit 4, Poulsen JOA, Article XVI.A.2(a).

33.    The JOAs contain a section entitled Order of Preference of Operations setting forth the protocol if JOA Parties submit conflicting proposals and cannot agree upon the manner in which to proceed with a proposed operation.  Exhibit 1, Baltzley North JOA, Article XVI.A.2(b); Exhibit 2, Baltzley South JOA, Article XVI.A.2(b); Exhibit 3, Craige JOA, Article XVI.A.2(b); Exhibit 4, Poulsen JOA, Article XVI.A.2(b).

34.    Article XVI states "In the event of a conflict of inconsistency between the provisions of this Article XVI and any other provisions of this Agreement, ***the provisions of this Article XVI shall control and prevail.***"  Exhibit 1, Baltzley North JOA, Article XVI.N (emphasis added); Exhibit 2, Baltzley South JOA, Article

XVI.N; Exhibit 3, Craige JOA, Article XVI.N; Exhibit 4, Poulsen JOA, Article XVI.N.

35.     Finally, if any new well drilled is capable of producing oil and/or gas in paying quantities, the Consenting Parties must complete and equip the well to produce and then turn the well over to the Operator "**if the Operator did not conduct the operation**." Exhibit 1, Baltzley North JOA, Article VI.2(b) (emphasis added); Exhibit 2, Baltzley South JOA, Article VI.2(b); Exhibit 3, Craige JOA, Article VI.2(b); Exhibit 4, Poulsen JOA, Article VI.2(b).

36.     The Operator then operates the newly-drilled well at its expense and for the account of the Consenting Parties. Exhibit 1, Baltzley North JOA, Article VI.2(b) (emphasis added); Exhibit 2, Baltzley South JOA, Article VI.2(b); Exhibit 3, Craige JOA, Article VI.2(b); Exhibit 4, Poulsen JOA, Article VI.2(b).

**B.     The Settlement Agreement**

37.     In September 2018, Epsilon filed a complaint against CHK in this Court styled *Epsilon Energy USA, Inc. v. Chesapeake Appalachia, L.L.C.*, No. 3:18-cv-01852.

38.     Among the allegations in that lawsuit, Epsilon asserted that CHK failed to follow the election processes in the JOAs at issue (which included the Baltzley South and Baltzley North JOAs) in order to improperly thwart Epsilon's efforts to propose and drill new wells.

39.     The dispute in the prior lawsuit involved new wells that Epsilon had proposed.  Epsilon had not proposed, and the dispute did not involve, work to be performed on existing wells.

40.     Epsilon sought declaratory and injunctive relief, among other demands for relief, and filed a motion for preliminary injunction.

41.     Before the Court conducted an injunction hearing, the parties settled the dispute.  A true and correct copy of the Settlement Agreement and Release entered on October 8, 2018 ("Settlement Agreement") is attached hereto as Exhibit 5.

42.     In the Settlement Agreement, CHK explicitly agreed:



Exhibit 5 at ¶¶ 8, 8(d).

43.     Accordingly, ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄
▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

44.     CHK further agreed that, ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄
▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄
▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

████████████████████████████████████████████████

████████████████████████

45.    In consideration for CHK's agreement to the above, ████████████

████████████████████████████████████████

46.    Epsilon did not propose any new wells until 2020.

██  ████████████████████████████████████████

████████████████████████████

48.    CHK drilled those new wells.

## C.    Ownership of Subsurface and Surface Rights

49.    Upon information and belief, CHK has obtained surface and subsurface easements for the estates that are subject to the Baltzley North, Baltzley South, Craige, Poulsen North, and Poulsen South Units.

50.    Under the JOAs, if any party owns or acquires an oil and gas interest in the estates subject to the Baltzley North, Baltzley South, Craige, Poulsen North, and Poulsen South Units, the interest is treated as if it were covered by the Oil and Gas Lease attached as an exhibit to the JOAs.  Exhibit 1, Baltzley North JOA, Article III; Exhibit 2, Baltzley South JOA, Article III; Exhibit 3, Craige JOA, Article III; Exhibit 4, Poulsen JOA, Article III.

51.    Oil and gas interest is a defined term that "shall mean unleased fee and mineral interest in Oil and Gas in tracts of land lying with the Contract Area which

are owned by parties to this Agreement." Exhibit 1, Baltzley North JOA, Exhibit B; Exhibit 2, Baltzley South JOA, Exhibit B; Exhibit 3, Craige JOA, Exhibit B; Exhibit 4, Poulsen JOA, Exhibit B.

52.    The exemplar lease attached to the JOAs provides broad rights to the subsurface and surface rights "as may be necessary or convenient . . . to explore for, develop produce, measure, and market production from the Leasehold, and from adjoining lands . . . to drill, maintain, operate . . . wells; to use or install roads, electric power . . . and to construct pipelines with appurtenant facilities . . . to use oil, gas and non-domestic water sources, free of cost . . ; to operate, maintain, repair and remove material and equipment." Exhibit 1, Baltzley North JOA, Exhibit B; Exhibit 2, Baltzley South JOA, Exhibit B; Exhibit 3, Craige JOA, Exhibit B; Exhibit 4, Poulsen JOA, Exhibit B.

53.    In addition, the JOAs require that CHK permit a Non-Operator (such as Epsilon) or its duly authorized representative "full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account on the Contract Area." Exhibit 1, Baltzley North JOA, Article V.D.5; Exhibit 2, Baltzley South JOA, Article V.D.5; Exhibit 3, Craige JOA, Article V.D.5; Exhibit 4, Poulsen JOA, Article V.D.5.

