## IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

EPSILON ENERGY USA, INC.,

     Plaintiff,

  v.

CHESAPEAKE APPALACHIA, LLC,

     Defendant.

Civil Action No. 1:21-cv-00658

District Court Judge Wilson

## STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Gregory J. Krock
Pa. I.D. No. 78308
Elizabeth M. Thomas
Pa. I.D. No. 322002

**McGUIREWOODS LLP**
Tower Two–Sixty
260 Forbes Avenue, 18th Floor
Pittsburgh, PA 15222–3142
(412) 667–6000 (Telephone)
(412) 667–6050 (Facsimile)
gkrock@mcguirewoods.com
ethomas@mcguirewoods.com

Jonathan T. Blank
Admitted *Pro Hac Vice*

**McGUIREWOODS LLP**
323 Second Street SE
Suite 700
Charlottesville, VA 22902
(434) 977–2500 (Telephone)
(434) 980–2222 (Facsimile)
jblank@mcguirewoods.com

*Counsel for Plaintiff Epsilon Energy USA, Inc.*

Plaintiff Epsilon Energy USA, Inc. ("Epsilon"), by and through its undersigned counsel, submits this Statement of Undisputed Material Facts in support of its Motion for Summary Judgment.

## I.   The JOAs

### a.  The Poulsen North and South JOA

1.      The Blanche Poulsen North and Blanche Poulsen South Units (the "Poulsen Units") are located in Susquehanna County, Pennsylvania.   Exhibit 1, Transcript of Henry Clanton Testimony, at 145:4-147:23; Exhibit 2, Epsilon Acreage Map; Exhibit 3 (identified below), Poulsen JOA, at Exhibits A, A-1.

2.      On February 1, 2010, Epsilon and Chesapeake Appalachia, LLC ("CHK") entered a Farmout Agreement that incorporated a draft model JOA that would apply to the assets contributed to the Farmout Agreement.   The Farmout Agreement is attached as Exhibit 3.

3.      Pursuant to the Farmout Agreement, CHK obtained a 50% interest in the assets Epsilon contributed, which included its interests in the Poulsen Units.   *Id.* at Exhibit A; Exhibit 1, at 158:13-25.

### b.  The Craige and Baltzley North and South JOAs

4.      The Baltzley South Unit is located in Susquehanna County, Pennsylvania. Exhibit 1, at 145:4-147:23; Exhibit 2; Exhibit 4 (identified below), at Exhibits A, A-1.

1

5.      On October 18, 2010, Epsilon, CHK, and other parties entered the Baltzley South Operating Agreement.  Baltzley South JOA, Exhibit 4.

6.      The Balzley North Unit is located in Susquehanna County, Pennsylvania. Exhibit 1, at 145:4-147:23; Exhibit 2; Exhibit 5 (identified below), at Exhibits A, A-1.

7.      On October 18, 2010, Epsilon, CHK, and other parties entered the Baltzley North Operating Agreement.  Baltzley North JOA, Exhibit 5.

8.      The Craige Unit is located in Susquehanna County, Pennsylvania. Exhibit 1, at 145:4-147:23, 164:15-18; Exhibit 2; Exhibit 6 (identified below), at Exhibits A, A-1.

9.      On December 16, 2010, Epsilon, CHK, and other parties entered the Craige Operating Agreement.[1]  Craige JOA, Exhibit 6.

   **c.  Proposals Under the JOAs**

10.      Under Articles VI.a and XVI of the JOAs, any party to the JOA (a "JOA Party" and collectively the "JOA Parties") is entitled to propose the drilling and completion of a new well (a "Well Proposal").  Michael Raleigh Testimony, Exhibit 7, 55:14-57:21.

---

[1] Collectively, the Poulsen, Baltzley, and Craige Operating Agreements will be referred to as the "JOAs."

11.     In order to fulfill the requirements of Article XVI, a party proposing a horizontal well must include: "(1) the estimated commencement date; (2) the proposed depth; (3) the objective formation or formations to be penetrated or tested; (4) the Authorized Objective, the surface and bottomhole locations, proposed directional operations; and (5) the estimated costs of the operation, including, but not limited to, the estimated costs of drilling, testing, and Completing or abandoning the well.   Operator's estimate of Completion costs should be included as an informational item."  Exhibits 3-6, Article XVI.A.2(a).

12.     The other JOA Parties may then elect whether they will consent to participate with their working interests or not consent to participate (either by responding or failing to respond).  *Id.* at Article VI.1.

