# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

EPSILON ENERGY USA, INC.,      :    Civil No. 1:21-CV-00658

             :

        Plaintiff,         :

             :

        v.            :

             :

CHESAPEAKE APPALACHIA, LLC,  :

             :

        Defendant.      :    Judge Jennifer P. Wilson

## MEMORANDUM

This is a diversity action that calls upon the court to interpret the language of several contracts between two oil and gas companies. The case is presently before the court on a motion to dismiss filed by Defendant Chesapeake Appalachia, LLC ("Chesapeake"). For the reasons that follow, the motion to dismiss is granted.

### BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Epsilon Energy USA, Inc. is an Ohio corporation with its principal place of business in Texas. (Doc. 4, ¶ 1; Doc. 72, ¶ 1.) Chesapeake is an Oklahoma corporation with its principal place of business in that state. (Doc. 4, ¶ 4; Doc. 72, ¶ 4.) Beginning in 2009, Epsilon, Chesapeake, and several other oil and gas companies entered into several Joint Operating Agreements ("JOAs") for the purpose of developing natural gas at locations in Pennsylvania.[1]

---

[1] The four JOAs relevant to this case are the Baltzley North JOA, dated October 18, 2010, the Baltzley South JOA, dated October 18, 2010, the Craige JOA, dated December 16, 2010, and the Poulsen JOA, which was a draft model JOA that was subsequently incorporated into the Farmout

Chesapeake is designated as the operator under the JOAs, which accordingly requires Chesapeake to "conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of [the JOAs]". (JOAs, Art. V.A.) Chesapeake may be permanently removed as operator under a JOA for good cause upon the affirmative vote of the other parties to the JOA that own a majority interest of the property that is subject to the JOA. (JOAs, Art. V.B.1.) In order for such a vote to be effective, a written notice must be provided to Chesapeake detailing its alleged defaults as operator. (*Id.*) Chesapeake then has thirty days in which to cure such defaults. (*Id.*)

Although Chesapeake is the operator, the JOAs provide that any party to the JOAs may propose the drilling of a new well or propose a project to rework, sidetrack, deepen, recomplete, or plug back a well. (*Id.* Art. VI.1.) A party proposing such work is required to provide the other JOA parties that "have not otherwise relinquished their interest in [the] objective Zone" of the proposal with written notice of the proposal "specifying the work to be performed, the location,

---

Agreement between Epsilon and Chesapeake. The court may consider the language of the JOAs in resolving the instant motion to dismiss because they are attached as exhibits to Epsilon's amended complaint and are explicitly relied upon in the amended complaint. (*See* Doc. 96 and attached exhibits.) Because the parties agree that the relevant provisions of the JOAs are legally indistinguishable from one another, *see* Transcript of Preliminary Injunction Hearing, May 11, 2021, pp. 90–91, the court will cite the four JOAs collectively as "JOAs" throughout the remainder of this opinion.

proposed depth, objective Zone, and the estimated cost of the operation." (*Id.*)
The other parties receiving notice have thirty days after receipt of the notice
"within which to notify the party proposing to do the work whether they elect to
participate in the cost of the proposed operation." (*Id.*)

The JOAs require different procedures for projects that have received the
unanimous consent of the JOA parties and projects that have not received
unanimous consent. When a project has received unanimous consent:

> the parties shall be contractually committed to participate therein
> provided such operations are commenced within the period hereafter
> set forth, and Operator shall, no later than ninety (90) days after
> expiration of the notice period of thirty (30) days (or as promptly as
> practicable after the expiration of the forty-eight (48) hour period when
> a drilling rig is on location, as the case may be), actually commence the
> proposed operation and thereafter complete it with due diligence at the
> risk and expense of the parties participating therein; provided, however,
> said commencement date may be extended upon written notice of same
> by Operator to the other parties, for a period of up to thirty (30)
> additional days if, in the sole opinion of Operator, such additional time
> is reasonably necessary to obtain permits from governmental
> authorities, surface rights (including rights-of-way) or appropriate
> drilling equipment, or to complete title examination or curative matter
> required for title approval or acceptance. If the actual operation has not
> been commenced within the time provided (including any extension
> thereof specifically permitted herein or in the force majeure provisions
> of Article XI) and if any party hereto still desires to conduct said
> operation, written notice proposing same must be resubmitted to the
> other parties in accordance herewith as if no prior proposal had been
> made.

