IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EPSILON ENERGY USA, INC., | : | Civil No. 1:21-CV-00658 |
| Plaintiff, | : | |
| v. | : | |
| CHESAPEAKE APPALACHIA, LLC, | : | |
| Defendant. | : | Judge Jennifer P. Wilson |

## MEMORANDUM

This is a diversity action arising from several contracts between two oil and gas companies. The court dismissed the case on September 22, 2021, finding that the well proposals on which Plaintiff's complaint were based had expired. Plaintiff has moved for partial reconsideration, arguing that the dismissal of the case should have been limited to Plaintiff's claims for injunctive relief and that Plaintiff's declaratory judgment claim should not have been dismissed. For the reasons that follow, the motion for reconsideration is denied.

### BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Epsilon Energy USA, Inc. is an Ohio corporation with its principal place of business in Texas. (Doc. 4, ¶ 1; Doc. 72, ¶ 1.) Defendant Chesapeake Appalachia, LLC ("Chesapeake") is an Oklahoma corporation with its principal place of business in that state. (Doc. 4, ¶ 4; Doc. 72, ¶ 4.) Beginning in 2009, Epsilon, Chesapeake, and several other oil and gas companies entered into several

1

Joint Operating Agreements ("JOAs") for the purpose of developing natural gas at locations in Pennsylvania.[1]

Chesapeake is designated as the operator under the JOAs, which accordingly requires Chesapeake to "conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of [the JOAs]". (JOAs, Art. V.A.) Chesapeake may be permanently removed as operator under a JOA for good cause upon the affirmative vote of the other parties to the JOA that own a majority interest of the property that is subject to the JOA. (JOAs, Art. V.B.1.) In order for such a vote to be effective, a written notice must be provided to Chesapeake detailing its alleged defaults as operator. (*Id.*) Chesapeake then has thirty days in which to cure such defaults. (*Id.*)

Although Chesapeake is the operator, the JOAs provide that any party to the JOAs may propose the drilling of a new well or propose a project to rework, sidetrack, deepen, recomplete, or plug back a well. (*Id.* Art. VI.1.) A party proposing such work is required to provide the other JOA parties that "have not otherwise relinquished their interest in [the] objective Zone" of the proposal with

---

[1] The four JOAs relevant to this case are the Baltzley North JOA, dated October 18, 2010, the Baltzley South JOA, dated October 18, 2010, the Craige JOA, dated December 16, 2010, and the Poulsen JOA, which was a draft model JOA that was subsequently incorporated into the Farmout Agreement between Epsilon and Chesapeake. Because the parties agree that the relevant provisions of the JOAs are legally indistinguishable from one another, *see* Transcript of Preliminary Injunction Hearing, May 11, 2021, pp. 90–91, the court will cite the four JOAs collectively as "JOAs" throughout the remainder of this opinion.

2

written notice of the proposal "specifying the work to be performed, the location, proposed depth, objective Zone, and the estimated cost of the operation." (*Id.*) The other parties receiving notice have thirty days after receipt of the notice "within which to notify the party proposing to do the work whether they elect to participate in the cost of the proposed operation." (*Id.*)

The JOAs require different procedures for projects that have received the unanimous consent of the JOA parties and projects that have not received unanimous consent. When a project has received unanimous consent:

> the parties shall be contractually committed to participate therein provided such operations are commenced within the period hereafter set forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of the parties participating therein; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior proposal had been made.

(*Id.* Art. VI.1.) When, on the other hand, a proposal receives less than unanimous support:

> the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2 [sic], shall comply with all terms and conditions of this agreement.

(*Id.* Art. VI.2(a).)

In 2018, a dispute arose over whether Chesapeake was complying with the JOAs with regard to wells proposed by Epsilon. The dispute led to Epsilon filing suit against Chesapeake in this district in September 2018. (*See Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, No. 3:18-CV-01852 (M.D. Pa. filed Sept. 20, 2018) [hereinafter *Epsilon I*].) Epsilon moved for preliminary injunctive relief in the suit. (*Epsilon I*, Doc. 2.) United States District Judge Malachy E. Mannion scheduled the case for a preliminary injunction hearing. (*Epsilon I*, Doc.