54.     Accordingly, if any JOA Party obtains an easement or other right to use property within a JOA's Contract Area, the other JOA Parties have the same right to use that property.

55.     Finally, the JOAs expressly state that, while all parties "shall be free to act on an arm's-length basis in accordance with their own respective self-interest, [that freedom is] subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder." Exhibit 1, Baltzley North JOA, Article VII.A; Exhibit 2, Baltzley South JOA, Article VII.A; Exhibit 3, Craige JOA, Article VII.A; Exhibit 4, Poulsen JOA, Article VII.A.

**D.     Ownership of Water Rights Associated with Wyalusing Creek**

56.     The Wyalusing Creek surface water withdrawal is the water source for the wells drilled under the Craige JOA.  *See* SRBC Commitment Letter, a true and correct copy is attached hereto as Exhibit 6.

57.     Epsilon's contractor (Turm Oil, Inc.) initially acquired the right to withdraw water from Wyalusing Creek from the Susquehanna River Basin Commission ("SRBC"), and subsequently transferred the SRBC permit evidencing that right into Epsilon's name as of August 9, 2019.  *See* Notice of Request for Transfer, a true and correct copy of which is attached hereto as Exhibit 7.

58.     In the Farmout Agreement, Epsilon conveyed an undivided one-half interest in its Wyalusing Creek surface water withdrawal to CHK.  *See* Exhibit 4,

Farmout Agreement, at 1.1 ("Epsilon agrees to farmout and convey and Chesapeake agrees to acquire and accept an undivided fifty percent (50%) interest . . . in all of the Properties for the Farmout Consideration . . . .").

59.     Exhibit A sets forth the "Real Property Interests" covered under the Farmout Agreement, including two Poulsen Wells (B. Poulsen #1H and B. Poulsen #2H) and the Hardic Well (Hardic #2H), which were drilled and supported by the Wyalusing Creek surface water withdrawal.  Exhibit 4, Farmout Agreement, at Exhibit A.

60.     The Farmout Agreement explicitly states that the "Real Property Interests" include "[a]ll easements, *permits*, licenses, servitudes, rights of way and *all other rights and appurtenances on or used in connection with the Real Property Interests*, Wells or any interests pooled or unitized therewith including, without limitation, those easements and rights of way described on Exhibit 'A'." Exhibit 4, Farmout Agreement, at 1.1.9 (emphasis added).

61.     As a permit conveying the right to use the water source that Epsilon utilized to drill and support the Poulsen Wells and the Hardic Well, the Wyalusing Creek surface water withdrawal permit issued by the SRBC was among the conveyed assets under the Farmout Agreement.

62.     The Wyalusing Creek surface water withdrawal also constituted a right or appurtenance "on or used in connection with the Real Property Interests"

described in Exhibit A to Farmout Agreement (namely, the Poulsen and the Hardic Wells).

63.   Consequently, the jointly-owned Wyalusing Creek surface water withdrawal permit (and the corresponding right to withdraw water from Wyalusing Creek) constitutes property that has been contributed for joint use under the JOAs.

64.   The JOAs require that "any [ ] facility necessary for the operation and development of the Contract Area shall be included as an integral part of any proposed operation made under Article VI.B of this Agreement . . . . Facility includes, but is not limited to . . . water handling and disposal facilities located within the Contract Area and specifically applicable to the proposed operation." Exhibit 1, Baltzley North JOA, Article XVI.B (Gathering Lines/Facilities); Exhibit 2, Baltzley South JOA, Article XVI.B; Exhibit 3, Craige JOA, Article XVI.B; Exhibit 4, Poulsen JOA, Article XVI.B.

65.   In March 2010, Epsilon transferred the jointly-owned SRBC permit evidencing the right to withdraw water from Wyalusing Creek into CHK's name. Exhibits 18, 19 (D. Ward Letter) (D. Ward Declaration).

66.   CHK did not pay any consideration to Epsilon in March 2010 in exchange for transferring the SRBC permit into CHK's name.  Instead, Epsilon transferred the jointly-owned permit into CHK's name because CHK would be

14

serving as the operator under the Farmout Agreement and JOAs.  Exhibit 19 (D. Ward Declaration).

67.     The SRBC does not allow more than one entity to be identified as the "owner" of an SRBC water permit.  Accordingly, it was not possible to list both Epsilon and CHK as co-owners of the permit.

68.     When the SRBC issues a water permit, it expressly states that the permit does not establish that the named permittee possesses any property rights.  *See* Exhibit 7, Notice of Request for Transfer, at Decision ¶ 17 ("Commission approval confers no property rights upon the project sponsor.").

69.     While CHK subsequently combined the jointly-owned permit with a separate permit that CHK possessed (which entitled CHK to withdraw a separate quantity of water from a nearby location in Wyalusing Creek), that combination did not extinguish Epsilon's co-ownership interest.  Epsilon continues to co-own an undivided interest in the current consolidated SRBC permit that evidences the right to withdraw water from Wyalusing Creek.

**E.      Ownership of the Marbaker Impoundment**

70.     The consenting parties under the JOAs are required to pay their pro rata share of the expenses associated with the building, repair, and use of the water facilities used to develop the Contract Area.  CHK is subject to accounting audits to ensure that parties are accurately billed for such expenses.  *See* Exhibit 1, Baltzley

North JOA, Article VII.A (Liability of Parties); Exhibit 2, Baltzley South JOA, Article VII.A; Exhibit 3, Craige JOA, Article VII.A; Exhibit 4, Poulsen JOA, Article VII. A ("Each party . . . shall be liable only for its proportionate share of the costs of developing and operating the Contract Area."); *see also* Stipulation of Parties Regarding Testimony of Lane Bond, Exhibit 20.