13.     If less than all JOA Parties elect to participate, the proposing party is required to notify the other consenting JOA Parties of the working interests consenting and whether the proposing party recommends proceeding with the Well Proposal.  *Id.* at Article VI.2.(a).

14.     If less than all JOA Parties elect to participate and CHK elects to not consent and to not act as operator, the proposing party is required to notify the other consenting JOA Parties and give them the opportunity to select an operator from among the consenting JOA parties.  *Id.*

15.    The consenting JOA Parties may participate with their proportionate share or elect to absorb the proportionate share of the non-consenting JOA Parties. *Id.*

16.    If the proposing party does not withdraw the Well Proposal, the proposing party is deemed to be participating with any outstanding interests needed to equal 100 percent subscription.  *Id.*

17.    Once 100 percent subscription is attained, the JOA Party serving as the operator must commence operations in accordance with the Well Proposal.  *Id.* at Articles VI.2, XVI; Exhibit 7, at 57:22-61:15.

18.    Article XVI provides the JOA Parties with the ability to set a commencement of operations date for the drilling of a new well.  Exhibit 7, at 136:1-11; Exhibit 1, at 209:4-18.

19.    Article XVI, however, states "In the event of a conflict or inconsistency between the provisions of this Article XVI and any other provisions of this Agreement, the provisions of this Article XVI shall control and prevail."  Exhibits 3-6, at Article XVI.E.

### d.  Property Rights Under the JOAs

20.    Under the JOAs, each JOA Party agreed to contribute its interests in oil and gas leases and to jointly develop those leases as drilling units within the geographical areas set forth in the JOAs.  *Id.* at Article I.

21.    Each of the JOAs at issue covers a different pooled unit, which is identified as the "Contract Area." *Id.* at Article I.C.

22.    Each JOA is a stand-alone agreement that governs a different geographical Contract Area. *See generally, id.*

23.    The JOAs require that "any [ ] facility necessary for the operation and development of the Contract Area shall be included as an integral part of any proposed operation made under Article VI.B of this Agreement . . . . Facility includes, but is not limited to . . . water handling and disposal facilities located within the Contract Area and specifically applicable to the proposed operation." *Id.*, at Article XVI.B.

24.    The JOAs require that all JOA Parties be provided "full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account on the Contract Area." *Id.* at Article V.D.

25.    The parties further agreed that any Contract Area leases entered on behalf of the JOA Parties, were to be used "as may be necessary or convenient . . . to explore for, develop produce, measure, and market production from the Leasehold, and from adjoining lands . . . to drill, maintain, operate . . . wells; to use or install roads, electric power . . . and to construct pipelines with appurtenant facilities . . . to use oil, gas and non-domestic water sources, free of cost . . ; to operate, maintain, repair and remove material and equipment." *Id.* at Exhibit B.

26.     Further, costs and liabilities are shared by the JOA parties.

27.     The JOA Parties agreed that "the liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area." *Id.* at Article VII.A.

28.     Additionally, the JOA Parties agreed that

[u]nless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.

Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other burdens shall be payable by Operator, and Operator shall pay or deliver, or cause to be paid or delivered, all burdens on production from the Contract Area, provided Non-Operator elects to market its Oil and Gas with Operator under Operator's standard marketing letter agreement if Non-Operator elects to take its Gas in kind and separately market, then it shall bear and pay its proportionate share of all royalties and Operator shall have no obligation to distribute such burdens on behalf of Non-Operator.

*Id.* at Article III.B; Exhibit 1, at 203:17-204:9.

29.     Under Article III.B, the equipment and materials used for the operations on the Contract Area are owned by the working interest owners, the JOA Parties. *Id.*

6

## II.   Water Resources and Access

### a.  The Wyalusing Creek Water Withdrawal

#### i.  Epsilon's Relationship with Turm Oil

30.    The Wyalusing Creek Water Withdrawal ("Wyalusing Creek") is the water source for the wells drilled under the Craige JOA.  *See* SRBC Commitment Letter, Exhibit 8.

31.    While Epsilon's contractor (Turm Oil, Inc.) initially acquired the right to withdraw water from Wyalusing Creek from the Susquehanna River Basin Commission ("SRBC"), the Master Services Agreement between Turm Oil and Epsilon made clear that Epsilon maintained ownership of Wyalusing Creek even though the SRBC permit was issued in Turm Oil's name.  Exhibit 9, Master Services Agreement, at § 8; Exhibit 10, Docket No. 20081227; Exhibit 1, at 178:13-181:10.