(*Id.* Art. VI.1.) When, on the other hand, a proposal receives less than unanimous
support:

3

the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2 [sic], shall comply with all terms and conditions of this agreement.

(*Id.* Art. VI.2(a).)

In 2018, a dispute arose over whether Chesapeake was complying with the JOAs with regard to wells proposed by Epsilon. The dispute led to Epsilon filing suit against Chesapeake in this district in September 2018. (*See Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, No. 3:18-CV-01852 (M.D. Pa. filed Sept. 20, 2018) [hereinafter *Epsilon I*].) Epsilon moved for preliminary injunctive relief in the suit. (*Epsilon I*, Doc. 2.) United States District Judge Malachy E. Mannion scheduled the case for a preliminary injunction hearing. (*Epsilon I*, Doc. 17.) Before the court conducted the hearing, however, the parties settled the case. (Doc. 96-8 [hereinafter Settlement Agreement].)

4

As part of the Settlement Agreement, the parties agreed that Epsilon could propose new wells under the JOAs "in accordance with the terms of the JOAs." (*Id.* ¶ 8.) The parties further agreed that if Chesapeake did not consent to a proposal and did not agree to act as the operator, Chesapeake would "cooperate with the party designated, to the extent permitted under the JOA, as operator" and would "not unreasonably withhold cooperation, including but not limited to, permitting and access to co-owned assets, such as water withdrawal points and impoundments." (*Id.* ¶ 8.d.)

The present dispute began when Epsilon formally proposed four new wells on December 22, 2020, which would be located on the Craige Well Pad in Rush Township, Susquehanna County. The proposed wells were labeled as Craige N 1LH, Craige N 1UHC, Craige N 4UHC (collectively, "the Craige North Wells"), and Craige S 3LHC ("the Craige South Well"). (*Id.*)

On January 19, 2021, Chesapeake advised that it would not participate in the drilling of the proposed wells and that it would not serve as the operator on the projects. (Doc. 1, ¶ 80.) Chesapeake also stated its position that Epsilon was not allowed to serve as the operator with regard to the proposed wells and refused to grant Epsilon access to the Craige Well Pad on that basis. (*Id.*) In a separate communication on January 19, 2021, Chesapeake proposed a separate well, labeled the Koromlan 107HC ("Koromlan Well"), which Chesapeake asserted would

5

conflict with the proposed Craige Wells. (Doc. 1, ¶¶ 81–82.) Chesapeake announced plans to drill the Koromlan Well in January 2022. (*Id.* ¶ 83.)

Subsequent to the proposal of the Craige Wells, Epsilon sent a draft commitment letter ("SRBC Letter") to Chesapeake that sought confirmation that Chesapeake was willing to provide water to Epsilon for the Craige Wells in accordance with permits that Chesapeake held with the Susquehanna River Basin Commission ("SRBC"). (*See* Doc. 96-9, p. 2 [hereinafter SRBC Letter].) Chesapeake informed Epsilon on February 11, 2021 that it would not sign the letter. (Doc. 1, ¶ 98.)

Epsilon brought suit against Chesapeake on March 10, 2021, seeking a declaration that if Chesapeake does not participate in the proposed Craige Wells, Epsilon has the right to drill the wells, Chesapeake is required to allow Epsilon to access and use jointly owned assets, and Chesapeake must cooperate with the operator of the proposed wells in order to facilitate the drilling of the wells. (*See Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, No. 1:21-CV-00433 (M.D. Pa. filed Mar. 10, 2021) [hereinafter *Epsilon II*].) The complaint also brought claims for breach of the parties' JOAs and breach of the parties' settlement agreement in *Epsilon I*, sought a declaration that Chesapeake's proposed Koromlan Well did not comply with the terms of the JOAs, and sought specific performance and injunctive relief. (*Epsilon II*, Doc. 5.)