17.) Before the court conducted the hearing, however, the parties settled the case. (Doc. 96-8 [hereinafter Settlement Agreement].)

As part of the Settlement Agreement, the parties agreed that Epsilon could propose new wells under the JOAs "in accordance with the terms of the JOAs." (*Id.* ¶ 8.) The parties further agreed that if Chesapeake did not consent to a proposal and did not agree to act as the operator, Chesapeake would "cooperate with the party designated, to the extent permitted under the JOA, as operator" and would "not unreasonably withhold cooperation, including but not limited to, permitting and access to co-owned assets, such as water withdrawal points and impoundments." (*Id.* ¶ 8.d.)

The present dispute began when Epsilon formally proposed four new wells on December 22, 2020, which would be located on the Craige Well Pad in Rush Township, Susquehanna County. The proposed wells were labeled as Craige N 1LH, Craige N 1UHC, Craige N 4UHC (collectively, "the Craige North Wells"), and Craige S 3LHC ("the Craige South Well"). (*Id.*)

On January 19, 2021, Chesapeake advised that it would not participate in the drilling of the proposed wells and that it would not serve as the operator on the projects. (Doc. 1, ¶ 80.) Chesapeake also stated its position that Epsilon was not allowed to serve as the operator with regard to the proposed wells and refused to grant Epsilon access to the Craige Well Pad on that basis. (*Id.*) In a separate

5

communication on January 19, 2021, Chesapeake proposed a separate well, labeled the Koromlan 107HC ("Koromlan Well"), which Chesapeake asserted would conflict with the proposed Craige Wells. (Doc. 1, ¶¶ 81–82.) Chesapeake announced plans to drill the Koromlan Well in January 2022. (*Id.* ¶ 83.)

Subsequent to the proposal of the Craige Wells, Epsilon sent a draft commitment letter ("SRBC Letter") to Chesapeake that sought confirmation that Chesapeake was willing to provide water to Epsilon for the Craige Wells in accordance with permits that Chesapeake held with the Susquehanna River Basin Commission ("SRBC"). (*See* Doc. 96-9, p. 2 [hereinafter SRBC Letter].) Chesapeake informed Epsilon on February 11, 2021 that it would not sign the letter. (Doc. 1, ¶ 98.)

Epsilon brought suit against Chesapeake on March 10, 2021, seeking declarations that (1) if Chesapeake did not participate in the proposed Craige Wells, Epsilon had the right to drill the wells; (2) Chesapeake was required to allow Epsilon to access and use jointly owned assets; and (3) Chesapeake must cooperate with the operator of the proposed wells in order to facilitate the drilling of the wells. (*See Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, No. 1:21-CV-00433 (M.D. Pa. filed Mar. 10, 2021) [hereinafter *Epsilon II*].) The complaint also brought claims for breach of the parties' JOAs and breach of the parties' settlement agreement in *Epsilon I*, sought a declaration that Chesapeake's

proposed Koromlan Well did not comply with the terms of the JOAs, and sought specific performance and injunctive relief. (*Epsilon II*, Doc. 5.)

Epsilon filed a motion for preliminary injunction in *Epsilon II* on March 10, 2021. (Doc. 7.) The court conducted a status conference with the parties on March 26, 2021 to discuss a briefing schedule for the preliminary injunction motion and to schedule a hearing on the motion. During that call, the parties discussed the fact that Chesapeake's filing for Chapter 11 bankruptcy was being litigated in the United States Bankruptcy Court for the Southern District of Texas ("the Bankruptcy Court") and that Chesapeake had recently filed a motion for emergency relief in the Bankruptcy Court seeking to enjoin Epsilon from proceeding with a suit against Chesapeake in this district.