71.     A water impoundment — known as the Marbaker Impoundment — and related water facilities were constructed in order to utilize the Wyalusing Creek water withdrawal to drill and further develop wells under the JOAs.  Exhibit 20 (Lane Bond Stipulation).

72.     Accordingly, Epsilon has paid the invoiced amounts issued by CHK in conjunction with water used in the operations of wells as permitted under the appropriate JOA procedures.  Exhibit 20 (Lane Bond Stipulation).

73.     Because CHK constructed and utilized the Marbaker Impoundment in order to develop jointly-owned wells under the JOAs, Epsilon is a co-owner of the Marbaker Impoundment.  Exhibit 20 (Lane Bond Stipulation).

**F.     Ownership of the Craige Well Pad**

74.     The consenting parties under the JOAs are also required to pay their pro rata share of the expenses associated with the building, repair, and use of the well pads that are used to develop the Contract Area.  CHK is subject to accounting audits to ensure that parties are accurately billed for such expenses.  *See* Exhibit 1, Baltzley

16

North JOA, Article VII.A (Liability of Parties); Exhibit 2, Baltzley South JOA, Article VII.A; Exhibit 3, Craige JOA, Article VII.A; Exhibit 4, Poulsen JOA, Article VII. A ("Each party . . . shall be liable only for its proportionate share of the costs of developing and operating the Contract Area."); Exhibit 20 (Lane Bond Stipulation).

75.     A well pad — known as the Craige Well Pad — was constructed in order to drill and further develop wells under the Craige JOA.  Exhibit 20 (Lane Bond Stipulation).

76.     Accordingly, Epsilon has paid the invoiced amounts issued by CHK in conjunction with the construction of the Craige Well Pad under the appropriate JOA procedures.  Exhibit 20 (Lane Bond Stipulation).

77.     Because CHK constructed and utilized the Craige Well Pad in order to develop jointly-owned wells under the JOAs, Epsilon is a co-owner of the Craige Well Pad.  Exhibit 20 (Lane Bond Stipulation).

**G.     The Proposed Wells**

78.     In May 2020, Epsilon began discussions with CHK regarding new well proposals that would advance Epsilon's goals of growth and production in the Auburn Development.  *See* E-Mail exchange attached hereto as Exhibit 8, May 12, 2020, H. Clanton to J. Woodard.

17

79.    In conjunction with these discussions, Epsilon shared its ideas for proposed wells at the Craige Well Pad, located in Rush Township, Susquehanna County, Pennsylvania. Exhibit 8, May 26, 2020, H. Clanton to J. Woodard.

80.    Throughout June 2020, the parties continued to discuss the design and spacing of the wells that Epsilon desired to drill. Exhibit 8, May–June 2020 E-mail Discussions, H. Clanton and J. Woodard.

81.    After an exchange between the parties regarding permitting, CHK requested further information on how Epsilon proposed to operate the wells. Exhibit 8, September 28, 2020, J. Woodard to H. Clanton.

82.    Epsilon responded that it was "less interested in who operates the proposed program as long as we believe quality, safety and costs are controlled. We are prioritized on developing the Marcellus reserves in Auburn and the larger resource for the benefit of our shareholders." Exhibit 8, September 28, 2020, H. Clanton to J. Woodard.

83.    Epsilon continued:

As we understand the JOA, CHK has the following options when well proposals are made by others. CHK can; consent and operate, non-consent but operate at the consenting parties request, or decline to operate. In a scenario where CHK elects not to participate and declines to operate, the consenting party or parties have the right to operate. We need to understand how CHK would transfer operatorship and cooperate with the designated operator, no matter whom.

An alternative approach could be to have one of the consenting parties serve as contract operator (drill/complete/flowback/turn-over to CHK

18

@ TIL) with CHK remaining the operator of record.

Again, thank you for your attention to the resolution of this matter.  We understand development in Auburn may not be a priority to CHK both from a manpower resources and commercial perspective, however it is obviously important to EPSN.

Exhibit 8, September 28, 2020, H. Clanton to J. Woodard.

84.    After this exchange, the parties discussed various options for how to move forward with Epsilon's suggested wells.  Exhibit 8, September 29, 2020– October 14, 2020, H. Clanton to J. Woodard.

85.    On October 14, 2020, Epsilon advised CHK that Epsilon intended to move forward with the wells that Epsilon had suggested to ensure it could meet permitting timelines for those wells.  Exhibit 8, October 14, 2020, H. Clanton to J. Woodard.

86.    The next day, Epsilon reminded CHK that Article VI.2 of the JOAs enabled Epsilon to proceed with the wells even if CHK elected not to participate and declined to serve as the operator of those wells.  Exhibit 8, October 15, 2020, H. Clanton to J. Woodard.

87.    In a separate communication, Epsilon provided CHK with further reason to move forward with Epsilon's suggested wells, noting that CHK would benefit from a 10% discount on the gathering rate.  *See* E-mail exchange attached hereto as Exhibit 9, October 16, 2020, M. Raleigh to J. Taylor.

19

88.     Two months later, on December 16, 2020, Epsilon reiterated its plan to drill new wells on the Craige Pad.  Exhibit 9, Dec. 16, 2020, M. Raleigh to J. Taylor.