32.    Turm Oil subsequently transferred the SRBC permit for Wyalusing Creek into Epsilon's name as of August 9, 2010.  *See* Notice of Request for Transfer, Exhibit 11.

#### ii.  Farmout Agreement

33.    In the Farmout Agreement, Epsilon conveyed an undivided one-half interest in Wyalusing Creek to CHK.  *See* Exhibit 3, at 1.1 ("Epsilon agrees to farmout and convey and Chesapeake agrees to acquire and accept an undivided fifty

percent (50%) interest . . . in all of the Properties for the Farmout Consideration . . . .").

34.     The Farmout Agreement explicitly states that the "Real Property Interests" include "[a]ll easements, *permits*, licenses, servitudes, rights of way and *all other rights and appurtenances on or used in connection with the Real Property Interests*, Wells or any interests pooled or unitized therewith including, without limitation, those easements and rights of way described on Exhibit 'A'."  Exhibit 3, at 1.1.9 (emphasis added); Exhibit 1, at 171:16-173:17.

35.     Exhibit A sets forth the "Real Property Interests" covered under the Farmout Agreement, including two Poulsen Wells (B. Poulsen #1H and B. Poulsen #2H) and the Hardic Well (Hardic #2H).  Exhibit 3, at Exhibit A; Exhibit 12, Affidavit of Henry Clanton, at 8.

36.     Epsilon utilized Wyalusing Creek to drill and support the Poulsen Wells and the Hardic Well.  Exhibit 12, Affidavit of Henry Clanton, at 6.

37.     Epsilon understood that the 50% interest it conveyed in "Real Property Interests" included its right to SBRC permits, including that for Wyalusing Creek, but that it also retained an undivided 50% interest in Wyalusing Creek.  Exhibit 1, at 172:22-174:10.

### iii.  The SRBC Permit for Wyalusing Creek

38.     The SRBC-issued permits for water sources are called dockets.  *See e.g.,* Exhibits 10, 13, 14 and 15.

39.     Wyalusing Creek is a water source that requires a SRBC permit/docket. *Id.*

40.     In March 2010, Epsilon transferred the jointly-owned SRBC permit evidencing the right to withdraw water from Wyalusing Creek into CHK's name. Exhibits 16, 17 (D. Ward Letter) (D. Ward Declaration).

41.     CHK did not pay any consideration to Epsilon in March 2010 in exchange for transferring the SRBC permit into CHK's name.  Exhibit 17 (D. Ward Declaration); Exhibit 1, at 189:20-190:1.

42.     Instead, Epsilon transferred the jointly-owned permit into CHK's name for administrative purposes because CHK would be serving as the operator under the Farmout Agreement — Epsilon conveyed the right to control and administer the SRBC docket/permit, but did not relinquish its undivided 50% ownership interest of Wyalusing Creek. JOAs.  Exhibit 17 (D. Ward Declaration); Exhibit 1, at 187:10-190:1.

43.     Epsilon understands that the SRBC does not allow more than one entity to be identified as the "owner" of an SRBC water permit.  Exhibit 1, at 189:7-190:1.

44.     Accordingly, Epsilon understood it was not possible to list both Epsilon and CHK as co-owners of the permit.  *Id.*

45.     When the SRBC issues a water permit, it expressly states that the permit does not establish that the named permittee possesses any property rights.  *See* Exhibit 11, Notice of Request for Transfer, at Decision ¶ 17 ("Commission approval confers no property rights upon the project sponsor.").

46.     Docket No. 20081227, which was originally in Turm Oil's name and transferred to Epsilon's name, was subsequently consolidated with CHK's SRBC permit identified as Docket No. 20090610.  Exhibits 10, 13 and 14 (Docket Nos. 20081227, 20090610, 20110607).

47.     That consolidating docket, Docket No. 20110607, clearly states that SRBC "approval confers no property rights upon the project sponsor."  Exhibit 14.

48.     A later docket, Docket No. 20121209, also in CHK's name, references and incorporates Docket No. 20081227:

> This approval is a renewal of a project originally approved under Commission Docket No. 20081227 [the original Turm Oil permit]. As a result of the transfer of Commission Docket No. 20090610, the project sponsor owned two approvals in close proximity to each other. The two approvals, Commission Docket Nos. 20090610 and 20081227, were subsequently consolidated into one approval for the combined quantity on June 23, 2011, under Commission Docket No. 20110607, and authorized to operate at the location reviewed and approved under Commission Docket No. 20081227. . . . The project sponsor has not requested any other changes to the features or quantity of the approved withdrawal, and no other charges are imposed with this renewal.