Epsilon filed a motion for preliminary injunction in *Epsilon II* on March 10, 2021. (Doc. 7.) The court conducted a status conference with the parties on March 26, 2021 to discuss a briefing schedule for the preliminary injunction motion and to schedule a hearing on the motion. During that call, the parties discussed the fact that Chesapeake's filing for Chapter 11 bankruptcy was currently being litigated in the United States Bankruptcy Court for the Southern District of Texas ("the Bankruptcy Court") and that Chesapeake had recently filed a motion for emergency relief in the Bankruptcy Court seeking to enjoin Epsilon from proceeding with a suit against Chesapeake in this district.

Following the March 26, 2021 conference, the court issued a scheduling order that set a briefing scheduled for Epsilon's motion for preliminary injunction, scheduled a preliminary injunction hearing, and set an expedited schedule for letter briefs on the issue of whether Chesapeake should be compelled to sign the SRBC Letter. (*Epsilon II*, Doc. 25.)

The Bankruptcy Court granted Chesapeake's motion for emergency relief on March 30, 2021, ordering Epsilon to dismiss the case in this district without prejudice and specifying that Epsilon could refile the case subject to conditions laid out by the Bankruptcy Court. (*See Epsilon II*, Doc. 30-1; *see also In re Chesapeake Energy Corp.*, No. 20-33233 (Bankr. S.D. Tex. hearing held Mar. 30, 2021).) Epsilon complied with the Bankruptcy Court's order on April 5, 2021, and

filed a notice of voluntary dismissal.  (*Epsilon II*, Docs. 31–32.)  This court accepted the notice of voluntary dismissal on April 6, 2021, and formally closed the case.  (*Epsilon II*, Doc. 33.)

Epsilon filed the instant case three days later, on April 9, 2021, moving for a preliminary injunction and expedited discovery on the same day.  (Docs. 4–5, 7.) On April 12, 2021, the court scheduled a status conference for April 19, 2021. (Doc. 13.)  Prior to the conference, Epsilon filed a letter brief on the SRBC Letter issue in conformity with the requirements that the court had previously imposed in *Epsilon II*.  (Doc. 15.)  The court accordingly set an expedited schedule for an opposition letter brief and reply letter brief on that issue.  (Doc. 16.)

On April 16, 2021, Chesapeake moved to dismiss the case for failure to join an indispensable party under Federal Rule of Civil Procedure 12(b)(7).  (Doc. 22.) The motion sought dismissal on the grounds that Epsilon had failed to join the other parties to the JOAs, which Chesapeake contended were indispensable parties under Federal Rule of Civil Procedure 19.  (*Id.*)

On April 26, 2021, the court denied Chesapeake's motion to dismiss for failure to join an indispensable party, concluding that the absent JOA parties were necessary parties under Federal Rule of Civil Procedure 19(a), but that they were not indispensable parties under Rule 19(b).  (Docs. 33–34.)  On April 27, 2021, the court denied Epsilon's request for preliminary injunctive relief on the SRBC Letter

issue without prejudice, concluding that Epsilon had not shown a sufficient likelihood of success on the merits as to that issue. (Docs. 44–45.) The court then denied Epsilon's motion for expedited discovery on May 3, 2021. (Docs. 50–51.)

Following a preliminary injunction hearing on May 11 and May 12, 2021, the court denied the motion for preliminary injunction on May 14, 2021. (Docs. 81, 89.)[2] The court found that Epsilon's well proposals had expired, and that Epsilon therefore had not shown a likelihood of success on the merits. (Doc. 89.) Given that conclusion, the court declined to decide whether Article VI.2(a), which specifies the procedures for certain projects receiving less than unanimous support from JOA parties, could apply to proposals to drill new wells. (*Id.* at p. 4 n.4.)

Following the denial of its motion for preliminary injunction, Epsilon reproposed the four Craige Wells on May 26, 2021. (*See* Doc. 104, ¶ 129.) Epsilon then moved for leave to amend its complaint on June 7, 2021, seeking to add allegations based on the reproposed wells. (Doc. 96.) Chesapeake opposed the motion, Doc. 98, and in response to Chesapeake's opposition, Epsilon conceded that Count IV of the proposed amended complaint could be dismissed along with the portions of Counts I–III that pertained to the Craige South Well. (Doc. 101, p. 9.) The court granted the motion for leave to amend on July 2, 2021, allowing

---

[2] Doc. 89 is a corrected version of the court's memorandum that was issued to correct typographical errors in the original version.