Following the March 26, 2021 conference, the court issued a scheduling order that set a briefing scheduled for Epsilon's motion for preliminary injunction, scheduled a preliminary injunction hearing, and set an expedited schedule for letter briefs on the issue of whether Chesapeake should be compelled to sign the SRBC Letter. (*Epsilon II*, Doc. 25.)

The Bankruptcy Court granted Chesapeake's motion for emergency relief on March 30, 2021, ordering Epsilon to dismiss the case in this district without prejudice and specifying that Epsilon could refile the case subject to conditions laid out by the Bankruptcy Court. (*See Epsilon II*, Doc. 30-1; *see also In re*

*Chesapeake Energy Corp.*, No. 20-33233 (Bankr. S.D. Tex. hearing held Mar. 30, 2021).) Epsilon complied with the Bankruptcy Court's order on April 5, 2021, and filed a notice of voluntary dismissal. (*Epsilon II*, Docs. 31–32.) This court accepted the notice of voluntary dismissal on April 6, 2021, and formally closed the case. (*Epsilon II*, Doc. 33.)

Epsilon filed the instant case three days later, on April 9, 2021, moving for a preliminary injunction and expedited discovery on the same day. (Docs. 4–5, 7.) On April 12, 2021, the court scheduled a status conference for April 19, 2021. (Doc. 13.) Prior to the conference, Epsilon filed a letter brief on the SRBC Letter issue in conformity with the requirements that the court had previously imposed in *Epsilon II*. (Doc. 15.) The court accordingly set an expedited schedule for an opposition letter brief and reply letter brief on that issue. (Doc. 16.)

On April 16, 2021, Chesapeake moved to dismiss the case for failure to join an indispensable party under Federal Rule of Civil Procedure 12(b)(7). (Doc. 22.) The motion sought dismissal on the grounds that Epsilon had failed to join the other parties to the JOAs, which Chesapeake contended were indispensable parties under Federal Rule of Civil Procedure 19. (*Id.*)

On April 26, 2021, the court denied Chesapeake's motion to dismiss for failure to join an indispensable party, concluding that the absent JOA parties were necessary parties under Federal Rule of Civil Procedure 19(a), but that they were

8

not indispensable parties under Rule 19(b). (Docs. 33–34.) On April 27, 2021, the court denied Epsilon's request for preliminary injunctive relief on the SRBC Letter issue without prejudice, concluding that Epsilon had not shown a sufficient likelihood of success on the merits as to that issue. (Docs. 44–45.) The court then denied Epsilon's motion for expedited discovery on May 3, 2021. (Docs. 50–51.)

Following a preliminary injunction hearing on May 11 and May 12, 2021, the court denied the motion for preliminary injunction on May 14, 2021, concluding that Epsilon's well proposals had expired and that Epsilon therefore had not shown a likelihood of success on the merits. (Docs. 81, 89.)[2] Given that conclusion, the court declined to decide whether Article VI.2(a), which specifies the procedures for certain projects receiving less than unanimous support from JOA parties, could apply to proposals to drill new wells. (*Id.* at p. 4 n.4.)

Following the denial of its motion for preliminary injunction, Epsilon reproposed the four Craige Wells on May 26, 2021. (*See* Doc. 104, ¶ 129.) Epsilon then moved for leave to amend its complaint on June 7, 2021, seeking to add allegations based on the reproposed wells. (Doc. 96.) Epsilon's proposed amended complaint included four counts for relief. In Count I, Epsilon sought a declaratory judgment declaring that it had the right to drill the proposed wells. (*Id.*

---

[2] Doc. 89 is a corrected version of the court's memorandum that was issued to correct typographical errors in the original version.

9

¶¶ 144–54.)  In Count II, Epsilon sought specific performance of the parties' settlement agreement in *Epsilon I*.  (*Id.* ¶¶ 154–66.)  In Count III, Epsilon sought specific performance of the JOAs.  (*Id.* ¶¶ 167–83.)  In Count IV, Epsilon sought a declaratory judgment declaring that the Koromlan Well proposal did not comply with the terms of the JOAs.  (*Id.* ¶¶ 184–91.)