89.     CHK responded that there was "not much incentive to CHK to work a deal here" and indicated that CHK wanted to come up with a scenario where "Epsilon agrees not to propose" any additional wells.  Exhibit 9, December 16, 2020 J. Taylor to M. Raleigh.

90.     Epsilon responded that it would be willing to consider other options but that it intended to continue pursuing its opportunities as allowed under the JOAs. Exhibit 9, December 17, 2020 M. Raleigh to J. Taylor.

91.     In response, CHK asserted that "CHK [was] not trying to prevent Epsilon from any rights that it may have under the JOA.  We simply feel that there is no obligation on the part of CHK to drill these wells."  Exhibit 9, December 18, 2020, J. Taylor to M. Raleigh.

92.     On December 22, 2020, Epsilon formally proposed four wells in accordance with the procedure set forth in the JOAs:  Craige N 1LH, Craige N 1UHC, Craige N 4UHC ("Craige North Wells") and Craige S 3LHC ("Craige South Well") to be located in Rush Township, Susquehanna County, Pennsylvania (the "Proposed Wells").  *See* Exhibit 17, an exemplar well proposal, Baltzley South Unit.

93.     In conjunction with the Proposed Wells, CHK could elect between three options:  (1) elect to participate in the drilling and completion of the Proposed Wells

and to serve as the operator; (2) elect not to participate in the Proposed Wells but to serve as the operator; or (3) elect not to participate in the Proposed Wells and decline to serve as the operator (such that Epsilon or another consenting party would serve as the operator).

94.     The other JOA Parties for the Craige South Well included Equinor Onshore Properties, Inc. (f/k/a Statoil) ("Statoil"), Chief Oil & Gas LLC (formally, MKR Holdings, LLC) ("Chief"), Jamestown Resources, L.L.C. ("Jamestown"), Enerplus Resources (USA) Corporation ("Enerplus"), Radler 2000 Limited Partnership ("Radler"), Tug Hill Marcellus, LLC ("Tug Hill"), and Unconventionals Natural Gas, LLC ("Unconventionals").

95.     The other JOA Parties for the Craige North Wells included Statoil and Jamestown.

96.     Chief, Radler, and Tug Hill elected to participate in the Craige South Well.  However, Statoil, Jamestown, Enerplus, and Unconventionals elected not to participate.

97.     The other JOA Parties elected not to participate in the Craige North Wells.

**H.    CHK's Refusal to Cooperate and Allow Epsilon Access to Jointly-Owned Property**

98.     On January 19, 2021, CHK advised that it would not participate in the drilling of the Proposed Wells and would not serve as the operator.  CHK also

21

asserted that Epsilon is not permitted to serve as the operator, and on that basis, refused to grant Epsilon access to the Craige Well Pad in order to drill the Proposed Wells. *See* Letters attached hereto as Exhibit 10, January 19, 2021 Non-Consent Letters, C. Moad to R. Collins.

99.  In a letter dated that same day (although it was not delivered to Epsilon until January 21, 2021), CHK purported to propose a new well known as the Koromlan 107HC ("Koromlan Well") that would be located in Rush Township, Susquehanna County, Pennsylvania. *See* Letter attached hereto as Exhibit 11, January 19, 2021 Koromlan Well Letter, C. Moad to R. Collins.

100.  CHK suggested that the Proposed Wells were in conflict "with the planned drilling of Chesapeake's Koromlan 107HC." Exhibit 11, January 19, 2021 Koromlan Well Letter, C. Moad to R. Collins.

101.  On January 20, 2021, CHK further stated: "Chesapeake maintains the right to Operate the Craige pad site and associated wells, and hereby does not grant approval or authority to Epsilon, or anyone else, to Operate from referenced pad. . . . Subsequently, Chesapeake has plans to drill the Koromlan 107HC in early 2022, which is in conflict with Epsilon's proposed Craige S 3LHC. As such, Chesapeake's well proposal will be forthcoming along with all elections for Epsilon's proposed wells." *See* E-mail attached hereto as Exhibit 12, January 20, 2021, Scott Glenn to Mike Raleigh.

102.   On February 9, 2021, Epsilon provided CHK with the required notice that it had received 100% Subscription to proceed with the Proposed Wells.  *See* Letter attached hereto as Exhibit 13, February 9, 2021 Epsilon's Notice of 100% Subscription.

103.   On February 11, 2021, Epsilon requested an update on the status of the letter that Epsilon needed CHK to sign so that Epsilon could obtain the water permit that it needed to drill the Proposed Wells (as discussed in the next section).  *See* E-mail exchange attached hereto as Exhibit 14, February 11, 2021, R. Collins to C. Moad.

104.   Ten minutes later, CHK responded by (1) asserting that the JOAs do not allow Epsilon to drill a new well if CHK elects not to participate in that well and (2) stating that CHK would not sign the letter that Epsilon needed to obtain a water permit for the Proposed Wells.  Exhibit 14, February 11, 2021, J. Woodard to R. Collins.

105.   Epsilon responded:

It is hard for Epsilon to understand why Chesapeake takes the position of stopping production by claiming a super veto power that is counter to the JOAs or our prior Settlement Agreement.  It is not in good faith and in fact it is deemed to be in bad faith. Of course, Article VI2 allows for another Operator when the designated Operator will not agree to operate.  Again, your interpretation is not in good faith.