Exhibit 15, Docket No. 20121209.

49.    The SRBC confirmed that the coordinates and location of the water permit that Epsilon initially obtained (Docket No. 20081227) are the same coordinates that appear in the later consolidated dockets in CHK's name.  Exhibit 1, at 169:15-171:15, 181:25-187:9; Exhibit 18, SRBC e-mail chain with Paula Ballaron; Exhibit 19, Wyalusing Creek Photograph.

### b. The Marbaker Impoundment

50.    The consenting parties under the JOAs are required to pay their pro rata share of the expenses associated with the building, repair, and use of the water facilities used to develop the Contract Area.  CHK is subject to accounting audits to ensure that parties are accurately billed for such expenses.  *See* Exhibits 4-7, at Article VII. A ("Each party . . . shall be liable only for its proportionate share of the costs of developing and operating the Contract Area."); *see also* Stipulation of Parties Regarding Testimony of Lane Bond, Exhibit 20.

51.    A water impoundment — known as the Marbaker Impoundment — and related water facilities were constructed in order to utilize Wyalusing Creek to drill and further develop wells under the JOAs.  Exhibit 20 (Lane Bond Stipulation); Exhibit 2, at 166:2-167:12; Exhibit 21, picture of Marbaker Impoundment.

52.     Accordingly, Epsilon has paid the invoiced amounts issued by CHK in conjunction with water used in the operations of wells as permitted under the appropriate JOA procedures.  Exhibit 20 (Lane Bond Stipulation).

53.     Because CHK constructed and utilized the Marbaker Impoundment in order to develop jointly-owned wells under the JOAs, Epsilon is a co-owner of the Marbaker Impoundment.  Exhibit 20 (Lane Bond Stipulation).

54.     The water from Wyalusing Creek is the predominant source that feeds into the Marbaker Impoundment.  Exhibit 1, at 167:19-24.

### c.  The Craige Well Pad

55.     The consenting parties under the JOAs are also required to pay their pro rata share of the expenses associated with the building, repair, and use of the well pads that are used to develop the Contract Area.  CHK is subject to accounting audits to ensure that parties are accurately billed for such expenses.  *See* Exhibits 3-6, Article VII. A ("Each party . . . shall be liable only for its proportionate share of the costs of developing and operating the Contract Area."); Exhibit 20 (Lane Bond Stipulation).

56.     A well pad — known as the Craige Well Pad — was constructed in order to drill and further develop wells under the Craige JOA.  Exhibit 11 (Lane Bond Stipulation); Exhibit 2, 163:24-165:4 (description of Craige Well Pad photograph); Exhibit 22, Craige Well Pad Photograph.

57.     Accordingly, Epsilon has paid the invoiced amounts issued by CHK in conjunction with the construction of the Craige Well Pad under the appropriate JOA procedures.  Exhibit 20 (Lane Bond Stipulation).

58.     Because CHK constructed and utilized the Craige Well Pad in order to develop jointly-owned wells under the JOAs, Epsilon is a co-owner of the Craige Well Pad.  Exhibit 20 (Lane Bond Stipulation).

### III.     The 2018 Litigation and the Settlement Agreement

59.     In September 2018, Epsilon filed a complaint against CHK in this Court styled as *Epsilon Energy USA, Inc. v. Chesapeake Appalachia, L.L.C.*, No. 3:18-cv-01852.

60.     Among the allegations in that lawsuit, Epsilon asserted that CHK failed to follow the election processes in the JOAs at issue (which included the Baltzley South and Baltzley North JOAs) in order to improperly thwart Epsilon's efforts to propose and drill new wells.  *Id.* at ECF No. 1, at 13-14; Exhibit 7, at 72:8-22.

61.     The dispute in the prior lawsuit involved new wells that Epsilon had proposed.  *Id.*

62.     Epsilon had not proposed, and the dispute did not involve, work to be performed on existing wells.  *See generally*, *Epsilon Energy USA, Inc. v. Chesapeake Appalachia, L.L.C.*, No. 3:18-cv-01852, at ECF No. 1.

63.     Epsilon sought declaratory and injunctive relief, among other demands for relief, and filed a motion for preliminary injunction.  *Id.*

64.     Epsilon believed that for "all intents and purposes, [the previous litigation was] exactly the same [dispute] as what we're talking about [in this litigation]."  Exhibit 7, at 72:8-13

65.     Before the Court conducted an injunction hearing, the parties settled the dispute.    Settlement  Agreement  and  Release  entered  on  October  8,  2018 ("Settlement Agreement"), Exhibit 23.