Epsilon to file its proposed amended complaint, but dismissing Count IV of the amended complaint and Counts I–III to the extent that they were based on the Craige South Well. (Docs. 102–03.) Epsilon's amended complaint was filed later that day. (Doc. 104.)

Chesapeake filed the instant motion to dismiss on July 16, 2021, *see* Doc. 109, and then filed a brief in support of the motion on July 30, 2021. (Doc. 110.) The primary issue that Chesapeake raises in its motion to dismiss is the one that the court deferred ruling on in resolving the motion for preliminary injunction: whether Article VI.2(a) of the JOAs could be used to shift operators for the drilling of new wells. (*Id.* at 13–14.) Chesapeake argues that the plain language of Article VI.2(a) limits operator shifting to proposals to rework, sidetrack, deepen, recomplete, or plug back an existing well and accordingly does not allow for operator shifting for the drilling of a new well. (*Id.*) Chesapeake also argues that even if Article VI.2(a) does allow operator shifting for new wells, Epsilon's amended complaint should still be dismissed because Epsilon has failed to allege that it has completed the necessary conditions precedent in order to complete such an operator shift under the terms of the JOAs. (*Id.* at 8–12.)

Epsilon opposes the motion to dismiss, arguing that the language of Article VI.2(a) allows operator shifting for new wells and that it has not failed to allege any conditions precedent for such operator shifting. (Doc. 111.) Chesapeake

responded to these arguments in a reply brief on August 19, 2021. (Doc. 112.) With briefing on the motion complete, it is now ripe for the court's review. The court considers the parties' arguments in more detail below.

## JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1332, which allows a district court to exercise subject matter jurisdiction where the parties are citizens of different states and the amount in controversy exceeds $75,000.

## STANDARD OF REVIEW

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Conclusory allegations of liability are insufficient" to survive a motion to dismiss. *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678–79). To determine whether a complaint survives a motion to dismiss, a court identifies "the elements a plaintiff must plead to state a claim for relief," disregards the allegations "that are no more than conclusions and thus not entitled to the assumption of truth," and determines

whether the remaining factual allegations "plausibly give rise to an entitlement to relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).

DISCUSSION

### A. The Operator-Shifting Language of Article VI.2(a) Does Not Support Dismissal of the Complaint

Chesapeake's motion to dismiss calls upon the court to interpret the language of the parties' JOAs. When interpreting a contract under Pennsylvania law, the court's task is to determine the intent of the parties and give effect to all of the provisions of the contract. *Capek v. Devito*, 767 A.2d 1047, 1050 (Pa. 2001) (citing *Commonwealth of Pa., Dep't of Transp. v. Manor Mines, Inc.*, 565 A.2d 428, 432 (1989)). The contract should be read as a whole, and one part of the contract cannot be interpreted in a way that would annul another part of the contract. *Commonwealth ex rel. Shapiro v. UPMC*, 208 A.3d 898, 911 (Pa. 2019) (citing *Commonwealth ex rel. Kane v. UPMC*, 129 A.3d 441, 463–64 (Pa. 2015)).

The court can interpret the contract as a matter of law if there is only one reasonable interpretation of the contract. *Wayne Land & Mineral Grp. LLC v. Del. River Basin Comm'n*, 894 F.3d 509, 528 (3d Cir. 2018) (citing *Allied Erecting & Dismantling, Co., Inc. v. USX Corp.*, 249 F.3d 191, 201 (3d Cir. 2001)). Where, on the other hand, the contract is susceptible to more than one reading, the proper

12

interpretation of the contract must be determined by the finder of fact. *Id.* (citing

*Allied Erecting*, 249 F.3d at 201).

The court will first consider Chesapeake's argument that the complaint

should be dismissed because Epsilon's claims are foreclosed by the plain language

of Article VI.2(a) of the JOAs. Article VI.2(a) provides in relevant part:

> If any party to whom such notice to Rework, Sidetrack, Deepen, Recomplete or Plug back is delivered as provided in Article VI.B.1 [sic] or VI.C.1 (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2. [sic], shall comply with all terms and conditions of this agreement.

(JOAs, Art. VI.2(a).)