Chesapeake opposed the motion for leave to amend, Doc. 98, and in response to Chesapeake's opposition, Epsilon conceded that Count IV of the proposed amended complaint could be dismissed along with the portions of Counts I–III that pertained to the Craige South Well.  (Doc. 101, p. 9.)  The court granted the motion for leave to amend on July 2, 2021, allowing Epsilon to file its amended complaint but dismissing Count IV of the amended complaint and Counts I–III to the extent that they were based on the Craige South Well.  (Docs. 102–03.)  Epsilon's amended complaint was filed later that day.  (Doc. 104.)

Chesapeake moved to dismiss the amended complaint on July 16, 2021 and filed a brief in support of the motion on July 30, 2021.  (Docs. 109–10.)  Chesapeake argued that dismissal was appropriate because the plain language of Article VI.2(a) limited operator shifting to proposals to rework, sidetrack, deepen, recomplete, or plug back an existing well and accordingly did not allow for operator shifting for the drilling of a new well.  (Doc. 110, pp. 13–14.)  Chesapeake also argued that even if Article VI.2(a) did allow operator shifting for

new wells, Epsilon's amended complaint should still be dismissed because Epsilon had failed to allege that it had completed the necessary conditions precedent in order to complete such an operator shift under the terms of the JOAs. (*Id.* at 8–12.) Specifically, Chesapeake argued that Epsilon's well proposals violated the JOAs because (1) no other parties had consented to the proposals, and the JOAs only allowed the designation of a consenting party as operator when multiple parties consented to that action and (2) the proposals proposed commencement dates that were past the 90-day time limit required by the JOAs. (*Id.*)

The court addressed the motion to dismiss through a memorandum and order on September 22, 2021. (Docs. 121–22.) The court concluded that dismissal was not warranted based on the language of Article VI.2(a) because the parties presented conflicting readings of the contract that were both reasonable in light of the language of the contract. (Doc. 121, pp. 12–17.) The court also rejected Chesapeake's argument that the JOAs conditioned operator shifting on the action of multiple consenting parties. (*Id.* at 18–19.) The court ultimately granted the motion to dismiss, however, because Epsilon's well proposals included proposed commencement dates that violated the timing requirements of the JOAs. (*Id.* at 20–26.) The court accordingly dismissed the amended complaint without further leave to amend but emphasized that this dismissal was "without prejudice to

Epsilon's right to file a new lawsuit based on new proposals made after this opinion." (*Id.* at 26.)

Epsilon moved for partial reconsideration on October 4, 2021 and filed a brief in support of the motion on the same day. (Docs. 123–24.) Epsilon argues (1) that dismissal of its amended complaint should have been limited to its injunctive relief claims and should not have affected its declaratory judgment claim because the declaratory judgment claim was not tied to the validity of any particular well proposal; (2) that the court already ruled that Epsilon could pursue its declaratory judgment claim even in the absence of a valid well proposal; and (3) that it will suffer significant prejudice if reconsideration is denied because Chesapeake can always cause Epsilon's well proposals to expire by not cooperating with the proposals, meaning that Epsilon's declaratory judgment claim will never be decided if it must be tied to an unexpired well proposal. (Doc. 124.) The parties have fully briefed the motion for reconsideration, and it is ripe for the court's disposition. (*See* Docs. 124–26, 130.)

Epsilon has additionally filed a notice of supplemental evidence in support of the motion for reconsideration. (Doc. 131.) In the notice, Epsilon asserts that after the motion for reconsideration was filed, Chesapeake "took action that constitutes an additional violation of its settlement agreement with Epsilon." (*Id.* at 1.) Specifically, Epsilon asserts that it began the process of trying to propose

new wells after the case was dismissed and accordingly sought to renew the requisite drilling permits with the Pennsylvania Department of Environmental Protection. (*Id.* at 2.) Chesapeake actively opposed Epsilon's efforts to secure the permits, which hindered Epsilon's ability to move forward with the renewed well proposals. (*Id.*) Epsilon asserts that this court should consider this evidence of Chesapeake's continued lack of cooperation as further support for its motion for reconsideration. (*Id.*) Chesapeake responded to the notice on January 12, 2022. (Doc. 132.) Chesapeake asserts that the additional evidence should not be considered in conjunction with the motion for reconsideration. (*Id.*)

## JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1332, which allows a district court to exercise subject matter jurisdiction where the parties are citizens of different states and the amount in controversy exceeds $75,000.