Epsilon is interested in promoting the production of the joined resources, which is one of the base reasons for entering a JOA. Epsilon is furthering this interest by proposing wells that will be beneficial for

the parties and has also been clear that it is willing to work with Chesapeake to ensure that Chesapeake can also proceed with its proposed well. Epsilon has continued to act in good faith and seeks only to have Chesapeake recognize its rights under the JOA and the Settlement Agreement and stop Chesapeake's obstruction of developing the resources. The first step in doing so is signing the SRBC letter, which Chesapeake has done in the past for other parties. The next step is confirming that Chesapeake will provide Epsilon with access to the properties, and otherwise cooperate with Epsilon, so that Epsilon can fulfill its responsibilities with respect to the four currently-proposed wells for which it has been designated as the operator.

Exhibit 14, February 11, 2021, R. Collins to J. Woodard and C. Moad.

106.   Two minutes later, CHK curtly responded, making it clear to Epsilon at that time that the parties had reached an impasse: "Respectfully, this is not a good faith/bad faith discussion.  The plain language of the JOA does not allow for Epsilon to assume operatorship."  Exhibit 14, February 11, 2021, J. Tarantelli to R. Collins.

107.   Epsilon's request for assistance in obtaining a water permit for the Proposed Wells was not a surprise to CHK.  Back on July 1, 2020 — when Epsilon shared its development plans with CHK — Epsilon sought CHK's assistance in obtaining the requisite approval from the Pennsylvania Department of Environmental Protection ("PaDEP") and the SRBC for a water management plan. Exhibit 8, July 1, 2020, H. Clanton to J. Woodard (noting that "Operators are required to submit a Water Management Plan for approval.").

108.   In accordance with its rights under the JOAs, Epsilon intends to use the jointly-owned Marbaker Impoundment and jointly-owned Craige Well Pad to drill the Proposed Wells.

109.   On September 18, 2020, Epsilon sent CHK a draft SRBC commitment letter, which CHK was required to execute in order for Epsilon to be able to use the Wyalusing Creek water withdrawal (as the SRBC permit is issued in CHK's name) and the Marbaker Impoundment.  Exhibit 8, September 18, 2020, H. Clanton to J. Woodard.

110.   On September 25, 2020, Epsilon reiterated that it needed CHK to sign the SRBC commitment letter in order for Epsilon "to move forward with [Epsilon's] well permitting. It's a simple one page, self-explanatory form."   Exhibit 8, September 25, 2020, H. Clanton to J. Woodard.

111.   On September 28, 2020, Epsilon contacted CHK once again about the SRBC commitment letter, and this time referenced the parties' obligations under the Settlement Agreement (which expressly required CHK to provide access to jointly-owned assets and water sources).  Exhibit 8, September 28, 2020, H. Clanton to J. Woodard.

112.   On September 29, 2020, CHK stated that, until Epsilon was named as the operator of any formally-proposed wells, CHK would not sign the SRBC commitment letter.  Exhibit 8, September 29, 2020, J. Woodard to H. Clanton.

113.   After making its formal proposal in December 2020, Epsilon renewed its efforts to obtain the water permit necessary to drill the Proposed Wells.   On January 29, 2021, the SRBC provided Epsilon with a commitment letter that CHK had recently used to obtain a similar permit.   *See* E-mail exchange attached hereto as Exhibit 15, January 29, 2021, G. Miller to W. Jenko.

114.   Using the commitment letter that CHK had recently used, Epsilon prepared a draft commitment letter (to be signed by CHK) that would enable Epsilon to utilize the right to withdraw water from Wyalusing Creek — an asset that Epsilon co-owns with CHK — to drill the Proposed Wells.   After reviewing the draft letter, the SRBC confirmed that it was acceptable and would enable Epsilon to obtain the water permit that it required for the Proposed Wells.   Exhibit 15, January 29, 2021, G. Miller to W. Jenko.

115.   On February 9, 2021, Epsilon sent the proposed letter to CHK for execution so that Epsilon could finalize the permitting for its Proposed Wells. Exhibit 13, February 9, 2021, R. Collins to J. Woodard.

116.   On February 11, 2021, CHK advised that it would not sign the SRBC commitment letter.   CHK reiterated its position that, because CHK had not elected to participate, Epsilon could not proceed with its Proposed Wells.   Exhibit 14, February 11, 2021, J. Woodard to R. Collins.

117.    Furthermore, CHK made clear in its communications with Epsilon that it would not grant Epsilon access to the Craige Well Pad in order to drill certain of the Proposed Wells.  Exhibit 10, January 19, 2021 Non-Consent Letter, C. Moad to R. Collins.

118.    Finally, on March 17, 2021, CHK filed a notice of appeal of the permits that the PaDEP had issued for the Proposed Wells with the Pennsylvania Environmental Hearing Board in another attempt to obstruct Epsilon's development of the Proposed Wells.

**I.      The Defective Proposal for the Koromlan Well**

119.    The proposal for the Koromlan Well, which CHK dated January 19, 2021 but did not provide to Epsilon until January 21, 2021, does not set forth a date on which operations on the well would commence.

120.    The proposal for the Koromlan Well indicates that the well would traverse the Craige, Poulsen North, Poulsen South, and Davis Units.

121.    The Koromlan Well would also traverse a drilling unit not yet formed, which CHK described as the Bradbury Unit.

122.    Because the Bradbury Unit has not yet been formed, the Koromlan Well would traverse acreage (including acreage owned by Epsilon) that cannot be pooled because it has not been unitized.