66.     In the Settlement Agreement, CHK explicitly agreed:

(1)     "that Epsilon may propose wells under all of the JOAs between them, in accordance with the terms of the JOAs . . ."; and

(2)     "If [CHK] does not consent to a proposal and will not act as the operator of that proposal, [CHK] will cooperate with the party designated, to the extent permitted under the JOA, as operator, and will not unreasonably withhold  cooperation,  including  but  not  limited  to,  permitting  and access  to  co-owned  assets,  such  as  water  withdrawal  points  and impoundments."

*Id.* at ¶¶ 8, 8(d).

67.     Epsilon understood the language "designated to the extent permitted under the JOA," in the Settlement Agreement to mean that the "party designated as operator had to be one of the consenting parties to the JOAs" because the JOAs required that the designated operator (where CHK does not consent) have an interest in the new well.  Exhibit 7, at 82:20-83:23.

68.     CHK further agreed that, if CHK elects not to participate in a new well that Epsilon has proposed and declines to serve as the operator, CHK will nevertheless cooperate with the party designated as operator of that well.   In particular, CHK will assist with permitting and provide access to co-owned assets. *Id.*; Exhibit 7, at 83:24-85:23.

69.     Epsilon included a reference to cooperation to co-owned water withdrawal points "[b]ecause Chesapeake operates water surfaces, impoundment ponds, access roads, pad, all of the things that are required to be constructed to actually drill[ ] a well."  Exhibit 7, at 83:24-84:3.

70.     At the time the parties entered the Settlement Agreement, the only co-owned water withdrawal point at issue was Wyalusing Creek.  *Id.* at 84:10-85:5.

71.     At the time the parties entered the Settlement Agreement, the parties co-owned the Marbaker and Lewis Impoundments.  *Id.* at 85:20-23.

72.     Epsilon further understood that the Settlement Agreement was referring to the drilling of new wells, not work to be completed on existing wells.  *Id.* at 81:3-82:11.

73.     Epsilon also agreed under the Settlement Agreement to not propose the drilling of new wells until 2020.  Exhibit 12, at ¶¶ 8(d), 8(e); Exhibit 7, at 81:15-82:11.

74.     Epsilon did not propose the drilling of new wells until 2020.  Exhibit 7, at 81:15-82:11.

**IV.     Epsilon's December 2020 Well Proposals**

75.     In May 2020, Epsilon began discussions with CHK regarding new well proposals in the Auburn Development.  *See* E-Mail exchange attached hereto as Exhibit 24, May 12, 2020, H. Clanton to J. Woodard.

76.     In conjunction with these discussions, Epsilon shared its ideas for proposed wells at the Craige Well Pad, located in Rush Township, Susquehanna County, Pennsylvania.  *Id.* at May 26, 2020, H. Clanton to J. Woodard.

77.     Throughout June 2020, the parties continued to discuss the design and spacing of the wells that Epsilon desired to drill.  *Id.* at May–June 2020 E-mail Discussions, H. Clanton and J. Woodard.

78.     After an exchange between the parties regarding permitting, CHK requested further information on how Epsilon proposed to operate the wells.  *Id.* at September 28, 2020, J. Woodard to H. Clanton.

79.     Epsilon responded that it was "less interested in who operates the proposed program as long as we believe quality, safety and costs are controlled. We are prioritized on developing the Marcellus reserves in Auburn and the larger resource for the benefit of our shareholders."  *Id.* at September 28, 2020, H. Clanton to J. Woodard.

16

80.    Epsilon continued:

As we understand the JOA, CHK has the following options when well proposals are made by others. CHK can; consent and operate, non-consent but operate at the consenting parties request, or decline to operate.  In a scenario where CHK elects not to participate and declines to operate, the consenting party or parties have the right to operate.  We need to understand how CHK would transfer operatorship and cooperate with the designated operator, no matter whom.

An alternative approach could be to have one of the consenting parties serve as contract operator (drill/complete/flowback/turn-over to CHK @ TIL) with CHK remaining the operator of record.

Again, thank you for your attention to the resolution of this matter.  We understand development in Auburn may not be a priority to CHK both from a manpower resources and commercial perspective, however it is obviously important to EPSN.

*Id.* at September 28, 2020, H. Clanton to J. Woodard.

81.    After this exchange, the parties discussed various options for how to move forward with Epsilon's suggested wells.  *Id.* at September 29, 2020–October 14, 2020, H. Clanton to J. Woodard.