Chesapeake argues that the language of Article VI.2(a) expressly limits its

operator-shifting provision to situations in which a party proposes work to

"rework, sidetrack, deepen, recomplete or plug back" a well. (Doc. 110, p. 14.)

Chesapeake argues that Article VI.2(a) therefore does not apply to this case

because Epsilon proposes new wells rather than work on existing wells. (*Id.*)

Epsilon argues that such a reading is "inconsistent with a common sense

reading of the JOAs, the other provisions of the JOAs, and [Chesapeake's] own

conduct" for three reasons. (Doc. 111, p. 16.) First, Epsilon argues that "the first

sentence of Article VI.2(a) is an if/then clause," meaning that the language "to

rework, sidetrack, deepen, recomplete or plug back" does not modify "the type of

operations that less than all parties may pursue, but instead, only establishes a time

limit for the enumerated operations." (*Id.*) In other words, "[t]he modification

retains the 90-day commencement period for the listed operations but carves the

drilling of new wells out of the 90-day limitation." (*Id.* at 16–17.)

Second, Epsilon argues that other subsections of Article VI confirm that "(1)

proposals to drill new wells may proceed even if there is less than 100%

participation and (2) one of the consenting parties may act as the operator if CHK

elects not to conduct the drilling." (*Id.* at 17.) Epsilon specifically points to

portions of Articles VI.2(b), VI.2(c), VI.2(d), VI.4, VI.5, VI.C.1, and VI.E, as

sections of Article VI that specifically refer to drilling and argues that "the Court

cannot interpret the JOAs in a manner that would render these provisions a

nullity." (*Id.* at 18–19.)

Third, Epsilon argues that Chesapeake's own conduct is inconsistent with its argument because Chesapeake has "proposed and drilled other wells, as recently as 2020, without 100% participation," which runs contrary to Chesapeake's argument that "Article VI.2 does not apply to the drilling of new wells." (*Id.* at 19.)

Having reviewed the language of Article VI and the parties' arguments, the court will deny this portion of the motion to dismiss because the contract is susceptible to more than one reasonable reading as to whether Article VI.2(a) allows operating shifting for the drilling of a new well.

Chesapeake's reading of Article VI.2(a) is reasonable because the first sentence of Article VI.2(a) seems to specifically limit its scope to situations in which a party has proposed work "to Rework, Sidetrack, Deepen, Recomplete or Plug Back" an existing well. (JOAs, Art. VI.2(a).)

Although Epsilon argues that the relevant language in the first sentence of Article VI.2(a) is part of an "if/then clause" that sets a time limit for proposals to rework, sidetrack, deepen, recomplete, or plug back a well but does not modify the types of operations that can be pursued, the second sentence of Article VI.2(a) forecloses Epsilon's reading. That sentence provides that "Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work

15

required by *such proposed operation* for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to *perform such work*." (JOAs, Art. VI.2(a) (emphasis added).) The pronoun "such" refers to "someone or something that has been or is being stated, implied, or exemplified." *Such*, MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY, https://unabridged.merriam-webster.com/unabridged /such (last visited Aug. 25, 2021). Thus, for the second sentence of Article VI.2(a) to have a coherent meaning, "such" must refer back to an antecedent "that has been . . . stated, implied, or exemplified." *See id.* Because no such antecedent is present in the second sentence of Article VI.2(a), "such" logically must refer back to the first sentence, and the only "proposed operation" or "work" mentioned in the first sentence is a proposal to "Rework, Sidetrack, Deepen, Recomplete or Plug Back" an existing well. Thus, Chesapeake's reading of Article VI.2(a) as limiting operator shifting to situations in which a party has proposed work on an existing well is a reasonable interpretation of the contract.

Epsilon, however, also proposes a reasonable interpretation of the contract that would *not* limit operator shifting under Article VI.2(a) to work on an existing well. Specifically, Epsilon argues that operator shifting for the drilling of new wells must be allowed under Article VI.2(a) because a contrary reading of Article VI.2(a) would render the language of Article VI.2(b) a nullity. (Doc. 111, pp. 18–19.) Article VI.2(b) states in relevant part:

16

> If any well *drilled,* Reworked, Sidetracked, Deepened, Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, *and the well shall then be turned over to Operator (if the Operator did not conduct the operation)* and shall be operated by it at the expense and for the account of the Consenting Parties.