## STANDARD OF REVIEW

A party seeking reconsideration of a district court's order must show either (1) "an intervening change in the controlling law"; (2) the availability of new evidence that was not available when the court issued its prior order; or (3) "the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (citing *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d

Cir. 1995)).  Motions for reconsideration "cannot be used to reargue issues that the court has already considered and disposed of." *McSparren v. Pennsylvania*, 289 F. Supp. 3d 616, 621 (M.D. Pa. 2018) (citing *Blanchard v. Gallick*, No. 1:09-CV-01875, 2011 WL 1878226 at *1 (M.D. Pa. May 17, 2011)).  Additionally, a motion for reconsideration "may not be used to present a new legal theory for the first time" or "to raise new arguments that could have been made in support of the original motion." *MMG Ins. Co. v. Guiro, Inc.*, 432 F. Supp. 3d 471, 474 (M.D. PA. 2020) (citing *Vaidya Xerox Corp.*, No. 97-CV-00547, 1997 WL 732464, *2 (E.D. Pa. Nov. 25, 1997)).  A "mere disagreement" with a court's legal conclusion is not a sufficient basis for reconsideration. *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 73 F. Supp. 3d 488, 491 (M.D. Pa. 2014) (citing *Mpala v. Smith*, No. 3:06-CV-00841, 2007 WL 136750, at *2 (M.D. Pa. Jan. 16, 2007)).

Although a court may reconsider a prior order based on a party's motion, motions for reconsideration "should be granted sparingly as federal courts have a strong interest in the finality of judgments." *Kitzmiller v. Dover Area Sch. Dist.*, 388 F. Supp. 2d 484, 488 (M.D. Pa. 2005).  The decision of whether to grant a motion for reconsideration is left to the discretion of the district court. *Le v. Univ. of Pa.*, 321 F.3d 403, 405 (3d Cir. 2003).

## DISCUSSION

Epsilon's motion for reconsideration argues that the court committed a clear error of law when it dismissed Epsilon's declaratory judgment claim. (Doc. 124, pp. 1–2.) Epsilon asserts that its "request for declaratory relief in Count I was not dependent upon the existence of a valid, current proposal to drill a particular well" and that "the request for declaratory relief sets forth a ripe controversy even if no proposal is pending." (*Id.* at 5, 8.) Epsilon further argues that the court already ruled, in its May 14, 2021 opinion denying Epsilon's motion for preliminary injunction, that Epsilon may "pursue its claim for declaratory relief in the absence of any breach of contract claim." (*Id.* at 9.)

Epsilon's argument for reconsideration is belied by the plain language of its amended complaint. Contrary to Epsilon's argument, the amended complaint made clear, repeatedly, that its request for declaratory relief was based on the specific wells proposed in this case and not on the language of the JOAs pertaining to well proposals generally. (*See* Doc. 104, pp. 32–35.) Most notably, the heading of Count I labels the claim for relief "DECLARATORY JUDGMENT (Epsilon's Right to Drill the Proposed Wells)." (*Id.* at 32.) The text of the declaratory judgment claim also indicates that Epsilon's request for declaratory judgment is based on the proposed Craige Wells. (*See, e.g.*, *id.* ¶ 146 ("CHK has unambiguously communicated that it will not to [sic] participate in the Proposed

15

Wells and will not serve as the operator for the Proposed Wells"); *id.* ¶ 148 ("CHK continuously refuses to cooperate with Epsilon so that Epsilon . . . can drill and operate the Proposed Wells."); *id.* ¶ 154 (noting that an actual controversy arises from, inter alia, Chesapeake's "refusal to sign the SRBC commitment letter so that Epsilon may complete its permitting requirements to obtain water necessary to drill the Proposed Wells" and Chesapeake's "refusal to otherwise cooperate with Epsilon so that it can drill the Proposed Wells.").