27

123.   In addition, the Koromlan Well's path is too close to the Craige South Well's path.

124.   Further, upon information and belief, the Koromlan Well would traverse a block of acreage known as the Rushboro Ventures block that is not leased (or whose lease is currently in question).

125.   The following is a projection of the path of the Koromlan Well (the only path that would comply with the JOA spacing rules) and depicts these issues:



126.   On February 9, 2021, Epsilon informed CHK that the proposal for the

Koromlan Well did not meet the JOA requirements for submitting a proposal.  While

Epsilon noted that the Koromlan Well's path would traverse non-unitized acreage,

as well as acreage with a title defect, Epsilon indicated that it might support a similar

well if these issues could be overcome (provided that CHK proposed such a well in

accordance with and compliance with the JOAs).  *See* Letter attached hereto as Exhibit 16, February 9, 2021, Koromlan 107HC Well Proposal Response.

127.   After submitting the proposal for the Koromlan Well, CHK did not seek to have the JOA Parties vote on whether to proceed with the Koromlan Well or the Craige South Well.

**J.   Epsilon Re-Proposes the Proposed Wells**

128.   On May 14, 2021, this Court issued an opinion and order in which it concluded that the proposals Epsilon submitted on December 23, 2020 to drill the Proposed Wells had expired.

129.   On May 26, 2021, Epsilon formally re-proposed the drilling of the Proposed Wells.  *See* Four Well Proposals collectively attached hereto as Exhibit 21.

130.   In light of the position that CHK has previously asserted in correspondence, and advanced in this lawsuit, Epsilon understands that CHK will not participate in the Proposed Wells and will not serve as the operator, but will nevertheless not cooperate so that Epsilon can drill the Proposed Wells.

**K.   Wells That CHK Has Proposed and Drilled Under the JOAs**

131.   CHK has proposed the drilling of new wells under the JOAs in which the deadlines to commence operations set forth in the well proposals were greater than 120 days from the dates of the proposals.  For example:

> (a)   CHK submitted a proposal on February 25, 2011 to drill the Bluegrass 4H well.  In the proposal, CHK identified the date on

which operations would commence as July 24, 2011 (149 days later).

(b)     CHK submitted a proposal on September 28, 2011 to drill the GB N SUS 2H well.  In the proposal, CHK identified the date on which operations would commence as February 14, 2012 (139 days later).

(c)     CHK submitted a proposal on September 25, 2013 to drill the Rosiemar SUS 1H well.  In the proposal, CHK identified the date on which operations would commence as February 10, 2014 (138 days later).

132.    CHK submitted a proposal on or about April 5, 2012 to drill the Cook S SUS 2H well.

133.    Epsilon did not consent to participate in the Cook S SUS 2H well.

134.    CHK drilled the Cook S SUS 2H well even though not all of the JOA Parties had consented to participate in that well.

135.    CHK submitted a proposal on or about February 20, 2020 to drill the Przbyszewski 1HC well.

136.    One or more of the JOA Parties did not consent to participate in the Przbyszewski 1HC well.

137.    CHK drilled the Przbyszewski 1HC well even though not all of the JOA Parties had consented to participate in that well.

138.    CHK submitted a proposal on or about May 27, 2020 to drill the Maris 123HC well.

139.    One or more of the JOA Parties did not consent to participate in the Maris 123HC well.

140.   CHK drilled the Maris 123HC well even though not all of the JOA Parties had consented to participate in that well.

141.   CHK submitted a proposal on or about May 27, 2020 to drill the Maris 22HC well.

142.   One or more of the JOA Parties did not consent to participate in the Maris 22HC well.

143.   CHK drilled the Maris 22HC well even though not all of the JOA Parties had consented to participate in that well.

## COUNT I – DECLARATORY JUDGMENT
### (Epsilon's Right to Drill the Proposed Wells)

144.   The allegations set forth in Paragraphs 1 through 137 are incorporated by reference as if fully set forth herein.

145.   Under the terms of the JOAs, CHK is required to make an election with regard to both (1) its participation in the Proposed Wells and (2) its service as the operator for the Proposed Wells.

146.   CHK has unambiguously communicated that it will not to participate in the Proposed Wells and will not serve as the operator for the Proposed Wells.

147.   Upon emerging from bankruptcy protection in early February 2021, CHK was obligated to cooperate with Epsilon so that Epsilon can drill and operate the Proposed Wells.

148.   However, CHK continuously refuses to cooperate with Epsilon so that Epsilon (or an otherwise designated operator by the consenting parties) can drill and operate the Proposed Wells.[1]

149.   To the contrary, CHK continuously takes the position that Epsilon (or an otherwise designated operator by the consenting parties) may not drill on the Craige Well Pad because CHK controls the subsurface and surface estates and will not grant Epsilon access to the well pad.

150.   In addition, CHK continuously takes the position that it will not sign the SRBC commitment letter so that Epsilon can obtain the permit that it requires in order to use jointly-owned water facilities to drill the Proposed Wells.

151.   Rather than cooperate to assist with Epsilon's efforts to obtain drilling permits for the Proposed Wells, CHK filed a notice of appeal with the Environmental Hearing Board in an attempt to vacate the drilling permits that the PaDEP has issued which will enable the Proposed Wells to be drilled.

152.   CHK's continuously refuses to cooperate, after its emergence from bankruptcy, so that Epsilon can proceed with the development of the Proposed Wells

---

[1] For avoidance of doubt, all of Epsilon's claims in all Counts are based on conduct that CHK took (or refused to take) after emerging from bankruptcy on February 9, 2021. The allegations contained herein regarding CHK's conduct before it emerged from bankruptcy are included for historical context. However, Epsilon's requests for equitable relief — including a declaratory judgment as to the parties' current duties and obligations — are based exclusively on CHK's conduct since emerging from bankruptcy.

constitutes a continuing breach of both the Settlement Agreement and the JOAs.