82.    On October 14, 2020, Epsilon advised CHK that Epsilon intended to move forward with the wells that Epsilon had suggested to ensure it could meet permitting timelines for those wells.  *Id.* at October 14, 2020, H. Clanton to J. Woodard.

83.    The next day, Epsilon reminded CHK that Article VI.2 of the JOAs enabled Epsilon to proceed with the wells even if CHK elected not to participate and

17

declined to serve as the operator of those wells. *Id.* at October 15, 2020, H. Clanton to J. Woodard.

84. In a separate communication, Epsilon provided CHK with further reason to move forward with Epsilon's suggested wells, noting that CHK would benefit from a 10% discount on the gathering rate. *See* Exhibit 25, October 16, 2020, M. Raleigh to J. Taylor.

85. Two months later, on December 16, 2020, Epsilon reiterated its plan to drill new wells on the Craige Pad. *Id.* at Dec. 16, 2020, M. Raleigh to J. Taylor.

86. CHK responded that there was "not much incentive to CHK to work a deal here" and indicated that CHK wanted to come up with a scenario where "Epsilon agrees not to propose" any additional wells. *Id.* at December 16, 2020 J. Taylor to M. Raleigh.

87. Epsilon responded that it would be willing to consider other options but that it intended to continue pursuing its opportunities as allowed under the JOAs. *Id.* at December 17, 2020 M. Raleigh to J. Taylor.

88. In response, CHK asserted that "CHK [was] not trying to prevent Epsilon from any rights that it may have under the JOA. We simply feel that there is no obligation on the part of CHK to drill these wells." *Id.* at December 18, 2020, J. Taylor to M. Raleigh.

89.    On December 22, 2020, Epsilon formally proposed four wells in accordance with the procedure set forth in the JOAs:  Craige N 1LH, Craige N 1UHC, Craige N 4UHC ("Craige North Wells") and Craige S 3LHC ("Craige South Well") to be located in Rush Township, Susquehanna County, Pennsylvania (the "Proposed Wells").  *See* Exhibit 26, an exemplar well proposal, Baltzley South Unit.

90.    In conjunction with the Proposed Wells, CHK could elect between three options:  (1) elect to participate in the drilling and completion of the Proposed Wells and to serve as the operator; (2) elect not to participate in the Proposed Wells but to serve as the operator; or (3) elect not to participate in the Proposed Wells and decline to serve as the operator.  *Id.*

91.    On January 19, 2021, CHK advised that it would not participate in the drilling of the Proposed Wells and would not serve as the operator.  CHK also asserted that Epsilon is not permitted to serve as the operator, and on that basis, refused to grant Epsilon access to the Craige Well Pad to drill the Proposed Wells.  *See* Exhibit 27, January 19, 2021 Non-Consent Letters, C. Moad to R. Collins.

92.    In a letter dated that same day (although it was not delivered to Epsilon until January 21, 2021), CHK purported to propose a new well known as the Koromlan 107HC ("Koromlan Well") that would be located in Rush Township, Susquehanna County, Pennsylvania.  *See* Exhibit 28, January 19, 2021 Koromlan Well Letter, C. Moad to R. Collins.

93.    CHK suggested that the Proposed Wells were in conflict "with the planned drilling of Chesapeake's Koromlan 107HC."  *Id.* at January 19, 2021 Koromlan Well Letter, C. Moad to R. Collins.

94.    On January 20, 2021, CHK further stated: "Chesapeake maintains the right to Operate the Craige pad site and associated wells, and hereby does not grant approval or authority to Epsilon, or anyone else, to Operate from referenced pad. . . . Subsequently, Chesapeake has plans to drill the Koromlan 107HC in early 2022, which is in conflict with Epsilon's proposed Craige S 3LHC.  As such, Chesapeake's well proposal will be forthcoming along with all elections for Epsilon's proposed wells." *See id.* at January 20, 2021, Scott Glenn to Mike Raleigh.

95.    On February 9, 2021, Epsilon provided CHK with the required notice that it had received 100% Subscription to proceed with the Proposed Wells.  *See* Exhibit 29, February 9, 2021 Epsilon's Notice of 100% Subscription.

96.    On February 11, 2021, Epsilon requested an update on the status of the letter that Epsilon needed CHK to sign so that Epsilon could obtain the water permit that it needed to drill the Proposed Wells (as discussed in Section V).  *See* Exhibit 30, February 11, 2021, R. Collins to C. Moad.

97.    Ten minutes later, CHK responded by (1) asserting that the JOAs do not allow Epsilon to drill a new well if CHK elects not to participate in that well and

(2) stating that CHK would not sign the letter that Epsilon needed to obtain a water permit for the Proposed Wells. *Id.* at February 11, 2021, J. Woodard to R. Collins.