(JOAs, Art. VI.2(b) (emphasis added).)

The emphasized language of Article VI.2(b) clearly contemplates situations in which a drilling operation is completed without the operator conducting the operation. It is reasonable to infer from this language that a party consenting to a drilling proposal may be temporarily designated to act as operator in Chesapeake's place. Article VI.2(a) is the only temporary operator-shifting provision in the JOAs, so it is therefore reasonable to read Article VI.2(a) as allowing operator-shifting for the drilling of new wells.

Thus, because the parties present conflicting readings of Article VI.2(a) that are both reasonable interpretations of the contract, the court cannot decide this issue as a matter of law. *Wayne Land & Mineral Grp.*, 894 F.3d at 528. The motion to dismiss is therefore denied to the extent that it seeks dismissal as a matter of law based on the operator-shifting provision of Article VI.2(a).

### B. Whether Epsilon Has Alleged Sufficient Conditions Precedent

Chesapeake raises two additional arguments as to why its motion to dismiss should be granted even if the court accepts Epsilon's reading of Article VI.2(a).

Specifically, Chesapeake argues that Epsilon has failed to allege two conditions precedent that are necessary in order to complete an operator shift under Article VI.2(a). (Doc. 110, p. 8.) The court considers these arguments seriatim.

### 1. The JOAs Do Not Condition Operator Shifting on the Action of Multiple Consenting Parties

Chesapeake argues that a consenting party may only be designated as operator for a proposed well by the action of multiple consenting parties, rather than the actions of a single consenting party. (Doc. 110, pp. 9–11.) The relevant language of the JOAs states:

> [I]f Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work.

JOAs, Art. VI.2(a). Chesapeake argues that the amended complaint should be dismissed based on this language because no other JOA parties have consented to the Craige North Wells, and Epsilon therefore cannot be designated as operator by the action of multiple consenting parties. (Doc. 110, pp. 9–11.)

Epsilon argues to the contrary that under the terms of the JOAs, words used in the singular include the plural and words used in the plural include the singular, unless the context clearly suggests otherwise. (Doc. 111, pp. 20–21; *see* JOAs,

Art. I.)  Thus, Epsilon argues, it should be allowed to designate itself as the operator on a proposal for which it is the only consenting party.  (Doc. 111, p. 21.)

Cheapeake argues that the context of Article VI.2(a) shows that the plural "Consenting Parties" should not be understood to include a single consenting party because the JOA parties carefully distinguished in the article between "Consenting Parties, a Non-Consenting Party, one of the Consenting Parties, any Consenting Party, and a Consenting Party."  (Doc. 112, p. 6.)

The court agrees with Epsilon that the JOAs do not condition operator shifting on the action of multiple consenting parties.  As Epsilon notes, references to a plural in the JOAs should be understood to include the singular unless the context clearly suggests otherwise, and the court does not find that the context of Article VI.2(a) clearly refutes the presumption that the plural should be understood to include the singular.  To the contrary, the language of Article VI.2(a) suggests that situations could arise in which the proposing party is the only consenting party.  (*See* JOAs, Art. VI.2(a) ("[I]n order to be entitled to the benefits of this Article, *the party or parties giving the notice* and such other parties as shall elect to participate in the operation shall . . . actually commence the proposed operation and complete it with due diligence." (emphasis added)).)  Accordingly, Chesapeake's argument is rejected.

## 2. Epsilon Has Not Complied with the JOAs' Timing Requirements

Chesapeake's other condition precedent argument is based on the timing requirements of Article VI.2(a). Article VI.2(a) states that in order to be entitled to the benefits of the article, the parties that have consented to a proposal must "actually commence the proposed operation" no later than "ninety (90) days after the expiration of the notice period of thirty (30) days." JOAs, Art. VI.2(a). Epsilon's proposals for the Craige North Wells, which were made on May 26, 2021, proposed commencement dates that would fall outside this 120-day range.[3] Based on this fact, Chesapeake argues that Epsilon has not satisfied a necessary condition precedent to shift operators under Article VI.2(a), and that the complaint should be dismissed on that basis. (Doc. 110, pp. 11–12.) Chesapeake also argues that this court already ruled that the JOAs establish a 120-day timeline in its memorandum and order denying Epsilon's motion for preliminary injunction, and that this ruling constitutes law of the case. (*Id.*)