Thus, while Epsilon is correct that it *could have* proceeded with a declaratory judgment claim based on the language of the JOAs generally rather than the specific wells proposed in this case, the claim that it actually raised sought declaratory relief only with regard to the proposed wells.[3] The court's decision that the terms of the well proposals did not conform to the timing requirements of the JOAs was therefore fatal both to Epsilon's claims for injunctive relief and its claim for declaratory relief. Because the well proposals did not comply with the JOAs, any declaratory relief that the court could issue with respect to the proposals would amount to an advisory opinion.

---

[3] The question of whether the court would have subject matter jurisdiction to decide a declaratory judgment claim based on the language of the JOAs generally rather than discrete wells proposed by Epsilon is not currently before the court and has not previously been raised in this litigation. Accordingly, nothing in this opinion shall be construed as a ruling that the court would have subject matter jurisdiction over such a claim.

The court's prior opinion denying the motion for preliminary injunction is not to the contrary. In that opinion, the court considered and rejected a threshold argument made by Chesapeake that Epsilon's declaratory judgment claim needed to be dismissed because it was not tied to an independent substantive claim. (*See* Doc. 80, pp. 20–23.)[4] The court noted that the Declaratory Judgment Act does not extend the jurisdiction of federal courts and that a party seeking a declaratory judgment therefore "must establish that there is a justiciable case or controversy giving rise to the declaratory judgment claim." (Doc. 80, p. 21.) The court reasoned, however, that a plaintiff seeking a declaratory judgment does not have to bring a substantive claim for the court to have jurisdiction over the declaratory judgment claim, as the standard instead is whether there exists "a case or controversy between the parties that could give rise to a coercive judgment action for which the court would have subject matter jurisdiction." (*Id.* at 21–22.) The court concluded that Epsilon's declaratory judgment claim met that standard both because its injunctive relief claim remained viable and because a hypothetical breach of contract claim between the parties would still present a justiciable case or

---

[4] Chesapeake's argument was based on the fact that Epsilon had brought a breach of contract claim in *Epsilon II* but that it had abandoned the breach of contract claim when it voluntarily dismissed *Epsilon II* at the direction of the Bankruptcy Court. (*See* Doc. 53 at 17–19.)

controversy notwithstanding the Bankruptcy Court's order for Epsilon to dismiss its breach of contract claim. (*Id.* at 22–23.)

The court's opinion therefore addressed the narrow jurisdictional issue of whether the dismissal of Epsilon's breach of contract claim deprived the court of jurisdiction to hear Epsilon's declaratory judgment claim. It did not address the scope of the declaratory relief that Epsilon sought. And as Epsilon's amended complaint makes clear, the scope of the declaratory judgment claim was limited to a request for declaratory relief relating to the proposed Craige Wells. (*See* Doc. 104, pp. 32–35.) In light of this limitation, dismissal of the declaratory judgment claim was appropriate because the proposals for the Craige Wells did not comply with the timing requirements of the JOAs and there was therefore no basis for the court to declare the parties' rights with respect to the proposed Craige Wells.

Finally, the additional evidence provided by Epsilon that Chesapeake has refused to cooperate with Epsilon's efforts to secure drilling permits does not alter the court's conclusion. The drilling permits that Epsilon seeks are related to renewed well proposals and not to the May 26, 2021 well proposals at issue in Epsilon's amended complaint. Thus, this evidence is not relevant to the motion for reconsideration that is currently before the court.

## CONCLUSION

For the foregoing reasons, Epsilon's motion for reconsideration is denied.

An appropriate order follows.

s/Jennifer P. Wilson<br>
JENNIFER P. WILSON<br>
United States District Court Judge<br>
Middle District of Pennsylvania

Dated: January 18, 2022