153. Nothing in the Settlement Agreement and/or the JOAs entitles CHK to unilaterally veto a Well Proposal that Epsilon has submitted in accordance with the JOAs.

154. An actual, present and justiciable controversy exists between Epsilon and CHK concerning: (1) the Settlement Agreement and JOAs between the parties; (2) Epsilon's right to drill a new well if CHK elects not to participate and declines to serve as the operator; (3) CHK's refusal to provide access to the Craige Well Pad so that a party designated by the consenting parties may serve as the operator; (4) CHK's refusal to sign the SRBC commitment letter so that Epsilon may complete its permitting requirements to obtain water necessary to drill the Proposed Wells; (5) CHK's appeal of the drilling permits that the PaDEP issued to enable the Proposed Wells to be drilled; and (6) CHK's refusal to otherwise cooperate with Epsilon so that it can drill the Proposed Wells.

WHEREFORE, Epsilon asks the Court to enter a judgment in its favor declaring that, if CHK elects not to participate in a new well proposed by Epsilon and declines to serve as the operator, then (1) Epsilon (or another consenting party) has the right to drill and operate the proposed new well; (2) CHK has an obligation to allow Epsilon (or another consenting party) to access the jointly-owned assets in order to do so, including taking any actions required to facilitate such access; (3) the

permit evidencing the right to withdraw water from Wyalusing Creek, the Craige Well Pad, and the Marbaker Impoundment are co-owned assets that Epsilon is entitled to utilize to drill such a proposed new well; and (4) CHK must otherwise cooperate with the operator designated by the consenting parties to facilitate those drilling operations.

## COUNT II – SPECIFIC PERFORMANCE
## (SETTLEMENT AGREEMENT)

155.   The allegations set forth in Paragraphs 1 through 148 are incorporated by reference as if fully set forth herein.

156.   The Settlement Agreement is a binding contract between CHK and Epsilon.

157.   CHK confirmed in the Settlement Agreement that ██████████████

██████████████████████████████████████

158.   CHK expressly agreed in the Settlement Agreement that, if ████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

159.   Since emerging from bankruptcy, CHK continuously refuses to cooperate with Epsilon with respect to the Proposed Wells.  In particular, CHK continues to (1) refuse to sign the SRBC commitment letter so that Epsilon can

obtain the requisite water permitting, (2) deny Epsilon access to the Craige Well Pad that will be utilized to drill the Proposed Wells, and (3) challenge the PaDEP's decision to issue the drilling permits that enable the Proposed Wells to be drilled.

160.   CHK's continuing refusal to cooperate regarding the Proposed Wells, since it emerged from bankruptcy, constitutes a continuing material breach of the Settlement Agreement.

161.   Epsilon is being irreparably harmed and has no adequate remedy at law to enforce the Settlement Agreement other than specific performance.

162.   Monetary damages would be inadequate to compensate Epsilon for CHK's continuing violations of the Settlement Agreement because property rights are inherently unique and no two tracts of land are identical.

163.   Monetary damages would not allow Epsilon to carry out the same, unique exploration activities or prospects anywhere else.

164.   CHK's continuing breach of the Settlement Agreement, since its emergence from bankruptcy, have damaged the value of Epsilon's mineral interests in an amount that is speculative and difficult to determine.

165.   Epsilon needs to timely complete its proposed drilling activity while working conditions are adequate and support doing so, an extensive delay would change the factors Epsilon considered in forwarding the Well Proposals.

166.   The only adequate remedy for the continuing violation of Epsilon's rights (since CHK emerged from bankruptcy) is to compel CHK to specifically perform the terms and provisions of the Settlement Agreement.

WHEREFORE, Epsilon respectfully requests that this Court order CHK to specifically perform under the Settlement Agreement by requiring CHK to (1) allow Epsilon to access all co-owned assets — including (but not limited to) the Wyalusing Creek water withdrawal point, Marbaker Impoundment, and Craige Well Pad — in order to drill the Proposed Wells; (2) sign the SRBC commitment letter so that Epsilon may secure the required permits and use co-owned water sources to drill and operate the Proposed Wells; (3) withdraw its appeal of the issuance of the drilling permits that PaDEP issued in conjunction with the Proposed Wells; (4) otherwise reasonably cooperate with Epsilon so that it can drill the Proposed Wells; and (5) grant Epsilon such other and further equitable relief as it deems just and appropriate.

## COUNT III – SPECIFIC PERFORMANCE
### (JOAs)

167.   The allegations set forth in Paragraphs 1 through 160 are incorporated by reference as if fully set forth herein.

168.   The Baltzley North, Baltzley South, Craige, and Poulsen JOAs are binding contracts between CHK and Epsilon.

169. Since emerging from bankruptcy, CHK continuously asserts that it may it may unilaterally prevent Epsilon from drilling the Proposed Wells by refusing to participate and declining to serve as the operator.

170. Contrary to its assertion, CHK does not possess any such "veto power" under the JOAs.

171. Since emerging from bankruptcy, CHK is continuously preventing Epsilon drilling of the Proposed Wells by preventing access to the Craige Well Pad.