98.    Epsilon responded:

It is hard for Epsilon to understand why Chesapeake takes the position of stopping production by claiming a super veto power that is counter to the JOAs or our prior Settlement Agreement.  It is not in good faith and in fact it is deemed to be in bad faith. Of course, Article VI2 allows for another Operator when the designated Operator will not agree to operate.  Again, your interpretation is not in good faith.

Epsilon is interested in promoting the production of the joined resources, which is one of the base reasons for entering a JOA.  Epsilon is furthering this interest by proposing wells that will be beneficial for the parties and has also been clear that it is willing to work with Chesapeake to ensure that Chesapeake can also proceed with its proposed well.  Epsilon has continued to act in good faith and seeks only to have Chesapeake recognize its rights under the JOA and the Settlement Agreement and stop Chesapeake's obstruction of developing the resources.  The first step in doing so is signing the SRBC letter, which Chesapeake has done in the past for other parties.  The next step is confirming that Chesapeake will provide Epsilon with access to the properties, and otherwise cooperate with Epsilon, so that Epsilon can fulfill its responsibilities with respect to the four currently-proposed wells for which it has been designated as the operator.

*Id.* at February 11, 2021, R. Collins to J. Woodard and C. Moad.

99.    Two minutes later, CHK responded: "Respectfully, this is not a good faith/bad faith discussion.  The plain language of the JOA does not allow for Epsilon to assume operatorship."  *Id.* at February 11, 2021, J. Tarantelli to R. Collins.

## V.    The SRBC Commitment Letter

100.   Previously, on July 1, 2020 — when Epsilon shared its development plans with CHK — Epsilon sought CHK's assistance in obtaining the requisite approval from the Pennsylvania Department of Environmental Protection ("PaDEP") and the SRBC for a water management plan.  Exhibit 24, July 1, 2020, H. Clanton to J. Woodard (noting that "Operators are required to submit a Water Management Plan for approval.").

101.   In accordance with its rights under the JOAs, Epsilon intends to use the jointly-owned Marbaker Impoundment and jointly-owned Craige Well Pad to drill the Proposed Wells.  Exhibit 1, at 166:5-167:12; 195:3-197:19; 200:13-23.

102.   On September 18, 2020, Epsilon sent CHK a draft SRBC commitment letter, which CHK was required to execute in order for Epsilon to be able to use Wyalusing Creek (as the SRBC permit is issued in CHK's name) and the Marbaker Impoundment.  Exhibit 24, at September 18, 2020, H. Clanton to J. Woodard.

103.   On September 25, 2020, Epsilon reiterated that it needed CHK to sign the SRBC commitment letter in order for Epsilon "to move forward with [Epsilon's] well permitting. It's a simple one page, self-explanatory form."  Exhibit 24, at September 25, 2020, H. Clanton to J. Woodard.

104.   On September 28, 2020, Epsilon contacted CHK once again about the SRBC commitment letter, and this time referenced the parties' obligations under the Settlement Agreement (which expressly required CHK to provide access to jointly-

owned assets and water sources).  Exhibit 24, at September 28, 2020, H. Clanton to J. Woodard.

105.   On September 29, 2020, CHK stated that, until Epsilon was named as the operator of any formally-proposed wells, CHK would not sign the SRBC commitment letter.  Exhibit 24, at September 29, 2020, J. Woodard to H. Clanton.

106.   After making its formal proposal in December 2020, Epsilon renewed its efforts to obtain the water permit necessary to drill the Proposed Wells.  *See* E-mail exchange attached hereto as Exhibit 31, January 29, 2021, G. Miller to W. Jenko.

107.   Epsilon sought assistance from the SRBC regarding its Well Proposals. Exhibit 1, at 194:1-11; Exhibit 31, E-mail with Glenda Miller.

108.   The SRBC informed Epsilon that it was required to obtain a SRBC Commitment Letter from CHK for use of Wyalusing Creek , which feeds into the Marbaker impoundment that is needed to drill the new wells.  Exhibit 1, at 194:12-21, 196:25-197:17; Exhibit 31, E-mail with Glenda Miller.

109.   On January 29, 2021, the SRBC provided Epsilon with a commitment letter that CHK had recently used to obtain a similar approval.  *See* Exhibit 31, January 29, 2021, G. Miller to W. Jenko.