Epsilon's primary argument in response relies on the provisions of Article XVI, which sets forth the requirements for proposing a new well. (*See* Doc. 111, pp. 21–22; JOAs, Art. XVI.) Under Article XVI, a party proposing a new well

---

[3] The proposed commencement dates for the Craige North Wells are October 1, 2021 for Craige N 1LH; October 16, 2021 for Craige N 1UHC; and November 8, 2021 for Craige N 4UHC. (*See* Doc. 96-10, pp. 76, 87, 100.) The 120-day timeline established by Article VI.2(a) would expire on September 23, 2021 for a proposal made on May 26, 2021.

must include in the proposal: (1) an estimated commencement date; (2) a proposed depth for the well; (3) the objective formation or formations that will be penetrated or tested; (4) the authorized depth, surface and bottomhole locations, and proposed directional operations for the well; and (5) the estimated cost of the well. (JOAs, Art. XVI.A.1.) Article XVI does not include any time limits as to when a project must be commenced. (*See* JOAs, Art. XVI.) Article XVI also states that "in the event of a conflict between the provisions of this Article XVI and any other provision of this agreement, the provisions of this Article XVI shall control and prevail." (JOAs, Art. XVI.N.)

Based on the language of Article XVI, Epsilon argues that its proposals for the Craige North Wells satisfy the terms of the JOAs because "Article XVI does not contain any requirement that a proposal for a new well include a date for commencement of operations that does not exceed 90 days following the close of the election period" and Article XVI "expressly trumps any inconsistent provisions set forth elsewhere in the JOA." (Doc. 111, p. 22.)

Epsilon further argues that the court's prior opinion does not constitute law of the case on this issue because "the Court merely concluded that Epsilon did not have an additional 30 days in which to commence operations—after the date set forth in its then-existing proposals had passed—based on the existence of any title defects." (*Id.*) Finally, Epsilon argues that Chesapeake's prior conduct is

inconsistent with its litigation position, because Chesapeake has proposed numerous wells that included proposed commencement dates more than 90 days after the expiration of the notice period.  (*Id.* at 22–23.)

The court rejects Epsilon's argument that Article XVI and Article VI are in conflict with one another.  Article XVI requires a proposing party to include an estimated commencement date in its proposal.  Article VI requires that the commencement of work occur within 90 days after the expiration of the notice period.  The two provisions can both be honored at the same time by proposing a commencement date within 90 days after the expiration of the notice period.  Thus, there is no conflict.

More fundamentally, Epsilon's argument fails based on a commonsense reading of the JOAs.  The *absence* of a timing provision in Article XVI cannot create a conflict with a separate provision of the JOAs that does contain a timing provision, because this would effectively mean that *any* timing provision of the JOAs was nullified unless Article XVI also contained the same timing provision.

Consider, by way of example, the provision of Article VI.1 allowing the operator to obtain a 30-day extension based on a title defect.  There is no provision of Article XVI that allows the operator to obtain such a 30-day extension, but Epsilon nonetheless relied on Article VI.1 earlier in this litigation to try to obtain a 30-day extension of its December 2020 well proposals.  By Epsilon's current logic,

however, the *absence* of such a provision in Article XVI creates a conflict with the provision that does exist in Article VI, and the conflict must be resolved in favor of Article XVI's absence, which would mean that no 30-day extensions could ever be obtained.

Other examples easily come to mind. Consider the language of Article VI.2(a) that is the subject of much of the current dispute. Article VI.2(a) states that in certain situations, a consenting party may be designated as operator to perform certain work. The parties and the court have devoted a significant amount of time and resources to resolving whether this provision allows operator shifting for a new well, but Epsilon's current argument would make those efforts unnecessary: Article XVI does not contain any provision allowing a consenting party to be designated as operator, so, by Epsilon's current logic, the language of Article VI.2(a) must yield to the absence of language in Article XVI, which would mean that no operator shifting is permitted.