172. Since emerging from bankruptcy, CHK is continuously preventing Epsilon from using the jointly-owned Wyalusing Creek surface water withdrawal and associated Marbaker Impoundment for the drilling of the Proposed Wells by (among other actions) refusing to sign the SRBC commitment letter.

173. After emerging from bankruptcy, CHK challenged the PaDEP's decision to issue the drilling permits that enable the Proposed Wells to be drilled.

174. CHK does not have the authority to block access to the jointly-owned assets of Epsilon under the JOAs.

175. CHK's continued refusal to allow Epsilon access to jointly-owned assets and to sign the SRBC commitment letter, following CHK's emergence from bankruptcy, constitutes a continuing material breach of the JOAs which has prevented — and continues to prevent — Epsilon from proceeding with the Proposed Wells.

176. Further, the JOAs expressly incorporate a duty on the parties to act in good faith "in their dealings with each other with respect to activities" taken pursuant to the JOAs.

177. By opposing Epsilon's efforts to develop its property rights and meet the shared goal of production, following CHK's emergence from bankruptcy, CHK has continuously acted in bad faith.

178. Epsilon is being irreparably harmed and has no adequate remedy at law to enforce the JOAs other than specific performance.

179. Monetary damages would be inadequate to compensate Epsilon for CHK's continuing violations of the JOAs because property rights are inherently unique and no two tracts of land are identical.

180. Monetary damages would not allow Epsilon to carry out the same, unique exploration activities or prospects anywhere else.

181. CHK's continuing breaches of the JOAs have damaged the value of Epsilon's mineral interests in an amount that is speculative and difficult to determine.

182. Epsilon needs to timely complete its proposed drilling activity while working conditions are adequate and support doing so, an extensive delay would change the factors Epsilon considered in forwarding the Well Proposals.

183.   The only adequate remedy for the continuing violation of Epsilon's rights is to compel CHK to specifically perform the terms and provisions of the JOAs, including the provisions regarding the election to participate and operate Well Proposals. *See* Exhibit 1, Baltzley North JOA, Articles VI.1, V.2; Exhibit 2, Baltzley South JOA, Articles VI.1., V.2; Exhibit 3, Craige JOA, Articles VI.1, V.2; Exhibit 4, Poulsen JOA, Articles VI.1, VI.2.

WHEREFORE, Epsilon respectfully requests that this Court order CHK to specifically perform under the JOAs by requiring CHK to (1) allow Epsilon to access all co-owned assets — including (but not limited to) the Wyalusing Creek water withdrawal point, Marbaker Impoundment, and Craige Well Pad — in order to drill the Proposed Wells; (2) sign the SRBC commitment letter so that Epsilon may secure the required permits and use co-owned water sources to drill and operate the Proposed Wells; (3) withdraw its appeal of the issuance of the drilling permits that PaDEP issued in conjunction with the Proposed Wells; (4) otherwise reasonably cooperate with Epsilon so that it can drill the Proposed Wells; and (5) grant Epsilon such other and further equitable relief as it deems just and appropriate.

## COUNT IV – DECLARATORY JUDGMENT
### (The Koromlan Well)

184.   The allegations set forth in Paragraphs 1 through 177 are incorporated by reference as if fully set forth herein.

40

185.  Since emerging from bankruptcy, CHK continuously suggests that the Koromlan Well is a valid proposal — and should take priority over the Craig South Well that Epsilon proposed — even though the Craig South Well was previously proposed and received the required 100% Subscription to proceed.

186.  Article XVI.A.2(a)(1) of the JOAs states that a proposal for a horizontal well must include the date on which the operation will commence.

187.  Nowhere in the proposal for the Koromlan Well did CHK include the estimated commencement date.

188.  Article XVI(b) of the JOAs states that the proposal for a horizontal well must include the Authorized Objective, which is defined as the length of the later drain hole for the horizontal well.

189.  Nowhere in the proposal for the Koromlan Well did CHK include the Authorized Objective.

190.  Accordingly, CHK's proposal to drill the Koromlan Well is null, void, and of no effect under the JOAs because it does not comply with the requirements for a valid well proposal.

191.  An actual, present and justiciable controversy has arisen between Epsilon and CHK concerning whether the proposal for the Koromlan Well constitutes a valid well proposal under the JOAs.

WHEREFORE, Epsilon asks the Court to enter a judgment in its favor declaring that (1) CHK's proposal of the Koromlan Well does not comply with the requirements for a well proposal under the JOAs; (2) the Koromlan Well proposal is null, void, and of no effect; and (3) the defective proposal for the Koromlan Well does not restrict or otherwise interfere with Epsilon's right to drill the Proposed Wells.

Dated: June 1, 2021

Respectfully submitted,

/s/ *Gregory J. Krock*
Gregory J. Krock
Pa. I.D. No. 78308
Elizabeth M. Thomas
Pa. I.D. No. 322002

MCGUIREWOODS LLP
Tower Two-Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222-3142
(412) 667-6000 (Telephone)
(412) 667-6050 (Facsimile)
gkrock@mcguirewoods.com
ethomas@mcguirewoods.com

Jonathan T. Blank
*Pro Hac Vice*
MCGUIREWOODS LLP
652 Peter Jefferson Parkway
Suite 350
Charlottesville, VA 22911
(434) 977-2500 (Telephone)
(434) 980-2222 (Facsimile)

jblank@mcguirewoods.com

*Counsel for Plaintiff Epsilon Energy*
*USA, Inc.*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing

**Amended Complaint** has been electronically served on counsel of record via the

CM/ECF filing system.


/s/ Gregory J. Krock
Gregory J. Krock