110.   Using the commitment letter that CHK had recently used, Epsilon prepared a draft commitment letter (to be signed by CHK) that would enable Epsilon

to utilize the right to withdraw water from Wyalusing Creek — an asset that Epsilon co-owns with CHK — to drill the Proposed Wells.

111.   The language provided by the SRBC formed the basis of the SRBC Commitment Letter that Epsilon requested CHK sign.  Exhibit 1, at 193:8-197:19; Exhibit 8, SRBC Commitment Letter.

112.   After reviewing the draft letter, the SRBC confirmed that it was acceptable and would enable Epsilon to obtain the water permit that it required for the Proposed Wells.  *See* Exhibit 31, January 29, 2021, G. Miller to W. Jenko.

113.   On February 9, 2021, Epsilon sent the proposed letter to CHK for execution so that Epsilon could finalize the permitting for its Proposed Wells. Exhibit 30, February 9, 2021, R. Collins to J. Woodard.

114.   On February 11, 2021, CHK advised that it would not sign the SRBC commitment letter.  CHK reiterated its position that, because CHK had not elected to participate, Epsilon could not proceed with its Proposed Wells.  Exhibit 30, February 11, 2021, J. Woodard to R. Collins.

115.   Furthermore, CHK made clear in its communications with Epsilon that it would not grant Epsilon access to the Craige Well Pad in order to drill the Proposed Wells.  Exhibit 27, January 19, 2021 Non-Consent Letter, C. Moad to R. Collins.

116.   The PaDEP is requiring Epsilon to have the SRBC Commitment Letter signed by CHK in order to obtain approval for the consumptive use of water on the Craige well pad.  Exhibit 1, at 195:12-17.

117.   Epsilon also requested that CHK enter a water sharing agreement because Epsilon understood that the SRBC prefers to have a defined agreement between the parties regarding water usage and Epsilon wanted to ensure it had defined parameters for usage for both parties.  Exhibit 1, at 195:18-196:6.

118.   Without SRBC's approval, Epsilon cannot move forward with drilling the wells proposed in the Wells Proposals.  *Id.* at 197:15-19.

## VI.   Epsilon's May 2021 Well Proposals

119.   On May 14, 2021, this Court issued an opinion and order in which it concluded that the proposals Epsilon submitted on December 23, 2020 to drill the Proposed Wells had expired.

120.   On May 26, 2021, Epsilon formally re-proposed the drilling of the Proposed Wells.  *See* Four Well Proposals collectively attached hereto as Exhibit 32.

## VII.   Wells CHK Proposed and Drilled Under the JOAs

121.   CHK has drilled at least four wells for which it did not have 100% participation of the JOA parties.  Exhibit 7, at 48:4-50:10.

25

122.   For example, CHK submitted a proposal on or about May 27, 2020 to drill the Maris 22HC well.  Exhibit 7, at 66:13-71:7; Exhibit 33, Maris 22HC Well Proposal.

123.   The language provided for in CHK's Maris 22HC Well Proposal mirrored the language in Article VI.2 of the JOAs.  Exhibit 7, at 66:13-71:7.

124.   One or more of the JOA Parties did not consent to participate in the Maris 22HC well.  Exhibit 7, at 66:13-71:7.

125.   CHK drilled the Maris 22HC well even though not all of the JOA Parties had consented to participate in that well.  *Id.*

126.   The same is true for three other wells, one of which Epsilon itself was unable to participate.  Exhibit 7, at 48:4-50:10; Exhibits 34-36 (well proposals and responses for the Cook N SUS 2H well, the Maris 123HC well, and the Przbyszewski 1HC well).

Dated: September 10, 2021

Respectfully submitted,

/s/    *Gregory J. Krock*
Gregory J. Krock
Pa. I.D. No. 78308
Elizabeth M. Thomas
Pa. I.D. No. 322002

MCGUIREWOODS LLP
Tower Two-Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222-3142
(412) 667-6000 (Telephone)
(412) 667-6050 (Facsimile)
gkrock@mcguirewoods.com
ethomas@mcguirewoods.com

Jonathan T. Blank
Admitted *Pro Hac Vice*
MCGUIREWOODS LLP
323 Second Street SE
Suite 700
Charlottesville, VA 22902
(434) 977-2500 (Telephone)
(434) 980-2222 (Facsimile)
jblank@mcguirewoods.com

*Counsel for Plaintiff*
*Epsilon Energy USA, Inc.*

## **<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that a true and correct copy of the foregoing **Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Summary Judgment** has been electronically served on the parties via the CM/ECF filing system.

*/s/ Gregory J. Krock*
Gregory J. Krock

28