As the above examples make clear, reading the absence of a provision in one part of the JOAs as creating a conflict with a separate provision of the JOAs that actually does exist is nonsensical. Thus, the court concludes that the relevant provisions of Article XVI and Article VI are not in conflict with one another.

The remainder of the court's analysis is straightforward, as the plain language of Article VI.2(a) clearly requires commencement of a proposed

operation within 90 days after the expiration of the 30-day notice period. (*See* JOAs, Art VI.2(a) ("[I]n order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days . . . actually commence the proposed operation and complete it with due diligence.").)[4]

Epsilon's argument that Chesapeake has engaged in prior conduct inconsistent with this reading of the contract does not change the court's conclusion. Epsilon argues that because Chesapeake has previously "proposed wells with a commencement date more than 90 days" after the expiration of the notice period, the JOAs clearly "do not impose a 90-day commencement period upon proposals to drill new wells." (Doc. 111, p. 22.)

Epsilon's argument calls upon the court to consider the parties' course of performance, which is "a sequence of conduct between the parties subsequent to formation of the contract during performance of the terms of the contract." *J.W.S. Delavau, Inc. v. E. Am. Transp. & Warehousing, Inc.*, 810 A.2d 672, 683–84 (Pa. Super. Ct. 2002). This is in contrast to a course of dealing, which is a "sequence of previous conduct between the parties which is fairly regarded as establishing a

_____

[4] The court bases this conclusion on the plain language of the JOAs and does not reach the issue of whether the court's prior opinion constitutes law of the case.

common basis of understanding for interpreting their expressions and other conduct." *Id.*

Unlike course of dealing evidence, which may be used to supplement or qualify the terms of an agreement, course of performance evidence "may be used only to interpret a contract." *Id.* (citing *Matthews v. Unisource Worldwide, Inc.*, 748 A.2d 219 (Pa. Super. Ct. 2000)). Thus, where the course of performance contradicts the unambiguous language of the contract, the court should not allow the course of performance to supersede the language of the contract. *See, e.g.*, *Allegheny Clinic v. Total Wellness Psychiatry, PLLC*, No. 2:19-CV-00517, 2021 WL 2317415, at *5 (W.D. Pa. June 7, 2021) ("[T]he express terms of the Agreement are to be given greater weight than course of performance."); *Intermetal Mexicana, S.A. v. Ins. Co. of N. Am.*, No. 84-CV-6179, 1986 WL 10547, at *3 (E.D. Pa. Sept. 17, 1986) (noting that when parties have erroneously performed in a way that contradicts the plain language of the contract, "the court should not perpetuate the error." (quoting *In re Chi. & E.I. Ry. Co.*, 94 F.2d 296, 300 (7th Cir. 1938))).

That is exactly the case here. Epsilon argues that Chesapeake has previously proposed wells that did not comply with Article VI.2(a)'s 120-day time limit, but the language of Article VI.2(a) unambiguously requires proposals to comply with that time limit. The court therefore gives effect to the unambiguous language of

the contract and holds that Article VI.2(a) requires proposed operations to include a proposed commencement date that is no more than 90 days after the expiration of the 30-day notice period. Epsilon's proposals for the Craige North Wells do not comply with that time period, and the court will dismiss Epsilon's amended complaint on that basis.

### C. Epsilon Will Not Be Given Leave to Amend

Before dismissing a complaint for failure to state a claim upon which relief may be granted a district should grant the plaintiff leave to file an amended complaint unless amendment of the complaint would be inequitable or futile. *See, e.g.*, *Banks v. Allstate Fire & Cas. Ins. Co.*, 454 F. Supp. 3d 428, 438 (M.D. Pa. 2020). Here, the court will deny leave to amend because amendment of the complaint would be futile. Epsilon's currently operative proposals for the drilling of new wells do not comply with the timing requirements of Article VI.2(a), so any amended complaint would not withstand a renewed motion to dismiss. The court emphasizes, however, that while it is dismissing the amended complaint without further leave to amend, this decision is without prejudice to Epsilon's right to file a new lawsuit based on new proposals made after this opinion.

**CONCLUSION**

For the foregoing reasons, Chesapeake's motion to dismiss is granted. An appropriate order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: September 22, 2021